```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
 2               CASE No. 8:08 CR 270 T 24 EAJ

 3
      UNITED STATES OF AMERICA
 4

 5               Plaintiff,
      v.                          January 27, 2009
 6                                9:30 a.m.

 7
      SHELDON SHORTER
 8    JEAN EVENS BAPTISTE
      HARDAWAY VOLCY
 9

10               Defendants.
      _____/
11

12

13               TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE WILLIAM J. CASTAGNA
14          UNITED STATES DISTRICT COURT JUDGE

15
      APPEARANCES:
16
      For the Government:    JAMES PRESTON
17                           Assistant U.S. Attorney
                             U.S. Attorney's Office
18                           400 North Tampa St.,
                             Ste. 3200
19                           Tampa, FL 33602

20    For the Defendant:     HUGO A. RODRIGUEZ
      Shorter                1210 Washington Avenue
21                           Suite 245
                             Miami Beach, FL  33139
22
      For the Defendant:     JORGE CHELALA
23    Baptiste               Chalela Law Group
                             3111 W MLK Blvd - Ste 100
24                           PO Box 173407
                             Tampa, FL 33672-0407
25
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | |
|---|---|
| 1 | For the Defendant:      STEPHEN CRAWFORD |
| | Volcy                  Law Office of Stephen M. |
| 2 | Crawford |
| | 610 W Bay St |
| 3 | Tampa, FL 33606 |
| 4 | |
| | Reported By:            Sandra K. Lee, RPR |
| 5 | Official Court Reporter |
| | U.S. District Court |
| 6 | 801 North Florida Avenue |
| | Tampa, FL 33602 |
| 7 | (813) 301-5699 |
| 8 | STENOGRAPHICALLY REPORTED |
| | COMPUTER-AIDED TRANSCRIPTION |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

INDEX

WITNESS:                                        PAGE:

 **RAMIRO ANTONIO PARRA**                            6
     DIRECT EXAMINATION                          7
 BY MR. PRESTON
     CROSS-EXAMINATION                         172
 BY MR. RODRIGUEZ
     CROSS-EXAMINATION                         250
 BY MR. CHALELA
     CROSS-EXAMINATION                         251
 BY MR. CRAWFORD:
     REDIRECT EXAMINATION                      279
 BY MR. PRESTON
 **CLEO MITCHELL**                                 283
     DIRECT EXAMINATION                        284
 BY MR. PRESTON

* * * * *

EXHIBITS:                    IDENTIFIED:


 EXHIBIT 29              63




EXHIBITS:                    RECEIVED:

 15                      31
 14                      38
 8A AND 8B               52
 17                      66
 16                      68
 8C AND 8D               70
 11, 11A THROUGH         87
 11M, 31, 31A
 12A THROUGH 12E        102

 9 AND 18               120
 19                     121
 11N                    122
 20                     170
 21                     171
 22                     302

<pre>
 1                 P R O C E E D I N G
 2              COURT SECURITY OFFICER:  Please rise for
 3    the jury.  Please be seated.
 4        (THEREUPON, THE JURY ENTERED THE COURTROOM.)
 5              COURT SECURITY OFFICER:  All rise.  This
 6    Honorable Court is now in session.  The Honorable
 7    William J. Castagna presiding.  Please be seated.
 8              THE COURT:  Good morning, ladies and
 9    gentlemen.
10              MR. PRESTON:  Morning, Your Honor.
11              THE COURT:  Our security officer,
12    Mr. Bolig, has mentioned to me that some of you
13    have requested permission to take notes.
14              You may take notes if you wish to do so.
15    It's difficult, however, for you to take detailed
16    notes especially if you're trying to take down
17    what the witnesses say.
18              So there's no prohibition against your
19    taking notes.  And I encourage you to do so if
20    you're accustomed and if you feel that will be
21    helpful to you.
22              But a few insights into that subject.
23    You are also obliged as part of your duties to
24    pass on the credibility of the witnesses who
25    testify.
</pre>

1    It's difficult to see them if you've got

2  your head down busily taking notes during the

3  whole time.  So don't get so engrossed in taking

4  notes that you don't see what's going on in the

5  courtroom.

6    Make sure that your taking of notes does

7  not interfere with your listening to or

8  considering all of the evidence.

9    Also if you do take notes, do not

10  discuss them with anyone before you begin your

11  deliberations.  Those will be your private notes

12  to refresh your own recollection about what takes

13  place in the courtroom.

14    Do not take your notes with you at the

15  end of the day.  Just leave them face down on the

16  table in the jury room and they'll be there when

17  you get back in the morning.

18    If you choose not to take notes, please

19  remember that it's still your responsibility to

20  listen carefully and attentively to what's going

21  on in the courtroom.  So do not plan on relying on

22  notes that may be taken by some of the other

23  jurors.

24    You must each try to remember as much as

25  you can personally and collectively as to what

takes place in the courtroom.  So that effort is
going to be a joint and several effort by all of
you at the time when you begin your deliberations
in the case.

Are we otherwise prepared to proceed,
gentlemen?

MR. RODRIGUEZ:  Yes, Your Honor.

MR. PRESTON:  The United States is,
Your Honor.

THE COURT:  Government may call its
first witness.

MR. PRESTON:  United States calls Ramiro
Parra.

COURTROOM DEPUTY CLERK:  Sir, if you'll
come forward to be sworn.  Raise your right hand.

Do you solemnly swear or affirm that the
testimony you shall give in this cause will be the
truth, the whole truth, and nothing but the truth,
so help you God?

THE WITNESS:  I do.

**RAMIRO ANTONIO PARRA,**
a witness, having been duly sworn to tell the
truth, the whole truth and nothing but the truth,
was examined and testified as follows:

COURTROOM DEPUTY CLERK:  Please be

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    seated in the witness stand.  Sir, if you'll state

2    your name and spell your last name for the record,

3    please.

4              THE WITNESS:  Ramiro Antonio Parra.

5    Last name is P-A-R-R-A.

6              THE COURT:  You may inquire, Counsel.

7              MR. PRESTON:  Thank you, Your Honor.

8                    <u>DIRECT EXAMINATION</u>

9    BY MR. PRESTON:

10   Q.    Mr. Parra, I'm going to ask you to please

11   use the microphone and to speak slowly enough so

12   that the court reporter can take down your

13   testimony here this morning.

14         Mr. Parra, are you currently awaiting

15   sentencing for a marijuana distribution conspiracy

16   charge?

17   A.    Yes, I am.

18   Q.    When were you arrested?

19   A.    I was arrested April 1st.

20   Q.    2008?

21   A.    Yes, sir.

22   Q.    Mr. Parra, you and I have, prior to your

23   appearance here this morning, met on three

24   occasions to talk about your testimony; correct?

25   A.    That's correct.

1   Q.    You have had other meetings with law

2   enforcement agents during the course of

3   cooperation; is that correct?

4   A.    That's also correct.

5   Q.    Mr. Parra, did you plead to the charge that

6   you were arrested on pursuant to an agreement with

7   the government?

8   A.    Yes, I did.

9   Q.    And in that agreement did you agree to

10  cooperate with the government?

11  A.    I did.

12  Q.    Are you hoping for a reduced sentence for

13  your cooperation?

14  A.    I'm hoping, yeah.

15  Q.    Prior to this April 1st, 2008, arrest did

16  you have a prior felony drug conviction for

17  marijuana distribution?

18          MR. RODRIGUEZ:  Judge, I'm going to

19  object to the leading form of the questions.

20          THE COURT:  That objection is overruled.

21  BY MR. PRESTON:

22  Q.    Did you have a former prior felony drug

23  conviction for distribution of marijuana?

24  A.    I had a possession of marijuana.  It

25  wasn't -- I don't -- I don't believe it was a

1    distribution though.

2    Q.    Was it a felony amount?

3    A.    Yes, sir.

4    Q.    Did that felony drug conviction result in

5    the government filing a Notice of Enhancement for

6    enhanced penalty based on your prior conviction?

7    A.    Yes, sir.

8    Q.    Do you know a Cleo Mitchell?

9    A.    Yes, I do.

10   Q.    By what names did you know Cleo Mitchell

11   during your association with him?

12   A.    Low, Pimp and Dread.

13   Q.    Do you know a person now known to you as

14   Sheldon Shorter?

15   A.    Yes, I do.

16   Q.    What names did you know this individual by

17   during your association with him?

18   A.    Big Pimp, Big Homey, and J.

19   Q.    Do you see that person in court today?

20   A.    Yes, I do.

21   Q.    Could you please identify him by location

22   and clothing description.

23   A.    The African-American gentlemen sitting in

24   between the two gentlemen with suits right here to

25   my left.

1      MR. PRESTON:  Identifying the defendant,
2  Sheldon Shorter, Your Honor.
3      THE COURT:  The record will so reflect.
4  BY MR. PRESTON:
5  Q.    Were you involved in the marijuana trade
6  with Cleo Mitchell and the defendant Shorter?
7  A.    Yes, I was.
8  Q.    Was your April 1st, 2008, arrest related to
9  your dealings with Mitchell and the defendant
10  Shorter?
11  A.    No, it wasn't.
12  Q.    Was that another deal?
13  A.    That was a side deal.
14  Q.    What did that involve?
15  A.    Involved, uhm, trafficking like 300 pounds.
16  Q.    Who were you involved in that 300-pound deal
17  with?
18  A.    That was a gentleman by the name of Josh
19  Morello, myself, a good friend of mine by the name
20  of Stavros, and two other gentlemen, David and
21  Victor.
22  Q.    Did that deal have anything to do with your
23  marijuana relationship with the defendant Mitchell
24  or the defendant Shorter?
25  A.    Could you repeat the question.

Q.     Did that marijuana deal, that 300-pound

deal, have anything to do with your relationship --

or your marijuana relationship with Cleo Mitchell

or the defendant Sheldon Shorter?

A.     No.  Like I said, that was a completely side

deal.

Q.     Prior to your April 1st, 2008, arrest, how

long had you been in the marijuana business?

A.     I've been in the marijuana business for

probably over ten years.

Q.     And how long prior to your arrest were you

involved in the marijuana business with Cleo

Mitchell and Sheldon Shorter?

          MR. RODRIGUEZ:  Objection to the leading

form of the question.

          THE COURT:  Overruled.

          You may answer the question.

          THE WITNESS:  I've had dealings with

Cleo Mitchell prior -- prior to '08.  So with both

the gentlemen I've had relationships with them

since probably like the beginning of '06.

BY MR. PRESTON:

Q.     Who were you first involved with in regard

to those two individuals, Cleo Mitchell and the

defendant Shorter?

A.    I was first involved with Cleo Mitchell.

Q.    Could you please describe for the jury what you generally did with and for Cleo Mitchell and this defendant J?

MR. RODRIGUEZ:  Objection, 801(2)(e), Your Honor.  No foundation.

THE COURT:  That objection is overruled.

You may answer the question.

THE WITNESS:  My job duties entitled anything from receiving marijuana in large quantity, distributing marijuana in large quantity, picking up money, dropping off large quantities of money to individuals.

Basically anything that was asked of me to complete the job I would -- I would do.  But my main job was receiving the marijuana because I was one of the few people that could be trusted to receive a large amount.

BY MR. PRESTON:

Q.    And when you say a large quantity of marijuana, what are you talking about?

A.    Anywhere from 5 to 800 to a ton, ton and a half.

Q.    When did you first meet Cleo Mitchell?

A.    I met Cleo Mitchell at a paint shop that I

```
 1    was employed at.  And it was probably -- probably
 2    '05.
 3    Q.    How soon after that meeting did you and he
 4    begin doing marijuana business together?
 5    A.    Two weeks.
 6    Q.    What did your initial dealings with Cleo
 7    Mitchell involve?
 8    A.    It was something -- me and Cleo Mitchell had
 9    something -- we'd meet every week.  He would
10    usually front me 20 pounds.  And I would have the
11    money the following week and he would front me
12    another 20.
13          And if I needed more than that I would just
14    put in the order for whatever amount I needed at
15    the time, and it would go from there.
16    Q.    You said it would go from there.  How did
17    the relationship develop?
18    A.    Basically I was asked to basically come
19    around a little bit more around him personally.
20    And he basically had to feel me out.
21          And he -- he always told me, he's like, you
22    know, look, it's going to get better.  Just stick
23    with me, and I'm going to promise, you know, it's
24    going to get bigger.
25          Right now, you know, is not the time, but
```

1   stick with me and in the near future everything is

2   going to get greater.

3   Q.    Did you stick with him?

4   A.    Yes, I did.

5   Q.    Did it get bigger and to use your word

6   "better"?

7   A.    Yes, it did.

8   Q.    And as it became bigger and better, what --

9   how would you describe your relationship with Cleo

10  Mitchell as far as any kind of business

11  relationship?

12  A.    I became his right-hand man.

13  Q.    Did you rent any warehouses at Cleo

14  Mitchell's request?

15  A.    Yes, I did.

16  Q.    Why were you originally asked to rent a

17  warehouse?

18  A.    Originally I got a warehouse that I leased

19  in my name.  Basically I was told to make it look

20  like -- you know, like my hobby shop or my shop

21  like a legitimate business, something of the sort.

22        And I was told not to ask any questions

23  about what was going on, and I was told there

24  would be certain days that I was not allowed to

25  come there.

```
1    Q.     When did you rent this particular warehouse?
2           MR. CRAWFORD:  Your Honor, could I
3    object and ask the Court if the witness is going
4    to testify what he was told, could he identify who
5    he was told by.
6           THE COURT:  Yes.  Please do so, Counsel.
7    BY MR. PRESTON:
8    Q.     Who did you rent the warehouse for again?
9    A.     I was told by Cleo Mitchell to rent the --
10   to lease the first warehouse.
11   Q.     And these other instructions that you just
12   referred to, who were they given to you by?
13   A.     Not to come by the warehouse on certain days
14   and basically to make it look like a hobby shop.
15   Q.     Who told you that?
16   A.     Cleo Mitchell.
17   Q.     You indicated you were told not to ask why.
18   Did you suspect why?
19   A.     I mean I'd been doing what I -- I did for
20   awhile.  And yes, I -- I kind of already assumed
21   my own, you know, assumptions.  It became very
22   clear to me when I showed up on a day I wasn't
23   supposed to be there and I saw a tractor trailer
24   backed up to the door.
25   Q.     When approximately did you rent this first
```

1    warehouse facility?

2    A.    Probably sometime early -- late '05 or early

3    '06.

4    Q.    You mentioned one time going by and seeing

5    this tractor trailer.  What observations did you

6    make at that time?

7    A.    I was on my motorcycle.  I was about to put

8    it up, and I noticed the tractor trailer backed up

9    to the door and a few gentlemen behind it kind of

10   running back and forth.

11   Q.    Did you inspect the scene further or ask any

12   questions in regard to that particular observation?

13   A.    No, sir.  I was approached by Cleo Mitchell.

14   He pulled up in a car and basically ordered me to

15   leave.

16   Q.    At some point in time did your suspicions

17   prove correct?

18   A.    Yes.

19   Q.    And when were you able to make any

20   observations that proved those suspicions to be

21   correct?

22   A.    There was a second lease that went into

23   effect probably about three to six months after I

24   saw that.  And on the second lease my job duties

25   changed, and I became the one receiving the

tractor trailer shipments.

Q.     You say tractor trailer shipments.  What
were you receiving?

A.     Marijuana.

Q.     At whose direction?

A.     It was the direction from J to Cleo Mitchell
to me.

Q.     And how do you know that?

A.     I mean it was told to me from Cleo Mitchell.
And later on it was very clear to see that, you
know, who was running things.

Q.     How long were you in the marijuana business
with Cleo Mitchell before you actually learned of
the defendant Shorter or J?

A.     I mean we had our small -- our small
relationship with the 20 pounds probably for, you
know, probably from the time I met him up until
early '06.  But early '06, somewhere in the
beginning of '06 that's where, you know, it became
clear that there was someone else in the picture
and that this was all a lot bigger than it was
before.

Q.     When approximately did you first meet this
J, the defendant Shorter?

A.     It wasn't like a direct meet, but I

1  basically saw him riding in the car with Cleo

2  Mitchell.  They came to my job.  I still was

3  employed at the time.

4       They came to my job, and I gave Cleo

5  Mitchell $20,000 for something prior.  And I saw

6  Shorter in the car with Mitchell.  And later on

7  asked if that was Big Homey, and he said yes.

8  Q.    And who was Big Homey or what did that term

9  represent?

10  A.    Big Homey, it was a name that we used

11  before, you know, J was brought about.

12  Q.    So you and Mitchell had discussed a Big

13  Homey before you observed the defendant Shorter in

14  Mitchell's company?

15  A.    Mitchell and I had discussed, you know,

16  there was things -- there was bigger things in the

17  process and that it was going to be coming from

18  Big Homey.

19  Q.    And after this observation of the two

20  together, how long was it before -- well, let me

21  ask you this:  Did you have an opportunity after

22  that to actually meet the defendant Shorter?

23  A.    Yeah.  It was a good amount of time after

24  the first load, second load, third load.  But I

25  did end up having a -- you know, a meeting with --

1    with J, who is Shorter.

2    Q.    And in these initial -- in this initial

3    meeting or initial contacts, was any marijuana

4    business discussed openly?

5    A.    No.  Everything was basically handed down

6    from Shorter to Mitchell to Parra.  So there

7    wasn't anything directly discussed at the

8    beginning.

9    Q.    Did there come a time when you were trusted

10   enough that the defendant Shorter would actually

11   speak with you about the business?

12   A.    To an extent.

13   Q.    How long did that take?

14   A.    Well, there was a -- Mitchell and I lived

15   together at Rocky Point Apartments in Tampa, which

16   was our second apartment together.  And at the

17   second apartment is basically aware all of us met

18   up and did certain duties to prepare for the next

19   week or, you know, whatever we had going on next.

20   And that's where, you know, we all would kind of

21   talk freely about whatever.  We felt safe there.

22   Q.    When you say "we all," who are you talking

23   about?

24   A.    Cleo Mitchell, Jermaine Hopkins, Shorter,

25   and a few of Shorter's associates.

Q.    You mentioned a second warehouse.  When

approximately was that obtained?

A.    Probably about three to six months after I

initially came by the first warehouse and I was

told to leave.  So we obtained the second

warehouse, and that's when my job duties went

completely up.

Q.    How did your job duties change in that

regard?

A.    Well, I was never in charge of receiving,

you know, a thousand pounds or anything of that

sort.  And basically it was me and a gentleman

that I know by the name of Pingy.  That it was

basically just him and I receiving these loads by

ourselves.

Q.    Was this Pingy your employee?

A.    No, he wasn't my employee.  He was basically

employed by Shorter to make sure everything was to

go all right.  Basically he was just there to make

sure I didn't screw up.

Q.    Now, you say you were responsible for

receiving loads.  Could you describe what that

involves.  This is at the second warehouse?

A.    This is at the second warehouse.  We had a

loading dock outside of the business.  I had a

business by the name of Parra's Auto Glass.  It
was basically like a front business.  It wasn't --
it was just there for receiving marijuana.  That's
it.

The truck would basically pull in.  I'd
unload whatever kind of load was on the truck.
Normally it would be some type of groceries or --
you know, it was -- it was a legitimate load going
to a legitimate destination.  But behind it was
usually anywhere from two pallets to four pallets
of marijuana.

I'd unload the truck however I thought was
the best way, normally with a forklift.  I would
bring all the pallets down.  This would be, you
know, right in the -- you know, just right in the
wide open for anybody to see if there was anyone
there.

Q.    Was this the general receipt process?

A.    Yes.

Q.    Do you remember the first load that you
received at that warehouse?

A.    Yeah, I do.

Q.    Where was this facility located, by the way?

A.    There was in Largo, Florida off of 118th
Ave.  There's some basically warehouse workshops

1   that you can rent.  And I believe it was 8056

2   118th Ave, Largo, Florida.

3   Q.    Now, in regard to the first load that you

4   actually received yourself, could you describe the

5   details as to how that was set up and what took

6   place and what you did for the jury.

7   A.    The ones that I received by myself --

8   Q.    The first one I want to talk --

9   A.    Oh, I'm sorry.  The first one that I

10  received I was accommodated by Pingy.  There would

11  be a burnout phone or like a throwaway phone that

12  would -- basically I was told to get.  And that

13  was the number that the driver would contact when

14  they reached the general area.  As soon as they

15  were like in the Tampa Bay area they would call

16  me.

17  Q.    Who's "they"?

18  A.    The drivers of the trucks, the tractor

19  trailers, they would call me and basically to see

20  where I was at and see where their destination was

21  at.  We basically coordinate which route to take,

22  which was usually the same route.  And once they

23  got to the shop, which after I gave them

24  directions to get there, we would start unloading

25  everything.  You know, we did it the quicker, the

1    better.

2    Q.    When you say "start unloading everything,"

3    what did you unload during that first load?

4    A.    The first load I believe it was -- it had --

5    I believe it had an ice pack on it like a cooler

6    on it to keep all the produce cold.  It was some

7    sort of fruit.  And then at the back of it or

8    towards the front -- like towards the front of the

9    trailer there was the pallets of marijuana.  And

10   what I mean pallets, it's just bundle after

11   bundle.  It's, you know, a large quantity.

12   Q.    Are you familiar with the term cover load?

13   A.    Yeah, cover load is basically what I would

14   unload and what we would -- not me personally, but

15   what Shorter or someone else might have had to

16   purchase in order to make an illegitimate load

17   look legitimate.

18   Q.    You indicated this first load had produce on

19   it; is that correct?

20   A.    Yes, sir.

21   Q.    Did you keep the produce?

22   A.    No.  Anything that was taken off then was

23   put back on except for the marijuana.  The

24   marijuana would stay in the workshop with me.  And

25   then steps from there would take place.

1    Q.    Were you ever left with any of these cover

2    loads?

3    A.    Yeah.  There was a cover load of Styrofoam

4    plates, cups, and like to go containers.  And I

5    was left with the cover load for quite some time.

6    And there was a couple times I might have gotten

7    yelled at by Mitchell, you know, telling me that I

8    was supposed to keep the cover load.

9          It was -- you know, it was kind of

10   unorganized on our part because the cover load

11   that I ended up keeping at the shop took up almost

12   the entire shop.

13   Q.    What kind of cover loads did you get yelled

14   at for disposing of?

15   A.    There were cover loads prior to that --

16   disposing of?  I mean there was -- there was other

17   ways of receiving the marijuana besides just the

18   tractor trailers.  And I disposed of the items

19   that they came in the other way.

20   Q.    Were other loads of marijuana received at

21   this warehouse in a similar fashion?

22   A.    Yes, we had alternate ways to basically

23   receive the marijuana.

24   Q.    As far as the trucks coming to the shop,

25   were there other loads that -- other truckloads

1    which were brought to this receipt facility?

2    A.    Yeah.    Instead of a 55-foot tractor trailer

3    there would be like a box truck that probably

4    would be like 15 to 20 feet.    And instead of

5    having a bunch of other stuff on it like, you

6    know, a cover load or produce or stuff like that,

7    it would just be my -- it would be whatever I had

8    coming to me, which would be in wood -- wood

9    crates.

10    And it would usually be like one to four

11    crates.    If it was four crates, then it meant it

12    was a higher amount of marijuana.    If it was one,

13    it was a lesser amount.    But we did that several

14    times also.

15    Q.    Getting back to the tractor trailers, did

16    you continue to receive marijuana from tractor

17    trailers?

18    A.    Yeah.    It wasn't going to stop.    It just

19    might have took a halt temporarily.

20    Q.    What was the frequency of the tractor

21    trailers arriving at the warehouse with shipments

22    of marijuana?

23    A.    If it would come in, everything would be

24    distributed within five to seven days.

25    Q.    But how often would they arrive there

1    with -- the trucks with shipments of marijuana?

2    A.    I would say at least once a month.

3    Q.    When you say at least, were there times when

4    there was more than one delivery per month?

5    A.    Yeah, there was probably one or two times

6    where there was two deliveries in a month.

7    Q.    And what were the average range of

8    quantities that you received on these shipments?

9    A.    It's not going to be any less than 800 on a

10   tractor trailer.

11   Q.    800 what?

12   A.    800 pounds.  And the highest amount was

13   probably a little over 300 -- or 300 -- I'm sorry.

14   It would be a little over 3,000 pounds, which

15   would be like a ton and a half.

16   Q.    Now, you mentioned this Pingy as an employee

17   of the defendant J's or Shorter's.  How often was

18   this Pingy around when the offloads were taking

19   place?

20   A.    He was around basically like just at the

21   beginning to keep an eye on stuff, make sure no

22   one was trying to rip us off from like a different

23   group from our area maybe found out where we were

24   receiving.

25         So he basically was around the first couple

```
1    times.  And he was just basically there to make
2    sure everything went all right and make sure I
3    wasn't dipping into anything or basically I was
4    doing what I had to do.
5    Q.    Were you advised by anyone where the
6    marijuana that was arriving in the tractor trailers
7    was coming from?
8    A.    Me and Cleo Mitchell had our conversations.
9    I mean obviously we knew it was coming from out
10   west, Arizona, California.
11   Q.    Did you keep records or notes as these loads
12   were coming in?
13   A.    Yeah.  Every time we had a shipment that I
14   was receiving, I had to make sure the phone was
15   ready, and I had to make sure I had all my
16   supplies at the shop ready.  Part of the supplies
17   meant having like a notebook that I kept inventory
18   on that I would later discuss with Cleo Mitchell.
19   Q.    When you say "kept inventory," could you
20   describe for the jury what you mean by that.
21   A.    Like I said, after I would unload it off the
22   truck and it was in the shop I had to account for
23   each bundle of marijuana that was in there.  A
24   bundle on the average being 20 pounds or more.  I
25   had to count each bundle, separate them.
```

1      Basically take a total count and write

2   everything down as inventory.  And from there

3   distribute --  you know, I'd start taking

4   addresses and orders for distributing the same

5   night.

6   Q.    Then what did you use these ledgers or books

7   for?

8   A.    Basically to keep inventory on what I gave

9   each individual I delivered to.  If I gave someone

10  four or 500 pounds I'd write down exactly what I

11  gave them.

12      Whatever I called them name wise I wrote it

13  down so then when I got back to my location I

14  could discuss, you know, what was -- what was

15  distributed in that night, what is left.

16      And basically what I would be taking or

17  basically -- basically the whole amount of

18  marijuana was accounted for in that ledger.  Money

19  was owed, anything like that, it was in the

20  ledger.

21  Q.    What would cause -- or at what point would

22  that ledger be closed?

23  A.    I was told after everything was done to

24  basically take the ledger and -- and, you know,

25  get rid of it.

Q.    Who told you that?

A.    Basically orders just worked their way down.

Q.    Well, who told you?

A.    Cleo Mitchell.

Q.    And how would you know when everything was done and it was okay to dispose of that particular load's notebook?

A.    Usually everything would be distributed within a week's time, and we'd just be waiting on the money to come back.

Q.    Well, how did you know when it was time to close that book?

A.    Because all the -- basically all the marijuana I was accounting for had came down from everything to nothing.  And then I would, you know, do what I thought was best to do with the book.

Q.    Were you the one who would collect all the monies to know that everything was nothing to use your term or did you hear it from somebody else?

A.    Yeah, I would basically hear it from someone else.

Q.    And who would that be?

A.    Cleo Mitchell.

Q.    Were any of those notebooks still around at

1    the time you were arrested?

2    A.    Yeah, I had one basically on me when I was

3    arrested, and I had one that I held onto that was

4    at my apartment.

5    Q.    When you say you had one on you, you didn't

6    have it in your pocket or anything like that, did

7    you?

8    A.    I carried like a -- like a -- somewhat of a

9    small backpack that I used to keep all my phones,

10   my ledger, money.  You know, basically I would

11   keep something to hold everything together, but I

12   had -- I had the ledger with me.

13   Q.    And the ledger that was with you, did that

14   relate to a load that had recently been received?

15   A.    That related to a load that was basically in

16   the process of still waiting to get the money back

17   for it.  And I -- you know, I still had -- I still

18   had marijuana from that load.

19        MR. PRESTON:  May I approach the

20   witness, Your Honor?

21        THE COURT:  You may.

22   BY MR. PRESTON:

23   Q.    Mr. Parra, I'm showing you what's been

24   marked for identification purposes as Government's

25   Exhibit No. 15.  We removed this notebook from the

package.  Please take a look at that and tell me if
you recognize it.

A.     Yeah, this is the ledger that I had on me at
the time of being arrested.

Q.     You've indicated that this particular ledger
refers to a load that was in the process of
distribution or collection?

A.     In the process of a little bit of -- the
distribution was basically out, and we were just
waiting on collections.  But my end of -- my end
of it was still in the process, so everything was
still in the process just waiting on the money to
come back.

Q.     So the arresting agents actually took this
from you on the date of your arrest?

A.     Yes, sir.

          MR. PRESTON:  Government would move into
evidence Government's Exhibit No. 15, Your Honor.

          MR. RODRIGUEZ:  No objection, Your
Honor.

          THE COURT:  It is received.

          (EXHIBIT 15 ADMITTED INTO EVIDENCE.)

BY MR. PRESTON:

Q.     Would you please open up that book.

          MR. PRESTON:  May I publish, Your Honor?

1          THE COURT:  You may.

2     BY MR. PRESTON:

3     Q.    The book that you just opened were you

4     looking at the same thing on the first page on the

5     screen?

6     A.    Yes.

7     Q.    Could you just tell the jury what we're

8     looking at here in regard to this first page of the

9     ledger.

10    A.    When I'm -- my first page of my ledger

11    usually always starts with the first person I

12    deliver to, which I normally put a name that I

13    think is best for the individual.

14          The first 210 pounds .45 at the top of it

15    was my first delivery towards the south side.  All

16    these -- all these units are basically a bundle,

17    so the bundle is 19.05.  All these are basically

18    one person's delivery.

19          The next name is another person's delivery

20    with the total amount I delivered to them.  And

21    the third name is also a delivery with the amount

22    I delivered to them.

23          THE COURT:  What names are you referring

24    to?

25          THE WITNESS:  At the top of the ledger

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

it says, Hey Joe.  It was someone that we

delivered to.  That's -- it was his favorite

saying.  He'd always greet me by saying, hey, Joe,

so I basically referred to this gentleman as Hey

Joe.

BY MR. PRESTON:

Q.     Is Hey Joe your customer?

A.     Hey Joe is Cleo Mitchell's customer that I

was given directions to deliver to.  A lot of

these bigger quantities were basically part of my

job process that I had to deliver to, which were,

you know, basically customers of Cleo Mitchell.

Q.     Did that include this J-U?  Is that --

A.     Yeah, Ju.  Yeah.  Now, I had a customer by

the name of Ju Ju, but Ju -- he also had a

customer by the name of Ju.

Q.     And Bro, whose customer was Bro?

A.     Bro was actually his older brother.

Q.     Who's "he"?

A.     Cleo Mitchell.

Q.     Would you turn the page, please.  We see on

this next page some figures under White Boy No. 1,

are these put in the ledger in the same manner you

just described?

A.     Basically like the first page it was later

1   on that evening.  I delivered the first amount of

2   119.7 to obviously a customer we had that was

3   Caucasian.  I called him White Boy, so this was my

4   delivery to him.

5        And then the second number, which is 217.05,

6   217 pounds, that was delivered to him I think like

7   the next day.

8   Q.    Who's White Boy No. 1?

9   A.    Seth.

10  Q.    Do you know him now to be Seth Clemens?

11  A.    Yes.

12  Q.    Would you go to the next page again, please.

13  At the top of the next page you have this delivery

14  entitled Big Homey.

15  A.    Right.

16  Q.    Who's Big Homey?

17  A.    Big Homey is Sheldon Shorter.

18  Q.    Now, you're not telling the jury that the

19  defendant Shorter took possession of this

20  303.2 pounds of marijuana?

21  A.    No, no.

22  Q.    What does that mean?

23  A.    Basically, like I said, I was given orders.

24  It's -- orders were to come down to me.  At this

25  point with the ledger we would be kind of slow

1    like we weren't moving as quick as we were

2    supposed to.

3         So a lot of the times -- several times there

4    were situations like this where I was told either

5    from Big Homey or from Cleo Mitchell that I had

6    something coming up that I was going to deliver to

7    someone that I wouldn't even know their name.

8         I would just know that they would be calling

9    me, and I had to have this certain amount ready

10   for delivery.

11   Q.    So as far as your accountability for this

12   load of marijuana or this portion of the load of

13   marijuana, what did this represent by noting

14   Big Homey for this particular portion of the load?

15   A.    This was basically someone that he referred

16   to us as coming to pick this marijuana up.

17   Q.    "He" being who?

18   A.    Sheldon Shorter.

19   Q.    Now, as far as Sheldon Shorter having you

20   deliver this, did he actually handle marijuana with

21   you at any point in time during this conspiracy?

22   A.    Not at all.  Someone in a high position like

23   that, it's very, very rare that you're even going

24   to see them around when this is taking place.  So

25   no, he did not -- the answer is no, he did not --

no, I never seen him deal anything marijuana.

Q.     Even touch it?

A.     Never.

Q.     Would you turn the page, please.  On this page you have a notation where it says grand total 1,340.  What does that represent?

A.     Usually at the end of my ledger or the end of my notebook I would end up having what me and Cleo Mitchell basically came to an agreement on what the total was for the load.  On this particular time the total on this was 1,340 pounds of marijuana.  This was a typical load.

Q.     Are the remaining pages that have writing on them similar notations in regard to this particular load?

A.     Yeah.  The remaining pages on here I -- on my ledgers I always had a -- I always had a -- basically a deduction list.  And I always had a list on basically what I owed personally.  So yes, it's all -- it all basically refers to each other.

        MR. PRESTON:  May I approach the witness, Your Honor?

        THE COURT:  You may.

        MR. PRESTON:  Your Honor, may I continue to approach the witness with exhibits during his

testimony this morning?

THE COURT:  Excuse me?

MR. PRESTON:  May I continue to approach the witness with other exhibits as he continues this morning?

THE COURT:  Yes, you may.

MR. PRESTON:  Thank you, Your Honor.

BY MR. PRESTON:

Q.    Mr. Parra, I've just handed you what's been marked for identification purposes as Government's Exhibit No. 14 if you could just please remove that notebook from the plastic and tell me if you recognize that.

A.    Yeah, this is one of my earlier ledgers that was turned over.

Q.    When you say it was turned over, could you please describe that process.

A.    Basically it's part of my cooperation.  I had to tell the truth about everything that I knew, and this -- this was part of it.  This was a previous load that was received months prior.

THE COURT:  What exhibit number is this?

MR. PRESTON:  14, Your Honor.

BY MR. PRESTON:

Q.    As far as Government's Exhibit 14 is

concerned, is this something you saved for the

inevitable day of your arrest?

A.     Basically.

Q.     And when you began cooperating, you turned

it over to law enforcement; correct?

A.     Yes, I did.

Q.     Mr. Parra, could you --

MR. PRESTON.  I'm sorry.  The government

would move to introduce into evidence at this time

Government's Exhibit No. 14.

MR. RODRIGUEZ:  No objection Your Honor.

THE COURT:  It is received.

(EXHIBIT 14 ADMITTED INTO EVIDENCE.)

BY MR. PRESTON:

Q.     Mr. Parra, I'd like to go through your

notations in this particular ledger as well.

MR. PRESTON:  With the Court's

permission I'd like to publish, Your Honor.

THE COURT:  You may.

BY MR. PRESTON:

Q.     Let's look at the first page that has

writing on it in your ledger.  Could you please

tell the jury what this particular page represents.

A.     This first page represents basically me

taking inventory.  This first page is basically me

taking inventory on what came in that night along
with all the other pages.  And similar to the
other book basically setting up deliveries for
that same night that I received it.

Q.    If we go to the next page, would that
reflect deliveries that you spoke about in the
earlier notebook that you referred to?

A.    Yes.  The --

Q.    Wait till we get it up, please.  Could you
tell us what we're looking at here.

A.    Yeah.  This is the second page.  This is
another amount that was set up once again for
Hey Joe, which I wrote south house because it was
South St. Petersburg.  206 pounds .75.  And then
the name White Boy comes up again because I made a
delivery to him also for 203 pounds .95.

And then usually at the end of each page
I'll do like a rough total trying to keep
everything intact because any time you have a
large quantity of stuff, you got to keep count to
every -- every -- every piece of it because you're
held responsible for it financially.

THE COURT:  The rough total that's noted
here is what, please?

THE WITNESS:  The rough total is

1   1,322 pounds .36.

2   BY MR. PRESTON:

3   Q.   Does another total figure appear on the next

4   page?

5   A.   The very bottom of the page it goes -- it

6   goes -- it goes up.  It's at 1,573.41.  And that's

7   another delivery at the top.  And these are more

8   deliveries at the bottom.

9           THE COURT:  Are you weighing this stuff?

10          THE WITNESS:  Any time -- any time the

11  marijuana comes in, there's numbers on the

12  packages already.  Now, I did have access to large

13  quantity scales which I did have at hand if I felt

14  like it was necessary to weigh the product,

15  because there was a time where it was questionable

16  of what the amount.

17          But in these times where I had the

18  numbers written down clearly, there's no question

19  in my mind that we're basically -- in order to run

20  a business we're basically taking their word that

21  each one of these items is the same amount.  And

22  after opening, you know, hundreds of them, they've

23  proved to be correct.  So these -- these bales

24  came with numbers written on them.

25  BY MR. PRESTON:

Q.     Numbers representing what?

A.     Numbers representing like -- okay.  We're on this page on Ju (phonetic).  Like say the first bale I set up to bring Ju was 17 pounds .50.  The second one was 18 pounds .85.  And my grand total to deliver to this gentleman was 110 pounds.

And all these numbers to my left are basically the numbers of the bales that I was loading up.  These are the numbers that I would actually have written on the bales.  So these numbers are coming off of the marijuana, you know.  That's the only place I could get the numbers from.

Q.     And from your experience you just used these numbers because you felt that you were accurately being represented --

A.     Yeah --

Q.     -- as written on the packages?

A.     Yes.  If there was sometime where there wasn't a number on the package, I then would weigh it myself.

Q.     Let's go to the next page, please.  At the top of the page again we see the -- too close to point on there, but we see the name Big Homey is here.

        You previously testified that that was a
designation for marijuana that was to go to
customers or associates of Sheldon Shorter.  Is
that correct on this page as well?

A.    Yes, that's also correct.

Q.    And this is approximately 50 pounds directly
which you're not going to ultimately be responsible
for; is that correct?

A.    Right.  I was just instructed to make the
delivery.  And it was usually someone coming from
an out of town area to receive this marijuana.

Q.    Right.  And if we go further down this page
we see in the left-hand column No. 1.  What does
No. 1 represent?

A.    This was actually one of our biggest loads.
No. 1 is basically representing this whole --
this whole pile.  It was -- it was pretty chaotic
that day.

        But this pile right here which is 179 pounds
.75, that's one pile of marijuana.  Then we've got
another pile of marijuana and then I had another
pile of marijuana.

            THE COURT:  Mr. Parra --

            THE WITNESS:  Yes, sir.

            THE COURT:  -- you may touch that screen

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  in front of you.

2          THE WITNESS:  Okay.  To point to it?

3          THE COURT:  Yes.

4          THE WITNESS:  Thank you.

5          The first --  the first portion of the

6  marijuana, like I said, this was a pile.  The

7  second one was a pile.  The third one was a pile.

8  And out of those three piles, this was my total.

9  Like I said, this one was probably one of my

10  biggest shipments that I received.  And I received

11  it by myself.

12  BY MR. PRESTON:

13  Q.    Can you turn to the next page which starts

14  at the top with the designation No. 2.

15  A.    Yeah.  This is similar to the last page.

16  This first pile which was 238.7, 286.3, and

17  297.95.  My total on that was 822.95 by itself.

18  So adding everything up it shows the quantity.

19  Q.    At the bottom of the page we see a figure

20  that says total 2,825.86, 168 pieces.  What does

21  that represent, please?

22  A.    Okay.  That's like -- basically like my

23  rough total, which me and Cleo Mitchell come to an

24  agreement on later on as being a little bit more

25  than that.  But that's basically my rough total,

1   168 pieces.

2        That basically represents 168 bales of

3   marijuana.  So if you add all these up, you'll

4   come to about 168 bales.  And as you can see here,

5   each bale represents a different number.  But

6   total there's 168 bales.  And that was basically

7   my rough total, 2,825.87 pounds of marijuana.

8   Q.    Do you recall when in relationship to your

9   arrest that this almost 3,000-pound load came in?

10  A.    I would say probably within six months of my

11  arrest.  Probably sooner than that.  Probably like

12  three months of my arrest.

13  Q.    Prior to your arrest were you aware that

14  your associates in that earlier transaction -- or

15  that other transaction, Josh Morello and company

16  had been arrested?

17  A.    Yes, I was aware they had been arrested.

18  Q.    After you went through this receipt process

19  on these occasions, what did you do with the

20  marijuana after inventorying it?

21  A.    After inventorying the marijuana and

22  basically taking my immediate distributing orders

23  for the night, after coming back from distributing

24  a large part of it, the other half of it would

25  normally go to a location that we held the

marijuana.

Basically we kept it safe for up to about a week until we could distribute the remaining amount of it.

Q.    In this same 118th Avenue warehouse?

A.    Definitely not.  We never ever kept marijuana at the -- basically we never kept it at the receiving warehouse longer than that night. It was always moved the same night, and it was moved by me -- by myself.

It was moved to another warehouse that I had obtained in my name also which was basically like another front.  It was like my hobby shop/paint shop.

That's basically one of the locations that we would hold the marijuana down for maybe two to five days, and then it would be distributed by then.  But never it would be left at the place where we received it.

That was basically like part of the rules that were handed down to us.

Q.    Where was that facility located?

A.    The second facility was located about five minutes away.  It was at 1299 Starkey Road also in Largo, Florida.

Q.    Who collected money for this marijuana that you distributed?

A.    It was basically me and Cleo Mitchell depending on the amounts.

Q.    Was any portion of the marijuana that was distributed given to people who were your customers?

A.    Yeah, of course.  There would be a certain amount that I would hold behind, and my customers would be distributed the marijuana.  And then in turn they would owe me the money, and I would owe the money to Cleo.

Q.    How much were you paid for each of these loads?

A.    In the beginning I wasn't paid anything, which is kind of shocking to me.  But basically was told to me that it was like a test to see if I had what it takes to make the big bucks.

    After about two or three loads of not getting paid anything, you know, my attention came to Cleo, and I was basically bugging him.  And finally he said, okay, we're going to give you $5,000 each load.

    And I said, okay, you're going to give me 5,000.  But realistically it would just be taken

1    out of the money that I owed him.

2    Q.    What would you owe him money for?

3    A.    For the marijuana that I kept for my own

4    distribution.

5    Q.    And did that dollar amount as far as what

6    you were paid increase from the $5,000?

7    A.    It went from 5,000 to 10,000 because, you

8    know, I was basically putting in my complaints

9    saying that, you know, I'm doing the -- one of the

10   hardest parts of the job and I'm doing it by

11   myself.

12        And there's been several times where, you

13   know, I felt like I needed people to work with me,

14   and I felt like I should be getting paid a lot,

15   lot more for what I was doing.

16   Q.    You were also profiting off of your own

17   marijuana sales, though; correct?

18   A.    Yes, sir.

19   Q.    How much were you paying for a pound of

20   marijuana that you put on the street?

21   A.    At the end I was paying like $900 dollars.

22   But at the beginning I was paying over a thousand

23   dollars.

24   Q.    So say average a thousand dollars a pound,

25   how much were you selling it for to your customers?

A.    We basically had a rule that was handed down
to us to only put like $50 on top of it.

Q.    Who's "we"?

A.    Cleo Mitchell basically came down on me
because I was trying to make like a hundred
dollars on each pound.  And he told me, look, you
can't do it like that.  You have to settle for $50
and try to move twice as many.

So Cleo Mitchell basically put a -- you
know, put the order down to me that, you know, I
had to make less money on each pound, but increase
my amount of pounds.

Q.    And in the times when you were collecting
money, what was the price per pound that you were
supposed to be receiving from these customers of
the organization?

A.    Well, there was a lot of customers I would
receive money from that I was told not to count
the money until I was in front of someone else
because obviously they wouldn't want me to see
what other people were paying because then they
might be upset that they were probably paying less
than I was paying or the same price, and I was
doing all the work.

Q.    What did you do with money that you did

1    collect?

2    A.    The money I did collect from individuals I

3    was basically given instructions to go get money

4    from them.  It would be taken to the apartment

5    that Cleo Mitchell and I had together.  And we

6    would put it in one of the two safes that we had

7    at the apartment.  And later on it would be

8    counted.

9    Q.    You alluded to this earlier, but were there

10   other means of receiving shipments of marijuana

11   besides the tractor trailers that arrived at the

12   118th Avenue address?

13   A.    Yes.  Like I referred to before, I call them

14   crates.  They're like head high wood boxes that

15   are like nailed shut.  There's no way you're

16   getting into them without a crowbar.  And they

17   usually have like a metal seal that goes around

18   them.

19        You have to break the seal.  And that was

20   one way.  And it was informed to me that there was

21   also a third way that was exclusively on Cleo

22   Mitchell's part, which I call it the brown box

23   because it was basically through UPS.

24   Q.    So any kind of brown box shipments had

25   nothing to do with your relationship with the

1  defendant Shorter; correct?

2  A.    Not that I know of because at the time it

3  was being made clear to me that Cleo Mitchell was

4  trying to do everything he could to try to back

5  away from Sheldon Shorter because he felt like he

6  could make more money on his own.  He felt like he

7  was getting screwed over financially.

8  Q.    Now, these crates, were you advised where

9  the creates were coming from or did they have any

10  markings that indicated where they were coming

11  from?

12  A.    Well, I checked the receipts.  And from my

13  knowledge they were being airborne.  They were

14  flown like I think like overnight to a location

15  that was later on transported them to my

16  warehouse.  And I -- from what I -- from what I

17  was reading on the receipts -- the inventory

18  receipts that came with them it usually took

19  anywhere from two to four days.  But I believe

20  they were coming from California.

21  Q.    At the time you were arrested did you have

22  any of these crates still around?

23  A.    Yes, I did.

24  Q.    Where did you have that kept?

25  A.    I had the crates with no marijuana in them,

1    just empty at the first warehouse that I was

2    talking about where I received the marijuana.

3    They only stayed there because there was nothing

4    inside of them.  And they were quite pricey.  I

5    was told not to throw them out.  I was told to

6    keep them.  They would be sent back.

7    Q.    Was there still a cover load there at that

8    time as well?

9    A.    Yes, there was.  There was -- one of the

10   last cover loads that I unloaded I was told to

11   keep it at the shop and later on it would be sent

12   back.

13   Q.    Do you recognize the photographs which I'm

14   handing you marked for identification as

15   Government's Exhibit 8A and 8B?

16   A.    Yes, I do.

17   Q.    Where were those photographs taken?

18   A.    Both -- both 8A and 8B were both taken at

19   my -- the warehouse that I received the marijuana

20   at.  8A is basically what a cover load would look

21   like.  Most of the times if it belonged -- if it

22   wasn't like a legitimate load, it was just

23   something that was being used as a front.

24          MR. CRAWFORD:  Judge, could I object

25   that he's testifying about a photograph that's not

1  yet in evidence.  And if we could see them before

2  they went to the witness so we could make sure we

3  know what exactly we're talking about.

4            THE COURT:  Yes.  You may do so,

5  Counsel.

6  BY MR. PRESTON:

7  Q.    Do photographs Government's Exhibits 8A and

8  8B fairly and accurately represent portions of your

9  warehouse at or around the time that you were

10 arrested?

11 A.    Yes, that's correct.

12 Q.    And this is the 118th Avenue location?

13 A.    The receiving -- yes, the receiving

14 location.

15           MR. PRESTON:  Government would move into

16 evidence Government's 8A and 8B, Your Honor.

17           MR. RODRIGUEZ:  No objection.

18           THE COURT:  They are received.

19           (EXHIBITS 8A AND 8B ADMITTED INTO

20 EVIDENCE.)

21           MR. PRESTON:  May I publish those

22 exhibits, Your Honor?

23           THE COURT:  You may.

24 BY MR. PRESTON:

25 Q.    Starting with Government's Exhibit 8A,

1    please.  What do we see here?

2    A.    We're looking at 8A, which is basically like

3    a front cover load.  These are all -- all these

4    pallets are just basically plastic to go

5    containers, plastic cups, and plastic plates which

6    I took off of a truck which had marijuana hidden

7    behind it.  So this -- all this stuff plus more

8    which you can't see in the picture would fill up a

9    55-foot trailer with the marijuana hidden behind

10   it.

11   Q.    This cover load was left in your possession;

12   is that correct?

13   A.    Yeah.  The cover load -- basically there was

14   an argument between me and the driver basically

15   going back and forth on whether or not they were

16   taking it or leaving it.  And basically it came

17   back to me that we were keeping it.

18   Q.    And it came back to you from who?  The

19   driver or someone else?

20   A.    From -- basically I would be in contact

21   every 10, 15, 20 minutes with Cleo Mitchell.  He

22   was calling to see what was going on, basically

23   checking my progress.  And he told me to basically

24   unload that and put that in the shop, and we were

25   going to hold it for temporary.

Q.      Now, you said you had in this particular
load some disagreement with the drivers of the
vehicle; correct?

A.      Yes, sir.

Q.      You don't know either of the gentlemen
seated on this side of the courtroom; is that
correct?

A.      No, I'm not familiar with them.

Q.      From your recollection they're not the
drivers in relation to this or any other load that
you've talked about so far; correct?

A.      That's correct.

Q.      Now, you indicated earlier that at some
point in time there was a more -- there was a freer
exchange regarding the marijuana business on
occasions between you and the defendant J or
Shorter; is that correct?

A.      That's correct.

Q.      Could you describe where and how that
relationship developed and what you mean by
learning more or discussing more with him.

A.      Like I said, when Cleo and I had apartments,
in the first apartment I really wasn't allowed to
be around when visits were coming.  Then once we
moved into the second apartment --

Q.    Where was the first apartment?

A.    The first apartment was off Gandy in

Pinellas Park, Florida.

Q.    And the second apartment?

A.    Was in Tampa at Rocky Point Apartments.  So

the second apartment was basically I had to prove,

you know, that I was reliable, I could be trusted,

and that, you know, I basically was a cash cow.

I basically was, you know, part of the

reason why everything was going so smoothly.  And

it just basically strengthened my relationship

with Shorter.

Q.    What sort of activities related to this

distribution scheme took place at the Rocky Point

apartment?

A.    Like I said earlier, basically any money

that I collected or any money that I was owed

would be brought to that apartment.

Maybe a day or two later, whatever day me

and Cleo Mitchell would come to an agreement, we

would basically pull out the machines -- the money

counters out.

And basically the -- you know, we never had

marijuana there because that was part of the

rules.  And basically it was just large amounts of

1  money that we were responsible for counting,

2  organizing, and preparing for delivery.

3  Q.    Was the defendant Shorter ever around during

4  this money counting process as your relationship

5  developed?

6  A.    Yeah, there was -- there was at least one

7  time when he was around.

8  Q.    And could you tell us about that one time,

9  please.

10  A.    Yeah.  It was told to me that basically he

11  was going to be there.  And later we -- you know,

12  to find out he was with another gentleman that

13  looked very much like him, just a younger version.

14        And we basically finished counting out the

15  money.  Basically getting the bags that the money

16  goes into prepared with the money with -- we

17  normally found a denomination to put them in.  And

18  everything is very organized, very put together.

19        It's cling wrapped.  And then each bag

20  basically without looking at it, you basically

21  have a knowledge of how much money is in each bag.

22  I think that day we prepared two to four bags that

23  I had to deliver to a destination shortly after.

24  Q.    How much money did the two to four bags

25  represent?

A.    I never had an exact total like Cleo
Mitchell, but I was assuming from doing this
several times that it could go anywhere from a
million dollars to, you know, million and a half.

Q.    Now, you indicated that you assumed some
responsibility for moving that money after it was
packaged?

A.    Yeah.

Q.    Who tasked you with that responsibility?

A.    Well, part of my job responsibility,
probably a lot doing it with the way I look,
basically was delivering money to the drivers or
delivering money to specific individuals beside
the drivers.

      But that specific day after we counted the
money, I delivered that money to the -- basically
the drivers I was familiar with that drove the
tractor trailers.  I delivered that money to them
at a truck stop with intentions of in the near
future receiving another load of marijuana.

Q.    And who told you to take that money to them?

A.    That day it was told to me by Shorter and by
Mitchell.

Q.    Did the defendant Shorter as this
relationship developed have you deliver money to

1    any other individuals?

2    A.    Definitely.

3    Q.    All right.  Could you tell the jury how many

4    times you did that.

5    A.    It wasn't as much at first.  But after our

6    relationship grew and basically I proved myself to

7    be able to drive from Tampa, Florida or St. Pete,

8    Florida to Fort Lauderdale, Florida or Miami,

9    Florida, it probably went from once every month to

10   maybe like two times a month.  Sometimes

11   delivering money for -- not as much money, but

12   just delivering money in general.

13   Q.    Did you ever deliver money directly to the

14   defendant Shorter?

15   A.    Yes, I did.

16   Q.    How many times did you deliver money

17   directly to him?

18   A.    Somewhere around five times.

19   Q.    And where did those deliveries take place?

20   A.    They would take place anywhere from Fort

21   Lauderdale to South Beach.  I remember a few times

22   meeting him outside a club.  He was with a young

23   lady.  He was in his Range Rover.

24         And basically I -- we didn't -- you know,

25   it's real causal.  It doesn't look like we're

1    doing anything.  We pulled over off the side of

2    the street.  And I threw the bags in his car, and

3    we said a few words to each other, and went our

4    way.

5         There was another situation where I met him

6    in the parking lot of a Walgreen's.  We were not

7    -- you know, very casual.  You know, if you were

8    to see this you wouldn't think we were doing

9    anything wrong.  But, you know, we'd exchange half

10   -- half a million or a million dollars in a matter

11   of minutes and be on our way.

12        There's another time where we met in a

13   parking lot of a Holiday Inn that I was staying

14   at.  And the same situation.  Just throw the bags

15   in the car and, you know, be on our way.

16        And there's another time where we met at the

17   Sawgrass Mall in Fort Lauderdale.  Same situation.

18   Put the bags in his car and say, you know,

19   good-bye, and we both go on our way.

20   Q.    You mentioned the Range Rover.  What vehicle

21   was the defendant driving at the Holiday Inn

22   exchange?

23   A.    The Holiday Inn he was driving a Bentley GT

24   convertible.  It was basically told to me that he

25   had just purchased it.  I was excited to see it.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.     You said it was told to you he just
purchased it.  Who told you that?

A.     Both Shorter and Mitchell.

Q.     Why do you say you were excited to see it?

A.     I mean who's not excited to see a Bentley
GT?  It's like -- it's a very expensive car.  It's
out of my -- I mean it's out of any of our range.

       And basically, you know, he pulled up kind
of fast.  My heart was pumping.  I'm -- I'm -- I
mean, I've been into cars all my life.  To sort of
see this up in person and for it to be someone
that I know, it kind of gets you going.

Q.     Did you ever assist Sheldon Shorter in
moving money to purchase a car?

A.     Yes.

Q.     Could you describe that for the jury,
please.

A.     Yeah.  Basically I received a phone call
from Shorter, which wasn't unusual to receive
calls from him.  He asked him if there was an Audi
dealership in my area.  And I told him, yes, there
was.

       And he told me he was looking at an Audi S5
two-door like coupe.  It was a fairly new model.
Whatever the highest one was, that's what I was

1    supposed to be looking at.

2         I went to the dealership, found out what I

3    needed to.  Relayed the information to Shorter.

4    And I was told to put a deposit on the car using

5    money that I owed for the marijuana.  And I asked,

6    you know, how am I going to get -- who am I going

7    to get the money from.  And basically was told to

8    me to take it out of the money that I owed.

9         I put a $5,000 deposit on the car with my

10   name on the deposit.  It was told to me that, you

11   know, he would be picking up the car later on that

12   week.

13        I picked him and a young lady up from the

14   airport.  Took them to the Audi dealership.  And

15   the same day we went, they purchased the Audi S5.

16   She put it in her name.  We were going to get a

17   cashier's check from the bank, but the dealership

18   insisted, you know, it's no problem.  Just write a

19   personal check.

20        So I had made the deposit for that car which

21   equaled up to $65,000 the day before into a

22   Wachovia account with the young lady's bank

23   account.  I had deposited the money into her

24   account in one day, which was unusual to deposit

25   that much into one account.

1       So basically put the money in that account.

2  And the next day they purchased the car and drove

3  back south to Miami and Fort Lauderdale with the

4  car.

5       And there was also something to do with the

6  purchase of another vehicle that the young lady

7  put a deposit on.  And it later fell through.  It

8  did not go through.

9  Q.    At the same Audi dealership?

10 A.    Yes, same Audi dealership, yeah.  It was

11 supposed to be a purchase of two cars.  And it

12 ended up being the purchase of one car.

13 Q.    Now, when you put this $5,000 cash deposit

14 on the Audi, were you provided with a receipt?

15 A.    I'm sure they were willing to give me one,

16 but I -- I basically, you know, was taking the

17 word of the dealership.  They were in my local

18 area.  It wasn't anything they were going to be

19 able to pull over on me.  Plus they really wanted

20 to sell this car.  They were having a real hard

21 time selling this car to somebody.

22 Q.    And this was a cash deposit?

23 A.    This was -- yeah, anything under $10,000 we

24 would deposit cash.

25 Q.    I'd like to show you what's marked for

1　identification purposes as Government's Exhibit

2　No. 29.

3　　　　　　(EXHIBIT 29 MARKED FOR IDENTIFICATION.)

4　BY MR. PRESTON:

5　Q.　　Would you please take a look at these two

6　pages from that exhibit and tell me if you

7　recognize those pages.

8　A.　　Yeah.  This is the deposit --

9　Q.　　Do you recognize those?

10　A.　　Yeah.  It's basically a receipt for my

11　deposit.

12　Q.　　Was that the Audi dealership that you were

13　dealing with, Crown Audi he?

14　A.　　Yes, Crown Audi.  That's in Clearwater, yes,

15　that's correct.

16　Q.　　What was the amount of the deposit?

17　A.　　The deposit was $5,000.

18　Q.　　You also indicated that you had used a bank

19　account to help facilitate this car purchase.  Who

20　gave you information in regard to any bank deposits

21　that you made?

22　A.　　Like I said, this wasn't -- this didn't seem

23　to be any marijuana transaction.  For me and

24　Shorter to talk about this transaction with the

25　car was -- you know, it was nothing -- nothing to

1  be shy about.  So all the directions on this car

2  were given to me by Shorter.

3  Q.    Where did the money come from?

4  A.    Basically the money that I owed to Cleo

5  Mitchell, which was in turn owed to Shorter.

6  Basically I took it out of the money that I had

7  from my personal distribution.

8  Q.    Money from the sale of marijuana?

9  A.    Of course.

10  Q.    Owed to the defendant Shorter?

11  A.    Yes, sir.

12  Q.    How were you aware of which bank account to

13  use?

14  A.    I was given a Wachovia bank account with the

15  young lady's name.  And I was told to have that

16  money in there by that certain day because he was

17  coming to get it.  And basically don't be, you

18  know, playing around.  Get this taken care of

19  ASAP.

20       So I had to go to several different banks

21  because my deposits consisted of around $9,000,

22  $9,000, $9,000.  Normally I would never deposit

23  anything over $9,000 because they would ask for

24  ID.

25  Q.    When you say normally you wouldn't deposit

1    anything over $9,000, did you deposit money into

2    bank accounts aside from conducting this vehicle

3    transaction?

4    A.    Most definitely.

5    Q.    How often would you do that?

6    A.    This was another part of my job duties as

7    well as Cleo Mitchell's job duties.  We would be

8    making deposits into several different bank

9    accounts on a regular basis several times a month.

10   Q.    Do you recognize Government's Exhibit

11   No. 17?

12          THE COURT:  Are you offering 29?

13          MR. PRESTON:  Not at this time, Your

14   Honor.

15          THE WITNESS:  Yes, I do.  This is most

16   likely a Washington Mutual bank account that money

17   was deposited into quite often as well as there

18   being several other bank accounts that were used

19   in turn to deposit money.

20   BY MR. PRESTON:

21   Q.    Was this turned over to law enforcement or

22   did you have it on your possession at the time you

23   were arrested?

24   A.    I believe it was turned over to law

25   enforcement.

1  Q.    Do you recall how this number came into your

2  possession?

3  A.    This account number?

4  Q.    Yes, sir.  And the name Sandra Burrell.

5  A.    I mean it would either be from Cleo Mitchell

6  or from Sheldon Shorter.  Those were the only two

7  that I was given instructions on any bank accounts

8  to deposit into.

9          MR. PRESTON:  Government moves 17 into

10  evidence, Your Honor.

11          MR. RODRIGUEZ:  No objection.

12          THE COURT:  It is received.

13          MR. PRESTON:  May I publish?

14          THE COURT:  You may.

15          (EXHIBIT 17 ADMITTED INTO EVIDENCE.)

16  BY MR. PRESTON:

17  Q.    What does the designation WMO mean there?

18  A.    WM is usually Washington Mutual.  We used

19  Washington Mutual, Bank of America, and Wachovia

20  because they didn't ask any questions.

21  Q.    This figure 9,000, is that part of the

22  account number?

23  A.    I believe it is.  It's been awhile since I

24  actually did a deposit, so you'd have to check to

25  see.  Each bank has a certain amount of account

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

numbers. That could be part of the account
number. But it was basically instructed to us
that each deposit be $9,000, not any more, not any
less. To keep them all the same.

Q.    Who instructed you in that regard?

A.    Cleo Mitchell.

Q.    Was there a significance to why it shouldn't
be more than $9,000?

A.    Anything over $10,000 cash you might have to
fill out like a form, some kind of IRS paperwork.
Basically it would bring the attention of a bank
manager. I mean if I'm doing $9,000 deposits on a
regular basis, it's already drawing attention.
But to do 10,000 is just not what you're supposed
to do. You're supposed to stay under 10,000, so
9,000 was our basic deposits on a regular basis.

Q.    When you were arrested, did you have any
deposit slips -- I'm sorry -- deposit receipts
still around?

A.    Yes, I did.

Q.    Did you turn those over to DEA?

A.    Yes, I did.

Q.    Please take a look at Government's Exhibit
No. 16 and tell me if you recognize that exhibit.
Do you recognize Government's Exhibit 16?

```
 1    A.    Yes.

 2    Q.    And are these receipts that you turned over

 3    to law enforcement?

 4    A.    Yes, they are.

 5    Q.    What common figure appears on those three

 6    bank receipts?

 7    A.    The Bank of America is a $9,000 deposit.

 8    And Washington Mutual is a $9,000 deposit.

 9          MR. PRESTON:  We'll move into evidence

10    Government's 16, Your Honor.

11          MR. RODRIGUEZ:  No objection.

12          THE COURT:  It is received.

13          MR. PRESTON:  May I publish, please?

14          THE COURT:  You may.

15          (EXHIBIT 16 ADMITTED INTO EVIDENCE.)

16    BY MR. PRESTON:

17    Q.    And that's a $9,000 that you just referred

18    to on the one Bank of America receipt; correct?

19    A.    Correct, yes, sir.

20    Q.    Thank you.  Now, Mr. Parra, at the time that

21    you were arrested, did you have in your custody or

22    control any marijuana from the last shipment?

23    A.    Yes, I did.

24    Q.    And approximately how much marijuana did you

25    have left at that time?
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.     I had right around 80 pounds left at the
first warehouse.

Q.     Who was responsible for that 80 pounds?

A.     I mean I definitely was.

Q.     Why is that?

A.     Because it was basically something that I
had to get rid of.  I was basically headed as my
responsibility to get rid of it to the people I
was going to distribute to and basically wait for
the money to come back.  And it never happened.

Q.     Where did you have that marijuana stored?

A.     I had -- just about anywhere where I kept
anything significant I would have a safe.  So at
the 1299 Starkey Road in Largo.

       The other warehouse I was talking about, not
the receiving warehouse, but basically the storage
warehouse, I had a probably like a head high safe.
It was like a -- like a gun safe or something like
that, but it was a pretty big one.  And I had the
80 pounds of marijuana in there.

Q.     Was that marijuana turned over to law
enforcement?

A.     Yes, it was.

Q.     I'd like to show you what has been marked as
Government's Exhibits 8C and 8D and ask you if you

1 recognize those photographs. Do you recognize

2 those?

3 A.    Yes. 8C is basically the safe from the

4 outside. And there was a wooden door that got

5 locked as well as it having a combination, so it

6 was pretty difficult to get into.

7        8D is -- gives you a picture of the

8 80 pounds. It kind of gives you an idea of what

9 the bales look like. So that's four bales

10 consisting of around 80 pounds of marijuana.

11 Q.    Does that fairly and accurately depict the

12 safe and the marijuana which you described?

13 A.    Yes.

14        MR. PRESTON:  I would move into evidence

15 8C and 8D at this time, Your Honor.

16        MR. RODRIGUEZ:  No objection.

17        THE COURT:  They are received.

18        (EXHIBITS 8C AND 8D ADMITTED INTO

19 EVIDENCE.)

20        MR. PRESTON:  May I publish?

21        THE COURT:  You may.

22 BY MR. PRESTON:

23 Q.    This is Government's Exhibit 8C. And is

24 this the safe that you referred to?

25 A.    Yes, it is the safe.

Q.    And you referred to a wooden door.

A.    There's a wooden door in front of it that blocks so if there's anybody that walks by they're not going to have any access to getting into it. They'd have to know the combination to the padlock as well as the combination to the safe.

Q.    Would they have any idea that there was actually a safe behind that wooden door?

A.    Not at all.  It's a big shelving unit that I had installed.  It was very low key.

Q.    And it was in this safe that you had the marijuana stored?

A.    Yes, sir.

Q.    And that's depicted in Government's Exhibit 8D; is that correct?

A.    Yes, that's correct.

Q.    What are we looking at here again?

A.    Okay.  I was trying to explain earlier. Each bale has a number on it.  If you look at this bottom bale it says 20.25, the writing on it.  All the bales above it also have numbers on them. It's just they're turned in a way that you can't see them.  Each bale -- like that bottom bale represents 20 pounds .25.

       All the other bales above it have their own

1    individual numbers on them.  That would most
2    likely be around 20 in order for it to equal 80
3    pounds.  But that's basically what a bale would
4    look like.  So that's four pieces or four units of
5    bale of marijuana.
6    Q.    Now, obviously looking at this photograph we
7    can't see marijuana, can we?
8    A.    If you look at the bottom one, it's
9    something that I unwrapped to basically check the
10   quality of and basically was reweighed.  And if
11   you check the wrapping on that compared to the one
12   on top, it's not as good a job to conceal it
13   because I had to check it.
14         So I opened that one, and you could see
15   straight through to the marijuana.  But the ones
16   above it are more like a professional job wrapping
17   it compared to what I could do by myself.
18         THE COURT:  Mr. Preston, we're going to take
19   our morning recess at this point.  We'll reconvene
20   at 11:15.
21         Do not discuss the case, ladies and
22   gentlemen.
23              COURT SECURITY OFFICER:  Please rise for
24   the jury.
25     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

1          COURT SECURITY OFFICER:  Please rise for

2     the jury.

3      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

4          COURT SECURITY OFFICER:  All rise.  This

5     Honorable Court is again in session.

6               Please be seated.

7               THE COURT:  You may continue.

8     BY MR. PRESTON:

9     Q.    Mr. Parra, I want to just go back a moment.

10    I forgot to address Government's Exhibit 8B with

11    you.

12               MR. PRESTON:  May I publish that, Your

13    Honor?

14               THE COURT:  You may.  8B did you say or

15    D?

16               MR. PRESTON:  8B.

17    BY MR. PRESTON:

18    Q.    Do you have that in front of you?

19    A.    Yes, sir.

20    Q.    What do we see in Government's Exhibit 8B

21    again, please?

22    A.    8B is the same location as the receiving

23    location.  And these are the crates I was

24    describing earlier.  This was basically the

25    alternate route of delivering the marijuana or

1  receiving the marijuana.

2      These -- I think -- I believe there was not

3  four crates, but these were the crates that were

4  shipped to me in the transport in the small box

5  trucks.  And I had to take them off with a

6  forklift.  But these are the crates I had in my

7  possession.

8  Q.    How much marijuana would come in these?

9  A.    It could go anywhere.  I mean obviously it's

10  not going to be under a certain amount because it

11  wouldn't be worth it, but it would be anywhere

12  from like 600 to a little over a thousand.  If you

13  had four crates it might equal 1,500.

14  Q.    I'm going to go back to Government's

15  Exhibit 8D.

16          THE COURT:  Has 8B been received?

17          MR. PRESTON:  Yes, Your Honor.

18          THE COURT:  You may proceed.

19          MR. PRESTON:  In the event that it

20  wasn't, Your Honor, I would again move it into

21  evidence.  I believe A and B at the same time came

22  in.

23  BY MR. PRESTON:

24  Q.    Now, we're talking about Government's

25  Exhibit 8D.  This is the 80 pounds of marijuana.

1   Did you owe money for that marijuana?

2   A.     Yeah.  Any time -- yes, I did.

3   Q.     And that was a debt that was still owed at

4   the time of your arrest; is that correct?

5   A.     Yes, it was.

6   Q.     Had you also distributed marijuana from that

7   shipment which you still needed to be paid for?

8   A.     Yes.

9   Q.     How much total do you feel or how much

10   total -- how much approximately do you feel you

11   still owed the defendant Shorter at the time you

12   were arrested for outstanding marijuana?

13   A.     Approximately like 150,000, so that would

14   equal 150 pounds that I had towards my own

15   distribution.

16   Q.     Does that include this 80 pounds?

17   A.     Yes, it does.

18   Q.     At the direction of law enforcement did you

19   collect monies that were owed to you as part of

20   this outstanding marijuana?

21   A.     Yes, I did.

22   Q.     Who were some of the people that you

23   collected money from in an undercover capacity?

24   A.     The people that I collected money from were

25   people that I distributed on -- on my end,

1    basically my customers.  Some of them being

2    Seth -- Seth Thomas, a gentleman that I call JJ,

3    another gentleman that I -- James Cooney.  And

4    there were probably about two or -- two other

5    gentlemen that I collected money from that was

6    later turned over.

7    Q.    And under law enforcement supervision did

8    you pay these monies back to the organization?

9    A.    Yes.

10   Q.    Could you describe that process, please.

11   A.    I mean it's a little bit different because I

12   was under -- you know, basically the money was the

13   same situation.  It was taken to the apartment,

14   put into the safe.  And basically from whatever

15   was going to happen to the money after that it --

16   you know, it was in the safe, so my end of the job

17   was done.

18   Q.    Why weren't you driving the money to South

19   Florida at this time?

20   A.    I was currently out on a federal bond, so I

21   couldn't leave any central Florida jurisdiction.

22   I couldn't leave the area.  It was against my

23   bond.  And I was basically limited to what I could

24   do being out on bond.

25   Q.    While we're on the topic of the bond, was

1   that bond something that the government agreed to?

2   A.     Yes.

3   Q.     Were you -- did you initially waive your

4   bond hearing and were you initially detained by the

5   Court?

6   A.     Yes.

7   Q.     And the bond came about after your initial

8   discussion with law enforcement; is that correct?

9   A.     That is correct.

10  Q.     Was there ever a problem which was presented

11  to you in regard to some of the money that was

12  placed in the safe during this cooperation

13  collection process?

14  A.     Yeah.  I mean the whole time I was being

15  basically pushed every day to come up with the

16  money, but there was a time where I put money in

17  there on one day, and the following day it was

18  close to like $20,000 short.  And there's only

19  three people that knew the combination.

20  Q.     What was the conclusion of that particular

21  accusation?

22  A.     I mean my conclusion came quick.  The money

23  was missing, and Cleo Mitchell's friend, Jermaine

24  Hopkins, was missing.  And he had turned off his

25  phone.  No one knew where he was.  So basically he

```
1    took the money and ran.  All his belongings were
2    gone, his clothes, all his shoes, everything.
3    Q.     Now, as this collection payment process took
4    place, did you have phone contact with Cleo
5    Mitchell and Sheldon Shorter about the money owed?
6    A.     Yes, I did on a regular basis.
7    Q.     Could you generally describe those types of
8    conversations.
9    A.     The conversations was like, you need to get
10   your ass in gear.  You know, what the -- you know,
11   what's your problem?  Basically, you know, nothing
12   can move forward until you come up with your end
13   of the money.  Everybody has to come up with their
14   end of the money in order for something to move
15   forward.
16   Q.     And I mentioned two names there.  Who did
17   you have such conversations with?
18   A.     Cleo Mitchell.  And I also had conversations
19   with J, Sheldon Shorter.
20   Q.     At the direction of law enforcement did you
21   record some of these conversations?
22   A.     Yes, I did.
23   Q.     Have you had an opportunity prior to your
24   testimony to review those recordings?
25   A.     Yes.
```

1    Q.    Did you review transcripts of those

2    recordings along with the recordings themselves?

3    A.    Yes.

4    Q.    Did you find the recordings to be fair and

5    accurate recordings of your conversations?

6    A.    Very accurate.

7    Q.    As far as the transcripts which you

8    reviewed, did you find them to be substantially

9    accurate?

10   A.    Yes.

11          MR. PRESTON:  Sorry, Your Honor.  Just a

12   moment.

13   BY MR. PRESTON:

14   Q.    I'm showing you these at one time.  What I'm

15   going to bring you are Government's Exhibits 11 and

16   11A through 11M as in Mary as well as Government's

17   Exhibit 31 and Government's Exhibit 31A.  Are these

18   the recordings and transcripts which you reviewed

19   and just testified in regard to the accuracy of?

20   A.    Yes, they are.

21          MR. PRESTON:  The government would move

22   into evidence at this time, Your Honor,

23   Government's Exhibits 11, 11A through 11 M, as

24   well as Government's Exhibits 31 and 31A.

25          MR. RODRIGUEZ:  Your Honor, objection

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  pursuant to Rule 106, the rule of completeness.  I

2  can approach if you don't want me to --

3          THE COURT:  Come to sidebar.

4          (AT WHICH TIME THE FOLLOWING SIDEBAR

5  DISCUSSION WAS HELD:)

6          MR. RODRIGUEZ:  At the time of all these

7  conversations he was working with the government,

8  was given recording equipment and instructions,

9  and was reporting to the agents.

10          Counsel prefaced his comments recorded

11  some of the conversations, which is going to

12  completely take out of context some of these

13  transcripts.

14          So I'm asking that the government

15  produce and introduce all of the recorded

16  conversations that this man had, especially with

17  my client.  And if there are non-recorded

18  conversations, please so disclose and so advise.

19          Because I have reason to believe that

20  there are non-recorded conversations.  And I think

21  that's why counsel is saying you recorded some of

22  these conversations.  And it will take it

23  completely out of context.

24          And it's not going to be sufficient for

25  me to address it in cross because I don't have it

1    nor do I know when they asked him to do things

2    when it was done.

3              THE COURT:  Are there any recorded

4    conversations other than those which you have

5    offered?

6              MR. PRESTON:  Yes, but none that have

7    not been turned over to the defense.

8              MR. RODRIGUEZ:  That's not my point,

9    Your Honor.  If he's going to introduce some,

10   under the rule of completeness I'm asking that

11   they all be introduced.

12             If he doesn't want to go through them

13   with the witness, fine, but introduce them and at

14   least allow me to develop it if that's going to be

15   the case.

16             And I also would like to know if there

17   are non-recorded conversations that he's either

18   going to ask him about or that have come up that I

19   am not aware of because I was concerned with

20   counsel saying some recorded conversations.

21             Now, if he's referring to the some that

22   we're only going to introduce these or if he's

23   referring to some conversations that this guy is

24   alleged to have had and they didn't record, then

25   I'm entitled to that also.

1          THE COURT:  Are there conversations that

2     were not recorded?

3          MR. PRESTON:  It's my understanding

4     that there were occasions when the recording

5     equipment -- he received phone calls when the

6     recording equipment was not readily available and

7     he had to answer his phone, but that was not very

8     often.

9          It has nothing to do with the rule of

10    completeness, and it certainly can be addressed on

11    cross-examination.  It happens in these

12    investigations all the time.  Has nothing to do

13    with the rule of completeness.

14         MR. RODRIGUEZ:  I wouldn't have asked

15    sidebar, Your Honor.  I wouldn't have had that

16    response from counsel and known any better to ask

17    if he had bad equipment or he didn't record when

18    he had been ordered to.  And that's all I'm trying

19    to say.

20         I think that that is definitely Brady.

21    I think it's under the rule of completeness if the

22    government just wants to give them a snapshot of

23    this guy's conversations with my client.

24         And I don't know when he was supposed to

25    have talked to the guy or what alledgedly was said

1 or not said.  And that puts me in a bad spot.

2     THE COURT:  Well, how can the government

3 produce conversations that were not recorded?

4     MR. RODRIGUEZ:  I don't know if he's

5 advised -- I don't know if he's advised the agents

6 that he's had other conversations.  I don't know

7 when they gave him the equipment.

8     I don't know what they ordered him to

9 do.  I don't know what they did as a result of

10 information he provided to them.  Then he said

11 that he had a conversation.

12     And the government is putting the guy on

13 and saying, hey, believe us, we gave him all this

14 equipment and we told him record this.  And now

15 listen to this.  And on top of that, look at these

16 transcripts.

17     And now the government is saying hey,

18 there's some conversations out there that this guy

19 didn't record.  The government says the equipment

20 didn't work.  Well, it worked real well for their

21 conversations, but maybe those other conversations

22 it didn't.  When did it happen?  How did it

23 happen?

24     THE COURT:  I don't know that there's

25 any legal solution to your question.  If

1    conversations have not been recorded and the

2    government doesn't plan on putting on any

3    testimony with regard to unrecorded conversations,

4    that's where you are.  You can do what you will

5    with it on cross-examination.

6              MR. RODRIGUEZ:  Can I have the

7    government produce at least a log of this guy's

8    contacts with all the agents as to when he did

9    make calls, he didn't make calls or something?  I

10   have nothing.

11             If counsel wouldn't have said right here

12   that there's unrecorded calls -- I jumped up when

13   he said some recorded conversations.  And I wanted

14   to develop whether it was this guy decided not to

15   record them and now he's going to proffer what he

16   wants --

17             THE COURT:  You can deal with that on

18   cross-examination.

19             MR. RODRIGUEZ:  Can I ask that the

20   government be required at least to introduce if he

21   doesn't have transcripts all of the conversations

22   that this guy recorded during the course of the

23   investigation?

24             I don't want to do it during my cross

25   because I don't want to affect my possible Rule

29, but it's going to put me in a very difficult
spot unless you want me to bring him back later
and then I'll go through it because the
government's only giving a snapshot.

Just let him introduce everything, and
I'll decide what I want to talk to him about.

THE COURT: Well, you can bring him back
later if you want to do that and if you feel that
that will give you a broader area of inquiry.

MR. RODRIGUEZ: Can I -- can I -- if I
cross, can I get into it in my cross then without
stepping over the bounds of my Rule 29 or can I
introduce other CDs that the government has given
me that are conversations that they're not going
to introduce?

THE COURT: Well, you can certainly
inquire on cross-examination as to whether there
were other conversations that were recorded. And
you can utilize that information in your closing
argument to the jury that they were not utilized.

MR. RODRIGUEZ: Thank you.

MR. CRAWFORD: Judge, before we go, I'd
like to invoke the rule of witness sequestration
at this time. I don't think --

THE COURT: Are there any witnesses in

1    the courtroom?

2         MR. CRAWFORD:  I don't believe so, but I

3    would like to from this point forward.

4         THE COURT:  All right.  Well, that

5    obligation is on all counsel if you see any

6    persons in the courtroom who are witnesses, notify

7    the Court or notify them that they may not -- if

8    they're your people, notify them that they

9    shouldn't be in the courtroom and ask them to

10   leave.  If there's any question in your mind about

11   it, let the Court know and I'll make an

12   announcement from the bench.

13        MR. CRAWFORD:  Thank you, sir.

14        THE COURT:  All right.

15        (AT WHICH TIME THE SIDEBAR DISCUSSION

16   WAS CONCLUDED AND THE PROCEEDING RESUMED AS

17   FOLLOWS:)

18   BY MR. PRESTON:

19   Q.    Now, Mr. Parra --

20        MR. PRESTON:  First I would reintroduce

21   the exhibits, Your Honor, Government's

22   Exhibits 11, 11A through 11M as well as 31 and

23   31A.

24        THE COURT:  Any objection to those

25   exhibits?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

MR. RODRIGUEZ: Nothing that wasn't
previously stated, Your Honor.

THE COURT: All right. They are
received.

(EXHIBITS 11, 11A THROUGH 11M, 31, 31A
ADMITTED INTO EVIDENCE.)

BY MR. PRESTON:

Q.    Mr. Parra, these recordings and transcripts
which are introduced into evidence, those weren't
the only conversations that were recorded during
your cooperation; is that correct?

A.    That's correct.

Q.    In fact, these exhibits just deal with
conversations that you had with the defendant,
Sheldon Shorter, and don't include recorded
conversations that you had with Cleo Mitchell; is
that correct?

A.    That's correct.

Q.    Was there an occasion or two when you did
not have the recording equipment available when you
did receive a call from either Cleo Mitchell or
Sheldon Shorter?

A.    Yes.

Q.    I said an occasion or two. Approximately
how many times do you think that might have

1　happened?

2　A.　Probably more than a couple.  I mean it's --

3　you get a phone call, you're not expecting it, and

4　you got to, you know, do what you have to do to

5　turn the device on and proceed with that.  So it

6　was probably like -- probably about four or five

7　calls from Shorter himself that I missed.

8　Q.　I'd like you first to examine Government's

9　Exhibit 11A.

10　　　　　MR. PRESTON:  And at this time I would

11　move to publish 11A, Your Honor, with the aid of

12　the transcript.

13　　　　　THE COURT:  Ladies and gentlemen, as

14　you've heard, a number of exhibits referred to as

15　transcripts have been received in evidence.

16　　　　　The transcripts purport to identify the

17　speakers and the exchange contained in telephonic

18　communications.  The transcripts are in writing of

19　course.  The transcripts have been admitted for

20　the limited and the secondary purpose of assisting

21　you in following the tape recording.

22　　　　　The evidence itself is the tape

23　recording.  That is the primary evidence.  The

24　transcripts are presented to you for your use so

25　that you can follow the recording.

                    If there is a difference that you

recognize between what is on the recording and

what is on the transcript, you will be expected to

utilize what is on the recording and not on the

transcript because the recording is the primary

evidence.

                    So if the transcript deviates from the

recording, you will ignore that portion of the

transcript to that extent.

                    All right, Mr. Preston.

                    MR. PRESTON:  Thank you, Your Honor.

Government's Exhibit 11A, please.

                    (AUDIOTAPE PLAYING AS FOLLOWS, 11A.)

                    MR. PARRA:  "Hey, what up, Big Pimp?"

                    MR. SHORTER:  "Yo, what's going on,

man?"

                    MR. PARRA:  "Shit.  I apologize I didn't

answer, man.  I was in the bathroom."

                    MR. SHORTER:  "Mmm.  Oh, well, anyway,

yo, what's going on, man, 'cuz I'm hearing you're

supposed to be bringing in this and you ain't

bring nothing yet, man."

                    MR. PARRA:  "No.  I'm" --

                    MR. SHORTER:  "It's like you slowing

shit up right now.  You fucking up right now,

man."

MR. PARRA: "I know. I was telling Pimp, uh, I know it doesn't really make a difference, but I was -- I was -- I didn't call him last night because my wife got in a bad accident. Um, we just got out of the hospital like early this morning about 6:00 in the morning. Um, I" --

MR. SHORTER: "Yeah, he was telling me about that, yeah."

MR. PARRA: "Yeah, it's uh" --

MR. SHORTER: "Yeah, he was telling me about that."

MR. PARRA: "The shit I have to get together is really coming from like one -- like one dude that I've been -- I've been cool with for awhile. Um, ever since I bonded out I haven't been able to actually make physical contact with him. I've been by his -- his dad's house and I've been by his, uh, mother's little -- like a little time share that she has. Um, but I just got -- I just -- I ran into somebody that -- that -- that -- that could basically run into him a lot easier than I could just because I really -- I really don't know his whole group of people. And

1  I shot dude $50 trying to fucking to get him to

2  fucking have him call me.  You know what I'm

3  saying?  Once he calls me I'll be able to

4  straighten everything out.  You know what I'm

5  saying?"

6          MR. SHORTER:  "Yeah, but you -- I don't

7  know.  You guys need to get up and go find the

8  motherfucker, man.  That's what I'm talking about

9  instead of just waiting for him to call."

10          MR. PARRA:  "Yeah, yeah."

11          MR. SHORTER:  "If he ain't been calling"

12  --

13          MR. PARRA:  "Well, no, I've been" --

14          MR. SHORTER:  -- "then you got to get up

15  and get in touch with that nigga."

16          MR. PARRA:  "Yeah.  Don't" --

17          MR. SHORTER:  "You feel me?"

18          MR. PARRA:  "Don't" --

19          MR. SHORTER:  "You can't just wait on

20  him."

21          MR. PARRA:  "Yeah.  Don't -- I mean I

22  don't know what Pimp's told you, but don't think

23  that I haven't, dude.  I've sat -- I've sat at his

24  dad's house, which I'm guaranteeing that he's not

25  at his dad's house.  Because I've sat there

probably one, two, three, four, probably three

days in a row for like three, four hours.

"And then I've sat there, uh, 'cuz he

told me to go late at night, he told me to go

early in the morning 'cuz the -- he goes -- he --

so from last time I heard he goes to, uh,

St. Petersburg Junior College.

"So I even went in the parking lot there

and sat to see if I could see his car.  And I

haven't ran into him at all.  I'm thinking that

he's not even around here.  You know what I'm

saying?

"But I'm waiting to verify it.  I'm --

you know, I'm -- anybody that I know that might

know, you know.  'Cuz I really -- I let him do his

thing.  Like I've been knowing him for a good -- a

good amount of time.  You get what I'm saying?"

MR. SHORTER:  "Yeah, a good amount of

time, but you spoke to him.  Didn't you speak to

him (unintelligible)?"

BY MR. PRESTON:

Q.    Let me interrupt right there.  Now,

Mr. Parra, what are you and the defendant, Sheldon

Shorter, talking about right here, this person that

you're looking for?

A.     This person that I was looking for, I was
basically telling him that he basically owed me
money that he was waiting on me to deliver.
Basically waiting on my end of the responsibility
that I was responsible for going back to
approximately about $150,000 that I was
responsible for.

Q.     All right.  When you start out and you refer
to -- we use the term "what up, Big Pimp," what
does that mean?

A.     Well, we just -- like I called Cleo Mitchell
Pimp, but there was always a Big Pimp for J or for
Sheldon Shorter because that was basically the way
I identified -- that's just how we talked to each
other.  It was our basic everyday lingo.  But I
always addressed him as Big Pimp, and I addressed
Cleo Mitchell as Pimp.

Q.     And when Sheldon Shorter tells you at the
beginning of this conversation "you ain't bring
nothing yet, man" --

A.     Yeah, like I've been out on bond and I
haven't been able to produce any money.

Q.     What did you understand he was telling you
when he says, "It's like you slowing shit up right
now, you f-ing up right now, man"?

A.     Basically like I'm putting in anything
that's supposed to be coming in at a halt because
of the money that I haven't produced.

Q.     You let your patsy, your employee talk to
you like that?

A.     Well, that's definitely not my employee.
That's my boss, so he can talk to me however he
wants to talk to me.

          MR. PRESTON:  Let's continue, please.

          MR. PARRA:  "I don't know what number he
called on because I tried calling him back and it
just goes straight to voice mail.  But I -- I
spoke to him, and he was asking me like, you know,
what was going on.  And, you know, I told him.  I
said, you know, this is something that I'm going
to be able to fucking shake.  Don't even fucking
sweat it.  This ain't -- it ain't -- I ain't get
caught red handed with nothing."

          MR. SHORTER:  "Then you need to tell
that nigga that he don't need to be worried about
that."

          MR. PARRA:  "Exactly."

          MR. SHORTER:  "He just need to get your
fucking money together.  That's it.  That the only
thing.  I don't know what the fuck is.  Yo, I

1   ain't with the bullshit right now

2   (unintelligible)."

3           MR. PARRA:  "And honestly, and I'm not

4   trying to be the reason.  I'm not trying to be the

5   roadblock, and I just want you to know that.  I'm

6   not -- I'm gonna take care of this, you have my

7   word.  I -- my fucking word.  Do you feel me?

8   Like I'm -- this is gonna get taken care of.  And

9   I know that Pimp's probably like pissed, like he's

10  so mad at me that we haven't -- you know what I'm

11  saying?  I understand.  I take full

12  responsibility.  I'm -- I'm completely at fault.

13  I'm not -- I'm not denying that at all.  You get

14  what I'm saying?"

15          MR. SHORTER:  "Mmm."

16          MR. PARRA:  "So I mean there's --

17  there's certain stuff that I told him I'd be able

18  to work out with him.  You know what I'm saying?

19  But -- but this in general I know it has to be

20  taken care of.  I'm -- I'm fully aware of it.  I'm

21  not trying -- I'm not trying to blow it off, you

22  know.  I'm not -- I'm not trying to, you know, put

23  myself in that position.  You get what I'm

24  saying?"

25          MR. SHORTER:  "Mmm."

1     MR. PARRA: "Yeah, it's just -- it's --

2 and honestly I ain't gonna lie. It took -- it

3 took me like a couple -- you know, 'cuz it took me

4 a couple days to fucking to -- you know, to -- to

5 get back on the ball. You know what I'm saying?

6 But I have been -- I have been bringing him -- I

7 have been bringing him this and that. But I guess

8 from what he said it hasn't added up to shit. And

9 really, I don't have any numbers in my head like I

10 normally do. Like I don't -- I don't understand

11 any of the numbers. You get what I'm saying?"

12     MR. SHORTER: "Mmm."

13     MR. PARRA: "So I'm just taking his word

14 for it on -- on certain stuff. You know what I'm

15 saying? And I know, you know, him and I don't

16 screw each other, so I know I can take his word

17 for it."

18     MR. SHORTER: "Yeah, but you -- you --

19 you should know. You should have an idea what you

20 -- what you did from what you ain't do before."

21     MR. PARRA: "Right, right, right,

22 right."

23     MR. SHORTER: "Do you know what I'm

24 talking about?"

25     MR. PARRA: "Right, right."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1            MR. SHORTER:  "You can't just be blank

2    like that.  He should know all right, he had -- I

3    had one, I had two, I had three, whatever."

4            MR. PARRA:  "Yeah, yeah."

5            MR. SHORTER:  "You should be able to see

6    around somewhere."

7            MR. PARRA:  "Yeah."

8            MR. SHORTER:  "You know?  So yeah, but

9    anyways" --

10           MR. PARRA:  "I just don't -- I don't --

11    I understand -- you know what I'm saying?  I

12    understand you calling.  And I just don't -- I --

13    just like I told Pimp, I don't want Big Pimp -- I

14    just don't want anybody to think I'm not taking

15    this seriously.  I am taking this very seriously.

16          "I have never let anybody down.  My

17    track record is beautiful.  You get what I'm

18    saying?  Like, yeah, I had a fuck up -- I had a

19    fuck up before.  And then I had a written fuck up

20    another time.  But I've always -- I always stand

21    behind my -- like I'm not ever going to back down

22    from what I've -- what I'm responsible for."

23           MR. SHORTER:  "Yeah, well, fuck all

24    that.  But just -- just -- just hurry up and

25    tighten up, though, all right?"

        MR. PARRA:  "All right, Pimp."

        MR. SHORTER:  "All right."

        MR. PARRA:  "All right."

BY MR. PRESTON:

Q.    What did you understand the defendant

Shorter to be telling you when he says at the end,

"Just hurry up and tighten up, though, all right?"

A.    Basically just hurry up and meet my

financial obligations of what I owed.

Q.    Right before that you indicated that you are

taking this very seriously.  What were you saying

there?

A.    If I wasn't taking it seriously then I might

be looked at like I'm playing with -- with his

money.  You know what I mean?  Which in turn would

be bad for me.

Q.    When you indicate, "I have been bringing him

this and that," who are you talking about?

A.    Well, I brought Cleo Mitchell some money

that I had collected from people that owed me

money in smaller amounts.  I had brought that to

Cleo Mitchell and Cleo Mitchell had it in his

possession, but they were just waiting on

basically the rest of it to come together.

Q.    What constituted the biggest portion of your

1    outstanding debt?

2    A.    The 80 pounds that was forfeited.

3    Q.    And there's another statement where you tell

4    the defendant Shorter that, "I take full

5    responsibility.  I'm -- I'm completely at fault.

6    I'm not denying that at all.  You get what I'm

7    saying?"

8          What were you saying there as far as full

9    responsibility?

10   A.    Basically taking full responsibility on

11   behalf of the money that I owed to -- you know,

12   basically the money that I owed, I was basically

13   taking responsibility for that.  I wasn't trying

14   to put it off on Cleo.  You know what I mean?

15   Because we had had some dealings before where, you

16   know, things got mixed around and we didn't know

17   who was responsible for it.

18   Q.    As you were paying this money back, were you

19   tasked with receiving another shipment of

20   marijuana?

21   A.    Basically that was the concept.  I mean, get

22   the money -- get the money that's owed and we can

23   get the ball rolling.

24   Q.    While you were cooperating, were you trusted

25   enough to get additional marijuana at the 118th

1    Avenue warehouse?

2    A.    Oh, yeah.  I mean there wouldn't be any

3    reason not to trust me.

4    Q.    Did you participate in the receipt of

5    another load of marijuana during the course of your

6    cooperation?

7    A.    Yes, I did.

8    Q.    What was the communications plan in regard

9    to that particular load?

10   A.    The communication plan was basically I had

11   another phone that was a burnout phone that was

12   going to be put at the apartment by Cleo Mitchell.

13   And I was to come and get the phone and have it

14   with me ready to answer it, you know, from the day

15   they put it there, you know, for the next day or

16   so.  And when that phone rang, I was to give the

17   driver on the other end of the phone directions to

18   the receiving warehouse.

19   Q.    Who told you to pick the phone up at that

20   apartment?

21   A.    Cleo Mitchell basically was handed the order

22   to tell me to pick the phone up and that it was

23   very important that I kept it with me.

24   Q.    How do you know Cleo Mitchell was given that

25   order by somebody else?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    A.      I mean, there's a chain of command.  There's
 2    always somewhat of a chain of command.
 3            MR. RODRIGUEZ:  Objection, Your Honor.
 4    Calls for speculation.
 5            THE COURT:  That objection is overruled.
 6    BY MR. PRESTON:
 7    Q.      What was the chain of command in your -- in
 8    this organization?
 9    A.      Sheldon Shorter being at the top.  Cleo
10    Mitchell being above me.  And then me being
11    basically like the do boy to bring everything in.
12    Q.      Did you pick up the phone at the Rocky Point
13    Apartments?
14    A.      Yes, I did.
15    Q.      And through that phone did you eventually
16    have contact with the person that you believed to
17    be the driver of the load?
18    A.      Yes, I did.
19    Q.      Did you provide directions in the course of
20    that communication process?
21    A.      Yes.
22    Q.      And were your conversations with the person
23    that you believed to be the driver recorded?
24    A.      Yes, they were.
25    Q.      Were they also transcribed?
```

A.      Yes.

Q.      Did you review and confirm the accuracy of the recordings and the transcripts as we've discussed in regard to the earlier tapes?

A.      Yes.

Q.      I hand you what's been marked for identification purposes as Government's Exhibit 12 as well as transcripts identified as Government's Exhibits 12A through 12E.

        Have you seen these exhibits and are these the exhibits that you just testified to in regard to your review for accuracy?

A.      Yes.

        MR. PRESTON:  I would move into evidence at this time Government Exhibit 12 and 12A through 12E, Your Honor.

        THE COURT:  Did you say through 12E?

        MR. PRESTON:  12A through 12E inclusive.

        MR. CHELALA:  Without objection, Your Honor.

        THE COURT:  They are received.

        (EXHIBITS 12A THROUGH 12E ADMITTED INTO EVIDENCE.)

BY MR. PRESTON:

Q.      Now, first in regard to the transcripts

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   there's only one voice that you specifically

2   recognize; correct?

3   A.    Yes.

4   Q.    And the designation of the person that you

5   were speaking to as Hardaway Volcy, you did not

6   provide that information because you had never met

7   that individual; correct?

8   A.    Right.

9   Q.    That came through -- that was just as

10   transcribed through other sources; correct?

11   A.    Correct.

12   Q.    So as you reviewed these you were merely

13   listening to conversations that you had between

14   yourself and who you believed to be the driver or

15   someone in the truck; correct?

16   A.    Yes.

17         THE COURT:  I call your attention,

18   ladies and gentlemen, to the same instructions

19   that I gave you early with regard to the

20   consideration of the tapes and the transcripts.

21   That the tapes are the primary evidence;

22   transcripts are secondary.

23         You may proceed, Mr. Preston.

24         MR. PRESTON:  Thank you, Your Honor.  I

25   would start by moving to publish Government's

Exhibit 12A.

THE COURT:  You may do so.

(AUDIOTAPE PLAYING AS FOLLOWS, 12A.)

MR. VOLCY:  "Hello."

MR. PARRA:  "Yo."

MR. VOLCY:  "Hey (unintelligible)."

MR. PARRA:  "What up, Big Pimp?  Hey, uh, how -- how far away are you?"

MR. VOLCY:  "Uh, not too far, man."

MR. PARRA:  "All right.  Uh, what, like about" --

MR. VOLCY:  "I'm about -- I'm about to get on 275."

MR. PARRA:  "Okay.  You're about to get on 275?"

MR. VOLCY:  "Yeah (unintelligible)."

MR. PARRA:  "All right.  What, about an hour?"

MR. VOLCY:  "No, no (unintelligible) 275 probably like five miles from here."

MR. PARRA:  "Oh, okay.  Okay.  All right."

MR. VOLCY:  "(Unintelligible) hello?"

MR. PARRA:  "Yeah, yeah, yeah, yeah."

1          MR. VOLCY:  "Okay."

2          MR. PARRA:  "Well, I'm going to start

3     heading over there right now."

4          MR. VOLCY:  "Huh?"

5          MR. PARRA:  "I'm going to start heading

6     over there right now.  Call me if you need

7     directions, but you -- you should be all right."

8          MR. VOLCY:  "I need directions.  I don't

9     know where I'm going."

10         MR. PARRA:  "Okay.  Call -- when you get

11    on that bridge, call me when you get on that

12    bridge."

13         MR. VOLCY:  "When I get on that bridge,

14    cal you?"

15         MR. PARRA:  "Yeah.  275, take that all

16    the way.  When you get on the long bridge, call

17    me.  I'll give you directions."

18         MR. VOLCY:  "What -- what -- what bridge

19    is that?"

20         MR. PARRA:  "Okay.  2 -- okay.  When you

21    get on 275 -- when you get on 275 heading south,

22    it's the Howard Franklin Bridge."

23         MR. VOLCY:  "Oh, okay."

24         MR. PARRA:  "All right.  But you said

25    you're just getting onto 275.  Like in about five,

ten minutes."

          MR. VOLCY:  "Okay."

          MR. PARRA:  "Okay."

          MR. VOLCY:  "All right."

          MR. PARRA:  "All right."

BY MR. PRESTON:

Q.     Mr. Parra, this conversation starts out with

Mr. Volcy or the driver answering the phone; is

that correct?

A.     Yeah.

Q.     And how was it that you were able to call

him?

A.     I believe it was on that burnout phone that

was left behind.  I believe the number was on the

phone.

Q.     How were you instructed to make that call at

that time?

A.     Basically I was told that this is the number

to contact.  Basically this was going to be the

person I gave directions to for receiving the

marijuana.

          MR. CRAWFORD:  If I could object and

have the individual identified as to who's telling

him this.

          MR. PRESTON:  I'll ask that question,

1    Your Honor.

2              THE COURT:  Please do.

3    BY MR. PRESTON:

4    Q.    Who was it that told you to make this call?

5    A.    My order came from Cleo Mitchell.

6    Q.    And when you and Mr. Volcy discussed

7    directions, directions to where?

8    A.    Directions to the receiving warehouse at

9    118th Avenue, Largo, Florida.  Same warehouse I

10   had received at before.

11             MR. PRESTON:  I'd like to publish

12   Government's Exhibit 12B at this time.

13             THE COURT:  You may.

14             (AUDIOTAPE PLAYING AS FOLLOWS, 12B.)

15             MR. VOLCY:  "Yo."

16             MR. PARRA:  "Hey, what up?  What up?"

17             MR. VOLCY:  "I'm like by downtown

18   (unintelligible)."

19             MR. PARRA:  Okay.  You're by downtown.

20   All you do is just keep -- all you do is keep

21   going straight.  And, uh, when you keep going

22   straight, it's going -- it's going to keep -- it's

23   going to put you directly onto a bridge.  It's

24   called the Howard Franklin Bridge."

25             MR. VOLCY:  "All right."

1            MR. PARRA:  "Keep going straight.  And

2    when you get on the bridge, call me back when you

3    get -- like when you're coming off the bridge and

4    I'll give you directions."

5            MR. VOLCY:  "Okay."

6            MR. PARRA:  "All right."

7    BY MR. PRESTON:

1    Q.    What downtown did you understand him to be

2    talking about?

3    A.    Downtown Tampa.

4    Q.    Were you given --

5              MR. PRESTON:  I'd like to publish at

6    this time Government's Exhibit 12C, Your Honor.

7              THE COURT:  You may.

8              (AUDIOTAPE PLAYING AS FOLLOWS, 12C.)

9              MR. PARRA:  "Yo.  Where you at now?"

10             MR. VOLCY:  "I'm on the bridge."

11             MR. PARRA:  "On the bridge?"

12             MR. VOLCY:  "Yeah."

13             MR. PARRA:  "All right.  Uh, when you --

14   when you come over the bridge, not the first exit.

15   It's 4th Street.  The second exit you come to is

16   Ulmerton Largo.  You get off Ulmerton Largo.  And

17   come all the way down Ulmerton to Belcher.

18   There'll be a 7-Eleven and an IHOP.  You make a

19   left."

20             MR. VOLCY:  "Okay.  You say get off on

21   the second exit?"

22             MR. PARRA:  "The second exit is Ulmerton

23   and Largo Road.  You -- you -- when you get off

24   the exit, you stay to your right."

25             MR. VOLCY:  "Okay (unintelligible) stay

1  right and then go west?"

2           MR. PARRA:  "Yeah.  And -- okay.  When

3  you get -- when you stay to your right and you

4  come on Ulmerton, take Ulmerton Road all the way

5  down for about 15 minutes, 20 minutes because

6  you're going to be in traffic.  You take it for

7  about 20 minutes down the road to a road called

8  Belcher Road."

9           MR. VOLCY:  "Belcher?"

10          MR. PARRA:  "Belcher."

11          MR. VOLCY:  "Belcher?"

12          MR. PARRA:  "Yeah.  At Belcher there'll

13  be a 7-Eleven on your left and an IHOP Restaurant

14  on your left.  You make a left on Belcher."

15          MR. VOLCY:  "Belcher.  Okay."

16          MR. PARRA:  "All right?"

17          MR. VOLCY:  "All right."

18          MR. PARRA:  "All right."

19  BY MR. PRESTON:

20  Q.     Anywhere in these directions are you

21  referring Mr. Volcy to a strip club at 19 and

22  Ulmerton?

23  A.     Yeah.  I mean 19 and Ulmerton you pass a

24  strip club on the right-hand side which is called

25  Oz.  There's another strip club called Baby Dolls.

1    But the directions were to basically pass that and

2    come straight down Ulmerton to Belcher Road and

3    make a left.

4    Q.      Which were the directions to where?

5    A.      The receiving warehouse.

6            MR. PRESTON:  I'd like to publish

7    Government's Exhibit 12D at this time.

8            THE COURT:  You may.

9            (AUDIOTAPE PLAYING AS FOLLOWS, 12D.)

10           MR. PARRA:  "All right.  What -- you see

11   Largo Ulmerton?"

12           MR. VOLCY:  "(Unintelligible I'm -- I'm

13   coming down now."

14           MR. PARRA:  "Okay.  That's fine."

15           MR. VOLCY:  "Uh, yeah, you say -- what

16   did you say the road is again?  Belch -- Belch --

17   Belcher?"

18           MR. PARRA:  "No.  Listen.  Ulmerton Road

19   in Largo.  It's the second exit."

20           MR. VOLCY:  "No.  I already get off that

21   exit, yeah."

22           MR. PARRA:  "All right.  So all you do

23   is come down for about 20 minutes.  You're going

24   to pass through, uh, construction.  You're going

25   to pass through, uh, uh -- like you're going to

pass through two construction zones.  You keep

going down for about 20 minutes.  It's -- you come

down and you get -- uh, you get on -- uh, you get

on Belcher Road."

            MR. VOLCY:  "Belcher Road and what?  You

make a left then?"

            MR. PARRA:  "Yeah, you make a left.

There'll be a 7-Eleven, uh, and an IHOP Restaurant

on the corner.  And there will also be like a CVS

or Walgreen's on your right."

            MR. VOLCY:  "All right (unintelligible)

what to do."

            MR. PARRA:  "Huh?"

            MR. VOLCY:  "(Unintelligible) what to

do.

            MR. PARRA:  "All right.  When you make

that left, you come down to 118th, which is the

next major intersection, and you make a right and

then call.  And come down that street, and I'm on

the left-hand side.  Call me.  You'll see me."

            MR. VOLCY:  "Okay."

            MR. PARRA:  "All right."

            MR. PRESTON:  At this time I'd publish

Government's Exhibit 12E, Your Honor.

            THE COURT:  I'm getting ready to take

1    our noon recess.  Is this a good time to do that?

2         MR. PRESTON:  Probably after this

3    recording.  It's very short.

4         THE COURT:  Complete this recording, and

5    then we'll recess.

6         MR. PRESTON:  Yes, sir.

7         THE COURT:  All right.  Proceed.

8         (AUDIOTAPE PLAYING AS FOLLOWS, 12E.)

9         MR. VOLCY:  "Yo.  I got pulled over by

10   police."

11        MR. PARRA:  "Huh?"

12        MR. VOLCY:  "I got pulled over, man."

13        MR. PARRA:  "You what?  I can't hear

14   you.  Hello.  Hello.  Hello."

15        THE COURT:  All right.  We'll take our

16   noon recess at this time, ladies and gentlemen.

17   We'll reconvene at 1:30.

18        Do not discuss the case.  Do not make up

19   your minds about any of the issues yet.

20        You may take the jury.

21        COURT SECURITY OFFICER:  Please rise for

22   the jury.

23      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

24        THE COURT:  You may come down,

25   Mr. Parra.  We're in recess until 1:30.

1          MR. RODRIGUEZ:  Judge, could we have an

2     instruction to the witness since he's on the

3     stand.

4          THE COURT:  Yes.  Mr. Parra --

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- do not discuss your

7     testimony, that which you have given or that which

8     you are about to give with any persons until we

9     reconvene.

10          THE WITNESS:  Yes, sir.

11          (THEREUPON, THE LUNCHEON RECESS WAS

12     TAKEN, AND THEN THE PROCEEDINGS CONTINUED AS

13     FOLLOWS:)

14          COURT SECURITY OFFICER:  All rise.

15       (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

16          COURT SECURITY OFFICER:  All rise.  This

17     Honorable Court is again in session.

18          Please be seated.

19          THE COURT:  Good afternoon, ladies and

20     gentlemen.

21          MEMBERS OF THE JURY:  Good afternoon.

22          THE COURT:  Mr. Preston.

23     BY MR. PRESTON:

24     Q.   Mr. Parra, following those conversations

25     that we just listened to, were you advised by

agents that the truck had in fact been stopped?

A.     Yes, I did.

Q.     And during the course of your communications with the trucker during this particular episode, did you also have communication with Sheldon Shorter?

A.     Yeah.

Q.     Was that recorded?

A.     I believe it was.

Q.     Do you still have in front of you Government's Exhibits 31 and 31A?

A.     Yes.

Q.     Is that a transcript of that recording?

A.     Yes.

          MR. PRESTON:  The government would move to publish 31 through 31A, Your Honor.

          THE COURT:  You may do so.

          (AUDIOTAPE PLAYING AS FOLLOW, 31A.)

          MR. PARRA:  "Yo."

          MR. SHORTER:  "Yo."

          MR. PARRA:  "What up?  I just got off the phone with Pimp, and he said -- he is telling me it will be another 30 minutes he said."

          MR. SHORTER:  "Yeah, ''cuz them -- them motherfuckers be lying talking about they right

1   there when they ain't right there.  You know what

2   I'm talking about?"

3           MR. PARRA:  "Yeah.  Yeah."

4           MR. SHORTER:  "These ain't -- these

5   ain't them other two."

6           MR. PARRA:  "But I'm -- I'm good to go.

7   I'm fucking -- I'm ready to rock and roll.  So I'm

8   -- I'm -- I'm just going to go to the store and

9   get some water and a Gatorade and I'm going to

10  come right back."

11          MR. SHORTER:  "But -- but when they

12  called you, how far they said they was from you?"

13          MR. PARRA:  "Okay.  When they called me

14  the first time, they said 275.  The second time

15  they said they was -- they was passing -- they was

16  passing downtown.

17          "So I don't -- you know what I'm saying?

18  I don't know where the fuck they're at.  I don't

19  know if they just were saying that and whether

20  they're on 75 or what."

21          MR. SHORTER:  "Yeah."

22          MR. PARRA:  "So I don't know just

23  fucking -- I don't know.  I know I'm on time and I

24  wasn't -- you know what I'm saying?  I'm good to

25  go.  I got everything warmed up."

1           MR. SHORTER: "All right."

2           MR. PARRA: "But it's -- it's quiet as

3 fuck over here. But" --

4           MR. SHORTER: "All right."

5           MR. PARRA: "Yeah. I'm -- I'm getting

6 something to drink and I'm coming right back."

7           MR. SHORTER: "All right."

8           MR. PARRA: "All right."

9 BY MR. PRESTON:

10 Q.    Mr. Parra, when you told Sheldon Shorter, "I

11 just got off the phone with Pimp," who were you

12 referring to?

13 A.    I was referring to Cleo Mitchell.

14 Q.    Were you in contact with him as well as this

15 truck was supposed to be arriving?

16 A.    I was in contact with both of them

17 constantly.

18 Q.    And when Sheldon Shorter told you, "These

19 ain't -- these ain't them other two," what did you

20 understand him to mean?

21 A.    It wasn't the other two drivers that I was

22 used to dealing with.

23 Q.    Even after the seizure were you still being

24 pursued by the defendant Shorter for the money owed

25 for the 80 pounds that you turned over to DEA?

A.    Yeah.

Q.    Did you provide the defendant Shorter with any car as a payment or part payment of that $80,000 or approximately $80,000 that was owed?

A.    Yeah.  It was a 2007 Dodge Charger, a Daytona edition.

Q.    How was it that you came to turn over a vehicle as part payment?

A.    Whoever's idea it was, it was told to me by Cleo Mitchell that that was what I had to do in order for everything to continue to be straight because basically I didn't have anything that was immediately paid off that belonged to me.

That was a vehicle that belonged to me that was paid off.  That was one of the few things I could hand over as basically showing that look, I'm -- I'm -- I'm not holding back.  Take this and whatever that's worth, knock that off of what I owe you, and I'll get the rest of the money to you shortly.

Q.    Do you recognize the vehicle shown in Government's Exhibit No. 9?

A.    Yes.  That was my car.

Q.    Does that fairly and accurately show the Charger that you just testified about?

A.      Yes.

Q.      Where was that photograph taken?

A.      This was at my warehouse facility that was
the No. 2 warehouse where sometimes I kept the
marijuana.

Q.      Did you earlier refer to that as 1299
Starkey Road?

A.      Yes, I did.

Q.      How many vehicles did you keep at that
location?

A.      The warehouse was full.  So I had eight bays
minus two for the office, so you figure I'd keep
anywhere from five to eight vehicles there at a
time.  But it would be no less than like five
vehicles.

Q.      How many of those did you own?

A.      The Dodge Ram truck was mine and the Dodge
Charger was mine.  The rest of them belonged to
Cleo Mitchell.  So it was basically him and I's
storage shop.

Q.      Do you recognize a copy of the document
which is Government's Exhibit No. 18?

A.      Yeah.  This is a -- the title to my Daytona
Charger which I had in someone else's name being
that it was paid off.

1    Q.    Why did you put it in someone else's name?

2    A.    I mean I'm doing illegal activity, and I

3    don't have any proof of income.  I can't be

4    putting paid -- cars that are completely paid off

5    in my name.

6    Q.    Does that title refer to the vehicle that's

7    shown in Government's Exhibit No. 9?

8    A.    Yes.

9         MR. PRESTON:  I move Government's

10   Exhibit 9 and 18 into evidence, Your Honor.

11        MR. CRAWFORD:  No objection.

12        THE COURT:  They are received.

13        (EXHIBITS 9 AND 18 ADMITTED INTO

14   EVIDENCE.)

15        MR. PRESTON:  May I publish No. 9,

16   please?

17        THE COURT:  You may.

18   BY MR. PRESTON:

19   Q.    And how was it arranged that this vehicle

20   would be delivered to the defendant Shorter?

21   A.    Someone was basically going to come up and

22   drive it back.  And it ended up having some kind

23   of difficulty starting, and I think we ended up

24   having to tow it down south to Fort Lauderdale.

25   And it went straight to a Dodge dealership down

1     there.  They fixed the problem.

2     Q.    Did you maintain and turn over to DEA a copy

3     of the tow receipt for that vehicle?

4     A.    Yes, I did.

5     Q.    Do you recognize the document which is in

6     Government's Exhibit No. 19 for identification?

7     A.    Yes, I do identify it.  This is the receipt

8     for the tow bill from -- basically from Starkey

9     Road, which was my warehouse, to Maroon Dodge down

10    in Pembroke Pines.

11          MR. PRESTON:  Government would move

12    Government's Exhibit 19 into evidence, Your Honor.

13          MR. CRAWFORD:  No objection.

14          THE COURT:  It is received.

15          (EXHIBIT 19 ADMITTED INTO EVIDENCE.)

16    BY MR. PRESTON:

17    Q.    What is the date on that tow transaction?

18    A.    The date on this receipt is 5/15 of '08.

19    Q.    After the delivery of that vehicle do you

20    recall having a conversation with the defendant

21    Shorter concerning the audio system in that

22    vehicle?

23    A.    Yes.

24          MR. PRESTON:  May I approach?

25    BY MR. PRESTON:

1    Q.    Would you please take a look at Government's

2    Exhibit 11N as in Nancy.  Do you recognize that

3    transcript?

4    A.    Yes, I do.

5    Q.    Did you review it in conjunction with the

6    recording of a particular conversation?

7    A.    Yes.

8    Q.    Did you find this transcript to be

9    substantially accurate?

10    A.    Yes.

11    Q.    And that recording is also found on

12    Government's Exhibit No. 11; is that correct?

13    A.    Yes.

14           MR. PRESTON:  I would move No. 11N into

15    evidence and move to publish, Your Honor.

16           MR. CRAWFORD:  No objection.

17           THE COURT:  It is received and you may

18    publish.

19           (EXHIBIT 11N ADMITTED INTO EVIDENCE.)

20           (AUDIOTAPE PLAYING AS FOLLOWS, 11N.)

21           MR. PARRA:  "Yo."

22           MR. SHORTER:  "Yo."

23           MR. PARRA:  "What up?  What up?"

24           MR. SHORTER:  "Yo.  Um, um, this -- this

25    -- this -- this system, right?"

1          MR. PARRA:  "Yeah.  It's all JL Audio.

2    JL Audio amps, JL Audio 10s.  They're W6s.

3    They're very good speakers."

4          MR. SHORTER:  "Oh, um, um, um, um how

5    much for the system?"

6          MR. PARRA:  "Um, I could probably get a

7    receipt.  The system was probably close to like

8    six grand."

9          MR. SHORTER:  "(Unintelligible.)"

10          MR. PARRA:  "I mean, yeah, the only

11    reason they gave me a good deal on this cause

12    they've -- I've known the people.  It's a shop

13    called Boulevard Customs.

14          MR. SHORTER:  "Oh, okay."

15          MR. PARRA:  "And they've known --

16    they've -- they've -- they've known me for like

17    ten years, so they hooked me up.  You know what

18    I'm saying?  But normally with all the shit that

19    they did" --

20          MR. SHORTER:  "Yeah."

21          MR. PARRA:  -- "why that shit sounds

22    clear.  It don't sound hood.  Do you feel me?"

23          MR. SHORTER:  "Yeah, yeah, yeah."

24          MR. PARRA:  "Nothing rattles.  It's just

25    real clean.  And it's all, uh, JL components, mids

1  and highs."

2          MR. SHORTER:  "Yeah.  No, cause I'm just

3  looking at it just now.  Like this is my first

4  time really looking at the car just now."

5          MR. PARRA:  "You turn it up?"

6          MR. SHORTER:  "No.  I'm fixing to go

7  fuck around with it."

8          MR. PARRA:  "Get -- get -- get -- yeah,

9  get inside the car and turn it up.  Now, the radio

10  has something called a memory in it.  It memorizes

11  your CDs.  So if you put a CD in there and you

12  like it, give it about five minutes.  You won't --

13  like it -- it'll -- it basically downloads your

14  music."

15          MR. SHORTER:  "Oh, okay."

16          MR. PARRA:  "After it downloads, it'll

17  keep a memory of it.  So all you have to do to go,

18  you go to a library and it shows you -- you don't

19  ever have to put that CD back in again."

20          MR. SHORTER:  "Okay.  Okay.  I'm gonna

21  check it out.  I'm gonna check it out."

22          MR. PARRA:  "And turn it up.  It should

23  be able to go loud -- it should be able to go

24  clear till about 26, 27."

25  BY MR. PRESTON:

1    Q.    Are you referring to the audio system

2    contained in the Charger during that conversation?

3    A.    Yeah, that's what we were talking about.

4    Q.    Did you participate in a plan to deliver a

5    fake payment of money to the defendant Shorter?

6    A.    Yes.

7    Q.    Who was eventually provided with that fake

8    payment or payment of sham money?

9    A.    Cleo Mitchell.

10   Q.    How did Cleo Mitchell end up being the

11   person picking up that payment?

12   A.    Most likely because he was in the immediate

13   area.  And basically it was -- it was basically he

14   was given instructions to do so.

15   Q.    Who were you talking to just prior to

16   meeting with Cleo Mitchell in regard to that

17   payment?

18   A.    I was on the phone with Shorter.

19   Q.    Were there calls over the days between

20   June 5th and June 12th discussing and leading up to

21   that payment?

22   A.    Yes.

23   Q.    Between yourself and defendant Shorter?

24   A.    Yes.

25   Q.    And those calls are also part of

1 Government's Exhibit No. 11; correct?

2 A.    Yes.  Going back to the car issue?

3 Q.    I'm sorry.  Going back to Government's

4 Exhibit 11B that you have -- do you still have that

5 in front of you, the transcript?

6 A.    Yes, I do.

7 Q.    Between June 5th and June 12th, Government's

8 Exhibits 11B through 11M are conversations between

9 yourself and defendant Shorter leading up to the

10 delivery of the sham money to Cleo Mitchell;

11 correct?

12 A.    Correct.

13         MR. PRESTON:  I move to publish

14 Government's Exhibit 11B at this time, Your Honor.

15         MR. CRAWFORD:  No objection.

16         THE COURT:  You may.

17         (AUDIOTAPE PLAYING, 11B.)

18         MR. PARRA:  "Hello."

19         MR. SHORTER:  "Yo."

20         MR. PARRA:  "Hey, what up?  What up?

21 Hey, uh, I got -- I got -- I got good news and I

22 got bad news.  Uh, bad news is the bike is --

23 hasn't went through yet.  They're not -- they're

24 saying it is -- is -- is gonna go through, but it

25 hasn't went through yet money wise.  Remember, uh,

1   I -- I don't think I got into, uh, an in-depth

2   conversation.  It doesn't really matter.  But out

3   of whatever I owe you, I'm going have 70 for you

4   tomorrow morning, so" --

5   BY MR. PRESTON:

6   Q.    70 what?

7   A.    $70,000.

8           MR. PRESTON:  Continue, please.

9           (AUDIOTAPE CONTINUES.)

10          MR. SHORTER:  "Tomorrow morning?"

11          MR. PARRA:  "Yeah, so that's gonna be

12  able to fucking -- that's gonna be able to fucking

13  put me in a lot better position.  You feel me?"

14          MR. SHORTER:  "Definitely.  Definitely."

15          MR. PARRA:  "So and I'm gonna fucking --

16  I'm gonna -- I'm gonna prove to you that I'm not,

17  you know, a pussy boy.  You know what I'm saying?

18  Like I'm not -- I'm not letting my credibility go

19  to shit.  You feel me?"

20          MR. SHORTER:  "All right.  So definitely

21  tomorrow morning?"

22          MR. PARRA:  "Yes.  That's why I was

23  going to tell you if you -- if you had someone up

24  here already, tell them to stay -- stay the

25  night."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. SHORTER:  "I'm -- I'm -- all right.

2    I'm gonna have somebody -- now I'm gonna have

3    somebody hop on a flight."

4          MR. PARRA:  All right.  Perfect.  But"

5    --

6          MR. SHORTER:  "You remember my little

7    nigga?"

8          MR. PARRA:  "Yeah, yeah, yeah.  Um" --

9          MR. SHORTER:  "Yeah."

10         MR. PARRA:  "All right.  So tomorrow if

11   you call me -- un, what time is it going to be?

12   If you -- any time -- any time -- any time I'll --

13   I'll be ready definitely by 11 o'clock.

14         MR. SHORTER:  "All right."

15         MR. PARRA:  "But just any time -- if he

16   wants to call me earlier just to check on it, no

17   problem.  But I'll -- I'll explain to him the

18   situation when I see him in person."

19         MR. SHORTER:  "All right."

20         MR. PARRA:  "But I'm -- I'm gonna be --

21   I'm getting -- I'm gonna have my shit back

22   together on track because I'm tired of fucking

23   looking like -- like -- like I'm not worth shit.

24   You feel me?"

25         MR. SHORTER:  "That's what I'm saying,

1    man.  Yeah, fuck."

2            MR. PARRA:  "Yeah.  Yeah, I apologize

3    100 percent.  But also will you take in

4    consideration, will you think about it and let me

5    know sometime tomorrow on -- on -- on how much

6    more I owe?  Because I'm not -- I don't want to

7    get into it now, but just take that and then

8    consider my Charger."

9            MR. SHORTER:  "Yeah, yeah, yeah, yeah.

10   All right."

11           MR. PARRA:  "But 'cuz I should" --

12           MR. SHORTER:  "All right."

13           MR. PARRA:  "I should -- I should be in

14   good standings.  You know what I'm saying?"

15           MR. SHORTER:  "Yeah."

16           MR. PARRA:  "All right.  But, uh, just

17   -- that's all -- that's basically the good news I

18   wanted to tell you.  And then -- and then I'll

19   probably still have the bike like in about a week,

20   maybe two weeks.  You know what I'm saying?"

21           MR. SHORTER:  "All right.  So" --

22           MR. PARRA:  "So" --

23           MR. SHORTER:  "All right.  So I'm gonna

24   hook up with you in the morning."

25           MR. PARRA:  "All right.  Bet."

1          MR. SHORTER:  "Yeah."

2          MR. PARRA:  "All right.  Respect."

BY MR. PRESTON:

Q.    Why were you apologizing a hundred percent to the defendant, Sheldon Shorter?

A.    Because I mean in my -- in the way I look at things basically if I don't come -- if I hadn't been able to come up with the money some way or another, basically I'd probably have some sort of threat or some sort of consequence for -- for not providing -- providing the money.

Q.    And when you asked him "to let me know tomorrow how much more I owe," what money are you talking about?

A.    I mean supposedly from the conversations that I had back and forth with him, he was making it very clear to me that I owed him a hundred thousand.  And --

Q.    When you say, "Just take that and consider my Charger," what were you telling him?

A.    I was basically trying to just clear up my hundred thousand dollar debt.  I was trying to basically provide the $70,000.  And I didn't see any reason why the Charger wouldn't be considered as 30 grand.  I paid more for that just stock, and I had probably invested like 15, 20 grand into it.

Q.    Did you in fact have $70,000 to deliver to

1    Sheldon Shorter at that time or at the time of this

2    conversation?

3    A.    No.

4    Q.    Did you continue to discuss with him this

5    debt in further conversations?

6    A.    Yes.

7              MR. PRESTON:  I'd like to publish

8    Government's Exhibit 11C at this time, Your Honor.

9              THE COURT:  You may.

10             MR. PRESTON:  Technical difficulty on

11   that one, Your Honor.  We'd like to next move to

12   11D.

13             (AUDIOTAPE PLAYING, 11D.)

14             MR. PARRA:  "Hello."

15             MR. SHORTER:  "Yo."

16             MR. PARRA:  "Hey, what up, Pimp?"

17             MR. SHORTER:  "Yo, what up?"

18             MR. PARRA:  "Shit, fucking, sitting

19   here, um, saying he got held up 'cuz of a little

20   bit of traffic.  So I'm gonna be -- uh, probably

21   head out there to meet him as long as -- as long

22   as nothing else gets held up.  Uh, you know what I

23   meant to tell you too?  I fucking watched the news

24   I think the other day.  And all of 75 South and

25   North is fucked up 'cuz of, uh, an oil explosion

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    or something to do with a truck hitting something

2    in the highway."

3              MR. SHORTER:  "Yeah."

4              MR. PARRA:  "So the traffic is fucking

5    crazy on fucking -- on the high -- on that."

6              MR. SHORTER:  "All of 75?"

7              MR. PARRA:  "Yeah.  It's fucking -- all

8    you gotta do is -- all you gotta do is turn

9    whatever the local news on and, uh, go to their

10   events or whatever.  The whole highway's fucked

11   up.  Not the whole thing, but a -- a part of it

12   like in the middle."

13             MR. SHORTER:  "Yeah, that ain't nothing.

14             MR. PARRA:  "Yeah."

15             MR. SHORTER:  "That -- that -- he's

16   flying anyways, so that ain't (unintelligible)."

17             MR. PARRA:  "Yeah, we're fine.  But if

18   you want you can just have him call me when he

19   touches down and I'll link up with him.  I'll just

20   fucking -- I should -- I should already have the

21   infor -- I should already be fucking having

22   everything set up to go pick it up.  It's up to

23   you."

24             MR. SHORTER:  "He -- he want to be in

25   and out.  He don't wanna be there."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. PARRA:  "Oh, yeah."

2          MR. SHORTER:  "You know what I'm talking

3    about?"

4          MR. PARRA:  "Yeah, I know.  I feel you."

5          MR. SHORTER:  "He wanna be in and out."

6          MR. PARRA:  "I feel you.  Um -- um" --

7          MR. SHORTER:  "It's way past" --

8          MR. PARRA:  "Plus" --

9          MR. SHORTER:  -- "two hours."

10         MR. PARRA:  "Yeah, I know.  Plus I don't

11   wanna be -- I don't wanna be fucking -- with the

12   way my luck's been, I don't wanna be fucking

13   sitting on money for too long anyways."

14         MR. SHORTER:  "Right, yeah, yeah, yeah,

15   yeah."

16         MR. PARRA:  "Um" --

17         MR. SHORTER:  "All right.  So I'm gonna

18   call you back in what?  In about what?"

19         MR. PARRA:  "Phew, 4 o'clock.  What time

20   was it I spoke to you at?  12:00?  Um, fuck.  I"

21   --

22         MR. SHORTER:  "Like an hour?"

23         MR. PARRA:  "Yeah, that's fine."

24         MR. SHORTER:  "All right."

25         MR. PARRA:  "All right."

BY MR. PRESTON:

Q.    Why were you telling the defendant, Sheldon Shorter, that there were problems on the highway?

A.    I mean there wasn't any problems on the highway.  Basically he had the impression that the money was being brought to me by someone who owed me quite a bit of money.  And that they were basically on their way to bring me the money, but basically there was no one bringing me the money.

Q.    When you tell him that there's these problems with the explosion on the highway and he indicates to you "that ain't nothing, he's flying anyways," do you know who he was talking about at that time?

A.    Prior to that when he was talking about his Little Homey, I knew who he was talking about.  But, you know, I was always under the assumption that he was coming, kind of kept me from fucking up -- excuse my language.

        MR. PRESTON:  At this time the government would publish Government's Exhibit 11E.

        THE COURT:  You may.

        (AUDIOTAPE PLAYING, 11E.)

        MR. PARRA:  "Hey, what up?  Na, I'm just getting off the phone with him.  He's fucking -- I

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

don't blame him 'cuz he's fucking up.  He's
nervous -- he don't -- he's nervous about meeting
somebody 'cuz he's been holding onto my money for
that.  Well, not my money, but he's been holding
onto the money for so long."

        MR. SHORTER:  "Yeah.  Well, tell him
it's a fucking girl he's gonna meet, man.  He's
gonna meet her outside the fucking mall."

        MR. PARRA:  "He's guaranteeing me --
he's guaranteeing me he'll -- he's come -- he's --
he's not backing out on me.  He's coming.  He
wants to give it to me personally.  And this is
basically the same dude that I fucking -- that
this is the same dude that he -- he really owes me
80 'cuz that's what was -- I think that's around
what was left over at the shop.  So I think -- I
think he owes me 80, but all he has for me is 70."

        MR. SHORTER:  "Hmm."

        MR. PARRA:  "You know what I'm saying?"

        MR. SHORTER:  "Yeah, but I can make him
meet a fucking girl.  He can meet her inside the
fucking mall.  That's all I give a fuck."

        MR. PARRA:  "No.  I -- I feel you on
that.  I didn't tell him a girl, but I told him"
--

 1          MR. SHORTER:  "All right.  So anyways,

 2    fuck it.  What time -- what time you talking about

 3    tomorrow?"

 4          MR. PARRA:  "Um, shit.  He didn't really

 5    say a specific time.  He just said tomorrow.  Like

 6    I guess tomorrow.  I'm not gonna say about this

 7    time, but he just said tomorrow he's gonna call me

 8    when he touches -- when he gets in.  And he's

 9    drive -- he said -- I said, are you flying?  I

10    said, you'd be dumb as fuck to fly.  He said, no.

11    I'm driving.  He's like, I got a car and I'm

12    driving.  I've been driving for like a day and a

13    half."

14          MR. SHORTER:  "All right.  I'll hit you

15    back."

16          MR. PARRA:  "All right."

17    BY MR. PRESTON:

18    Q.    When this conversation begins with

19    references to "he" -- he's nervous, for example,

20    what are you telling the defendant, Sheldon

21    Shorter?

22    A.    Basically I was like -- basically I was

23    talking about the person that was supposedly

24    bringing me the money didn't want to meet anybody

25    else, didn't want to take the money to any other

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    location, but directly to me.

2    Q.    What did you understand the defendant

3    Shorter to be telling you when he said, "Yeah, but

4    I can make him meet an f-ing girl.  He can meet her

5    inside the F-ing mall.  That's all I give an F."

6    A.    Well, I -- I told him that my associate was

7    basically driving through Atlanta on the way down

8    here to bring me the money.  And he told me that

9    that's not a problem.  He can have someone in

10   Atlanta meet them, and it don't even have to be a

11   guy.  It could be like just a girl could meet them

12   either in the mall or outside the mall to receive

13   the money so then it could be resolved quicker.

14   Q.    When you say that he was referring to a

15   pickup potentially somewhere outside of Atlanta, is

16   that referenced in Government's Exhibit 11C which

17   we didn't play?  Do you have that transcript?

18        MR. PRESTON:  Actually I think we've

19   ironed that difficulty out, Your Honor.  If I

20   could, I'd like to publish 11C at this time.

21        THE COURT:  You may.

22        THE WITNESS:  Yeah, that pertains to

23   about having someone meet him because I was saying

24   he was right outside of Atlanta.

25        MR. PRESTON:  We're going to publish

1    that tape, please.

2            (AUDIOTAPE PLAYING AS FOLLOWS, 11C.)

3            MR. PARRA:  "Hello.  Hello."

4            MR. SHORTER:  "Yo."

5            MR. PARRA:  "Pimp, Pimp, what up?  Hey,

6    listen, I wish I could have fucking got ahold of

7    you right after.  Right after I got off the phone

8    with you, he's telling me that he's -- he's in a

9    little bit of a delay, but he's definitely coming.

10   He's coming from out of state, but fucking, he's

11   in a delay.

12            "He's gonna call me probably like

13   tomorrow.  And what I'm thinking if I have to

14   because I know it's becoming an inconvenience, uh,

15   I can travel within the middle -- or the central

16   part of Florida.  I just can't go outside of

17   Central Florida ''cuz of my bond -- my bond

18   release."

19            MR. SHORTER:  "Yeah."

20            MR. PARRA:  "Um, if I have to I can

21   fucking -- I can link up with him and then I can

22   fucking drive down to like Fort Myers or something

23   like that or fucking Naples?

24            "I don't think I can go past Naples.

25   ''Cuz my -- my lawyer's telling me not to fuck

anything up because everything's looking very good

like looking like they ain't got no case

whatsoever.  You know what I'm saying?"

MR. SHORTER:  (Makes grunting type

sound.)

MR. PARRA:  "So he's saying don't fu --

he told me like last week, he said, don't fuck up

on no little dumb shit."

MR. SHORTER: "Uh-huh."

MR. PARRA:  "So I'm fucking -- what I'm

thinking is as soon as I get him out -- as soon as

I get fucking dip shit out of the way, uh, I can

grab that and then just fucking shoot" --

MR. SHORTER:  "Yeah, but I'm saying I --

I already got the nigga there.  I'm thinking the

nigga won't be there."

MR. PARRA:  "Oh, shit.  Yeah.  I'm --

that's why I -- I don't -- I ain't really have no

way to call you right back so I was like, fuck, I

just gotta wait for him to call back.

"And I told him -- I told him I'm on a

time issue.  You know what I'm saying?  But this

mother fu -- I don't (unintelligible)."

MR. SHORTER:  "So what you saying now?

What you -- what you -- so what are you saying

1   you're going to do (unintelligible) this shit?"

2          MR. PARRA:  "He's -- he's telling me

3   that he's gonna -- he's trying to -- basically

4   he's trying to tell me that he'll be with me

5   sometime tomorrow.  So, therefore, I fucking -- as

6   soon as I -- I been -- I been calling him.  I got

7   his number, so it's not like I don't have contact

8   with him."

9          MR. SHORTER:  "So where -- where --

10  where he at out of town?  Where he at?"

11         MR. PARRA:  "He says he's" --

12         MR. SHORTER:  "'Cuz I'm gonna make him

13  get (unintelligible) somebody anywhere.  Where he

14  at?"

15         MR. PARRA:  "He says he's in -- like

16  right outside of Atlanta.  So he's out of state.

17  He came further -- he came further than that,

18  though.  But he's in" --

19         MR. SHORTER:  "So yo, I can make him

20  give it to somebody in Atlanta.  So call him back.

21  And I'm gonna call you back in ten minutes."

22         MR. PARRA:  "Call him back and --

23         MR. SHORTER:  "And he's

24  (unintelligible)."

25         MR. PARRA:  "All right."

MR. SHORTER: "I'm gonna call you back
in five minutes. Call him back right now and see
where he at ''cuz I can just make him meet and
give it to them -- give it to them in Atlanta."

MR. PARRA: "All right. Let me see
what's up."

MR. SHORTER: "Yeah."

MR. PARRA: "Yeah." **

BY MR. PRESTON:

Q.    I'm going back to 11E that we had played
just before this. That was the conversation that
referred to the girl in the mall?

A.    Yes.

MR. PRESTON: I'm going to publish 11F
at this time from June 7th.

(AUDIOTAPE PLAYING, 11F.)

MR. PARRA: "Hello."

MR. SHORTER: "Yo."

MR. PARRA: "Pimp, what up?"

MR. SHORTER: "Yo, what up?"

MR. PARRA: "Shit. I'm waiting on this
fucking -- uh, I'm waiting on him to call me to
see if he fucking left or not 'cuz I called him
twice and told him he needs to hurry up and get
down here."

MR. SHORTER:  "Yeah, man, you're getting on my nerves with your bullshit, man.  That's some real bullshit."

MR. PARRA:  "I -- I agree -- I agree.  I ain't -- I'm -- that's -- that's why I was saying when -- when he does -- when he gets -- I already knew he was gonna be fucking taking his time by the way he sounded yesterday.  'Cuz I don't know if I spooked him out yesterday or not, but I told him -- I told him he could meet someone up there.  And he was like -- he was like, how the fuck do you know anyone up there?  And I'm like, Dog, it's just a friend.  I said, it's not a big deal.  He's like, no, no, no, I'm not gonna meet anyone else.  I'm going to meet you so I'm -- I'm straightened up with you.  I'm like, well, you know where I'm at.  I said, I've been waiting on you forever."

MR. SHORTER:  "Yo, call this fucking dude and see what the fuck he's doing, man, 'cuz y'all are stressing me out there."

MR. PARRA:  "All right.  I'm sorry."

MR. SHORTER:  "I got things I gotta -- I gotta take care of, and I need my shit to take care of what I gotta take care of.  Y'all are really getting on my nerves, man.  For real I got

1   things I got to do, man."

2   MR. PARRA:  "Yeah, I know."

3   MR. SHORTER:  "You call that

4   motherfucker (unintelligible)."

5   MR. PARRA:  "All right."

6   BY MR. PRESTON:

7   Q.     When the defendant, Sheldon Shorter, tells

8   you, "I got things I gotta -- I gotta take care of,

9   and I need my shit," what did you understand him to

10  be saying to you?

11  A.     I mean basically any time we're being pushed

12  for money, we're just trying to push forward to

13  take care of the next load or the next delivery,

14  you know, something to do with the next move.  So

15  I was delinquent on paying for quite some time.

16  MR. PRESTON:  Government will publish at

17  this time Government's Exhibit 11G from June 7th.

18  (AUDIOTAPE PLAYING, 11G.)

19  MR. PARRA:  "Hey, Pimp."

20  MR. SHORTER:  "Yo."

21  MR. PARRA:  "My bad man, I fucking fell

22  asleep.  I saw that you had fucking

23  (unintelligible)."

24  MR. SHORTER:  "Yeah."

25  MR. PARRA:  "My bad.  Yeah, dude's

1   fucking.  I -- I talked to him a little bit.  I --

2   I don't know what time this afternoon, but I

3   talked to him.  I told him that it's -- I -- you

4   know, I'm basically at a standstill without that.

5   He's -- he's fucking.  He's -- he's -- he's

6   telling me he's -- he's definitely coming, da, da,

7   da.  He's basically just starting to fucking,

8   pissing me off 'cuz it's not that I doubt that

9   he's got the money 'cuz he was acting all paranoid

10  about having it.  But he's just fucking -- I guess

11  he just hasn't -- I don't know what his problem

12  is.  I don't -- I don't know if he's left yet or

13  what.  So I'm -- I'm telling him that I'll fucking

14  come damn near to the border just to meet him.

15  You know what I'm saying?"

16          MR. SHORTER:  "Yo, you see, man.  This

17  is the bullshit I'm talking about, man.  You gotta

18  go by his momma house something, man.  That's what

19  you need to do.  You need to ride by his momma

20  house and hand his momma the phone so she can tell

21  her boyfriend the fucking, the thing.  You don't

22  think so?"

23          MR. PARRA:  "Well, his momma don't live

24  down here.  His dad does, though.  I could go by

25  there."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. SHORTER:  "So, yeah, just go do that

2    then.  Do something, man."

3          MR. PARRA:  "All right."

4          MR. SHORTER:  "Can't just sit -- sit

5    here.  Do something."

6          MR. PARRA:  "All right."

7          MR. SHORTER:  "All right."

8          MR. PARRA:  "All right.  Apologize.

9    I'll -- I'll -- I'll get it taken care of."

10         MR. SHORTER:  "Yeah, but you gotta go

11   see -- go over there now.  You know what I'm

12   talking about?"

13         MR. PARRA:  "No.  I will.  I will."

14         MR. SHORTER:  "All right.  I'll call you

15   back."

16         MR. PARRA:  "All right."

17   BY MR. PRESTON:

18   Q.    Mr. Parra, what did you understand the

19   defendant, Sheldon Shorter, to be asking you when

20   he said, "You need to ride by his momma house and

21   hand his momma the phone so she can tell her

22   boyfriend the f-ing, the thing?"

23   A.    I mean there's been several instances where

24   there's been money owed --

25   Q.    What did you understand in this instance?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.     Basically just putting like a threatening
pressure on his family to tell him to bring the
money.

         MR. PRESTON:  June 12th, Government's
Exhibit 11H we'll publish at that time, Your
Honor?

         THE COURT:  You may.

         (AUDIOTAPE PLAYING, 11H.)

         MR. PARRA:  "Yo."

         MR. SHORTER:  "Yo."

         MR. PARRA:  "Big Pimp, what up?  What
up?  I fucking just met up with him a little
minute ago.  I was just calling, Pimp, to fucking
give you the heads up.  So I'm finishing up
fucking, getting shit put away.  And I'm fucking
heading back.  It's probably gonna take me about
two, two and a half hours."

         MR. SHORTER:  "Oh.  So where you said
you're at?"

         MR. PARRA:  "Well, I'm fucking -- well,
I was -- well, I was a little bit north of
Gainesville, but I'm just gonna head back.  I'm --
I'm -- I'm -- you know, I'm not rushing.  So if --
if it takes a little bit longer, then it'll take a
little bit longer."

1          MR. SHORTER:  "Oh, okay.  So" --

2          MR. PARRA:  "But I just wanted you to

3     have the heads up because, you know, wanted -- I

4     wanted -- really wanted to know where I'm supposed

5     to be going or what I'm supposed to do or

6     whatever."

7          MR. SHORTER:  "All right.  So I'm -- I'm

8     gonna meet you up there."

9          MR. PARRA:  "Okay."

10          MR. SHORTER:  "So you're gonna be -- be

11     back in about three hours?"

12          MR. PARRA:  "Yeah.  So what?  You want

13     to meet me halfway you said?"

14          MR. SHORTER:  "No.  I'm gonna come up --

15     I'm gonna come to Tampa."

16          MR. PARRA:  "Oh, okay, okay, okay.  All

17     right.  And then" --

18          MR. SHORTER:  "I ain't gonna make you

19     drive all the way."

20          MR. PARRA:  "All right.  No.  That's --

21     I was -- I was hoping I didn't have to drive that

22     far 'cuz, you know, I ain't -- I'm -- yeah.  All

23     right.  All right.  So you gonna hit me back --

24     you gonna hit me back probably by the time I make

25     it back?"

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1              MR. SHORTER:  "Yeah.  Yeah."

 2              MR. PARRA:  "All right.  Bet that."

 3              MR. SHORTER:  "All right."

 4              MR. PARRA:  "Yeah."

 5    BY MR. PRESTON:

 6    Q.    Mr. Parra, what was the purpose on June 12th

 7    of telling the defendant Shorter that you were in

 8    Gainesville having met with him?

 9    A.    Supposedly I had received the money from the

10    gentleman who owed me money.  And I was

11    basically -- I had basically received the money

12    and I was ready to deliver it to him.

13    Q.    Did you continue communicating with him on

14    June 12th after this conversation in regard to a

15    meeting?

16    A.    Yes.

17              MR. PRESTON:  I'd like to publish

18    Government's Exhibit 11I at this time, Your Honor.

19              MR. CRAWFORD:  No objection.

20              THE COURT:  Okay.

21              (AUDIOTAPE PLAYING.)

22              MR. PARRA:  "Pimp."

23              MR. SHORTER:  (Talking in Patwa.)

24              MR. PARRA:  "What up?  What up?  What

25    up?
```

MR. SHORTER:  "Yo.  What up, son?"

MR. PARRA:  "Chillin, man.  I'm just --
I'm just -- I'm just about to be entering Tampa
here in the next like five, ten minutes."

MR. SHORTER:  "Like five or ten minutes?
All right.  Um, let me -- all right.  Let me call
you back.  Let me see how soon I can meet you by
the -- you know the gas station right there."

MR. PARRA:  "Well, I'm -- I'm posted --
I got a room at the Fairfield Inn right here off
the interstate."

MR. SHORTER:  "What the fuck hotel?
Which one is that?"

MR. PARRA:  "Uh, Fairfield.  Like, uh, I
think it's on the corner of 75 and, uh, Fletcher."

MR. SHORTER:  "Uh, Pimp know that --
that hotel?"

MR. PARRA:  "I don't know.  I've never
stayed there with him.  It's just where I've been
staying at."

MR. SHORTER:  "I don't even know what
fucking hotel that.  I don't know how to get
there."

MR. PARRA:  "Um, it's right of 75.  You
just get off 75 and Fletcher.  It's right there on

the corner.  There's like three different hotels.
But the -- the -- the Fairfield is the cheapest
one I could find."

        MR. SHORTER:  "Where the fuck you at?"

        MR. PARRA:  "I'm" --

        MR. SHORTER:  "Off of 75?"

        MR. PARRA:  "No.  I-75 and Fletcher."

        MR. SHORTER:  "So why (unintelligible,
subjects talking over each other)."

        MR. PARRA:  "No.  I'm -- I'm -- I don't
know.  I'm just not -- I'm -- I'm -- this is where
I've been.  This is where I was headed to when I
got back."

        MR. SHORTER:  "Oh, I don't know over
there.  I ain't trying to go all the way over
there."

        MR. PARRA:  "All right.  All right.  So
where you going to be?"

        MR. SHORTER:  "Just meet me over there
across the bridge right there."

        MR. PARRA:  "Uh, what -- what" --

        MR. SHORTER:  "You know, like -- all
right.  Look.  What -- what gas station that is?
Man, you know that fucking gas station?"

        MR. PARRA:  "You talking the big one?"

1          MR. SHORTER:  "The gas station, man.
2     It's right there beside like where you -- you know
3     where you get off the freeway right there in
4     Tampa.  And it's like across the street from that.
5     What's that hotel name right there?  Um, the
6     Hyatt?"
7          MR. PARRA:  "You talking about by the
8     strip club?  Oh, you talking about where the old
9     spot was."
10          MR. SHORTER:  "No, man.  Look.  Not all
11     the way down there by the strip club.  You know
12     the first -- when you come off the bridge, all
13     right, you know the first exit."
14          MR. PARRA:  "The big bridge?"
15          MR. SHORTER:  "Yeah.  When you come over
16     the bridge.  What's that?  Kennedy?  What the fuck
17     is the name of that street, son?"
18          MR. PARRA:  "When you come over the big
19     bridge, that's Howard Franklin.  That's 275 goes
20     in to the bridge."
21          MR. SHORTER:  "You know, you -- you're
22     confusing me right now."
23          MR. PARRA:  "Okay."
24          MR. SHORTER:  "You know -- you know like
25     when you're coming from St. Pete; right?"

1          MR. PARRA:  "Oh, you're talking about

2    Tampa side?

3          MR. SHORTER:  "Yeah."

4          MR. PARRA:  "Okay.  Okay.  When you get

5    off -- when you get off the bridge, the gas

6    station" --

7          MR. SHORTER:  "And then you make the

8    right and the gas station is right there on the

9    left."

10          MR. PARRA:  "Yeah.  You're talking about

11    right there by Westshore?"

12          MR. SHORTER:  "Yeah, that's the fuck.

13    I'm talking about Kennedy right there."

14          MR. PARRA:  "Okay."

15          MR. SHORTER:  "And that gas station.

16    How long before you get there?"

17          MR. PARRA:  "Um, probably like -- shit.

18    I don't know.  How long is it going to take you?

19    'Cuz I don't want to be sitting waiting."

20          MR. SHORTER:  "No, I ain't going to make

21    you sit there.  I ain't -- I ain't too far.

22    That's what I'm trying to tell you."

23          MR. PARRA:  "Um, damn."

24          MR. SHORTER:  "About 10 minutes, 15,

25    20 minutes?"

1          MR. PARRA:  "Yeah, but -- yeah, like 20,

2     25 minutes."

3          MR. SHORTER:  "Like 25 minutes?"

4          MR. PARRA:  "Yeah."  I'm in a --

5          MR. SHORTER:  "All right."

6          MR. PARRA:  "I'm in a red Impala, same

7     car."

8          MR. SHORTER:  "All right.  You what?"

9          MR. PARRA:  "I'm in my red Impala, the

10    little rental I've been driving for the last

11    couple weeks."

12         MR. SHORTER:  "All right."

13         MR. PARRA:  "All right.  What -- you

14    driving or what?"

15         MR. SHORTER:  "Yeah."

16         MR. PARRA:  "All right."

17         MR. SHORTER:  "I'm gonna jump in one of

18    these cars right here in a bit.  All right."

19         MR. PARRA:  "All right.  I should be --

20    I should be there probably right before you."

21         MR. SHORTER:  "All right."

22         MR. PARRA:  "All right."

23    BY MR. PRESTON:

24    Q.   Did the defendant, Sheldon Shorter, show up

25    at a gas station in the area of Westshore on

1  Kennedy?

2  A.    No.

3  Q.    Did you go there?

4  A.    Yes.

5  Q.    Did you meet anyone there?

6  A.    Yes.

7  Q.    Who did you meet?

8  A.    Cleo Mitchell.

9  Q.    What happened?

10  A.    He got a little bit nervous and he basically

11  told me to go to a different location.

12  Q.    Did you and he travel to a second location?

13  A.    Yeah.  After a little bit of traveling we

14  made it down to 54th Street North off the

15  interstate.

16  Q.    What happened there?

17  A.    Basically I gave him what was supposed to be

18  the money.

19  Q.    When you say "it was supposed to be the

20  money," what was your understanding of what you

21  were giving him?

22  A.    It was like -- it was just like a fake

23  package.  It wasn't real currency.  I don't know

24  what you would call it, but it wasn't real money.

25  Q.    How was it packaged?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.    It was wrapped almost like how we cling wrap large amounts of money.  And it was put in a duffle bag like it normally is with personal items on top of it to hide it.

Q.    Did you have conversations with the defendant, Sheldon Shorter, after you turned this package over to Cleo Mitchell?

A.    Yes, I did.

MR. PRESTON:  I'd like to publish Government's Exhibit 11J at this time, Your Honor.

THE COURT:  You may.

(AUDIOTAPE PLAYING, 11J).

MR. PARRA:  "Hello."

MR. SHORTER:  "Yo."

MR. PARRA:  "What up, Pimp?  What up?"

MR. SHORTER:  "Where the fuck this nigga at, man?  I'm calling this nigga and he ain't picking up.  I'm down here waiting on this nigga, man."

MR. PARRA:  "He said he was going down south.  He didn't -- he didn't -- he didn't tell me where, but he just said he was going down south.  I -- I told him -- I told him to have you call me.  But after you check over what you got to check over, you and me should be pretty close to

straight.  So I just want to make sure you and I

are on good terms.  And then me and him can talk

about some other whatever that other bullshit is."

        MR. SHORTER:  "How much you gave him

just now?"

        MR. PARRA:  "I gave him 70.  And so and

the Charger, I'm thinking I should be damn near --

if I'm not already there, I should be damn near at

a" --

        MR. SHORTER:  "I'm here waiting on this

fucking nigga, man.  I'm call -- yo, call him and

see if you can get him on the phone."

        MR. PARRA:  "All right.  What?  He's not

picking up?"

        (Talking simultaneously.)

        MR. SHORTER:  "Yeah, man."

        MR. PARRA:  "All right.  I'll call you

right back.  Let me call him."

BY MR. PRESTON:

Q.    Who was this third person that you and

Sheldon Shorter were talking about?

A.    Cleo Mitchell.

        MR. PRESTON:  Next going to publish

Government's Exhibit 11K.

        (AUDIOTAPE PLAYING, 11K.)

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. PARRA:  "Hey, I just tried calling

2    the nigga two times.  I don't know why he ain't

3    picking up."

4          MR. SHORTER:  "Well, he ain't picked up"

5    --

6          MR. PARRA:  "Well, he seemed -- seemed

7    like he was mad.  I'm like trying to tell him,

8    Dog, you need to fucking -- you and I need to

9    fucking -- I told him I need to straighten shit

10   out with him now.  You know what I'm saying?  It's

11   -- it's not going to be a problem.  It's just I'm

12   going to need a couple weeks.  You know what I'm

13   saying?  I know that nigga's mad at me, but God

14   damn."

15         MR. SHORTER:  "Yeah, let me try to call

16   him, man."

17         MR. PARRA:  "I'm trying to get -- you

18   know what I'm saying?  I'm trying to -- trying to

19   get at least a little bit of my respect back.  You

20   know what I'm saying?"

21         MR. SHORTER:  "Yeah.  Let me try to

22   call.  Let me try to call him."

23         MR. PARRA:  "All right."

24   BY MR. PRESTON:

25   Q.    Mr. Parra, do you remember at this time

1  whether you had been informed by law enforcement

2  that Cleo Mitchell had been stopped and the fake

3  money taken from him?

4  A.    Yes.

5       MR. PRESTON:  I'd like to next publish

6  Government's Exhibit 11L.

7            (AUDIOTAPE PLAYING, 11L.)

8       MR. PARRA:  "Yo."

9       MR. SHORTER:  "Yo."

10      MR. PARRA:  What up?  What up?"

11      MR. SHORTER:  "Yo.  I just spoke with

12  Pimp.  You spoke to him?"

13      MR. PARRA:  "That nigga he just called

14  me talking -- he said something about did I sell

15  him a car or some shit.  I said, I don't know.  I

16  said, call me back when you get a minute.  He's

17  like all right.  I'll call you back in two

18  minutes."

19      BACKGROUND VOICE:  (Unintelligible).

20      MR. SHORTER:  "(Unintelligible) yeah,

21  they took the money from him."

22      MR. PARRA:  "Yeah, right."

23      MR. SHORTER:  "Yeah, they pulled him

24  over.  They took the money."

25      MR. PARRA:  "Who did?"

1    BACKGROUND VOICE:  "Got caught

2  (unintelligible)."

3    MR. PARRA:  "What happened?  Hold on.

4  Hold on.  What happened now?"

5    BACKGROUND VOICE:  "(Unintelligible)

6  that car didn't come with the navigation

7  (unintelligible).

8    MR. SHORTER:  "Mmm."

9    BACKGROUND VOICE:  (Unintelligible).

10    MR. SHORTER:  "Mmm."

11    MR. PARRA:  "Dog, what the" --

12    (Talking simultaneously.)

13    MR. SHORTER:  "Mmm."

14    BACKGROUND VOICE:  (Unintelligible.)

15    MR. SHORTER:  "Hold on.  What about the

16  radio?"

17    BACKGROUND VOICE:  "I mean they gonna

18  charge you $300 for (unintelligible)."

19    MR. PARRA:  "Tell me -- tell me what

20  happened."

21    MR. SHORTER:  "Yo.  Hello?"

22    MR. PARRA:  "Yeah, tell me what

23  happened."

24    MR. SHORTER:  "Na.  They pulled him over

25  and took the money from him."

MR. PARRA: "Yeah, right. Who did? Who pulled him over?"

MR. SHORTER: "They did. Soon as you gave him the money, he got pulled over and they took it."

MR. PARRA: "Who pulled him over, Pimp?"

MR. SHORTER: "Huh?"

MR. PARRA: "Who pulled him -- like who pulled him over?"

MR. SHORTER: "You already asked him. I don't fucking know. Police. Nigga."

MR. PARRA: "Nigga asked -- I didn't ask him that because he wasn't -- it sounded like he was sitting in front of somebody."

MR. SHORTER: "Oh, okay."

MR. PARRA: "'Cuz when he called me, he was asking me about like a bill of sale for a car. I said, yeah, I got it at the shop. I said, you need me to bring it to you? I said, I can bring it to you right now. And he's like -- he's like give me a minute. I'll call you right back. I'm like, if you want I'll come see you right now and bring you the bill of sale. 'Cuz I'm thinking he's -- he's -- he's talking -- I don't know -- I don't know what the -- I don't know what he was

1  talking about."

2          MR. SHORTER:  "All right.  Call him

3  right now and see what he's talking about.  I'll

4  call you back.  Call him right now."

5          MR. PARRA:  "Yeah."

6  BY MR. PRESTON:

7  Q.    Did you speak with the defendant, Sheldon

8  Shorter, in another conversation shortly after this

9  one?

10  A.    Yes.

11  Q.    Would that be contained in Government's

12  Exhibit 11M?  Is that 11M?

13  A.    In front of me, yes, sir.

14  Q.    Is that the next conversation with the

15  defendant Shorter?

16  A.    Yes, sir.

17  Q.    Had you spoken to Cleo Mitchell just before

18  that conversation?

19  A.    I believe so, sir.

20          MR. PRESTON:  I'd move to publish 11M at

21  this time, Your Honor.

22          MR. CRAWFORD:  No objection.

23          (AUDIOTAPE PLAYING, 11M.)

24          MR. PARRA:  "Hello."

25          MR. SHORTER:  "(Unintelligible) yo."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. PARRA:  "Hey, I just got off the

2    phone with him.  He's talking about he got pulled

3    over and he -- hold on.  He's talking about he got

4    pulled over and they fucking took the bread from

5    him.  But what I'm trying to tell him is that

6    there -- there shouldn't be any reason.  He didn't

7    commit no felony.  There's no reason why they

8    should take any bread from him."

9          MR. SHORTER:  "That's what I'm trying to

10   tell him too, but you know his little scared ass."

11         MR. PARRA:  "Dog, ask him -- ask him --

12   I don't know if he told you about my scenario,

13   but, Dog, all you gotta do is have an alibi that

14   sounds and everything's fucking straight.

15         "He just told me -- he just told me to

16   call this fucking phone number.  He didn't tell

17   me -- he said call this phone -- I ain't calling

18   it yet.  And I'm gonna ask -- I gotta talk -- I'd

19   have to ask my lawyer before I did any of that

20   because it says -- it says he gave me a phone

21   number with an extension.

22         "I said, what's this number?  He said,

23   that's a cracker's number.  You gotta call them

24   and tell them it's your money.  Okay.  Yeah.  No

25   problem."

1          MR. SHORTER:  "Yeah."

2          MR. PARRA:  "I can call them and tell

3     them it's the business's money."

4          MR. SHORTER:  "Exactly."

5          MR. PARRA:  "But I can't tell them it's

6     my money."

7          MR. SHORTER:  "No.  The business 'cuz

8     y'all can use -- you -- you've got a little

9     fucking business.  So this nigga he -- he -- he

10    acting like he don't fucking know how to think or

11    whatever."

12         MR. PARRA:  "Or why didn't he just call

13    me because I was about 10, 20 minutes tops."

14         MR. SHORTER:  "Fucking, yeah."

15         MR. PARRA:  "And I could have turned

16    back around and been like -- 'cuz that car's in my

17    name."

18         MR. SHORTER:  "Uh-huh."

19         MR. PARRA:  "You get what I'm saying?

20    So I could have turned around 'cuz I'm already" --

21         MR. SHORTER:  "Yo.  Anyway yo, how much

22    you paid -- how much you paid for the rims on --

23    on -- on the Charger?"

24         MR. PARRA:  "The rims on the Charger?

25    They're cheaper now.  I can get those for a little

1    bit over four stacks.  But when I got them, I paid

2    like 55, 56.

3              MR. SHORTER:  "Oh."

4              MR. PARRA:  "But they're cheaper now

5    'cuz everybody's starting to do 26s on the

6    Chargers."

7              MR. SHORTER:  "Oh, them 26s?"

8              MR. PARRA:  "No.  Those are 24s."

9              MR. SHORTER:  "Oh, they're 24s."

10             MR. PARRA:  "The reason they went

11   cheaper is 'cuz people are starting to do 26s on

12   Chargers."

13             MR. SHORTER:  "Oh, so they had to drop

14   the price on them?"

15             MR. PARRA:  "Yeah, 'cuz so many people

16   aren't buying them no more.  They're buying the

17   26s and 28s."

18             MR. SHORTER:  "Oh, okay."

19             MR. PARRA:  "Feel me?"

20             MR. SHORTER:  "Hey, yo, anyway, yo, call

21   him back and -- and figure this shit out and y'all

22   just call and tighten this shit up, man.  Just put

23   in the business number or whatever.  All right?"

24             MR. PARRA:  "All right.  I'll call you

25   back."

1          MR. SHORTER:  "Yeah.  All right."

2          MR. PARRA:  "Pimp, I can't call you."

3          MR. SHORTER:  "I'm a -- I'm a -- yeah."

4          MR. PARRA:  "Just get something like a

5     little -- like a little burnout."

6          MR. SHORTER:  "That's what I'm gonna do.

7     Yeah."

8          MR. PARRA:  "All right."

9          MR. SHORTER:  "All right."

10    BY MR. PRESTON:

11    Q.    When you tell the defendant, Sheldon

12    Shorter, "I can't call you," why not?

13    A.    Because I'm not in that position.  I'm not

14    Cleo Mitchell.  Cleo Mitchell had direct contact

15    with him through a cell phone number.  And unless

16    I was given that privilege, I didn't -- I didn't

17    have direct contact.

18    Q.    All these calls that we just listened to,

19    were those all calls that he made to you?

20    A.    Yes.

21    Q.    And when he tells you near the conclusion of

22    that conversation, "Tighten this shit up, man,"

23    what did you understand him to say?

24    A.    He basically wanted me to help Cleo Mitchell

25    try to retain that money back from the police.

1  Q.     Did anyone ask you again to try to get that

2  money back from the police?

3  A.     Yeah, Cleo Mitchell asked me several times.

4  Q.     Are you familiar with a 2007 money delivery

5  in a Range Rover?

6  A.     Yes.

7  Q.     What do you know about such a delivery?

8  A.     Cleo informed me that we had to make a money

9  drop-off, but the money had to be specifically all

10  in hundreds, so we had to shift through the money

11  that we had at the apartment to pull out

12  everything that we had with hundreds.

13       After getting the money together, the

14  location to drop the money off was to be at

15  International Mall, which was to be to an

16  associate of Sheldon Shorter which in turn drove

17  the money out of state.

18  Q.     And how did -- by what name, nickname,

19  identification did you recognize that associate to

20  be?

21  A.     His associate's name was MO.

22  Q.     Did you meet with MO in regard to this Range

23  Rover?

24  A.     Yeah.  Cleo Mitchell and I met MO at the

25  mall and put the money in like a little secret

1    compartment.  And he left in the Range Rover.

2    Q.    Do you recall the approximate sum the

3    hundreds came to be?

4    A.    I can't be exact.  It was a large amount of

5    money.

6    Q.    Where was the Range Rover supposed to go?

7    A.    It was in my belief it was going towards --

8    out west towards California.  He told me it was

9    going to be like a two or three-day trip.

10   Q.    Were you asked during your participation in

11   this scheme to do anything in regard to private

12   jets?

13   A.    Yeah.  It was brought to my attention that

14   if --

15   Q.    By who?

16   A.    Cleo was kind of bragging about it.

17   Q.    Okay.

18   A.    About me and him being able to fly in a

19   private jet if I could get the account.  I tried

20   to do everything I could with it, but I just

21   couldn't -- the requirements that they were asking

22   were beyond my financial level and beyond any

23   financial level I could -- that I could propose

24   paying someone to help me in that situation.

25   Q.    What would you and Cleo Mitchell be doing if

1  you traveled on a private jet?

2  A.    I mean, he -- he basically told me what it

3  was.  He was telling me that we'd basically be --

4  it would be another way to move large amounts of

5  money out of state without having to -- without

6  being -- you know, having the fear of getting

7  pulled over, having the money confiscated or

8  anything of that sort.  Almost like a foolproof

9  plan.

10  Q.    During your cooperation did you travel to

11  the area of Pembroke Pines to attempt to locate any

12  residents that you associated with the defendant,

13  Sheldon Shorter?

14  A.    Yes, I did.

15  Q.    Do you recognize the picture in Government's

16  Exhibit No. 20?

17  A.    Yes.  This is the corner unit.  I was there

18  prior to April 1st.

19  Q.    Does that fairly and accurately show the

20  location that you pointed out to law enforcement in

21  Pembroke Pines?

22  A.    Yes.

23  Q.    You said you had been there prior to April

24  1st.  April 1st being your arrest date?

25  A.    Yes.

Q.      What purpose did you have being at that
location?

A.      I mean, I -- I came down there thinking it
was on business, but really we were all just kind
of letting loose and like basically we took like
four or five days off.  And there were several
associates that were there.  But this is where I
stayed the night like two of the nights.

Q.      When you say "several associates," who are
you referring to in regards to this trip?

A.      Cleo Mitchell, me, Sheldon Shorter, MO, and
several other associates of Sheldon Shorter.  We
were almost like guests.

        MR. PRESTON:  May I publish Government's
Exhibit No. 20, Your Honor?  May I publish
Government's Exhibit No. 20, Your Honor?

        THE COURT:  Yes, you may.

        MR. PRESTON:  Thank you.

BY MR. PRESTON:

Q.      Do you recognize --

        MR. PRESTON:  I don't know if I moved in
No. 20 before I published it, but I will move to
admit it at this time if I haven't.

        MR. CRAWFORD:  No objection.

        (EXHIBIT 20 ADMITTED INTO EVIDENCE.)

BY MR. PRESTON:

Q.    Do you recognize the vehicle in Government's Exhibit No. 21?

A.    Yes.

Q.    How do you recognize that vehicle?

A.    It's the vehicle that I forfeited over to Sheldon Shorter.

Q.    How do you know -- why do you believe that is the specific vehicle that you turned over to Sheldon Shorter?

A.    It's at the condo area in Pembroke Pines that I had been to that I had spent some time there before getting arrested.

Q.    And what about the vehicle itself do you recognize?

A.    Distinctly I recognize the rims and just the whole look of the car.  That was my car.  I'd recognize it anywhere.

        MR. PRESTON:  Government moves Government's Exhibit No. 21 into evidence, Your Honor.

        MR. CRAWFORD:  No objection.

        THE COURT:  It is received.

        (EXHIBIT 21 ADMITTED INTO EVIDENCE.)

        MR. PRESTON:  And publish that briefly.

```
 1              THE COURT:  You may.

 2              MR. RODRIGUEZ:  What was the date of

 3      that photo, Counsel?  20, the date.

 4              MR. PRESTON:  21.

 5              MR. RODRIGUEZ:  Thank you.

 6              MR. PRESTON:  That wasn't the date.

 7              MR. RODRIGUEZ:  Okay.

 8              MR. PRESTON:  Thank you, Your Honor.  I

 9      have no additional questions of the witness at

10      this time.

11              THE COURT:  Cross-examination.

12              MR. RODRIGUEZ:  Give me a moment, Your

13      Honor.

14              THE COURT:  Yes.

15              MR. RODRIGUEZ:  Could I have a moment to

16      speak to counsel?

17              THE COURT:  Yes.

18              MR. RODRIGUEZ:  Your Honor, we've had

19      some difficulty with our electronics on our side

20      of the table, so I'm going to be relying on the

21      government to display some of the exhibits as I go

22      through my cross of the witness.

23              THE COURT:  All right.

24                      CROSS-EXAMINATION

25      BY MR. RODRIGUEZ:
```

Q.    Mr. Parra, we've never met before, have we?

A.    No, we have not.

Q.    I haven't promised you to try to get you out of jail any earlier than you're going to get out, have I?

A.    No.

Q.    Okay.  Mr. Parra, can you identify for the record the two gentlemen that are sitting at this table for us.

A.    I don't know last names, but I just -- you know, I know the first names are Jim and Justin.

Q.    And who are they?

A.    I don't know Jim's exact position, but I know Justin's a DEA agent.

Q.    Okay.  From April 1st of this year until today, how many times have you met with Justin, some of the other agents, the government either in jail, out of jail, in this building, in their offices, on the street, on a surveillance in Broward County or in this county or in Pinellas County total?  Just give us an estimate of how many times you've met with them.

A.    I don't have an exact number, but it's been a lot of times.

Q.    40, 50 times at least; right?

```
 1   A.      Probably.
 2   Q.      At least; right?
 3   A.      Possibly.
 4   Q.      How many recordings have you made in this
 5   case?
 6   A.      I mean you have the paperwork.  I'm really
 7   not quite sure what the amount of numbers of the
 8   recordings.
 9   Q.      How many recordings have you made?
10   A.      A lot.
11   Q.      How many is a lot?  More than a hundred?
12   A.      I wouldn't say more than a hundred.
13   Q.      More than 75?
14   A.      It might be around there.
15   Q.      So your words around 75 recordings and
16   you've met with the government around 50 times.
17   You comfortable with that?
18   A.      I probably met with them more than that.  I
19   just don't have an exact number for you.
20   Q.      Okay.  You've met with them more than 50
21   times.  And that's all prior to you coming in here
22   this morning and testifying; right?
23   A.      Yes.
24   Q.      When was the last time that you were with
25   Justin?
```

```
1    A.    The last time I was with him?

2    Q.    Yes, sir.

3    A.    It's been quite some time.

4    Q.    You weren't with him during the lunch hour?

5    A.    Yeah.

6    Q.    Well, isn't that the most recent time, or

7    did you forget that?

8    A.    No, I guess you're right.  I was with him

9    for lunch.

10   Q.    You went to lunch?

11   A.    No.  I sat right here in the room and ate

12   lunch.

13   Q.    With him?

14   A.    With several people.

15   Q.    And who are those people?

16   A.    Him and some other DEA agents.

17   Q.    Are you in custody?

18   A.    No, I'm not.

19   Q.    You're at home.  You slept in your bed last

20   night?

21   A.    Yes, I did.

22   Q.    Why were you with them for the entire hour

23   and a half then?

24   A.    Somewhat for my safety.

25   Q.    For your safety in the federal courthouse?
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

| | |
|---|---|
| 1 | A.    In general.  Anywhere in general.  My life |
| 2 | has been threatened several times. |
| 3 | Q.    Because you're a drug dealer? |
| 4 | A.    Excuse me? |
| 5 | Q.    Because you're a drug dealer? |
| 6 | A.    Am I what? |
| 7 | Q.    Because you're a drug dealer? |
| 8 | A.    No.  My life was threatened because |
| 9 | basically all this stuff has basically unraveled. |
| 10 | Q.    Okay.  You've been dealing drugs for at |
| 11 | least ten years by your own guesstimation; correct? |
| 12 | A.    Yes, sir. |
| 13 | Q.    That's from 1998; correct? |
| 14 | A.    Yes, sir. |
| 15 | Q.    Who was your source of drugs in 1998, |
| 16 | Mr. Parra? |
| 17 | A.    1998 it was just petty street level stuff. |
| 18 | So it was basically whoever was at the trap. |
| 19 | Q.    Who was your source of drugs in 1998, |
| 20 | Mr. Parra? |
| 21 | A.    In 1998? |
| 22 | Q.    Yes, sir. |
| 23 | A.    Probably a white Caucasian male by the first |
| 24 | name of Ray. |
| 25 | Q.    Ray?  Are you just making that up? |

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    A.      No.  I went to school with him.

 2    Q.      What school was that, Mr. Parra?

 3    A.      Largo High School.

 4    Q.      And is that what you told the agents about

 5    who started you in the sale of drugs?

 6    A.      Not necessarily.  It didn't have anything to

 7    pertain to the case.

 8    Q.      You didn't tell the agents that then?

 9    A.      I said I have been dealing drugs for about

10    ten years.

11    Q.      What's kind of drugs did you start dealing

12    with in 1998, Mr. Parra?

13    A.      When I was younger I had a couple charges

14    with crack cocaine.

15    Q.      When was the first charge with crack

16    cocaine?

17    A.      Probably right after I got kicked out of my

18    house, which was probably like '97 -- '97, '98.

19    Q.      Okay.  '97, '98 you started selling crack

20    cocaine?

21    A.      No, I wasn't selling it.  I got caught with

22    possession of it.

23    Q.      You were using crack cocaine?

24    A.      No.  It was in my vehicle.

25    Q.      You were giving away crack cocaine?
```

1    A.    No.  Someone else had left it in my car.

2    Q.    Someone else had left it in your car?

3    A.    Uh-huh.

4    Q.    And you were arrested for that?

5    A.    Yes, sir.

6    Q.    And were you convicted for that, Mr. Parra?

7    A.    No, I was not.

8    Q.    Okay.  So that's 1997, 1998.

9          1998 is also when you start buying what kind

10   of drugs from Ray?

11   A.    Basically I was getting fronted marijuana.

12   Q.    How long did -- how long was Ray your

13   dealer?

14   A.    I don't have an exact time of how long I had

15   a dealer because I probably moved on to someone

16   else.

17   Q.    When did you move on and who did you move on

18   with?

19   A.    I don't have specifics.

20   Q.    You were very specific since 9:30 this

21   morning.  Why not more specific now?

22              MR. PRESTON:  Objection.  Argumentative.

23              THE COURT:  Sustained.

24   BY MR. RODRIGUEZ:

25   Q.    You don't remember who it was or you don't

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    want to tell us?

2    A.    Who I switched to?

3    Q.    Yeah.

4    A.    That's -- you know, that's ten years ago.

5    This is something that's within a year ago.

6    Q.    Who was it?

7    A.    I'm not sure, sir.

8    Q.    You're not sure or you don't want to say?

9    A.    I'm not sure.

10   Q.    Is that part of your agreement with the

11   government or you're not covered for that time?

12   A.    I honestly don't remember.

13   Q.    Who then became your source of drugs,

14   Mr. Parra?

15   A.    From that point on I just did marijuana.

16   Just whoever had it.

17   Q.    And prior to that you dealt in what other

18   drugs since now you just switched to marijuana?

19   A.    No.  That's my only -- I was just explaining

20   my previous charges.  But I made a decision to

21   strictly stick with marijuana.

22   Q.    After you were caught with the crack

23   cocaine, you decided just to stick with the

24   marijuana?

25   A.    (Nods head.)

```
1    Q.    Okay.  And so could we say that you've been
2    dealing -- have you been dealing exclusively in
3    marijuana since the year 2000?
4    A.    Yes.
5    Q.    And who was your source of marijuana in the
6    year 2000?
7    A.    Whoever had a better price.
8    Q.    And who was that?
9    A.    I'm not quite sure, sir.
10   Q.    You don't remember?
11   A.    No, sir.
12   Q.    You're not sure?
13   A.    Not sure.
14   Q.    Who was your source of marijuana in 2001?
15   A.    Same answer.
16   Q.    Don't remember?
17   A.    Yes, sir.
18   Q.    How about in 2002, Mr. Parra?  Who was your
19   source of marijuana then?
20   A.    Like I said before, whoever -- you know,
21   whoever had the cheapest price is whoever I dealt
22   with at the time.
23   Q.    Well, why don't you tell us who that was.
24   A.    I'm really not sure.
25   Q.    Is that part of your plea agreement with the
```

1  government?

2  A.     No, sir, that's just the truth.  It's just

3  the truth.  I don't remember.

4  Q.     In your over 50 meetings with the government

5  nobody asked you who your source of marijuana was

6  five years ago?

7  A.     Well, sir, from any time before the present

8  time with me and Cleo Mitchell, there was never

9  any substantial marijuana to be even discussed.  I

10 mean we're talking about a half a pound to a pound

11 to at the very most like a pound.  As compared to

12 what this situation is, it's -- it -- it, you

13 know, never was really went into specifics.

14          MR. RODRIGUEZ:  Your Honor, could I ask

15 the reporter to repeat my question because I don't

16 know exactly what it was and I don't want to be

17 argumentative.  Could I just ask her to repeat my

18 question, please.

19          THE COURT:  Yes.

20    (RECORD REQUESTED READ BY THE COURT REPORTER.)

21          THE WITNESS:  Five years ago?  I don't

22 remember if they did or not.

23 BY MR. RODRIGUEZ:

24 Q.     That's fine.  Now, let's talk about some of

25 these times that you've met.  You were arrested on

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  April 1st?

2  A.    That's correct.

3  Q.    And you were set up by somebody that you did

4  sales with prior to; right?  They gave you up?

5  A.    Basically.

6  Q.    Basically?  Somebody gave you up that you

7  were doing business with?

8  A.    They brought me in on a conspiracy, that's

9  correct.

10  Q.    Okay.  Someone else brought you in on a

11  conspiracy and you were arrested at your warehouse

12  on April 1st; correct?

13  A.    Well, if you check the address, I was

14  arrested at a residence.

15  Q.    Okay.  You were arrested at a residence?

16  A.    Uh-huh.

17  Q.    Your residence?

18  A.    Yes, sir.

19  Q.    On April 1st?

20  A.    Yes, sir.

21  Q.    And you were charged with possession with

22  the intent to distribute marijuana; correct?

23  A.    I was charged with -- there's no possession.

24  It was just a -- it was just conspiracy to traffic

25  300 pounds.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.    Of marijuana?

A.    Yes, sir.

Q.    The case that you pled guilty to?

A.    I pled guilty to it.

Q.    Okay.  And that was on April 1st; correct?

A.    I didn't plead guilty on April 1st, but I was arrested on April 1st.

Q.    You were arrested on April 1st.  You went to jail?

A.    Yes, sir.

Q.    You went to Pinellas Country?

A.    Yes, sir.

Q.    You weren't given a bond?

A.    No, I wasn't given a bond right away, but I wasn't at Pinellas County yet.  I was in Tampa.

Q.    But you were incarcerated?

A.    Yes, sir.

Q.    In jail.  And you made phone calls from that jail, didn't you, after your arrest?

A.    I believe I did.  I probably called my wife to ask her what was going on with my lawyer.

Q.    And you also called Cleo Mitchell, didn't you?

A.    I might have to tell him I was in a bind.

Q.    And several days later you're visited by

1    Agent Justin; correct?  More specifically on the

2    3rd of April.

3    A.    Also visited by my lawyer, Bjorn Brunvand.

4    Q.    And does he still represent you?

5    A.    Yes, he does.

6    Q.    On the 3rd you agreed to start cooperating

7    with the government?

8    A.    That's correct.

9    Q.    The way someone else had set you up and made

10   a deal with the government that caused you to be

11   arrested; right?

12   A.    Similar to that, yes.

13   Q.    Okay.  And at that time on your -- is that

14   your first visit or your first interaction with the

15   federal government after your arrest?

16   A.    Yes, sir.

17   Q.    On April 1st did you sit down and explain to

18   them your involvement in this extravagant drug

19   conspiracy?

20   A.    I didn't explain anything on April 1st.

21   Q.    You didn't say anything to them on

22   April 1st; right?

23   A.    No, I did not.

24   Q.    You didn't say anything to them on April 2nd

25   either?

```
1    A.      I didn't say anything till I had spoken to

2    my lawyer.

3    Q.      That's fine.  And after you spoke to your

4    lawyer, you decided to cooperate with the

5    government?

6    A.      Yes, sir.

7    Q.      And that's what brings you here today, your

8    cooperation?

9    A.      Yes, sir.

10   Q.      And that's what you hope will get you not to

11   go back to jail?

12   A.      Well, I'm going to jail regardless, sir.

13   Q.      You're not in jail now, though, are you?

14   A.      I'm out on bond.

15   Q.      And they agreed to let you out on bond,

16   didn't they?

17   A.      Due to the circumstances.

18   Q.      They agreed to let you out on bond, they let

19   you travel within the District of --

20   A.      South Florida.

21   Q.      Yeah.

22   A.      Yes, sir.

23   Q.      Drive your cars, go out wherever you wanted

24   to, meet your friends at Las Vegas; right?

25   A.      I can't go to Las Vegas.
```

1    Q.    No.  The club Las Vegas there's here on Dale

2    Mabry.  You know that place?

3    A.    I haven't been there since I made bond.

4    Q.    Okay.  Anyway, on the 3rd is your -- is

5    that -- the 3rd your first meeting with the

6    government; right?

7    A.    I believe so.

8    Q.    And at that time you tell them that you're

9    working for Cleo Mitchell and it's a much bigger

10    operation?

11    A.    Something like that.

12    Q.    Prior to that you talked to them about your

13    arrest and those people that you were involved

14    with; correct?

15    A.    That's correct.

16    Q.    Told them about Victor Hernandez, told them

17    about Joshua Morello?

18    A.    I didn't really tell them about it.  I just

19    basically told them that, you know, they weren't

20    lying.

21    Q.    Right.  You explained to them in detail that

22    operation, the exchange of thousands of dollars

23    that went on prior to your arrest; isn't that true?

24    A.    I basically read it in my paperwork.

25    Q.    We're going to get to that.  You've seen all

1  this paperwork and they've given you copies of the

2  statements that you've given, haven't they?

3  A.    My statements?

4  Q.    The interviews that they've done with you,

5  you've gone over those with the agents, haven't

6  you?

7         MR. PRESTON:  Objection.  Good faith

8  basis.

9         THE COURT:  Witness may answer the

10 question.

11        THE WITNESS:  Have I went over the

12 statements?

13 BY MR. RODRIGUEZ:

14 Q.    Yeah, your conversations with them and what

15 you told them before.

16 A.    Yeah.

17 Q.    Okay.

18        MR. RODRIGUEZ:  That sufficient,

19 Counsel?

20        THE COURT:  Counsel, let's refrain from

21 counsel to counsel discourse.

22 BY MR. RODRIGUEZ:

23 Q.    Now, we're going to get back to going over

24 your statements prior to you coming to trial, but I

25 want to take you back to April 3rd.  Among the

1  things you told them at that time were the
2  operations that you were involved with before, and
3  then you gave them a new operation; correct?  You
4  told them at that time that you worked for Cleo
5  Mitchell; isn't that correct?
6  A.    Correct.
7  Q.    And it was at that same time that you were
8  interested in giving them some information in order
9  for you to be released from jail; correct?
10  A.    Yes.
11  Q.    So were you in Tampa or in Pinellas County
12  jail at that time?
13  A.    After being processed I was in Pinellas.
14  Q.    You're in Pinellas.  And this is where the
15  first meeting took place --
16  A.    Yes, sir.
17  Q.    -- with the government?  Okay.  And you
18  basically asked if you gave them information, would
19  they be willing to let you out of jail, didn't you?
20  A.    No.  I just told them the truth.  I told
21  them that there was a time sensitive matter at
22  hand and that I could provide them something that
23  was still in the process of working its way to
24  come.
25  Q.    Time sensitive matter?

1   A.      Yes, sir.

2   Q.      Help me get out of jail, is that a better

3   translation?

4   A.      I guess, but the delivery was still going to

5   come.  And if I wasn't there to receive it, then

6   it might have not came to our location.

7   Q.      But you asked them to put you back out on

8   the street; isn't that true?

9   A.      I told them that if I was back out on the

10  street I would be able to basically receive the

11  shipment.

12  Q.      And several days later the government agrees

13  to recommend that you make bond; correct?

14  A.      I believe it was on a Friday.

15  Q.      So how many days were you in jail?

16  A.      Probably like nine days.

17  Q.      Nine days.

18          Now, before we get into this operation, in

19  your first meeting you discussed with them how

20  you'd approach one of your other cohorts and try to

21  talk him into renting apartments for you; isn't

22  that true?  That you'd pay him $500.  And you

23  didn't want the apartments in your name.  You

24  wanted it in someone else's name.  Do you recall

25  that?

1    A.    That sounds correct.

2    Q.    Okay.  And you also went on to say that you

3    didn't want it in your name.  So the apartment that

4    you worked out of or your safe house for the money

5    was leased by who?

6    A.    The first apartment was leased by Stavros

7    Patanakos (phonetic).

8    Q.    Stop right there.  Tell the jury who he is.

9    A.    Stavros Patanakos has been a friend of mine

10   probably since I was about 17.

11   Q.    And you asked him to do you this favor, to

12   put everything in his name, and you'd pay him an

13   additional $500 for doing you that favor; correct?

14   A.    Yeah.

15   Q.    And the second apartment, how much did you

16   pay your sister for putting that apartment in her

17   name?

18   A.    Probably the same amount.

19   Q.    That's the apartment that you spent an hour

20   discussing where the safe was at and where you and

21   Cleo would divide up the money; right?

22   A.    That's -- yeah, that was our last apartment

23   together.

24   Q.    That's Rocky Point; correct?

25   A.    Yes, sir.

1  Q.    You had your sister lease that apartment for

2  you; correct?

3  A.    Yes.

4  Q.    And you told your sister you were going to

5  use it to count the money from your drug

6  enterprise; isn't that true?

7  A.    That's not true.

8  Q.    Okay.  You didn't want her to know, did you?

9  A.    I didn't tell her anything.  I just asked

10  her I needed a favor.  Same thing with Steve.

11  Q.    Same thing from Steve?

12  A.    Yeah.

13  Q.    Because you didn't want it in your name;

14  isn't that correct?

15  A.    Yes, sir.

16  Q.    Later on we're going to talk, but at one

17  time in the safe there at the apartment leased by

18  your sister there was a hundred thousand dollars;

19  correct at least?

20  A.    I believe so.

21  Q.    Do you have -- you mentioned carrying

22  ledgers.  And you mentioned holding one, I think

23  your response was, to help you get out of jail or

24  for when you were arrested.  Do you remember

25  something like that?

A.    Well, I just -- for some reason I didn't

have the immediate -- I didn't -- usually I'd get

rid of everything written down about a week after,

but I kept that.

Q.    Do you have a ledger of how many times you

met with the government?

A.    No, I don't.

Q.    Let's talk about this.  You recorded you

said at least 75 recordings; correct?

A.    Sounds about right.

Q.    What equipment did the DEA give you to

record these conversations?

A.    I don't know the exact terminology for it,

but it's basically something that you put in your

ear and you place it in your ear and it records as

you talk on the cell phone.

Q.    You plug it in the top of the cell phone?

A.    No.  It's a device that you plug into itself

and wear it on your ear and just hold the phone to

it.

Q.    So this wasn't -- it wasn't very big, was

it?

A.    No.

Q.    Something you put right into your cell phone

that you could carry in your pocket?

A.    Well, it doesn't really plug into your cell
phone.  It just goes around your ear and just sits
in your pocket, and your phone goes to your ear
and you record as you talk.

Q.    Sort of like a Blue Tooth?

A.    Not necessarily, but --

Q.    Jaw Bone?

A.    I'm not familiar with that.

Q.    But anyway, it's an apparatus that goes
behind your ear?

A.    Right.

Q.    Do you still have it or did you give it back
to the government?

A.    No, I do not have it.  I don't have any use
for it.

Q.    Okay.  So something you put behind your ear.
And then if you put your cell phone close enough
it'll record the conversations?

A.    Yeah.  It picks up very well.

Q.    And that's why your conversations are much
clearer than the other people on the other end; is
that right?

A.    I would assume.

Q.    Okay.  And you carried that with you?

A.    Yeah, I had it with me for quite some time.

Q.    When did you first get that from the
government?

A.    Whenever I felt like it was necessary.

Q.    When did you first get it from them?

A.    I couldn't give you an exact date.  I
wouldn't know.

Q.    Beginning of April 2008?

A.    Yeah.

Q.    Okay.  And when did you give it back to
them?

A.    It was basically brought -- brought to me.
And then after I was done with it, it was taken
back.  And then if I needed it again, it was
brought to me again.  It wasn't something I kept.

Q.    Who would bring it to you?

A.    Normally whatever agent was in charge.

Q.    Did you have any other recording equipment
that was given to you at any time?

A.    Not that I recall.

Q.    Did you ever wear a body mike during any of
these conversations with anyone?

A.    No.

Q.    Now, the conversations that have been played
by the government were approximately 12 to 15.
Have you listened to the other 60 or 65 recordings?

A.    I listened to almost all the recordings that were made, but some of them were like just bad quality.

Q.    But you listened to all of them?

A.    I've listened to everything that basically was put in front of me.

Q.    So you don't know if it was all of them or not; right?

A.    I wouldn't be -- I wouldn't be sure on that.

Q.    And you testified earlier that you didn't record all the conversations; isn't that correct?

A.    Any of the conversations that would have me, Cleo Mitchell, or Sheldon Shorter I definitely would have recorded them.

Q.    Okay.  When you first were given whatever equipment was provided you by the DEA, what were the instructions that you were given prior to recording any conversations?

A.    What?  On the equipment?

Q.    And the equipment and any other instructions as to your conversations.

A.    I mean, basically it was just showed me how to use the equipment.

Q.    What else did they tell you?

A.    It wasn't that difficult.

Q.    What else did they tell you?

A.    Just to record the conversation of what was going on.

Q.    And not push anybody into any conversation, not to entrap anyone?

A.    I mean, you don't -- the truth tells itself. You don't got to entrap anybody.

Q.    I didn't ask you that. I asked you if you had that conversation with them.

A.    No, I didn't.

Q.    Okay. Now, the second time you met with them you explained to them your function initially was to collect and distribute. And that Cleo was never in the warehouse for delivery; isn't that correct?

A.    He might have been in the area. But just like Sheldon, he didn't want to be in the immediate presence.

Q.    Thank you. Cleo was never at a warehouse to accept delivery; isn't that what you told the agents?

A.    That's what's I believe is correct. He's been at the warehouse, just not at the same time of a delivery.

Q.    If you don't understand my question, I'll

1    break it down for you.

2    A.    All right.

3    Q.    During delivery Cleo was never there?

4    A.    For a delivery?

5    Q.    During delivery.

6    A.    During delivery?  He was probably within the

7    vicinity, but he wasn't directly with me.

8    Q.    Try it again.  During delivery of marijuana

9    Cleo Mitchell was not at the warehouse?

10   A.    Not that I recall.

11   Q.    Do you want to think about it a little

12   while?

13   A.    I can't recall it.

14   Q.    And you told the agent that he wasn't -- he

15   was never at the warehouse, but he was always in

16   the vicinity probably watching out; isn't that

17   correct?

18   A.    Sounds correct.

19   Q.    Now, we're going to get back to it, but I

20   want to talk about Rocky Point, the apartment that

21   you and Cleo had.

22   A.    Yes, sir.

23   Q.    This is where Cleo ordered you to count the

24   money or you would count the money with him?

25   A.    We'd count it together.

1    Q.    You counted it together and you stored it;

2    right?  And there was a safe there; correct?

3    A.    Yes, sir.

4    Q.    And that safe had a combination?

5    A.    Yes, sir.

6    Q.    And the combination of that safe was given

7    to three people; correct?

8    A.    Yes, sir.

9    Q.    You -- you had the combination?

10   A.    Yes, sir.

11   Q.    Cleo had the combination?

12   A.    Yes, sir.

13   Q.    And Cleo's cousin, Hopkins, had the

14   combination; correct?

15   A.    If that's his cousin, yeah.

16         MR. RODRIGUEZ:  Excuse me a second.

17   BY MR. RODRIGUEZ:

18   Q.    I want to clarify some of the things that

19   you discussed with Mr. Preston in your direct.

20         Had you met with Mr. Preston prior to

21   testifying here today?

22   A.    Yes, sir.

23   Q.    Have you discussed your testimony with

24   Mr. Preston or anyone else prior to today?

25   A.    Yes, sir.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.    Did you guys have a basic idea of what the questions were going to be asked and the answers that you were going to be giving?

A.    Yes, sir.

Q.    Now, let's get back to your testimony that started off this morning.

You started off this morning saying that your function was to receive the marijuana; correct?

A.    I'm listening.  Yeah.

Q.    Is that yes or no?

A.    Yes, sir.

Q.    To pick up the money?

A.    Not in this order, but yes, I'm agreeing to what you're saying.

Q.    Dropping off the money?

A.    (Nods head.)

Q.    And distributing marijuana?

A.    (Nods head.)

Q.    Correct?

A.    Yes, sir.

Q.    But you said of those, your main job initially was receiving the marijuana?

A.    That was the most important part of it, yes.

Q.    And we're talking about the beginning.

A.     In the beginning?

Q.     In the beginning.  That was your most important function was to receive the marijuana?

A.     Correct.

Q.     You initially met Cleo by buying marijuana from him; isn't that true?

A.     I never bought marijuana from him, but I basically was given marijuana on a front meaning I didn't have to have my money.  Basically he gave it to me, and he gave me a certain amount of time to come back with the money.

Q.     For the non-drug dealers, okay, can you explain to us what the front is.

A.     It's just basically getting the product without having to pay for it.

Q.     Consignment sort of?

A.     Something like that.

Q.     And from there after you did good, as you said, or became reliable, you became Cleo's right-hand man?

A.     Yes, sir.

Q.     That's when he asked you to rent the first warehouse; correct?

A.     Correct.

Q.     And is the first warehouse that he asked you

1  to rent the one that you set up as a hobby shop?

2  A.    Yes, sir.

3  Q.    And where was that located?

4  A.    That was off of 62nd Street by the Auto

5  Trader in Largo, Florida.

6  Q.    So after you became Cleo's right-hand man,

7  Cleo asked you to rent the warehouse which was

8  subsequently on 62nd Street?

9  A.    Yes, sir.

10  Q.    That was the -- so that warehouse you set up

11  as a hobby shop sort of, you said?

12  A.    Yes, sir.

13  Q.    That was the front for the warehouse that

14  Cleo asked you to rent?

15  A.    Yeah.  I had cars I was working on.

16  Q.    And that warehouse was in whose name?

17  A.    That warehouse was in my name.

18  Q.    Wasn't in Cleo's name; right?

19  A.    No.

20  Q.    Cleo asked you to rent the warehouse?

21  A.    Yes, sir.

22  Q.    And put it in your name?

23  A.    Yes, sir.

24  Q.    Was the hobby shop your idea or Cleo's idea?

25  A.    Basically both our ideas.

1    Q.    At that time Cleo also told you and you

2    testified earlier not to ask him any questions;

3    isn't that true?

4    A.    Basically, yeah.

5    Q.    And he also told you at times to get lost

6    and not be around; isn't that true?

7    A.    That's what I said.

8    Q.    Cleo also told you that sometimes not to ask

9    why or why not.  Just not to be there; correct?

10    A.    Correct.

11    Q.    Several times -- on more than one time you

12    were ordered by Cleo to leave the area; isn't that

13    true?

14    A.    I just recall like one time showing up

15    unannounced and he told me to leave.

16    Q.    Cleo is the one that ordered you to leave?

17    A.    Yes.

18    Q.    Now, whose name was the second lease in of

19    the warehouse?

20    A.    Which one?  Because the first one moved and

21    the second one --

22    Q.    We just discussed the hobby shop.

23    A.    Yes, sir.

24    Q.    Cleo asked you to put that in your name.

25    A.    Right.

1    Q.    Now we're at a second warehouse.

2    A.    All the leases were in my name.

3    Q.    For warehouses?

4    A.    Yes, sir.

5    Q.    Because the apartments were in your friend's

6    and your sister's name?

7    A.    Yeah.  But before the apartments came, the

8    warehouses were before the apartments.

9    Q.    Okay.  But I'm just discussing warehouses.

10   A.    Yes, sir.

11   Q.    The second warehouse, what was the front

12   that you used for the second warehouse?

13   A.    Pinellas Auto Glass.

14   Q.    And Pinellas Auto Glass, was that your idea

15   or Cleo's idea?

16   A.    That was my idea.

17   Q.    You eventually paid Cleo for the marijuana

18   that he fronted you; correct?

19   A.    Yes.

20   Q.    And that was approximately $20,000?

21   A.    Somewhere around there.

22   Q.    Do you remember approximately the time frame

23   of when this is, the second warehouse?  When was

24   that?

25   A.    The second warehouse where I started

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  receiving personally?

2  Q.    Yes, sir.

3  A.    Probably like the beginning of '06.

4  Q.    All right.  Now, you testified earlier that

5  you thought that Pingy was employed by Sheldon

6  Shorter; right?

7  A.    That's what it was told to me.

8  Q.    By who?  By Cleo?

9  A.    By Cleo.

10  Q.    Why would Pingy be employed by Shorter if

11  Pingy is driving Cleo's Cadillac that's registered

12  to Cleo's mother?

13  A.    I don't know what to tell you.

14  Q.    But Cleo told you that Pingy was Shorter's

15  person; right?

16  A.    Well, later on I came to find out their

17  relationship was definitely a solid relationship.

18  Pingy was like a muscle.

19  Q.    A muscle.  And you told that to the agents

20  too, right, that Pingy was a muscle?

21  A.    Basically, yeah.

22  Q.    Do you recall when you told them that?

23  A.    Basically said that he was -- excuse me.  I

24  didn't understand the question.

25  Q.    When did you tell the agents that Pingy was

1  a muscle?

2  A.    Basically the first time I told them who

3  accompanied me on the first deliveries.  Basically

4  he was there to, you know, keep an eye on things

5  and make sure everything went smooth.

6  Q.    When you first started receiving marijuana

7  at the warehouses, Cleo was the one that explained

8  to you how it worked and what you were supposed to

9  do; isn't that correct?

10  A.    Him and Pingy.

11  Q.    Okay.  And you testified earlier that you'd

12  bring in two to four pallets and you personally and

13  you only would use the forklift for those pallets;

14  correct?

15  A.    Yeah.  I was the only one who knew how to

16  work the forklift.

17  Q.    Okay.  And at one time -- at least one time

18  Cleo yelled at you concerning cover loads; isn't

19  that true?  He screamed at you?

20  A.    For messing up a cover load, yeah, that's

21  accurate.

22  Q.    Okay.  There's no doubt that he was the one

23  that was telling you what to do and how it was to

24  function at that time; isn't that true?

25  A.    Well, he was above me in command.

1    Q.    And you and Cleo discussed what the

2    operation was and what your duties were to be;

3    right?

4    A.    Yeah, somewhat.

5    Q.    Cleo told you that you were to inventory the

6    marijuana?

7    A.    I mean, basically the first couple times I

8    was really shown like how to do everything from

9    Pingy being there kind of helping me through it.

10   But, yeah, he told me a rough outline of what he

11   needed done, and I did it.

12   Q.    He told you -- Cleo told you that you were

13   responsible for inventorying the marijuana?

14   A.    That's correct.

15   Q.    He told you that you had to account to him

16   for the marijuana?

17   A.    That's correct.

18   Q.    He told you that you had to separate out for

19   various buyers the marijuana; true?

20   A.    Yeah, deliveries that were to be made that

21   night.

22   Q.    Okay.  I'll use the word deliveries.  Excuse

23   me.  You took orders from Cleo as to the

24   distribution of the marijuana that would come in;

25   correct?

1    A.      Correct.

2    Q.      You kept a ledger or more than one ledger;

3    correct?

4    A.      I usually kept one ledger at a time.

5    Q.      Right.  For each load?

6    A.      Yes, sir.

7    Q.      And that was to keep an accounting so that

8    Cleo would know what you were doing and you could

9    square up with Cleo; isn't that true?

10   A.      Yeah.

11   Q.      Okay.  Because you didn't want there to be

12   any discrepancy or any monies owed by you to Cleo?

13   A.      Correct.

14   Q.      And Cleo told you after each particular load

15   to destroy the ledger, didn't he?

16   A.      Yes.

17   Q.      Now, you didn't do that, though, did you?

18   A.      It wasn't done with the current load so I

19   still had the ledger.  But the ledger prior to

20   that.

21   Q.      The one at your apartment?

22   A.      Yes, I still had that.  I didn't get rid of

23   it.

24   Q.      I think the government described that as you

25   wanted to keep it until you were arrested.

A.    I just wanted to hold onto it.  Something
told me to hold onto it.

Q.    Like a get out of jail card type thing that
you could use it like you're using it now?

A.    No, you're not going to get out of jail with
it, but it's important information.

Q.    Are you in jail now?

A.    No.

Q.    Did you give it to the government?

A.    I forfeited it.

Q.    You gave it to the government?

A.    Yeah.  I had to forfeit everything.

Q.    And you got out of jail?

A.    I was already out of jail.  I forfeited it
willingly.

Q.    Okay.  So you kept it even though he ordered
you to destroy them.  And why did he tell you to
destroy them?

A.    He said that was told to him.  Basically an
order was put down on how we should handle
ourselves and how things should be done.  And
basically this was just coming down the chain of
command to me.

Q.    You testified earlier that the money was
coming in was money for Cleo; do you remember that?

1    That you were upset that you were doing all the

2    work and you weren't getting your part of the

3    action; do you remember that?

4    A.    Yes, sir.

5    Q.    But you were responsible to Cleo for all the

6    money.  And one of the reasons for the ledgers and

7    the accountings we're going to talk about is that

8    you wanted to square up with Cleo because you

9    didn't want there to be a problem with Cleo;

10   correct?

11   A.    Right, I didn't want the problem to go past

12   him.

13         MR. RODRIGUEZ:  Could we have 15,

14   please.

15   BY MR. RODRIGUEZ:

16   Q.    Let me show you what has been previously

17   introduced as Government's Exhibit No. 15.  Do you

18   see that on your screen?

19   A.    I see the first page.

20   Q.    Hey Joe was Cleo's customer?

21   A.    Yes, sir.

22   Q.    Ju was Cleo's customer?

23   A.    That's correct.

24   Q.    Bro is Cleo's brother?

25   A.    That's correct.

1      MR. RODRIGUEZ:  Could we go to the next

2 page, please.

3 BY MR. RODRIGUEZ:

4 Q.    White Boy No. 1, that's Seth Clemens; right?

5 A.    Yes, sir.

6 Q.    Seth Clemens is a co-defendant in this

7 particular case, is he not?

8 A.    I believe so.

9 Q.    Seth Clemens pled guilty and has been

10 sentenced in this case; isn't that true, Mr. Parra?

11 A.    Sounds correct.

12 Q.    And we have White Boy No. 2; right?

13 A.    No. 1.  And there was supposed to be No. 2,

14 but they're kept in the same thing.

15 Q.    Now, on your total down here, this is the

16 number that you wanted to be exact so you would

17 have no problem with Cleo Mitchell; isn't that

18 correct?

19 A.    That's not a total.  That's just two

20 different delivery amounts.

21 Q.    You wanted the numbers to be exact so he

22 wouldn't give you any trouble; isn't that true?

23 A.    Yeah, numbers have to be correct any time.

24 Any situation they have to be correct or you're

25 held accountable.

1  Q.   You're held accountable to Cleo -- you were?

2  A.   Or above him.

3  Q.   You were held accountable to Cleo?

4  A.   Yeah.  If Cleo couldn't handle the

5  situation, then it would come down from above him.

6  Q.   Let me ask the question again.  You were

7  accountable to Cleo?

8  A.   Yes, sir.

9  Q.   Where's Cleo's name in No. 15 here?  If all

10 this was his dope, where's Cleo's name?

11 A.   I never put real names to anything.  I mean,

12 this is -- this right here is basically my records

13 so him and I could go over it at a later time.  He

14 kept his own ledger with his own information in

15 it.  And his information was basically in regards

16 to Shorter.

17 Q.   Government's Exhibit No. 15, you had to

18 reconcile with Cleo at the end of this, did you

19 not, to come up with a grand total?

20 A.   I was basically working for him, so my

21 responsibilities were to him.

22 Q.   You had to come up with a grand total that

23 would satisfy Cleo, did you not?

24 A.   I don't see the total, but yeah, that's

25 basically the idea.

1    Q.    Okay.

2          MR. RODRIGUEZ:  Could I have No. 14,

3    please.

4    BY MR. RODRIGUEZ:

5    Q.    You're seeing a portion of Government's

6    Exhibit No. 14.  Again, that's -- is that 14?

7    That's another ledger you kept?

8    A.    Yes, sir.

9    Q.    And this is another ledger where you felt

10   that you were being held responsible by Cleo; isn't

11   that true?

12   A.    Yes, sir.

13   Q.    At this time or at that time for this

14   load -- can we use that word -- this transaction,

15   this marijuana?

16   A.    Yeah, you can call it a load.

17   Q.    Load?

18   A.    Yes, sir.

19   Q.    You'll understand what we're talking about?

20   You and Cleo were the ones that collected the money

21   from everyone.  Isn't that true?

22   A.    The majority of his customers he didn't want

23   me collecting the money from them to see how much

24   they were paying, so he would collect.  But there

25   are some of his customers I collected money from,

1    yes, sir.

2    Q.    You and Cleo were the only ones responsible

3    for collecting the money from this load; true?

4    A.    What we got rid of to our customers, yes.

5    Q.    Okay.  And you had to reconcile that with

6    Cleo?

7    A.    Reconcile what?

8    Q.    The numbers that you sold and the monies

9    that you collected.

10   A.    Well, we -- out of this load we took

11   everything that we distributed to our customers,

12   and we're responsible for the money.  But anything

13   that was distributed for any of Shorter's

14   associates, we weren't responsible for it.

15   Q.    Where's Shorter's name on that list, by the

16   way, if you'd put that back up because you keep

17   throwing that in there?

18   A.    Okay.

19          MR. RODRIGUEZ:  Can you put 14 back up

20   there.

21   BY MR. RODRIGUEZ:

22   Q.    Can you show me Shorter's name up there.

23   A.    Well, as I advised earlier, it's probably on

24   a different page, but I refer to him as Big Homey.

25   Q.    Today you referred to him as Big Homey;

1    right?

2    A.    Any time me and Cleo talked, we would use

3    two or three different names.  We would use J,

4    Big Homey, or Big Pimp in reference to him.

5    Q.    And in all the transcripts and all the 95

6    phone calls that you have, you refer to Sheldon

7    Shorter as Big Homey, don't you?

8    A.    Not all of them.

9    Q.    Any of them?

10   A.    Any of what?

11   Q.    Any of your conversations that you had with

12   him that you recorded, did you say to him or did

13   you refer to him as Big Homey?

14   A.    Probably Big Pimp or J.

15   Q.    Let me ask you the question again.

16   A.    No, I did not.

17   Q.    In none of the phone calls that you had to

18   him did you ever refer to him as Big Homey, did

19   you?

20   A.    Not that I recall.

21   Q.    The only time you referred to him as

22   Big Homey is after you met with the government and

23   you come in here and you testimony that that fake

24   name that you put up here is Sheldon Shorter; isn't

25   that true?

1  A.     That's not true.  That was just information

2  that we used to talk to each other about

3  situations without having to use the real name.

4  Q.     Okay.

5  A.      And the real name was -- that I thought

6  was J.

7  Q.     Now, was that -- we're talking about the

8  collections of monies for 14.  And that's when Cleo

9  came down on you pretty hard, didn't he, about

10  selling, wanting you to do more volume, and you

11  were concerned about being cut out a little bit?

12  A.     Something like that.

13  Q.     Why don't you explain that to us.  You

14  wanted more of the cut; isn't that true?

15  A.     Well, I just felt for the responsibilities

16  that I was at hand for, from what other people

17  told me in our little organization, they basically

18  said that five to $10,000 was nowhere near enough

19  money to be doing that kind of work.

20  Q.     You wanted more money?

21  A.     I guess, yeah, that's --

22  Q.     Wanted a bigger cut of the pie?

23  A.     Just wanted more money for the work I was

24  doing.

25  Q.     You wanted a little upward mobility in the

1  organization?

2  A.     I mean, I had the respect.  I just didn't

3  have the money to go with it.

4  Q.     Okay.  And is that what you mean by he came

5  down on you a couple times?

6  A.     Who are you referring to?

7  Q.     Cleo.  You testified earlier, Cleo put the

8  order down on me to make more sales.

9  A.     Well, he basically wanted me to lower the

10 price so more people would want to purchase

11 because basically he was unhappy with my numbers.

12 My numbers were going to have to go up.

13 Q.     And since he controlled it, he didn't want

14 you to know what the other people were paying him;

15 isn't that true, Mr. Parra?

16 A.     Sounds accurate.

17 Q.     Okay.  He wanted to keep you separate in a

18 way and use you; isn't that true?

19 A.     Sounds accurate.

20 Q.     Put the warehouses in your name, have your

21 sister put the apartment where you kept all your

22 money in her name; correct?

23 A.     Sounds accurate.

24 Q.     Have you do all the dirty work at the

25 warehouse, pallets, accounting, collecting,

1    ledgers; correct?

2    A.    That's my ledger.  Like I said before, he

3    had his own ledger.

4    Q.    And then he sold to his own people and you

5    were getting cut out?

6    A.    It wasn't any of my business.

7    Q.    Because that's the way it was?

8    A.    That was part of my job duties.

9    Q.    In other words you -- correct me.  You had

10   your functions, and he compartmentalized what you

11   were supposed to know and what you were supposed to

12   do?

13   A.    I had my functions.  And that was just to

14   deliver and don't ask any questions.

15   Q.    Don't ask any questions.  And get out of

16   here if I tell you to get out of here.  And don't

17   ask any questions about certain monies; true?

18   A.    Sounds accurate.

19            THE COURT:  Mr. Rodriguez, we're going

20   to take our afternoon recess at this point.  We'll

21   reconvene at 3:30.  I remind you again, ladies and

22   gentlemen, do not discuss the case.  Do not make

23   up your minds about any of the issues yet.

24            COURT SECURITY OFFICER:  Please rise for

25   the jury.

1       (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

2               THE COURT:  You may come down.

3       (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

4           PROCEEDINGS CONTINUED AS FOLLOWS:)

5               COURT SECURITY OFFICER:  All rise for

6   the jury.

7       (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

8               COURT SECURITY OFFICER:  All rise.

9               THE COURT:  Mr. Rodriguez, you may

10  continue.

11              MR. RODRIGUEZ:  Thank you.

12  BY MR. RODRIGUEZ:

13  Q.      Mr. Parra, your street name is Mini?

14  A.      My street name?

15  Q.      Yeah.

16  A.      I don't believe so.

17  Q.      Why don't you tell the jury what your street

18  name is.

19  A.      My street name Ro.

20  Q.      Ro?

21          Now I want to refer you back to April 11th

22  of this year when there was a search of the

23  warehouse that you were renting.  And I'm going to

24  talk to you about this safe which is in

25  Government's Exhibit No. 8A.  Can you see it there

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    in front of you?

2    A.    Yes, sir, I see it.

3    Q.    You discussed before that at one time at

4    this warehouse you had gotten in an argument with a

5    driver.  Do you recall that?

6    A.    At this warehouse?

7    Q.    Am I mistaken?

8    A.    I mean, you haven't given me -- you haven't

9    asked me to basically go into it, but this

10   warehouse is 1299 Starkey Road, Largo, Florida.

11   Q.    It's 104?

12   A.    Excuse me?

13   Q.    Isn't that storage facility No. 104?

14   A.    104 was the original storage unit that was

15   on 62nd Street by the Auto Trader.

16   Q.    Okay.

17   A.    I closed the lease on that.  And then after

18   opening the second lease where I received, this

19   business -- I basically opened this lease -- I

20   basically transferred my lease from 104 to 1299.

21   Q.    Okay.  This is the safe that later on -- and

22   we can show it now -- has the marijuana in it?

23   A.    That's correct.

24   Q.    That you had put something in front of as a

25   facade so that nobody would notice it's a safe?

1   A.      Basically, yeah.

2   Q.      To hide it?  I mean, it's okay.  To hide it;

3   right?

4   A.      Correct.

5   Q.      And that safe had a combination on it?

6   A.      Yes, it did.

7   Q.      And only two people had the combination to

8   that safe; correct?

9   A.      That's correct.

10  Q.      You had a combination and Cleo Mitchell had

11  a combination; correct?

12  A.      That's correct.

13  Q.      Nobody else could get into that safe?

14  A.      Not that I'm aware of.

15  Q.      And nobody else did get into that safe;

16  isn't that true?

17  A.      Basically I mean that's -- yeah.

18  Q.      Okay.  I now want to take you to April 24th.

19  You had previously testified about setting up the

20  truck and things along those lines.  Do you

21  remember that?

22  A.      The delivery?

23  Q.      Yes.  Now, explain to the jury.  You just

24  didn't come up with that idea, did you?  Whose idea

25  was that?

1  A.    Well, it was already set.  It was already --

2  the progress was already set in stone.  They just

3  were waiting on me to get out of jail.

4  Q.    So you get out of jail.  You discuss it with

5  them.  And then they discuss with you a plan; isn't

6  that true?

7  A.    No.  I mean -- I mean my associates were

8  basically waiting on me to get out of jail so the

9  truck could be delivered --

10  Q.    I understand.

11  A.    -- because they didn't want it delivered to

12  anyone else.

13  Q.    Because you're the one that they trusted?

14  A.    Basically at that location, yeah.

15  Q.    But you and the agents -- and you received

16  instructions from the agents as to what you were

17  going to do and how you were going to do it, how

18  they were going to surveil it, and how it was going

19  to go down; isn't that true, Mr. Parra?

20  A.    That's correct.

21  Q.    So you met with them to discuss all of this;

22  right?

23  A.    That's correct.

24  Q.    And they basically told you what they needed

25  to do?

A.     Sounds correct.

Q.     Okay.  That they were going to have people in the area surveilling or watching; correct?

A.     Sounds correct.

Q.     All right.  And you basically were given direction on how to put it into place so that they could cover this truck; is that safe?

A.     All I did is basically give them the same directions I had given any other driver.

Q.     I'm not asking you that.  I'm asking about the instructions you received from the government.

A.     Say your statement again.

Q.     I know this truck was previously coming.

A.     Right.

Q.     You had to coordinate that.  And the DEA had to know about it?

A.     Right.  I told them about it.

Q.     Told them about it?

A.     Right.

Q.     And then they had to be in a place to have a parole officer pull them over, go through the ruse, and doing all that stuff because you had given them the information.  So that had to all be coordinated; right?

A.     I basically, yeah, told them a delivery was

1    coming.

2    Q.    Okay.  And you met with them and you

3    discussed that with them several times; isn't that

4    true?

5    A.    That's correct.

6    Q.    By the way, Sheldon Shorter didn't have a

7    combination to that safe, did he?

8    A.    I don't believe so.

9    Q.    At the time of your arrest you were holding

10   at least $60,000 cash, were you not?

11   A.    At the time of my arrest --

12   Q.    Somewhere you were holding $60,000 or more

13   in cash; isn't that right?

14   A.    Referring to what?

15   Q.    Referring to money you had.

16   A.    I guess that's correct, yeah.

17   Q.    I don't want you to guess.  Did you have at

18   least $60,000 cash?

19   A.    Of my own money?

20   Q.    I don't care whose money it was.  $60,000

21   cash.

22   A.    Yeah, that's correct.

23   Q.    And part of your deal with the DEA was that

24   you'd turn over that money to them.  And you did?

25   A.    I willingly forfeited the money, correct.

Q.    Willing forfeited the money?

A.    Yes.

Q.    You gave DEA that money; right?

A.    That's correct.

Q.    From the warehouse that we just saw where the safe was at on No. 8, Cleo was the one who tasked you to make deliveries to certain drivers, did he not?

A.    To certain drivers?

Q.    Yes.  That was your testimony before?

A.    Yeah.  The people coming in from out of town?

Q.    Correct.

A.    Yeah.

Q.    Cleo was the one that told you to make the delivery or to do whatever you had to do with them; isn't that correct?

A.    That's correct.

Q.    Okay.  Now, somewhere during your testimony you were asked -- and I'm going to ask you again -- Sheldon Shorter never possessed marijuana; isn't that true?

A.    That's true.

Q.    And I think counsel asked you, he never touched marijuana; isn't that true?

1    A.    That's also true.

2          MR. RODRIGUEZ:  Can you go to No. 17,

3    please.

4    BY MR. RODRIGUEZ:

5    Q.    You described this as a bank account and the

6    $9,000 that Cleo told you how to deposit in the

7    bank; correct?

8    A.    I just said it was a bank account number

9    that I believed to be at Washington Mutual.

10   Q.    And that's Cleo's handwriting; correct?

11   A.    That's correct.

12   Q.    Okay.  Cleo wrote that information down on a

13   piece of paper and gave it to you?

14   A.    Sounds correct.

15   Q.    You in turn deposited $9,000 wherever that

16   is at?

17   A.    Yeah, whoever's account that is.

18   Q.    Okay.  But Cleo gave you those orders?

19   A.    Pretty much.

20   Q.    Cleo gave you that piece of paper?

21   A.    Yes, sir.

22   Q.    Cleo gave you those instructions?

23   A.    Yes, sir.

24   Q.    Thank you.  Now, let's talk about the Audi.

25          MR. RODRIGUEZ:  Could you put 29 up.  I

```
 1    don't know if I'm going to go through all of it.
 2    It's a composite; right?
 3    BY MR. RODRIGUEZ:
 4    Q.    Cleo told you to go and buy an Audi S5;
 5    true?
 6    A.    That's incorrect.
 7    Q.    Cleo didn't tell you to go buy an Audi?
 8    A.    No, Cleo did not.
 9    Q.    Okay.
10    A.    The instructions came from Sheldon Shorter.
11    Q.    Let me see if you answer my question -- if
12    you can hear my question again.  Did Cleo tell you
13    to go buy an Audi?
14    A.    No, he did not.
15    Q.    Okay.  Who -- Sheldon Shorter told you to go
16    buy an Audi?
17    A.    Yeah.  I had a phone call from him asking me
18    to do him a favor.
19    Q.    And is that one of those phone calls that
20    you recorded?
21    A.    I'm really not sure.
22    Q.    You recorded every conversation from Sheldon
23    Shorter, you said earlier.
24    A.    I didn't say every conversation.  I said the
25    majority of the conversations.
```

1    Q.      Have it read back to you?

2            MR. PRESTON:  Objection, Your Honor.

3    The date is on the document.  That can clear

4    things up.

5            THE COURT:  All right.

6    BY MR. RODRIGUEZ:

7    Q.      Did you record this alleged conversation

8    that you had with Sheldon Shorter, Mr. Parra?

9    A.      I don't think this is recorded.

10   Q.      You don't think it's recorded.  Let me ask

11   you again, did you record the conversation with

12   Mr. Parra [sic] that you were testifying to here

13   today?

14           MR. PRESTON:  Objection.  Asked and

15   answered.

16           THE COURT:  Witness can answer to his

17   best ability.

18           THE WITNESS:  I can't recall.

19   BY MR. RODRIGUEZ:

20   Q.      You can't recall.  Do you recall testifying

21   earlier that the monies you paid for that car and

22   the monies that were deposited in that account were

23   monies that you owed to Cleo Mitchell?  Do you

24   remember your testimony from earlier today?

25   A.      Yeah, my money that was owed for what I was

1    responsible for.

2    Q.    So you're saying that Mr. Shorter called

3    you, but the monies that you put into those

4    accounts, including the $5,000 check, were monies

5    that you owed to Cleo Mitchell -- you personally

6    owed to Cleo Mitchell; correct?

7    A.    Basically.

8    Q.    That includes the cash that was put into a

9    woman's bank account and the $5,000 check that you

10   paid; correct?

11   A.    Just a $5,000 deposit, not a check.

12   Q.    You also told the government in your

13   conversations about James Cooney; correct?

14   A.    Yeah.

15   Q.    James Cooney was indicted in this case?

16   A.    I believe he was.

17   Q.    He pled guilty?

18   A.    I believe he did.

19   Q.    And he's been sentenced?

20   A.    (Nods head.)

21   Q.    And they were arrested -- he was arrested

22   well after you were because you're the one that

23   gave the information concerning him; correct?

24   A.    Sounds correct.

25   Q.    Okay.  You also provided them information

1   about a James Kurmay; true?

2   A.   Yeah, I believe that's who I referred to as

3   JJ.

4   Q.   JJ.  And he's been arrested.  He was

5   indicted based on your information; correct?

6   A.   Sounds correct.

7   Q.   He's pled guilty and he's been sentenced?

8   A.   Okay.

9   Q.   And that all happened months after you were

10  arrested, did it not?

11  A.   I believe so.

12  Q.   Why haven't you been sentenced?

13  A.   Waiting on this trial.  I really don't --

14  Q.   What?  The nail has to be put in the coffin

15  before you can be sentenced?

16          MR. PRESTON:  Objection.  Argumentative.

17          THE COURT:  Sustained.

18  BY MR. RODRIGUEZ:

19  Q.   Why haven't you been sentenced?  You were

20  arrested well before they were?  What are you

21  waiting for?

22  A.   I'm not sure.

23          MR. RODRIGUEZ:  One second, Your Honor.

24  BY MR. RODRIGUEZ:

25  Q.   Do you remember meeting with Agent Duralia

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   on April 20th to discuss with him the delivery of

2   the Charger in their office?

3   A.    I'm not really too positive on last names of

4   an agent, but I do remember talking to someone

5   about the delivery of the vehicle.

6   Q.    When I refer to Mr. Duralia --

7   Agent Duralia, this is Justin.

8   A.    Okay.

9   Q.    For our purposes I'll just refer to him as

10  Justin.

11  A.    Yes, that's much better.

12  Q.    He's your case agent, is he not?

13  A.    Excuse me?

14  Q.    He's your case agent?  He's the agent -- the

15  case agent --

16  A.    Yes.

17  Q.    He's the one responsible for you?  He's your

18  handler; correct?

19  A.    Pretty much.

20  Q.    You've heard that term?

21  A.    Yeah.

22  Q.    He's the one that handles you.  He's the one

23  that's responsible for you; right?

24  A.    Sounds accurate.

25  Q.    Either through him or others that he's

1  delegated, they have to give you instructions on

2  what to do?

3  A.    Sounds accurate.

4  Q.    What not to do?

5  A.    There's really -- I haven't -- yeah,

6  basically.

7  Q.    Yeah.  He told you you can't do anything

8  illegal unless they approve it; didn't he tell you

9  that?

10  A.    I don't recall doing anything illegal, but,

11  yeah, I --

12  Q.    I didn't ask you that.  He told you that you

13  can't do anything illegal unless he says it's okay;

14  isn't that true?

15  A.    We never discussed about doing anything

16  illegal if it was okay.

17  Q.    He never told you that you can't commit any

18  illegal acts while you're under his care?

19  A.    Yeah.  He said not to do anything that

20  basically would put me in jail.  That was obvious.

21  Q.    And on April 20th you met with him and you

22  told him that Cleo met you, asked you to pay off a

23  debt to him by giving him your Charger; isn't that

24  true?

25  A.    Well, the debt wasn't towards Cleo Mitchell.

Q.     You told Agent Justin that Cleo Mitchell
told you to pay off your debt to him, a part of it,
by giving him your Charger; isn't that true?

A.     Yeah.  The Charger was being given to
Shorter, not to Mitchell.

Q.     Let me try it one more time.  You told this
agent that Cleo Mitchell told you to pay off your
debt to Mitchell.  You would be giving -- he wanted
you to give him your Charger.  Is that true or not
true?

A.     I was paying off my debt.

Q.     To Cleo Mitchell?

A.     With the Charger.

Q.     I'm not asking you what you were doing.  I'm
asking you what you told the government.

A.     Okay.  That sounds accurate.

Q.     Now, this car, you expected -- who did you
expect to pick up this car?

A.     I was under the impression that MO was
picking up the car.

Q.     Okay.  And the agents gave you a body mike,
did they not?

A.     Wasn't really a body mike.  It was like a
keyless entry mike.

Q.     Explain to the jury what a keyless entry

1    mike is.

2    A.    Just like the same thing that you open and

3    shut your car with, the keyless entry remote pad.

4    But it had a microphone in it.

5    Q.    Okay.  And that wasn't for your cell phone,

6    was it?

7    A.    I don't believe that was for my cell phone.

8    Q.    So when you testified earlier that you were

9    given no other recording device, you didn't

10   remember it at that time?

11              MR. PRESTON:  Objection.  Misstates the

12   prior testimony.

13   BY MR. RODRIGUEZ:

14   Q.    Did you not testify earlier that you were

15   never given any other recording device except the

16   one for your cell phone?

17   A.    You asked me if I had a body mike.

18   Q.    Excuse me.  You held it in your hand;

19   correct?

20   A.    Yes.

21   Q.    Is your hand a part of your body?

22   A.    It is.

23   Q.    Thank you.  So you were prepared and given

24   instructions to record whatever conversation you

25   had with whomever you were supposed to meet;

1 correct?

2 A.    Sounds correct.

3 Q.    And this was really a setup at the time;

4 correct?

5 A.    I don't know what you mean by setup.

6 Q.    You told the government what you thought.

7 They gave you instructions what to tell other

8 people, and you directed those people to do that.

9 That's a setup.  Is that what you did?

10 A.    Sounds accurate.

11 Q.    Okay.  Who did you meet that day to pick up

12 the car?

13 A.    I met up with Cleo, and I met up with an

14 associate of Shorter by the name of MO.

15 Q.    Keep trying.  You met with who?

16 A.    An associate of Shorter.

17 Q.    Okay.  And did the government play that

18 recording earlier today when you were testifying?

19 A.    I didn't hear it.

20 Q.    Did you hear -- have you heard it before?

21 A.    I can't recall.

22 Q.    Sheldon Shorter is not on that recording

23 that you held in your hand covertly, is he?

24 A.    No.

25 Q.    Now, let's get to the truck stop -- for my

1  lack of better words you know what I'm referring

2  to?  The setup of the truck?

3  A.     Where I was dropping off money?

4  Q.     No, not that one.  Excuse me.  Apologize.

5  Can I have a second?  No.  I want to get into a

6  conversation with you concerning the setup where

7  Cleo told you to go pick up a phone --

8  A.     About the shipment that was -- yeah, about

9  receiving a shipment.

10  Q.     Receiving a shipment.  It was Cleo that told

11  you to pick up this phone that you described

12  earlier, was it not?

13  A.     That sounds correct.

14  Q.     And it was Cleo that gave you the

15  instructions on what to do after you got that

16  telephone; isn't that true?

17  A.     I mean, the instructions are pretty clear

18  without having any instructions.

19  Q.     Cleo told you what to do?

20  A.     He told me to pick the phone up and

21  basically answer the call when the call came in.

22  Q.     And the call was going to be coming in

23  concerning a load or a shipment, as you would say?

24  A.     Yeah.

25  Q.     And Cleo also ordered you to call back a

1    certain number, did he not?

2    A.    I believe -- yeah, I believe there was a

3    number on there that basically referred to his

4    driver.

5    Q.    Okay.  But I'm saying you didn't know that

6    without Cleo ordering you to do it; correct?

7    A.    Sounds accurate.

8    Q.    Now, you talked about some cars that you had

9    that you stored and you also stored for Cleo.  Do

10   you remember that?

11   A.    Yes, sir.  I believe it was at the 1299

12   Starkey Road address.

13   Q.    We'll just say Starkey Road?

14   A.    Yeah, that's fine.

15   Q.    That's the warehouse that was searched?

16   A.    Yes, sir.

17   Q.    The one that had the safe?

18   A.    Yes, sir.

19   Q.    The one that had the marijuana?

20   A.    Yes, sir.

21   Q.    The one that you and Cleo had the

22   combination to the safe, that one?

23   A.    (Nods head.)

24   Q.    You had cars there?

25   A.    Yes, sir.

Q.    You had three cars there?

A.    I believe I had two cars there.

Q.    One was your --

A.    No, you're right.  I had three there.

Q.    Just -- it will be faster.  Tell me what those cars were.

A.    A Dodge Ram, Dodge Charger, and I had a Nissan Titan that was in my name.

Q.    Whose name was the Dodge Ram in?

A.    The Dodge Ram was actually -- it was in my name.

Q.    The title was in your name?

A.    Yeah, the Dodge Ram.

Q.    Which one of those cars wasn't in your name?

A.    The Dodge Charger.

Q.    The Charger?

A.    Yes, sir.

Q.    Who did you have buy that for you?

A.    I had a young lady by the name of Lori Weber purchase it for me.

Q.    How did you give Lori the money for her to be able to buy that car?

A.    I had a trade-in which there wasn't any money owed on it.  And then I believe she wrote a check for the remaining balance.  I don't remember

1    the balance, but she wrote a check for the

2    remaining balance.

3    Q.    Okay.  You testified earlier that you

4    thought you owed Cleo over a hundred thousand

5    dollars; right?

6    A.    I said that I believed I owed Shorter a

7    hundred thousand.  But altogether I owed out about

8    150.

9    Q.    A hundred thousand that you say you owed to

10    Shorter, is that on your ledgers there, all the

11    information in the documents that you've given to

12    the government?  Do you show anything like that

13    that you owe Shorter a hundred thousand dollars?

14    A.    I don't believe it's on the ledger.

15    Q.    Did you forget to put it on the ledger?

16    A.    Honestly I don't recall.

17    Q.    Does it sound accurate that you didn't put

18    it on any ledger?

19    A.    It was on a ledger.  It just probably wasn't

20    on my ledger.

21    Q.    Oh, I see.  So it's on Cleo's ledger?

22    A.    It could be.

23    Q.    Have you seen that ledger?

24    A.    Have not.

25    Q.    Now, of the hundred thousand dollars, you

1    told the government that 30 of that was going to be

2    the car that you were giving Cleo; isn't that true?

3    A.    I assumed that, yeah.

4    Q.    You assumed that, but that's what you told

5    them that you assumed?

6    A.    Right.  That's what I assumed it was worth.

7    Q.    Okay.  Well --

8    A.    Market value.

9    Q.    A hundred minus 30.  70 sound accurate?

10    A.    Sounds about right.

11    Q.    Okay.  So you owed Cleo $70,000.  And now

12    we're going to be talking about the fake or the

13    sham money that you described before.  All right.

14    70, 30, 100.  Sound accurate?

15    A.    I'm following you.

16    Q.    Okay.  That $70,000 again was a setup;

17    correct?

18    A.    Basically.

19    Q.    You received instructions from the

20    government on where to go and what to do and how to

21    get these guys there; correct?

22    A.    Sounds accurate.

23    Q.    The Fairfield that you talked about was

24    being surveilled by the government, wasn't it?

25    A.    Sounds accurate.

Q.    You probably had another little mike in your
hand for that transaction, didn't you?

A.    I might have.

Q.    Second one you don't remember; right?

A.    Second one what?

Q.    That you don't remember that you had.  We'll
get off that.

      You had a recorder -- another recorder?

A.    I believe so.

Q.    You had a recorder for your telephone, and
you had a recorder in your hand that you could
record everything that was going on?

A.    I believe so, yes.

Q.    At Fairfield -- at least at Fairfield there
were agents staked out; right?

A.    Sounds accurate.

Q.    And you wanted to lure whoever was coming to
the Fairfield parking lot?

A.    That was basically where I was going to have
them meet me, correct.

Q.    Because that way your story could be
verified.  They could take pictures.  They could
possibly arrest people; correct?

A.    Sounds accurate.

Q.    Gives you more credit, more bang for your

1  getting out of jail; correct?  Sound accurate?

2  A.     I guess so.

3  Q.     But it didn't go down at the Fairfield, did

4  it?

5  A.     No, it didn't.

6  Q.     And you told the government that you thought

7  that Sheldon Shorter would come and pick up that

8  money; right?

9  A.     I was basically under the intimidation

10  factor that it was him picking it up.

11  Q.     Who came to pick up the money?

12  A.     He basically told Cleo Mitchell to come get

13  it.

14  Q.     Who picked up the money?

15  A.     Cleo Mitchell was told to pick it up.

16  Q.     Who picked up the money?

17  A.     Cleo Mitchell.

18  Q.     Thank you.

19         MR. PRESTON:  Objection to the

20  editorializing thank you's.

21  BY MR. RODRIGUEZ:

22  Q.     Now, just to discuss with you the

23  transcripts of the conversations.  Sometimes you

24  would meet with the agents and you would discuss

25  the conversations, where they would go, and in the

1    directions they should be taken?  Does that sound
2    accurate?
3    A.    Sounds accurate.
4    Q.    And you would discuss with them various
5    scenarios of what to say and do; sound accurate?
6    A.    Yes.
7    Q.    Whether it be Gainesville, Fairfield, it was
8    being choreographed by the government; sound
9    accurate?
10    A.    Sounds accurate.
11    Q.    And you testified from questions from the
12    government that you couldn't call Mr. Shorter.  And
13    you said, quote, I can't do that.  Do you recall
14    that?
15    A.    Yeah.  I didn't have a direct number.
16    Q.    Let's now move on to the next setup, the
17    choreographed Range Rover.  Okay?  Cleo told you
18    about the Range Rover; correct?  Sound accurate?
19    A.    About the Range Rover that was driving the
20    money?
21    Q.    The Range Rover that Cleo told you would
22    have $70,000; sound accurate?
23    A.    Yeah.
24    Q.    Cleo told you that in that car would be the
25    monies.  You in turn told the government.  They in

1    turn boxed up whatever they were going to box up or

2    whatever was going to be exchanged.  And it was

3    sham money, or as counsel says, fake money.  There

4    was no $70,000?

5    A.    I'm not following what you're saying about

6    the Range Rover.

7    Q.    Okay.  Let me go back.  Cleo was the one

8    that told you about the Range Rover.  Cleo called

9    you about the Range Rover.  Cleo told you that

10   there would be money in the Range Rover or that

11   there was going to be an exchange of those monies?

12   A.    I was told that there was -- we were taking

13   money for a delivery that was going to be hidden

14   in a Range Rover for delivery to out -- I'm

15   assuming to California.

16   Q.    Okay.

17   A.    But that had nothing to do with what you

18   call the sham money.

19   Q.    I apologize.  I didn't want to mix you up.

20   Okay?

21   A.    I'm just trying to follow -- I'm trying to

22   follow you.

23   Q.    I'm trying to move it along.  Thank you.

24   A.    No problem.

25   Q.    Let me move you along.  Did you ever fly on

1  a private jet?

2  A.    No, I did not.

3  Q.    Did Cleo discuss flying on private jets --

4  A.    Yeah, he did.

5  Q.    -- to pick up deals?

6  A.    He did.

7  Q.    And setting up drug deals?

8  A.    No, he didn't discuss setting up drug deals.

9  He just said that we basically needed an account

10  with the private jet company that was outside of

11  Tampa's airport by the International Mall.  I was

12  to try to obtain an account with them.  And once

13  the account was obtained, that we would be using

14  it.

15          MR. RODRIGUEZ:  Excuse me, Your Honor.

16  May I get the board a second?

17          THE COURT:  You may.  Counselor --

18          MR. RODRIGUEZ:  Yes.  Where would you

19  like this, Your Honor?

20          THE COURT:  Put it over that -- on that

21  side of the -- angle it so the jury can see the

22  board.  Defense counsel, you can move so that you

23  can see the board.

24          MR. RODRIGUEZ:  They can take it out on

25  me.

1          THE COURT:  Mr. Preston, you may also

2    change position if you wish to do so.

3    BY MR. RODRIGUEZ:

4    Q.     Sir, you previously testified that you pled

5    guilty to conspiracy with marijuana; right?

6    A.     Yes, sir.

7    Q.     But you didn't plead guilty in this case,

8    did you?

9    A.     I just pled guilty to my conspiracy.

10   Q.     But you're telling us and you've testified

11   for a full day that you're a conspirator in this

12   case; isn't that correct?  Does that sound

13   accurate?

14   A.     It sounds accurate.

15   Q.     You have not been charged by the federal

16   government or by the DEA for all the things that

17   you've admitted to here in this courtroom, have

18   you?

19   A.     I don't believe so.

20   Q.     And you don't anticipate being charged for

21   that, do you?

22   A.     No, I don't.

23   Q.     You anticipate, sounds accurate, to get a

24   free pass on everything that you've discussed?

25   A.     Not a free pass, but --

```
1    Q.      You're not going to be charged, are you?

2    A.      Won't be held accountable.

3    Q.      You won't be held accountable.  You won't be

4    charged for your involvement -- your admitted

5    involvement in this enterprise; correct?

6    A.      Sounds accurate.

7    Q.      They only charged you in the other case

8    where you were involved in; correct?

9    A.      Sounds accurate.

10   Q.      Saved you 25 years of your life; sound

11   accurate?

12   A.      Sounds right.

13   Q.      Because if you were in this Indictment and

14   you pled guilty or were found guilty, you'd

15   possibly be sentenced to 25 years in jail; isn't

16   that true?

17   A.      I'm not sure how long it would be.  But if

18   that's what the guidelines require, then that's

19   what it is.

20   Q.      25 years.  You pled in another case.  How

21   much time do you expect to serve?

22   A.      I haven't been given any amount of time.  I

23   know I was looking at ten years.

24   Q.      And you're getting ten years because you've

25   been doubled up.  You've been enhanced because
```

1  you're a prior convicted felon, aren't you?

2  A.    I had previous charges, that's correct.

3  Q.    So when you say you're a convicted felon,

4  we're not talking about the case that the

5  government arrested you here for.  You're a

6  convicted felon for something you did years ago?

7  A.    Sounds accurate.

8  Q.    For another drug case; right?

9  A.    A drug possession.

10  Q.    A drug possession case?

11  A.    Yeah.

12  Q.    In Pinellas County?

13  A.    Yes.

14  Q.    Drug conviction?

15  A.    Adjudication withheld on the possession and

16  convicted on a firearm charge.

17  Q.    You had a gun and you had dope; correct?

18  A.    Sounds correct.

19  Q.    As a result, your possible sentence is

20  enhanced.  Have you heard those words?  Does it

21  sound accurate?

22  A.    Yeah, I've heard the enhancement.

23  Q.    And the enhancement is that you could be

24  sentenced not to these 25, but you could get 10

25  years in that other case; sound accurate?

```
1    A.      Yes, sir.
2                 THE COURT:  Gentlemen, with regard to
3    what is becoming a casual use of the phrase sound
4    accurate, let's abandon that and either answer the
5    question yes or no or you don't know.
6                 THE WITNESS:  Yes, Your Honor.
7                 THE COURT:  All right.
8    BY MR. RODRIGUEZ:
9    Q.      And if I could be heard, safe to say at the
10   present time you could possibly be sentenced to
11   35 years in jail; is that accurate?
12   A.      Yes.
13   Q.      Excuse me.  Right now you're on bond.  And
14   you hope that Mr. Preston will file a motion with
15   the Court so that you don't go to jail; isn't that
16   what you wish?
17   A.      I'm definitely going to jail.
18   Q.      Are you?
19   A.      Yes, sir.
20   Q.      Just like you're definitely in jail right
21   now?
22   A.      No.  I'm --
23                 MR. PRESTON:  Objection.  Argumentative.
24   BY MR. RODRIGUEZ:
25   Q.      You're not in jail right now, are you?
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.      I'm on bond right now.

Q.      You're not in jail, are you?

A.      No, I'm not.

Q.      You were in jail nine days this last time?

A.      Yes.

Q.      A lot different than 35 years, isn't it?

A.      Yes.

Q.      Thousands of days less than the 35 years;
right?  Right?

A.      Yeah -- yes.

Q.      And even though the government has given
you, as you say, a pass on these 25 years, and you
were arrested months ago, you have yet to be
sentenced; isn't that true?

A.      I've just been awaiting sentencing.

Q.      Mr. Parra, if you could tell a lie for you
not to go to 35 years to jail, would you do it?

A.      If I could tell a lie and --

Q.      If you could tell a lie in this courtroom
that would guarantee you that you wouldn't go to
jail for 35 years, would you do it?

A.      I'm not allowed to lie.  I would be in
trouble just for lying.

        MR. RODRIGUEZ:  Thank you, Your Honor.
No further questions.

1          THE COURT:  Redirect?  Any redirect on

2     that inquiry?

3          MR. PRESTON:  I do have redirect, yes,

4     Your Honor.

5          THE COURT:  All right.  Well, let's have

6     cross-examination by other defense counsel.  And

7     then you can conduct your redirect generally on

8     their cross-examination.

9          MR. PRESTON:  Yes, sir.

10          MR. CHALELA:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12     BY MR. CHALELA:

13     Q.     Taking your attention specifically to

14     April 24th where you've testified earlier about

15     this truck that's coming in with the load of

16     marijuana to the 118th Avenue warehouse address --

17     you know which one I'm talking about?

18     A.     Yeah.  The last shipment?

19     Q.     Yeah, the last shipment.  Okay.  And we've

20     heard today that you get on the phone and are

21     having this conversation giving some directions;

22     correct?

23     A.     Yes.

24     Q.     Okay.  Focusing your attention on that day

25     only, if I could have Mr. Baptiste stand up and

1    Mr. Volcy stand up, on that day about which you've

2    testified, April 24th, had you ever met these two

3    gentlemen before?

4    A.    I've never met them.

5         MR. CHALELA:  Thank you.  Nothing

6    further, Your Honor.

7         THE COURT:  Mr. Crawford.

8         MR. CRAWFORD:  Thank you, Your Honor.

9                   CROSS-EXAMINATION

10   BY MR. CRAWFORD:

11   Q.    Mr. Parra, during your cooperation with the

12   government were you ever shown a photograph of my

13   client, Mr. Volcy?

14   A.    Of one of the drivers?

15   Q.    Correct.

16   A.    If I was shown, I didn't -- I didn't know

17   who it was.

18   Q.    All right.  So if you were show the

19   photograph, you weren't able to identify anyone

20   because you've never seen him before; right?

21   A.    I've never met him.

22   Q.    And the same goes for Mr. Baptiste.  If you

23   were shown a photograph of him, you weren't able to

24   identify him; right?

25   A.    Yeah, I've never met him.

1    Q.    Do you know what a photo pack is?

2    A.    I believe that's where it has numerous

3    photos of different people.

4    Q.    Right.  And they want -- it's kind of a

5    photographic lineup.  They want to see if you can

6    pick someone out of that photographic lineup and

7    identify them; correct?

8    A.    Yeah, I'm aware of what that is.

9    Q.    Okay.  Were you shown any photographic

10   lineups in this case?

11   A.    I know I was shown photos.  As far as it

12   being in a lineup, I don't think it was

13   necessarily in that order.

14   Q.    All right.  Same question then.  When

15   looking at those photos, any of them, whether in a

16   photo pack or not, you never picked out Mr.

17   Hardaway Volcy or Mr. Jean Baptiste; correct?

18   A.    Yeah, I've never met them like I said

19   before.

20   Q.    All right.  Let me show you what I have

21   previously marked for identification as Defendant

22   Volcy's Exhibits No. 37A, 37B, and 37C and ask if

23   you would look at those three quickly.  And with --

24   have you had a chance to look at them?

25   A.    Yeah, I looked at them.

Q.    Are all three of them photographs?

A.    Yeah, photographs of a tractor trailer.

Q.    Wait.  Wait.  You can't talk about them until they're in evidence.

A.    Oh, I'm sorry.

Q.    Okay.  So let me ask you this:  Do you recognize what is depicted in any of those three photographs?

A.    I mean it's unfamiliar to me.

Q.    Thank you.

      Now, it's fair to say that you were involved in the marijuana business for approximately ten years; correct?

A.    Yes.

Q.    And it is your experience that the people that deal with each other in the marijuana business are very secretive; correct?

A.    Yes.

Q.    All right.  So in other words you only tell people what they need to know in order to transact your business; right?

A.    Yes.

Q.    Okay.  So in this particular case that we've been talking about all day today you don't know who supplied the seed or the plant that led to the

1  marijuana that you subsequently dealt with;

2  correct?

3  A.    Can you like explain to me what you mean by

4  the seed.

5  Q.    Well, sure.  You had marijuana at some point

6  during this case, right, that you would receive at

7  the warehouse; correct?

8  A.    Correct.

9  Q.    A truckload of marijuana.  You have no idea

10  who provided the seed or the plants that led to

11  that marijuana, do you?

12          MR. PRESTON:  Objection.  Relevancy.

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  The seed?  No, I'm unaware

15  of who planted the seed, if that's what you're

16  saying.

17  BY MR. CHALELA:

18  Q.    Right.  You don't need to know that in order

19  for you to do your job, do you?

20  A.    Right.

21  Q.    And the same goes with the individual or

22  individuals that grew the marijuana.  You don't

23  need to know who that is, do you?

24  A.    Correct.

25  Q.    And you don't know who that is, do you?

A.    I don't, no.

Q.    Okay.  No one ever told you who was growing

the marijuana, did they?  In fact, you don't even

know where it came from, do you?

A.    I mean, I had an understanding of where it

was coming from.

Q.    Right.  You had a vague idea that it was

coming from out west or southern California; right?

A.    At some point in the process it was

explained to me that it was coming from Arizona,

and that it was too hot and they were moving to

California.

Q.    Who told you that?

A.    I believe it was mentioned to me from Cleo.

Q.    Okay.  All right.  So the only way you would

have knowledge as to where the marijuana was coming

from is if someone told you, right, because you

never went out to see where it was being grown in

the field, did you?

A.    No, I did not.

Q.    Okay.  Because you didn't need to know that

to do your job, did you?

A.    That's correct.

Q.    All right.  And the same goes with

harvesting.  The people that came and cut down the

1 marijuana and harvested, you don't know who those

2 people are, do you?

3 A.     No, I do not.

4 Q.     You didn't need to know who those people

5 were, did you?

6 A.     No.

7 Q.     And no one in the organization told you or

8 volunteered who they were, did they?

9 A.     No.

10 Q.     All right.  And the same goes with after the

11 marijuana was harvested and put into the warehouse

12 and dried or whatever had to be -- you have no idea

13 who those people were, do you?

14 A.     No.

15 Q.     You did not need to know, did you?

16 A.     Nope.

17 Q.     Same questions with the people that packed

18 it, the people that put it in that wrappings.  You

19 remember the photograph we saw of the, what was it,

20 80 pounds that was in your safe --

21 A.     Yeah.

22 Q.     -- that you turned over to DEA?  Someone put

23 that wrapping around the marijuana; right?

24 A.     Yeah.

25 Q.     You don't know who did that, do you?

```
1    A.     Nope.

2    Q.     No one told you, did they; correct?

3    A.     Correct.

4    Q.     You've got to answer verbally because the

5    court reporter can't take down --

6    A.     All right.  I'm sorry about that.

7    Q.     No.  That's all right.  You're doing fine.

8           Okay.  So you have no idea who those people

9    were; right?

10   A.     No.

11   Q.     Because you did not need to know who those

12   people were in order for you to do your job?

13   A.     I just didn't really -- I didn't care.

14   Q.     Okay.  But you didn't need to know, did you?

15   A.     Correct.

16   Q.     Okay.  Now, the people that shipped it, that

17   brought it over, you didn't know who those people

18   were, did you?

19   A.     Some of the drivers?

20   Q.     Yeah.

21   A.     I didn't know who they were, but I became

22   familiar with them as deliveries went on.

23   Q.     Okay.  So now we get to the point where

24   you're starting to know who's who; right?

25   A.     Well, I started to recognize the face with
```

1    voices.

2    Q.    Okay.  So at this point you know who they

3    are because you have to deal with them directly;

4    right?

5    A.    Right, for receiving.

6    Q.    Okay.  Did you know their name before they

7    arrived?

8    A.    They didn't know my name.  I didn't know

9    theirs.

10   Q.    Because that's the nature of the marijuana

11   organization.  You don't tell each other your

12   names; right?  It's secretive; correct?

13   A.    To an extent.

14   Q.    All right.  Do you know who recruited the

15   drivers to bring the marijuana to Florida?

16   A.    It was told to me that anything to do with

17   the drivers or hiring or paying for them or

18   anything to do with the loads basically fell back

19   on Shorter.

20   Q.    And Cleo told you that?

21   A.    Yes.

22   Q.    Did you ever pay the drivers?

23   A.    I gave the drivers money, yes.

24   Q.    Okay.

25   A.    It wasn't me paying them, though.  It was

1   money that basically was told to me to give to

2   them.

3   Q.    And you were told that by Cleo?

4   A.    Yes.

5   Q.    And you paid them a certain amount; correct?

6   A.    Correct.  There was also the other situation

7   where it was told to me from Shorter to deliver

8   the money to the driver.

9   Q.    All right.  So you needed to know how much

10  to pay them; right?  So you were told how much to

11  pay the drivers; correct?

12  A.    I never said that.

13  Q.    Well, you gave the drivers money; correct?

14  A.    Yes.

15  Q.    Did you give them money to pay them for

16  driving or did you give them money in duffle bags

17  to be shipped somewhere else that you don't know

18  where it went?

19  A.    I gave them duffle bags of money.  And once

20  in awhile there would be a small package that I

21  was told went to the driver directly.

22  Q.    Okay.  But you don't know how much that was?

23  A.    No, I did not.

24  Q.    Okay.  You didn't need to know exactly how

25  much it was, did you?

1    A.    I didn't ask.

2    Q.    You didn't need to know, did you?  You just

3    needed to know what you need to know?  Were told to

4    give them this small package; right?

5    A.    Correct.

6    Q.    Okay.  Because that's the nature of the

7    business.  You were only told what you needed to

8    know; right?  Correct?

9    A.    I mean, if I wanted to know, I'd ask.

10   Q.    All right.  And sometimes you were told and

11   sometimes you weren't?

12   A.    If I asked, pretty much I was told, yes.

13   Q.    All right.  And sometimes you were told --

14   well, let's use an example.  There was one time

15   that you showed up at the warehouse -- the first

16   warehouse, and Cleo told you not to on certain

17   days.  And you showed up anyway; right?

18   A.    Uh-huh.

19   Q.    Isn't that correct?

20   A.    That's correct.

21   Q.    Okay.  And at that time you saw for the

22   first time a tractor trailer pulled up to the

23   warehouse; correct?

24   A.    Correct.

25   Q.    Okay.  What type of tractor trailer was it?

A.     I mean like a 55, 50-foot like your common

trailer.

Q.     All right.

A.     Wasn't anything extravagant.

Q.     Now, this is somewhat ironic, but do you

know what a reefer is in trucking terms?

A.     No, I don't know what a reefer is in

trucking terms.

Q.     Do you know what a reefer is in marijuana

terms?

A.     It's another term for marijuana.

Q.     Okay.  Have you ever heard a reefer used in

trucking terms to mean a refrigerator truck?

A.     Reefer for a refrigerator truck?

Q.     Right.

A.     I mean, I've had refrigerator trucks that

I've unloaded, but I don't recall that term.

Q.     You're too young to remember the song

Convoy, huh?

A.     I've never heard of it.

Q.     Okay.  All right.  The first tractor trailer

truck that you see when you go to the warehouse and

you're not supposed to be there, right, remember

this day?

A.     Yes, sir.

Q.    And you see it there.  What color is the cab
of the truck?

A.    The cab of the truck?  I can't recall the
cab, but I can recall the trailer was white.

Q.    Okay.  This first one was white.

A.    It was the biggest part.

Q.    And what names, if anything, were on the
white trailer?

A.    Well, like I said, I pulled up -- I don't
know if you remember hearing me, but I pulled up
on my motorcycle, so I had my helmet on.  I took
my helmet off.  As I was taking it off Cleo
Mitchell approached me, him and a young lady that
were in a car.  And basically he told me that, you
know, I needed to get out of there.

Q.    So this is an example where you didn't need
to know something, right, and he kicked you off the
property; right?

A.    Yeah.  I was just dropping off my
motorcycle, but I figured I could do it later.

Q.    Okay.  And you were told certain days not to
be there; right?

A.    Correct.

Q.    Because there's certain things you didn't
need to know at that time; right?

```
1    A.    Didn't need to see.

2    Q.    And then later on in the operation you got

3    to see more; right?

4    A.    Yeah, I got -- yeah, basically.

5    Q.    You got to know -- you got to know what you

6    needed to know to do your job; correct?

7    A.    Correct.

8    Q.    Okay.  Let's talk about after this first one

9    where you got run off the property.  Later on you

10   got to where you were the warehouseman.  You would

11   be there to receive the load from the tractor

12   trailer trucks; correct?

13   A.    When I had the second lease, that's correct.

14   Q.    Okay.  Give us an idea of the type of

15   tractor trailer trucks that would come in.

16   A.    It was predominantly the same cab.  And they

17   were always talking about switching the actual

18   back end of the trailer, the -- I don't know what

19   the right terminology is for the actual -- not the

20   cab, but the trailer that it's towing.

21   Q.    Right.  Well, let's use this terminology

22   then.  Let's say cab, which would be the truck up

23   front.

24   A.    Uh-huh.

25   Q.    And let's call it trailer, which is what
```

SANDRA K. LEE, RPR   OFFICIAL UNITED STATES COURT REPORTER

1  it's towing.

2  A.    Correct.

3  Q.    So what you're telling us is is that most of

4  the time it was the same cab?

5  A.    Correct.

6  Q.    Same truck?

7  A.    And they would talk about changing the

8  trailer, but they were saying that it hadn't

9  happened yet.  The trailer was white.

10  Q.    Describe the trailer.

11  A.    A white trailer.  It usually would have

12  Swift written on the side of it.  Didn't have a --

13  didn't have like a business or anything like that.

14  Q.    And the letters that spelled out Swift were

15  what color?

16  A.    I believe they were like -- they were

17  definitely a dark color because it stood out on

18  the white.

19  Q.    They were blue?

20  A.    Maybe blue or black.  They were a dark

21  color.  Yeah, they could have been blue.

22  Q.    Okay.  Now, there came a point where you

23  rented apartments in other people's names; correct?

24  A.    Correct.

25  Q.    And you used your friend to rent one

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    apartment.  And I apologize.  It was a Greek last

2    name.  I can't remember --

3    A.    Patanakos.

4    Q.    Yes.  And you asked him if he would rent the

5    apartment for you; right?

6    A.    The first apartment, that's correct.

7    Q.    Okay.  And you paid him a little extra money

8    for him to do that for you; right?

9    A.    Yes, sir.

10   Q.    Okay.  Did he know you were using the

11   apartment for your drug business?

12   A.    He didn't know anything.

13   Q.    Okay.

14   A.    I just told him I had basically had a fall

15   out with my wife and basically I just needed

16   somewhere to stay.

17   Q.    So this is an example of someone who is

18   doing something to help you do the drug dealing,

19   but has no knowledge of it; right?  Right?

20   A.    Yes.

21   Q.    Okay.  And then you get another apartment,

22   and this time in your sister's name; right?

23   A.    That's correct.

24   Q.    And you ask her to go rent it for you

25   because she fills out all the paperwork; right?

1    A.    That's correct.

2    Q.    And you pay her a certain amount to pay the

3    monthly rent; right?

4    A.    Well, I just paid the monthly rent myself,

5    that's correct.

6    Q.    Okay.  You gave her a little money to thank

7    her for her time and effort or did she just do this

8    because she's your sister?

9    A.    No, that's correct.

10   Q.    Okay.  But it was in her name?

11   A.    Yes, sir.

12   Q.    And you never told her that you were using

13   this apartment for your marijuana dealing, did you?

14   A.    No.

15   Q.    Because she didn't need to know, did she?

16   A.    I guess.

17   Q.    She was completely innocent; right?  She

18   didn't know that you were dealing dope and using

19   this apartment as part of it; right?

20   A.    Yeah, she had no idea.

21   Q.    Okay.  Let's talk for a moment about what

22   you call burnout phones.  Okay?

23   A.    Yes, sir.

24   Q.    Is that your term?

25   A.    Burnouts, throwaways.  Yeah, just something

1   that you pick up for like 20 to $50.

2   Q.     So you go to one of these places you see on

3   the side of the road?

4   A.     You can get them at Walmart as long as you

5   have a SIM card to switch over.

6   Q.     Okay.  And you buy them and there's so much

7   time on them.  And then when they're done, you

8   throw them away?  Is that what you mean by that?

9   A.     The time is usually on your SIM card.  Yeah,

10  that's about -- that's the idea.

11  Q.     Okay.  And now the regular procedure I

12  believe you testified to was that you would have a

13  burnout phone that would be left by Cleo in the

14  apartment either in your Greek friend's name or in

15  your sister's name.  They would leave it in that

16  apartment.  And you would be told to go pick it up;

17  right?

18  A.     Correct.

19  Q.     And then you would have that phone on you.

20  And when the driver was coming in to deliver a load

21  to the warehouse, the driver would call you and ask

22  you for directions.  Is that the way it normally

23  worked?

24  A.     Yes.

25  Q.     Okay.  Now, let's talk about what happened

1   on April the 24th of last year.  Okay?

2       In that particular case you tell us that you

3   had already been arrested on April 1st; right?

4   A.    That's correct.

5   Q.    And on April 3rd you're cooperating with law

6   enforcement; correct?

7   A.    Yes.

8   Q.    And during that cooperation with law

9   enforcement you tell them, hey, there's another

10  load coming.  And I have to --  will get a phone

11  from Cleo.  And I'll be able to know when it's

12  coming and we can take down the load; right?

13  A.    Basically, yeah.

14  Q.    Okay.  And law enforcement agreed this was a

15  good idea and that's what happened; right?

16  A.    Correct.

17  Q.    Now, if you look at -- let me ask you

18  this --

19       MR. CRAWFORD:  I'm going to ask the

20  government to put the transcript of 12A up on the

21  screen and also play this short recording.  So if

22  you'll watch the monitor in front of you.

23       (AUDIOTAPE PLAYING, 12A.)

24       MR. VOLCY:  "Hello."

25       MR. PARRA:  "Yo."

```
1              MR. VOLCY:  "Hey (unintelligible).)
2              MR. PARRA:  What up, Big Pimp?  Hey, how
3    -- how far away are you?"
4              MR. CRAWFORD:  Okay.  I asked him to
5    stop.
6    BY MR. CRAWFORD:
7    Q.    All right.  So we hear a ring and then we
8    hear someone say hello, which means that you
9    initiated the call; correct?  Is that right?
10   A.    Yeah, that's the way it went, yes.
11   Q.    Is it the way it went?
12   A.    That was probably the number I was told to
13   contact, correct.
14   Q.    Okay.  Okay.  Who told you to call that
15   number?
16   A.    My instructions were given to me by Cleo
17   Mitchell.
18   Q.    Okay.  So Cleo said call this phone number,
19   and this will be the phone of the drivers of the
20   marijuana truck?  Is that what you were told?
21   A.    Correct.
22   Q.    And that's why you called it and that's why
23   the first voice we hear is attributed to Volcy.
24   And he says hello; right?
25   A.    Correct.
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Okay.  Now, the specific time of this call
2  was when, do you know?
3    A.    Unless you show me -- I mean unless I have
4  paperwork in front of me, I wouldn't know the
5  specific time.
6    Q.    Let me ask if Agent Duralia will scroll it
7  down for us.  And you see where it says April 24th,
8  2008, at 5:00 p.m.; right?
9    A.    Right.
10   Q.    Any reason to doubt that that's when the
11  call was?
12   A.    No, because most deliveries were after
13  5 o'clock work hours.
14   Q.    Okay.  So 5 o'clock for the first call.
15  Now, the second call that we saw -- or that we
16  heard was 12B.  And that was at 5:26 p.m.; right?
17  Or do you know?
18   A.    I'm taking it by what you're telling me.
19   Q.    All right.  Let me show you a transcript --
20        MR. CRAWFORD:  If I could approach, Your
21  Honor.
22        THE COURT:  Okay.
23  BY MR. CRAWFORD:
24   Q.    -- of 12B and ask if this might refresh your
25  recollection.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.      5:26.

Q.      After looking at that, would agree that it was probably at 5:26?

A.      Yeah, from what that says.

Q.      Okay.  You don't know who put the times on these transcripts, do you?

A.      I'm not sure.

Q.      When you were making and recording these calls, was anyone standing next to you?

A.      No.  But a lot of my calls I would end with the date, the time, and what the call referred to.

Q.      Okay.  So where were you when these calls were being recorded?

A.      When the calls were being recorded I was at the DEA's office and I was also at the warehouse.

Q.      And when you were at the DEA office, who was there with you?

A.      I believe it was Justin and I.

Q.      So fair to say that they were probably taking careful note as to what time the calls were being made, if you know?

A.      I didn't really pay attention to that, but --

Q.      All right.  So we then have the next call, 12C.  And do you know what time that was?

A.    Probably shortly after.

Q.    Okay.  And I have to then go to 12D and ask
you -- that's the fourth call.  Was it at
approximately 5:56 p.m.?

A.    Okay.

Q.    You're assuming that based on what's on
the -- you wouldn't know for sure --

A.    Well, I know everything -- I know everything
in the time range it took.  I just don't know the
exact minute.

Q.    Okay.  And the final call is 12E.  And that
is -- there is no time there, so we don't know, do
we?  You don't know, do you?

A.    The last call with me and the driver?

Q.    Yes.

A.    It was probably like within the hour after.

Q.    Okay.  All right.  Now, other than unloading
trucks every now and then at the warehouse, do you
know much about the trucking business?

A.    As far as what?

Q.    Well, do you know how independent truck
drivers get their loads?  You know anything about
brokers and how that works?

A.    I just know how to unload them.

Q.    Do you know what a seal is that is placed on

the back of a particular trailer?

A.    Yeah, basically it's showing if anyone's tampered with it or not.

Q.    And at times did the trucks ever arrive at your warehouse with a seal on them?

A.    I have seen a seal before, but it was not a regular basis thing.

Q.    So the seal was unusual.  How would you handle the seal if it came to your warehouse and it was sealed?

A.    If there was a seal on it, it would take a set of bolt cutters to cut it off.

Q.    And is that what you do?

A.    Well, if necessary.

Q.    Well, if necessary, was there any other way to get into the trailer other than through the back doors that were sealed?

A.    No, no, no.

Q.    Right.  You had to cut it off?

A.    Correct.

Q.    That's the only way you could get in and unload whatever was there; correct?

A.    Correct.

Q.    Do you know what role the truck driver plays when the truck is picking up a load?  You don't, do

1  you?

2  A.     I do not.

3  Q.     You've never been a long haul truck driver,

4  have you --

5  A.     No, I --

6  Q.     -- or even a short haul truck driver; right?

7  A.     Correct.

8  Q.     So you don't know what a truck driver does

9  when he backs a truck up to the loading dock and

10 sits in the cab and waits for stuff to be loaded

11 in, do you?  You don't, do you?

12 A.     No.  I've never went along for the ride.

13 Q.     All right.  Did you know what a bill of

14 lading is?

15 A.     A bill of lading on what?  On the items?

16 Q.     A bill of lading that is carried by a truck

17 driver, do you know what that is?

18 A.     I believe it's something that basically

19 describes what's in the load --

20 Q.     Okay.

21 A.     -- and what the weight of it is.

22 Q.     All right.  That's your understanding?

23 A.     Yeah.

24 Q.     Do you know what other role it plays in the

25 business of trucking?

A.    No.

Q.    It's not your business; right?  You didn't
need to know that, did you?

A.    Never asked.

Q.    Okay.  Let's talk for a minute -- and I've
got two more areas and then I'm done.  Let's talk
for a minute about language.

On some of these tape recordings that we
have listened to, you keep using the phrase "you
feel me."  What does that mean?

A.    It's just the way we talk.

Q.    It's slang, isn't it?  You don't mean
literally that someone is feeling you, touching
you, do you?

A.    That's correct.

Q.    Right.  Feel me is kind of a slang way of
saying you understand what I'm talking about.  You
understand what I'm coming from; right?

A.    Correct.

Q.    That's what you mean when you say "you feel
me;" right?

A.    That's correct.

Q.    Okay.  And there were some points in there
where you were saying he owes 80 or he owes 70.
And you just used those particular terms.  Well,

1    that didn't mean literally 70 or literally 80, did
2    it?  It meant 70,000 or $80,000; right?
3    A.    That's correct.
4    Q.    You were using slang or shorthand because
5    you were talking with someone who had some context
6    to understand what you were talking about; right?
7    A.    That's correct.
8    Q.    So you speak differently with your wife, who
9    I'm assuming you've been married to for some time,
10   than you would with a perfect stranger; correct?
11   A.    Most definitely.
12   Q.    Okay.  Because you know each other and
13   there's certain shorthand, certain ways you can
14   talk to communicate that you couldn't with a
15   perfect stranger; correct?
16   A.    Yes.
17   Q.    All right.  Now, another example, you say in
18   the particular transcript on one of them that you
19   got this bike and you're going to sell this bike.
20   Now, I'm assuming because I know you had a
21   motorcycle that you're talking about your
22   motorcycle; right?
23   A.    That's correct.
24   Q.    But a perfect stranger could think you were
25   talking about a motorcycle or a bicycle; right?

1   A.     That's true.

2   Q.     Because they wouldn't have any context in

3   which to put that in; correct?

4   A.     That's correct.

5   Q.     All right.  Now, you indicated that you used

6   the word Big Pimp for a particular individual.  Do

7   you remember testifying about that?

8   A.     I remember saying that.

9   Q.     Okay.  In 12A that we just listened to and

10   just saw --

11   A.     Yeah, I saw that.

12   Q.     Yeah, so did I.  MR. VOLCY:  Hello.

13         You:  Yo.

14         MR. VOLCY:  Hey.

15         You:  What up, Big Pimp?  Hey, how

16   far -- how far away are you?

17         All right?

18   A.     Uh-huh.

19   Q.     So you think you were talking to Big Pimp at

20   the time?

21   A.     You're meaning Shorter?

22   Q.     If that's who you think Big Pimp is, is that

23   who you're talking to at the time?

24   A.     No, I wasn't -- I wasn't talking to Shorter.

25   Q.     You used the phase Big Pimp.  You don't even

1    know who you're talking to, do you?

2    A.    I was -- I knew I was talking to the driver.

3    Q.    Okay.  But you called him Big Pimp; right?

4    A.    Correct.

5    Q.    Why?

6    A.    Just spontaneous.  It came -- you know, it

7    just came out.

8    Q.    Exactly.

9          There's another time in these tapes where

10   you're talking about buying 24s or 26s or 28s.  I

11   have no idea what you're talking about.  But if you

12   understand that you're talking about rims and the

13   sizes of the rims, then those particular numbers

14   make sense; correct?

15   A.    Yep -- yes.

16   Q.    Okay.  Final issue.  You were arrested on

17   April 1st of 1908 on a separate marijuana case.

18   You decide with the help of your lawyer to

19   cooperate and meet with law enforcement officials

20   two days later on April 3rd; correct?

21   A.    That's correct.

22   Q.    And you tell them during that April 3rd

23   debriefing -- that's what we call it, a debriefing.

24   And the agents from DEA are there.  You tell them

25   that there's another shipment that's going to be

1    coming soon.  And if you can be at the warehouse,

2    you can help set that up and they can catch

3    somebody; right?

4    A.    Yes.

5    Q.    Okay.  And you tell them that the next

6    shipment is arriving in a tractor trailer truck;

7    correct?

8    A.    Yes.

9    Q.    And you tell them that the cab of the

10   tractor trailer truck will be metallic blue;

11   correct?

12   A.    Yes.

13   Q.    And you tell them that the trailer will be

14   white; correct?

15   A.    Yes.

16   Q.    And on April 3rd you tell them that the name

17   Swift is going to be painted on the side of the

18   trailer; correct?

19   A.    Yes.

20   Q.    And you tell them that Swift is going to be

21   in blue colored letters; correct?

22   A.    Yes.

23              MR. CRAWFORD:  Thank you, sir.

24              THE COURT:  Redirect.

25                    REDIRECT EXAMINATION

1  BY MR. PRESTON:

2  Q.    Is that the description of the truck that

3  you previously dealt with or you said that is in

4  fact the truck that's going to arrive on

5  April 24th?

6  A.    That was the truck that I was used to

7  dealing with.  And, you know, I had no idea there

8  was a change-up.

9  Q.    Mr. Crawford asked you about this seal.  And

10  you have in fact broken seals on trucks; is that

11  correct?

12  A.    If I can recall correctly, I think there

13  might have been one seal that me and the driver

14  broke together.

15  Q.    Did the driver express any concern, oh, no,

16  I won't be able to deliver my load if you break the

17  seal?

18  A.    No.  The only concern with the load was not

19  damaging it.

20  Q.    These drivers that participated in the

21  deliveries, did they know what was going on?

22  A.    Of course.

23  Q.    Because they needed to know?

24  A.    I guess.  They were basically a part of the

25  operation, so they knew.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Now, Mr. Rodriguez questioned you in regard

2    to accountability in referring to Government's

3    Exhibit 15, I believe.  Government's Exhibit 15,

4    one of your ledgers, you indicated earlier that

5    that was the ledger from the most recent load prior

6    to your arrest; correct?

7    A.    Correct.

8    Q.    Now, in regard to that particular load, you

9    also testified that there was marijuana debt

10   outstanding; correct?

11   A.    That's correct.

12   Q.    And Mr. Rodriguez in referring to

13   Government's Exhibit 15 kept questioning you on

14   your accountability to Cleo Mitchell for the

15   outstanding debt that's reflected in that journal;

16   correct?

17   A.    That's correct.

18   Q.    When we listened to the telephone

19   conversations that are in Government's Exhibit

20   No. 11, who was it that was demanding

21   accountability for that drug debt?

22   A.    It was Sheldon Shorter.

23   Q.    The defendant, Sheldon Shorter?

24   A.    Yes.

25   Q.    Mr. Rodriguez questioned you about names of

1    sources that you had had in the past.  When during

2    the course of this case did you actually learn of

3    any formal name used by the defendant, Sheldon

4    Shorter?

5    A.    I didn't -- I didn't know anything but J.

6    And that wasn't immediately.  That was, you know,

7    after -- after doing business for awhile.

8    Q.    Until an Indictment was returned in this

9    case had you even heard the name Sheldon Shorter?

10              MR. RODRIGUEZ:  Objection to the leading

11   nature of that question, Your Honor.

12              THE COURT:  Overruled.

13              THE WITNESS:  No, I had not.

14   BY MR. PRESTON:

15   Q.    Mr. Rodriguez referred a number of times to

16   so you don't have to go to jail.  And you indicated

17   you're going to jail regardless; correct?

18   A.    That's correct.

19   Q.    Do you recall a pre-Christmas pretrial

20   meeting with the government to discuss your

21   testimony?

22   A.    Yeah, I remember -- I remember meeting to

23   talk about the case, correct.

24   Q.    Before Christmas?

25   A.    Yes.

Q.     And how bluntly was it put to you that you were going to prison for a long period of time?

A.     Oh, it made me sick.  I mean, I queased up. I mean, I definitely felt the reality of it on that day and prior to that day.

Q.     What were you told in regard to the holiday?

A.     I was told that, you know, I better enjoy my Christmas with my newborn son and with my wife because it was going to be a long time before I had another Christmas with them.

            MR. PRESTON:  Nothing further, Your Honor.

            THE COURT:  You may come down, Mr. Parra.

            Your next witness, Mr. Preston.

            MR. PRESTON:  Cleo Mitchell, please.

            COURTROOM DEPUTY CLERK:  Sir, if you'll raise your right hand.

            Do you solemnly swear or affirm that the testimony you shall give in this cause will be the truth, the whole truth, and nothing but the truth, so help you God?

            THE WITNESS:  I do.

                    **CLEO MITCHELL,**

a witness, having been duly sworn to tell the

 1   truth, the whole truth and nothing but the truth,

 2   was examined and testified as follows:

 3           COURTROOM DEPUTY CLERK:  Be seated in

 4   the witness stand.  Sir, if you'll state your name

 5   and spell your last name for the record.

 6           THE WITNESS:  Cleo M-I-T-C-H-E-L-L.

 7           THE COURT:  You may inquire, Counsel.

 8                DIRECT EXAMINATION

 9   BY MR. PRESTON:

10   Q.    Good afternoon, Mr. Mitchell.  Mr. Mitchell,

11   you and I have met on three occasions to discuss

12   your testimony in this case; correct?

13   A.    Yeah.

14   Q.    Why are you dressed like that, Mr. Mitchell?

15   A.    Because I'm in jail.

16   Q.    What are you in jail for?

17   A.    Selling weed.

18   Q.    What is weed?

19   A.    Marijuana.

20   Q.    Are you currently detained in jail awaiting

21   sentencing for conspiring to distribute marijuana?

22   A.    Yeah.

23   Q.    Did you plead to that charge?

24   A.    Yeah.

25   Q.    Mr. Mitchell, did you plead pursuant to a

1   plea agreement with the government?

2   A.    Yes.

3   Q.    Does that plea agreement call for your

4   cooperation?

5   A.    Yeah.

6   Q.    Does it call for testimony if asked to do

7   so?

8   A.    Yeah.

9   Q.    Are you hoping for a reduced sentence on

10  your charge for your cooperation?

11  A.    Yeah.

12  Q.    And based on an enhancement notice that was

13  filed in this case, what is the starting point for

14  you?

15          MR. RODRIGUEZ:  Excuse me, Your Honor.

16  This is direct.  And I would object to the leading

17  form of the questions.

18          THE COURT:  Preliminary questions.

19          Proceed, Counsel.

20  BY MR. PRESTON:

21  Q.    What is your starting point time wise?

22  A.    20 years.

23  Q.    Do you have a prior felony drug conviction?

24  A.    Yeah.

25  Q.    Prior to your arrest in this case, how long

1   had you been selling marijuana?

2   A.    Since about 2000, 2002.

3   Q.    Do you know a person who became identified

4   to you as Sheldon Shorter also known as J?

5   A.    Yeah.

6   Q.    Do you see him in court today?

7   A.    Yeah.

8   Q.    Could you please tell the jury where he's

9   seated and what he's wearing.

10  A.    Seated right there with the black suit on.

11  Q.    How far from me?  How many people over at

12  that front table?

13  A.    Second person over.

14        MR. PRESTON:  Identifying the defendant,

15  Sheldon Shorter, Your Honor.

16        THE COURT:  The record will so reflect.

17  BY MR. PRESTON:

18  Q.    By what name or names did you know the

19  defendant Shorter during your association with him?

20  A.    Junglis, J, and Big Homey.

21  Q.    I'm sorry.  What was the third name?

22  A.    Big Homey.

23  Q.    Did he ever use the name Sheldon Shorter

24  during your association with him?

25  A.    No.

```
1    Q.    When approximately did you first meet the
2    defendant Shorter?
3    A.    Back in 2006.
4    Q.    When did you -- did you do marijuana
5    business with him?
6    A.    Yeah.
7    Q.    When did that begin?
8    A.    2006.
9    Q.    What was the nature of the marijuana
10   business that you would do with the defendant
11   Shorter?
12   A.    He was my connect.
13   Q.    What does that mean?
14   A.    That's where I got my stuff from, my weed.
15   Q.    By weed you're talking about marijuana?
16   A.    Yeah.
17   Q.    Were you doing marijuana business with him
18   at the time that you were arrested?
19   A.    Yeah.
20   Q.    Do you remember what the date of your arrest
21   was in this case?
22   A.    July 21st.
23   Q.    2008?
24   A.    Yeah.
25   Q.    And for how long prior to your July 21st,
```

1    2008, arrest had you been dealing marijuana with

2    the defendant Shorter?

3    A.    Since '06.

4    Q.    Could you please tell the jury how your

5    marijuana dealings with Sheldon Shorter started and

6    how they developed in the general fashion.

7    A.    We met up one day.  We met up through a

8    mutual friend one day and then --

9    Q.    Was this mutual friend involved in

10   marijuana?

11   A.    Yeah.

12   Q.    In what capacity?

13   A.    He really just linked us up together.

14   Q.    Please continue.

15   A.    And we had a little talk that day.  And from

16   that day I flew out to Arizona.  And it was -- it

17   was done from there.

18   Q.    Did that talk that day involve anything

19   about Arizona?

20   A.    Yeah.

21   Q.    What did you and the defendant, Sheldon

22   Shorter, discuss in regard to Arizona during that

23   first conversation about marijuana?

24   A.    That I was going to have to fly there and

25   pick out the type of marijuana I liked.

1 Q. Did you in fact fly to Arizona?

2 A. Yeah.

3 Q. Who'd you meet with out there?

4 A. I met with a mutual friend, MO.

5 Q. Do you remember that person's name?

6 A. Yeah.

7 Q. Who was that?

8 A. Jacko.

9 Q. And when you met with Jacko, what took place

10 in Arizona?

11 A. We -- we -- we rode down to Tucson, and he

12 took me to -- we went to the house where the weed

13 was.  And I picked out the weed I liked.

14 Q. How much weed was in this particular house

15 that you went to?

16 A. Probably around eight to 10,000 pounds.

17 Q. And from that eight to 10,000 pounds, did

18 you select any marijuana?

19 A. Yeah.

20 Q. How much marijuana did you select?

21 A. About 900.

22 Q. Other than you and Jacko, were there other

23 individuals at that house showing you the

24 marijuana?

25 A. Yeah, a Mexican.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Did you learn their names or they were just

2    there?

3    A.    No.  They were just there.

4    Q.    Did you pay these Mexicans any money at the

5    time you picked out the marijuana?

6    A.    No.

7    Q.    What was done with that 900 pounds of

8    marijuana that you selected?

9    A.    It was sent back to Pinellas County in a

10   tractor trailer.

11   Q.    Did your marijuana dealings involve a person

12   you know as Ro who you learned is Ramiro Parra?

13   A.    Yeah.

14   Q.    How long were you and Ro -- Ramiro Parra

15   involved in the marijuana business together?

16   A.    Since 2005.

17   Q.    What was Ramiro Parra's role in the

18   marijuana distribution scheme?

19   A.    He unload the trucks and distribute it to

20   who he was told to take it to.

21   Q.    And did he in fact do this with this first

22   900 pounds that came from Arizona?

23   A.    Yeah.

24   Q.    Who advised Ramiro Parra when that load

25   would arrive?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.      Me.

Q.      Who advised him as to what to do with the
load?

A.      Me.

Q.      In regard to that first 900-pound load, who
was it distributed to?

A.      Seth, William Parker, Cooney, to people I
told him to take it to, and some of his own
clients.

Q.      So you both had customers for that
marijuana?

A.      Yeah.

Q.      Who collected the money?

A.      He did.  Ro.

Q.      What was done with the money?

A.      He'd take it to the house and put it in the
safe.

Q.      Did the money have to get back to Phoenix --
I'm sorry -- to Arizona?

A.      Yeah.

Q.      And how was that arranged?

A.      It was put back on a truck and took back out
there.

Q.      In regard to that 900-pound load, aside from
sending you out to Arizona, what role did the

1　defendant, Sheldon Shorter, have in that particular

2　transaction?

3　A.　　He come down, and we organize the money and

4　count the money and get it together to send back

5　out.

6　Q.　　Was all the money from the sale of marijuana

7　sent back to Arizona or did some of it stay here?

8　A.　　Some of it stayed.

9　Q.　　And how was that profit distributed?

10　A.　　He would just take what he wanted.

11　Q.　　Who's "he"?

12　A.　　Shorter.

13　Q.　　Where did you first meet Ramiro Parra?

14　A.　　At a rim shop in Pinellas Park.

15　Q.　　And at this rim shop did you and he

16　ultimately discuss marijuana on that meeting?

17　A.　　Yeah.

18　Q.　　What was the nature of your initial dealings

19　in regard to marijuana with Ramiro Parra?

20　A.　　I just fronted him probably like 20, 30

21　pounds.　And he'd take about a week and pay me

22　back.

23　Q.　　At that time was the defendant Shorter

24　involved in this relationship you had with

25　Ramiro Parra?

1    A.    No.

2    Q.    How long had you and Parra been engaged in

3    these 20 plus pound distribution plans before the

4    defendant Shorter became involved with you?

5    A.    About a year.

6    Q.    How many trips did you take to Arizona

7    total?

8    A.    About three or four.

9    Q.    Why did you stop traveling to Arizona?

10   A.    Because they pretty much knew what I liked

11   and what kind of weed I liked.

12   Q.    Did the marijuana continue to come to the

13   Middle District of Florida?

14   A.    Yeah.

15   Q.    Could you please tell the jury as -- in

16   regard to how often and how much.

17   A.    Probably about -- it was -- nah, it was once

18   a month anywhere from about 12 to 1500 pounds.

19   Q.    What was the weight?

20   A.    Twelve to fifteen hundred.

21   Q.    What was the largest amount that you

22   remember coming in?

23   A.    About 2200.

24   Q.    Now, as far as your involvement with that

25   marijuana, was it hands on?

1    A.    No.

2    Q.    What -- who was responsible for the hands on

3    part of -- of the operation?

4    A.    Ro.

5    Q.    Ramiro Parra?

6    A.    Yeah.

7    Q.    And this one to two times a month continued

8    up until the time you were arrested; is that

9    correct?

10   A.    Yeah.

11   Q.    Now, how was Ramiro Parra paid for his

12   participation?

13   A.    I -- I pay him like $10,000 at a time he

14   unloaded the truck and did what he had to do.

15   Q.    Did you give him cash for that, or did it

16   come off of the money that he owed for his -- his

17   own product?

18   A.    It was both ways.

19   Q.    And other than receiving the marijuana, what

20   other jobs did you have Ramiro Parra perform?

21   A.    Like I said, he'd collect the money.  And

22   then sometimes he'd take money out of town.  And

23   he would rent the warehouses and stuff like that.

24   Q.    At some point during your marijuana

25   relationship with Parra, did Parra come to meet the

1 defendant Sheldon Shorter?

2 A.     Yeah.

3 Q.     How long did it take before you allowed that

4 introduction to take place?

5 A.     Probably -- probably about a year, probably.

6 Q.     And when I say you allowed, who was it

7 that -- was there a reason why Parra couldn't meet

8 Shorter before then?

9 A.     I mean, yeah, yeah.  I ain't really want him

10 around him.  I ain't want him around him then.

11 Q.     Okay.  And whose idea was it that they

12 should in fact meet at some point in time?

13 A.     It wasn't really like no meeting.  It was

14 like he just ended up being around a couple times

15 when we was putting money together and stuff like

16 that and like that.

17 Q.     And from him being around this money

18 situation did a comfort level become established?

19 A.     Yeah.

20 Q.     From that comfort level did Ramiro Parra

21 assume additional responsibilities which would be

22 performed with or around the defendant Shorter?

23 A.     Yeah.

24 Q.     Like what?

25 A.     He'd like go to -- go to car dealerships

1    and -- and take money and stuff like that

2    different places.

3    Q.    You indicated that Ramiro Parra would

4    deliver money.  Who would he deliver money to?

5    A.    I don't know specifically, but he used to

6    just take it down south.

7    Q.    And you indicated that you had this

8    association with the defendant Sheldon Shorter up

9    to about the time of your arrest.

10   When was the last load that you remember

11   coming to the Middle District of Florida as part of

12   this scheme?

13   A.    In April.

14   Q.    April of 2008?

15   A.    Yeah.

16   Q.    In April of 2008 did you instruct Ramiro

17   Parra concerning a shipment of marijuana that was

18   coming to the Middle District of Florida?

19   A.    Yeah.

20   Q.    What did you tell him?

21   A.    I told him go -- I -- I put a phone

22   somewhere.  To go pick up the phone.  I called him

23   to go get the phone and answer and direct the dude

24   in and do what he normally do.

25   Q.    When you say you put a phone somewhere,

1   what -- where did you put this phone?

2   A.    At the apartment in Post Rocky Point.

3   Q.    Did you put a phone number into that phone

4   for communications purposes before Ramiro Parra

5   picked it up?

6   A.    Yeah.

7   Q.    And who was that phone number supposed to go

8   to?

9   A.    To the -- to the -- to the truck drivers.

10  Q.    Did you -- how did you get that phone number

11  for the truck drivers?

12  A.    Shorter gave it to me.

13  Q.    Defendant Sheldon Shorter?

14  A.    Yeah.

15  Q.    And how did Ramiro Parra know when to

16  contact the truck drivers?

17  A.    Because when I told him to go pick up the

18  phone, when he got to the phone he was supposed to

19  call.  I told him.

20  Q.    You told him when?

21  A.    Yeah.

22  Q.    And how did you know when he was supposed to

23  make the phone calls?

24  A.    Because Shorter told me.

25  Q.    In regard to that April 2008 delivery, did

```
1    you maintain contact with the defendant -- I'm
2    sorry, with Ramiro Parra during that delivery
3    process?
4    A.    Yeah.
5    Q.    Did you also remain in contact with the
6    defendant Sheldon Shorter during that delivery
7    process?
8    A.    Yeah.
9    Q.    What happened to that load?
10   A.    Police got it.
11   Q.    How do you know that?
12   A.    Because that's why I'm here.
13   Q.    At the time that the police got it, did
14   anyone tell you --
15   A.    Yeah.
16   Q.    -- that it had been seized?
17   A.    Yeah.
18   Q.    Who?
19   A.    Shorter.
20   Q.    What did he tell you?
21   A.    He told me that -- that the police got it
22   because he -- he talked to the truck drivers and
23   they're in jail.
24   Q.    Did he indicate whether the truck drivers
25   advised him anything about the phone they were
```

1  using?

2  A.     Yeah.  They said they broke -- they was

3  getting pulled over by the police, and broke the

4  chip on the phone.

5  Q.     And what's the chip on the phone?

6  A.     The SIM card.

7  Q.     And did J, defendant Shorter, advise you

8  that's what he learned from the drivers?

9  A.     Yeah.

10 Q.     Did that create any suspicions in regard to

11 Ramiro Parra?

12 A.     Yeah.

13 Q.     Did you discuss those discussions with J,

14 the defendant Sheldon Shorter?

15 A.     Yeah.

16 Q.     What did you discuss as far as suspicions of

17 Ramiro Parra after this April seizure?

18 A.     Just figured out that he was -- he was

19 probably working for the police, and we was just

20 going to try to get the rest of the money he owed.

21 Q.     And did you continue to collect money from

22 Ramiro Parra?

23 A.     Yeah.

24 Q.     Are you familiar prior to that with the fact

25 that he had been arrested on another case, he being

1    Ramiro Parra?

2    A.    Yeah.

3    Q.    At the time that he was arrested how much

4    money do you believe he owed the organization?

5    A.    About 200 and some thousand dollars.

6    Q.    And is this part of the money that you just

7    referred to that the defendant Shorter insisted

8    that still be collected even after you believed

9    Ramiro Parra was cooperating?

10   A.    Yeah.

11   Q.    As Ramiro Parra was paying back this money,

12   how was the money delivered to you?

13   A.    He would -- he would just take it and put it

14   in the safe.

15   Q.    What safe?

16   A.    The safe at Post Rocky Point at the

17   apartment.

18   Q.    And then what did you do with the money?

19   A.    I put it together and give it to Shorter.

20   Q.    And how did you do that?

21   A.    I took it out the safe and put it in the bag

22   and had somebody deliver it down there.

23   Q.    When you say "down there," what are you

24   talking about?

25   A.    Miami.

1   Q.    What was the last payment that you actually

2   received from Parra?

3   A.    Seventy thousand.

4   Q.    And what happened with that 70,000?

5   A.    I got pulled over and the police took it.

6   Q.    Did you ever even look at that $70,000?

7   A.    No.

8   Q.    Were you given a receipt when the police

9   took the $70,000?

10   A.    Yeah.

11         MR. PRESTON:  May I approach the

12   witness, Your Honor?

13         THE COURT:  Yes, you may.

14   BY MR. PRESTON:

15   Q.    Mr. Mitchell, could you please take a look

16   at Government's Exhibit No. 22.  Do you recognize

17   that, sir?

18   A.    Yes.

19   Q.    What is Government's Exhibit No. 22?

20   A.    It's a picture that the troopers gave me

21   after they took the money.

22   Q.    And what is the date of that seizure?

23   A.    6/12 -- April 12th.

24   Q.    6/12?

25   A.    Yeah, June.  Sorry.

1      MR. PRESTON:  Government would move into

2   evidence Government's Exhibit No. 22, Your Honor.

3      MR. RODRIGUEZ:  No objection.

4      THE COURT:  It is received.

5      (EXHIBIT 22 ADMITTED INTO EVIDENCE.)

6      MR. PRESTON:  May I briefly publish?

7      THE COURT:  You may.

8      MR. PRESTON:  Thank you.

9   BY MR. PRESTON:

10  Q.    In regard to you receiving this payment,

11  this $70,000 payment, how was it that you ended up

12  meeting with Cleo Mitchell -- I'm sorry, with

13  Ramiro Parra on June 12th of 2008 to receive this

14  package?

15  A.    Shorter told me to meet him at the store.

16  Bu the told me, you know, don't -- don't tell them

17  it's me coming.  Just show up and wait till you

18  see me there.

19  Q.    You say don't tell them it's me that's

20  coming, what --

21  A.    Don't tell them I'm -- I'm the one that's

22  coming.

23  Q.    So you weren't supposed to tell Ramiro Parra

24  that you were receiving the package?

25  A.    Right.

Q.    And who told you that?

A.    Shorter.

Q.    Did he tell you why you weren't supposed to tell Ramiro Parra that you weren't coming?

A.    Not -- he didn't really say.  I just figured that since he said that -- that Ro probably thought it was him picking it up.

THE COURT:  Mr. Preston, that brings us to the close of the day.  We will recess until 9:30 tomorrow morning.

I remind you, ladies and gentlemen, do not discuss the case.  Keep yourselves insulated from the receipt of any information about this case from any source outside of this courtroom.

Mr. Bohlig.

COURT SECURITY OFFICER:  Please rise for the jury.

(THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

THE COURT:  You may come down, Mr. Mitchell.

We'll be in recess.

MR. RODRIGUEZ:  Your Honor, could I ask for an instruction to the witness, please.  He's in the middle of his testimony.

THE COURT:  Yes.  Mr. Mitchell, you're

1    not to discuss your testimony with anyone, not

2    your testimony that you have given or that which

3    you are about to give.  You understand?

4             THE WITNESS:  Yeah.

5             THE COURT:  Thank you.

6             MR. CRAWFORD:  Your Honor, I've got some

7    matters in the morning at another courthouse that

8    are unrelated, and I may be no more than five

9    minutes late.  Could I have permission to have

10   Mr. Chalela fill in for me for those five minutes

11   until I get here?

12             THE COURT:  Is that agreeable with

13   Mr. Volcy?

14             DEFENDANT VOLCY:  Yes.

15             MR. CRAWFORD:  He responded yes, Your

16   Honor.

17             THE COURT:  All right.  And agreeable

18   with Mr. Chalela?

19             MR. CHALELA:  Yes, Your Honor.

20             THE COURT:  All right.  You'll have five

21   minutes.

22             MR. CRAWFORD:  Understood, Your Honor.

23             THE COURT:  9:30 tomorrow morning.

24                  (Proceeding adjourned.)

25             I CERTIFY that the foregoing is a true

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    and accurate transcription of my stenographic

2    notes.

3    Dated:  07/23/2009.

4

5                    ___s/ Sandra K. Lee_____
                      SANDRA K. LEE, RPR
6                     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [4] - 62:23, 67:9, 215:18, 294:13
**$150,000** [1] - 93:6
**$20,000** [3] - 18:5, 77:18, 203:20
**$300** [1] - 160:18
**$5,000** [8] - 46:23, 47:6, 61:9, 62:13, 63:17, 228:4, 228:9, 228:11
**$50** [4] - 48:2, 48:7, 91:1, 267:1
**$500** [2] - 189:22, 190:13
**$60,000** [4] - 223:10, 223:12, 223:18, 223:20
**$65,000** [1] - 61:21
**$70,000** [10] - 127:7, 131:21, 131:25, 239:11, 239:16, 242:22, 243:4, 301:6, 301:9, 302:11
**$80,000** [3] - 118:4, 276:2
**$9,000** [13] - 64:21, 64:22, 64:23, 65:1, 67:3, 67:8, 67:12, 68:7, 68:8, 68:17, 225:6, 225:15
**$900** [1] - 47:21

## '

**"cuz** [4] - 115:24, 139:17, 139:25, 142:3
**'05** [2] - 13:2, 16:2
**'06** [7] - 11:21, 16:3, 17:18, 17:19, 204:3, 288:3
**'08** [2] - 11:19, 121:18
**'97** [3] - 177:18, 177:19
**'98** [2] - 177:18, 177:19
**'cuz** [27] - 89:20, 92:3, 92:5, 92:15, 96:3, 129:11, 132:19, 132:25, 136:1, 136:3, 136:15, 141:12, 142:23, 143:8, 143:19, 145:8, 145:9, 148:22, 153:19, 161:16, 161:23, 164:7, 164:16, 164:20, 165:5,

165:11, 165:15

## 1

**1** [7] - 33:22, 34:8, 42:13, 42:14, 42:16, 210:4, 210:13
**1,322** [1] - 40:1
**1,340** [2] - 36:6, 36:11
**1,500** [1] - 74:13
**1,573.41** [1] - 40:6
**10** [4] - 53:21, 153:24, 164:13, 247:24
**10,000** [5] - 47:7, 67:14, 67:15, 289:16, 289:17
**100** [3] - 1:23, 129:3, 239:14
**101** [1] - 3:22
**104** [4] - 219:11, 219:13, 219:14, 219:20
**106** [1] - 80:1
**10s** [1] - 123:2
**11** [10] - 3:21, 79:15, 79:23, 86:22, 87:5, 122:12, 126:1, 128:13, 281:20
**110** [1] - 41:6
**118th** [9] - 21:24, 22:2, 45:5, 49:12, 52:12, 99:25, 107:9, 112:17, 250:16
**119** [1] - 3:23
**119.7** [1] - 34:2
**11:15** [1] - 72:20
**11A** [9] - 3:21, 79:16, 79:23, 86:22, 87:5, 88:9, 88:11, 89:12, 89:13
**11B** [4] - 126:4, 126:8, 126:14, 126:17
**11C** [4] - 132:8, 138:16, 138:20, 139:2
**11D** [2] - 132:12, 132:13
**11E** [3] - 135:21, 135:23, 142:10
**11F** [2] - 142:14, 142:16
**11G** [2] - 144:17, 144:18
**11H** [2] - 147:5, 147:8
**11I** [1] - 149:18
**11J** [1] - 156:10
**11J)** [1] - 156:12

**11K** [2] - 157:24, 157:25
**11L** [2] - 159:6, 159:7
**11M** [9] - 3:21, 79:16, 86:22, 87:5, 126:8, 162:12, 162:20, 162:23
**11N** [5] - 3:24, 122:2, 122:14, 122:19, 122:20
**11th** [1] - 218:21
**12** [4] - 102:7, 102:15, 194:24, 293:18
**120** [1] - 3:23
**121** [1] - 3:24
**1210** [1] - 1:20
**1299** [6] - 45:24, 69:14, 119:6, 219:10, 219:20, 236:11
**12:00** [1] - 134:20
**12A** [10] - 3:22, 102:9, 102:15, 102:18, 102:22, 104:1, 104:3, 268:20, 268:23, 277:9
**12B** [4] - 107:12, 107:14, 270:16, 270:24
**12C** [3] - 109:6, 109:8, 271:25
**12D** [3] - 111:7, 111:9, 272:2
**12E** [9] - 3:22, 102:9, 102:16, 102:17, 102:18, 102:22, 112:24, 113:8, 272:11
**12th** [7] - 125:20, 126:7, 147:4, 149:6, 149:14, 301:23, 302:13
**14** [11] - 3:18, 37:11, 37:23, 37:25, 38:10, 38:13, 212:2, 212:6, 213:19, 215:8
**15** [17] - 3:18, 25:4, 30:25, 31:18, 31:22, 53:21, 110:5, 131:24, 153:24, 194:24, 209:13, 209:17, 211:9, 211:17, 281:3, 281:13
**150** [2] - 75:14, 238:8
**150,000** [1] - 75:13
**1500** [1] - 293:18
**16** [5] - 3:20, 67:24, 67:25, 68:10, 68:15
**168** [5] - 43:20, 44:1, 44:2, 44:4, 44:6
**169** [1] - 3:24

**17** [7] - 3:19, 41:4, 65:11, 66:9, 66:15, 190:10, 225:2
**170** [1] - 3:25
**171** [1] - 3:5
**173407** [1] - 1:24
**179** [1] - 42:19
**18** [5] - 3:23, 41:5, 119:22, 120:10, 120:13
**19** [6] - 3:23, 110:21, 110:23, 121:6, 121:12, 121:15
**19.05** [1] - 32:17
**1908** [1] - 278:17
**1997** [1] - 178:8
**1998** [8] - 176:13, 176:15, 176:17, 176:19, 176:21, 177:12, 178:8, 178:9
**1:30** [2] - 113:17, 113:25
**1st** [20] - 7:19, 8:15, 10:8, 11:7, 169:18, 169:24, 173:15, 182:1, 182:12, 182:19, 183:5, 183:6, 183:7, 183:8, 184:17, 184:20, 184:22, 268:3, 278:17

## 2

**2** [5] - 43:14, 105:20, 119:4, 210:12, 210:13
**2,825.86** [1] - 43:20
**2,825.87** [1] - 44:7
**20** [27] - 3:24, 13:10, 13:12, 17:16, 25:4, 27:24, 53:21, 71:24, 72:2, 110:5, 110:7, 111:23, 112:2, 131:24, 153:25, 154:1, 164:13, 169:16, 170:15, 170:16, 170:22, 170:25, 172:3, 267:1, 285:22, 292:20, 293:3
**20.25** [1] - 71:20
**200** [1] - 300:5
**2000** [3] - 180:3, 180:6, 286:2
**2001** [1] - 180:14
**2002** [2] - 180:18, 286:2
**2005** [1] - 290:16
**2006** [2] - 287:3, 287:8
**2007** [2] - 118:5,

**167:4
**2008** [12] - 7:20, 8:15, 10:8, 11:7, 194:7, 270:8, 287:23, 288:1, 296:14, 296:16, 297:25, 302:13
**2009** [1] - 1:5
**203** [1] - 39:16
**206** [1] - 39:14
**20th** [2] - 230:1, 231:21
**21** [5] - 3:25, 171:3, 171:20, 171:24, 172:4
**210** [1] - 32:14
**217** [1] - 34:6
**217.05** [1] - 34:5
**21st** [2] - 287:22, 287:25
**22** [5] - 3:25, 301:16, 301:19, 302:2, 302:5
**2200** [1] - 293:23
**238.7** [1] - 43:16
**24** [1] - 1:2
**245** [1] - 1:21
**249** [1] - 3:6
**24s** [3] - 165:8, 165:9, 278:10
**24th** [6] - 220:18, 250:14, 251:2, 268:1, 270:7, 280:5
**25** [8] - 71:24, 154:2, 154:3, 246:10, 246:15, 246:20, 247:24, 249:12
**250** [1] - 3:7
**26** [1] - 124:24
**26s** [5] - 165:5, 165:7, 165:11, 165:17, 278:10
**27** [2] - 1:5, 124:24
**270** [1] - 1:2
**275** [9] - 104:14, 104:16, 104:20, 105:15, 105:21, 105:25, 116:14, 152:19
**278** [1] - 3:8
**282** [1] - 3:9
**283** [1] - 3:9
**286.3** [1] - 43:16
**28s** [2] - 165:17, 278:10
**29** [7] - 3:14, 63:2, 63:3, 65:12, 85:1, 85:12, 225:25
**297.95** [1] - 43:17
**2nd** [1] - 184:24

## 3

**3,000** [1] - 26:14
**3,000-pound** [1] - 44:9
**30** [7] - 3:18, 115:23, 131:23, 239:1, 239:9, 239:14, 292:20
**300** [4] - 10:15, 26:13, 182:25
**300-pound** [2] - 10:16, 11:1
**301** [1] - 3:25
**301-5699** [1] - 2:7
**303.2** [1] - 34:20
**31** [7] - 3:21, 79:17, 79:24, 86:22, 87:5, 115:11, 115:16
**3111** [1] - 1:23
**31A** [8] - 3:21, 79:17, 79:24, 86:23, 87:5, 115:11, 115:16, 115:18
**3200** [1] - 1:18
**33139** [1] - 1:21
**33602** [2] - 1:19, 2:6
**33606** [1] - 2:3
**33672-0407** [1] - 1:24
**35** [5] - 248:11, 249:6, 249:8, 249:17, 249:21
**36** [1] - 40:1
**37** [1] - 3:18
**37A** [1] - 252:22
**37B** [1] - 252:22
**37C** [1] - 252:22
**3:30** [1] - 217:21
**3rd** [9] - 184:2, 184:6, 186:4, 186:5, 187:25, 268:5, 278:20, 278:22, 279:16

## 4

**4** [1] - 134:19
**40** [1] - 173:25
**400** [1] - 1:18
**45** [1] - 32:14
**4th** [1] - 109:15

## 5

**5** [4] - 3:3, 12:22, 270:13, 270:14
**5,000** [2] - 46:25, 47:7
**5/15** [1] - 121:18

## 50

**50** [6] - 41:4, 42:6, 173:25, 174:16, 174:20, 181:4
**50-foot** [1] - 261:1
**500** [1] - 28:10
**51** [1] - 3:19
**54th** [1] - 155:14
**55** [2] - 165:2, 261:1
**55-foot** [2] - 25:2, 53:9
**56** [1] - 165:2
**5:00** [1] - 270:8
**5:26** [3] - 270:16, 271:1, 271:3
**5:56** [1] - 272:4
**5th** [2] - 125:20, 126:7

## 6

**6** [1] - 3:4
**6/12** [2] - 301:23, 301:24
**60** [1] - 194:25
**600** [1] - 74:12
**610** [1] - 2:2
**62** [1] - 3:14
**62nd** [2] - 201:4, 201:8, 219:15
**65** [2] - 3:19, 194:25
**67** [1] - 3:20
**69** [1] - 3:20
**6:00** [1] - 90:7

## 7

**7-Eleven** [3] - 109:18, 110:13, 112:8
**70** [8] - 127:3, 127:6, 136:17, 157:6, 239:9, 239:14, 275:24, 276:1
**70,000** [2] - 276:2, 301:4
**75** [12] - 39:14, 42:20, 116:20, 132:24, 133:6, 150:15, 150:24, 150:25, 151:6, 174:13, 174:15, 192:9
**7th** [2] - 142:15, 144:17

## 8

**8** [1] - 224:6
**80** [15] - 69:1, 69:3, 69:20, 70:8, 70:10, 72:2, 74:25, 75:16,

**99:2, 117:25, 136:15, 136:17, 256:20, 275:24, 276:1**
**800** [4] - 12:22, 26:9, 26:11, 26:12
**801** [1] - 3:20
**801(2)(e** [1] - 12:5
**8056** [1] - 22:1
**813** [1] - 2:7
**822.95** [1] - 43:17
**85** [1] - 41:5
**86** [1] - 3:21
**8:08** [1] - 1:2
**8A** [10] - 3:19, 51:15, 51:18, 51:20, 52:7, 52:16, 52:19, 52:25, 53:2, 218:25
**8B** [12] - 3:19, 51:15, 51:18, 52:8, 52:16, 52:19, 73:10, 73:14, 73:16, 73:20, 73:22, 74:16
**8C** [6] - 3:20, 69:25, 70:3, 70:15, 70:18, 70:23
**8D** [8] - 3:20, 69:25, 70:7, 70:15, 70:18, 71:15, 74:15, 74:25

## 9

**9** [6] - 3:23, 118:22, 120:7, 120:10, 120:13, 120:15
**9,000** [2] - 66:21, 67:16
**900** [3] - 289:21, 290:7, 290:22
**900-pound** [2] - 291:5, 291:24
**95** [2] - 39:16, 214:5
**9:30** [4] - 1:6, 178:20, 303:10, 304:23

## A

**a.m** [1] - 1:6
**abandon** [1] - 248:4
**ability** [1] - 227:17
**able** [22] - 16:19, 58:7, 62:19, 90:18, 91:3, 93:22, 94:16, 95:17, 97:5, 106:11, 124:23, 127:12, 131:6, 168:18, 189:10, 237:22, 251:19, 251:23, 268:11, 280:16
**accept** [1] - 196:20

**access** [2] - 40:12, 71:4
**accident** [1] - 90:6
**accommodated** [1] - 22:10
**accompanied** [1] - 205:3
**account** [24] - 27:22, 61:22, 61:23, 61:24, 61:25, 62:1, 63:19, 64:12, 64:14, 65:16, 66:3, 66:22, 66:25, 67:1, 168:19, 206:15, 225:5, 225:8, 225:17, 227:22, 228:9, 244:9, 244:12, 244:13
**accountability** [4] - 35:11, 281:2, 281:14, 281:21
**accountable** [6] - 210:25, 211:1, 211:3, 211:7, 246:2, 246:3
**accounted** [1] - 28:18
**accounting** [3] - 29:14, 207:7, 216:25
**accountings** [1] - 209:7
**accounts** [5] - 65:2, 65:9, 65:18, 66:7, 228:4
**accuracy** [3] - 79:19, 102:2, 102:12
**accurate** [40] - 79:5, 79:6, 79:9, 122:9, 205:21, 216:16, 216:19, 216:23, 217:18, 230:24, 231:3, 232:16, 234:10, 236:7, 238:17, 239:9, 239:14, 239:22, 239:25, 240:16, 240:24, 241:1, 242:2, 242:3, 242:5, 242:9, 242:10, 242:18, 242:22, 245:13, 245:14, 245:23, 246:6, 246:9, 246:11, 247:7, 247:21, 247:25, 248:4, 248:11
**accurately** [5] - 41:15, 52:8, 70:11, 118:24, 169:19
**accusation** [1] - 77:21
**accustomed** [1] - 4:20
**acting** [2] - 145:9, 164:10

**action** [1] - 209:3
**activities** [1] - 55:13
**activity** [1] - 120:2
**acts** [1] - 231:18
**actual** [2] - 263:17, 263:19
**add** [1] - 44:3
**added** [1] - 96:8
**adding** [1] - 43:18
**additional** [4] - 99:25, 172:9, 190:13, 295:21
**address** [6] - 49:12, 73:10, 80:25, 182:13, 236:12, 250:16
**addressed** [3] - 82:10, 93:16
**addresses** [1] - 28:4
**adjourned** [1] - 304:24
**adjudication** [1] - 247:15
**admit** [1] - 170:23
**admitted** [3] - 88:19, 245:17, 246:4
**ADMITTED** [14] - 31:22, 38:13, 52:19, 66:15, 68:15, 70:18, 87:6, 102:22, 120:13, 121:15, 122:19, 170:25, 171:24, 302:5
**advise** [2] - 80:18, 299:7
**advised** [9] - 27:5, 50:8, 83:5, 114:25, 213:23, 290:24, 291:2, 298:25
**affect** [1] - 84:25
**affirm** [2] - 6:16, 283:19
**African** [1] - 9:23
**African-American** [1] - 9:23
**afternoon** [5] - 114:19, 114:21, 145:2, 217:20, 284:10
**Agent** [5] - 184:1, 229:25, 230:7, 232:1, 270:6
**agent** [9] - 173:14, 194:16, 197:14, 230:4, 230:12, 230:14, 230:15, 232:7
**agents** [20] - 8:2, 31:14, 80:9, 83:5, 84:8, 115:1, 173:17, 175:16, 177:4, 177:8, 187:5, 196:21, 204:19, 204:25, 221:15, 221:16,

232:21, 240:15, 241:24, 278:24

**ago** [7] - 147:13, 179:4, 179:5, 181:6, 181:21, 247:6, 249:13

**agree** [4] - 8:9, 143:4, 271:2

**agreeable** [2] - 304:12, 304:17

**agreed** [5] - 77:1, 184:6, 185:15, 185:18, 268:14

**agreeing** [1] - 199:14

**agreement** [9] - 8:6, 8:9, 36:9, 43:24, 55:20, 179:10, 180:25, 285:1, 285:3

**agrees** [1] - 189:12

**ahold** [1] - 139:6

**aid** [1] - 88:11

**AIDED** [1] - 2:8

**ain't** [32] - 89:21, 91:11, 93:19, 94:17, 95:1, 96:2, 96:20, 116:1, 116:4, 116:5, 117:19, 133:13, 133:16, 135:12, 140:2, 140:18, 143:5, 148:18, 148:22, 151:15, 153:20, 153:21, 156:17, 158:2, 158:4, 163:17, 295:9, 295:10

**airborne** [1] - 50:13

**airport** [2] - 61:14, 244:11

**alibi** [1] - 163:13

**alledgedly** [1] - 82:25

**alleged** [2] - 81:24, 227:7

**allow** [1] - 81:14

**allowed** [5] - 14:24, 54:23, 249:22, 295:3, 295:6

**alluded** [1] - 49:9

**almost** [6] - 24:11, 44:9, 156:1, 169:8, 170:13, 195:1

**alternate** [2] - 24:22, 73:25

**altogether** [1] - 238:7

**America** [3] - 66:19, 68:7, 68:18

**AMERICA** [1] - 1:3

**American** [1] - 9:23

**amount** [32] - 9:2, 12:18, 13:14, 18:23, 25:12, 25:13, 26:12,

28:17, 32:20, 32:21, 34:1, 35:9, 39:12, 40:16, 40:21, 45:4, 46:9, 47:5, 48:12, 63:16, 66:25, 74:10, 92:17, 92:18, 168:4, 174:7, 190:18, 200:10, 246:22, 259:5, 266:2, 293:21

**amounts** [6] - 46:4, 55:25, 98:21, 156:2, 169:4, 210:20

**amps** [1] - 123:2

**AND** [9] - 3:19, 3:20, 3:23, 52:19, 70:18, 86:16, 114:12, 120:13, 218:3

**angle** [1] - 244:21

**announcement** [1] - 86:12

**answer** [15] - 11:17, 12:8, 35:25, 82:7, 89:18, 100:14, 180:15, 187:9, 226:11, 227:16, 235:21, 248:4, 254:13, 257:4, 296:23

**answered** [1] - 227:15

**answering** [1] - 106:8

**answers** [1] - 199:2

**anticipate** [2] - 245:20, 245:23

**Antonio** [1] - 7:4

**ANTONIO** [2] - 3:3, 6:21

**anyway** [6] - 89:19, 164:21, 165:20, 186:4, 193:9, 260:17

**anyways** [5] - 97:9, 133:16, 134:13, 135:13, 137:1

**apartment** [39] - 19:16, 19:17, 30:4, 49:4, 49:7, 54:23, 54:25, 55:1, 55:2, 55:4, 55:6, 55:15, 55:18, 76:13, 100:12, 100:20, 167:11, 190:3, 190:6, 190:15, 190:16, 190:19, 190:22, 191:1, 191:17, 197:20, 207:21, 216:21, 265:1, 265:5, 265:6, 265:11, 265:21, 266:13, 266:19, 267:14, 267:16, 297:2, 300:17

**apartments** [7] - 54:22, 189:21, 189:23, 203:5, 203:7, 203:8, 264:23

**Apartments** [3] - 19:15, 55:5, 101:13

**apologize** [6] - 89:17, 129:2, 146:8, 235:4, 243:19, 265:1

**apologizing** [1] - 131:2

**apparatus** [1] - 193:9

**appear** [1] - 40:3

**appearance** [1] - 7:23

**APPEARANCES** [1] - 1:15

**approach** [9] - 30:19, 36:21, 36:25, 37:3, 80:2, 121:24, 189:20, 270:20, 301:11

**approached** [2] - 16:13, 262:13

**approve** [1] - 231:8

**approximate** [1] - 168:2

**April** [43] - 7:19, 8:15, 10:8, 11:7, 169:18, 169:23, 169:24, 173:15, 182:1, 182:12, 182:19, 183:5, 183:6, 183:7, 183:8, 184:2, 184:17, 184:20, 184:22, 184:24, 187:25, 194:7, 218:21, 220:18, 230:1, 231:21, 250:14, 251:2, 268:1, 268:3, 268:5, 270:7, 278:17, 278:20, 278:22, 279:16, 280:5, 296:13, 296:14, 296:16, 297:25, 299:17, 301:23

**area** [15] - 22:14, 22:15, 26:23, 42:11, 60:21, 62:18, 76:22, 85:9, 125:13, 154:25, 169:11, 171:11, 196:16, 202:12, 222:3

**areas** [1] - 275:6

**argument** [3] - 53:14, 85:20, 219:4

**argumentative** [4] - 178:22, 181:17, 229:16, 248:23

**Arizona** [13] - 27:10, 255:10, 288:16,

288:19, 288:22, 289:1, 289:10, 290:22, 291:19, 291:25, 292:7, 293:6, 293:9

**arranged** [2] - 120:19, 291:21

**arrest** [24] - 8:15, 10:8, 11:7, 11:11, 31:15, 38:2, 44:9, 44:11, 44:12, 44:13, 75:4, 169:24, 183:19, 184:15, 186:13, 186:23, 223:9, 223:11, 240:23, 281:6, 285:25, 287:20, 288:1, 296:9

**arrested** [38] - 7:18, 7:19, 8:6, 30:1, 30:3, 31:4, 44:16, 44:17, 50:21, 52:10, 65:23, 67:17, 68:21, 75:12, 171:13, 178:4, 181:25, 182:11, 182:14, 182:15, 183:7, 183:8, 184:11, 191:24, 207:25, 228:21, 229:4, 229:10, 229:20, 247:5, 249:13, 268:3, 278:16, 287:18, 294:8, 299:25, 300:3

**arresting** [1] - 31:14

**arrive** [4] - 25:25, 273:4, 280:4, 290:25

**arrived** [2] - 49:11, 258:7

**arriving** [4] - 25:21, 27:6, 117:15, 279:6

**AS** [12] - 86:16, 89:13, 104:3, 107:14, 109:8, 111:9, 113:8, 114:12, 115:18, 122:20, 139:2, 218:4

**ASAP** [1] - 64:19

**aside** [2] - 65:2, 291:24

**asleep** [1] - 144:22

**ass** [2] - 78:10, 163:10

**assist** [1] - 60:13

**Assistant** [1] - 1:17

**assisting** [1] - 88:20

**associate** [5] - 138:6, 167:16, 167:19, 234:14, 234:16

**associate's** [1] - 167:21

**associated** [1] -

169:12

**associates** [8] - 19:25, 42:3, 44:14, 170:7, 170:9, 170:12, 213:14, 221:7

**association** [5] - 9:11, 9:17, 286:19, 286:24, 296:8

**assume** [2] - 193:23, 295:21

**assumed** [6] - 15:20, 57:5, 239:3, 239:4, 239:5, 239:6

**assuming** [5] - 57:2, 243:15, 272:6, 276:9, 276:20

**assumption** [1] - 135:17

**assumptions** [1] - 15:21

**AT** [2] - 80:4, 86:15

**ate** [1] - 175:11

**Atlanta** [7] - 138:7, 138:10, 138:15, 138:24, 141:16, 141:20, 142:4

**attempt** [1] - 169:11

**attention** [8] - 46:20, 67:11, 67:13, 103:17, 168:13, 250:13, 250:24, 271:22

**attentively** [1] - 5:20

**Attorney** [1] - 1:17

**Attorney's** [1] - 1:17

**attributed** [1] - 269:23

**Audi** [15] - 60:20, 60:23, 61:14, 61:15, 62:9, 62:10, 62:14, 63:12, 63:13, 63:14, 225:24, 226:4, 226:7, 226:13, 226:16

**audio** [2] - 121:21, 125:1

**Audio** [3] - 123:1, 123:2

**AUDIOTAPE** [18] - 89:13, 104:3, 107:14, 109:8, 111:9, 113:8, 115:18, 122:20, 126:17, 127:9, 132:13, 135:23, 144:18, 149:21, 157:25, 159:7, 162:23, 268:23

**aUDIOTAPE** [4] - 139:2, 142:16, 147:8, 156:12

**Auto** [5] - 21:1, 201:4, 203:13,

203:14, 219:15
**available** [2] - 82:6, 87:20
**Ave** [2] - 21:25, 22:2
**Avenue** [8] - 1:20, 2:6, 45:5, 49:12, 52:12, 100:1, 107:9, 250:16
**average** [3] - 26:7, 27:24, 47:24
**awaiting** [3] - 7:14, 249:15, 284:20
**aware** [8] - 19:17, 44:13, 44:17, 64:12, 81:19, 95:20, 220:14, 252:8
**awhile** [5] - 15:20, 66:23, 90:17, 259:20, 282:7

## B

**Baby** [1] - 110:25
**backed** [2] - 15:24, 16:8
**BACKGROUND** [6] - 159:19, 160:1, 160:5, 160:9, 160:14, 160:17
**backing** [1] - 136:11
**backpack** [1] - 30:9
**backs** [1] - 274:9
**bad** [9] - 82:17, 83:1, 90:5, 98:16, 126:22, 144:21, 144:25, 195:2
**bag** [4] - 56:19, 56:21, 156:3, 300:21
**bags** [8] - 56:15, 56:22, 56:24, 59:2, 59:14, 59:18, 259:16, 259:19
**balance** [3] - 237:25, 238:1, 238:2
**bale** [8] - 41:4, 44:5, 71:19, 71:20, 71:23, 72:3, 72:5
**bales** [10] - 40:23, 41:8, 41:10, 44:2, 44:4, 44:6, 70:9, 71:21, 71:25
**ball** [2] - 96:5, 99:23
**bang** [1] - 240:25
**bank** [18] - 61:17, 61:22, 63:18, 63:20, 64:12, 64:14, 65:2, 65:8, 65:16, 65:18, 66:7, 66:25, 67:11, 68:6, 225:5, 225:7, 225:8, 228:9
**Bank** [3] - 66:19,

68:7, 68:18
**banks** [1] - 64:20
**BAPTISTE** [1] - 1:8
**baptiste** [1] - 1:23
**Baptiste** [3] - 250:25, 251:22, 252:17
**based** [4] - 9:6, 229:5, 272:6, 285:12
**basic** [3] - 67:16, 93:15, 199:1
**basis** [6] - 65:9, 67:13, 67:16, 78:6, 187:8, 273:7
**bathroom** [1] - 89:18
**Bay** [2] - 2:2, 22:15
**bays** [1] - 119:11
**Beach** [1] - 1:21, 58:21
**beautiful** [1] - 97:17
**became** [12] - 14:8, 14:12, 15:21, 16:25, 17:19, 179:13, 200:19, 201:6, 257:21, 286:3, 293:4
**become** [1] - 295:18
**becoming** [2] - 139:14, 248:3
**bed** [1] - 175:19
**BEFORE** [1] - 1:13
**began** [1] - 38:4
**begin** [4] - 5:10, 6:3, 13:4, 287:7
**beginning** [12] - 11:21, 17:19, 19:8, 26:21, 46:15, 47:22, 93:19, 194:7, 199:25, 200:1, 200:2, 204:3
**begins** [1] - 137:18
**behalf** [1] - 99:11
**behind** [10] - 16:9, 21:9, 46:9, 53:7, 53:9, 71:8, 97:21, 106:14, 193:10, 193:16
**Belch** [1] - 111:16
**Belcher** [11] - 109:17, 110:8, 110:9, 110:10, 110:11, 110:12, 110:14, 111:2, 111:17, 112:4, 112:5
**belcher** [1] - 110:15
**belief** [1] - 168:7
**belonged** [4] - 51:21, 118:13, 118:14, 119:18
**belongings** [1] - 78:1
**bench** [1] - 86:12
**Bentley** [2] - 59:23, 60:5
**beside** [2] - 57:13,

152:2
**best** [4] - 21:13, 29:16, 32:13, 227:17
**bet** [2] - 129:25, 149:2
**better** [11] - 13:22, 14:6, 14:8, 23:1, 82:16, 127:13, 180:7, 189:2, 230:11, 235:1, 283:7
**between** [9] - 9:24, 53:14, 54:16, 89:2, 103:13, 125:19, 125:23, 126:7, 126:8
**beyond** [2] - 168:22
**bicycle** [1] - 276:25
**big** [11] - 9:18, 18:10, 46:18, 69:19, 71:9, 143:13, 147:11, 151:25, 152:14, 152:18, 192:21
**Big** [35] - 9:18, 18:7, 18:8, 18:12, 18:18, 34:14, 34:16, 34:17, 35:5, 35:14, 41:24, 89:14, 93:9, 93:12, 93:16, 97:13, 104:7, 213:24, 213:25, 214:4, 214:7, 214:13, 214:14, 214:18, 214:22, 269:2, 277:6, 277:15, 277:19, 277:22, 277:25, 278:3, 286:20, 286:22
**bigger** [8] - 13:24, 14:5, 14:8, 17:21, 18:16, 33:10, 186:9, 215:22
**biggest** [4] - 42:15, 43:10, 98:25, 262:6
**bike** [4] - 126:22, 129:19, 276:19
**bill** [6] - 121:8, 161:17, 161:23, 274:13, 274:15, 274:16
**bind** [1] - 183:24
**bit** [17] - 13:19, 31:8, 43:24, 76:11, 132:20, 135:7, 139:9, 145:1, 147:21, 147:24, 147:25, 154:18, 155:10, 155:13, 158:19, 165:1, 215:11
**Bjorn** [1] - 184:3
**black** [2] - 264:20, 286:10
**blame** [1] - 136:1
**blank** [1] - 97:1
**blocks** [1] - 71:3

**blow** [1] - 95:21
**Blue** [1] - 193:5
**blue** [5] - 264:19, 264:20, 264:21, 279:10, 279:21
**bluntly** [1] - 283:1
**Blvd** [1] - 1:23
**board** [3] - 244:16, 244:22, 244:23
**body** [5] - 194:20, 232:21, 232:23, 233:17, 233:21
**Bohlig** [1] - 303:15
**Bolig** [1] - 4:12
**bolt** [1] - 273:12
**bond** [19] - 76:20, 76:23, 76:24, 76:25, 77:1, 77:4, 77:7, 93:21, 139:17, 183:13, 183:14, 185:14, 185:15, 185:18, 186:3, 189:13, 248:13, 249:1
**bonded** [1] - 90:17
**Bone** [1] - 193:7
**book** [5] - 29:12, 29:17, 31:24, 32:3, 39:3
**books** [1] - 28:6
**border** [1] - 145:14
**boss** [1] - 94:7
**bottom** [6] - 40:5, 40:8, 43:19, 71:20, 71:23, 72:8
**bought** [1] - 200:7
**Boulevard** [1] - 123:13
**bounds** [1] - 85:12
**Box** [1] - 1:24
**box** [5] - 25:3, 49:22, 49:24, 74:4, 243:1
**boxed** [1] - 243:1
**boxes** [1] - 49:14
**boy** [2] - 101:11, 127:17
**Boy** [6] - 33:22, 34:3, 34:8, 39:15, 210:4, 210:12
**boyfriend** [2] - 145:21, 146:22
**Brady** [1] - 82:20
**bragging** [1] - 168:16
**bread** [2] - 163:4, 163:8
**break** [3] - 49:19, 197:1, 280:16
**bridge** [18] - 105:11, 105:12, 105:13, 105:16, 105:18,

107:23, 108:2, 108:3, 109:10, 109:11, 109:14, 151:20, 152:12, 152:14, 152:16, 152:19, 152:20, 153:5
**Bridge** [2] - 105:22, 107:24
**briefly** [2] - 171:25, 302:6
**bring** [18] - 21:14, 41:4, 67:11, 79:15, 85:2, 85:7, 89:22, 93:19, 101:11, 135:8, 138:8, 147:2, 161:19, 161:23, 194:15, 205:12, 258:15
**bringing** [6] - 89:21, 96:6, 96:7, 98:17, 135:9, 137:24
**brings** [2] - 185:7, 303:8
**Bro** [4] - 33:17, 33:18, 209:24
**broader** [1] - 85:9
**broke** [3] - 280:14, 299:2, 299:3
**broken** [1] - 280:10
**brokers** [1] - 272:23
**brother** [2] - 33:18, 209:24
**brought** [13] - 18:11, 25:1, 55:18, 98:19, 98:21, 135:6, 168:13, 182:8, 182:10, 194:11, 194:14, 257:17
**Broward** [1] - 173:20
**brown** [2] - 49:22, 49:24
**Brunvand** [1] - 184:3
**bu** [1] - 302:16
**bucks** [1] - 46:18
**bugging** [1] - 46:21
**building** [1] - 173:18
**bullshit** [5] - 95:1, 143:2, 143:3, 145:17, 157:3
**bunch** [1] - 25:5
**bundle** [7] - 23:10, 23:11, 27:23, 27:24, 27:25, 32:16, 32:17
**burnout** [6] - 22:11, 100:11, 106:13, 166:5, 266:22, 267:13
**burnouts** [1] - 266:25
**Burrell** [1] - 66:4
**busily** [1] - 5:2
**business** [35] - 11:8,

11:9, 11:12, 13:4, 14:10, 14:21, 17:12, 19:4, 19:11, 20:25, 21:1, 21:2, 40:20, 54:15, 164:7, 164:9, 165:23, 170:4, 182:7, 217:6, 219:19, 253:12, 253:16, 253:21, 260:7, 264:13, 265:11, 272:19, 274:25, 275:2, 282:7, 287:5, 287:10, 287:17, 290:15

**business's** [1] - 164:3
**buy** [7] - 226:4, 226:7, 226:13, 226:16, 237:18, 237:22, 267:6
**buyers** [1] - 206:19
**buying** [5] - 165:16, 178:9, 200:5, 278:10
**BY** [98] - 3:4, 3:5, 3:6, 3:7, 3:8, 3:10, 7:9, 8:21, 10:4, 11:22, 12:19, 15:7, 30:22, 31:23, 32:2, 33:6, 37:8, 37:24, 38:14, 38:20, 40:2, 40:25, 43:12, 52:6, 52:24, 63:4, 65:20, 66:16, 68:16, 70:22, 73:8, 73:17, 74:23, 79:13, 86:18, 87:7, 92:21, 98:4, 101:6, 102:24, 106:6, 107:3, 108:7, 110:19, 114:23, 117:9, 120:18, 121:16, 121:25, 124:25, 127:5, 131:1, 135:1, 137:17, 142:9, 144:6, 146:17, 149:5, 154:23, 157:19, 158:24, 162:6, 166:10, 170:19, 171:1, 172:25, 178:24, 181:20, 181:23, 187:13, 187:22, 198:17, 209:15, 210:3, 212:4, 218:12, 225:4, 226:3, 227:6, 227:19, 229:18, 229:24, 233:13, 241:21, 245:3, 248:8, 248:24, 250:12, 251:10, 254:17, 270:23, 280:1, 282:14, 284:9, 285:20, 286:17,

301:14, 302:9
**bye** [1] - 59:19

## C

**cab** [9] - 262:1, 262:3, 262:4, 263:16, 263:20, 263:22, 264:4, 274:10, 279:9
**Cadillac** [1] - 204:11
**cal** [1] - 105:14
**California** [6] - 27:10, 50:20, 168:8, 243:15, 255:8, 255:12
**capacity** [2] - 75:23, 288:12
**car** [46] - 16:14, 18:1, 18:6, 59:2, 59:15, 59:18, 60:6, 60:14, 61:4, 61:9, 61:11, 61:20, 62:2, 62:4, 62:12, 62:20, 62:21, 63:19, 63:25, 64:1, 92:9, 118:3, 118:23, 124:4, 124:9, 126:2, 137:11, 154:7, 159:15, 160:6, 161:17, 171:17, 178:1, 178:2, 227:21, 232:17, 232:18, 232:20, 233:3, 234:12, 237:22, 239:2, 242:24, 262:14, 295:25
**car's** [1] - 164:16
**card** [4] - 208:3, 267:5, 267:9, 299:6
**care** [13] - 64:18, 95:6, 95:8, 95:20, 143:23, 143:24, 144:8, 144:13, 146:9, 223:20, 231:18, 257:13
**careful** [1] - 271:20
**carefully** [1] - 5:20
**carried** [3] - 30:8, 193:24, 274:16
**carry** [1] - 192:25
**carrying** [1] - 191:21
**cars** [12] - 60:10, 62:11, 120:4, 154:18, 185:23, 201:15, 236:8, 236:24, 237:1, 237:2, 237:6, 237:14
**case** [38] - 6:4, 72:21, 81:15, 113:18, 140:2, 174:5, 177:7, 183:3, 210:7, 210:10, 217:22, 228:15,

230:12, 230:14, 230:15, 245:7, 245:12, 246:7, 246:20, 247:4, 247:8, 247:10, 247:25, 252:10, 253:23, 254:6, 268:2, 278:17, 282:2, 282:9, 282:23, 284:12, 285:13, 285:25, 287:21, 299:25, 303:12, 303:14
**CASE** [1] - 1:2
**cash** [11] - 55:8, 62:13, 62:22, 62:24, 67:9, 223:10, 223:13, 223:18, 223:21, 228:8, 294:15
**cashier's** [1] - 61:17
**Castagna** [1] - 4:7
**CASTAGNA** [1] - 1:13
**casual** [2] - 59:7, 248:3
**catch** [1] - 279:2
**Caucasian** [2] - 34:3, 176:23
**caught** [4] - 94:18, 160:1, 177:21, 179:22
**causal** [1] - 58:25
**caused** [1] - 184:10
**CD** [2] - 124:11, 124:19
**CDs** [2] - 85:13, 124:11
**cell** [9] - 166:15, 192:16, 192:17, 192:24, 193:1, 193:17, 233:5, 233:7, 233:16
**Central** [1] - 139:17
**central** [2] - 76:21, 139:15
**certain** [22] - 14:24, 15:13, 19:18, 35:9, 46:8, 64:16, 66:25, 74:10, 95:17, 96:14, 200:10, 217:17, 224:7, 224:9, 236:1, 259:5, 260:16, 262:21, 262:24, 266:2, 276:13
**certainly** [2] - 82:10, 85:16
**CERTIFY** [1] - 304:25
**chain** [4] - 101:1, 101:2, 101:7, 208:22
**Chalela** [3] - 1:23, 304:10, 304:18

**CHALELA** [6] - 3:6, 250:10, 250:12, 251:5, 254:17, 304:19
**chance** [1] - 252:24
**change** [3] - 20:8, 245:2, 280:8
**change-up** [1] - 280:8
**changed** [1] - 16:25
**changing** [1] - 264:7
**chaotic** [1] - 42:17
**charge** [9] - 7:16, 8:5, 20:10, 160:18, 177:15, 194:16, 247:16, 284:23, 285:10
**charged** [7] - 182:21, 182:23, 245:15, 245:20, 246:1, 246:4, 246:7
**Charger** [20] - 118:5, 118:25, 119:18, 119:24, 125:2, 129:8, 131:18, 131:22, 157:7, 164:23, 164:24, 230:2, 231:23, 232:3, 232:4, 232:9, 232:13, 237:7, 237:15, 237:16
**Chargers** [2] - 165:6, 165:12
**charges** [3] - 177:13, 179:20, 247:2
**cheaper** [3] - 164:25, 165:4, 165:11
**cheapest** [2] - 151:2, 180:21
**check** [17] - 61:17, 61:19, 66:24, 72:9, 72:11, 72:13, 124:21, 128:16, 156:24, 156:25, 182:13, 228:4, 228:9, 228:11, 237:25, 238:1
**checked** [1] - 50:12
**checking** [1] - 53:23
**CHELALA** [2] - 1:22, 102:19
**chillin** [1] - 150:2
**chip** [2] - 299:4, 299:5
**choose** [1] - 5:18
**choreographed** [2] - 242:8, 242:17
**Christmas** [4] - 282:19, 282:24, 283:8, 283:10
**circumstances** [1] - 185:17
**clarify** [1] - 198:18

**clean** [1] - 123:25
**clear** [10] - 15:22, 17:10, 17:20, 50:3, 123:22, 124:24, 131:15, 131:19, 227:3, 235:17
**clearer** [1] - 193:21
**clearly** [1] - 40:18
**Clearwater** [1] - 63:14
**Clemens** [4] - 34:10, 210:4, 210:6, 210:9
**Cleo** [195] - 9:8, 9:10, 10:6, 11:3, 11:12, 11:19, 11:24, 12:1, 12:3, 12:24, 12:25, 13:6, 13:8, 14:9, 14:13, 15:9, 15:16, 16:13, 17:6, 17:9, 17:13, 18:1, 18:4, 19:24, 27:8, 27:18, 29:4, 29:24, 33:8, 33:12, 33:20, 35:5, 36:9, 43:23, 46:3, 46:12, 46:21, 48:4, 48:9, 49:5, 49:21, 50:3, 53:21, 54:22, 55:20, 57:1, 64:4, 65:7, 66:5, 67:6, 77:23, 78:4, 78:18, 87:16, 87:21, 93:11, 93:17, 98:19, 98:22, 99:14, 100:12, 100:21, 100:24, 101:9, 107:5, 117:13, 118:10, 119:19, 125:9, 125:10, 125:16, 126:10, 155:8, 156:7, 157:22, 159:2, 162:17, 166:14, 166:24, 167:3, 167:8, 167:24, 168:16, 168:25, 170:11, 181:8, 183:22, 186:9, 188:4, 190:21, 195:13, 196:13, 196:19, 197:3, 197:9, 197:21, 197:23, 198:11, 200:5, 201:7, 201:14, 201:20, 202:1, 202:8, 202:12, 202:16, 203:17, 204:8, 204:9, 204:14, 205:7, 205:18, 206:1, 206:5, 206:12, 206:23, 207:8, 207:9, 207:12, 207:14, 208:25, 209:5, 209:8, 209:9, 210:17, 211:1, 211:3,

211:4, 211:7, 211:18, 211:23, 212:10, 212:20, 213:2, 213:6, 214:2, 215:8, 216:7, 220:10, 224:6, 225:6, 225:12, 225:18, 225:20, 225:22, 226:4, 226:7, 226:8, 226:12, 227:23, 228:5, 228:6, 231:22, 231:25, 232:1, 232:7, 232:12, 234:13, 235:7, 235:10, 235:14, 235:19, 235:25, 236:6, 236:9, 236:21, 238:4, 239:2, 239:11, 241:12, 241:15, 241:17, 242:17, 242:21, 242:24, 243:7, 243:8, 243:9, 244:3, 255:14, 258:20, 259:3, 260:16, 262:12, 267:13, 268:11, 269:16, 269:18, 281:14, 283:16, 284:6, 302:12

**CLEO** [2] - 3:9, 283:24

**cleo** [2] - 202:24, 224:15

**Cleo's** [15] - 198:13, 200:19, 201:6, 201:18, 201:24, 203:15, 204:11, 204:12, 209:20, 209:22, 209:24, 211:9, 211:10, 225:10, 238:21

**CLERK** [4] - 6:14, 6:25, 283:17, 284:3

**client** [3] - 80:17, 82:23, 251:13

**clients** [1] - 291:9

**cling** [2] - 56:19, 156:1

**close** [7] - 29:12, 41:23, 77:18, 123:7, 156:25, 193:17, 303:9

**closed** [2] - 28:22, 219:17

**closing** [1] - 85:19

**clothes** [1] - 78:2

**clothing** [1] - 9:22

**club** [2] - 58:22, 110:21, 110:24, 110:25, 152:8, 152:11, 186:1

**co** [1] - 210:6

**co-defendant** [1] -

210:6

**cocaine** [6] - 177:14, 177:16, 177:20, 177:23, 177:25, 179:23

**coffin** [1] - 229:14

**cohorts** [1] - 189:20

**cold** [1] - 23:6

**collect** [8] - 29:18, 49:1, 49:2, 75:19, 196:13, 212:24, 294:21, 299:21

**collected** [11] - 46:1, 55:17, 75:23, 75:24, 76:5, 98:20, 212:20, 212:25, 213:9, 291:13, 300:8

**collecting** [4] - 48:13, 212:23, 213:3, 216:25

**collection** [3] - 31:7, 77:13, 78:3

**collections** [2] - 31:10, 215:8

**collectively** [1] - 5:25

**College** [1] - 92:7

**color** [4] - 262:1, 264:15, 264:17, 264:21

**colored** [1] - 279:21

**column** [1] - 42:13

**combination** [15] - 70:5, 71:5, 71:6, 77:19, 198:4, 198:6, 198:9, 198:11, 198:14, 220:5, 220:7, 220:10, 220:11, 223:7, 236:22

**comfort** [2] - 295:18, 295:20

**comfortable** [1] - 174:17

**coming** [53] - 18:17, 24:24, 25:8, 27:7, 27:9, 27:12, 35:6, 35:16, 41:11, 42:10, 44:23, 50:9, 50:10, 50:20, 54:24, 64:17, 90:15, 94:2, 108:3, 111:13, 117:6, 135:18, 136:11, 139:9, 139:10, 145:6, 152:25, 174:21, 187:24, 208:22, 208:25, 222:13, 223:1, 224:11, 235:22, 240:17, 250:15, 255:6, 255:8, 255:10, 255:16, 267:20, 268:10,

268:12, 275:18, 279:1, 293:22, 296:11, 296:18, 302:17, 302:20, 302:22, 303:4

**command** [5] - 101:1, 101:2, 101:7, 205:25, 208:23

**comments** [1] - 80:10

**commit** [2] - 163:7, 231:17

**common** [2] - 68:5, 261:1

**communicate** [1] - 276:14

**communicating** [1] - 149:13

**communication** [3] - 100:10, 101:20, 115:5

**communications** [4] - 88:18, 100:8, 115:3, 297:4

**company** [3] - 18:14, 44:15, 244:10

**compared** [3] - 72:11, 72:17, 181:11

**compartment** [1] - 168:1

**compartmentalized** [1] - 217:10

**complaints** [1] - 47:8

**complete** [2] - 12:15, 113:4

**completely** [8] - 11:5, 20:7, 80:12, 80:23, 95:12, 99:5, 120:4, 266:17

**completeness** [5] - 80:1, 81:10, 82:10, 82:13, 82:21

**components** [1] - 123:25

**composite** [1] - 226:2

**COMPUTER** [1] - 2:8

**COMPUTER-AIDED** [1] - 2:8

**conceal** [1] - 72:12

**concept** [1] - 99:21

**concern** [2] - 280:15, 280:18

**concerned** [2] - 38:1, 81:19, 215:11

**concerning** [6] - 121:21, 205:18, 228:23, 235:6, 235:23, 296:17

**CONCLUDED** [1] - 86:16

**conclusion** [3] - 77:20, 77:22, 166:21

**condo** [1] - 171:11

**conduct** [1] - 250:7

**conducting** [1] - 65:2

**confirm** [1] - 102:2

**confiscated** [1] - 169:7

**confusing** [1] - 152:22

**conjunction** [1] - 122:5

**connect** [1] - 287:12

**consequence** [1] - 131:8

**consider** [2] - 129:8, 131:17

**consideration** [2] - 103:20, 129:4

**considered** [1] - 131:22

**considering** [1] - 5:8

**consignment** [1] - 200:16

**consisted** [1] - 64:21

**consisting** [1] - 70:10

**conspiracy** [8] - 7:15, 35:21, 182:8, 182:11, 182:24, 184:19, 245:5, 245:9

**conspirator** [1] - 245:11

**conspiring** [1] - 284:21

**constantly** [1] - 117:17

**constituted** [1] - 98:25

**construction** [2] - 111:24, 112:1

**contact** [15] - 22:13, 53:20, 78:4, 90:18, 101:16, 106:19, 117:14, 117:16, 141:7, 166:14, 166:17, 269:13, 297:16, 298:1, 298:5

**contacts** [2] - 19:3, 84:8

**contained** [3] - 88:17, 125:2, 162:11

**containers** [2] - 24:4, 53:5

**context** [4] - 80:12, 80:23, 276:5, 277:2

**continue** [13] - 25:16, 36:24, 37:3, 73:7, 94:9, 118:11,

127:8, 132:4, 149:13, 218:10, 288:14, 299:22

**CONTINUED** [2] - 114:12, 218:4

**continued** [1] - 294:7

**continues** [1] - 37:4

**CONTINUES** [1] - 127:9

**control** [1] - 68:22

**controlled** [1] - 216:13

**conversation** [26] - 83:11, 93:19, 106:7, 121:20, 122:6, 125:2, 127:2, 132:2, 137:18, 142:11, 149:14, 162:8, 162:14, 162:18, 166:22, 196:2, 196:4, 196:9, 226:22, 226:24, 227:7, 227:11, 233:24, 235:6, 250:21, 288:23

**conversations** [56] - 27:8, 78:8, 78:9, 78:17, 78:18, 78:21, 79:5, 80:7, 80:11, 80:16, 80:18, 80:20, 80:22, 81:4, 81:17, 81:20, 81:23, 82:1, 82:23, 83:3, 83:6, 83:18, 83:21, 84:1, 84:3, 84:13, 84:21, 85:14, 85:18, 87:10, 87:14, 87:16, 101:22, 103:13, 114:24, 126:8, 131:13, 132:5, 156:5, 187:14, 192:12, 193:18, 193:20, 194:21, 194:23, 195:11, 195:12, 195:18, 195:21, 214:11, 226:25, 228:13, 241:23, 241:25, 281:19

**convertible** [1] - 59:24

**convicted** [5] - 178:6, 247:1, 247:3, 247:6, 247:16

**conviction** [6] - 8:16, 8:23, 9:4, 9:6, 247:14, 285:23

**Convoy** [1] - 261:19

**cool** [1] - 90:16

**cooler** [1] - 23:5

**Cooney** [4] - 76:3, 228:13, 228:15, 291:7

**cooperate** [3] - 8:10, 185:4, 278:19

**cooperating** [5] - 38:4, 99:24, 184:6, 268:5, 300:9

**cooperation** [12] - 8:3, 8:13, 37:18, 77:12, 87:11, 100:6, 169:10, 185:8, 251:11, 268:8, 285:4, 285:10

**coordinate** [2] - 22:21, 222:15

**coordinated** [1] - 222:24

**copies** [1] - 187:1

**copy** [2] - 119:21, 121:2

**corner** [4] - 112:9, 150:15, 151:1, 169:17

**correct** [232] - 7:24, 7:25, 8:3, 8:4, 16:17, 16:21, 23:19, 38:5, 40:23, 42:4, 42:5, 42:8, 47:17, 50:1, 52:11, 53:12, 54:3, 54:7, 54:11, 54:12, 54:17, 54:18, 63:15, 68:18, 68:19, 71:15, 71:16, 75:4, 77:8, 77:9, 87:11, 87:12, 87:17, 87:18, 103:2, 103:7, 103:10, 103:11, 103:15, 106:9, 122:12, 126:1, 126:11, 126:12, 176:11, 176:13, 182:2, 182:9, 182:12, 182:22, 183:5, 184:1, 184:8, 186:14, 186:15, 188:3, 188:5, 188:6, 188:9, 189:13, 190:1, 190:13, 190:24, 191:2, 191:14, 191:19, 192:9, 195:11, 196:15, 196:22, 197:17, 197:18, 198:2, 198:7, 198:14, 199:9, 199:20, 200:4, 200:23, 200:24, 202:9, 202:10, 203:18, 205:9, 205:14, 206:14, 206:17, 206:25, 207:1, 207:3, 207:13, 209:10, 209:23, 209:25, 210:11, 210:18, 210:23, 210:24, 216:22,

217:1, 217:9, 219:23, 220:4, 220:8, 220:9, 220:11, 220:12, 221:20, 221:23, 222:1, 222:3, 222:4, 223:5, 223:16, 223:22, 223:25, 224:4, 224:13, 224:17, 224:18, 225:7, 225:10, 225:11, 225:14, 228:6, 228:10, 228:13, 228:23, 228:24, 229:5, 229:6, 230:18, 233:19, 234:1, 234:2, 234:4, 235:13, 236:6, 239:17, 239:21, 240:20, 240:23, 241:1, 242:18, 245:12, 246:5, 246:8, 247:2, 247:17, 247:18, 250:22, 251:15, 252:7, 252:17, 253:13, 253:17, 254:2, 254:7, 254:8, 254:24, 255:23, 257:2, 257:3, 257:15, 258:12, 259:5, 259:6, 259:11, 259:13, 260:5, 260:8, 260:19, 260:20, 260:23, 260:24, 262:23, 263:6, 263:7, 263:12, 263:13, 264:2, 264:5, 264:23, 264:24, 265:6, 265:23, 266:1, 266:5, 266:9, 267:18, 268:4, 268:6, 268:16, 269:9, 269:13, 269:21, 269:25, 273:20, 273:22, 273:23, 274:7, 275:15, 275:19, 275:22, 276:3, 276:7, 276:10, 276:15, 276:23, 277:3, 277:4, 278:4, 278:14, 278:20, 278:21, 279:7, 279:11, 279:14, 279:18, 279:21, 280:11, 281:6, 281:7, 281:10, 281:11, 281:16, 281:17, 282:17, 282:18, 282:23, 284:12, 294:9

**correctly** [1] - 280:12

**counsel** [14] - 80:10, 80:21, 81:20, 82:16, 84:11, 86:5, 172:16,

187:20, 187:21, 224:24, 243:3, 244:22, 250:6

**Counsel** [7] - 7:6, 15:6, 52:5, 172:3, 187:19, 284:7, 285:19

**counselor** [1] - 244:17

**count** [9] - 27:25, 28:1, 39:20, 48:18, 191:5, 197:23, 197:24, 197:25, 292:4

**counted** [3] - 49:8, 57:15, 198:1

**counters** [1] - 55:22

**counting** [3] - 56:1, 56:4, 56:14

**Country** [1] - 183:11

**County** [6] - 173:20, 173:21, 183:15, 188:11, 247:12, 290:9

**county** [1] - 173:20

**coupe** [1] - 60:24

**couple** [11] - 24:6, 26:25, 88:2, 96:3, 96:4, 154:11, 158:12, 177:13, 206:7, 216:5, 295:14

**course** [10] - 8:2, 46:8, 64:9, 84:22, 88:19, 100:5, 101:19, 115:3, 280:22, 282:2

**Court** [10] - 2:5, 2:5, 4:6, 15:3, 73:5, 77:5, 86:7, 86:11, 114:17, 248:15

**COURT** [142] - 1:1, 1:14, 4:2, 4:5, 4:8, 4:11, 6:10, 7:6, 8:20, 10:3, 11:16, 12:7, 15:6, 30:21, 31:21, 32:1, 32:23, 36:23, 37:2, 37:6, 37:22, 38:12, 38:19, 39:23, 40:9, 42:23, 42:25, 43:3, 52:4, 52:18, 52:23, 65:12, 66:12, 66:14, 68:12, 68:14, 70:17, 70:21, 72:18, 72:23, 73:1, 73:4, 73:7, 73:14, 74:16, 74:18, 80:3, 81:3, 82:1, 83:2, 83:24, 84:17, 85:7, 85:16, 85:25, 86:4, 86:14, 86:24, 87:3, 88:13, 101:5, 102:17, 102:21, 103:17, 104:2, 107:2, 107:13, 109:7, 111:8, 112:25,

113:4, 113:7, 113:15, 113:21, 113:24, 114:4, 114:6, 114:14, 114:16, 114:19, 114:22, 115:17, 120:12, 120:17, 121:14, 122:17, 126:16, 132:9, 135:22, 138:21, 147:7, 149:20, 156:11, 170:17, 171:23, 172:1, 172:11, 172:14, 172:17, 172:23, 178:23, 181:19, 181:20, 187:9, 187:20, 217:19, 217:24, 218:2, 218:5, 218:8, 218:9, 227:5, 227:16, 229:17, 244:17, 244:20, 245:1, 248:2, 248:7, 250:1, 250:5, 251:7, 254:13, 270:22, 279:24, 282:12, 283:13, 284:7, 285:18, 286:16, 301:13, 302:4, 302:7, 303:8, 303:16, 303:19, 303:25, 304:5, 304:12, 304:17, 304:20, 304:23

**court** [4] - 7:12, 9:19, 257:5, 286:6

**Court's** [1] - 38:17

**courthouse** [2] - 175:25, 304:7

**courtroom** [11] - 5:5, 5:13, 5:21, 6:1, 54:6, 86:1, 86:6, 86:9, 245:17, 249:19, 303:14

**COURTROOM** [8] - 4:4, 6:14, 6:25, 73:3, 114:15, 218:7, 283:17, 284:3

**cousin** [2] - 198:13, 198:15

**cover** [19] - 23:12, 23:13, 24:1, 24:3, 24:5, 24:8, 24:10, 24:13, 24:15, 25:6, 51:7, 51:10, 51:20, 53:3, 53:11, 53:13, 205:18, 205:20, 222:7

**covered** [1] - 179:11

**covertly** [1] - 234:23

**cow** [1] - 55:8

**CR** [1] - 1:2

**crack** [6] - 177:14, 177:15, 177:19, 177:23, 177:25, 179:22

**cracker's** [1] - 163:23

**crates** [12] - 25:9, 25:11, 49:14, 50:8, 50:22, 50:25, 73:23, 74:3, 74:6, 74:13

**crawford** [1] - 280:9

**CRAWFORD** [27] - 2:1, 3:7, 15:2, 51:24, 85:22, 86:2, 86:13, 106:22, 120:11, 121:13, 122:16, 126:15, 149:19, 162:22, 170:24, 171:22, 251:8, 251:10, 268:19, 269:4, 269:6, 270:20, 270:23, 279:23, 304:6, 304:15, 304:22

**Crawford** [2] - 2:2, 251:7

**crazy** [1] - 133:5

**create** [1] - 299:10

**creates** [1] - 50:9

**credibility** [2] - 4:24, 127:18

**credit** [1] - 240:25

**cross** [12] - 80:25, 82:11, 84:5, 84:18, 84:24, 85:11, 85:17, 172:11, 172:22, 250:6, 250:8

**CROSS** [6] - 3:5, 3:6, 3:7, 172:24, 250:11, 251:9

**cross-examination** [7] - 82:11, 84:5, 84:18, 85:17, 172:11, 250:6, 250:8

**CROSS-EXAMINATION** [6] - 3:5, 3:6, 3:7, 172:24, 250:11, 251:9

**crowbar** [1] - 49:16

**Crown** [2] - 63:13, 63:14

**cups** [2] - 24:4, 53:5

**currency** [1] - 155:23

**current** [1] - 207:18

**custody** [2] - 68:21, 175:17

**customer** [8] - 33:7, 33:8, 33:14, 33:16, 33:17, 34:2, 209:20, 209:22

**customers** [13] -

33:12, 42:3, 46:7, 46:9, 47:25, 48:15, 48:17, 76:1, 212:22, 212:25, 213:4, 213:11, 291:10
**Customs** [1] - 123:13
**cut** [7] - 215:11, 215:14, 215:22, 217:5, 255:25, 273:12, 273:19
**cutters** [1] - 273:12
**CVS** [1] - 112:9

# D

**dad** [1] - 145:24
**dad's** [3] - 90:19, 91:24, 91:25
**Dale** [1] - 186:1
**damaging** [1] - 280:19
**damn** [5] - 145:14, 153:23, 157:7, 157:8, 158:14
**dark** [2] - 264:17, 264:20
**date** [12] - 31:15, 121:17, 121:18, 169:24, 172:2, 172:3, 172:6, 194:5, 227:3, 271:11, 287:20, 301:22
**David** [1] - 10:20
**days** [19] - 14:24, 15:13, 25:24, 45:17, 50:19, 92:2, 96:4, 125:19, 170:6, 183:25, 189:12, 189:15, 189:16, 189:17, 249:4, 249:8, 260:17, 262:21, 278:20
**Daytona** [2] - 118:6, 119:23
**DEA** [14] - 67:21, 117:25, 121:2, 173:14, 175:16, 192:11, 195:16, 222:15, 223:23, 224:3, 245:16, 256:22, 271:16, 278:24
**DEA's** [1] - 271:15
**deal** [16] - 10:12, 10:13, 10:16, 10:22, 11:1, 11:2, 11:6, 36:1, 84:17, 87:13, 123:11, 143:13, 184:10,

**dealer** [5] - 176:3, 176:5, 176:7, 178:13, 178:15
**dealers** [1] - 200:12
**dealership** [9] - 60:21, 61:2, 61:14, 61:17, 62:9, 62:10, 62:17, 63:12, 120:25
**dealerships** [1] - 295:25
**dealing** [12] - 63:13, 117:22, 176:10, 177:9, 177:11, 180:2, 265:18, 266:13, 266:18, 280:7, 288:1
**dealings** [7] - 10:9, 11:18, 13:6, 99:15, 288:5, 290:11, 292:18
**deals** [3] - 244:5, 244:7, 244:8
**dealt** [4] - 179:17, 180:21, 254:1, 280:3
**debriefing** [2] - 278:23
**debt** [12] - 75:3, 99:1, 131:20, 132:5, 231:23, 231:25, 232:2, 232:8, 232:11, 281:9, 281:15, 281:21
**decide** [2] - 85:6, 278:18
**decided** [3] - 84:14, 179:23, 185:4
**decision** [1] - 179:20
**deduction** [1] - 36:18
**Defendant** [4] - 1:20, 1:22, 2:1, 252:21
**DEFENDANT** [1] - 304:14
**defendant** [68] - 10:1, 10:6, 10:9, 10:23, 10:24, 11:4, 11:25, 12:4, 17:14, 17:24, 18:13, 18:22, 19:10, 26:17, 34:19, 50:1, 54:16, 56:3, 57:24, 58:14, 59:21, 64:10, 75:11, 87:14, 92:23, 98:5, 99:4, 117:24, 118:2, 120:20, 121:20, 125:5, 125:23, 126:9, 131:3, 135:2, 137:20, 138:2, 144:7, 146:19, 149:7, 154:24, 156:6, 162:7, 162:15, 166:11, 169:12, 210:6, 281:23, 282:3, 286:14, 286:19,

223:23, 253:16, 258:3
**Defendants** [1] - 1:10
**defense** [3] - 81:7, 244:22, 250:6
**definitely** [19] - 45:6, 58:2, 65:4, 69:4, 82:20, 94:6, 127:14, 127:20, 128:13, 139:9, 145:6, 195:13, 204:17, 248:17, 248:20, 264:17, 276:11, 283:4
**delay** [2] - 139:9, 139:11
**delegated** [1] - 231:1
**deliberations** [2] - 5:11, 6:3
**delinquent** [1] - 144:15
**deliver** [21] - 32:12, 33:9, 33:11, 35:6, 35:20, 41:6, 56:23, 57:25, 58:13, 58:16, 93:3, 125:4, 131:25, 149:12, 217:14, 259:7, 267:20, 280:16, 296:4, 300:22
**delivered** [12] - 28:9, 32:20, 32:22, 33:2, 34:1, 34:6, 57:16, 57:18, 120:20, 221:9, 221:11, 300:12
**deliveries** [12] - 26:6, 39:3, 39:6, 40:8, 58:19, 205:3, 206:20, 206:22, 224:7, 257:22, 270:12, 280:21
**delivering** [5] - 57:12, 57:13, 58:11, 58:12, 73:25
**delivery** [37] - 26:4, 32:15, 32:18, 32:19, 32:21, 34:4, 34:13, 35:10, 39:16, 40:7, 42:10, 56:2, 121:19, 126:10, 144:13, 167:4, 167:7, 189:4, 196:14, 196:20, 196:24, 197:3, 197:4, 197:5, 197:6, 197:8, 210:20, 220:22, 222:25, 224:16, 230:1, 230:5, 243:13,

287:2, 287:10, 288:2, 288:21, 292:1, 292:23, 293:4, 295:1, 295:22, 296:8, 297:13, 298:1, 298:6, 299:7, 299:14, 300:7
**Defendants** [1] - 1:10
**defense** [3] - 81:7, 244:22, 250:6
**definitely** [19] - 45:6, 58:2, 65:4, 69:4, 82:20, 94:6, 127:14, 127:20, 128:13, 139:9, 145:6, 195:13, 204:17, 248:17, 248:20, 264:17, 276:11, 283:4
**delay** [2] - 139:9, 139:11
**delegated** [1] - 231:1
**deliberations** [2] - 5:11, 6:3
**delinquent** [1] - 144:15
**deliver** [21] - 32:12, 33:9, 33:11, 35:6, 35:20, 41:6, 56:23, 57:25, 58:13, 58:16, 93:3, 125:4, 131:25, 149:12, 217:14, 259:7, 267:20, 280:16, 296:4, 300:22
**delivered** [12] - 28:9, 32:20, 32:22, 33:2, 34:1, 34:6, 57:16, 57:18, 120:20, 221:9, 221:11, 300:12
**deliveries** [12] - 26:6, 39:3, 39:6, 40:8, 58:19, 205:3, 206:20, 206:22, 224:7, 257:22, 270:12, 280:21
**delivering** [5] - 57:12, 57:13, 58:11, 58:12, 73:25
**delivery** [37] - 26:4, 32:15, 32:18, 32:19, 32:21, 34:4, 34:13, 35:10, 39:16, 40:7, 42:10, 56:2, 121:19, 126:10, 144:13, 167:4, 167:7, 189:4, 196:14, 196:20, 196:24, 197:3, 197:4, 197:5, 197:6, 197:8, 210:20, 220:22, 222:25, 224:16, 230:1, 230:5, 243:13,

243:14, 297:25, 298:2, 298:6
**demanding** [1] - 281:20
**denomination** [1] - 56:17
**denying** [2] - 95:13, 99:6
**depict** [1] - 70:11
**depicted** [2] - 71:14, 253:7
**deposit** [26] - 61:4, 61:9, 61:10, 61:20, 61:24, 62:7, 62:13, 62:22, 62:24, 63:8, 63:11, 63:16, 63:17, 64:22, 64:25, 65:1, 65:19, 66:8, 66:24, 67:3, 67:18, 68:7, 68:8, 225:6, 228:11
**deposited** [4] - 61:23, 65:17, 225:15, 227:22
**deposits** [5] - 63:20, 64:21, 65:8, 67:12, 67:16
**depth** [1] - 127:1
**DEPUTY** [4] - 6:14, 6:25, 283:17, 284:3
**describe** [11] - 12:2, 14:9, 20:22, 22:4, 27:20, 37:17, 54:19, 60:16, 76:10, 78:7, 264:10
**described** [6] - 33:24, 70:12, 207:24, 225:5, 235:11, 239:13
**describes** [1] - 274:19
**describing** [1] - 73:24
**description** [2] - 9:22, 280:2
**designation** [4] - 42:2, 43:14, 66:17, 103:4
**destination** [3] - 21:9, 22:20, 56:23
**destroy** [3] - 207:15, 208:17, 208:18
**detail** [1] - 186:21
**detailed** [1] - 4:15
**details** [1] - 22:5
**detained** [2] - 77:4, 284:20
**develop** [3] - 13:17, 81:14, 84:14
**developed** [4] - 54:20, 56:5, 57:25, 288:6

**deviates** [1] - 89:7
**device** [4] - 88:5, 192:18, 233:9, 233:15
**difference** [2] - 89:1, 90:4
**different** [13] - 26:22, 44:5, 64:20, 65:8, 76:11, 151:1, 155:11, 210:20, 213:24, 214:3, 249:6, 252:3, 296:2
**differently** [1] - 276:8
**difficult** [5] - 4:15, 5:1, 70:6, 85:1, 195:25
**difficulty** [4] - 120:23, 132:10, 138:19, 172:19
**dip** [1] - 140:12
**dipping** [1] - 27:3
**DIRECT** [4] - 3:4, 3:9, 7:8, 284:8
**direct** [7] - 17:25, 166:14, 166:17, 198:19, 242:15, 285:16, 296:23
**directed** [1] - 234:8
**direction** [5] - 17:5, 17:6, 75:18, 78:20, 222:6
**directions** [20] - 22:24, 33:9, 64:1, 100:17, 101:19, 105:7, 105:8, 105:17, 106:20, 107:7, 107:8, 108:4, 110:20, 111:1, 111:4, 222:9, 242:1, 250:21, 267:22
**directly** [9] - 19:7, 42:6, 58:13, 58:17, 107:23, 138:1, 197:7, 258:3, 259:21
**dirty** [1] - 216:24
**disagreement** [1] - 54:2
**disclose** [1] - 80:18
**discourse** [1] - 187:21
**discrepancy** [1] - 207:12
**discuss** [25] - 5:10, 27:18, 28:14, 72:21, 113:18, 114:6, 132:4, 217:22, 221:4, 221:5, 221:21, 230:1, 241:22, 241:24, 242:4, 244:3, 244:8, 282:20, 284:11, 288:22, 292:16,

299:13, 299:16, 303:12, 304:1

**discussed** [16] - 18:12, 18:15, 19:4, 19:7, 102:4, 107:6, 181:9, 189:19, 198:19, 198:23, 202:22, 206:1, 219:3, 223:3, 231:15, 245:24

**discussing** [4] - 54:21, 125:20, 190:20, 203:9

**discussion** [1] - 77:8

**DISCUSSION** [2] - 80:5, 86:15

**discussions** [1] - 299:13

**display** [1] - 172:21

**dispose** [1] - 29:6

**disposed** [1] - 24:18

**disposing** [2] - 24:14, 24:16

**distinctly** [1] - 171:16

**distribute** [7] - 28:3, 45:3, 69:9, 182:22, 196:13, 284:21, 290:19

**distributed** [13] - 25:24, 28:15, 29:8, 45:17, 46:2, 46:6, 46:10, 75:6, 75:25, 213:11, 213:13, 291:6, 292:9

**distributing** [5] - 12:11, 28:4, 44:22, 44:23, 199:18

**distribution** [13] - 7:15, 8:17, 8:23, 9:1, 31:7, 31:9, 47:4, 55:14, 64:7, 75:15, 206:24, 290:18, 293:3

**DISTRICT** [3] - 1:1, 1:1, 1:14

**District** [5] - 2:5, 185:19, 293:13, 296:11, 296:18

**divide** [1] - 190:21

**dock** [2] - 20:25, 274:9

**document** [3] - 119:21, 121:5, 227:3

**documents** [1] - 238:11

**Dodge** [11] - 118:5, 119:17, 120:25, 121:9, 237:7, 237:9, 237:10, 237:13, 237:15

**dog** [1] - 160:11

**Dog** [4] - 143:12, 158:8, 163:11, 163:13

**dollar** [2] - 47:5, 131:20

**dollars** [12] - 47:21, 47:23, 47:24, 48:6, 57:4, 59:10, 186:22, 191:18, 238:5, 238:13, 238:25, 300:5

**Dolls** [1] - 110:25

**done** [14] - 28:23, 29:6, 76:17, 81:2, 187:4, 194:12, 206:11, 207:18, 208:21, 267:7, 275:6, 288:17, 290:7, 291:15

**door** [7] - 15:24, 16:9, 60:24, 70:4, 71:1, 71:2, 71:8

**doors** [1] - 273:17

**dope** [3] - 211:10, 247:17, 266:18

**doubled** [1] - 246:25

**doubt** [3] - 145:8, 205:22, 270:10

**down** [71] - 4:16, 5:2, 5:15, 7:12, 19:5, 21:14, 28:2, 28:10, 28:13, 29:2, 29:14, 34:24, 40:18, 42:12, 45:16, 45:21, 48:1, 48:4, 48:10, 97:16, 97:21, 109:17, 110:5, 110:7, 111:2, 111:13, 111:23, 112:2, 112:3, 112:17, 112:19, 113:24, 120:24, 120:25, 121:9, 133:19, 138:7, 139:22, 142:25, 145:24, 152:11, 155:14, 156:18, 156:20, 156:22, 170:3, 184:17, 192:3, 197:1, 208:20, 208:22, 210:15, 211:5, 215:9, 216:5, 216:8, 218:2, 221:19, 225:12, 241:3, 255:25, 257:5, 268:12, 270:7, 283:13, 289:11, 292:3, 296:6, 300:22, 300:23, 303:19

**downloads** [2] - 124:13, 124:16

**downtown** [5] - 107:17, 107:19, 109:1, 109:3, 116:16

**drawing** [1] - 67:13

**Dread** [1] - 9:12

**dressed** [1] - 284:14

**dried** [1] - 256:12

**drink** [1] - 117:6

**drive** [7] - 58:7, 120:22, 137:9, 139:22, 148:19, 148:21, 185:23

**driver** [24] - 22:13, 53:14, 53:19, 100:17, 101:17, 101:23, 103:14, 106:8, 219:5, 222:9, 236:4, 259:8, 259:21, 267:20, 267:21, 272:14, 273:24, 274:3, 274:6, 274:8, 274:17, 278:2, 280:13, 280:15

**drivers** [26] - 22:18, 54:2, 54:10, 57:12, 57:14, 57:17, 117:21, 224:7, 224:9, 251:14, 257:19, 258:15, 258:17, 258:22, 258:23, 259:11, 259:13, 269:19, 272:22, 280:20, 297:9, 297:11, 297:16, 298:22, 298:24, 299:8

**driving** [12] - 59:21, 59:23, 76:18, 137:11, 137:12, 138:7, 154:10, 154:14, 204:11, 242:19, 259:16

**drop** [3] - 165:13, 167:9, 167:14

**drop-off** [1] - 167:9

**dropping** [4] - 12:12, 199:16, 235:3, 262:19

**drove** [3] - 57:17, 62:2, 167:16

**drug** [19] - 8:16, 8:22, 9:4, 176:3, 176:5, 176:7, 184:18, 191:5, 200:12, 244:7, 244:8, 247:8, 247:9, 247:10, 247:14, 265:11, 265:18, 281:21, 285:23

**drugs** [9] - 176:10, 176:15, 176:19, 177:5, 177:9, 177:11, 178:10, 179:13, 179:18

**dude** [7] - 90:16, 91:1, 91:23, 136:13, 136:14, 143:19, 296:23

**dude's** [1] - 144:25

**due** [1] - 185:17

**duffle** [3] - 156:3, 259:16, 259:19

**duly** [2] - 6:22, 283:25

**dumb** [2] - 137:10, 140:8

**Duralia** [4] - 229:25, 230:6, 230:7, 270:6

**during** [36] - 5:2, 8:2, 9:11, 9:17, 23:3, 35:21, 36:25, 56:3, 77:12, 84:22, 84:24, 87:10, 100:5, 115:3, 115:4, 125:2, 168:10, 169:10, 175:4, 194:20, 197:3, 197:5, 197:6, 197:8, 224:19, 251:11, 254:6, 268:8, 278:22, 282:1, 286:19, 286:24, 288:22, 294:24, 298:2, 298:6

**duties** [10] - 4:23, 12:9, 16:24, 19:18, 20:6, 20:8, 65:6, 65:7, 206:2, 217:8

## E

**EAJ** [1] - 1:2

**ear** [7] - 192:15, 192:19, 193:2, 193:3, 193:10, 193:16

**early** [7] - 16:2, 17:18, 90:7, 92:5, 103:19

**easier** [1] - 90:24

**edition** [1] - 118:6

**editorializing** [1] - 241:20

**effect** [1] - 16:23

**effort** [3] - 6:1, 6:2, 266:7

**eight** [4] - 119:11, 119:13, 289:16, 289:17

**either** [11] - 35:4, 54:5, 66:5, 81:17, 87:21, 138:12, 173:17, 184:25, 230:25, 248:4, 267:14

**electronics** [1] - 172:19

**employed** [5] - 13:1, 18:3, 20:18, 204:5, 204:10

**employee** [5] -

20:16, 20:17, 26:16, 94:4, 94:6

**empty** [1] - 51:1

**encourage** [1] - 4:19

**end** [21] - 5:15, 18:25, 31:10, 36:7, 36:8, 39:17, 47:21, 75:25, 76:16, 78:12, 78:14, 93:4, 98:6, 100:17, 125:10, 193:21, 211:18, 263:18, 271:10

**ended** [6] - 24:11, 62:12, 120:22, 120:23, 295:14, 302:11

**enforcement** [16] - 8:2, 38:5, 65:21, 65:25, 68:3, 69:22, 75:18, 76:7, 77:8, 78:20, 159:1, 169:20, 268:6, 268:9, 268:14, 278:19

**engaged** [1] - 293:2

**engrossed** [1] - 5:3

**enhanced** [3] - 9:6, 246:25, 247:20

**enhancement** [3] - 247:22, 247:23, 285:12

**Enhancement** [1] - 9:5

**enjoy** [1] - 283:7

**ENTERED** [1] - 4:4

**entering** [1] - 150:3

**enterprise** [2] - 191:6, 246:5

**entire** [2] - 24:12, 175:22

**entitled** [3] - 12:9, 34:14, 81:25

**entrap** [2] - 196:5, 196:7

**entry** [3] - 232:24, 232:25, 233:3

**episode** [1] - 115:4

**equal** [3] - 72:2, 74:13, 75:14

**equaled** [1] - 61:21

**equipment** [14] - 80:8, 82:5, 82:6, 82:17, 83:7, 83:14, 83:19, 87:20, 192:11, 194:17, 195:16, 195:19, 195:20, 195:23

**especially** [2] - 4:16, 80:16

**established** [1] - 295:18

**estimate** [1] - 173:21
**evening** [1] - 34:1
**EVENS** [1] - 1:8
**event** [1] - 74:19
**events** [1] - 133:10
**eventually** [3] -
101:15, 125:7, 203:17
**everyday** [1] - 93:15
**evidence** [23] - 5:8,
31:18, 38:9, 52:1,
52:16, 66:10, 68:9,
70:14, 74:21, 79:22,
87:9, 88:15, 88:22,
88:23, 89:6, 102:14,
103:21, 120:10,
121:12, 122:15,
171:20, 253:4, 302:2
**EVIDENCE** [14] -
31:22, 38:13, 52:20,
66:15, 68:15, 70:19,
87:6, 102:23, 120:14,
121:15, 122:19,
170:25, 171:24, 302:5
**exact** [11] - 57:1,
168:4, 173:13,
173:23, 174:19,
178:14, 192:13,
194:5, 210:16,
210:21, 272:10
**exactly** [7] - 28:10,
52:3, 94:22, 164:4,
181:16, 259:24, 278:8
**examination** [7] -
82:11, 84:5, 84:18,
85:17, 172:11, 250:6,
250:8
**EXAMINATION** [12] -
3:4, 3:5, 3:6, 3:7, 3:8,
3:9, 7:8, 172:24,
250:11, 251:9,
279:25, 284:8
**examine** [1] - 88:8
**examined** [2] - 6:24,
284:2
**example** [5] -
137:19, 260:14,
262:16, 265:17,
276:17
**except** [2] - 23:23,
233:15
**exchange** [6] -
54:15, 59:9, 59:22,
88:17, 186:22, 243:11
**exchanged** [1] -
243:2
**excited** [3] - 59:25,
60:4, 60:5
**exclusively** [2] -
49:21, 180:2
**excuse** [13] - 37:2,

135:19, 176:4,
198:16, 204:23,
206:22, 219:12,
230:13, 233:18,
235:4, 244:15,
248:13, 285:15
**Exhibit** [65] - 30:25,
31:18, 37:11, 37:25,
38:10, 51:15, 52:25,
63:1, 65:10, 67:23,
67:25, 70:23, 71:15,
73:10, 73:20, 74:15,
74:25, 79:17, 88:9,
89:12, 102:7, 102:15,
104:1, 107:12, 109:6,
111:7, 112:24,
118:22, 119:22,
120:7, 120:10, 121:6,
121:12, 122:2,
122:12, 126:1, 126:4,
126:14, 132:8,
135:21, 138:16,
144:17, 147:5,
149:18, 156:10,
157:24, 159:6,
162:12, 169:16,
170:15, 170:16,
171:3, 171:20,
209:17, 211:17,
212:6, 218:25, 281:3,
281:13, 281:19,
301:16, 301:19, 302:2
**EXHIBIT** [11] - 3:14,
31:22, 38:13, 63:3,
66:15, 68:15, 121:15,
122:19, 170:25,
171:24, 302:5
**exhibit** [1] - 37:22,
63:6, 67:24
**Exhibits** [10] - 52:7,
69:25, 79:15, 79:23,
79:24, 86:22, 102:9,
115:11, 126:8, 252:22
**exhibits** [10] - 36:25,
37:4, 52:22, 86:21,
86:25, 87:13, 88:14,
102:10, 102:11,
172:21
**EXHIBITS** [7] - 3:13,
3:17, 52:19, 70:18,
87:5, 102:22, 120:13
**exit** [8] - 109:14,
109:15, 109:21,
109:22, 109:24,
111:19, 111:21,
152:13
**expect** [2] - 232:18,
246:21
**expected** [2] - 89:3,
232:17

**expecting** [1] - 88:3
**expensive** [1] - 60:6
**experience** [2] -
41:14, 253:15
**explain** [9] - 71:18,
128:17, 184:17,
184:20, 200:13,
215:13, 220:23,
232:25, 254:3
**explained** [4] -
186:21, 196:12,
205:7, 255:10
**explaining** [1] -
179:19
**explosion** [2] -
132:25, 135:11
**express** [1] - 280:15
**extension** [1] -
163:21
**extent** [3] - 19:12,
89:9, 258:13
**extra** [1] - 265:7
**extravagant** [2] -
184:18, 261:4
**eye** [2] - 26:21, 205:4

---

# F

**f-ing** [3] - 93:25,
138:4, 146:22
**F-ing** [1] - 138:5
**facade** [1] - 219:25
**face** [2] - 5:15,
257:25
**facilitate** [1] - 63:19
**facility** [7] - 16:1,
21:23, 25:1, 45:22,
45:23, 119:3, 219:13
**fact** [10] - 87:13,
115:1, 131:25, 255:3,
280:4, 280:10, 289:1,
290:21, 295:12,
299:24
**factor** [1] - 241:10
**fair** [3] - 79:4,
253:11, 271:19
**Fairfield** [9] - 150:10,
150:14, 151:2,
239:23, 240:14,
240:18, 241:3, 242:7
**fairly** [5] - 52:8,
60:24, 70:11, 118:24,
169:19
**faith** [1] - 187:7
**fake** [7] - 125:5,
125:7, 155:22, 159:2,
214:23, 239:12, 243:3
**fall** [1] - 265:14
**familiar** [7] - 23:12,

54:8, 57:17, 167:4,
193:8, 257:22, 299:24
**family** [1] - 147:2
**far** [22] - 14:10,
24:24, 35:11, 35:19,
37:25, 47:5, 54:11,
79:7, 99:8, 104:9,
104:10, 116:12,
148:22, 153:21,
252:11, 269:3,
272:20, 277:16,
286:11, 293:24,
299:16
**fashion** [2] - 24:21,
288:6
**fast** [1] - 60:9
**faster** [1] - 237:5
**fault** [2] - 95:12, 99:5
**favor** [4] - 190:11,
190:13, 191:10,
226:18
**favorite** [1] - 33:2
**fear** [1] - 169:6
**federal** [4] - 76:20,
175:25, 184:15,
245:15
**feet** [1] - 25:4
**fell** [3] - 62:7, 144:21,
258:18
**felon** [3] - 247:1,
247:3, 247:6
**felony** [6] - 8:16,
8:22, 9:2, 9:4, 163:7,
285:23
**felt** [11] - 19:21,
40:13, 41:15, 47:13,
47:14, 50:5, 50:6,
194:3, 212:9, 215:15,
283:4
**few** [7] - 4:22, 12:17,
16:9, 19:25, 58:21,
59:3, 118:15
**field** [1] - 255:19
**fifteen** [1] - 293:20
**figure** [6] - 40:3,
43:19, 66:21, 68:5,
119:12, 165:21
**figured** [3] - 262:20,
299:18, 303:5
**figures** [1] - 33:22
**file** [1] - 248:14
**filed** [1] - 285:13
**filing** [1] - 9:5
**fill** [3] - 53:8, 67:10,
304:10
**fills** [1] - 265:25
**final** [2] - 272:11,
278:16
**finally** [1] - 46:22
**financial** [1] - 98:9,

168:22, 168:23
**financially** [2] -
39:22, 50:7
**fine** [8] - 81:13,
111:14, 133:17,
134:23, 181:24,
185:3, 236:14, 257:7
**finished** [1] - 56:14
**finishing** [1] - 147:14
**firearm** [1] - 247:16
**first** [79] - 6:11,
11:23, 12:1, 12:24,
15:10, 15:25, 17:23,
18:24, 20:4, 21:20,
22:3, 22:8, 22:9, 23:3,
23:4, 23:18, 26:25,
32:4, 32:8, 32:10,
32:11, 32:14, 32:15,
33:25, 34:1, 38:21,
38:24, 38:25, 41:3,
43:5, 43:16, 51:1,
54:23, 55:1, 55:2,
58:5, 69:2, 86:20,
88:8, 102:25, 109:14,
116:14, 124:3,
152:12, 152:13,
173:11, 176:23,
177:15, 184:14,
186:5, 188:15,
189:19, 190:6, 194:1,
194:4, 195:15,
200:22, 200:25,
202:20, 205:2, 205:3,
205:6, 206:7, 209:19,
260:15, 260:22,
261:21, 262:5, 263:8,
265:6, 269:23,
270:14, 287:1,
288:23, 290:21,
291:5, 292:13
**five** [20] - 25:24,
45:17, 45:23, 58:18,
88:6, 104:21, 105:25,
119:13, 119:14,
124:12, 142:2, 150:4,
150:5, 170:6, 181:6,
181:21, 215:18,
304:8, 304:10, 304:20
**fixed** [1] - 121:1
**fixing** [1] - 124:6
**FL** [5] - 1:19, 1:21,
1:24, 2:3, 2:6
**Fletcher** [3] - 150:15,
150:25, 151:7
**flew** [1] - 288:16
**flight** [1] - 128:3
**FLORIDA** [1] - 1:1
**Florida** [21] - 2:6,
21:24, 22:2, 45:25,
55:3, 58:7, 58:8, 58:9,

76:19, 76:21, 107:9, 139:16, 139:17, 185:20, 201:5, 219:10, 258:15, 293:13, 296:11, 296:18
**flown** [1] - 50:14
**fly** [5] - 137:10, 168:18, 243:25, 288:24, 289:1
**flying** [4] - 133:16, 135:12, 137:9, 244:3
**focusing** [1] - 250:24
**FOLLOW** [1] - 115:18
**follow** [3] - 88:25, 243:21, 243:22
**following** [6] - 13:11, 77:17, 88:21, 114:24, 239:15, 243:5
**FOLLOWING** [1] - 80:4
**follows** [2] - 6:24, 284:2
**FOLLOWS** [11] - 86:17, 89:13, 104:3, 107:14, 109:8, 111:9, 113:8, 114:13, 122:20, 139:2, 218:4
**foolproof** [1] - 169:8
**FOR** [2] - 1:1, 63:3
**foregoing** [1] - 304:25
**forever** [1] - 143:17
**forfeit** [1] - 208:12
**forfeited** [6] - 99:2, 171:6, 208:10, 208:14, 223:25, 224:1
**forget** [2] - 175:7, 238:15
**forgot** [1] - 73:10
**forklift** [4] - 21:13, 74:6, 205:13, 205:16
**form** [4] - 8:19, 11:15, 67:10, 285:17
**formal** [1] - 282:3
**former** [1] - 8:22
**Fort** [6] - 58:8, 58:20, 59:17, 62:3, 120:24, 139:22
**forth** [3] - 16:10, 53:15, 131:14
**forward** [5] - 6:15, 78:12, 78:15, 86:3, 144:12
**foundation** [1] - 12:6
**four** [19] - 21:10, 25:10, 25:11, 28:10, 50:19, 56:22, 56:24, 70:9, 72:4, 74:3,

74:13, 88:6, 92:1, 92:2, 165:1, 170:6, 205:12, 293:8
**fourth** [1] - 272:3
**frame** [1] - 203:22
**Franklin** [3] - 105:22, 107:24, 152:19
**free** [2] - 245:24, 245:25
**freely** [1] - 19:21
**freer** [1] - 54:14
**freeway** [1] - 152:3
**frequency** [1] - 25:20
**Friday** [1] - 189:14
**friend** [8] - 10:19, 77:23, 143:13, 190:9, 264:25, 288:8, 288:9, 289:4
**friend's** [2] - 203:5, 267:14
**friends** [1] - 185:24
**front** [27] - 13:10, 13:11, 21:2, 23:8, 43:1, 45:13, 48:19, 51:23, 53:3, 71:2, 73:18, 115:10, 126:5, 161:14, 162:13, 195:6, 200:8, 200:13, 201:13, 203:11, 219:1, 219:24, 263:23, 268:22, 270:4, 286:12
**fronted** [1] - 178:11, 203:18, 292:20
**fruit** [1] - 23:7
**fu** [2] - 140:6, 140:23
**fuck** [23] - 94:25, 97:18, 97:19, 97:23, 116:18, 117:3, 124:7, 129:1, 134:20, 136:22, 137:2, 137:10, 139:25, 140:7, 140:19, 143:11, 143:19, 150:12, 151:4, 152:16, 153:12, 156:16
**fucked** [2] - 132:25, 133:10
**fucking** [69] - 89:25, 91:1, 91:2, 94:16, 94:24, 95:7, 96:4, 116:7, 116:23, 127:12, 127:15, 128:22, 132:18, 132:23, 133:4, 133:5, 133:7, 133:20, 133:21, 134:11, 134:12, 135:18, 135:25, 136:1, 136:7,

136:8, 136:13, 136:21, 136:22, 139:6, 139:10, 139:21, 139:22, 139:23, 140:10, 140:12, 140:13, 141:5, 142:22, 142:23, 143:7, 143:18, 144:21, 144:22, 145:1, 145:5, 145:7, 145:10, 145:13, 145:21, 147:12, 147:13, 147:15, 147:20, 150:22, 151:24, 157:11, 158:8, 158:9, 161:11, 163:4, 163:14, 163:16, 164:9, 164:10, 164:14
**full** [6] - 95:11, 99:4, 99:8, 99:10, 119:11, 245:11
**fully** [1] - 95:20
**function** [4] - 196:12, 199:8, 200:3, 205:24
**functions** [2] - 217:10, 217:13
**future** [2] - 14:1, 57:20

## G

**Gainesville** [3] - 147:22, 149:8, 242:7
**Gandy** [1] - 55:2
**gas** [8] - 150:8, 151:23, 151:24, 152:1, 153:5, 153:8, 153:15, 154:25
**Gatorade** [1] - 116:9
**gear** [1] - 78:10
**general** [7] - 21:18, 22:14, 58:12, 95:19, 176:1, 288:6
**generally** [3] - 12:3, 78:7, 250:7
**gentleman** [8] - 10:18, 20:12, 33:4, 41:6, 56:12, 76:2, 76:3, 149:10
**gentlemen** [19] - 4:9, 6:6, 9:23, 9:24, 10:20, 11:20, 16:9, 54:5, 72:22, 76:5, 88:13, 103:18, 113:16, 114:20, 173:8, 217:22, 248:2, 251:3, 303:11
**girl** [6] - 136:7, 136:21, 136:24,

138:4, 138:11, 142:12
**given** [38] - 15:12, 33:9, 34:23, 46:6, 49:3, 64:2, 64:14, 66:7, 80:8, 85:13, 100:24, 109:4, 114:7, 125:14, 166:16, 183:13, 183:14, 187:1, 187:2, 194:18, 195:15, 195:17, 198:6, 200:8, 219:8, 222:5, 222:9, 222:22, 232:4, 233:9, 233:15, 233:23, 238:11, 246:22, 249:11, 269:16, 301:8, 304:2
**Glass** [3] - 21:1, 203:13, 203:14
**God** [3] - 6:19, 158:13, 283:22
**gonna** [42] - 95:6, 95:8, 96:2, 124:20, 124:21, 126:24, 127:11, 127:12, 127:15, 127:16, 128:2, 128:20, 128:21, 129:23, 132:20, 134:17, 136:7, 136:8, 137:6, 137:7, 139:12, 141:3, 141:12, 141:21, 142:1, 143:7, 143:14, 147:16, 147:22, 148:8, 148:10, 148:14, 148:15, 148:18, 148:23, 148:24, 154:17, 160:17, 163:18, 166:6
**good-bye** [1] - 59:19
**gotta** [13] - 133:8, 140:20, 143:22, 143:23, 143:24, 144:8, 145:17, 146:10, 163:13, 163:18, 163:23
**Government** [2] - 1:16, 102:15
**government** [68] - 6:10, 8:7, 8:10, 9:5, 31:17, 38:8, 52:15, 66:9, 77:1, 79:21, 80:7, 80:14, 82:22, 83:2, 83:12, 83:17, 83:19, 84:2, 84:7, 84:20, 85:13, 115:15, 121:11, 135:21, 144:16, 171:19, 172:21, 173:17, 174:16, 179:11, 181:1, 181:4, 184:7,

184:10, 184:15, 185:5, 186:6, 188:17, 189:12, 192:6, 193:13, 194:2, 194:24, 207:24, 208:9, 208:11, 214:22, 222:11, 228:12, 232:15, 234:6, 234:17, 238:12, 239:1, 239:20, 239:24, 241:6, 242:8, 242:12, 242:25, 245:16, 247:5, 249:11, 251:12, 268:20, 282:20, 285:1, 302:1
**Government's** [74] - 30:24, 31:18, 37:10, 37:25, 38:10, 51:15, 52:7, 52:16, 52:25, 63:1, 65:10, 67:23, 67:25, 68:10, 69:25, 70:23, 71:14, 73:10, 73:20, 74:14, 74:24, 79:15, 79:16, 79:17, 79:23, 79:24, 86:21, 88:8, 89:12, 102:7, 102:8, 103:25, 107:12, 109:6, 111:7, 112:24, 115:11, 118:22, 119:22, 120:7, 120:9, 121:6, 121:12, 122:1, 122:12, 126:1, 126:3, 126:7, 126:14, 132:8, 135:21, 138:16, 144:17, 147:4, 149:18, 156:10, 157:24, 159:6, 162:11, 169:15, 170:14, 170:16, 171:2, 171:20, 209:17, 212:5, 218:25, 281:2, 281:3, 281:13, 281:19, 301:16, 301:19, 302:2
**government's** [2] - 85:4, 211:17
**grab** [1] - 140:13
**grand** [7] - 36:5, 41:5, 123:8, 131:23, 131:24, 211:19, 211:22
**greater** [1] - 14:2
**Greek** [2] - 265:1, 267:14
**greet** [1] - 33:3
**grew** [2] - 58:6, 254:22
**groceries** [1] - 21:7

**Group** [1] - 1:23
**group** [2] - 26:23, 90:25
**growing** [1] - 255:2
**grown** [1] - 255:18
**grunting** [1] - 140:4
**GT** [2] - 59:23, 60:6
**guarantee** [1] - 249:20
**guaranteeing** [3] - 91:24, 136:9, 136:10
**guess** [11] - 96:7, 137:6, 145:10, 175:8, 189:4, 215:21, 223:16, 223:17, 241:2, 266:16, 280:24
**guesstimation** [1] - 176:11
**guests** [1] - 170:13
**guidelines** [1] - 246:18
**guilty** [11] - 183:3, 183:4, 183:6, 210:9, 228:17, 229:7, 245:5, 245:7, 245:9, 246:14
**gun** [2] - 69:18, 247:17
**guy** [7] - 81:23, 82:25, 83:12, 83:18, 84:14, 84:22, 138:11
**guys** [3] - 91:7, 199:1, 239:21

**H**

**half** [10] - 12:23, 26:15, 44:24, 57:4, 59:9, 59:10, 137:13, 147:17, 175:23, 181:10
**halfway** [1] - 148:13
**halt** [2] - 25:19, 94:2
**hand** [20] - 6:15, 14:12, 40:13, 42:13, 102:6, 110:24, 112:20, 118:16, 145:20, 146:21, 188:22, 200:20, 201:6, 215:16, 233:18, 233:21, 234:23, 240:2, 240:11, 283:18
**handed** [6] - 19:5, 37:9, 45:21, 48:1, 94:18, 100:21
**handing** [1] - 51:14
**handle** [4] - 35:20, 208:20, 211:4, 273:9
**handler** [1] - 230:18

**handles** [1] - 230:22
**hands** [2] - 293:25, 294:2
**handwriting** [1] - 225:10
**hard** [2] - 62:20, 215:9
**HARDAWAY** [1] - 1:8
**Hardaway** [2] - 103:5, 252:17
**hardest** [1] - 47:10
**harvested** [2] - 256:1, 256:11
**harvesting** [1] - 255:25
**haul** [2] - 274:3, 274:6
**head** [11] - 5:2, 49:14, 69:17, 96:9, 132:21, 147:22, 179:25, 199:17, 199:19, 228:20, 236:23
**headed** [2] - 69:7, 151:12
**heading** [4] - 105:3, 105:5, 105:21, 147:16
**heads** [2] - 147:14, 148:3
**hear** [9] - 29:20, 29:21, 113:13, 226:12, 234:19, 234:20, 269:7, 269:8, 269:23
**heard** [12] - 88:14, 92:6, 230:20, 234:20, 247:20, 247:22, 248:9, 250:20, 261:12, 261:20, 270:16, 282:9
**hearing** [3] - 77:4, 89:20, 262:10
**heart** [1] - 60:9
**HELD** [1] - 80:5
**held** [13] - 30:3, 39:22, 44:25, 132:19, 132:22, 210:25, 211:1, 211:3, 212:10, 233:18, 234:23, 246:2, 246:3
**Hello** [1] - 142:17
**hello** [16] - 104:4, 104:24, 113:14, 126:18, 132:14, 139:3, 156:13, 160:21, 162:24, 268:24, 269:8, 269:24, 277:12
**helmet** [2] - 262:11, 262:12

**help** [10] - 6:19, 63:19, 166:24, 168:24, 189:2, 191:23, 265:18, 278:18, 279:2, 283:22
**helpful** [1] - 4:21
**helping** [1] - 206:9
**Hernandez** [1] - 186:16
**hidden** [3] - 53:6, 53:9, 243:13
**hide** [3] - 156:4, 220:2
**High** [1] - 177:3
**high** [4] - 35:22, 49:14, 69:17, 133:5
**higher** [1] - 25:12
**highest** [2] - 26:12, 60:25
**highs** [1] - 124:1
**highway** [4] - 133:2, 135:3, 135:5, 135:11
**highway's** [1] - 133:10
**himself** [1] - 88:7
**hiring** [1] - 258:17
**hit** [3] - 137:14, 148:23, 148:24
**hitting** [1] - 133:1
**Hmm** [1] - 136:18
**hobby** [7] - 14:20, 15:14, 45:13, 201:1, 201:11, 201:24, 202:22
**Hold** [1] - 160:15
**hold** [10] - 30:11, 45:16, 46:9, 53:25, 160:3, 160:4, 163:3, 192:19, 208:1, 208:2
**holding** [6] - 118:17, 136:3, 136:4, 191:22, 223:9, 223:12
**holiday** [1] - 283:6
**Holiday** [3] - 59:13, 59:21, 59:23
**home** [1] - 175:19
**Homey** [22] - 9:18, 18:7, 18:8, 18:10, 18:13, 18:18, 34:14, 34:16, 34:17, 35:5, 35:14, 41:24, 135:16, 213:24, 213:25, 214:4, 214:7, 214:13, 214:18, 214:22, 286:20, 286:22
**honestly** [4] - 95:3, 96:2, 179:12, 238:16
**Honor** [83] - 4:10, 6:7, 6:9, 7:7, 10:2, 12:6, 15:2, 30:20,

31:18, 31:20, 31:25, 36:22, 36:24, 37:7, 37:23, 38:11, 38:18, 52:16, 52:22, 65:14, 66:10, 68:10, 70:15, 73:13, 74:17, 74:20, 79:11, 79:22, 79:25, 81:9, 82:15, 86:21, 87:2, 88:11, 89:11, 101:3, 102:16, 102:20, 103:24, 107:1, 109:6, 112:24, 115:16, 120:10, 121:12, 122:15, 126:14, 132:8, 132:11, 138:19, 147:6, 149:18, 156:10, 162:21, 170:15, 170:16, 171:21, 172:8, 172:13, 172:18, 181:14, 227:2, 229:23, 244:15, 244:19, 248:6, 249:24, 250:4, 250:10, 251:6, 251:8, 270:21, 282:11, 283:12, 285:15, 286:15, 301:12, 302:2, 303:22, 304:6, 304:16, 304:19, 304:22
**HONORABLE** [1] - 1:13
**Honorable** [4] - 4:6, 73:5, 114:17
**hood** [1] - 123:22
**hook** [1] - 129:24
**hooked** [1] - 123:17
**hop** [1] - 128:3
**hope** [2] - 185:10, 248:14
**hoping** [4] - 8:12, 8:14, 148:21, 285:9
**Hopkins** [3] - 19:24, 77:24, 198:13
**hospital** [1] - 90:6
**hot** [1] - 255:11
**hotel** [4] - 150:12, 150:17, 150:22, 152:5
**hotels** [1] - 151:1
**hour** [6] - 104:19, 134:22, 175:4, 175:22, 190:19, 272:16
**hours** [5] - 92:2, 134:9, 147:17, 148:11, 270:13
**house** [3] - 39:13, 90:19, 91:24, 91:25,

145:18, 145:20, 146:20, 177:18, 190:4, 289:12, 289:14, 289:23, 291:16
**Howard** [3] - 105:22, 107:24, 152:19
**HUGO** [1] - 1:20
**hundred** [14] - 48:5, 131:2, 131:15, 131:20, 174:11, 174:12, 191:18, 238:4, 238:7, 238:9, 238:13, 238:25, 239:9, 293:20
**hundreds** [4] - 40:22, 167:10, 167:12, 168:3
**hurry** [4] - 97:24, 98:7, 98:8, 142:24
**Hyatt** [1] - 152:6

**I**

**I's** [1] - 119:19
**I-75** [1] - 151:7
**ice** [1] - 23:5
**ID** [1] - 64:24
**idea** [24] - 70:8, 71:7, 96:19, 118:9, 199:1, 201:24, 203:14, 203:15, 203:16, 211:25, 220:24, 254:9, 255:7, 256:12, 257:8, 263:14, 266:20, 267:10, 268:15, 278:11, 280:7, 295:11
**ideas** [1] - 201:25
**identification** [8] - 30:24, 37:10, 51:14, 63:1, 102:7, 121:6, 167:19, 252:21
**IDENTIFICATION** [1] - 63:3
**identified** [4] - 93:14, 102:8, 106:23, 286:3
**IDENTIFIED** [1] - 3:13
**identify** [8] - 9:21, 15:4, 88:16, 121:7, 173:7, 251:19, 251:24, 252:7
**identifying** [2] - 10:1, 286:14
**ignore** [1] - 89:8
**IHOP** [3] - 109:18, 110:13, 112:8
**illegal** [6] - 120:2,

231:8, 231:10, 231:13, 231:16, 231:18
**illegitimate** [1] - 23:16
**immediate** [4] - 44:22, 125:12, 192:2, 196:18
**immediately** [2] - 118:13, 282:6
**Impala** [2] - 154:6, 154:9
**important** [4] - 100:23, 199:24, 200:3, 208:6
**impression** [2] - 135:5, 232:19
**in-depth** [1] - 127:1
**incarcerated** [1] - 183:16
**include** [3] - 33:13, 75:16, 87:15
**includes** [1] - 228:8
**including** [1] - 228:4
**inclusive** [1] - 102:18
**income** [1] - 120:3
**inconvenience** [1] - 139:14
**incorrect** [1] - 226:6
**increase** [2] - 47:6, 48:11
**independent** [1] - 272:21
**INDEX** [1] - 3:1
**indicate** [2] - 98:17, 298:24
**indicated** [13] - 15:17, 23:18, 31:5, 50:10, 54:13, 57:5, 63:18, 98:10, 277:5, 281:4, 282:16, 296:3, 296:7
**indicates** [1] - 135:12
**indicted** [2] - 228:15, 229:5
**Indictment** [2] - 246:13, 282:8
**individual** [8] - 9:16, 28:9, 32:13, 72:1, 103:7, 106:23, 254:21, 277:6
**individuals** [7] - 11:24, 12:13, 49:2, 57:13, 58:1, 254:22, 289:23
**inevitable** [1] - 38:2
**infor** [1] - 133:21
**information** [18] -

61:3, 63:20, 83:10, 85:19, 103:6, 188:8, 188:18, 208:6, 211:14, 211:15, 215:1, 222:23, 225:12, 228:23, 228:25, 229:5, 238:11, 303:13
**informed** [3] - 49:20, 159:1, 167:8
**ing** [4] - 93:25, 138:4, 138:5, 146:22
**initial** [6] - 13:6, 19:2, 19:3, 77:7, 292:18
**initiated** [1] - 269:9
**Inn** [4] - 59:13, 59:21, 59:23, 150:10
**innocent** [1] - 266:17
**inquire** [3] - 7:6, 85:17, 284:7
**inquiry** [2] - 85:9, 250:2
**inside** [4] - 51:4, 124:9, 136:21, 138:5
**insights** [1] - 4:22
**insisted** [2] - 61:18, 300:7
**inspect** [1] - 16:11
**installed** [1] - 71:10
**instance** [1] - 146:25
**instances** [1] - 146:23
**instead** [3] - 25:2, 25:4, 91:9
**instruct** [1] - 296:16
**instructed** [4] - 42:9, 67:2, 67:5, 106:16
**instruction** [2] - 114:2, 303:23
**instructions** [20] - 15:11, 49:3, 66:7, 80:8, 103:18, 125:14, 195:17, 195:20, 221:16, 222:11, 225:22, 226:10, 231:1, 233:24, 234:7, 235:15, 235:17, 235:18, 239:19, 269:16
**insulated** [1] - 303:12
**intact** [1] - 39:19
**intent** [1] - 182:22
**intentions** [1] - 57:19
**interaction** [1] - 184:14
**interested** [1] - 188:8
**interfere** [1] - 5:7
**International** [2] -

167:15, 244:11
**interrupt** [1] - 92:22
**intersection** [1] - 112:18
**interstate** [2] - 150:11, 155:15
**interviews** [1] - 187:4
**intimidation** [1] - 241:9
**INTO** [14] - 31:22, 38:13, 52:19, 66:15, 68:15, 70:18, 87:6, 102:22, 120:13, 121:15, 122:19, 170:25, 171:24, 302:5
**introduce** [9] - 38:9, 80:15, 81:9, 81:13, 81:22, 84:20, 85:5, 85:13, 85:15
**introduced** [3] - 81:11, 87:9, 209:17
**introduction** [1] - 295:4
**inventory** [8] - 27:17, 27:19, 28:2, 28:8, 38:25, 39:1, 50:17, 206:5
**inventorying** [3] - 44:20, 44:21, 206:13
**invested** [1] - 131:24
**investigation** [1] - 84:23
**investigations** [1] - 82:12
**invoke** [1] - 85:23
**involve** [4] - 10:14, 13:7, 288:18, 290:11
**involved** [14] - 10:5, 10:15, 10:16, 11:12, 11:23, 12:1, 186:13, 188:2, 246:8, 253:11, 288:9, 290:15, 292:24, 293:4
**involvement** [4] - 184:18, 246:4, 246:5, 293:24
**involves** [1] - 20:23
**ironed** [1] - 138:19
**ironic** [1] - 261:5
**IRS** [1] - 67:10
**issue** [3] - 126:2, 140:22, 278:16
**issues** [2] - 113:19, 217:23
**it'll** [4] - 124:13, 124:16, 147:24, 193:18
**items** [4] - 24:18, 40:21, 156:3, 274:15

**itself** [5] - 43:17, 88:22, 171:14, 192:18, 196:6

**J**

**J's** [1] - 26:17
**jacko** [1] - 289:8
**Jacko** [2] - 289:9, 289:22
**jail** [41] - 173:4, 173:18, 183:9, 183:18, 183:19, 185:11, 185:12, 185:13, 188:9, 188:12, 188:19, 189:2, 189:15, 191:23, 208:3, 208:5, 208:7, 208:13, 208:14, 221:3, 221:4, 221:8, 231:20, 241:1, 246:15, 248:11, 248:15, 248:17, 248:20, 248:25, 249:2, 249:4, 249:17, 249:21, 282:16, 282:17, 284:15, 284:16, 284:20, 298:23
**JAMES** [1] - 1:16
**James** [4] - 76:3, 228:13, 228:15, 229:1
**January** [1] - 1:5
**jaw** [1] - 193:7
**jEAN** [1] - 1:8
**Jean** [1] - 252:17
**Jermaine** [2] - 19:24, 77:23
**jet** [4] - 168:19, 169:1, 244:1, 244:10
**jets** [2] - 168:12, 244:3
**Jim** [1] - 173:11
**Jim's** [1] - 173:13
**JJ** [3] - 76:2, 229:3, 229:4
**JL** [4] - 123:1, 123:2, 123:25
**job** [22] - 12:9, 12:15, 12:16, 16:24, 18:2, 18:4, 20:6, 20:8, 33:11, 47:10, 57:10, 65:6, 65:7, 72:12, 72:16, 76:16, 199:22, 217:8, 254:19, 255:22, 257:12, 263:6
**jobs** [1] - 294:20
**Joe** [7] - 33:1, 33:3, 33:5, 33:7, 33:8,

39:13, 209:20
**joint** [1] - 6:2
**JORGE** [1] - 1:22
**Josh** [2] - 10:18, 44:15
**Joshua** [1] - 186:17
**journal** [1] - 281:15
**JU** [1] - 33:13
**Ju** [8] - 33:14, 33:15, 33:16, 41:3, 41:4, 209:22
**judge** [3] - 51:24, 85:22, 114:1
**Judge** [1] - 8:18
**JUDGE** [1] - 1:14
**July** [2] - 287:22, 287:25
**jump** [1] - 154:17
**jumped** [1] - 84:12
**June** [11] - 125:20, 126:7, 142:15, 144:17, 147:4, 149:6, 149:14, 301:25, 302:13
**junglis** [1] - 286:20
**Junior** [1] - 92:7
**jurisdiction** [1] - 76:21
**jurors** [1] - 5:23
**JURY** [14] - 1:13, 4:4, 72:25, 73:3, 113:23, 114:15, 114:21, 218:1, 218:7, 303:18
**jury** [26] - 4:3, 5:16, 12:2, 22:6, 27:20, 32:7, 34:18, 38:23, 58:3, 60:16, 72:24, 73:2, 85:20, 113:20, 113:22, 190:8, 217:25, 218:6, 218:17, 220:23, 232:25, 244:21, 286:8, 288:4, 293:15, 303:17
**Justin** [4] - 173:11, 173:16, 174:25, 184:1, 230:7, 230:10, 232:1, 271:18
**Justin's** [1] - 173:14

**K**

**keep** [30] - 23:6, 23:21, 24:8, 26:21, 27:11, 28:8, 30:9, 30:11, 39:18, 39:20, 51:6, 51:11, 67:4, 107:20, 107:21, 107:22, 108:1, 112:1,

119:9, 119:12, 124:17, 205:4, 207:7, 207:25, 213:16, 216:17, 234:15, 275:9, 303:12
**keeping** [2] - 24:11, 53:17
**Kennedy** [3] - 152:16, 153:13, 155:1
**kept** [21] - 27:17, 27:19, 45:2, 45:6, 45:7, 47:3, 50:24, 69:12, 100:23, 119:4, 135:18, 192:4, 194:14, 207:2, 207:4, 208:16, 210:14, 211:14, 212:7, 216:21, 281:13
**key** [1] - 71:10
**keyless** [3] - 232:24, 232:25, 233:3
**kicked** [2] - 177:17, 262:17
**kind** [25] - 14:10, 15:20, 16:9, 19:20, 21:6, 24:9, 24:13, 34:25, 46:16, 49:24, 60:8, 60:12, 67:10, 70:8, 120:22, 135:18, 168:16, 170:4, 177:11, 178:9, 206:9, 215:19, 252:4, 275:16, 293:11
**knock** [1] - 118:18
**knowing** [1] - 92:16
**knowledge** [4] - 50:13, 56:21, 255:16, 265:19
**known** [6] - 9:13, 82:16, 123:12, 123:15, 123:16, 286:4
**Kurmay** [1] - 229:1

## L

**lack** [1] - 235:1
**ladies** [8] - 4:8, 72:21, 88:13, 103:18, 113:16, 114:19, 217:21, 303:11
**lading** [3] - 274:14, 274:15, 274:16
**lady** [5] - 58:23, 61:13, 62:6, 237:19, 262:13
**lady's** [2] - 61:22, 64:15
**language** [2] - 135:19, 275:7

**large** [13] - 12:10, 12:11, 12:12, 12:18, 12:20, 23:11, 39:20, 40:12, 44:24, 55:25, 156:2, 168:4, 169:4
**largest** [1] - 293:21
**Largo** [13] - 21:24, 22:2, 45:25, 69:14, 107:9, 109:16, 109:23, 111:11, 111:19, 177:3, 201:5, 219:10
**Las** [3] - 185:24, 185:25, 186:1
**last** [23] - 7:2, 43:15, 51:10, 68:22, 90:5, 92:6, 140:7, 154:10, 173:10, 174:24, 175:1, 175:19, 190:22, 230:3, 249:4, 250:18, 250:19, 265:1, 268:1, 272:14, 284:5, 296:10, 301:1
**Last** [1] - 7:5
**late** [3] - 16:2, 92:4, 304:9
**Lauderdale** [5] - 58:8, 58:21, 59:17, 62:3, 120:24
**law** [16] - 8:1, 38:5, 65:21, 65:24, 68:3, 69:21, 75:18, 76:7, 77:8, 78:20, 159:1, 169:20, 268:5, 268:8, 268:14, 278:19
**Law** [2] - 1:23, 2:1
**lawyer** [6] - 163:19, 183:21, 184:3, 185:2, 185:4, 278:18
**lawyer's** [1] - 139:25
**leading** [6] - 8:19, 11:14, 125:20, 126:9, 282:10, 285:16
**learn** [2] - 282:2, 290:1
**learned** [3] - 17:13, 290:12, 299:8
**learning** [1] - 54:21
**lease** [10] - 15:10, 16:22, 16:24, 191:1, 202:18, 219:17, 219:18, 219:19, 219:20, 263:13
**leased** [4] - 14:18, 190:5, 190:6, 191:17
**leases** [1] - 203:2
**least** [16] - 26:2, 26:3, 56:6, 81:14, 84:7, 84:20, 158:19, 173:25, 174:2,

176:11, 191:19, 192:9, 205:17, 223:10, 223:18, 240:14
**leave** [10] - 5:15, 16:15, 20:5, 76:21, 76:22, 86:10, 202:12, 202:15, 202:16, 267:15
**leaving** [1] - 53:16
**led** [2] - 253:25, 254:10
**ledger** [37] - 28:18, 28:20, 28:22, 28:24, 30:10, 30:12, 30:13, 31:3, 31:5, 32:9, 32:10, 32:25, 33:23, 34:25, 36:7, 38:16, 38:22, 192:5, 207:2, 207:4, 207:15, 207:19, 211:14, 212:7, 212:9, 217:2, 217:3, 238:14, 238:15, 238:18, 238:19, 238:20, 238:21, 238:23, 281:5
**ledgers** [8] - 28:6, 36:17, 37:14, 191:22, 209:6, 217:1, 238:10, 281:4
**lee** [1] - 2:4
**left** [28] - 9:25, 24:1, 24:5, 28:15, 41:7, 42:13, 45:18, 53:11, 68:25, 69:1, 106:14, 109:19, 110:13, 110:14, 111:3, 112:6, 112:7, 112:17, 112:20, 136:16, 142:23, 145:12, 153:9, 168:1, 178:1, 178:2, 267:13
**left-hand** [2] - 42:13, 112:20
**legal** [1] - 83:25
**legitimate** [5] - 14:21, 21:8, 21:9, 23:17, 51:22
**less** [6] - 26:9, 48:11, 48:22, 67:4, 119:14, 249:8
**lesser** [1] - 25:13
**letters** [2] - 264:14, 279:21
**letting** [2] - 127:18, 170:5
**level** [5] - 168:22, 168:23, 176:17, 295:18, 295:20
**library** [1] - 124:18

**lie** [5] - 96:2, 249:16, 249:18, 249:19, 249:22
**life** [4] - 60:10, 176:1, 176:8, 246:10
**likely** [3] - 65:16, 72:2, 125:12
**limited** [2] - 76:23, 88:20
**lines** [1] - 220:20
**lineup** [3] - 252:5, 252:6, 252:12
**lineups** [1] - 252:10
**lingo** [1] - 93:15
**link** [2] - 133:19, 139:21
**linked** [1] - 288:13
**list** [3] - 36:18, 36:19, 213:15
**listen** [3] - 5:20, 83:15, 139:6
**Listen** [1] - 111:18
**listened** [1] - 114:25, 166:18, 194:25, 195:1, 195:4, 195:5, 275:9, 277:9, 281:18
**listening** [3] - 5:7, 103:13, 199:10
**literally** [3] - 275:13, 276:1
**live** [1] - 145:23
**lived** [1] - 19:14
**load** [71] - 18:24, 21:6, 21:8, 21:20, 22:3, 23:3, 23:4, 23:12, 23:13, 23:16, 23:18, 24:3, 24:5, 24:8, 24:10, 25:6, 30:14, 30:15, 30:18, 31:6, 35:12, 35:14, 36:10, 36:12, 36:15, 37:21, 44:9, 46:23, 51:7, 51:20, 51:22, 53:3, 53:11, 53:13, 54:2, 54:10, 57:20, 100:5, 100:9, 101:17, 144:13, 205:20, 207:5, 207:14, 207:18, 212:14, 212:16, 212:17, 213:3, 213:10, 235:23, 250:15, 263:11, 267:20, 268:10, 268:12, 273:25, 274:19, 280:16, 280:18, 281:5, 281:8, 290:24, 291:3, 291:5, 291:24, 296:10, 298:9
**load's** [1] - 29:7

**loaded** [1] - 274:10
**loading** [3] - 20:25, 41:9, 274:9
**loads** [15] - 20:14, 20:22, 24:2, 24:13, 24:15, 24:20, 24:25, 27:11, 42:15, 46:14, 46:19, 51:10, 205:18, 258:18, 272:22
**local** [2] - 62:17, 133:9
**locate** [1] - 169:11
**located** [4] - 21:23, 45:22, 45:23, 201:3
**location** [17] - 9:21, 28:13, 44:25, 50:14, 52:12, 52:14, 73:22, 73:23, 119:10, 138:1, 155:11, 155:12, 167:14, 169:20, 170:2, 189:6, 221:14
**locations** [1] - 45:15
**locked** [1] - 70:5
**log** [1] - 84:7
**look** [28] - 13:22, 14:19, 15:14, 23:17, 31:1, 38:21, 48:6, 51:20, 57:11, 58:25, 63:5, 67:23, 70:9, 71:19, 72:4, 72:8, 83:15, 118:16, 122:1, 131:4, 151:23, 152:10, 171:17, 252:23, 252:24, 268:17, 301:6, 301:15
**looked** [3] - 56:13, 98:14, 252:25
**looking** [10] - 32:4, 32:8, 39:10, 53:2, 56:20, 60:23, 61:1, 71:17, 72:6, 92:25, 93:1, 124:3, 124:4, 128:23, 140:1, 140:2, 246:23, 252:15, 271:2
**loose** [1] - 170:5
**Lori** [2] - 237:19, 237:21
**lost** [1] - 202:5
**loud** [1] - 124:23
**low** [2] - 9:12, 71:10
**lower** [1] - 216:9
**luck's** [1] - 134:12
**lunch** [4] - 175:4, 175:9, 175:10, 175:12
**LUNCHEON** [1] - 114:11
**lure** [1] - 240:17
**lying** [3] - 115:25, 186:20, 249:23

# M

**M-I-T-C-H-E-L-L** [1] - 284:6

**Mabry** [1] - 186:2

**machines** [1] - 55:21

**mad** [3] - 95:10, 158:7, 158:13

**mail** [1] - 94:12

**main** [2] - 12:16, 199:22

**maintain** [2] - 121:2, 298:1

**major** [1] - 112:18

**majority** [2] - 212:22, 226:25

**male** [1] - 176:23

**mall** [7] - 136:8, 136:22, 138:5, 138:12, 142:12, 167:25

**Mall** [3] - 59:17, 167:15, 244:11

**man** [37] - 14:12, 80:16, 89:16, 89:18, 89:20, 89:22, 90:1, 91:8, 93:20, 93:25, 104:10, 113:12, 129:1, 136:7, 143:1, 143:2, 143:19, 143:25, 144:1, 144:21, 145:16, 145:17, 145:18, 146:2, 150:2, 151:24, 152:1, 152:10, 156:17, 156:19, 157:11, 157:16, 158:16, 165:22, 166:22, 200:20, 201:6

**manager** [1] - 67:12

**manner** [1] - 33:23

**marijuana** [184] - 7:15, 8:17, 8:23, 8:24, 10:5, 10:23, 11:1, 11:3, 11:8, 11:9, 11:12, 12:10, 12:11, 12:16, 12:21, 13:4, 17:4, 17:12, 19:3, 21:3, 21:11, 23:9, 23:23, 23:24, 24:17, 24:20, 24:23, 25:12, 25:16, 25:22, 26:1, 27:6, 27:23, 28:18, 29:14, 30:18, 34:20, 35:12, 35:13, 35:16, 35:20, 36:1, 36:12, 40:11, 41:11, 42:2, 42:11, 42:20, 42:21, 42:22, 43:6, 44:3,

44:7, 44:20, 44:21, 45:1, 45:7, 45:16, 46:1, 46:5, 46:10, 47:3, 47:17, 47:20, 49:10, 50:25, 51:2, 51:19, 53:6, 53:9, 54:15, 55:24, 57:20, 61:5, 63:23, 64:8, 68:22, 68:24, 69:11, 69:20, 69:21, 70:10, 70:12, 71:12, 72:5, 72:7, 72:15, 73:25, 74:1, 74:8, 74:25, 75:1, 75:6, 75:12, 75:20, 99:20, 99:25, 100:5, 106:21, 119:5, 178:11, 179:15, 179:18, 179:21, 179:24, 180:3, 180:5, 180:14, 180:19, 181:5, 181:9, 182:22, 183:1, 197:8, 199:8, 199:18, 199:23, 200:3, 200:5, 200:7, 200:8, 203:17, 205:6, 206:6, 206:13, 206:16, 206:19, 206:24, 212:15, 219:22, 224:21, 224:25, 236:19, 245:5, 250:16, 253:12, 253:16, 254:1, 254:5, 254:9, 254:11, 254:22, 255:3, 255:16, 256:1, 256:11, 256:23, 258:10, 258:15, 260:9, 261:11, 266:13, 269:20, 278:17, 281:9, 284:19, 284:21, 286:1, 287:4, 287:9, 287:15, 287:17, 288:1, 288:5, 288:10, 288:23, 288:25, 289:18, 289:20, 289:24, 290:5, 290:8, 290:11, 290:15, 290:18, 291:11, 292:6, 292:16, 292:19, 293:12, 293:25, 294:19, 294:24, 296:17

**MARKED** [1] - 63:3

**marked** [7] - 30:24, 37:10, 51:14, 62:25, 69:24, 102:6, 252:21

**market** [1] - 239:8

**markings** [1] - 50:10

**Maroon** [1] - 121:9

**married** [1] - 276:9

**Mary** [1] - 79:16

**matter** [4] - 59:10, 127:2, 188:21, 188:25

**matters** [1] - 304:7

**mean** [73] - 15:19, 17:9, 17:15, 23:10, 24:16, 27:9, 27:20, 34:22, 54:20, 60:5, 60:7, 60:10, 66:5, 66:17, 67:12, 69:4, 74:9, 76:11, 77:14, 77:22, 88:2, 91:21, 93:10, 95:16, 98:15, 99:14, 99:21, 100:2, 101:1, 110:23, 117:20, 120:2, 123:10, 131:4, 131:13, 135:4, 144:11, 146:23, 160:17, 169:2, 170:3, 174:6, 181:10, 195:22, 196:6, 206:7, 211:11, 216:2, 216:4, 219:8, 220:2, 220:17, 221:7, 234:5, 235:17, 253:9, 254:3, 255:5, 260:9, 261:1, 261:13, 261:16, 267:8, 270:3, 275:10, 275:12, 275:20, 276:1, 283:3, 283:4, 287:13, 295:9

**meaning** [2] - 200:8, 277:21

**means** [2] - 49:10, 269:8

**meant** [4] - 25:11, 27:17, 132:23, 276:2

**meet** [42] - 12:24, 13:9, 17:23, 17:25, 18:22, 98:8, 132:21, 136:7, 136:8, 136:21, 137:24, 138:4, 138:10, 138:11, 138:23, 142:3, 143:10, 143:14, 143:15, 145:14, 148:8, 148:13, 150:7, 151:19, 155:5, 155:7, 167:22, 185:24, 233:25, 234:11, 240:20, 241:24, 278:19, 287:1, 289:3, 292:13, 294:25, 295:7, 295:12, 302:15

**meeting** [16] - 13:3, 18:25, 19:3, 58:22, 125:16, 136:2, 149:15, 186:5, 188:15, 189:19,

229:25, 282:20, 282:22, 292:16, 295:13, 302:12

**meetings** [2] - 8:1, 181:4

**MEMBERS** [1] - 114:21

**memorizes** [1] - 124:10

**memory** [2] - 124:10, 124:17

**mentioned** [9] - 4:12, 16:4, 20:1, 26:16, 59:20, 78:16, 191:21, 191:22, 255:14

**merely** [1] - 103:12

**messing** [1] - 205:20

**met** [40] - 7:23, 12:25, 17:17, 19:17, 59:5, 59:12, 59:16, 103:6, 147:12, 149:8, 167:24, 173:1, 173:16, 173:22, 174:16, 174:18, 174:20, 181:25, 192:6, 196:11, 198:20, 200:5, 214:22, 221:21, 223:2, 231:21, 231:22, 234:13, 234:15, 251:2, 251:4, 251:21, 251:25, 252:18, 284:11, 288:7, 289:4, 289:9

**metal** [1] - 49:17

**metallic** [1] - 279:10

**Mexican** [1] - 289:25

**Mexicans** [1] - 290:4

**Miami** [4] - 1:21, 58:8, 62:3, 300:25

**microphone** [2] - 7:11, 233:4

**Middle** [3] - 293:13, 296:11, 296:18

**MIDDLE** [1] - 1:1

**middle** [3] - 133:12, 139:15, 303:24

**mids** [1] - 123:25

**might** [16] - 23:15, 24:6, 25:19, 48:22, 67:9, 74:13, 87:25, 92:14, 98:13, 174:14, 183:24, 189:6, 196:16, 240:3, 270:24, 280:13

**mike** [7] - 194:20, 232:21, 232:23, 232:24, 233:1, 233:17, 240:1

**miles** [1] - 104:21

**million** [4] - 57:4, 59:10

**mind** [2] - 40:19, 86:10

**minds** [2] - 113:19, 217:23

**mine** [4] - 10:19, 119:17, 119:18, 190:9

**Mini** [1] - 218:13

**minus** [2] - 119:12, 239:9

**minute** [6] - 147:13, 159:16, 161:21, 272:10, 275:5, 275:7

**minutes** [24] - 45:24, 53:21, 59:11, 106:1, 110:5, 110:7, 111:23, 112:2, 115:23, 124:12, 141:21, 142:2, 150:4, 150:5, 153:24, 153:25, 154:2, 154:3, 159:18, 164:13, 304:9, 304:10, 304:21

**missed** [1] - 88:7

**missing** [2] - 77:23, 77:24

**misstates** [1] - 233:11

**mistaken** [1] - 219:7

**Mitchell** [117] - 9:8, 9:10, 10:6, 10:9, 10:23, 11:3, 11:13, 11:19, 11:24, 12:1, 12:3, 12:24, 12:25, 13:7, 13:8, 14:10, 15:9, 15:16, 16:13, 17:6, 17:9, 17:13, 18:2, 18:5, 18:6, 18:12, 18:15, 19:6, 19:14, 19:24, 24:7, 27:8, 27:18, 29:4, 29:24, 33:12, 33:20, 35:5, 36:9, 43:23, 46:3, 48:4, 48:9, 49:5, 50:3, 53:21, 55:20, 57:2, 57:23, 60:3, 64:5, 66:5, 67:6, 78:5, 78:18, 87:16, 87:21, 93:11, 93:17, 98:19, 98:22, 100:12, 100:21, 100:24, 101:10, 107:5, 117:13, 118:10, 119:19, 125:9, 125:10, 125:16, 126:10, 155:8, 156:7, 157:22, 159:2, 162:17, 166:14, 166:24, 167:3,

167:24, 168:25, 170:11, 181:8, 183:22, 186:9, 188:5, 195:13, 197:9, 210:17, 220:10, 227:23, 228:5, 228:6, 231:25, 232:1, 232:5, 232:7, 232:8, 232:12, 241:12, 241:15, 241:17, 262:13, 269:17, 281:14, 283:16, 284:10, 284:25, 301:15, 302:12, 303:20, 303:25

**mitchell** [1] - 284:14
**MITCHELL** [2] - 3:9, 283:24
**Mitchell's** [6] - 14:14, 18:14, 33:8, 49:22, 65:7, 77:23
**mix** [1] - 243:19
**mixed** [1] - 99:16
**MLK** [1] - 1:23
**MO** [7] - 167:21, 167:22, 167:24, 170:11, 232:19, 234:14, 289:4
**mobility** [1] - 215:25
**model** [1] - 60:24
**moment** [5] - 73:9, 79:12, 172:12, 172:15, 266:21
**momma** [6] - 145:18, 145:19, 145:20, 145:23, 146:20, 146:21
**money** [215] - 12:12, 12:13, 13:11, 28:18, 29:10, 30:10, 30:16, 31:12, 46:1, 46:11, 46:12, 47:1, 47:2, 48:11, 48:14, 48:18, 48:19, 48:25, 49:2, 49:3, 50:6, 55:16, 55:17, 55:21, 56:1, 56:4, 56:15, 56:16, 56:21, 56:24, 57:6, 57:12, 57:13, 57:16, 57:18, 57:21, 57:25, 58:11, 58:12, 58:13, 58:16, 60:14, 61:5, 61:7, 61:8, 61:23, 62:1, 64:3, 64:4, 64:6, 64:8, 64:16, 65:1, 65:16, 65:19, 69:10, 75:1, 75:23, 75:24, 76:5, 76:12, 76:15, 76:18, 77:11, 77:16, 77:22, 78:1, 78:5,

78:13, 78:14, 93:3, 93:22, 94:3, 94:24, 98:15, 98:19, 98:21, 99:11, 99:12, 99:18, 99:22, 117:24, 118:19, 125:5, 125:8, 126:10, 126:25, 131:6, 131:9, 131:11, 134:13, 135:6, 135:7, 135:8, 135:9, 136:3, 136:4, 136:5, 137:24, 137:25, 138:8, 138:13, 144:12, 145:9, 146:24, 147:3, 149:9, 149:10, 149:11, 155:18, 155:20, 155:24, 156:2, 159:3, 159:21, 159:24, 160:25, 161:4, 163:24, 164:3, 164:6, 166:25, 167:2, 167:4, 167:8, 167:9, 167:10, 167:13, 167:14, 167:17, 167:25, 168:5, 169:5, 169:7, 190:4, 190:21, 191:5, 197:24, 199:13, 199:16, 200:9, 200:11, 208:24, 208:25, 209:6, 212:20, 212:23, 212:25, 213:3, 213:12, 215:19, 215:20, 215:23, 216:3, 216:22, 223:15, 223:19, 223:20, 223:24, 223:25, 224:1, 224:3, 227:25, 235:3, 237:21, 237:24, 239:13, 241:8, 241:11, 241:14, 241:16, 242:20, 243:3, 243:10, 243:13, 243:18, 258:23, 259:1, 259:8, 259:13, 259:15, 259:16, 259:19, 265:7, 266:6, 290:4, 291:13, 291:15, 291:18, 292:3, 292:4, 292:6, 294:16, 294:21, 294:22, 295:15, 295:17, 296:1, 296:4, 299:20, 299:21, 300:4, 300:6, 300:11, 300:12, 300:18, 301:21
**monies** [14] - 29:19, 75:19, 76:8, 207:12,

213:8, 215:8, 217:17, 227:21, 227:22, 227:23, 228:3, 228:4, 242:25, 243:11
**monitor** [1] - 268:22
**month** [8] - 26:2, 26:4, 26:6, 58:9, 58:10, 65:9, 293:18, 294:7
**monthly** [2] - 266:3, 266:4
**months** [7] - 16:23, 20:3, 37:21, 44:10, 44:12, 229:9, 249:13
**Morello** [3] - 10:19, 44:15, 186:17
**morning** [22] - 4:8, 4:10, 5:17, 7:13, 7:23, 37:1, 37:5, 72:19, 90:7, 92:5, 127:4, 127:10, 127:21, 129:24, 174:22, 178:21, 199:6, 199:7, 303:10, 304:7, 304:23
**most** [13] - 51:21, 65:4, 65:15, 72:1, 125:12, 175:6, 181:11, 199:24, 200:2, 264:3, 270:12, 276:11, 281:5
**mother** [2] - 140:23, 204:12
**mother's** [1] - 90:20
**motherfucker** [2] - 91:8, 144:4
**motherfuckers** [1] - 115:25
**motion** [1] - 248:14
**motorcycle** [6] - 16:7, 262:11, 262:20, 276:21, 276:22, 276:25
**move** [30] - 31:17, 38:9, 48:8, 52:15, 68:9, 70:14, 74:20, 78:12, 78:14, 79:21, 88:11, 102:14, 115:15, 120:9, 121:11, 122:14, 122:15, 126:13, 132:11, 144:14, 162:20, 169:4, 170:22, 178:17, 242:16, 243:23, 243:25, 244:22, 302:1
**moved** [7] - 45:9, 45:10, 45:11, 54:25, 170:21, 178:15, 202:20
**moves** [2] - 66:9,

171:19
**moving** [5] - 35:1, 57:6, 60:14, 103:25, 255:11
**MR** [724] - 3:4, 3:5, 3:6, 3:7, 3:8, 3:10, 4:10, 6:7, 6:8, 6:12, 7:7, 7:9, 8:18, 8:21, 10:1, 10:4, 11:14, 11:22, 12:5, 12:19, 15:2, 15:7, 30:19, 30:22, 31:17, 31:19, 31:23, 31:25, 32:2, 33:6, 36:21, 36:24, 37:3, 37:7, 37:8, 37:23, 37:24, 38:8, 38:11, 38:14, 38:17, 38:20, 40:2, 40:25, 43:12, 51:24, 52:6, 52:15, 52:17, 52:21, 52:24, 63:4, 65:13, 65:20, 66:9, 66:11, 66:13, 66:16, 68:9, 68:11, 68:13, 68:16, 70:14, 70:16, 70:20, 70:22, 73:8, 73:12, 73:16, 73:17, 74:17, 74:19, 74:23, 79:11, 79:13, 79:21, 79:25, 80:6, 81:6, 81:8, 82:3, 82:14, 83:4, 84:6, 84:19, 85:10, 85:21, 85:22, 86:2, 86:13, 86:18, 86:20, 87:1, 87:7, 88:10, 89:11, 89:14, 89:15, 89:17, 89:19, 89:23, 89:24, 90:2, 90:9, 90:11, 90:12, 90:14, 91:6, 91:10, 91:11, 91:13, 91:14, 91:16, 91:17, 91:18, 91:19, 91:21, 92:18, 92:21, 94:9, 94:10, 94:19, 94:22, 94:23, 95:3, 95:15, 95:16, 95:25, 96:1, 96:12, 96:13, 96:18, 96:21, 96:23, 96:25, 97:1, 97:4, 97:5, 97:7, 97:8, 97:10, 97:23, 98:1, 98:2, 98:3, 98:4, 101:3, 101:6, 102:14, 102:18, 102:19, 102:24, 103:24, 104:4, 104:5, 104:6, 104:7, 104:10, 104:11, 104:13, 104:15, 104:17, 104:18, 104:20, 104:22, 104:24, 104:25, 105:1, 105:2,

105:4, 105:5, 105:8, 105:10, 105:13, 105:15, 105:18, 105:20, 105:23, 105:24, 106:2, 106:3, 106:4, 106:5, 106:6, 106:22, 106:25, 107:3, 107:11, 107:15, 107:16, 107:17, 107:19, 107:25, 108:1, 108:5, 108:6, 108:7, 109:5, 109:9, 109:10, 109:11, 109:12, 109:13, 109:20, 109:22, 109:25, 110:2, 110:9, 110:10, 110:11, 110:12, 110:15, 110:16, 110:18, 110:19, 111:6, 111:10, 111:12, 111:14, 111:15, 111:18, 111:20, 111:22, 112:5, 112:7, 112:11, 112:13, 112:14, 112:16, 112:21, 112:22, 112:23, 113:2, 113:6, 113:9, 113:11, 113:12, 113:13, 114:1, 114:23, 115:15, 115:19, 115:20, 115:21, 115:24, 116:3, 116:4, 116:6, 116:11, 116:13, 116:21, 116:22, 117:1, 117:2, 117:4, 117:5, 117:7, 117:8, 117:9, 120:9, 120:11, 120:15, 120:18, 121:11, 121:13, 121:16, 121:24, 121:25, 122:14, 122:16, 122:21, 122:22, 122:23, 122:24, 123:1, 123:4, 123:6, 123:9, 123:10, 123:14, 123:15, 123:20, 123:21, 123:23, 123:24, 124:2, 124:5, 124:6, 124:8, 124:15, 124:16, 124:20, 124:22, 124:25, 126:13, 126:15, 126:18, 126:19, 126:20, 127:5, 127:8, 127:10, 127:11, 127:14, 127:15,

127:20, 127:22,
128:1, 128:4, 128:6,
128:8, 128:9, 128:10,
128:14, 128:15,
128:19, 128:20,
128:25, 129:2, 129:9,
129:11, 129:12,
129:13, 129:15,
129:16, 129:21,
129:22, 129:23,
129:25, 130:1, 130:2,
131:1, 132:7, 132:10,
132:14, 132:15,
132:16, 132:17,
132:18, 133:3, 133:4,
133:6, 133:7, 133:13,
133:14, 133:15,
133:17, 133:24,
134:1, 134:2, 134:4,
134:5, 134:6, 134:7,
134:8, 134:9, 134:10,
134:14, 134:16,
134:17, 134:19,
134:22, 134:23,
134:24, 134:25,
135:1, 135:20,
135:24, 136:6, 136:9,
136:18, 136:19,
136:20, 136:23,
137:1, 137:4, 137:14,
137:16, 137:17,
138:18, 138:25,
139:3, 139:4, 139:5,
139:19, 139:20,
140:4, 140:6, 140:9,
140:10, 140:14,
140:17, 140:24,
141:2, 141:9, 141:11,
141:12, 141:15,
141:19, 141:22,
141:23, 141:25,
142:1, 142:5, 142:7,
142:8, 142:9, 142:14,
142:17, 142:18,
142:19, 142:20,
142:21, 143:1, 143:4,
143:18, 143:21,
143:22, 144:2, 144:3,
145:4, 144:6, 144:16,
144:19, 144:20,
144:21, 144:24,
144:25, 145:16,
145:23, 146:1, 146:3,
146:4, 146:6, 146:7,
146:8, 146:10,
146:13, 146:14,
146:16, 146:17,
147:4, 147:9, 147:10,
147:11, 147:18,
147:20, 148:1, 148:2,
148:7, 148:9, 148:10,

148:12, 148:14,
148:16, 148:18,
148:20, 149:1, 149:2,
149:3, 149:4, 149:5,
149:17, 149:19,
149:22, 149:23,
149:24, 150:1, 150:2,
150:5, 150:9, 150:12,
150:14, 150:16,
150:18, 150:21,
150:24, 151:4, 151:5,
151:6, 151:7, 151:8,
151:10, 151:14,
151:17, 151:19,
151:21, 151:22,
151:25, 152:1, 152:7,
152:10, 152:14,
152:15, 152:18,
152:21, 152:23,
152:24, 153:1, 153:3,
153:4, 153:7, 153:10,
153:12, 153:14,
153:15, 153:17,
153:20, 153:23,
153:24, 154:1, 154:3,
154:4, 154:5, 154:6,
154:8, 154:9, 154:12,
154:13, 154:15,
154:16, 154:17,
154:19, 154:21,
154:22, 154:23,
156:9, 156:13,
156:14, 156:15,
156:16, 156:20,
157:4, 157:6, 157:10,
157:13, 157:16,
157:17, 157:19,
157:23, 158:1, 158:4,
158:6, 158:15,
158:17, 158:21,
158:23, 158:24,
159:5, 159:8, 159:9,
159:10, 159:11,
159:13, 159:20,
159:22, 159:23,
159:25, 160:3, 160:8,
160:10, 160:11,
160:13, 160:15,
160:19, 160:21,
160:22, 160:24,
161:1, 161:3, 161:6,
161:7, 161:8, 161:10,
161:12, 161:15,
161:16, 162:2, 162:5,
162:6, 162:20,
162:22, 162:24,
162:25, 163:1, 163:9,
163:11, 164:1, 164:2,
164:4, 164:5, 164:7,
164:12, 164:14,
164:15, 164:18,

164:19, 164:21,
164:24, 165:3, 165:4,
165:7, 165:8, 165:9,
165:10, 165:13,
165:15, 165:18,
165:19, 165:20,
165:24, 166:1, 166:2,
166:3, 166:4, 166:6,
166:8, 166:9, 166:10,
170:14, 170:18,
170:19, 170:21,
170:24, 171:1,
171:19, 171:22,
171:25, 172:2, 172:4,
172:5, 172:6, 172:7,
172:8, 172:12,
172:15, 172:18,
172:25, 178:22,
178:24, 181:14,
181:23, 187:7,
187:13, 187:18,
187:22, 198:16,
198:17, 209:13,
209:15, 210:1, 210:3,
212:2, 212:4, 213:19,
213:21, 218:11,
218:12, 225:2, 225:4,
225:25, 226:3, 227:2,
227:6, 227:14,
227:19, 229:16,
229:18, 229:23,
229:24, 233:11,
233:13, 241:19,
241:21, 244:15,
244:18, 244:24,
245:3, 248:8, 248:23,
248:24, 249:24,
250:3, 250:9, 250:12,
251:5, 251:10,
254:12, 254:17,
268:19, 268:24,
268:25, 269:1, 269:2,
269:4, 269:6, 270:20,
270:23, 277:12,
277:14, 279:23,
280:1, 282:10,
282:14, 283:11,
283:16, 284:9,
285:15, 285:20,
286:14, 286:17,
301:11, 301:14,
302:1, 302:3, 302:6,
302:8, 302:9, 303:22,
304:6, 304:15,
304:19, 304:22
  muscle [4] - 204:18,
204:19, 204:20, 205:1
  music [1] - 124:14
  must [1] - 5:24
  Mutual [5] - 65:16,
66:18, 66:19, 68:8,

225:9
  mutual [3] - 288:8,
288:9, 289:4
  Myers [1] - 139:22

## N

  nah [1] - 293:17
  nail [1] - 229:14
  nailed [1] - 49:15
  name [82] - 7:2, 7:5,
10:18, 10:19, 14:19,
18:10, 20:13, 21:1,
28:12, 32:12, 32:19,
32:21, 33:15, 33:16,
35:7, 39:15, 41:24,
45:12, 61:10, 61:16,
64:15, 66:4, 119:24,
120:1, 120:5, 152:5,
152:17, 164:17,
167:18, 167:21,
176:24, 189:23,
189:24, 190:3,
190:12, 190:17,
191:13, 201:16,
201:17, 201:18,
201:22, 202:18,
202:24, 203:2, 203:6,
211:9, 211:10,
213:15, 213:22,
214:24, 215:3, 215:5,
216:20, 216:22,
218:13, 218:14,
218:18, 218:19,
234:14, 237:8, 237:9,
237:11, 237:12,
237:14, 237:19,
258:6, 258:8, 265:2,
265:22, 266:10,
267:14, 267:15,
279:16, 282:3, 282:9,
284:4, 284:5, 286:18,
286:21, 286:23, 289:5
  names [15] - 9:10,
9:16, 32:23, 78:16,
173:10, 173:11,
211:11, 214:3, 230:3,
258:12, 262:7,
264:23, 281:25,
286:18, 290:1
  Nancy [1] - 122:2
  Naples [2] - 139:23,
139:24
  nature [1] - 258:10,
260:6, 282:11, 287:9,
292:18
  navigation [1] -
160:6
  near [7] - 14:1,
57:19, 145:14, 157:7,

157:8, 166:21, 215:18
  necessarily [3] -
177:6, 193:6, 252:13
  necessary [4] -
40:14, 194:3, 273:14,
273:15
  need [33] - 78:9,
91:7, 94:19, 94:20,
94:23, 105:6, 105:8,
143:23, 144:9,
145:19, 146:20,
158:8, 158:9, 158:12,
161:19, 253:20,
254:18, 254:23,
255:21, 256:4,
256:15, 257:11,
257:14, 259:24,
260:2, 260:3, 262:16,
262:25, 263:1,
266:15, 275:3
  needed [17] - 13:13,
13:14, 47:13, 61:3,
75:7, 191:10, 194:13,
206:11, 221:24,
244:9, 259:9, 260:3,
260:7, 262:15, 263:6,
265:15, 280:23
  needs [1] - 142:24
  nerves [2] - 143:2,
143:25
  nervous [4] - 136:2,
137:19, 155:10
  never [40] - 20:10,
36:1, 36:3, 45:6, 45:7,
45:18, 55:23, 57:1,
64:22, 69:10, 97:16,
103:6, 150:18, 173:1,
181:8, 181:13,
196:14, 196:19,
197:3, 197:15, 200:7,
211:11, 224:21,
224:24, 231:15,
231:17, 233:15,
251:4, 251:20,
251:21, 251:25,
252:16, 252:18,
255:18, 259:12,
261:20, 266:12,
274:3, 274:12, 275:4
  new [2] - 60:24,
188:3
  newborn [1] - 283:8
  news [6] - 126:21,
126:22, 129:17,
132:23, 133:9
  next [28] - 19:18,
19:19, 32:19, 33:22,
34:7, 34:12, 34:13,
39:5, 40:3, 41:22,
43:13, 62:2, 100:15,

112:18, 132:11, 144:13, 144:14, 150:4, 157:23, 159:5, 162:14, 210:1, 242:16, 271:9, 271:24, 279:5, 283:15

**nickname** [1] - 167:18

**nigga** [14] - 91:15, 94:20, 128:7, 140:15, 140:16, 156:16, 156:17, 156:18, 157:11, 158:2, 159:13, 161:11, 161:12, 164:9

**nigga's** [1] - 158:13

**night** [13] - 28:5, 28:15, 39:1, 39:4, 44:23, 45:8, 45:9, 90:5, 92:4, 127:25, 170:8, 175:20, 206:21

**nights** [1] - 170:8

**nine** [3] - 189:16, 189:17, 249:4

**Nissan** [1] - 237:8

**nobody** [4] - 181:5, 219:25, 220:13, 220:15

**non** [4] - 80:17, 80:20, 81:17, 200:12

**non-drug** [1] - 200:12

**non-recorded** [3] - 80:17, 80:20, 81:17

**none** [2] - 81:6, 214:17

**noon** [2] - 113:1, 113:16

**normally** [13] - 21:7, 21:13, 32:12, 44:25, 56:17, 64:22, 64:25, 96:10, 123:18, 156:3, 194:16, 267:22, 296:24

**North** [4] - 1:18, 2:6, 132:25, 155:14

**north** [1] - 147:21

**notation** [1] - 36:5

**notations** [2] - 36:14, 38:16

**note** [1] - 271:20

**notebook** [6] - 27:17, 29:7, 30:25, 36:8, 37:12, 39:7

**notebooks** [1] - 29:25

**noted** [1] - 39:23

**notes** [13] - 4:13, 4:14, 4:16, 4:19, 5:2, 5:4, 5:6, 5:9, 5:11,

5:14, 5:18, 5:22, 27:11

**nothing** [24] - 6:18, 6:23, 29:15, 29:19, 49:25, 51:3, 63:25, 78:11, 82:9, 82:12, 84:10, 87:1, 89:22, 93:20, 94:18, 132:22, 133:13, 135:12, 243:17, 251:5, 283:11, 283:21, 284:1

**Nothing** [1] - 123:24

**notice** [2] - 219:25, 285:12

**Notice** [1] - 9:5

**noticed** [1] - 16:8

**notify** [3] - 86:6, 86:7, 86:8

**noting** [1] - 35:13

**nowhere** [1] - 215:18

**number** [35] - 22:13, 34:5, 37:22, 41:20, 44:5, 66:1, 66:3, 66:22, 67:2, 71:19, 88:14, 94:10, 106:14, 106:18, 141:7, 163:16, 163:21, 163:22, 163:23, 165:23, 166:15, 173:23, 174:19, 210:16, 225:8, 236:1, 236:3, 242:15, 269:12, 269:15, 269:18, 282:15, 297:3, 297:7, 297:10

**numbers** [23] - 40:11, 40:18, 40:24, 41:1, 41:2, 41:7, 41:8, 41:9, 41:11, 41:12, 41:15, 67:1, 71:21, 72:1, 96:9, 96:11, 174:7, 210:21, 210:23, 213:8, 216:11, 216:12, 278:13

**numerous** [1] - 252:2

## O

**o'clock** [4] - 128:13, 134:19, 270:13, 270:14

**object** [5] - 8:19, 15:3, 51:24, 106:22, 285:16

**objection** [34] - 8:20, 11:14, 12:5, 12:7, 31:19, 38:11, 52:17, 66:11, 68:11, 70:16,

79:25, 86:24, 101:3, 101:5, 102:19, 120:11, 121:13, 122:16, 126:15, 149:19, 162:22, 170:24, 171:22, 178:22, 187:7, 227:2, 227:14, 229:16, 233:11, 241:19, 248:23, 254:12, 282:10, 302:3

**obligation** [1] - 86:5

**obligations** [1] - 98:9

**obliged** [1] - 4:23

**observation** [2] - 16:12, 18:19

**observations** [2] - 16:5, 16:20

**observed** [1] - 18:13

**obtain** [1] - 244:12

**obtained** [4] - 20:2, 20:5, 45:12, 244:13

**obvious** [1] - 231:20

**obviously** [5] - 27:9, 34:2, 48:20, 72:6, 74:9

**occasion** [2] - 87:19, 87:24

**occasions** [5] - 7:24, 44:19, 54:16, 82:4, 284:11

**OF** [4] - 1:1, 1:3, 1:13, 114:21

**offered** [1] - 81:5

**offering** [1] - 65:12

**Office** [2] - 1:17, 2:1

**office** [4] - 119:12, 230:2, 271:15, 271:16

**OFFICER** [12] - 4:2, 4:5, 72:23, 73:1, 73:4, 113:21, 114:14, 114:16, 217:24, 218:5, 218:8, 303:16

**officer** [2] - 4:11, 222:21

**offices** [1] - 173:19

**Official** [1] - 2:5

**officials** [1] - 278:19

**offloads** [1] - 26:18

**often** [6] - 25:25, 26:17, 65:5, 65:17, 82:8, 293:16

**oil** [1] - 132:25

**old** [1] - 152:8

**older** [1] - 33:18

**once** [9] - 22:22, 26:2, 39:12, 54:24, 58:9, 91:3, 244:12, 259:19, 293:17

**one** [115] - 12:17,

16:4, 16:25, 22:8, 22:9, 25:10, 25:12, 26:4, 26:5, 26:22, 29:18, 30:2, 30:3, 30:5, 32:18, 37:14, 40:21, 41:5, 42:15, 42:20, 43:7, 43:9, 45:15, 47:9, 49:6, 49:20, 51:9, 56:6, 56:8, 60:25, 61:24, 61:25, 62:12, 62:15, 68:18, 69:19, 72:8, 72:11, 72:14, 77:17, 77:25, 79:14, 90:15, 90:16, 92:1, 97:3, 103:1, 118:15, 132:11, 135:9, 150:13, 151:3, 151:25, 154:17, 162:9, 189:20, 191:16, 191:22, 201:1, 202:11, 202:14, 202:16, 202:20, 202:21, 205:7, 205:15, 205:17, 205:22, 207:2, 207:4, 207:21, 209:6, 219:3, 221:13, 224:6, 224:15, 226:19, 228:22, 229:23, 230:17, 230:22, 232:6, 233:16, 235:4, 236:17, 236:19, 236:21, 236:22, 237:3, 237:14, 240:4, 240:5, 243:7, 250:17, 251:14, 255:2, 256:7, 257:2, 260:14, 262:5, 263:8, 264:25, 267:2, 276:18, 280:13, 281:4, 288:7, 288:8, 294:7, 302:21

**ones** [4] - 22:7, 72:15, 212:20, 213:2

**open** [3] - 21:16, 31:24, 233:2

**opened** [3] - 32:3, 72:14, 219:19

**opening** [2] - 40:22, 219:18

**openly** [1] - 19:4

**operation** [8] - 186:10, 186:22, 188:3, 189:18, 206:2, 263:2, 280:25, 294:3

**operations** [1] - 188:2

**opportunity** [2] - 18:21, 78:23

**order** [18] - 13:14, 23:16, 40:19, 48:10, 72:2, 78:14, 100:21, 100:25, 107:5, 118:11, 188:8, 199:14, 208:20, 216:8, 252:13, 253:20, 254:18, 257:12

**ordered** [8] - 16:14, 82:18, 83:8, 197:23, 202:12, 202:16, 208:16, 235:25

**ordering** [1] - 236:6

**orders** [7] - 28:4, 29:2, 34:23, 34:24, 44:22, 206:23, 225:18

**organization** [8] - 48:16, 76:8, 101:8, 215:17, 216:1, 256:7, 258:11, 300:4

**organize** [1] - 292:3

**organized** [1] - 56:18

**organizing** [1] - 56:2

**original** [1] - 219:14

**originally** [2] - 14:16, 14:18

**other)** [1] - 151:9

**otherwise** [1] - 6:5

**ourselves** [2] - 20:15, 208:21

**outline** [1] - 206:10

**outside** [11] - 20:25, 58:22, 70:4, 136:8, 138:12, 138:15, 138:24, 139:16, 141:16, 244:10, 303:14

**outstanding** [5] - 75:12, 75:20, 99:1, 281:10, 281:15

**overnight** [1] - 50:14

**overruled** [6] - 8:20, 11:16, 12:7, 101:5, 254:13, 282:12

**owe** [9] - 46:11, 47:2, 75:1, 118:19, 127:3, 129:6, 131:11, 238:13

**owed** [39] - 28:19, 36:19, 47:1, 55:17, 61:5, 61:8, 64:4, 64:5, 64:10, 75:3, 75:11, 75:19, 78:5, 93:2, 98:9, 98:20, 99:11, 99:12, 99:22, 117:24, 118:4, 131:15, 135:6, 146:24, 149:10, 207:12, 227:23, 227:25, 228:5, 228:6, 237:24, 238:4, 238:6,

238:7, 238:9, 239:11, 294:16, 299:20, 300:4
**owes** [4] - 136:14, 136:17, 275:24
**own** [16] - 5:12, 15:21, 47:3, 47:16, 50:6, 71:25, 75:14, 119:16, 176:11, 211:14, 217:3, 217:4, 223:19, 291:8, 294:17
**Oz** [1] - 110:25

## P

**P-A-R-R-A** [1] - 7:5
**p.m** [3] - 270:8, 270:16, 272:4
**pack** [23] - 23:5, 252:1, 252:16
**package** [8] - 31:1, 41:20, 155:23, 156:7, 259:20, 260:4, 302:14, 302:24
**packaged** [2] - 57:7, 155:25
**packages** [2] - 40:12, 41:18
**packed** [1] - 256:17
**pad** [1] - 233:3
**padlock** [1] - 71:5
**PAGE** [1] - 3:2
**page** [30] - 32:4, 32:8, 32:10, 33:21, 33:22, 33:25, 34:12, 34:13, 36:4, 36:5, 38:21, 38:23, 38:24, 38:25, 39:5, 39:11, 39:17, 40:4, 40:5, 41:3, 41:22, 41:23, 42:4, 42:12, 43:13, 43:15, 43:19, 209:19, 210:2, 213:24
**pages** [5] - 36:13, 36:16, 39:2, 63:6, 63:7
**paid** [22] - 46:13, 46:15, 46:20, 47:6, 47:14, 75:7, 118:13, 118:15, 119:25, 120:4, 131:23, 164:22, 165:1, 203:17, 227:21, 228:10, 259:5, 265:7, 266:4, 294:11
**paint** [1] - 12:25
**painted** [1] - 279:17
**pallets** [9] - 21:10, 21:14, 23:9, 23:10, 53:4, 205:12, 205:13,

216:25
**paper** [2] - 225:13, 225:20
**paperwork** [6] - 67:10, 174:6, 186:24, 187:1, 265:25, 270:4
**paranoid** [1] - 145:9
**Park** [2] - 55:3, 292:14
**Parker** [1] - 291:7
**parking** [4] - 59:6, 59:13, 92:8, 240:18
**parole** [1] - 222:21
**Parra** [69] - 6:13, 7:4, 7:10, 7:14, 8:5, 19:6, 30:23, 37:9, 38:7, 38:15, 42:23, 68:20, 73:9, 86:19, 87:8, 92:23, 106:7, 113:25, 114:4, 114:24, 117:10, 149:6, 158:25, 173:1, 173:7, 176:16, 176:20, 177:12, 178:6, 179:14, 180:18, 210:10, 216:15, 218:13, 221:19, 227:8, 227:12, 249:16, 251:11, 283:14, 290:12, 290:14, 290:24, 292:13, 292:19, 292:25, 293:2, 294:5, 294:11, 294:20, 294:25, 295:7, 295:20, 296:3, 296:17, 297:4, 297:15, 298:2, 299:11, 299:17, 299:22, 300:1, 300:9, 300:11, 301:2, 302:13, 302:23, 303:4
**PARRA** [239] - 3:3, 6:21, 89:14, 89:17, 89:23, 90:2, 90:11, 90:14, 91:10, 91:13, 91:16, 91:18, 91:21, 94:10, 94:22, 95:3, 95:16, 96:1, 96:13, 96:21, 96:25, 97:4, 97:7, 97:10, 98:1, 98:3, 104:5, 104:7, 104:11, 104:15, 104:18, 104:22, 104:25, 105:2, 105:5, 105:10, 105:15, 105:20, 105:24, 106:3, 106:5, 107:16, 107:19, 108:1, 108:6, 109:9, 109:11,

109:13, 109:22, 110:2, 110:10, 110:12, 110:16, 110:18, 111:10, 111:14, 111:18, 111:22, 112:7, 112:13, 112:16, 112:22, 113:11, 113:13, 115:19, 115:21, 116:3, 116:6, 116:13, 116:22, 117:2, 117:5, 117:8, 122:21, 122:23, 123:1, 123:6, 123:10, 123:15, 123:21, 123:24, 124:5, 124:8, 124:16, 124:22, 126:18, 126:20, 127:11, 127:15, 127:22, 128:4, 128:8, 128:10, 128:15, 128:20, 129:2, 129:11, 129:13, 129:16, 129:22, 129:25, 130:2, 132:14, 132:16, 132:18, 133:4, 133:7, 133:14, 133:17, 134:1, 134:4, 134:6, 134:8, 134:10, 134:16, 134:19, 134:23, 134:25, 135:24, 136:9, 136:19, 136:23, 137:4, 137:16, 139:3, 139:5, 139:20, 140:6, 140:10, 140:17, 141:2, 141:11, 141:15, 141:22, 141:25, 142:5, 142:8, 142:17, 142:19, 142:21, 143:4, 143:21, 144:2, 144:5, 144:19, 144:21, 144:25, 145:23, 146:3, 146:6, 146:8, 146:13, 146:16, 147:9, 147:11, 147:20, 148:2, 148:9, 148:12, 148:16, 148:20, 149:2, 149:4, 149:22, 149:24, 150:2, 150:9, 150:14, 150:18, 150:24, 151:5, 151:7, 151:10, 151:17, 151:21, 151:25, 152:7, 152:14, 152:18, 152:23, 153:1, 153:4, 153:10, 153:14, 153:17, 153:23,

154:1, 154:4, 154:6, 154:9, 154:13, 154:16, 154:19, 154:22, 156:13, 156:15, 156:20, 157:6, 157:13, 157:17, 158:1, 158:6, 158:17, 158:23, 159:8, 159:10, 159:13, 159:22, 159:25, 160:3, 160:11, 160:19, 160:22, 161:1, 161:6, 161:8, 161:12, 161:16, 162:5, 162:24, 163:1, 163:11, 164:2, 164:5, 164:12, 164:15, 164:19, 164:24, 165:4, 165:8, 165:10, 165:15, 165:19, 165:24, 166:2, 166:4, 166:8, 268:25, 269:2
**parra** [3] - 7:22, 146:18, 177:2
**Parra's** [2] - 21:1, 290:17
**part** [35] - 4:23, 24:10, 27:16, 33:10, 37:18, 37:20, 44:24, 45:20, 49:22, 55:9, 55:24, 57:10, 65:6, 66:21, 67:1, 75:19, 118:3, 118:8, 125:25, 133:11, 139:16, 179:10, 180:25, 199:24, 209:2, 217:8, 223:23, 232:2, 233:21, 262:6, 266:19, 280:24, 294:3, 296:11, 300:6
**participate** [2] - 100:4, 125:4
**participated** [1] - 280:20
**participation** [2] - 168:10, 294:12
**particular** [26] - 15:1, 16:12, 29:6, 31:5, 35:14, 36:11, 36:14, 38:16, 38:23, 54:1, 77:20, 100:9, 115:4, 122:6, 207:14, 210:7, 253:23, 268:2, 273:1, 275:25, 276:18, 277:6, 278:13, 281:8, 289:14, 292:1
**parts** [1] - 47:10
**pass** [9] - 4:24, 110:23, 111:1,

111:24, 111:25, 112:1, 245:24, 245:25, 249:12
**passing** [2] - 116:15, 116:16
**past** [4] - 134:7, 139:24, 209:11, 282:1
**Patanakos** [3] - 190:7, 190:9, 265:3
**patsy** [1] - 94:4
**Patwa** [1] - 149:23
**pay** [18] - 76:8, 189:22, 190:12, 190:16, 200:15, 231:22, 232:2, 232:7, 258:22, 259:10, 259:11, 259:15, 266:2, 271:22, 290:4, 292:21, 294:13
**paying** [15] - 47:19, 47:21, 47:22, 48:21, 48:22, 48:23, 99:18, 144:15, 168:24, 212:24, 216:14, 232:11, 258:17, 258:25, 300:11
**payment** [13] - 78:3, 118:3, 118:8, 125:5, 125:8, 125:11, 125:17, 125:21, 301:1, 302:10, 302:11
**Pembroke** [4] - 121:10, 169:11, 169:21, 171:11
**penalty** [1] - 9:6
**people** [45] - 12:17, 46:6, 47:13, 48:21, 69:8, 75:22, 75:24, 75:25, 77:19, 86:8, 90:25, 98:20, 123:12, 165:11, 165:15, 175:14, 175:15, 186:13, 193:21, 198:7, 215:16, 216:10, 216:14, 217:4, 220:7, 222:2, 224:11, 234:8, 240:23, 252:3, 253:15, 253:20, 255:25, 256:2, 256:4, 256:13, 256:17, 256:18, 257:8, 257:12, 257:16, 257:17, 286:11, 291:7
**people's** [1] - 264:23
**per** [2] - 26:4, 48:14
**percent** [2] - 129:3, 131:2
**perfect** [4] - 128:4, 276:10, 276:15,

276:24
**perform** [1] - 294:20
**performed** [1] - 295:22
**period** [1] - 283:2
**permission** [3] - 4:13, 38:18, 304:9
**person** [18] - 9:13, 9:19, 32:11, 60:11, 92:24, 93:1, 101:16, 101:22, 103:4, 106:20, 125:11, 128:18, 137:23, 157:20, 204:15, 286:3, 286:13, 290:11
**person's** [3] - 32:18, 32:19, 289:5
**personal** [3] - 61:19, 64:7, 156:3
**personally** [8] - 5:25, 13:19, 23:14, 36:19, 136:12, 204:1, 205:12, 228:5
**persons** [2] - 86:6, 114:8
**pertain** [1] - 177:7
**pertains** [1] - 138:22
**Pete** [2] - 58:7, 152:25
**Petersburg** [2] - 39:14, 92:7
**petty** [1] - 176:17
**phase** [1] - 277:25
**phew** [1] - 134:19
**Phoenix** [1] - 291:18
**phone** [73] - 22:11, 27:14, 60:18, 77:25, 78:4, 82:5, 82:7, 88:3, 100:11, 100:13, 100:16, 100:17, 100:19, 100:22, 101:12, 101:15, 106:8, 106:13, 106:15, 115:22, 117:11, 125:18, 135:25, 139:7, 145:20, 146:21, 157:12, 163:2, 163:16, 163:17, 163:20, 166:15, 183:18, 192:16, 192:17, 192:19, 192:24, 193:2, 193:3, 193:17, 214:6, 214:17, 226:17, 226:19, 233:5, 233:7, 233:16, 235:7, 235:11, 235:20, 250:20, 267:13, 267:19, 268:10,

269:18, 269:19, 296:21, 296:22, 296:23, 296:25, 297:1, 297:3, 297:7, 297:10, 297:18, 297:23, 298:25, 299:4, 299:5
**phones** [2] - 30:9, 266:22
**phonetic)** [2] - 41:3, 190:7
**photo** [3] - 172:3, 252:1, 252:16
**photograph** [7] - 51:25, 72:6, 119:2, 251:12, 251:19, 251:23, 256:19
**photographic** [3] - 252:5, 252:6, 252:9
**photographs** [7] - 51:13, 51:17, 52:7, 70:1, 253:1, 253:2, 253:8
**photos** [3] - 252:3, 252:11, 252:15
**phrase** [2] - 248:3, 275:9
**physical** [1] - 90:18
**pick** [21] - 35:16, 100:19, 100:22, 101:12, 133:22, 199:13, 232:18, 235:3, 235:7, 235:11, 235:20, 241:7, 241:11, 241:15, 244:5, 252:6, 267:1, 267:16, 288:25, 296:22, 297:17
**picked** [8] - 61:13, 158:4, 241:14, 241:16, 252:16, 289:13, 290:5, 297:5
**picking** [10] - 12:12, 61:11, 125:11, 156:18, 157:14, 158:3, 232:20, 241:10, 273:25, 303:7
**picks** [1] - 193:19
**pickup** [1] - 138:15
**picture** [5] - 17:20, 53:8, 70:7, 169:15, 301:20
**pictures** [1] - 240:22
**pie** [1] - 215:22
**piece** [3] - 39:21, 225:13, 225:20
**pieces** [3] - 43:20, 44:1, 72:4
**pile** [9] - 42:17,

42:19, 42:20, 42:21, 42:22, 43:6, 43:7, 43:16
**piles** [1] - 43:8
**Pimp** [35] - 9:12, 9:18, 89:14, 90:3, 93:9, 93:12, 93:16, 93:17, 97:13, 98:1, 104:7, 115:22, 117:11, 132:16, 139:5, 142:19, 144:19, 147:11, 147:13, 149:22, 150:16, 156:15, 159:12, 161:6, 214:4, 214:14, 269:2, 277:6, 277:15, 277:19, 277:22, 277:25, 278:3
**pimp** [2] - 139:5, 166:2
**Pimp's** [2] - 91:22, 95:9
**Pinellas** [12] - 55:3, 173:20, 183:11, 183:15, 188:11, 188:13, 188:14, 203:13, 203:14, 247:12, 290:9, 292:14
**Pines** [4] - 121:10, 169:11, 169:21, 171:11
**Pingy** [14] - 20:13, 20:16, 22:10, 26:16, 26:18, 204:5, 204:10, 204:11, 204:14, 204:18, 204:20, 204:25, 205:10, 206:9
**pissed** [1] - 95:9
**pissing** [1] - 145:8
**place** [19] - 5:13, 6:1, 22:6, 23:25, 26:19, 35:24, 41:12, 45:18, 55:14, 58:19, 58:20, 78:4, 186:2, 188:15, 192:15, 222:6, 222:20, 289:9, 295:4
**placed** [2] - 77:12, 272:25
**places** [2] - 267:2, 296:2
**Plaintiff** [1] - 1:5
**plan** [7] - 5:21, 84:2, 100:8, 100:10, 125:4, 169:9, 221:5
**plans** [1] - 293:3
**plant** [1] - 253:25
**planted** [1] - 254:15
**plants** [1] - 254:10
**plastic** [4] - 37:12, 53:4, 53:5

**plates** [2] - 24:4, 53:5
**play** [1] - 138:17, 234:17, 268:21
**played** [2] - 142:10, 194:23
**PLAYING** [21] - 89:13, 104:3, 107:14, 109:8, 111:9, 113:8, 115:18, 122:20, 126:17, 132:13, 135:23, 139:2, 142:16, 144:18, 147:8, 149:21, 156:12, 157:25, 159:7, 162:23, 268:23
**playing** [2] - 64:18, 98:14
**plays** [2] - 273:24, 274:24
**plea** [3] - 180:25, 285:1, 285:3
**plead** [5] - 8:5, 183:6, 245:7, 284:23, 284:25
**pled** [9] - 183:3, 183:4, 210:9, 228:17, 229:7, 245:4, 245:9, 246:14, 246:20
**plug** [3] - 192:17, 192:18, 193:1
**plus** [5] - 53:7, 62:19, 134:8, 134:10, 293:3
**PO** [1] - 1:24
**pocket** [3] - 30:6, 192:25, 193:3
**point** [21] - 16:16, 28:21, 34:25, 35:21, 41:24, 43:2, 54:14, 72:19, 81:8, 86:3, 179:15, 217:20, 254:5, 255:9, 257:23, 258:2, 264:22, 285:13, 285:21, 294:24, 295:12
**Point** [8] - 19:15, 55:5, 55:14, 101:12, 190:24, 197:20, 297:2, 300:16
**pointed** [1] - 169:20
**points** [1] - 275:23
**police** [1] - 113:10, 161:11, 166:25, 167:2, 298:10, 298:13, 298:21, 299:3, 299:19, 301:5, 301:8
**portion** [7] - 35:12, 35:14, 43:5, 46:5,

89:8, 98:25, 212:5
**portions** [1] - 52:8
**position** [6] - 35:22, 95:23, 127:13, 166:13, 173:13, 245:2
**positive** [1] - 230:3
**possessed** [1] - 224:21
**possession** [13] - 8:24, 34:19, 53:11, 65:22, 66:2, 74:7, 98:23, 177:22, 182:21, 182:23, 247:9, 247:10, 247:15
**possible** [2] - 84:25, 247:19
**possibly** [4] - 174:3, 240:23, 246:15, 248:10
**Post** [2] - 297:2, 300:16
**posted** [1] - 150:9
**potentially** [1] - 138:15
**pound** [9] - 47:19, 47:24, 48:6, 48:11, 48:14, 181:10, 181:11, 293:3
**pounds** [42] - 10:15, 13:10, 17:16, 20:11, 26:12, 26:14, 27:24, 28:10, 32:14, 34:6, 34:20, 36:11, 39:14, 39:16, 40:1, 41:4, 41:5, 41:6, 42:6, 42:19, 44:7, 48:12, 69:1, 69:3, 69:20, 70:8, 70:10, 71:24, 72:3, 74:25, 75:14, 75:16, 99:2, 117:25, 182:25, 256:20, 289:16, 289:17, 290:7, 290:22, 292:21, 293:18
**pre** [1] - 282:19
**pre-Christmas** [1] - 282:19
**predominantly** [1] - 263:16
**prefaced** [1] - 80:10
**preliminary** [1] - 285:18
**prepare** [1] - 19:18
**prepared** [4] - 6:5, 56:16, 56:22, 233:23
**preparing** [1] - 56:2
**presence** [1] - 196:18
**present** [2] - 181:7, 248:10

**presented** [2] - 77:10, 88:24

**presiding** [1] - 4:7

**pressure** [1] - 147:2

**PRESTON** [163] - 1:16, 3:4, 3:8, 3:10, 4:10, 6:8, 6:12, 7:7, 7:9, 8:21, 10:1, 10:4, 11:22, 12:19, 15:7, 30:19, 30:22, 31:17, 31:23, 31:25, 32:2, 33:6, 36:21, 36:24, 37:3, 37:7, 37:8, 37:23, 37:24, 38:8, 38:14, 38:17, 38:20, 40:2, 40:25, 43:12, 52:6, 52:15, 52:21, 52:24, 63:4, 65:13, 65:20, 66:9, 66:13, 66:16, 68:9, 68:13, 68:16, 70:14, 70:20, 70:22, 73:8, 73:12, 73:16, 73:17, 74:17, 74:19, 74:23, 79:11, 79:13, 79:21, 81:6, 82:3, 86:18, 86:20, 87:7, 88:10, 89:11, 92:21, 94:9, 98:4, 101:6, 102:14, 102:18, 102:24, 103:24, 106:6, 106:25, 107:3, 107:11, 108:7, 109:5, 110:19, 111:6, 112:23, 113:2, 113:6, 114:23, 115:15, 117:9, 120:9, 120:15, 120:18, 121:11, 121:16, 121:24, 121:25, 122:14, 124:25, 126:13, 127:5, 127:8, 131:1, 132:7, 132:10, 135:1, 135:20, 137:17, 138:18, 138:25, 142:9, 142:14, 144:6, 144:16, 146:17, 147:4, 149:5, 149:17, 154:23, 156:9, 157:19, 157:23, 158:24, 159:5, 162:6, 162:20, 166:10, 170:14, 170:18, 170:19, 170:21, 171:1, 171:19, 171:25, 172:4, 172:6, 172:8, 178:22, 187:7, 227:2, 227:14, 229:16, 233:11, 241:19, 248:23, 250:3, 250:9, 254:12,

280:1, 282:14, 283:11, 283:16, 284:9, 285:20, 286:14, 286:17, 301:11, 301:14, 302:1, 302:6, 302:8, 302:9

**Preston** [1] - 72:18, 89:10, 103:23, 114:22, 198:19, 198:20, 198:24, 245:1, 248:14, 283:15, 303:8

**pretrial** [1] - 282:19

**pretty** [10] - 42:17, 69:19, 70:6, 156:25, 215:9, 225:19, 230:19, 235:17, 260:12, 293:10

**previous** [3] - 37:21, 179:20, 247:2

**previously** [8] - 42:1, 87:2, 209:16, 220:19, 222:13, 245:4, 252:21, 280:3

**price** [6] - 48:14, 48:23, 165:14, 180:7, 180:21, 216:10

**pricey** [1] - 51:4

**primary** [3] - 88:23, 89:5, 103:21

**prison** [1] - 283:2

**private** [7] - 5:11, 168:11, 168:19, 169:1, 244:1, 244:3, 244:10

**privilege** [1] - 166:16

**problem** [3] - 61:18, 77:10, 78:11, 121:1, 128:17, 138:9, 145:11, 158:11, 163:25, 209:9, 209:11, 210:17, 243:24

**problems** [3] - 135:3, 135:4, 135:11

**procedure** [1] - 267:11

**proceed** [6] - 6:5, 74:18, 88:5, 103:23, 113:7, 285:19

**proceeding** [1] - 304:24

**PROCEEDING** [1] - 86:16

**PROCEEDINGS** [2] - 114:12, 218:4

**process** [19] - 18:17, 21:18, 30:16, 31:6, 31:8, 31:11, 31:12,

33:11, 37:17, 44:18, 56:4, 76:10, 77:13, 78:3, 101:20, 188:23, 255:9, 298:3, 298:7

**processed** [1] - 188:13

**produce** [8] - 23:6, 23:18, 23:21, 25:6, 80:15, 83:3, 84:7, 93:22

**produced** [1] - 94:3

**product** [3] - 40:14, 200:14, 294:17

**professional** [1] - 72:16

**proffer** [1] - 84:15

**profit** [1] - 292:9

**profiting** [1] - 47:16

**progress** [2] - 53:23, 221:2

**prohibition** [1] - 4:18

**promise** [1] - 13:23

**promised** [1] - 173:3

**proof** [1] - 120:3

**property** [2] - 262:18, 263:9

**propose** [1] - 168:23

**prove** [3] - 16:17, 55:6, 127:16

**proved** [3] - 16:20, 40:23, 58:6

**provide** [5] - 101:19, 103:6, 118:2, 131:21, 188:22

**provided** [6] - 62:14, 83:10, 125:7, 195:16, 228:25, 254:10

**providing** [2] - 131:9

**publish** [34] - 31:25, 38:18, 52:21, 66:13, 68:13, 70:20, 73:12, 88:11, 103:25, 107:11, 109:5, 111:6, 112:23, 115:16, 120:15, 122:15, 122:18, 126:13, 132:7, 135:21, 138:20, 138:25, 142:14, 144:16, 147:5, 149:17, 156:9, 157:23, 159:5, 162:20, 170:14, 170:15, 171:25, 302:6

**published** [1] - 170:22

**pull** [5] - 21:5, 55:21, 62:19, 167:11, 222:21

**pulled** [20] - 16:14, 59:1, 60:8, 113:9, 113:12, 159:23,

160:24, 161:2, 161:4, 161:6, 161:8, 161:9, 163:2, 163:4, 169:7, 260:22, 262:9, 262:10, 299:3, 301:5

**pumping** [1] - 60:9

**purchase** [8] - 23:16, 60:14, 62:6, 62:11, 62:12, 63:19, 216:10, 237:20

**purchased** [4] - 59:25, 60:2, 61:15, 62:2

**purport** [1] - 88:16

**purpose** [3] - 88:20, 149:6, 170:1

**purposes** [6] - 30:24, 37:10, 63:1, 102:7, 230:9, 297:4

**pursuant** [3] - 8:6, 80:1, 284:25

**pursued** [1] - 117:24

**push** [1] - 144:12, 196:4

**pushed** [2] - 77:15, 144:11

**pussy** [1] - 127:17

**put** [79] - 13:14, 16:7, 23:23, 32:12, 33:23, 47:20, 48:2, 48:9, 48:10, 49:6, 53:24, 56:17, 56:18, 59:18, 61:4, 61:9, 61:16, 62:1, 62:7, 62:13, 76:14, 77:16, 85:1, 95:22, 99:14, 100:12, 100:15, 107:23, 120:1, 124:11, 124:19, 127:13, 147:15, 156:2, 165:22, 167:25, 189:7, 190:12, 192:14, 192:24, 193:16, 193:17, 195:6, 201:22, 202:24, 208:20, 211:11, 213:16, 213:19, 214:24, 216:7, 216:20, 216:21, 219:24, 222:6, 225:25, 228:3, 228:8, 229:14, 231:20, 238:15, 238:17, 244:20, 256:11, 256:18, 256:22, 268:20, 271:5, 277:3, 283:1, 291:16, 291:22, 296:21, 296:25, 297:1, 297:3, 300:13,

300:19, 300:21

**puts** [1] - 83:1

**putting** [8] - 47:8, 83:12, 84:2, 94:1, 120:4, 147:1, 190:16, 295:15

**Q**

**quality** [2] - 72:10, 195:3

**quantities** [3] - 12:13, 26:8, 33:10

**quantity** [7] - 12:11, 12:12, 12:20, 23:11, 39:20, 40:13, 43:18

**queased** [1] - 283:3

**questionable** [1] - 40:15

**questioned** [2] - 281:1, 281:25

**questioning** [1] - 281:13

**questions** [15] - 8:19, 14:22, 16:12, 66:20, 172:9, 199:2, 202:2, 217:14, 217:15, 217:17, 242:11, 249:25, 256:17, 285:17, 285:18

**quick** [2] - 35:1, 77:22

**quicker** [2] - 22:25, 138:13

**quickly** [1] - 252:23

**quiet** [1] - 117:2

**quite** [9] - 24:5, 51:4, 65:17, 135:7, 144:15, 174:7, 175:3, 180:9, 193:25

**quote** [1] - 242:13

**R**

**radio** [2] - 124:9, 160:16

**Raise** [1] - 6:15

**raise** [1] - 283:18

**Ram** [5] - 119:17, 237:7, 237:9, 237:10, 237:13

**RAMIRO** [2] - 3:3, 6:21

**Ramiro** [27] - 6:12, 7:4, 290:12, 290:14, 290:17, 290:24, 292:13, 292:19, 292:25, 294:5,

294:11, 294:20, 295:20, 296:3, 296:16, 297:4, 297:15, 298:2, 299:11, 299:17, 299:22, 300:1, 300:9, 300:11, 302:13, 302:23, 303:4

**ran** [3] - 78:1, 90:22, 92:10

**rang** [1] - 100:16

**Range** [15] - 58:23, 59:20, 167:5, 167:22, 168:1, 168:6, 242:17, 242:18, 242:19, 242:21, 243:6, 243:8, 243:9, 243:10, 243:14

**range** [3] - 26:7, 60:7, 272:9

**rare** [1] - 35:23

**rattles** [1] - 123:24

**Ray** [4] - 176:24, 176:25, 178:10, 178:12

**reached** [1] - 22:14

**read** [2] - 186:24, 227:1

**READ** [1] - 181:20

**readily** [1] - 82:6

**reading** [1] - 50:17

**ready** [8] - 27:15, 27:16, 35:9, 100:14, 112:25, 116:7, 128:13, 149:12

**real** [11] - 58:25, 62:20, 83:20, 123:25, 143:3, 143:25, 155:23, 155:24, 211:11, 215:3, 215:5

**realistically** [1] - 46:25

**reality** [1] - 283:4

**really** [34] - 54:23, 62:19, 90:3, 90:15, 90:24, 90:25, 92:15, 96:9, 124:4, 127:2, 136:14, 137:4, 140:18, 143:25, 148:4, 170:4, 174:6, 180:24, 181:13, 186:18, 193:1, 206:8, 226:21, 229:13, 230:3, 231:5, 232:23, 234:3, 257:13, 271:22, 288:13, 295:9, 295:13, 303:5

**reason** [12] - 55:10, 80:19, 95:4, 100:3, 123:11, 131:22, 163:6, 163:7, 165:10,

192:1, 270:10, 295:7

**reasons** [1] - 209:6

**receipt** [13] - 21:18, 25:1, 44:18, 62:14, 63:10, 68:18, 100:4, 121:3, 121:7, 121:18, 123:7, 301:8, 303:13

**receipts** [6] - 50:12, 50:17, 50:18, 67:18, 68:2, 68:6

**receive** [15] - 12:18, 24:23, 25:16, 42:11, 48:18, 60:19, 87:21, 138:12, 189:5, 189:10, 199:8, 200:3, 254:6, 263:11, 302:13

**RECEIVED** [1] - 3:17

**received** [39] - 21:21, 22:4, 22:7, 22:10, 24:20, 26:8, 30:14, 31:21, 37:21, 38:12, 39:4, 43:10, 45:19, 51:2, 51:19, 52:18, 60:18, 66:12, 68:12, 70:17, 74:16, 82:5, 87:4, 88:15, 102:21, 107:10, 120:12, 121:14, 122:17, 149:9, 149:11, 171:23, 219:18, 221:15, 222:11, 239:19, 301:2, 302:4

**receiving** [34] - 12:10, 12:16, 16:25, 17:3, 20:10, 20:14, 20:22, 21:3, 24:17, 26:24, 27:14, 45:8, 48:15, 49:10, 52:13, 57:20, 69:16, 73:22, 74:1, 99:19, 100:18, 106:20, 107:8, 111:5, 199:23, 204:1, 205:6, 235:9, 235:10, 258:5, 294:19, 302:10, 302:24

**recent** [2] - 175:6, 281:5

**recently** [1] - 30:14

**RECESS** [2] - 114:11, 218:3

**recess** [8] - 72:19, 113:1, 113:5, 113:16, 113:25, 217:20, 303:9, 303:21

**recognize** [27] - 31:2, 37:13, 51:13, 63:7, 63:9, 65:10, 67:24, 67:25, 70:1, 89:2, 103:2, 118:21, 119:21, 121:5, 122:2,

167:19, 169:15, 170:20, 171:2, 171:5, 171:15, 171:16, 171:18, 253:7, 257:25, 301:16

**recollection** [3] - 5:12, 54:9, 270:25

**recommend** [1] - 189:13

**reconcile** [3] - 211:18, 213:5, 213:7

**reconvene** [4] - 72:19, 113:17, 114:9, 217:21

**RECORD** [1] - 181:20

**record** [21] - 7:2, 10:3, 78:21, 81:24, 82:17, 83:14, 83:19, 84:15, 97:17, 173:8, 192:12, 193:4, 193:18, 195:11, 196:2, 227:7, 227:11, 233:24, 240:12, 284:5, 286:16

**recorded** [7] - 80:10, 80:15, 80:17, 80:20, 80:21, 81:3, 81:17, 81:20, 82:2, 83:3, 84:1, 84:13, 84:22, 85:18, 87:10, 87:15, 101:23, 115:8, 192:8, 195:14, 214:12, 226:20, 226:22, 227:9, 227:10, 271:13, 271:14

**recorder** [4] - 240:8, 240:10, 240:11

**recording** [24] - 80:8, 82:4, 82:6, 87:20, 88:21, 88:23, 88:25, 89:2, 89:4, 89:5, 89:8, 113:3, 113:4, 115:13, 122:6, 122:11, 194:17, 195:18, 233:9, 233:15, 234:18, 234:22, 268:21, 271:8

**recordings** [16] - 78:24, 79:2, 79:4, 79:5, 79:18, 87:8, 102:3, 174:4, 174:8, 174:9, 174:15, 192:9, 194:25, 195:1, 275:8

**records** [3] - 27:11, 192:15, 211:12

**recruited** [1] - 258:14

**red** [3] - 94:18,

154:6, 154:9

**redirect** [5] - 250:1, 250:3, 250:7, 279:24

**REDIRECT** [2] - 3:8, 279:25

**reduced** [2] - 8:12, 285:9

**reefer** [5] - 261:6, 261:7, 261:9, 261:12, 261:14

**refer** [10] - 93:8, 119:6, 120:6, 213:24, 214:6, 214:13, 214:18, 218:21, 230:6, 230:9

**reference** [1] - 214:4

**referenced** [1] - 138:16

**references** [1] - 137:19

**referred** [17] - 15:12, 33:4, 35:15, 39:7, 49:13, 68:17, 70:24, 71:1, 88:14, 142:12, 213:25, 214:21, 229:2, 236:3, 271:11, 282:15, 300:7

**referring** [15] - 32:23, 81:21, 81:23, 110:21, 117:12, 117:13, 125:1, 138:14, 170:10, 216:6, 223:14, 223:15, 235:1, 281:2, 281:12

**refers** [2] - 31:6, 36:20

**reflect** [3] - 10:3, 39:6, 286:16

**reflected** [1] - 281:15

**refrain** [1] - 187:20

**refresh** [2] - 5:12, 270:24

**refrigerator** [3] - 261:13, 261:14, 261:16

**regard** [32] - 11:23, 16:12, 20:9, 22:3, 32:8, 36:14, 63:20, 67:5, 77:11, 79:19, 84:3, 100:8, 102:4, 102:11, 102:25, 103:19, 125:16, 149:14, 167:22, 168:11, 248:2, 281:1, 281:8, 283:6, 288:22, 291:5, 291:24, 292:19, 293:16, 297:25, 299:10, 302:10

**regarding** [1] - 54:15

**regardless** [2] - 185:12, 282:17

**regards** [2] - 170:10, 211:15

**registered** [1] - 204:11

**regular** [6] - 65:9, 67:13, 67:16, 78:6, 267:11, 273:7

**reintroduce** [1] - 86:20

**relate** [1] - 30:14

**related** [3] - 10:8, 30:15, 55:13

**relation** [1] - 54:10

**relationship** [18] - 10:23, 11:2, 11:3, 13:17, 14:9, 14:11, 17:16, 44:8, 49:25, 54:20, 55:11, 56:4, 57:25, 58:6, 204:17, 292:24, 294:25

**relationships** [1] - 11:20

**relayed** [1] - 61:3

**release** [1] - 139:18

**released** [1] - 188:9

**relevancy** [1] - 254:12

**reliable** [2] - 55:7, 200:19

**relying** [2] - 5:21, 172:20

**remain** [1] - 298:5

**remaining** [5] - 36:13, 36:16, 45:3, 237:25, 238:2

**remember** [39] - 5:19, 5:24, 21:20, 58:21, 126:25, 128:6, 158:25, 178:25, 179:12, 180:10, 180:16, 181:3, 181:22, 191:24, 203:22, 208:25, 209:3, 220:21, 227:24, 229:25, 230:4, 233:10, 236:10, 237:25, 240:4, 240:6, 256:19, 261:18, 261:23, 262:10, 265:2, 277:7, 277:8, 282:22, 287:20, 289:5, 293:22, 296:10

**remind** [2] - 217:21, 303:11

**remote** [1] - 233:3

**remove** [1] - 37:11

**removed** [1] - 30:25

**rent** [18] - 14:13, 14:16, 15:1, 15:8, 15:9, 15:25, 22:1, 200:22, 201:1, 201:7, 201:14, 201:20, 264:25, 265:4, 265:24, 266:3, 266:4, 294:23
**rental** [1] - 154:10
**rented** [1] - 264:23
**renting** [2] - 189:21, 218:23
**repeat** [3] - 10:25, 181:15, 181:17
**reported** [1] - 2:4
**REPORTED** [1] - 2:8
**REPORTER** [1] - 181:20
**Reporter** [1] - 2:5
**reporter** [3] - 7:12, 181:15, 257:5
**reporting** [1] - 80:9
**represent** [8] - 18:9, 35:13, 36:6, 42:14, 43:21, 52:8, 56:25, 184:4
**represented** [1] - 41:16
**representing** [3] - 41:1, 41:2, 42:16
**represents** [5] - 38:23, 38:24, 44:2, 44:5, 71:24
**request** [1] - 14:14
**requested** [1] - 4:13
**REQUESTED** [1] - 181:20
**require** [1] - 246:18
**required** [1] - 84:20
**requirements** [1] - 168:21
**residence** [3] - 182:14, 182:15, 182:17
**residents** [1] - 169:12
**resolved** [1] - 138:13
**respect** [3] - 130:2, 158:19, 216:2
**responded** [1] - 304:15
**response** [2] - 82:16, 191:23
**responsibilities** [3] - 211:21, 215:15, 295:21
**responsibility** [11] - 5:19, 57:6, 57:9, 57:10, 69:8, 93:4, 95:12, 99:5, 99:9,

99:10, 99:13
**responsible** [19] - 20:21, 39:22, 42:7, 56:1, 69:3, 93:5, 93:7, 97:22, 99:17, 206:13, 209:5, 212:10, 213:2, 213:12, 213:14, 228:1, 230:17, 230:23, 294:2
**rest** [4] - 98:24, 118:19, 119:18, 299:20
**Restaurant** [2] - 110:13, 112:8
**result** [3] - 9:4, 83:9, 247:19
**RESUMED** [1] - 86:16
**retain** [1] - 166:25
**RETIRED** [4] - 72:25, 113:23, 218:1, 303:18
**returned** [1] - 282:8
**RETURNED** [3] - 73:3, 114:15, 218:7
**review** [5] - 78:24, 79:1, 102:2, 102:12, 122:5
**reviewed** [3] - 79:8, 79:18, 103:12
**reweighed** [1] - 72:10
**rid** [6] - 28:25, 69:7, 69:8, 192:3, 207:22, 213:4
**ride** [3] - 145:19, 146:20, 274:12
**riding** [1] - 18:1
**right-hand** [4] - 14:12, 110:24, 200:20, 201:6
**rim** [2] - 292:14, 292:15
**rims** [5] - 164:22, 164:24, 171:16, 278:12, 278:13
**ring** [1] - 269:7
**rip** [1] - 26:22
**rise** [12] - 4:2, 4:5, 72:23, 73:1, 73:4, 113:21, 114:14, 114:16, 217:24, 218:5, 218:8, 303:16
**Ro** [7] - 218:19, 218:20, 290:12, 290:14, 291:14, 294:4, 303:6
**Road** [14] - 45:24, 69:14, 109:23, 110:4, 110:8, 111:2, 111:18, 112:4, 112:5, 119:7,

121:9, 219:10, 236:12, 236:13
**road** [4] - 110:7, 111:16, 267:3
**roadblock** [1] - 95:5
**rock** [1] - 116:7
**Rocky** [8] - 19:15, 55:5, 55:14, 101:12, 190:24, 197:20, 297:2, 300:16
**rode** [1] - 289:11
**RODRIGUEZ** [71] - 1:20, 3:5, 6:7, 8:18, 11:14, 12:5, 31:19, 38:11, 52:17, 66:11, 68:11, 70:16, 79:25, 80:6, 81:8, 82:14, 83:4, 84:6, 84:19, 85:10, 85:21, 87:1, 101:3, 114:1, 117:2, 172:5, 172:7, 172:12, 172:15, 172:18, 172:25, 178:24, 181:14, 181:23, 187:13, 187:18, 187:22, 198:16, 198:17, 209:13, 209:15, 210:1, 210:3, 212:2, 212:4, 213:19, 213:21, 218:11, 218:12, 225:2, 225:4, 225:25, 226:3, 227:6, 227:19, 229:18, 229:23, 229:24, 233:13, 241:21, 244:15, 244:18, 244:24, 245:3, 248:8, 248:24, 249:24, 282:10, 285:15, 302:3, 303:22
**Rodriguez** [6] - 217:19, 218:9, 281:1, 281:12, 281:25, 282:15
**role** [4] - 273:24, 274:24, 290:17, 291:25
**roll** [1] - 116:7
**rolling** [1] - 99:23
**ROOM** [4] - 72:25, 113:23, 218:1, 303:18
**room** [3] - 5:16, 150:10, 175:11
**rough** [7] - 39:18, 39:23, 39:25, 43:23, 43:25, 44:7, 206:10
**route** [2] - 22:21, 22:22, 73:25
**Rover** [15] - 58:23, 59:20, 167:5, 167:23,

168:1, 168:6, 242:17, 242:18, 242:19, 242:21, 243:6, 243:8, 243:9, 243:10, 243:14
**row** [1] - 92:2
**RPR** [1] - 2:4
**rule** [7] - 48:1, 80:1, 81:10, 82:9, 82:13, 82:21, 85:23
**Rule** [3] - 80:1, 84:25, 85:12
**rules** [2] - 45:20, 55:25
**run** [3] - 40:19, 90:23, 263:9
**running** [2] - 16:10, 17:11
**ruse** [1] - 222:21
**rushing** [1] - 147:23

**S**

**S5** [3] - 60:23, 61:15, 226:4
**safe** [40] - 19:21, 45:2, 69:13, 69:17, 69:18, 70:3, 70:12, 70:24, 70:25, 71:6, 71:8, 71:11, 76:14, 76:16, 77:12, 190:4, 190:20, 191:17, 198:2, 198:4, 198:6, 218:24, 219:21, 219:25, 220:5, 220:8, 220:13, 220:15, 222:7, 223:7, 224:6, 236:17, 236:22, 248:9, 256:20, 291:17, 300:14, 300:15, 300:16, 300:21
**safes** [1] - 49:6
**safety** [2] - 175:24, 175:25
**sale** [5] - 64:8, 161:17, 161:23, 177:5, 292:6
**sales** [3] - 47:17, 182:4, 216:8
**Sandra** [2] - 2:4, 66:4
**sat** [6] - 91:23, 91:25, 92:3, 92:9, 175:11
**satisfy** [1] - 211:23
**saved** [2] - 38:1, 246:10
**saw** [11] - 15:23, 16:24, 18:1, 18:5, 144:22, 224:5, 256:19, 260:21,

270:15, 277:10, 277:11
**Sawgrass** [1] - 59:17
**scales** [1] - 40:13
**scared** [1] - 163:10
**scenario** [1] - 163:12
**scenarios** [1] - 242:5
**scene** [1] - 16:11
**scheme** [4] - 55:14, 168:11, 290:18, 296:12
**school** [2] - 177:1, 177:2
**School** [1] - 177:3
**screamed** [1] - 205:19
**screen** [4] - 32:5, 42:25, 209:18, 268:21
**screw** [2] - 20:20, 96:16
**screwed** [1] - 50:7
**scroll** [1] - 270:6
**seal** [11] - 49:17, 49:19, 272:25, 273:5, 273:6, 273:8, 273:9, 273:11, 280:9, 280:13, 280:17
**sealed** [2] - 273:10, 273:17
**seals** [1] - 280:10
**search** [1] - 218:22
**searched** [1] - 236:15
**seated** [9] - 4:3, 4:7, 7:1, 54:6, 73:6, 114:18, 284:3, 286:9, 286:10
**second** [42] - 16:22, 16:24, 18:24, 19:16, 19:17, 20:1, 20:5, 20:23, 20:24, 34:5, 39:11, 41:5, 43:7, 45:23, 54:25, 55:4, 55:6, 109:15, 109:21, 109:22, 111:19, 116:14, 155:12, 190:15, 196:11, 198:16, 202:18, 202:21, 203:1, 203:12, 203:12, 203:23, 203:25, 219:18, 229:23, 235:5, 240:4, 240:5, 244:16, 263:13, 270:15, 286:13
**secondary** [2] - 88:20, 103:22
**secret** [1] - 167:25
**secretive** [2] - 253:17, 258:12

**SECURITY** [12] - 4:2,
4:5, 72:23, 73:1, 73:4,
113:21, 114:14,
114:16, 217:24,
218:5, 218:8, 303:16
  **security** [1] - 4:11
  **see** [68] - 5:1, 5:4,
9:19, 17:10, 21:16,
22:19, 22:20, 33:21,
35:24, 41:23, 41:24,
42:13, 43:19, 44:4,
46:17, 48:20, 52:1,
53:1, 53:8, 53:22,
59:8, 59:25, 60:4,
60:5, 60:11, 66:25,
71:23, 72:7, 72:14,
73:20, 86:5, 92:9,
97:5, 111:10, 112:20,
128:18, 131:21,
142:2, 142:5, 142:23,
143:19, 145:16,
146:11, 150:7,
157:12, 161:22,
162:3, 209:18,
209:19, 211:24,
212:23, 218:25,
219:2, 226:11,
238:21, 244:21,
244:23, 252:5,
255:18, 261:22,
262:1, 263:1, 263:3,
267:2, 270:7, 286:6,
302:18
  **seed** [5] - 253:25,
254:4, 254:10,
254:14, 254:15
  **seeing** [2] - 16:4,
212:5
  **seem** [1] - 63:22
  **seized** [1] - 298:16
  **seizure** [3] - 117:23,
299:17, 301:22
  **select** [2] - 289:18,
289:20
  **selected** [1] - 290:8
  **sell** [3] - 62:20,
159:14, 276:19
  **selling** [7] - 47:25,
62:21, 177:19,
177:21, 215:10,
284:17, 286:1
  **send** [1] - 292:4
  **sending** [1] - 291:25
  **sense** [1] - 278:14
  **sensitive** [2] -
188:21, 188:25
  **sent** [4] - 51:6,
51:11, 290:9, 292:7
  **sentence** [3] - 8:12,
247:19, 285:9

  **sentenced** [10] -
210:10, 228:19,
229:7, 229:12,
229:15, 229:19,
246:15, 247:24,
248:10, 249:14
  **sentencing** [3] -
7:15, 249:15, 284:21
  **separate** [4] - 27:25,
206:18, 216:17,
278:17
  **sequestration** [1] -
85:23
  **seriously** [4] - 97:15,
98:11, 98:13
  **serve** [1] - 246:21
  **session** [3] - 4:6,
73:5, 114:17
  **set** [12] - 22:5, 39:12,
41:4, 133:22, 182:3,
184:9, 201:1, 201:10,
221:1, 221:2, 273:12,
279:2
  **seth** [1] - 34:9
  **Seth** [7] - 34:10,
76:2, 210:4, 210:6,
210:9, 291:7
  **setting** [4] - 39:3,
220:19, 244:7, 244:8
  **settle** [1] - 48:7
  **setup** [7] - 234:3,
234:5, 234:9, 235:2,
235:6, 239:16, 242:16
  **seven** [1] - 25:24
  **seventy** [1] - 301:3
  **several** [20] - 6:2,
25:13, 35:3, 47:12,
57:3, 64:20, 65:8,
65:9, 65:18, 146:23,
167:3, 170:6, 170:9,
170:12, 175:14,
176:2, 183:25,
189:12, 202:11, 223:3
  **shake** [1] - 94:16
  **shall** [2] - 6:17,
283:20
  **sham** [5] - 125:8,
126:10, 239:13,
243:3, 243:18
  **share** [1] - 90:21
  **Sheldon** [67] - 9:14,
10:2, 11:4, 11:13,
34:17, 35:18, 35:19,
42:3, 50:5, 60:13,
66:6, 78:5, 78:19,
87:15, 87:22, 92:23,
93:13, 93:18, 101:9,
115:5, 117:10,
117:18, 131:3, 132:1,
135:2, 137:20, 144:7,

146:19, 154:24,
156:6, 157:21, 162:7,
166:11, 167:16,
169:13, 170:11,
170:12, 171:7,
171:10, 195:13,
196:17, 204:5, 214:6,
214:24, 223:6,
224:21, 226:10,
226:15, 226:22,
227:8, 234:22, 241:7,
281:22, 281:23,
282:3, 282:9, 286:4,
286:15, 286:23,
288:5, 288:21, 292:1,
295:1, 296:8, 297:13,
298:6, 299:14
  **SHELDON** [1] - 1:7
  **shelving** [1] - 71:9
  **shift** [1] - 167:10
  **shipment** [14] -
27:13, 68:22, 75:7,
99:19, 189:11, 235:8,
235:9, 235:10,
235:23, 250:18,
250:19, 278:25,
279:6, 296:17
  **shipments** [8] - 17:1,
17:2, 25:21, 26:1,
26:8, 43:10, 49:10,
49:24
  **shipped** [3] - 74:4,
257:16, 259:17
  **Shit** [1] - 89:17
  **shit** [25] - 89:25,
90:14, 93:24, 96:8,
123:18, 123:21,
127:19, 128:21,
128:23, 132:18,
137:4, 140:8, 140:12,
140:17, 141:1,
142:21, 143:23,
144:9, 147:15,
153:17, 158:9,
159:15, 165:21,
165:22, 166:22
  **shocking** [1] - 46:16
  **shoes** [1] - 78:2
  **shoot** [1] - 140:13
  **shop** [23] - 12:25,
14:20, 15:14, 22:23,
24:11, 24:12, 24:24,
27:16, 27:22, 45:14,
51:11, 53:24, 119:20,
123:12, 136:16,
161:18, 201:1,
201:11, 201:24,
202:22, 292:14,
292:15
  **shop/paint** [1] -

45:13
  **short** [4] - 77:18,
113:3, 268:21, 274:6
  **shorter** [6] - 228:2,
242:12, 292:12,
297:12, 302:15, 303:2
  **SHORTER** [185] -
1:7, 89:15, 89:19,
89:24, 90:9, 90:12,
91:6, 91:11, 91:14,
91:17, 91:19, 92:18,
94:19, 94:23, 95:15,
95:25, 96:12, 96:18,
96:23, 97:1, 97:5,
97:8, 97:23, 98:2,
115:20, 115:24,
116:4, 116:11,
116:21, 117:1, 117:4,
117:7, 122:22,
122:24, 123:4, 123:9,
123:14, 123:20,
123:23, 124:2, 124:6,
124:15, 124:20,
126:19, 127:10,
127:14, 127:20,
128:1, 128:6, 128:9,
128:14, 128:19,
128:25, 129:9,
129:12, 129:15,
129:21, 129:23,
130:1, 132:15,
132:17, 133:3, 133:6,
133:13, 133:15,
133:24, 134:2, 134:5,
134:7, 134:9, 134:14,
134:17, 134:22,
134:24, 136:6,
136:18, 136:20,
137:1, 137:14, 139:4,
139:19, 140:4, 140:9,
140:14, 140:24,
141:9, 141:12,
141:19, 141:23,
142:1, 142:7, 142:18,
142:20, 143:1,
143:18, 143:22,
144:3, 144:20,
144:24, 145:16,
146:1, 146:4, 146:7,
146:10, 146:14,
147:10, 147:18,
148:1, 148:7, 148:10,
148:14, 148:18,
149:1, 149:3, 149:23,
150:1, 150:5, 150:12,
150:16, 150:21,
151:4, 151:6, 151:8,
151:14, 151:19,
151:22, 152:1,
152:10, 152:15,
152:21, 152:24,

153:3, 153:7, 153:12,
153:15, 153:20,
153:24, 154:3, 154:5,
154:8, 154:12,
154:15, 154:17,
154:21, 156:14,
156:16, 157:4,
157:10, 157:16,
158:4, 158:15,
158:21, 159:9,
159:11, 159:20,
159:23, 160:8,
160:10, 160:13,
160:15, 160:21,
160:24, 161:3, 161:7,
161:10, 161:15,
162:2, 162:25, 163:9,
164:1, 164:4, 164:7,
164:14, 164:18,
164:21, 165:3, 165:7,
165:9, 165:13,
165:18, 165:20,
166:1, 166:3, 166:6,
166:9
  **Shorter** [137] - 1:20,
9:14, 10:2, 10:6,
10:10, 10:24, 11:4,
11:13, 11:25, 17:14,
17:24, 18:6, 18:13,
18:22, 19:1, 19:6,
19:10, 19:24, 20:18,
23:15, 34:17, 34:19,
35:18, 35:19, 42:3,
50:1, 50:5, 54:17,
55:12, 56:3, 57:22,
57:24, 58:14, 60:3,
60:13, 60:19, 61:3,
63:24, 64:2, 64:5,
64:10, 66:6, 75:11,
78:5, 78:19, 87:15,
87:22, 88:7, 92:24,
93:13, 93:18, 98:6,
99:4, 101:9, 115:6,
117:10, 117:18,
117:24, 118:2,
120:20, 121:21,
125:5, 125:18,
125:23, 126:9, 131:3,
132:1, 135:3, 137:21,
138:3, 144:7, 146:19,
149:7, 154:24, 156:6,
157:21, 162:8,
162:15, 166:12,
167:16, 169:13,
170:11, 170:12,
171:7, 171:10,
195:13, 204:6,
204:10, 211:16,
214:7, 214:24, 223:6,
224:21, 226:10,
226:15, 226:23,

227:8, 232:5, 234:14, 234:16, 234:22, 238:6, 238:10, 238:13, 241:7, 258:19, 259:7, 277:21, 277:24, 281:22, 281:23, 282:4, 282:9, 286:4, 286:15, 286:19, 286:23, 287:2, 287:11, 288:2, 288:5, 288:22, 292:1, 292:23, 293:4, 295:1, 295:8, 295:22, 296:8, 297:13, 297:24, 298:6, 298:19, 299:7, 299:14, 300:7, 300:19

**Shorter's** [6] - 19:25, 26:17, 204:14, 213:13, 213:15, 213:22

**shorthand** [2] - 276:4, 276:13

**shortly** [4] - 56:23, 118:20, 162:8, 272:1

**shot** [1] - 91:1

**show** [14] - 62:25, 69:24, 118:24, 154:24, 169:19, 209:16, 213:22, 219:22, 238:12, 251:18, 252:20, 270:3, 270:19, 302:17

**showed** [4] - 15:22, 195:22, 260:15, 260:17

**showing** [6] - 30:23, 79:14, 118:16, 202:14, 273:2, 289:23

**shown** [8] - 118:21, 120:7, 206:8, 251:12, 251:16, 251:23, 252:9, 252:11

**shows** [2] - 43:18, 124:18

**shut** [2] - 49:15, 233:3

**shy** [1] - 64:1

**sic** [1] - 227:12

**sick** [1] - 283:3

**side** [3] - 10:13, 11:5, 32:15, 54:6, 59:1, 110:24, 112:20, 153:2, 172:19, 244:21, 264:12, 267:3, 279:17

**sidebar** [2] - 80:3, 82:15

**SIDEBAR** [2] - 80:4, 86:15

**significance** [1] - 67:7

**significant** [1] - 69:13

**SIM** [3] - 267:5, 267:9, 299:6

**similar** [5] - 24:21, 36:14, 39:2, 43:15, 184:12

**simultaneously** [2] - 157:15, 160:12

**sister** [6] - 190:16, 191:1, 191:4, 191:18, 216:21, 266:8

**sister's** [3] - 203:6, 265:22, 267:15

**sit** [4] - 146:4, 153:21, 184:17

**sits** [2] - 193:2, 274:10

**sitting** [6] - 9:23, 132:18, 134:13, 153:19, 161:14, 173:8

**situation** [11] - 59:5, 59:14, 59:17, 76:13, 128:18, 168:24, 181:12, 210:24, 211:5, 259:6, 295:18

**situations** [2] - 35:4, 215:3

**six** [4] - 16:23, 20:3, 44:10, 123:8

**sizes** [1] - 278:13

**slang** [3] - 275:12, 275:16, 276:4

**slept** [1] - 175:19

**slips** [1] - 67:18

**slow** [1] - 34:25

**slowing** [2] - 89:24, 93:24

**slowly** [1] - 7:11

**small** [6] - 17:15, 30:9, 74:4, 259:20, 260:4

**smaller** [1] - 98:21

**smooth** [1] - 205:5

**smoothly** [1] - 55:10

**snapshot** [2] - 82:22, 85:4

**sold** [2] - 213:8, 217:4

**solemnly** [2] - 6:16, 283:19

**solid** [1] - 204:17

**solution** [1] - 83:25

**someone** [36] - 17:20, 23:15, 28:9, 29:21, 33:1, 35:7, 35:15, 35:22, 42:10, 48:19, 53:19, 60:11,

103:15, 119:24, 120:1, 120:21, 127:23, 135:6, 138:9, 138:23, 143:10, 168:24, 178:1, 178:2, 178:15, 182:10, 184:9, 189:24, 230:4, 252:6, 255:17, 256:22, 265:17, 269:8, 275:13, 276:5

**sometime** [4] - 16:2, 41:19, 129:5, 141:5

**sometimes** [8] - 58:10, 119:4, 202:8, 241:23, 260:10, 260:11, 260:13, 294:22

**somewhat** [5] - 30:8, 101:2, 175:24, 206:4, 261:5

**somewhere** [11] - 17:18, 58:18, 97:6, 138:15, 203:21, 223:12, 224:19, 259:17, 265:16, 296:22, 296:25

**son** [3] - 150:1, 152:17, 283:8

**song** [1] - 261:18

**soon** [8] - 13:3, 22:14, 140:11, 141:6, 150:7, 161:3, 279:1

**sooner** [1] - 44:11

**sorry** [14] - 22:9, 26:13, 38:8, 67:18, 79:11, 126:3, 143:21, 253:5, 257:6, 286:21, 291:19, 298:2, 301:25, 302:12

**sort** [11] - 14:21, 20:12, 23:7, 55:13, 60:10, 131:7, 131:8, 169:8, 193:5, 200:16, 201:11

**sound** [16] - 123:22, 140:5, 238:17, 239:9, 239:14, 241:1, 242:1, 242:5, 242:8, 242:18, 242:22, 245:12, 246:10, 247:21, 247:25, 248:3

**sounded** [2] - 143:8, 161:13

**sounds** [36] - 123:21, 163:14, 190:1, 192:10, 197:18, 210:11, 216:16, 216:19, 216:23, 217:18, 222:1, 222:4, 225:14,

228:24, 229:6, 230:24, 231:3, 232:16, 234:2, 234:10, 235:13, 236:7, 239:10, 239:22, 239:25, 240:16, 240:24, 242:3, 242:10, 245:14, 245:23, 246:6, 246:9, 246:12, 247:7, 247:18

**source** [8] - 176:15, 176:19, 179:13, 180:5, 180:14, 180:19, 181:5, 303:14

**sources** [2] - 103:10, 282:1

**South** [4] - 39:14, 58:21, 76:18, 132:24

**south** [9] - 32:15, 39:13, 62:3, 105:21, 120:24, 156:21, 156:23, 185:20, 296:6

**southern** [1] - 255:8

**speakers** [2] - 88:17, 123:3

**speaking** [1] - 103:5

**specific** [8] - 57:13, 57:15, 137:5, 171:9, 178:20, 178:21, 270:1, 270:5

**specifically** [5] - 103:1, 167:9, 184:1, 250:13, 296:5

**specifics** [2] - 178:19, 181:13

**speculation** [1] - 101:4

**spell** [2] - 7:2, 284:5

**spelled** [1] - 264:14

**spent** [2] - 171:12, 190:19

**spoken** [2] - 162:17, 185:1

**spontaneous** [1] - 278:6

**spooked** [1] - 143:9

**spot** [3] - 83:1, 85:2, 152:9

**square** [2] - 207:9, 209:8

**St** [6] - 1:18, 2:2, 39:14, 58:7, 92:7, 152:25

**stacks** [1] - 165:1

**staked** [1] - 240:15

**stand** [6] - 7:1, 97:20, 114:3, 250:25, 251:1, 284:4

**standing** [1] - 271:9

**standings** [1] - 129:14

**standstill** [1] - 145:4

**Starkey** [7] - 45:24, 69:14, 119:7, 121:8, 219:10, 236:12, 236:13

**start** [10] - 22:24, 23:2, 28:3, 93:8, 103:25, 105:2, 105:5, 177:11, 178:9, 184:6

**started** [8] - 177:5, 177:19, 199:6, 199:7, 203:25, 205:6, 257:25, 288:5

**starting** [8] - 52:25, 120:23, 145:7, 165:5, 165:11, 257:24, 285:13, 285:21

**starts** [3] - 32:11, 43:13, 106:7

**state** [6] - 7:1, 139:10, 141:16, 167:17, 169:5, 284:4

**statement** [2] - 99:3, 222:12

**statements** [4] - 187:2, 187:3, 187:12, 187:24

**States** [2] - 6:8, 6:12

**STATES** [3] - 1:1, 1:3, 1:14

**station** [8] - 150:8, 151:23, 151:24, 152:1, 153:6, 153:8, 153:15, 154:25

**Stavros** [3] - 10:20, 190:6, 190:9

**stay** [9] - 23:24, 67:15, 109:24, 109:25, 110:3, 127:24, 265:16, 292:7

**stayed** [4] - 51:3, 150:19, 170:8, 292:8

**staying** [2] - 59:13, 150:20

**Ste** [2] - 1:18, 1:23

**STENOGRAPHICA LLY** [1] - 2:8

**STEPHEN** [1] - 2:1

**Stephen** [1] - 2:1

**stepping** [1] - 85:12

**steps** [1] - 23:25

**Steve** [2] - 191:10, 191:11

**stick** [5] - 13:22, 14:1, 14:3, 179:21, 179:23

**still** [25] - 5:19, 18:2, 29:25, 30:16, 30:17,

31:11, 31:12, 50:22, 51:7, 67:19, 75:3, 75:7, 75:11, 115:10, 117:23, 126:4, 129:19, 184:4, 188:23, 189:4, 193:12, 207:19, 207:22, 300:8
**stock** [1] - 131:23
**stone** [1] - 221:2
**stood** [1] - 264:17
**stop** [6] - 25:18, 57:19, 190:8, 234:25, 269:5, 293:9
**stopped** [2] - 115:1, 159:2
**storage** [4] - 69:16, 119:20, 219:13, 219:14
**store** [2] - 116:8, 302:15
**stored** [5] - 69:11, 71:12, 198:1, 236:9
**story** [1] - 240:21
**straight** [10] - 72:15, 94:12, 107:21, 107:22, 108:1, 111:2, 118:11, 120:25, 157:1, 163:14
**straighten** [2] - 91:4, 158:9
**straightened** [1] - 143:15
**stranger** [3] - 276:10, 276:15, 276:24
**Street** [5] - 109:15, 155:14, 201:4, 201:8, 219:15
**street** [13] - 47:20, 59:2, 112:19, 152:4, 152:17, 173:19, 176:17, 189:8, 189:10, 218:13, 218:14, 218:17, 218:19
**strengthened** [1] - 55:11
**stressing** [1] - 143:20
**strictly** [1] - 179:21
**strip** [5] - 110:21, 110:24, 110:25, 152:8, 152:11
**stuff** [16] - 25:5, 25:6, 26:21, 39:20, 40:9, 53:7, 95:17, 96:14, 176:9, 176:17, 222:22, 274:10, 287:14, 294:23,

295:15, 296:1
**Styrofoam** [1] - 24:3
**subject** [1] - 4:22
**subjects** [1] - 151:9
**subsequently** [2] - 201:8, 254:1
**substantial** [1] - 181:9
**substantially** [2] - 79:8, 122:9
**sufficient** [2] - 80:24, 187:18
**suit** [1] - 286:10
**Suite** [1] - 1:21
**suits** [1] - 9:24
**sum** [1] - 168:2
**supervision** [1] - 76:7
**supplied** [1] - 253:25
**supplies** [2] - 27:16
**supposed** [28] - 15:23, 24:8, 35:2, 48:15, 61:1, 62:11, 67:14, 67:15, 82:24, 89:21, 94:2, 117:15, 148:4, 148:5, 155:17, 155:19, 168:6, 205:8, 210:13, 217:11, 233:25, 261:23, 297:7, 297:18, 297:22, 302:23, 303:3
**supposedly** [3] - 131:13, 137:23, 149:9
**surveil** [1] - 221:18
**surveillance** [1] - 173:19
**surveilled** [1] - 239:24
**surveilling** [1] - 222:3
**suspect** [1] - 15:18
**suspicions** [4] - 16:16, 16:20, 299:10, 299:16
**sustained** [2] - 178:23, 229:17
**swear** [2] - 6:16, 283:19
**sweat** [1] - 94:17
**Swift** [4] - 264:12, 264:14, 279:17, 279:20
**switch** [1] - 267:5
**switched** [2] - 179:2, 179:18
**switching** [1] - 263:17
**sworn** [3] - 6:15, 6:22, 283:25
**system** [5] - 121:21,

122:25, 123:5, 123:7, 125:1

**T**

**table** [4] - 5:16, 172:20, 173:9, 286:12
**TAKEN** [2] - 114:12, 218:3
**Tampa** [16] - 1:18, 1:19, 1:24, 2:3, 2:6, 19:15, 22:15, 55:5, 58:7, 109:3, 148:15, 150:3, 152:4, 153:2, 183:15, 188:11
**Tampa's** [1] - 244:11
**tampered** [1] - 273:3
**tape** [4] - 88:21, 88:22, 139:1, 275:8
**tapes** [4] - 102:4, 103:20, 103:21, 278:9
**tasked** [3] - 57:9, 99:19, 224:7
**technical** [1] - 132:10
**telephone** [3] - 235:16, 240:10, 281:18
**telephonic** [1] - 88:17
**temporarily** [1] - 25:19
**temporary** [1] - 53:25
**ten** [12] - 11:10, 106:1, 123:17, 141:21, 150:4, 150:5, 176:11, 177:10, 179:4, 246:23, 246:24, 253:12
**term** [8] - 18:8, 23:12, 29:20, 93:9, 230:20, 261:11, 261:17, 266:24
**terminology** [3] - 192:13, 263:19, 263:21
**terms** [6] - 157:2, 261:6, 261:8, 261:10, 261:13, 275:25
**test** [1] - 46:17
**testified** [22] - 6:24, 42:1, 79:19, 102:11, 118:25, 195:10, 202:2, 204:4, 205:11, 208:24, 216:7, 220:19, 233:8, 238:3, 242:11, 245:4, 245:10, 250:14,

251:2, 267:12, 281:9, 284:2
**testify** [3] - 4:25, 15:4, 233:14
**testifying** [7] - 51:25, 174:22, 198:21, 227:12, 227:20, 234:18, 277:7
**testimony** [21] - 6:17, 7:13, 7:24, 37:1, 78:24, 84:3, 114:7, 198:23, 199:5, 214:23, 224:10, 224:19, 227:24, 233:12, 282:21, 283:20, 284:12, 285:6, 303:24, 304:1, 304:2
**THE** [175] - 1:1, 1:1, 1:13, 4:4, 4:8, 4:11, 6:10, 6:20, 7:4, 7:6, 8:20, 10:3, 11:16, 11:18, 12:7, 12:9, 15:6, 30:21, 31:21, 32:1, 32:23, 32:25, 36:23, 37:2, 37:6, 37:22, 38:12, 38:19, 39:23, 39:25, 40:9, 40:10, 42:23, 42:24, 42:25, 43:2, 43:3, 43:4, 52:4, 52:18, 52:23, 65:12, 65:15, 66:12, 66:14, 68:12, 68:14, 70:17, 70:21, 72:18, 72:25, 73:3, 73:7, 73:14, 74:16, 74:18, 80:3, 80:4, 81:3, 82:1, 83:2, 83:24, 84:17, 85:7, 85:16, 85:25, 86:4, 86:14, 86:15, 86:16, 86:24, 87:3, 88:13, 101:5, 102:17, 102:21, 103:17, 104:2, 107:2, 107:13, 109:7, 111:8, 112:25, 113:4, 113:15, 113:23, 113:24, 114:4, 114:5, 114:6, 114:10, 114:11, 114:12, 114:15, 114:19, 114:21, 114:22, 115:17, 120:12, 120:17, 121:14, 122:17, 126:16, 132:9, 135:22, 138:21, 138:22, 147:7, 149:20, 156:11, 170:17, 171:23, 172:11, 172:14,

172:17, 172:23, 178:23, 181:19, 181:20, 181:21, 187:9, 187:11, 187:20, 217:19, 218:1, 218:2, 218:3, 218:7, 218:9, 227:5, 227:16, 227:18, 229:17, 244:17, 244:20, 245:1, 248:2, 248:6, 248:7, 250:1, 250:5, 251:7, 254:13, 254:14, 270:22, 279:24, 282:12, 282:13, 283:13, 283:23, 284:6, 284:7, 285:18, 286:16, 301:13, 302:4, 302:7, 303:8, 303:18, 303:19, 303:25, 304:4, 304:5, 304:12, 304:17, 304:20, 304:23
**theirs** [1] - 258:9
**themselves** [1] - 79:2
**THEN** [2] - 114:12, 218:3
**there'll** [3] - 109:18, 110:12, 112:8
**therefore** [1] - 141:5
**THEREUPON** [10] - 4:4, 72:25, 73:3, 113:23, 114:11, 114:15, 218:1, 218:3, 218:7, 303:18
**they've** [8] - 40:22, 123:12, 123:15, 123:16, 187:1, 187:4
**thinking** [7] - 92:10, 139:13, 140:11, 140:15, 157:7, 161:23, 170:3
**third** [6] - 18:24, 32:21, 43:7, 49:21, 157:20, 286:21
**Thomas** [1] - 76:2
**thousand** [14] - 20:11, 47:22, 47:24, 74:12, 131:16, 131:20, 191:18, 238:4, 238:7, 238:9, 238:13, 238:25, 300:5, 301:3
**thousands** [2] - 186:22, 249:8
**threat** [1] - 131:8
**threatened** [2] - 176:2, 176:8
**threatening** [1] -

147:1
  **three** [24] - 7:23,
16:23, 20:3, 43:8,
44:12, 46:19, 68:5,
77:19, 92:1, 92:2,
97:3, 148:11, 151:1,
168:9, 198:7, 214:3,
237:1, 237:4, 252:23,
253:1, 253:7, 284:11,
293:8
  **three-day** [1] - 168:9
  **threw** [1] - 59:2
  **THROUGH** [4] - 3:21,
3:22, 87:5, 102:22
  **throw** [3] - 51:5,
59:14, 267:8
  **throwaway** [1] -
22:11
  **throwaways** [1] -
266:25
  **throwing** [1] - 213:17
  **tighten** [3] - 97:25,
98:7, 165:22
  **Tighten** [1] - 166:22
  **TIME** [2] - 80:4,
86:15
  **tired** [1] - 128:22
  **Titan** [1] - 237:8
  **title** [3] - 119:23,
120:6, 237:12
  **TO** [7] - 72:25, 73:3,
113:23, 114:15,
218:1, 218:7, 303:18
  **today** [12] - 9:19,
173:16, 185:7,
198:21, 198:24,
213:25, 227:13,
227:24, 234:18,
250:20, 253:24, 286:6
  **together** [21] - 13:4,
18:20, 19:15, 19:16,
30:11, 49:5, 56:18,
90:15, 94:24, 98:24,
128:22, 167:13,
190:23, 197:25,
198:1, 280:14,
288:13, 290:15,
292:4, 295:15, 300:19
  **tomorrow** [13] -
127:4, 127:21,
128:10, 129:5,
131:11, 137:3, 137:5,
137:6, 137:7, 139:13,
141:5, 303:10, 304:23
  **Tomorrow** [1] -
127:10
  **ton** [3] - 12:22, 26:15
  **took** [33] - 22:5,
24:11, 25:19, 31:14,
34:19, 50:18, 53:6,

55:14, 61:14, 64:6,
78:1, 78:3, 96:2, 96:3,
159:21, 159:24,
160:25, 161:5, 163:4,
170:5, 188:15,
206:23, 213:10,
262:11, 272:9, 289:9,
289:12, 291:22,
300:21, 301:5, 301:9,
301:21
  **Tooth** [1] - 193:5
  **top** [12] - 32:14,
32:25, 34:13, 40:7,
41:23, 43:14, 48:2,
72:12, 83:15, 101:9,
156:4, 192:17
  **topic** [1] - 76:25
  **tops** [1] - 164:13
  **total** [27] - 28:1,
32:20, 36:5, 36:10,
36:11, 39:18, 39:23,
39:25, 40:3, 41:5,
43:8, 43:17, 43:20,
43:23, 43:25, 44:6,
44:7, 57:1, 75:9,
75:10, 173:21,
210:15, 210:19,
211:19, 211:22,
211:24, 293:7
  **touch** [1] - 36:2,
42:25, 91:15
  **touched** [1] - 224:25
  **touches** [2] - 133:19,
137:8
  **touching** [1] - 275:13
  **tow** [4] - 120:24,
121:3, 121:8, 121:17
  **towards** [7] - 23:8,
32:15, 75:14, 168:7,
168:8, 231:25
  **towing** [2] - 263:20,
264:1
  **town** [4] - 42:11,
141:10, 224:12,
294:22
  **track** [2] - 97:17,
128:22
  **tractor** [24] - 15:23,
16:5, 16:8, 17:1, 17:2,
22:18, 24:18, 25:2,
25:15, 25:16, 25:20,
26:10, 27:6, 49:11,
57:18, 253:2, 260:22,
260:25, 261:21,
263:11, 263:15,
279:6, 279:10, 290:10
  **trade** [2] - 10:5,
237:23
  **trade-in** [1] - 237:23
  **Trader** [2] - 201:5,

219:15
  **traffic** [4] - 110:6,
132:20, 133:4, 182:24
  **trafficking** [1] -
10:15
  **trailer** [32] - 15:23,
16:5, 16:8, 17:1, 17:2,
23:9, 25:2, 26:10,
53:9, 253:2, 260:22,
260:25, 261:2,
261:21, 262:4, 262:8,
263:12, 263:15,
263:18, 263:20,
263:25, 264:8, 264:9,
264:10, 264:11,
273:1, 273:16, 279:6,
279:10, 279:13,
279:18, 290:10
  **trailers** [8] - 22:19,
24:18, 25:15, 25:17,
25:21, 27:6, 49:11,
57:18
  **transact** [1] - 253:20
  **transaction** [9] -
44:14, 44:15, 63:23,
63:24, 65:3, 121:17,
212:14, 240:2, 292:2
  **transcribed** [2] -
101:25, 103:10
  **TRANSCRIPT** [1] -
1:13
  **transcript** [13] -
88:12, 89:3, 89:5,
89:7, 89:9, 115:13,
122:3, 122:8, 126:5,
138:17, 268:20,
270:19, 276:18
  **TRANSCRIPTION** [1]
- 2:8
  **transcripts** [20] -
79:1, 79:7, 79:18,
80:13, 83:16, 84:21,
87:8, 88:15, 88:16,
88:18, 88:19, 88:24,
102:3, 102:8, 102:25,
103:20, 103:22,
214:5, 241:23, 271:6
  **transferred** [1] -
219:20
  **translation** [1] -
189:3
  **transport** [1] - 74:4
  **transported** [1] -
50:15
  **trap** [1] - 176:18
  **travel** [4] - 139:15,
155:12, 169:10,
185:19
  **traveled** [1] - 169:1
  **traveling** [2] -

155:13, 293:9
  **TRIAL** [1] - 1:13
  **trial** [2] - 187:24,
229:13
  **tried** [3] - 94:11,
158:1, 168:19
  **trip** [2] - 168:9,
170:10
  **trips** [1] - 293:6
  **troopers** [1] - 301:20
  **trouble** [2] - 210:22,
249:23
  **truck** [47] - 21:5,
21:6, 21:12, 25:3,
27:22, 53:6, 57:19,
103:15, 115:1,
117:15, 119:17,
133:1, 220:20, 221:9,
222:7, 222:13,
234:25, 235:2,
250:15, 261:13,
261:14, 261:22,
262:2, 262:3, 263:22,
264:6, 269:20,
272:21, 273:24,
273:25, 274:3, 274:6,
274:8, 274:9, 274:16,
279:6, 279:10, 280:2,
280:4, 280:6, 291:22,
294:14, 297:9,
297:11, 297:16,
298:22, 298:24
  **trucker** [1] - 115:4
  **trucking** [5] - 261:6,
261:8, 261:13,
272:19, 274:25
  **truckload** [1] - 254:9
  **truckloads** [1] -
24:25
  **trucks** [11] - 22:18,
24:24, 26:1, 74:5,
261:16, 263:12,
263:15, 272:18,
273:4, 280:10, 290:19
  **true** [45] - 186:23,
189:8, 189:22, 191:6,
191:7, 200:6, 202:3,
202:6, 202:13,
205:19, 205:24,
206:19, 207:9,
210:10, 210:22,
212:11, 212:21,
213:3, 214:25, 215:1,
215:14, 216:15,
216:18, 217:17,
220:16, 221:6,
221:19, 223:4,
224:22, 224:23,
224:25, 225:1, 226:5,
229:1, 231:14,

231:24, 232:3, 232:9,
232:10, 235:16,
239:2, 246:16,
249:14, 277:1, 304:25
  **trust** [1] - 100:3
  **trusted** [5] - 12:17,
19:9, 55:7, 99:24,
221:13
  **truth** [17] - 6:18,
6:23, 37:19, 181:2,
181:3, 188:20, 196:6,
283:21, 284:1
  **try** [14] - 5:24, 48:8,
50:4, 158:15, 158:21,
158:22, 166:25,
167:1, 173:3, 189:20,
197:8, 232:6, 244:12,
299:20
  **trying** [31] - 4:16,
26:22, 39:18, 48:5,
50:4, 71:18, 82:18,
91:1, 95:4, 95:21,
95:22, 99:13, 131:19,
131:20, 141:3, 141:4,
144:12, 151:15,
153:22, 158:7,
158:17, 158:18,
163:5, 163:9, 234:15,
243:21, 243:23
  **Tucson** [3] - 289:11
  **turn** [20] - 33:21,
36:4, 43:13, 46:11,
64:5, 65:19, 67:21,
88:5, 98:15, 118:7,
121:2, 124:5, 124:9,
124:22, 133:8,
167:16, 223:24,
225:15, 242:25, 243:1
  **turned** [17] - 37:15,
37:16, 38:4, 65:21,
65:24, 68:2, 69:21,
71:22, 76:6, 77:24,
81:7, 117:25, 156:6,
164:15, 164:20,
171:9, 256:22
  **twelve** [1] - 293:20
  **twice** [2] - 48:8,
142:24
  **two** [50] - 9:24,
10:20, 11:24, 13:5,
18:19, 21:10, 26:5,
26:6, 45:16, 46:19,
49:6, 50:19, 55:19,
56:22, 56:24, 58:10,
60:24, 62:11, 63:5,
66:6, 76:4, 78:16,
87:19, 87:24, 92:1,
97:3, 112:1, 116:5,
117:19, 117:21,
119:12, 129:20,

134:9, 147:17, 158:2, 159:17, 168:9, 170:8, 173:8, 205:12, 210:19, 214:3, 220:7, 237:2, 251:2, 275:6, 278:20, 294:7

**two-door** [1] - 60:24
**type** [6] - 21:7, 140:4, 208:3, 260:25, 263:14, 288:25
**types** [1] - 78:7
**typical** [1] - 36:12

## U

**U.S** [3] - 1:17, 1:17, 2:5
**Ulmerton** [11] - 109:16, 109:17, 109:22, 110:4, 110:22, 110:23, 111:2, 111:11, 111:18
**ultimately** [2] - 42:7, 292:16
**unannounced** [1] - 202:15
**unaware** [1] - 254:14
**under** [12] - 33:22, 62:23, 67:15, 74:10, 76:7, 76:12, 81:10, 82:21, 135:17, 231:18, 232:19, 241:9
**undercover** [1] - 75:23
**understood** [1] - 304:22
**unfamiliar** [1] - 253:9
**unhappy** [1] - 216:11
**unintelligible** [11] - 92:20, 104:20, 104:24, 109:25, 112:11, 141:1, 141:13, 151:8, 159:20, 160:14, 162:25
**Unintelligible** [4] - 111:12, 112:14, 123:9, 160:5
**unintelligible)** [13] - 95:2, 104:6, 104:17, 107:18, 133:16, 140:23, 141:24, 144:4, 144:23, 160:2, 160:7, 160:18, 269:1
**Unintelligible)** [2] - 159:19, 160:9
**unit** [3] - 71:9, 169:17, 219:14
**UNITED** [3] - 1:1,

1:3, 1:14
**United** [2] - 6:8, 6:12
**units** [2] - 32:16, 72:4
**unless** [6] - 85:2, 166:15, 231:8, 231:13, 270:3
**unload** [9] - 21:6, 21:12, 23:3, 23:14, 27:21, 53:24, 272:24, 273:22, 290:19
**unloaded** [3] - 51:10, 261:17, 294:14
**unloading** [3] - 22:24, 23:2, 272:17
**unorganized** [1] - 24:10
**unraveled** [1] - 176:9
**unrecorded** [2] - 84:3, 84:12
**unrelated** [1] - 304:8
**unusual** [3] - 60:19, 61:24, 273:8
**unwrapped** [1] - 72:9
**up** [209] - 12:12, 15:22, 15:24, 16:8, 16:14, 17:17, 18:25, 19:18, 20:7, 20:20, 22:5, 24:11, 31:24, 35:6, 35:16, 36:8, 39:3, 39:9, 39:12, 39:15, 40:6, 41:4, 41:9, 43:18, 44:3, 45:2, 53:8, 60:8, 60:11, 61:11, 61:13, 61:21, 62:12, 77:15, 78:12, 78:13, 81:18, 84:12, 89:14, 89:25, 91:7, 91:14, 93:9, 93:24, 93:25, 96:8, 97:18, 97:19, 97:24, 97:25, 98:7, 98:8, 100:19, 100:22, 101:12, 104:7, 107:16, 113:18, 115:21, 116:25, 120:21, 120:22, 120:23, 122:23, 123:17, 124:5, 124:9, 124:22, 125:10, 125:11, 125:20, 126:9, 126:20, 127:23, 129:24, 131:6, 131:19, 132:16, 132:17, 132:19, 132:22, 132:25, 133:11, 133:19, 133:22, 135:19, 135:24, 136:1, 139:5, 139:21,

140:1, 140:7, 142:6, 142:19, 142:20, 142:24, 143:10, 143:12, 143:16, 147:11, 147:12, 147:14, 148:3, 148:8, 148:14, 149:24, 149:25, 150:1, 154:24, 156:15, 156:18, 157:14, 158:3, 158:4, 159:10, 165:22, 166:22, 176:25, 182:3, 182:4, 182:6, 184:9, 190:21, 193:19, 199:13, 201:1, 201:10, 202:14, 205:20, 207:9, 209:8, 211:19, 211:22, 213:16, 213:19, 213:22, 214:24, 216:12, 217:23, 220:19, 220:24, 225:25, 227:4, 232:18, 232:20, 234:11, 234:13, 235:7, 235:11, 235:20, 241:7, 241:10, 241:11, 241:14, 241:15, 241:16, 243:1, 243:19, 244:5, 244:7, 244:8, 246:25, 250:25, 251:1, 260:15, 260:17, 260:22, 262:9, 262:10, 263:22, 267:1, 267:16, 268:20, 269:2, 273:25, 274:9, 277:15, 279:2, 280:8, 283:3, 288:7, 288:13, 294:8, 295:14, 296:8, 296:22, 297:5, 297:17, 302:11, 302:17, 303:7
**UPS** [1] - 49:23
**upset** [2] - 48:22, 209:1
**upward** [1] - 215:25
**utilize** [2] - 85:19, 89:4
**utilized** [1] - 85:20

## V

**vague** [1] - 255:7
**value** [1] - 239:8
**various** [2] - 206:19, 242:4
**Vegas** [3] - 185:24,

185:25, 186:1
**vehicle** [19] - 54:3, 59:20, 62:6, 65:2, 118:8, 118:14, 118:21, 120:6, 120:19, 121:3, 121:19, 121:22, 171:2, 171:5, 171:6, 171:9, 171:14, 177:24, 230:5
**vehicles** [3] - 119:9, 119:13, 119:15
**verbally** [1] - 257:4
**verified** [1] - 240:22
**verify** [1] - 92:13
**version** [1] - 56:13
**vicinity** [2] - 197:7, 197:16
**Victor** [2] - 10:21, 186:16
**visit** [1] - 184:14
**visited** [2] - 183:25, 184:3
**visits** [1] - 54:24
**VOICE** [6] - 159:19, 160:1, 160:5, 160:9, 160:14, 160:17
**voice** [3] - 94:12, 103:1, 269:23
**voices** [1] - 258:1
**Volcy** [10] - 2:1, 103:5, 106:8, 107:6, 110:21, 251:1, 251:13, 252:17, 269:23, 304:13
**VOLCY** [42] - 1:8, 104:4, 104:6, 104:10, 104:13, 104:17, 104:20, 104:24, 105:1, 105:4, 105:8, 105:13, 105:18, 105:23, 106:2, 106:4, 107:15, 107:17, 107:25, 108:5, 109:10, 109:12, 109:20, 109:25, 110:9, 110:11, 110:15, 110:17, 111:12, 111:15, 111:20, 112:5, 112:11, 112:14, 112:21, 113:9, 113:12, 268:24, 269:1, 277:12, 277:14, 304:14
**Volcy's** [1] - 252:22
**volume** [1] - 215:10
**volunteered** [1] - 256:8

## W

**W6s** [1] - 123:2
**Wachovia** [3] - 61:22, 64:14, 66:19
**wait** [7] - 39:9, 69:9, 91:19, 140:20, 253:3, 302:17
**waiting** [19] - 29:9, 30:16, 31:10, 31:12, 91:9, 92:13, 93:3, 93:4, 98:23, 142:21, 142:22, 143:17, 153:19, 156:18, 157:10, 221:3, 221:8, 229:13, 229:21
**waits** [1] - 274:10
**waive** [1] - 77:3
**Walgreen's** [2] - 59:6, 112:10
**walks** [1] - 71:3
**Walmart** [1] - 267:4
**wanna** [5] - 133:25, 134:5, 134:11, 134:12
**wants** [5] - 82:22, 84:16, 94:8, 128:16, 136:12
**warehouse** [76] - 14:17, 14:18, 15:1, 15:8, 15:10, 15:13, 16:1, 20:1, 20:4, 20:6, 20:23, 20:24, 21:21, 21:25, 24:21, 25:21, 45:5, 45:8, 45:11, 50:16, 51:1, 51:19, 52:9, 69:2, 69:15, 69:16, 69:17, 100:1, 100:18, 107:8, 107:9, 111:5, 119:3, 119:4, 119:11, 121:9, 182:11, 196:14, 196:19, 196:23, 197:9, 197:15, 200:23, 200:25, 201:7, 201:10, 201:13, 201:16, 201:17, 201:20, 202:19, 203:1, 203:11, 203:12, 203:23, 203:25, 216:25, 218:23, 219:4, 219:6, 219:10, 224:5, 236:15, 250:16, 254:7, 256:11, 260:15, 260:16, 260:23, 261:22, 267:21, 271:15, 272:18, 273:5, 273:9, 279:1

**warehouseman** [1] - 263:10

**warehouses** [7] - 14:13, 203:3, 203:8, 203:9, 205:7, 216:20, 294:23

**warmed** [1] - 116:25

**WAS** [4] - 80:5, 86:16, 114:11, 218:3

**Washington** [6] - 1:20, 65:16, 66:18, 66:19, 68:8, 225:9

**watch** [1] - 268:22

**watched** [1] - 132:23

**watching** [2] - 197:16, 222:3

**water** [1] - 116:9

**ways** [4] - 24:17, 24:22, 276:13, 294:18

**wear** [2] - 192:19, 194:20

**wearing** [1] - 286:9

**Weber** [1] - 237:19

**weed** [8] - 284:17, 284:18, 287:14, 287:15, 289:12, 289:13, 289:14, 293:11

**week** [9] - 13:9, 13:11, 19:19, 45:3, 61:12, 129:19, 140:7, 192:3, 292:21

**week's** [1] - 29:9

**weeks** [4] - 13:5, 129:20, 154:11, 158:12

**weigh** [2] - 40:14, 41:20

**weighing** [1] - 40:9

**weight** [2] - 274:21, 293:19

**west** [4] - 27:10, 110:1, 168:8, 255:8

**Westshore** [2] - 153:11, 154:25

**whatsoever** [1] - 140:3

**WHICH** [2] - 80:4, 86:15

**white** [8] - 176:23, 262:4, 262:5, 262:8, 264:9, 264:11, 264:18, 279:14

**White** [6] - 33:22, 34:3, 34:8, 39:15, 210:4, 210:12

**who'd** [1] - 289:3

**whoever's** [2] - 118:9, 225:17

**whole** [13] - 5:3,

6:18, 6:23, 28:17, 42:16, 42:17, 77:14, 90:25, 133:10, 133:11, 171:17, 283:21, 284:1

**wide** [1] - 21:16

**wife** [5] - 90:5, 183:20, 265:15, 276:8, 283:8

**WILLIAM** [1] - 1:13

**William** [2] - 4:7, 291:7

**willing** [3] - 62:15, 188:19, 224:1

**willingly** [2] - 208:15, 223:25

**wise** [3] - 28:12, 126:25, 285:21

**wish** [4] - 4:14, 139:6, 245:2, 248:16

**withheld** [1] - 247:15

**witness** [21] - 6:11, 6:22, 7:1, 15:3, 30:20, 36:22, 36:25, 37:4, 52:2, 81:13, 85:23, 114:2, 172:9, 172:22, 187:9, 227:16, 283:15, 283:25, 284:4, 301:12, 303:23

**WITNESS** [24] - 3:2, 6:20, 7:4, 11:18, 12:9, 32:25, 39:25, 40:10, 42:24, 43:2, 43:4, 65:15, 114:5, 114:10, 138:22, 181:21, 187:11, 227:18, 248:6, 254:14, 282:13, 283:23, 284:6, 304:4

**witnesses** [4] - 4:17, 4:24, 85:25, 86:6

**WM** [1] - 66:18

**WMO** [1] - 66:17

**woman's** [1] - 228:9

**wood** [3] - 25:8, 49:14

**wooden** [4] - 70:4, 71:1, 71:2, 71:8

**word** [10] - 14:5, 40:20, 62:17, 95:7, 96:13, 96:16, 206:22, 212:14, 277:6

**words** [6] - 59:3, 174:15, 217:9, 235:1, 247:20, 253:19

**works** [1] - 272:23

**workshop** [1] - 23:24

**workshops** [1] - 21:25

**worried** [1] - 94:20

**worth** [4] - 74:11, 118:18, 128:23, 239:6

**wrap** [1] - 156:1

**wrapped** [2] - 56:19, 156:1

**wrapping** [3] - 72:11, 72:16, 256:23

**wrappings** [1] - 256:18

**write** [3] - 28:1, 28:10, 61:18

**writing** [4] - 36:13, 38:22, 71:20, 88:18

**written** [7] - 40:18, 40:24, 41:10, 41:18, 97:19, 192:3, 264:12

**wrote** [5] - 28:12, 39:13, 225:12, 237:24, 238:1

## Y

**y'all** [4] - 143:20, 143:24, 164:8, 165:21

**year** [8] - 173:15, 179:5, 180:3, 180:6, 218:22, 268:1, 293:5, 295:5

**years** [22] - 11:10, 123:17, 176:11, 177:10, 179:4, 181:6, 181:21, 246:10, 246:15, 246:20, 246:23, 246:24, 247:6, 247:25, 248:11, 249:6, 249:8, 249:12, 249:17, 249:21, 253:13, 285:22

**yelled** [3] - 24:7, 24:13, 205:18

**yesterday** [2] - 143:8, 143:9

**Yo** [14] - 89:15, 107:15, 113:9, 115:19, 122:21, 139:4, 147:9, 147:10, 150:1, 156:14, 159:8, 159:11, 160:21, 268:25

**yo** [24] - 89:20, 94:25, 104:5, 109:9, 115:20, 122:22, 122:24, 126:19, 132:15, 132:17, 141:19, 142:18, 142:20, 143:18, 144:20, 145:16, 157:11, 159:9, 162:25, 164:21,

165:20, 277:13

**you's** [1] - 241:20

**young** [8] - 58:22, 61:13, 61:22, 62:6, 64:15, 237:19, 261:18, 262:13

**younger** [2] - 56:13, 177:13

**yourself** [4] - 22:4, 103:14, 125:23, 126:9

**yourselves** [1] - 303:12

## Z

**zones** [1] - 112:1