IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:08 CR 270 T 24 EAJ


UNITED STATES OF AMERICA


      Plaintiff,

v.
                January 28, 2009
                9:40 a.m.

SHELDON SHORTER
JEAN EVENS BAPTISTE
HARDAWAY VOLCY


      Defendants.
_____/



TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM J. CASTAGNA
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Government:    JAMES PRESTON
                    Assistant U.S. Attorney
                    U.S. Attorney's Office
                    400 North Tampa St.,
                    Ste. 3200
                    Tampa, FL 33602

For the Defendant:    HUGO A. RODRIGUEZ
Shorter              1210 Washington Avenue
                    Suite 245
                    Miami Beach, FL  33139

For the Defendant:    JORGE CHELALA
Baptiste             Chalela Law Group
                    3111 W MLK Blvd - Ste 100
                    PO Box 173407
                    Tampa, FL 33672-0407

```
For the Defendant:      STEPHEN CRAWFORD
Volcy                   Law Office of Stephen M.
                        Crawford
                        610 W Bay St
                        Tampa, FL 33606


Reported By:            Sandra K. Lee, RPR
                        Official Court Reporter
                        U.S. District Court
                        801 North Florida Avenue
                        Tampa, FL 33602
                        (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION
```

# INDEX

WITNESS:                                              PAGE:

**CLEO MITCHELL**                                        7
    DIRECT EXAMINATION                            7
BY MR. PRESTON
    CROSS-EXAMINATION                            20
BY MR. RODRIGUEZ
    CROSS-EXAMINATION                            40
BY MR. CRAWFORD:
    REDIRECT EXAMINATION                         42
BY MR. PRESTON:
**LANCE NOEL**                                          44
    DIRECT EXAMINATION                           45
BY MR. PRESTON:
    CROSS-EXAMINATION                            50
BY MR. RODRIGUEZ:
**JUSTIN DURALIA**                                      52
    DIRECT EXAMINATION                           53
BY MR. PRESTON:
    CROSS-EXAMINATION                           101
BY MR. CHELALA
    CROSS-EXAMINATION                           124
BY MR. RODRIGUEZ
    CROSS-EXAMINATION                           200
BY MR. CRAWFORD:
    REDIRECT EXAMINATION                        217
BY MR. PRESTON
**ROBERT QUINN**                                       219
    DIRECT EXAMINATION                          219
BY MR. PRESTON
**DAVID SHERWOOD**                                     224
    DIRECT EXAMINATION                          224
BY MR. PRESTON
    CROSS-EXAMINATION                           233
BY MR. RODRIGUEZ
**ROBERT LANESE**                                      237
    DIRECT EXAMINATION                          237
BY MR. PRESTON
    CROSS-EXAMINATION                           255
BY MR. CRAWFORD:

\* \* \* \* \*

EXHIBITS:                    IDENTIFIED:


  Exhibit 7                  39



EXHIBITS:                    RECEIVED:

  27                         17
  27                         49
  1                          56
  2A1 and 2A2                58
  4                          70
  3                          71
  24 and 25                  73
  30                         78
  10                         89
  6                          91
  33                         93
  37                         96
  1                          191
  S2                         193
  S5                         193
  37A, B, C, and D           202
  23                         205
  16                         208
  15                         210
  20                         211
  32                         227
  7A, 7B, 7C, and            250
  35
  33A through 33Y            258

```
 1              P R O C E E D I N G
 2              COURT SECURITY OFFICER:  Please rise for
 3    the jury.
 4      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)
 5                   (PAUSE IN PROCEEDING.)
 6              COURT SECURITY OFFICER:  All rise.  The
 7    Honorable William J. Castagna presiding.  This
 8    Honorable Court is now in session.
 9              THE COURT:  Good morning, ladies and
10    gentlemen.
11              MEMBERS OF THE JURY:  Good morning.
12              MR. PRESTON:  Good morning, Your Honor.
13              THE COURT:  Prepared to go forward,
14    gentlemen?
15              MR. PRESTON:  Yes, sir.
16              MR. CHELALA:  Yes.
17              THE COURT:  All right.  You may proceed.
18              I understand we have an additional
19    interpreter.
20              THE INTERPRETER:  Good morning, Judge.
21              THE COURT:  Have you been sworn?
22              THE INTERPRETER:  Not as yet, Judge.
23              THE COURT:  Please come forward.
24              COURTROOM DEPUTY CLERK:  If you'll raise
25    your right hand.
```

1    Do you solemnly swear that you will

2    justly, truly, fairly, and impartially act as an

3    interpreter in the case now before the Court, so

4    help you God?

5         THE INTERPRETER:  I do.

6         COURTROOM DEPUTY CLERK:  Please state

7    your name for the record.

8         THE INTERPRETER:  Alex Berrault.  I'm a

9    certified federal court interpreter.

10        THE COURT:  Glad to have you,

11   Mr. Berrault.

12        THE INTERPRETER:  Thank you, sir.

13        THE COURT:  Mr. Preston.

14        MR. PRESTON:  Thank you, Your Honor.

15                **CLEO MITCHELL,**

16   a witness, having been previously sworn to tell

17   the truth, the whole truth and nothing but the

18   truth, was examined and testified as follows:

19             DIRECT EXAMINATION

20   BY MR. PRESTON:

21   Q.    Good morning, Mr. Mitchell.

22   A.    Good morning.

23   Q.    Mr. Mitchell, after Ramiro Parra began

24   receiving loads of marijuana at the warehouse, did

25   you ever have hands on involvement in -- with that

1  marijuana?

2  A.     No.

3  Q.     Did you ever have any direct contact,

4  face-to-face contact with the drivers of the

5  tractor trailers that were bringing the marijuana?

6  A.     No.

7  Q.     Did you ever have phone conversations with

8  the drivers that were bringing the marijuana?

9  A.     Once in awhile.

10  Q.     Seated at the tables here to your far left

11  in the front standing there, that's Mr. Jean Evens

12  Baptiste, and behind him is -- is Mr. Hardaway

13  Volcy.  Do you know either Mr. Baptiste or

14  Mr. Volcy?

15  A.     No.

16  Q.     Thank you.  Now, we left off yesterday

17  finishing off the discussion concerning your

18  receipt of the $70,000 from Ramiro Parra which was

19  seized from law enforcement; correct?

20  A.     Yeah.

21  Q.     And who was it that directed you to meet

22  with Ramiro Parra to receive that money?

23  A.     Shorter.

24  Q.     Sorry?

25  A.     Shorter.

Q.     Following that seizure, was any plan -- did
you discuss with anyone a plan to get that seized
money back?

A.     Yeah.

Q.     And who did you talk to about that?

A.     Me and Shorter talked about it.

Q.     What was discussed as far as any plan or
idea?

A.     That role was going to have to go through
the -- to the police and claim the money.

Q.     Was that your idea or the defendant
Shorter's ideas?

A.     That was Shorter's idea.

Q.     Was that information passed back to Ramiro
Parra?

A.     Yes.  I think he talked to him too about it.

Q.     "He" being the defendant Shorter?

A.     Yeah.  Yeah.

Q.     Now, you've indicated that you were aware of
an April 1st arrest of Ramiro Parra; correct?

A.     Yeah.

Q.     Between the time of that arrest and the
seizure of the $70,000, are you familiar with
conversations concerning the debt that was owed to
Parra?

1    A.    Yeah.

2    Q.    Did you have such conversations -- owed by

3    Parra.  I'm sorry.

4         Did you have such conversations regarding

5    the debt owed by Parra with the defendant Shorter?

6    A.    Yeah.

7    Q.    And what was the nature of those

8    conversations?

9    A.    Just that he -- he needed to come up with

10   the money.

11   Q.    Who's "he"?

12   A.    Ro.  Parra.

13   Q.    Did you also convey that information to

14   Ramiro Parra after receiving it from the defendant

15   Shorter?

16   A.    Yeah.

17   Q.    Were you aware that the defendant -- whether

18   the defendant Shorter contacted Ramiro Parra

19   directly during that period of time concerning the

20   debt that was owed by Parra?

21   A.    Yeah.

22   Q.    And how did you learn that those calls were

23   made?

24   A.    Because Ro made me know.

25   Q.    Did the defendant Shorter ever tell you that

1  he made such calls to Ramiro Parra?

2  A.    Yeah, he said he talked to him.

3  Q.    Aside from the tractor trailers which were

4  used to deliver marijuana, were there other methods

5  used to receive marijuana?

6  A.    Yeah.

7  Q.    What other methods are you familiar with?

8  A.    Freight.

9  Q.    Could you please describe the use of freight

10  to receive marijuana.

11  A.    The money would go out west, and then it

12  would come back on -- by delivery service I guess

13  through the air.

14  Q.    What sort of -- what sort of packages would

15  arrive?  We talking about boxes?

16  A.    Like crates.  Like wooden crates.

17  Q.    And how much marijuana would be contained

18  within a wooden crate?

19  A.    Probably about around -- around a thousand.

20  Q.    A thousand pounds?

21  A.    Yeah.

22  Q.    How many times did you receive or did this

23  group receive crated marijuana through freight?

24  A.    About six, seven times.

25  Q.    What was the defendant Shorter's

1    involvement, if any, in the freight shipments of

2    marijuana?

3    A.    Taking the money out west.

4    Q.    How was the money taken out west?

5    A.    By plane.  He'd rent a plane and take it out

6    there.

7    Q.    How do you know about that?

8    A.    Because he told me.

9    Q.    How was the money transported out west in

10   regard to the tractor trailer shipments of

11   marijuana?

12   A.    By the tractor trailer.

13   Q.    The same tractor trailers that would bring

14   the marijuana?

15   A.    Yeah.

16   Q.    And the monies going out west were for what?

17   A.    For marijuana.

18   Q.    Did you ever fly by private carrier --

19   private carrier or charter carrier to carry money

20   out west?

21   A.    No.

22   Q.    Did you ever participate in any event

23   concerning the movement of marijuana money from the

24   Middle District of Florida to out west?

25   A.    Yeah.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.     Could you describe that event for the jury,
please.

A.     Like he'd call me and tell me to get the
money ready.

Q.     Who's "he"?

A.     Shorter.  He'd call me and tell -- Shorter'd
call me and tell me to get the money ready.  And
then he would come in town and I'd -- I'd meet him
and give him the money, and he'd go to the -- to
the private airport.

Q.     Where would you meet?

A.     Like in the mall parking lot, on the side of
the road.

Q.     How do you know that the defendant Shorter
would take that money to the airport?

A.     Because I followed him that one time.

Q.     And where did you follow him to?

A.     To the private airport next to International
Mall.

Q.     How much money had you delivered to him on
that date?

A.     Seven, eight hundred thousand.

Q.     How was it packaged?

A.     In a duffle bag.  Nike duffle bag.

Q.     Were bank accounts used in the marijuana

1    business that you had with the defendant Shorter?

2    A.    Yeah.

3    Q.    Could you describe the purpose for the bank

4    accounts and what -- and how they were used for the

5    jury, please.

6    A.    I don't really know the purpose of what they

7    was used for, but he used to have me put like

8    eight or $9,000 in different -- different

9    accounts.

10   Q.    How many different accounts?

11   A.    Probably about five -- five different

12   accounts.

13   Q.    Was Ramiro Parra involved in this deposit --

14   these $9,000 deposits at different bank accounts?

15   A.    Yeah.

16   Q.    And how would Ramiro Parra be aware of the

17   accounts that monies would be put into?

18   A.    I -- I'd tell him.

19   Q.    And where did you get the information?

20   A.    From Shorter.

21            MR. PRESTON:  May I approach the

22   witness, Your Honor?

23            THE COURT:  You may.

24   BY MR. PRESTON:

25   Q.    Mr. Mitchell, do you recognize what's in

1   Government's Exhibit No. 17?

2   A.      Yeah.

3   Q.      Who's handwriting is that in, please?

4   A.      That's mine.

5           MR. PRESTON:  Can I bring that up,

6   please.

7   BY MR. PRESTON:

8   Q.      What do you recognize Government's 17 to be?

9   A.      Account number with the amount of money to

10  put in the account.

11  Q.      And the name Sandra Burrell, who was that?

12  A.      I don't know.

13  Q.      How did you get that name and account

14  number?

15  A.      From Shorter.

16  Q.      All right.  Thank you.

17          Now, in regard to any other financial

18  transactions, are you familiar or did you ever

19  participate in some fashion in any automobile

20  purchases on behalf of the defendant?

21  A.      Yeah.

22  Q.      Could you tell the jury what you did in

23  regard to any sort of automobile purchase.

24  A.      I -- I had a buddy who could get cashier

25  checks, so he'd give me the money, and I had the

1    dude go get a cashier's check for him.

2    Q.    Do you remember how much that cashier check

3    was for?

4    A.    A hundred and fifty thousand.

5    Q.    Where did that money come from?

6    A.    From Shorter.

7    Q.    What was the source of that money?

8    A.    From the marijuana.

9    Q.    And who was this friend that you gave

10   $150,000 cash with to get a cashier's check?

11   A.    Kevin Wells.

12   Q.    What do you with the cashier's check after

13   you got it?

14   A.    I gave it to Shorter.

15   Q.    And what was that for?

16   A.    For a car.

17   Q.    Do you remember what kind of car?

18   A.    A Benz.

19   Q.    When you say "Benz," what does that mean?

20   A.    I think it was CL63.

21   Q.    Mercedes Benz?

22   A.    Yeah.

23   Q.    I'd like to show you a page from

24   Government's Exhibit No.  27.

25            MR. PRESTON:  May I approach, Your

1  Honor?

2              THE COURT:  You may.

3  BY MR. PRESTON:

4  Q.    Do you recognize the cashier's check which

5  is on Government's Exhibit No. 27?

6  A.    Yeah.

7  Q.    And what does that represent to you?

8  A.    That's the cashier check I got for him.

9              MR. RODRIGUEZ:  Counsel, what number is

10 that?  27?

11             MR. PRESTON:  No.  27.

12             MR. RODRIGUEZ:  Thank you.

13             MR. PRESTON:  Judge, I move to admit a

14 portion of Exhibit 27 at this time, and that would

15 be the page just referred to.

16             MR. RODRIGUEZ:  No objection, Your

17 Honor.

18             THE COURT:  All right.

19             MR. PRESTON:  Move to publish, please.

20             THE COURT:  You may.  That exhibit is

21 received.

22             (EXHIBIT 27 ADMITTED INTO EVIDENCE.)

23 BY MR. PRESTON:

24 Q.    And this is the cashier's check we just

25 referred to?

1   A.     Yes.

2   Q.     And who is it made out to?

3   A.     Kevin Wells.

4   Q.     Well, who is Kevin Wells?

5   A.     That's my -- my buddy.

6   Q.     All right.  He's the remitter.  And it says

7   paid to the order of Mercedes Benz of Fort

8   Lauderdale; correct?

9   A.     Yeah.

10  Q.     How did you know to have the check made out

11  to Mercedes Benz of Fort Lauderdale?

12  A.     That's who Shorter wanted it made out to.

13  Q.     And this was $150,000?

14  A.     Yeah.

15  Q.     All right.  Was this cash that you gave

16  Kevin Wells to purchase this check?

17  A.     Yeah.

18  Q.     Was Kevin Wells paid anything by you to help

19  do this?

20  A.     Nah.

21  Q.     The incident that you mentioned at the

22  International Mall where you followed the defendant

23  back to the gate for the private part of the

24  airport, was he with anyone else at that time, do

25  you recall?

1    A.    Yeah.

2    Q.    How many people was he with?

3    A.    Two other people.

4    Q.    Did you know either of those people?

5    A.    No.

6                MR. PRESTON:  May I have a moment, Your

7    Honor?

8                THE COURT:  You may.

9    BY MR. PRESTON:

10   Q.    Mr. Mitchell, do you recall a vehicle being

11   involved in the payment of the debt owed by Ramiro

12   Parra?

13   A.    Yeah.

14   Q.    What do you know about that?

15   A.    I know he -- he -- he gave up his Charger to

16   Shorter because he owed him for some of the money.

17   Q.    In what way, if any, did you participate in

18   the exchange of the Charger as part of this debt?

19   A.    I told him where he had to send it to.

20   Q.    Do you recognize Government's Exhibit No. 9?

21   A.    Yeah.

22   Q.    Is that the Charger that you're talking

23   about?

24   A.    Yeah.

25   Q.    When you told Ramiro Parra who to send the

1  Charger to, what was that Charger representing at

2  that point in time?

3  A.    Some of the -- some of the -- to take his

4  debts down.

5  Q.    I'm sorry?

6  A.    The -- to knock off some of his debt, the

7  money he owed.

8  Q.    Money he owed for what?

9  A.    For the -- for the -- for the marijuana.

10        MR. PRESTON:  I have no additional

11  questions at this time, Your Honor.

12        THE COURT:  Cross-examination,

13  Mr. Rodriguez.

14        MR. RODRIGUEZ:  I do, Your Honor.  Can

15  you give me one second, please?

16        THE COURT:  Yes, you may.

17             CROSS-EXAMINATION

18  BY MR. RODRIGUEZ:

19  Q.    Mr. Mitchell?

20  A.    Yeah.

21  Q.    You don't want to be here today.  Do you?

22  A.    What you mean if I want to be here today?

23  What you mean by that?

24  Q.    Did you want do come here today and testify?

25  A.    Yeah.

Q.    Okay.  Why is that?

A.    Because I'm hoping to get treated fairly for doing this.

Q.    Treated fairly?

A.    Yeah.

Q.    What do you mean by that?

A.    Hopefully I get under 20 years.

Q.    Because you know that you're going to get 20 years or more; isn't that true?

A.    Yeah.

Q.    Because that's what someone in this case would get if they're convicted; isn't that true?

A.    Yeah.

Q.    Okay.  And you're hoping that by testifying here today Mr. Preston will make a motion to the Court to reduce your sentence; correct?

A.    Yeah.

Q.    And you know the judge can't reduce your sentence without Mr. Preston making that request?

A.    Right.

Q.    Now, Mr. Preston asked you early on how many times you had met with him.  Do you remember that?

A.    Yeah.

Q.    You said three times.

A.    Yeah.

```
1    Q.      How many times did you meet with the
2    government total, including the DEA and debriefings
3    that you had?
4    A.      Probably about two -- about five or six
5    times.
6    Q.      Okay.  So we have five or six times with the
7    DEA, and three times with Mr. Preston prior to you
8    coming to trial?
9    A.      Yeah.
10   Q.      They showed you photographs?
11   A.      Yeah.
12   Q.      They showed you transcripts?
13   A.      Yeah.
14   Q.      They showed you reports?
15   A.      Yeah.
16   Q.      They showed you some of the evidence they
17   had?
18   A.      Yeah.
19   Q.      They told you about how they were going to
20   prosecute the case?
21   A.      What you mean prosecute the case?
22   Q.      How they were going to present the case to
23   the jury.
24   A.      Yeah.
25   Q.      What your role was going to be in that?
```

1    A.    Yeah.

2    Q.    What they he wanted you to say?

3    A.    No, they didn't tell me what they wanted me

4    to say.

5    Q.    Okay.  You told them what -- they explained

6    to you how they were going to present it and showed

7    you the evidence; correct?

8    A.    Yeah.

9    Q.    And you saw all of that; right?

10    A.    Uh-huh.

11    Q.    And each time that the agents came back, you

12    would give them more information; isn't that true?

13    A.    Yeah.

14    Q.    You're here because you're a drug dealer;

15    right?

16    A.    Yeah.

17    Q.    And that's not because of what you did here,

18    but you have a previous conviction for being a drug

19    dealer?

20    A.    Yeah.

21    Q.    In that case you went to trial, didn't you?

22    A.    No.

23    Q.    You pled guilty?

24    A.    Yeah.

25    Q.    You worked out a deal?

1    A.     Yeah.

2    Q.     Just like you're doing here?

3    A.     No, it wasn't the same.

4    Q.     Here you're working out a deal?

5    A.     Yeah.

6    Q.     Here you're trying to work your time down --

7    A.     Yeah.

8    Q.     -- right?

9    A.     Yeah.

10    Q.     You know how the system works; correct?

11    A.     Yeah.

12    Q.     You testified that you flew to Arizona four

13 or five times.

14    A.     Right.

15    Q.     And when you went to Arizona, you went out

16 to -- you said to pick out your dope, your

17 marijuana.

18    A.     Yeah.

19    Q.     It was like going into a store.  But you

20 went into a house and you selected what you wanted.

21    A.     Yeah.

22    Q.     Okay.  And you flew out of Tampa airport?

23    A.     Yeah.

24    Q.     On Southwest?

25    A.     Yeah.

Q.    To Phoenix or Las Vegas; right?

A.    Yeah.

Q.    So if you flew to Las Vegas, you'd then get in a car and drive to Arizona; right?

A.    Yeah.

Q.    Why did you fly to Las Vegas if you were going to Arizona?

A.    So nobody know I was going.

Q.    So no -- so you couldn't -- so you wouldn't get caught.  So nobody would figure it out; right?

A.    Yeah.

Q.    Okay.  And that's the way you set up what you were doing?  You set it up so that you wouldn't get caught; correct?

A.    Yeah.

Q.    Bad for you that your boy Parra got arrested; right?

A.    Yeah.

Q.    Because prior to that you set it up in a way that you wouldn't get caught?

A.    I mean that wasn't my instructions to fly into Las Vegas.

Q.    Okay.  Let me -- let's go back.  You set yourself up so that you wouldn't get caught?

A.    It wasn't my instruction to fly into Las

1  Vegas.

2  Q.    I'm off Las Vegas.  Let's go back to

3  something else?

4  A.    Oh.

5  Q.    You set yourself up so you wouldn't get

6  caught --

7  A.    Right.

8  Q.    -- in this operation because you -- you had

9  a prior drug operation from before because you've

10 been selling weed for a long time?

11 A.    Yeah.

12 Q.    Okay.  You've been selling weed and getting

13 your weed from a whole lot of people; right?

14 A.    Yeah.

15 Q.    For a long time?

16 A.    Yeah.

17 Q.    So in this operation you brought in somebody

18 to do your dirty work for you; right?

19 A.    Yeah.

20 Q.    Parra?

21 A.    Yeah.

22 Q.    Okay.  And you had Parra rent a warehouse;

23 right?

24 A.    Yes.

25 Q.    In his name, not your name?

```
1    A.     Yeah.

2    Q.     Because you didn't want to get caught?

3    A.     Yeah.

4    Q.     So he rented not one warehouse, but two

5    warehouses --

6    A.     Yeah.

7    Q.     -- right?

8    A.     Yeah.

9    Q.     Second warehouse was also in his name.

10   A.     Yeah.

11   Q.     And then you had him rent an apartment;

12   right?

13   A.     Yeah.

14   Q.     At Rocky Point?

15   A.     Yeah.

16   Q.     You had a safe in there --

17   A.     Yeah.

18   Q.     -- correct?

19          You had Parra, and Parra put that name in

20   his sister's name; right?

21   A.     Yeah.

22   Q.     So that you guys wouldn't get caught --

23   A.     Yeah.

24   Q.     -- correct?

25          That -- there was a safe there?
```

```
 1    A.      Yeah.

 2    Q.      Parra put the safe in there because you

 3    asked him to put the safe in there; correct?

 4    A.      Yeah.

 5    Q.      And at one time your cousin lived with you;

 6    right?  Hopkins?

 7    A.      That ain't my cousin.

 8    Q.      He ain't your cousin?

 9    A.      No.

10    Q.      Okay.  Who is he to you, one of your

11    dealers?

12    A.      No.  He's just a dude I know.

13    Q.      Dude you know?

14    A.      Yeah.

15    Q.      Dude that was in this conspiracy; right?

16    A.      Yeah.

17    Q.      Dude who pled guilty?

18    A.      Yeah.

19    Q.      Dude who's been sentenced?

20    A.      Yeah.

21    Q.      So you knew him more than just knowing him;

22    right?

23    A.      Yeah.

24    Q.      Okay.  Who had the combinations to that

25    safe?
```

```
1   A.      Me.  To the safe?

2   Q.      Yeah.  Who?

3   A.      Me, Ro.

4   Q.      And who else?

5   A.      And Hopkins.

6   Q.      Hopkins --

7   A.      Yeah.

8   Q.      -- Parra, and you?

9   A.      Yeah.

10  Q.      Okay.  In the warehouse where you had the

11  marijuana brought in from -- now, the marijuana

12  that came in was marijuana that you went out to

13  Mexico and picked out --

14  A.      Yeah.

15  Q.      -- right?

16          In that warehouse you ordered Parra to

17  accept the delivery; right?

18  A.      Yeah.

19  Q.      And you didn't want to be anywhere around;

20  right?

21  A.      Uh-huh.

22  Q.      The reason you didn't want to be around is

23  you didn't want to get caught?

24  A.      Right.

25  Q.      So you were outside?
```

A.     Uh-huh.

Q.     Putting an eye on it; right?

A.     Uh-huh.

Q.     Making sure it went down okay?

A.     Uh-huh.

Q.     Supervising what was going on?

        THE COURT:  Mr. Mitchell, you'll have to
answer yes or no to the questions.  The court
reporter can't take down when you say "uh-huh."

        THE WITNESS:  All right.  Okay.  Yeah.

BY MR. CHELALA:

Q.     You were outside looking around?

A.     Yeah.

Q.     You were making sure that everything was
okay?

A.     Yeah.

Q.     Okay.  Once the load got there you ordered
Parra to take it out?

A.     Yeah.

Q.     You -- and I'm not going to use ordered.
You -- you explained to him how to take it out, you
told him how to set up the ledgers --

A.     Yeah.

Q.     -- correct?

A.     Yeah.

```
1    Q.    You told him who the dope was going to?

2    A.    Yeah.

3    Q.    And sometimes you had him deliver it for

4    you?

5    A.    Yeah.

6    Q.    You told him what money to collect?

7    A.    Yeah.

8    Q.    And he brought it back to you?

9    A.    Yeah.

10   Q.    You guys took that money and you up put it

11   into the safe that you had at Rocky Point?

12   A.    Yeah.

13   Q.    The safe that you had the combination to,

14   that he had the combination to, and that your boy,

15   Hopkins, had the combination to?

16   A.    Yeah.

17   Q.    Okay.  At the warehouse also there was a

18   bigger safe; right?

19   A.    Yeah.

20   Q.    Government showed you the pictures of that

21   safe; right?

22   A.    Yeah.

23   Q.    When you were in jail, they took them to

24   you, they showed them to you?

25   A.    No, they ain't showed them to me.
```

Q.    They didn't show -- you haven't seen
pictures of that safe?

A.    The lawyer I had -- my first lawyer showed
them to me.

Q.    Okay.  You've seen the pictures of that
safe, the big one?

A.    Yeah.

Q.    You had the combination?

A.    No, not to that one.

Q.    Only Ro had the combination?

A.    Yeah.

Q.    Because you didn't want to have the
combination and you didn't want to have anything to
do with it because you didn't want to get caught
with it --

A.    Yeah.

Q.    -- right?

A.    Yeah.

Q.    Okay.  When you flew -- we're going to talk
about the five -- at least five times you said that
you flew to Mexico -- I mean flew to Arizona.
Excuse me.  But when you went there you met some
Mexican guys; right?

A.    Yeah.

Q.    You don't know who they are; right?

```
 1    A.      Nah.
 2    Q.      Okay.  You flew from Tampa to either Las
 3    Vegas or to Phoenix, and then went to somewhere in
 4    Arizona --
 5    A.      Yeah.
 6    Q.      -- correct?
 7    A.      Yeah.
 8    Q.      You flew commercially --
 9    A.      Yeah.
10    Q.      -- right?
11            And you used your own name?
12    A.      Yeah.
13    Q.      You didn't want to get caught; correct?
14    A.      Right.
15    Q.      So sometimes you would fly to other airports
16    before you went to where you were going; right?
17    A.      Yeah.
18    Q.      Okay.  One time when you were caught --
19    well, excuse me.  One time when you were flying
20    back, at Phoenix airport you were stopped by the
21    police, weren't you?
22    A.      Yeah.
23    Q.      They shook you down and took $7,000 from
24    you, didn't they?
25    A.      Yeah.
```

1    Q.    What did you pay Ro for all this stuff he

2    did for you?

3    A.    Ten thousand.

4    Q.    Ten thousand a load?

5    A.    Yeah.

6    Q.    And that was for collecting it, distributing

7    it, delivering it, and whatever else he had to do?

8    A.    Yeah.

9    Q.    Okay.  Did he want more from you?

10   A.    Sometimes he'll bring it up, but, you know.

11   Q.    But he was the hands on guy; right?

12   A.    Yeah.

13   Q.    As Mr. Preston said, you weren't hands on?

14   A.    No.

15   Q.    You wanted to be away from it?

16   A.    Yeah.

17   Q.    Okay.  Who's Pingy?

18   A.    The dude -- the guy that introduced me to

19   Shorter.

20   Q.    The guy that introduced you and Shorter is

21   Pingy; right?

22   A.    Yeah.

23   Q.    And Pingy's driving your Cadillac that's

24   registered to your mama?

25   A.    It ain't registered to my mama.

1    Q.    You sure of that?

2    A.    Yeah.

3    Q.    And what's your mother's game?

4    A.    Kathy.

5    Q.    Kathleen what?

6    A.    Mitchell.

7    Q.    What's her middle name?

8    A.    Kathleen Anne Pingy.

9    Q.    Okay.  You're a pretty accomplished

10   businessman, aren't you?

11   A.    Yeah.

12   Q.    You were successful for a long while; right?

13   A.    Yeah.

14   Q.    Made a lot of money?

15   A.    Yeah.

16   Q.    Tried to fly under the radar as we would

17   say?

18   A.    Yes.

19   Q.    Used a lot of people?

20   A.    Yeah.

21   Q.    Because you didn't want to get caught?

22   A.    Yeah.

23   Q.    But you're here today to say that everything

24   you did Sheldon Shorter told you to do; right?

25   A.    Yeah.

Q.    Because you know that the only way that
Mr. Preston will file a motion with this Court is
if you implicate somebody else; isn't that true?

A.    I got to tell the truth.

Q.    Your truth.  The only way you can get a
reduction is to implicate someone else; isn't that
true.

A.    Is to tell the truth, right.

Q.    It's not enough for you to come to the jury
and say I did it.  Unless you implicate and provide
substantial assistance concerning some other
person, you get nada; correct?

A.    I guess.

Q.    And for you that's Sheldon Shorter; isn't
that true?

A.    Yeah.

Q.    You're going to ride Sheldon Shorter
hopefully to a lot less time in jail; correct?

A.    Yeah.

Q.    Who's Big Bo?

A.    It's a dude I know.

Q.    A dude that you sold dope for; right?

A.    For.

Q.    Huh?  You grew up with Big Bo, didn't you?

A.    Yeah.

1   Q.     You went to school with Big Bo, didn't you?

2   A.     Yeah.

3   Q.     You grew up in the neighborhood with Big Bo;

4   right?

5   A.     Yeah.

6   Q.     You distributed marijuana for Big Bo; right?

7   A.     Yeah.

8   Q.     You -- a lot of dope for -- a lot of

9   marijuana for Big Bo?

10  A.     Yeah.

11  Q.     First a hundred pounds?

12  A.     Yeah.

13  Q.     Then it went up to 300 pounds?

14  A.     Yeah.

15  Q.     Then you guys were dealing in 4,000 pounds

16  right?

17  A.     No, I ain't never get nothing like that from

18  him.

19          MR. RODRIGUEZ:  May I approach the

20  witness, Your Honor?

21          THE COURT:  You may.

22  BY MR. CHELALA:

23  Q.     Let me show you what I have marked as

24  Defendant's Exhibit No. 7, and ask you to look at

25  it.  Do you recognize that?

```
1    A.      Yeah.

2    Q.      Who is that?

3    A.      That's Bo.

4    Q.      Bo?

5    A.      Yeah.

6    Q.      Big Bo?

7    A.      Yeah.

8            MR. RODRIGUEZ:  Your Honor, could I have

9    a second?

10           Your Honor, I need some technical

11   assistance.  Our computers went down.

12           THE COURT:  Are you addressing the

13   Court, Mr. Rodriguez?

14           MR. RODRIGUEZ:  I am, Your Honor.  I

15   would like to use the ELMO.

16           THE COURT:  You may.

17           MR. RODRIGUEZ:  I need it to be turned

18   on.

19           THE COURT:  You may.

20           MR. RODRIGUEZ:  Your Honor, at this time

21   I believe with no objection from the government

22   I'd like to introduce S7.  I'm marking it S for

23   Shorter.

24           THE COURT:  Mark it defendant Shorter --

25           MR. RODRIGUEZ:  No. 7.
```

1          THE COURT:  -- No. 7.

2             (Exhibit 7 for identification.)

3     BY MR. CHELALA:

4     Q.    Big Bo, isn't it?

5     A.    Yeah.

6     Q.    All these photos are Big Bo, aren't they?

7     A.    Yeah.

8     Q.    And when you grow -- were growing up with by

9     Big Bo, when he was younger this is what he looked

10    like; right?

11    A.    Yeah.

12    Q.    Big Bo's a pretty bad guy, isn't he?

13    A.    What you mean by bad?

14    Q.    Huh?

15    A.    He big.

16    Q.    He's big?

17    A.    Yeah.

18    Q.    And he's bad?

19    A.    Yeah.

20    Q.    You're not here testifying against Big Bo,

21    are you?

22    A.    No.

23    Q.    You're hear to put the word on Sheldon

24    Shorter; right?

25    A.    Yeah.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.    Big Bo is the one that you sold dope for?

2   Big Bo is your dealer?  Big Bo is your man.  And

3   you don't want to squeal him out; isn't that right?

4   A.    I told them about him already.

5           MR. RODRIGUEZ:  Thank you, Your Honor.

6   No further questions.

7           THE COURT:  Further cross-examination,

8   Mr. Chalela.

9           MR. CHALELA:  No questions, Your Honor,

10  thank you.

11          THE COURT:  Mr. Crawford.

12          MR. CRAWFORD:  Thank you, Your Honor.

13              CROSS-EXAMINATION

14  BY MR. CRAWFORD:

15  Q.    Mr. Mitchell, just one area.  On April 24th

16  there was a stop of a tractor trailer over in

17  Pinellas County that the trailer had a load of

18  marijuana.  Are you familiar with that?

19  A.    Yeah.

20  Q.    And if I remember correctly, yesterday you

21  testified that you first learned of this stop

22  because you got a telephone call from Mr. Shorter.

23  A.    Yeah.

24  Q.    Okay.  And that Mr. Shorter told you that

25  the police had stopped and had seized this

1    particular load; is that correct?

2    A.    Right.

3    Q.    And it's your testimony that he learned that

4    because he received a phone call from the jail; is

5    that right?

6    A.    Yeah -- no.  He didn't say from the jail.

7    Q.    From the truck drivers?

8    A.    Yeah.  Somehow communication got to him from

9    the truck drivers that they got knocked off.

10    Q.    Well, that's what I want to ask you.

11    Because yesterday you said, if I remember

12    correctly, that you heard from Shorter that he had

13    gotten phone calls from the truck drivers at the

14    jail.  Now, let's be real clear here.  Do you know

15    how Mr. Shorter found out about this?

16    A.    I don't know for certain.

17    Q.    What did he say, if anything, about who he

18    had learned the information from?

19    A.    He didn't say specifically.  I don't

20    remember -- he talked to somebody who told him

21    that they got knocked off.

22    Q.    If you testified yesterday that the call

23    came from the truck drivers at jail, that's not

24    correct?

25    A.    Yeah, it ain't come from jail.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    That's what I wanted to clear up.  Thank

2    you, sir.

3    A.    All right.

4              THE COURT:  Redirect.

5                  REDIRECT EXAMINATION

6    BY MR. PRESTON:

7    Q.    But you did indicate that Mr. Shorter

8    advised you that he had learned that someone had

9    also broken the chip from the phone; correct?

10   A.    Yes.

11   Q.    Now, Mr. Rodriguez went through a litany of

12   things about Ramiro Parra working for you; correct?

13   A.    Right.

14   Q.    And who did you work for in this marijuana

15   enterprise?

16   A.    Shorter.

17   Q.    He also discussed Ramiro Parra's receipt and

18   distribution and collection of money and the money

19   going to the apartment.  We stopped one step short

20   there.  Who's money was that?

21   A.    Shorter.

22   Q.    And where did that money that was in the

23   safe in the apartment ultimately end up?

24   A.    Shorter's hands.

25   Q.    When you lost that $7,000 in Phoenix, did

1  you tell the defendant Shorter about that?

2  A.    Yeah.

3  Q.    How did he react to you losing $7,000?

4  A.    He -- he -- he -- he was -- he was upset

5  about the whole situation.

6  Q.    Describe that, please.

7  A.    He was upset by the whole situation because

8  he was mad that I was flying into Arizona instead

9  of flying into L. A. -- I mean Las Vegas.

10 Q.    You were also asked by Mr. Rodriguez if you

11 talked to law enforcement about Big Bo; correct?

12 A.    Yeah.

13 Q.    You were advised that all the statements

14 that you were reporting from law enforcement

15 concerning your testimony were going to be turned

16 over to the defense; correct?

17 A.    Yeah.

18 Q.    And those were statements that you made to

19 Agent Duralia about Big Bo?

20 A.    What statements now?

21 Q.    You told Agent Duralia about your marijuana

22 relationship with Big Bo; correct?

23 A.    Yeah.

24 Q.    Was Big Bo a source of supply before or

25 after the defendant Shorter?

```
 1    A.      Before.

 2    Q.      Did defendant Shorter take his place?

 3    A.      Yeah.

 4            MR. PRESTON:  Thank you.  Nothing

 5    further, Your Honor.

 6            THE COURT:  You may come down,

 7    Mr. Mitchell.

 8            Your next witness, Mr. Preston.

 9            MR. PRESTON:  Yes, sir.  Lance Noel,

10    please.

11            COURTROOM DEPUTY CLERK:  Please come

12    forward to be sworn.  Raise your right hand.

13            Do you solemnly swear or affirm that the

14    testimony you shall give in this cause shall be

15    the truth, the whole truth, and nothing but the

16    truth, so help you God?

17            THE WITNESS:  I do.

18                         LANCE NOEL,

19    a witness, having been duly sworn to tell the

20    truth, the whole truth and nothing but the truth,

21    was examined and testified as follows:

22            COURTROOM DEPUTY CLERK:  Please be

23    seated in the witness stand.

24            Sir, if you'll state your name and spell

25    your last name for the record, please.
```

1          THE WITNESS:  My name is Lance Noel,

2     N-O-E-L.

3          THE COURT:  You may inquire, Counsel.

4          MR. PRESTON:  Thank you, Your Honor.

5               DIRECT EXAMINATION

6     BY MR. PRESTON:

7     Q.    Good morning, Mr. Noel.

8     A.    Good morning.

9     Q.    You and I met yesterday afternoon; correct?

10    A.    Yes, we did.

11    Q.    And prior to that you had met with the DEA

12    concerning your potential testimony in this case;

13    correct?

14    A.    Correct.

15    Q.    Mr. Noel, are you here pursuant to a

16    subpoena that you've received from the United

17    States to appear in court?

18    A.    Yes, I am.

19    Q.    And those subpoenas were received at your

20    business; is that correct?

21    A.    Yes, it was.

22    Q.    Would you please tell the jury who work for?

23    A.    I work for Mercedes Benz of Fort Lauderdale.

24    Q.    How long have you worked there?

25    A.    Ten years.

Q.    What are your duties at Mercedes Benz of
Fort Lauderdale?

A.    Fleet account executive and salesman.

Q.    Were you approached by law enforcement in
regard to the purchase of a Mercedes Benz in or
about May of 2007 by a person who identified
himself as Anthony Kaseem Dubois?

A.    Yes.

Q.    What type of vehicle was the subject of your
negotiations or discussions with Mr. Dubois?

A.    It was a Mercedes Benz CL63.

Q.    Was this a standard stock item in your
organization?

A.    At the time, no.

Q.    Was it a vehicle that you anticipated being
delivered to Mercedes Benz of Fort Lauderdale?

A.    Yes, it was.

Q.    Why is that?

A.    It was a -- it's a rare vehicle at that
time.  It was hard to get.  And you had to order
it and basically wait for it to come in.

Q.    Was it specifically ordered by the person
who ended up purchasing it?

A.    No, it was not.

Q.    And who was it ordered by?

1    A.    It was ordered by a gentlemen by the name of
2    Richey Atkinson.
3    Q.    Was Mr. Atkinson a regular customer of
4    yours?
5    A.    Yes, he was.
6    Q.    Did Mr. Atkinson make referrals to your
7    company?
8    A.    All the time.
9    Q.    How did you come to meet with this Anthony
10   Dubois in regards to this vehicle?
11   A.    Through my friend, Richey.
12   Q.    That's Mr. Atkinson?
13   A.    Mr. Atkinson, yes.
14   Q.    He made the referral?
15   A.    Yes, he did.
16   Q.    How many times did you actually meet with
17   this Anthony Dubois?
18   A.    Twice.
19   Q.    What was the nature of the two meetings?
20   A.    One to see if I could get him the car, and
21   the other one when he -- when he picked the car
22   up.
23   Q.    Do you see this Anthony Dubois in court
24   today?
25   A.    Yes.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.    Could you please tell the jury where he's seated and what he's wearing.

MR. RODRIGUEZ:  Your Honor, we will stipulate and acknowledge that this was Anthony Dubois for the purpose of this purchase, Your Honor.

THE COURT:  All right.  The record will so reflect.

BY MR. PRESTON:

Q.    Now, does Mercedes Benz of Fort Lauderdale maintain records of such transactions during the normal course of business?

A.    Yes.

Q.    And are these records kept as a function of the business at Mercedes Benz of Fort Lauderdale?

A.    Yes, it is.

Q.    Prior to testifying today did you have an opportunity to look at the file in regard to this particular transaction?

A.    Yes, I did.

MR. PRESTON:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. PRESTON:

Q.    I just handed you what's been marked as for

1  identification purposes as Government's Exhibit

2  No. 27.  Are these the business records which

3  reflect the transaction that we're discussing in

4  regard to Anthony Kaseem Dubois?

5  A.    Yes, it is.

6        MR. PRESTON:  I'd move Government's

7  Exhibit 27 into evidence, Your Honor.

8        MR. RODRIGUEZ:  No objection.

9        THE COURT:  It is received.

10       (EXHIBIT 27 ADMITTED INTO EVIDENCE.)

11  BY MR. PRESTON:

12  Q.    How was this particular vehicle paid for?

13  A.    I believe it was paid by cash -- cashier's

14  check.

15  Q.    And going to first the -- I'm sorry, seventh

16  page of that exhibit --

17  A.    Okay.

18  Q.    -- is this the cashier's check that you're

19  referring to?

20  A.    Yes, it is.

21  Q.    And what is the amount of that check?

22  A.    A hundred and fifty thousand dollars.

23  Q.    What was the total purchase price before tax

24  and title?

25  A.    About 141,9 I believe.

```
1    Q.    And after tax and title were added in?

2    A.    After tax and title, 150.

3    Q.    The check that was provided to Mercedes Benz

4    of Fort Lauderdale reflects a remitter by the name

5    of Kevin Wells.  Do you know who Kevin Wells is?

6    A.    No, I do not.

7    Q.    When Mr. Dubois, the defendant Sheldon

8    Shorter, made this purchase, was he with another

9    gentleman?

10   A.    He was with a couple of people.  I don't

11   quite recall exactly who.

12   Q.    But you don't remember being introduced to

13   anybody by the name of Kevin Wells?

14   A.    No.

15   Q.    Was there any haggling over the price of

16   this vehicle?

17   A.    Not really, no.

18   Q.    When you say "not really," what does that

19   mean?

20   A.    I mean he asked, but he wasn't going to get

21   a discount on it.

22         MR. PRESTON:  That's all I have.  Thank

23   you, Your Honor.

24         THE COURT:  Mr. Rodriguez.

25              CROSS-EXAMINATION
```

BY MR. RODRIGUEZ:

Q.    Thank you, Mr. Noel.  Maybe you'll be able to get back to Fort Lauderdale real quick.

A.    Okay.

Q.    Mr. Noel, we're referring to Government's Exhibit No. 27.  I think you have it there before your screen.  The cashier's check made out to your employer by Kevin Wells.

A.    Yes.

Q.    Do you recall having a conversation with this gentlemen that he was buying the car for someone else during that time -- during the inquiry of why the check was made by somebody else or something to that effect?

A.    Could have been.  I don't know.

        MR. RODRIGUEZ:  Okay.  Thank you very much.  No further questions.

        THE COURT:  Any further inquiry by defense counsel?

        MR. CHELALA:  No, Your Honor.

        THE COURT:  Mr. Crawford.

        MR. CRAWFORD:  No, sir.  Thank you.

        THE COURT:  Any redirect?

        MR. PRESTON:  No, Your Honor.

        THE COURT:  You may come down, Mr. Noel.

1   You are excused from further attendance.

2               Your next witness, Mr. Preston.

3               MR. PRESTON:  Justin Duralia, please.

4               Judge, with the Court's permission,

5   Madeline Tejera, our support specialist from the

6   U.S. Attorney's Office will be assisting me during

7   Agent Duralia's testimony in case I need to refer

8   to computerized evidence.

9               THE COURT:  Thank you.

10              MR. PRESTON:  Thank you.

11              COURTROOM DEPUTY CLERK:  Sir, if you'll

12  raise your right hand.

13              Do you solemnly swear or affirm that the

14  testimony you shall give in this cause will be the

15  truth, the whole truth, and nothing but the truth,

16  so help you God?

17              THE WITNESS:  I do.

18              **JUSTIN DURALIA,**

19  a witness, having been duly sworn to tell the

20  truth, the whole truth and nothing but the truth,

21  was examined and testified as follows:

22              COURTROOM DEPUTY CLERK:  Please be

23  seated in the witness stand.

24              Sir, if you'll state your name and spell

25  your last name for the record, please.

1          THE WITNESS:  My name is Justin Duralia.

2    Last name is spelled D-U-R-A-L-I-A.

3          THE COURT:  You may inquire, Counsel.

4          MR. PRESTON:  Thank you.

5                  DIRECT EXAMINATION

6    BY MR. PRESTON:

7    Q.    Who do you work for?

8    A.    I work for the Drug Enforcement

9    Administration.

10   Q.    How long have you worked for DEA?

11   A.    Approximately nine years.

12   Q.    Did you have any prior law enforcement

13   experience before entering into service with the

14   Drug Enforcement Administration?

15   A.    Yes, I did.  I was a police officer with the

16   City of Largo for approximately six years.

17   Q.    Did you participate in an investigation

18   leading to the arrest of Ramiro Parra on April 1st

19   of 2008?

20   A.    Yes, I did.

21   Q.    Did you participate in a follow-up

22   investigation of Sheldon Shorter, Cleo Mitchell,

23   and others with Mr. Parra's assistance?

24   A.    Yes.

25   Q.    What was your role in that follow-up

1  investigation?

2  A.    Well, I was the case agent to that

3  investigation.

4  Q.    Could you just advise the jury generally

5  what that means, the case agent.

6  A.    Oftentimes in drug investigations several

7  agents will be involved, but there's usually one

8  agent in particular who coordinates all the

9  investigative activity.

10 Q.    And that was you in this investigation that

11 we're speaking of?

12 A.    Yes, that's correct.

13 Q.    Do you see a person identified as Sheldon

14 Shorter in court today?

15 A.    Yes, I do.

16 Q.    Could you please tell the jury where he's

17 seated, what he's wearing.

18 A.    He's seated at defense counsel table wearing

19 a dark colored suit.

20 Q.    Could you be more specific.

21 A.    Sitting to the right of Mr. Rodriguez.

22        MR. PRESTON:  Identifying the defendant,

23 Your Honor.

24        THE COURT:  The record will so reflect.

25 BY MR. PRESTON:

Q.    Following Mr. Parra's arrest did he
surrender marijuana to the Drug Enforcement
Administration?

A.    Yes, he did.  He advised me he had a
quantity of marijuana stored in a warehouse
facility, and I accompanied to that warehouse and
I seized the marijuana.

Q.    How much marijuana was that?

A.    It was approximately 88 pounds.

        MR. PRESTON:  May I approach the witness
during this questioning, Your Honor?

        THE COURT:  You may.

BY MR. PRESTON:

Q.    Agent Duralia, would you please take a look
at what's been marked as Government's Exhibit 1 for
identification.  Do you recognize that photograph?

A.    Yes, I do.

Q.    And what is Government's Exhibit No. 1?

A.    This is a photograph of the four bales of
marijuana which I seized from the warehouse
facility on Starkey Road.

Q.    Does it fairly and accurately show those
four bales?

A.    Yes, it does.

        MR. PRESTON:  I move Government's

1    Exhibit No. 1 into evidence, Your Honor.

2              MR. RODRIGUEZ:  No objection.

3              THE COURT:  It is received.

4              MR. PRESTON:  May I publish?

5              THE COURT:  You may.

6              (EXHIBIT 1 ADMITTED INTO EVIDENCE.)

7    BY MR. PRESTON:

8    Q.     Yesterday there was an exhibit entered into

9    evidence of some bales of marijuana in the safe.

10   Are you familiar with that?

11   A.     Yes.

12   Q.     Does that represent these four bales as

13   stacked in the safe?

14   A.     Yes.  These are the same four bales.

15   Obviously had been removed from the safe and laid

16   out on the floor.

17   Q.     Were representative samples collected from

18   this supply of marijuana for testing purposes?

19   A.     Yes, they were.

20   Q.     Were they sent to the Drug Enforcement

21   laboratory for testing purposes?

22   A.     They were.

23             MR. PRESTON:  Judge, could I have the

24   witness step down, please.

25   BY MR. PRESTON:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Agent Duralia, did you bring those

2    representative samples to court with you today?

3    A.    They are here in the courtroom.

4              MR. PRESTON:  Could the witness step

5    down to secure those exhibits, Your Honor?

6              THE COURT:  Yes.  Yes, you may.

7              MR. PRESTON:  Referring to what have

8    been marked as identification purpose -- for

9    identification purposes as Government's

10   Exhibits 2A1 and 2A2.

11   BY MR. PRESTON:

12   Q.    Agent Duralia, have the representative

13   samples contained in the boxes that you just

14   carried up to the witness stand, have they been

15   removed and tagged for evidence purposes already?

16   A.    There are several representative samples

17   within these boxes.  The one labeled Exhibit 2A

18   has been marked with a government exhibit tag.

19   Q.    Could you remove that exhibit, please.

20   A.    (Witness complies.)

21   Q.    Now, you have two bags there.  How are they

22   marked, please?

23   A.    The bag in my hand now is marked as

24   Government Exhibit 2A1.

25   Q.    And the second bag, please?

A.      And the second bag is marked Government
Exhibit 2A2.

Q.      And were these exhibits submitted to the
Drug Enforcement laboratory for analysis?

A.      Yes, they were.

Q.      And were they found to contain marijuana?

A.      Yes.

          MR. PRESTON:  I move into evidence
Government Exhibits 2A1 and 2A2, Your Honor.

          MR. CHELALA:  No objection, Your Honor.

          THE COURT:  They are received.

          MR. PRESTON:  Can I hold them up for the
jury, Your Honor.

          THE COURT:  Yes you may.

          (EXHIBITS 2A1 and 2A2 ADMITTED INTO
EVIDENCE.)

BY MR. PRESTON:

Q.      Where did you secure these four bales of
marijuana again?

A.      After they were seized from the warehouse,
they were --

Q.      I'm sorry.  Where did you -- where did you
obtain them?

A.      Oh, I obtained them from the warehouse
facility located at 1299 Starkey Road in Largo.

Q.   At the time that Mr. Parra began his
cooperation did he indicate whether he owed money
for this marijuana?

          MR. RODRIGUEZ:  Objection, hearsay.

          MR. PRESTON:  Not for the truth of the
matter, Your Honor.

          MR. RODRIGUEZ:  Hearsay.

          THE COURT:  Your objection is overruled.

BY MR. PRESTON:

Q.   Did Mr. Parra indicate whether he owed money
for the marijuana?

A.   Yes, he did.

Q.   And based on that information was a
follow-up investigation plan put into place?

A.   Yes, it was.

Q.   All right.  Could you generally describe for
the jury what plan was developed in regard to any
drug debt owed by Ramiro Parra.

A.   Well, the initial part of the drug debt
involved money that was owed to Parra from his
customers.  These debts were still outstanding, so
we put an investigative plan in place to have
Parra meet with his customers, engage them in
conversation about what the money was owed for,
collect those funds, and then have Mr. Parra do

what he would normally do and bring those to the
safe located inside the apartment in Tampa.

Q.     Does Drug Enforcement -- the Drug
Enforcement Administration use a term "trafficker
directed funds"?

A.     Yes.

Q.     What does that mean?

A.     Trafficker directed funds are money given to
somebody, usually an undercover agent or a
confidential source, given to one of those
subjects with a specific purpose.  Not just money
that's seized, but money that's given to somebody
for a specific purpose.

Q.     And in this investigation were there
trafficker directed funds?

A.     Yes.  The money that was collected from
Parra's customers was treated as trafficker
directed funds.

Q.     When drugs are received as trafficker
directed funds do they have to be forfeited
immediately?

A.     No, they do not.

Q.     Are they able to be used to further an
investigation?

A.     Yes.  With the proper approval we're able to

1    use those to further the investigation.

2    Q.    Was that done in this case?

3    A.    Yes, it was.

4    Q.    Could you describe for the jury what was

5    done in regard to trafficker directed funds

6    collected by Ramiro Parra in this case.

7    A.    Once the money is collected we will

8    immediately meet up with Mr. Parra, take the funds

9    from him.  They will be counted, the money will be

10   photographed, returned back to Mr. Parra.  Then

11   while under surveillance he will be followed to

12   the apartment where he will secure those funds

13   inside the safe.

14   Q.    How does law enforcement or DEA make sure

15   that Mr. Parra or anyone in that situation isn't

16   carrying their own money into or out of any of

17   those transactions?

18   A.    What we would do, not only in this case but

19   in any case involving informants and meeting with

20   targets of investigation, they will be searched by

21   two agents before they go to meet with somebody,

22   and then immediately after that meeting they will

23   be searched again.

24         And in this case before giving the money

25   back to Mr. Parra he was searched.  And then he

1  was searched after he dropped the funds off at the

2  safe.

3  Q.    Was Ramiro Parra directed to make recordings

4  of meetings and phone calls with persons during

5  this investigative contact?

6  A.    Yes.  I provided him with a digital audio

7  recorder which he maintained possession of, and he

8  used that for any telephone conversations that he

9  had with anybody in this investigation, whether it

10 be his customers or people that he reported to.

11 And any time there was a face-to-face meeting with

12 somebody, he was provided with a different type of

13 recorder which would record that meeting.

14 Q.    And as these phone calls took place or these

15 meetings were scheduled did Mr. Parra maintain

16 contact with you?

17 A.    I'm sorry.  Could you repeat the question.

18 Q.    As these meetings were scheduled or these

19 phone conversations took place did Mr. Parra

20 maintain a continuing contact with you as to what

21 was going on?

22 A.    Yes.  There was a period of time during the

23 investigation where I had almost daily contact

24 with Mr. Parra.

25 Q.    During those contacts did he advise you of

1    tasks that he was asked to perform during the

2    course of his undercover involvement with any of

3    the targets of the investigation?

4    A.    Yes.

5    Q.    Did Mr. Parra advise you of an incoming load

6    of marijuana in April of 2008?

7    A.    Yes, he did.

8    Q.    When approximately did he indicate that

9    there was an impending load?

10   A.    Well, I would advise -- I was advised there

11   was an impending load very early in April.  And I

12   would say it was probably within -- I'm guessing

13   here -- but two to three days before we actually

14   made that seizure when we knew that it was going

15   to be coming up in the very near future.  But we

16   knew about an impending load a couple weeks in

17   advance.

18   Q.    How close to the April 1st arrest did Ramiro

19   Parra advise you that there was something in the

20   works?

21   A.    I believe I spoke to him for the first time

22   on April 3rd, probably April 4th.

23   Q.    Did he advise you at that time of this

24   potential?

25   A.    Yeah.  He said based on the frequency of

1    shipments that would come into the Tampa Bay area

2    he was estimating that one would be arriving in

3    the very near future.

4    Q.    After being released on bond was Ramiro

5    Parra instructed to participate in the receipt of

6    that load pursuant to his cooperation?

7    A.    Yes.

8    Q.    What was the investigative plan in regard to

9    the receipt of this potential load of marijuana?

10   A.    At this point in time it was relatively

11   early stages of the investigation.  It was our

12   goal to try and identify everyone who was

13   involved.  Not only Mr. Parra's customers, but

14   people above him in the organization.

15        Knowing that the load was going to be coming

16   in, we obviously didn't want it to be known to any

17   of the violators that the Drug Enforcement

18   Administration was conducting this investigation.

19   So I had contacted the Florida Highway Patrol and

20   I'd asked for their participation.

21   Q.    At some point in time did this go from being

22   a potential load to something that was -- appeared

23   to actually be happening?

24   A.    Yes.  On April 24th of 2008.

25   Q.    What steps were taken by law enforcement in

1    regard to April 24, 2008?

2    A.    Well, in the days prior to that I --

3    Mr. Parra made me aware of the fact that there was

4    a cellular telephone inside the apartment at Rocky

5    Point, which when he was told to do so, he was

6    supposed to obtain that phone and use that to

7    communicate with the truck drivers.

8    Q.    Did you have him in fact do that?

9    A.    Well, he was going to be told to do that by

10   Cleo Mitchell.  So when the time came, he was

11   going to get the phone.  So when he was notified

12   to get the phone, he contacted me.

13        Prior to that I already talked to Florida

14   Highway Patrol Trooper Bob Lanese, and he had

15   agreed to assist me with his part of the

16   investigation.  I told him that I would notify him

17   as soon as we knew where the truck was and that it

18   is inbound in an effort to stop that tractor

19   trailer.

20        So on April 24th Mr. Parra contacted me and

21   told me that he had just spoke to somebody who he

22   believed was the driver of the truck, and that

23   they were approaching the Tampa Bay area.  So it

24   was at that point in time that I called Trooper

25   Lanese, told him what I had just found out.  And

he agreed to set up on the Howard Franklin bridge
in an attempt to locate the truck as it coming
into Pinellas County.

Q.    What happened?

A.    From that point on Mr. Parra was in fairly
regular telephonic contact with who he believed
was the truck driver.  Once he would finish a
telephone call, he would call me to give me an
update.  At that point in time I would end that
phone call, call Trooper Lanese and give him the
update as to where we believed the truck may be.

Q.    You weren't with Mr. Parra as these calls
were coming in or being made?

A.    Well, not initially.

Q.    Was he with other agents initially?

A.    Not during the first phone calls because
they came early.  And as soon as he notified me, I
instructed him to go to the area of the DEA office
in Tampa.  I believe he met with other agents
until I was able to arrive.  But I know maybe the
first couple phone calls he would have been by
himself, I believe.

Q.    What happened next, please?

A.    At one point Mr. Parra called to tell me
that he had just spoken to somebody in the truck,

1  and they were on the Howard Franklin bridge

2  traveling westbound into Pinellas County.

3  Q.    What do you do with that information?

4  A.    I called Trooper Lanese, who was already set

5  up on the west side of the Howard Franklin bridge.

6  At that point in time I notified him that the

7  truck is coming his way.  And based on the delay

8  between the phone calls, I anticipated that it may

9  very well be on the west side of the bridge.

10  Q.    Based on information from the historical

11  aspects of these deliveries did you tell Trooper

12  Lanese what the suspect vehicle might look like?

13  A.    Yeah.  I told him based on my conversations

14  with Mr. Parra there was at least one previous

15  delivery where the truck was described as being a

16  blue cab with a white trailer with the word

17  "Swift" imprinted on the side in dark blue

18  letters.  So I provided that vehicle description

19  to Trooper Lanese.

20  Q.    Did you ask Trooper Lanese to look

21  exclusively for that particular tractor trailer?

22  A.    No.  That was a description we had on a

23  previous delivery.  We really were not certain

24  what the vehicle description would be for this

25  delivery.  It basically was our best guess.

1    Q.    At some point did you learn that Trooper

2    Lanese moved from the Howard Franklin bridge to

3    another vantage point?

4    A.    Yes.  When I was describing to him that the

5    tractor trailer was on the Howard Franklin bridge,

6    he advised me that a tractor trailer had just gone

7    by his location, so he had moved from that

8    location in an attempt to catch up to that truck.

9    Q.    Was that truck ultimately stopped?

10    A.    Yes, it was.

11    Q.    And what color -- or what's the description

12    of that truck, please?

13    A.    The cab was kind of a rust colored orangeish

14    color cab.  I believe it was a white trailer, but

15    I don't recall.

16    Q.    And was it identified by any specific

17    company or markings?

18    A.    Yeas.  It was identified with a company

19    named Cool Carriers.

20    Q.    Where did the stop take place?

21    A.    The traffic stop occurred in the area of

22    Belcher Road and 118th Avenue North.

23    Q.    How close was that location to the offload

24    storage facility that Mr. Parra was providing

25    directions to?

A.      The stop occurred just east of where the
warehouse facility is on the same street.

Q.      Any estimate in regard to distance?

A.      Mere blocks.

Q.      From the investigation are you familiar with
the location of a strip club called Oz?

A.      Yes, I am.

Q.      Where's that located?

A.      That's in the area of Ulmerton Road and U.S.
Highway 19 in Pinellas County.

Q.      How far is that from the point of the stop
of the vehicle -- of the tractor trailer?

A.      I don't know the exact distance.  I'd say at
least a couple miles.

Q.      Was marijuana seized from the truck?

A.      Yes, it was.  Approximately 1561 pounds.

Q.      And was a photograph taken of the entirety
of that load of marijuana?

A.      Yes.

Q.      Do you recognize what's shown in
Government's Exhibit No. 4?

A.      Yes, I do.

Q.      What is Government's Exhibit No. 4?

A.      This is a photograph I took of the marijuana
bales after they were offloaded from the truck.

1    Q.    Does it fairly and accurately show the

2    contents of that load?

3    A.    Yes, it does.

4         MR. PRESTON:  Government will move into

5    evidence Government's Exhibit No. 4, Your Honor.

6         MR. CHELALA:  No objection, Your Honor.

7         THE COURT:  It is received.

8         (EXHIBIT 4 ADMITTED INTO EVIDENCE.)

9    BY MR. PRESTON:

10   Q.    Was a representative sample of marijuana

11   collected from this load for testing purposes?

12   A.    Yes, it was.

13   Q.    Do you recognize Government's Exhibit 3A for

14   identification?

15   A.    Yes, I do.

16   Q.    What is Government's Exhibit 3A please?

17   A.    This is one of the representative samples

18   from the 1561 pounds that was seized from the

19   truck on April 24, 2008.

20   Q.    Was that sent for testing purposes?

21   A.    Yes.  It was sent to the southeast

22   laboratory in Miami.

23   Q.    Was it found to contain marijuana?

24   A.    Yes.

25         MR. PRESTON:  Moving 3A into evidence,

1    Your Honor.

2              THE COURT:  Any objection?

3              MR. CHELALA:  No objection, Your Honor.

4              THE COURT:  It is received.

5              (EXHIBIT 3 ADMITTED INTO EVIDENCE.)

6    BY MR. PRESTON:

7    Q.    Agent Duralia, were documents seized from

8    the truck as well?

9    A.    Yes, they were.

10   Q.    What sort of documents were seized from the

11   truck?

12   A.    Various trucking related documents to

13   include, I believe, some manifests from some

14   previous deliveries as well as the daily driver

15   logs.

16   Q.    I'd like to show you what's been marked for

17   identification purposes as Government's Exhibit 24

18   and 25.  Do you recognize those exhibits?

19   A.    Yes, I do.

20   Q.    What is Government's Exhibit No. 24?

21   A.    Government Exhibit 24 is labeled Driver's

22   Daily Log.  First one is dated April 18, 2008.

23   Second one is dated April 19, 2008.  And the third

24   one is dated April 21st, 2008.

25   Q.    What driver is represented in Government's

1    Exhibit No. 24?

2    A.    It says driver signature or driver's full

3    signature, Hardaway Volcy.  And then to the right

4    of that it says co-driver's name J. Evens B.

5    Q.    Government's Exhibit No. 25, what is that,

6    please?

7    A.    It is also labeled as being a driver's daily

8    log.  The date's on top.  The first one is April

9    18th, 2008.  Second one is April 19th, 2008.  And

10   the third one is April 21st, 2008.  And for

11   drivers full signature it says J. Evens B.  And

12   then for co-driver's name it says H. Volcy.

13   Q.    And both sets of records reflect the period

14   between April 18th and April 20th of 2008; is that

15   correct?

16   A.    Yes, that is correct.

17             MR. PRESTON:  I would move Government's

18   Exhibit 24 and 25 into evidence, Your Honor.

19             MR. CHELALA:  Your Honor, I object to

20   relevance.

21             THE COURT:  I'm not hearing you.

22             MR. CHALELA:  I'm sorry.  I'm sorry,

23   Your Honor.  I object -- Mr. Baptiste objects as

24   to relevance on the driver logs moved into

25   evidence April 18th to April 20th have no

1 relevance to the April 24th.

2          THE COURT:  That objection is overruled.

3          MR. PRESTON:  May I publish No. 24, Your

4 Honor?

5          THE COURT:  You may.

6          (EXHIBITS 24 and 25 ADMITTED INTO

7 EVIDENCE.)

8 BY MR. PRESTON:

9 Q.    On April 18th of 2008, Government's Exhibit

10 No. 24 beginning at 10:00 p.m. shows a location of

11 Riverside, California; is that correct?

12 A.    That is correct.

13 Q.    By the way, on this document does it reflect

14 a trailer number of 1238?

15 A.    Yes, it does in this block right there.  I

16 apologize.  I covered the first two numbers, but I

17 was attempting to circle around the 1238 in that

18 block.

19 Q.    Could you -- while this is up there, could

20 you just look at Government's Exhibit No. 25 and

21 see if that shows anything different than what

22 we're looking in regard to Exhibit 24.

23 A.    It's written somewhat different as opposed

24 to what's on the screen now in Exhibit 25.  It

25 says TR No. 2024 and then TL No. 1238.  But the

1  numbers on this form are consistent with what's on

2  the screen.

3  Q.    How about the overall data that's recorded

4  as far as locations and dates and times, things of

5  that nature?  Are the documents substantially the

6  same.

7  A.    They're substantially the same.  There's

8  nothing -- no glaring inconsistencies.  There

9  might be more information on one page than the

10  other, but generally speaking it appears to be

11  consistent.

12        MR. PRESTON:  Could we go to the next

13  page please, which would reflect the date of

14  April 19th, 2008.

15  BY MR. PRESTON:

16  Q.    On this date where does this document tell

17  us the drivers have placed their vehicle?

18  A.    According to this document it shows them

19  being in Riverside, California, that entire day.

20  Q.    And the next page for April 20th of 2008,

21  where is the truck supposed to be located on this

22  date?

23  A.    Once again, according to this document, it

24  shows it in Riverside, California, for that entire

25  day.

Q.    On the document for April 21st of 2008, does
it reflect approximately when the vehicle was to be
moved or had moved from Riverside, California,
approximately?

A.    It appears as though they're -- they're
still in Riverside, California.  But it looks like
according to the form here there was some activity
around 2:30 p.m. that day because it shows a
change from an off duty status to what I guess
would be a sleeper berth status.

Q.    The word "off duty" doesn't appear here;
correct?

A.    Aside from this part of the form I don't see
off duty written anywhere else on there.

Q.    Was off duty shown on the form which is
Government's Exhibit No. 25 on the second page?

A.    Yes.  On Government Exhibit 25 it's actually
handwritten in the remarks section off duty.  Off
being spelled incorrectly, but off duty,
Riverside, California, for April 19, 2008, and
April 20th, 2008.

Q.    Government's Exhibit No. 25 then does -- has
no specific driver's daily log for April 20th of
2008; is that correct?

A.    No.  I did not locate one for April 20th.

1    But on the form for April 19th there is a remark,

2    as I testified just a minute ago, off duty

3    Riverside, California, for the 19 and the 20th.

4            MR. PRESTON:  Could we go to the next

5    page, please, of Government's Exhibit No. 25.

6    BY MR. PRESTON:

7    Q.    Does this provide more specific information

8    in regard to the movement of the vehicle?

9    A.    Yes.  It appears as though it has moved from

10   Riverside, California, and at approximately 4:00

11   p.m. to 4:30 p.m. looks like they're in Irvine,

12   California.

13   Q.    And what is the status of the driver as

14   indicated by the line on this particular document?

15   A.    According to this document it shows him as

16   having an on duty status as of 2:00 p.m. that day.

17   Q.    What happens at approximately 4:30 in Column

18   No. 2 -- or Row No. 2?

19   A.    It appears that around 4:30 p.m. they go to

20   a -- what I would call a sleeper berth status.

21   Q.    That's what the document reflects; correct?

22   A.    Yes.

23   Q.    Aside from the marijuana that was in the

24   tractor trailer, did you observe any other load --

25   let me rephrase that.

Was there anything else on the truck besides marijuana?

A.    Oh, yes.  There were numerous, numerous boxes of what were labeled to be frozen cookie dough.

Q.    Did you find a document -- was a document secured from the truck which referred to cookie dough in any fashion?

A.    Yes, there was.

Q.    Would you please take a look at Government's Exhibit No. 30.  Do you recognize that as being a document coming from the truck?

A.    Yes, I do.

Q.    And what is Government's Exhibit No. 30?

A.    It's a document from Countryside Baking, and it's labeled as a picking sheet.  And it gives information that these items were sold to Walmart Stores, Bentonville, Arizona, but to be shipped to Walmart at 5600 State Road 544 in Winter Haven, Florida.

And it describes the items as oatmeal raisin cookie dough.  And in the section where it shows quantity ordered is the number 77.  And then in the area where it shows shipped, it also says 77.

MR. PRESTON:  Government moves into

1    evidence No. 30 at this time Your Honor.

2              MR. CHALELA:  No objection, Your Honor.

3              THE COURT:  It is received.

4              (EXHIBIT 30 ADMITTED INTO EVIDENCE.)

5              MR. PRESTON:  May I publish?

6              THE COURT:  You may publish it.

7    BY MR. PRESTON:

8    Q.    Mr. Duralia, you've indicated in regards to

9    the number 77, it says 77.  That same number, 77,

10   is reflected at the bottom of the page; correct?

11   A.    Yes.  On the bottom left-hand corner it says

12   total cases 77.00.

13   Q.    Total cases?

14   A.    Correct.

15   Q.    All right.  And the inspection of the

16   tractor trailer, did it -- was there only 77 cases

17   of cookie dough on that tractor trailer?

18   A.    I guess it would depend on how you define a

19   case.  But there were more than 77 boxes.

20   Q.    Were there in fact pallets of boxes of

21   cookie dough all the way to the nose of the shell

22   where the marijuana was found?

23   A.    Correct.

24   Q.    And the date that this picking sheet is

25   signed is what, please?

A.      On the bottom next to the signature is the
date April 21st, 2008.

Q.      And the temperature reflected on the
document?

A.      The temperature reflected on the document is
negative ten degrees Fahrenheit.

Q.      There's also an indication in regard to a
seal; correct?

A.      Yes, there is.

Q.      And that says Seal No. 0000082; correct?

A.      Yes.

Q.      Were there any other cookie dough documents
that you were able to find after examining the
documents removed from the truck?

A.      I recall one other document.  But it was
very similar to this.  It wasn't an exact
document, but it had no additional information
that I remember.

Q.      Agent Duralia, we spoke about this 80 or so
pounds of marijuana that you seized.  Was there a
further investigative plan made to make a payment
in regard to covering the $80,000 or approximately
$80,000 debt owed by Parra for that specific amount
of marijuana?

                MR. CRAWFORD:  Judge, if I could

1    interrupt before Mr. Preston goes into the next

2    area.  Can we approach sidebar for just a moment?

3             THE COURT:  You may.

4             (AT WHICH TIME THE FOLLOWING SIDEBAR

5    DISCUSSION WAS HELD:)

6             MR. CRAWFORD:  If I could inquire of the

7    government if this would be a good time to take a

8    break.

9             THE COURT:  I'm just about to do so.

10             MR. CRAWFORD:  Good.  That's what I was

11    going to hope.

12             THE COURT:  While we're here, the

13    security officer mentioned something about you

14    have a phone call.

15             MR. RODRIGUEZ:  Judge, I gave to your

16    courtroom deputy Judge Graham's courtroom deputy's

17    number in Miami.  I got a text last nights at 6:00

18    that I needed to be available for a telephone

19    conference at 4:45 p.m. on a status conference on

20    a case that I have before Judge Graham.  I think

21    his courtroom deputy is aware that I'm in trial

22    here.  I gave it to your courtroom deputy.  I'll

23    do whatever I'm supposed to do.

24             THE COURT:  Okay.  Well, if it's 4:45, I

25    don't have any problem with that.

1          MR. RODRIGUEZ:  Would we just cut off at

2     4:45?

3          THE COURT:  Yes?

4          MR. RODRIGUEZ:  Fine.  Then I'll just go

5     into the anteroom because you've allowed me to

6     bring my cell phone.  And I'll just have the

7     conference call from there.

8          THE COURT:  That'll be fine.

9          MR. RODRIGUEZ:  Is that okay, Jim?

10          MR. PRESTON:  That's fine by me.

11          THE COURT:  All right.  Well, I

12     didn't --  I was a little hesitant about the 4:30

13     suggestion that I had.

14          MR. RODRIGUEZ:  4:45.

15          THE COURT:  The case is not moving that

16     fast.

17          MR. RODRIGUEZ:  I think we're --

18          THE COURT:  Are we moving along all

19     right?

20          MR. PRESTON:  Coming on the other side

21     of the hill, Judge.

22          MR. RODRIGUEZ:  I think we're over the

23     hump.

24          THE COURT:  All right.  Good.

25          MR. RODRIGUEZ:  Thank you.

1          (WHEREUPON, THE SIDEBAR DISCUSSION WAS

2    CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

3          THE COURT:  We'll take our morning

4    recess at this point, ladies and gentlemen.  We'll

5    reconvene at 11:20.  Do not discuss the case.  Do

6    not make up your minds about any of the issues

7    yet.

8          COURT SECURITY OFFICER:  Please rise for

9    the jurors.

10     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

11      (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

12          PROCEEDINGS CONTINUED AS FOLLOWS:)

13          COURT SECURITY OFFICER:  Please rise for

14    the jury.

15     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

16          COURT SECURITY OFFICER:  Please be

17    seated.

18          All rise.

19          THE COURT:  Mr. Preston.

20          MR. PRESTON:  Thank you, Your Honor.

21    Before further questioning, Your Honor, the

22    parties have reached a stipulation in regard to

23    the marijuana exhibits in this case.  May I

24    publish it at this time?

25          THE COURT:  Agreed, counsel?

1          MR. RODRIGUEZ:  Yes, Your Honor.

2          MR. CHELALA:  Yes, Your Honor.

3          MR. CRAWFORD:  Yes, sir.

4          THE COURT:  Proceed.

5          MR. PRESTON:  Thank you, Your Honor.

6    Government's Exhibit No. 5, which I'm also moving

7    into evidence, is a stipulation which reads:  "It

8    is stipulated and agreed between the parties that,

9    one, representative samples, Government

10   Exhibits 2A1 and 2 of the substances shown in

11   Government Exhibit 1 were tested by Ivette Maria

12   Vallejo, senior forensic chemist, United States

13   Drug Enforcement Administration, and were found to

14   contain marijuana.  The substance shown in

15   Government Exhibit 1 weighed approximately

16   80 pounds.

17          "Two, representative samples,

18   Government's Exhibit 3A, of the substances shown

19   in Government Exhibit 4 were tested by Ethon L.

20   Jolly, senior forensic chemist, United States Drug

21   Enforcement Administration, were found to contain

22   marijuana.  The substance shown in Government

23   Exhibit 4 weighed approximately 1561 pounds.

24          "This stipulation is submitted in lieu

25   of the testimony of Miss Vallejo and Mr. Jolly.

1    Agreed by counsel for all parties."

2              THE COURT:  You may consider that

3    information as having been appropriately presented

4    to you for your consideration.

5    BY MR. PRESTON:

6    Q.    Agent Duralia, when we broke we were talking

7    about a debt owed for the 80 pounds of marijuana by

8    Ramiro Parra.  Was there a further investigative

9    plan to make payments to cover that approximate

10   $80,000 debt?

11   A.    Yes, there was.

12   Q.    What was the plan?

13   A.    There had been numerous conversations back

14   and forth between Mr. Parra, Mr. Mitchell, as well

15   as Mr. Parra, and Mr. Shorter.  There was -- the

16   common theme of all these conversations was to get

17   this money collected and get it delivered.

18   Q.    At this point in time what had the

19   investigation revealed in regard to the defendant

20   Shorter as far as his identity?  Did you know who

21   he was?

22   A.    I'm trying to remember at what point we

23   established the name Sheldon Shorter.  Initially,

24   no, we did not know who he was.  The only name

25   that we knew him by was the nicknames of J or Big

1    Homey.

2    Q.    Was the plan in regard to the payment of

3    money designed in any way to try to further

4    identify the defendant Shorter?

5    A.    Yes.

6    Q.    Could you please explain that.

7    A.    The plan was to provide Mr. Parra with what

8    I am going to refer to as sham currency.  It was

9    material to look like money that was vacuum sealed

10   in plastic to where the only way you would

11   determine that it was not currency would be if you

12   were to cut into it.  The plan was to attempt to

13   deliver that to whoever would pick it up in hopes

14   that Mr. Shorter would in fact travel to take

15   receipt of that money.

16         Early indications were that it could

17   possibly be an associate of his.  But as with most

18   things, we would not know until it actually

19   happened.

20   Q.    Could you please tell the jury how the plan

21   then developed.

22   A.    The plan developed was I instructed

23   Mr. Parra to tell Mr. Shorter that he had a

24   customer of his in the Atlanta area who had

25   collected not all the money but almost all of it,

1   approximately $70,000.  That he was going to meet

2   with that individual, take receipt of the money,

3   and in turn deliver it to wherever the defendant

4   told him to deliver it to.

5        I met with the defendant, I provided him

6   with a black bag which contained the sham currency

7   that I previously described.  At that point in

8   time he had telephonic contact with the defendant

9   who said in fact he was going to meet with

10  Mr. Parra to collect that money.

11  Q.    Did Mr. Parra meet with Mr. Shorter in

12  regard to obtaining that sham package of money?

13  A.    No, he didn't.  At one point Mr. Parra was

14  given instructions by the defendant to meet him at

15  a gas station in the area of Kennedy and Westshore

16  in Tampa.  At that point in time I instructed

17  Mr. Parra to travel to that location, which he did

18  while under surveillance.  When he arrived,

19  surveillance agents observed Cleo Mitchell in the

20  parking lot of that gas station.

21             THE COURT:  Excuse me, Mr. Duralia.

22  When you refer to the defendant, to whom are you

23  referring?

24             THE WITNESS:  I apologize, Judge.  When

25  I referred to the defendant, I meant the defendant

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  Sheldon Shorter.

2           THE COURT:  All right.

3           THE WITNESS:  So at that point in time

4  it became evidence that Cleo Mitchell was the one

5  who was going to take receipt of that money and

6  not Sheldon Shorter.

7           At that point in time I had been in

8  telephonic contact with Mr. Parra who told me that

9  Cleo Mitchell wanted him to follow him to a

10 different location because Cleo Mitchell did not

11 feel comfortable taking the money at that gas

12 station parking lot.

13          So we eventually followed both Cleo

14 Mitchell and Ramiro Parra, who were driving in

15 separate vehicles, but driving in tandem.  We

16 followed them to a location in St. Petersburg,

17 Florida, where Mr. Parra delivered a bag to Cleo

18 Mitchell.

19 Q.    What was done after the bag was delivered?

20 A.    Once again I had contacted the Florida

21 Highway Patrol, and once again it was Trooper

22 Lanese who assisted me by conducting a traffic

23 stop on Cleo Mitchell's car after he had taken

24 receipt of the bag from Mr. Parra.

25 Q.    When these packages of sham money were put

1    together, at whose direction was this done as far

2    as the design of the packages?

3    A.    Well, actually these specific packages that

4    I used in this case were constructed by another

5    agent in my office and used on a previous

6    enforcement operation.  But they suited my needs

7    and purposes for this, so I went ahead and used

8    them.

9    BY MR. PRESTON:

10   Q.    We heard descriptions of Mr. Parra talking

11   about wrapping money.  Was there any necessity for

12   this to be packaged in the same fashion as the

13   organization was using in the past?

14   A.    And that's one of the reasons that the agent

15   in my office constructed it the way he did.  It

16   was common for drug traffickers to package their

17   money vacuum sealed, shrink-wrapped.  It was

18   consistent with the way people would transport

19   bulk currency.

20   Q.    Do you recognize the packages shown in the

21   photograph which is Government's Exhibit No. 10?

22   A.    Yes, I do.

23   Q.    What do you see there?

24   A.    Those are the vacuum sealed packages of sham

25   currency that were used on that date.

Q.    Do they fairly and accurately -- does that photograph fairly and accurately show the packages that were used?

A.    It does.

          MR. PRESTON:  I would move Government's 10 at this time, Your Honor.

          MR. CHELALA:  No objection, Your Honor.

          THE COURT:  It is received.

          (EXHIBIT 10 ADMITTED INTO EVIDENCE.)

          MR. PRESTON:  May I publish?

          THE COURT:  It may be published

BY MR. PRESTON:

Q.    We see the designation on the packages, 30, 30, and 10.  What does that represent, please?

A.    The -- the amount of money in each package. 30 representing $30,000, the second 30 representing $30,000, and then the 10 representing $10,000 for a total of $70,000.

Q.    And these packages were seized from Cleo Mitchell?

A.    Yes, they were pursuant to the traffic stop by the Florida Highway Patrol.

Q.    How far was Cleo Mitchell allowed to travel before the seizure took place?

A.    Not very far.  You know, unfortunately in an

1    ideal world I would have let him travel even

2    further away, but the risk was too high of

3    surveillance losing that vehicle.  And obviously

4    we didn't want anybody getting to a position where

5    they could cut into these packages and determine

6    that they weren't in fact real currency.  So it

7    was important that we stop him prior to him having

8    an opportunity to do that.

9    Q.    And why was that important?

10   A.    Well, because once they cut into these

11   packages and realized that it was not money, there

12   would be to say the least a great amount of

13   suspicion on Mr. Parra that he's either

14   cooperating with law enforcement or trying to rip

15   these guys off.  Either way would not make a good

16   situation.

17   Q.    There was some discussions or testimony

18   already about an apartment in Point -- Rocky

19   Point -- or -- or Post Rocky Point.

20   A.    Post Rocky Point.

21   Q.    Did you have an opportunity after Mr. Parra

22   began cooperating to go to that location?

23   A.    Yes, I did.

24   Q.    Did you see a money counter in that

25   apartment?

A.    Yes.  In one of the closets inside that apartment there was a money counter resting on a top shelf in that closet.

Q.    Was that photographed?

A.    Yes, it was.

Q.    Do you recognize Government's Exhibit No. 6?

A.    Yes, I do.

Q.    Does Government's Exhibit No. 6 fairly and accurately describe the location and the money counter that you just talked about?

A.    Yes.

          MR. PRESTON:  Moving Government No. 6 into evidence, Your Honor.

          MR. CHELALA:  No objection.

          THE COURT:  It is received.

          (EXHIBIT 6 ADMITTED INTO EVIDENCE.)

          MR. PRESTON:  May I publish briefly, Your Honor?

          THE COURT:  You may.

BY MR. PRESTON:

Q.    Why was it important to note or photograph a money counter in this apartment?

A.    In speaking to Mr. Parra, this was a money counter that was used to count the money that was collected, the marijuana proceeds that were

1   collected before being turned over to Sheldon
2   Shorter.
3   Q.      During the course of your investigation did
4   you have an opportunity to speak with a Lance Noel
5   from Fort Lauderdale -- Mercedes Benz of Fort
6   Lauderdale?
7   A.      Yes, I did.
8   Q.      Mr. Noel testified already this morning?
9   A.      Yes.
10  Q.      All right.  Did you review the records that
11  were produced by his business in regard to the
12  transaction which he discussed?
13  A.      I did.
14  Q.      All right.  In that package is there a copy
15  of a driver's license which was submitted at the
16  time of the purchase?
17  A.      Yes, there was.
18  Q.      That is a black and white copy; is that
19  correct?
20  A.      Yes.  The copy they have in their record is
21  a black and white copy.
22  Q.      Did you obtain a color copy of the
23  information contained within that driver's license
24  that was photocopied?
25  A.      I did.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.    And that was from the Department of Highway

2   Safety and Motor Vehicles; is that correct?

3   A.    Yeah.  It's from a database that they

4   maintain for driver's license records.

5   Q.    I'd like to show you what's been marked for

6   identification purposes as Government's Exhibit

7   No. 33.  Do you recognize that, please?

8   A.    Yes, I do.

9   Q.    What is Government's Exhibit No. 33?

10   A.    This is the computer printout including the

11   driver's license information and the photograph,

12   which matches the driver's license that was

13   presented to the Mercedes Benz of Fort Lauderdale

14   when that vehicle was purchased.

15         MR. PRESTON:  I would move that into

16   evidence at this time, Your Honor.

17         MR. CRAWFORD:  No objection.

18         THE COURT:  It is received.

19         MR. PRESTON:  Thank you, Your Honor.

20   May I publish briefly?

21         THE COURT:  You may

22         (EXHIBIT 33 ADMITTED INTO EVIDENCE.)

23         MR. PRESTON:  33, please.

24         May I use the overhead instead, Your

25   Honor?

1  BY MR. PRESTON:

2  Q.    What was the name for this particular

3  driver's license?

4  A.    The name here is Anthony Kaseem Dubois.

5  Q.    And who do you recognize this individual to

6  be?

7  A.    I recognize that to be the defendant Sheldon

8  Shorter.

9  Q.    Agent Duralia, during your investigation did

10 you also speak with individuals who worked for a

11 charter flight company called Hop-A-Jet?

12 A.    Yes, I did.

13 Q.    Specifically, did you speak with an

14 individual who worked there by the name of

15 Mr. Sherwood?

16 A.    Yes, David Sherwood.

17 Q.    And in speaking to David Sherwood, did you

18 show him a photo pack in regard to your

19 investigation?

20 A.    Yes, I did.

21 Q.    And could you describe for the jury what a

22 photo pack or photo spread is.

23 A.    A photo spread, photo pack, photo lineup is

24 a collection of photographs, usually in this case

25 six photographs, all of the photos being of people

of similar characteristics, the same gender, same race. And they're all put together to show to a witness to see if they can recognize the person in question. We do a series of photographs to not be overly suggestive. As opposed to just throwing one in front of them, you give them a series of photographs to choose from.

Q.    Were any of the subjects of your investigation in that photo pack that you put together?

A.    Yes. Sheldon Shorter was in that photo lineup.

Q.    Could you take a look, please, at Government's Exhibit No. 37 for identification.

MR. RODRIGUEZ: Excuse me, Your Honor. Could I have a moment with counsel?

THE COURT: Yes.

MR. RODRIGUEZ: Thank you.

BY MR. PRESTON:

Q.    Do you recognize Government's Exhibit No. 37?

A.    Yes. This is the photo lineup that I presented to Mr. Sherwood.

MR. PRESTON: I would move 37 into evidence at this time, Your Honor.

1          MR. RODRIGUEZ:  No objection.

2          THE COURT:  It is received.

3          (EXHIBIT 37 ADMITTED INTO EVIDENCE.)

4     BY MR. PRESTON:

5     Q.    Mr. Sherwood indicate whether he recognized

6     anyone in that particular photo lineup?

7     A.    Yes.  Upon viewing the lineup, he looked at

8     the defendant Sheldon Shorter's photograph and

9     stated that he looks like one of the subjects that

10    was on the aircraft that he was a pilot on.

11    Q.    And did you ask him to write that on that

12    particular document and initial it?

13    A.    What I instructed him to do was to --

14    whatever photograph that he thought he recognized,

15    to -- each position is give a number designation,

16    one, two, three, four, five, six.  I said please

17    circle the number of the photo you identified.

18    Mark it with your initials.  And then write

19    whatever you want to write to explain to me why

20    that photograph is significant.

21    Q.    And did he do that?

22    A.    He did.  In this case Sheldon Shorter's

23    photograph is in Position 3.  He circled the

24    three, marked it with his initials, and he wrote,

25    "Looks like the lead guy."

1          MR. PRESTON:  May I publish that, Your

2     Honor?

3          THE COURT:  You may.

4     BY MR. PRESTON:

5     Q.    Position 3, though it has a little glare on

6     it, is this location here?

7     A.    That is correct.

8     Q.    Agent Duralia, were recordings made during

9     the course of this investigation?

10    A.    Yes, there were.

11    Q.    And were transcripts prepared of those

12    recordings?

13    A.    There were transcripts prepared, but not of

14    every recording made in the investigation.

15    Q.    Are you familiar with the transcripts which

16    had been admitted thus far in the investigation?

17    A.    Yes.

18    Q.    I specifically would like to refer you to

19    the transcripts which are contained with

20    Exhibit 12.  And that would be Exhibits 12A through

21    12E.  Did you prepare those transcripts?

22    A.    Can you refresh my memory as to what those

23    transcripts pertain to?

24    Q.    I'll hand you copies.  Did you prepare those

25    transcripts that I've just handed you, Government's

1  Exhibit 12A through 12E?

2  A.    Yes, I did.

3  Q.    The person speaking on those transcripts --

4  or on that recording as I -- or start over.

5      The person speaking in the recordings which

6  are reflected in those various transcripts are

7  identified by name; correct?

8  A.    Well, yes and no.  One of the speakers is

9  identified by name, and that's the name Volcy.

10  The other speaker, it's identified by CS.

11  Q.    What does CS represent?

12  A.    It's an abbreviation for confidential

13  source.

14  Q.    And who was the confidential source on those

15  recordings?

16  A.    It's referring to Ramiro Parra.

17  Q.    Stating the obvious I guess, but are you

18  familiar with Ramiro Parra's voice?

19  A.    Yes, I am.

20  Q.    And from meeting with Mr. Volcy and court

21  appearances are you familiar with his voice?

22  A.    I've actually met with Mr. Volcy, we spoke

23  on the telephone on one occasion, and I've heard

24  his voice in court.  And it's from those

25  encounters that I am familiar with his voice.

Q.    Was it based on that familiarity that you
identified Mr. Volcy as the other participant to
these conversations?

A.    Yes.  And in addition to that, I listened to
another recording where Mr. Volcy's voice was
captured.  I listened to that as well as what I
just described.  And based on all of that that's
how I came to that determination.

          MR. PRESTON:  Could I have a moment,
Your Honor?

BY MR. PRESTON:

Q.    Agent Duralia, are you familiar with what
has been marked for identification purposes as
Government's Exhibits No. 13 and a transcript, 13A?

A.    If you're referring to the conversation that
was in Creole, then I am.

Q.    Was a conversation recorded that was in
Creole?

A.    Yes.

Q.    Did you obtain a copy of that recording from
the Florida Highway Patrol?

A.    I did.

Q.    Did you listen to it?

A.    I listened to it to confirm that I actually
did have a recording of the conversation, that

1    the -- that the equipment actually worked.

2    Q.    What voices on that recording were you able

3    to identify?

4    A.    Initially I was able to identify Trooper

5    Lanese's voice.

6    Q.    Okay.  And from your contact with any other

7    individuals were you ultimately able to identify

8    additional voices?

9    A.    Yes.  Not during the first time that I

10   listened to it, but later on after I reviewed it

11   again I was able to review Mr. Volcy and

12   Mr. Baptiste.

13   Q.    Both Mr. Volcy and Mr. Baptiste?

14   A.    Yes.  Mr. Volcy based on other contact I had

15   with him, and then obviously Mr. Baptiste by

16   process of elimination.

17   Q.    And then did you have a later occasion to

18   hear Mr. Baptiste speak?

19   A.    Yes, I've heard Mr. Baptiste speak in court.

20   Q.    Did you provide information to the

21   translators in regard to the designation of voices

22   on the particular recording?

23   A.    Yes, I did.  Any time we submit any kind of

24   recording for translation, we have to give some

25   sort of background to give them some guidance so

that they can make that determination.

Q.    And from your review of the transcript are
the voices -- from your preliminary review of the
transcript were the voices appropriately placed in
regard to the speakers?

A.    Yes, I believe so.

Q.    Agent Duralia, from your experience are you
familiar with conversion of kilograms to pounds?

A.    Roughly, yes.

Q.    And roughly what does a kilogram way in
pound quantities?

A.    One kilogram is equal to approximately two
point two pounds.

Q.    So a thousand kilograms would be about
2200 pounds?

A.    Yes.

        MR. PRESTON:  I believe that's all I
have at this time, Your Honor.  I would -- I'd
like to reserve the right to recall Agent Duralia
if necessary.

        THE COURT:  All right.
Cross-examination.

        MR. CHELALA:  Yes, Your Honor.
                CROSS-EXAMINATION
BY MR. CHELALA:

1   Q.      Good afternoon --

2   A.      Good morning.

3   Q.      -- or late morning still.

4           When you were looking earlier at

5   Government's Exhibit 30, it seemed to be a sheet

6   from a Countryside Baking you said?

7   A.      Yes.  I still have that exhibit in front of

8   me.  Government Exhibit 30 is labeled a picking

9   sheet from Countryside Baking Company.

10  Q.      And where does that -- does that sheet tell

11  you where Countryside Baking is?

12  A.      Yes.

13  Q.      And where is that?

14  A.      It's located at 1722 Kettering Street in

15  Irvine, California.

16  Q.      In Irvine.  Okay.  And when reviewing the

17  driver logs contained in Government's 24 and 25

18  earlier, you were showing the jury driver logs for

19  Mr. Volcy and Mr. Baptiste apparently; correct?

20  A.      That's correct.

21  Q.      Okay.  And you were reviewing with the jury

22  earlier their driver logs for April 18th through

23  the April 20th; correct -- or the 21st rather?

24  A.      Yes.  April 18, 2008, through April 21st,

25  2008.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.     And specifically you educated the jury

earlier that on April -- excuse me.  You educated

the jury earlier that on April 19th and 20th, at

least according to those logs, you indicated

some -- that one of the logs said off duty in

Riverside, California, on the April 19 and 20?

A.     Yes.  On April 19th in one way or another

both logs designate an off duty status --

Q.     Okay.

A.     -- as well as -- give me a moment and I can

tell you about the 20th as well.  Yes.  And for

April 20th they both show an off duty status.

Q.     So that off -- just so that we're all on the

same page, for April 19th and 20th, it's -- it's

reflecting, those logs are, off duty status in

Riverside, California, at least according to those

logs?

A.     Yes.

Q.     Okay.  And would you agree with me that

April 19th is a Sunday and April 20th is a Monday

last year?

A.     I do not know.

Q.     Okay.  You do not know.  Now, you did review

as well with us earlier that after April 20th in

Riverside, California, that there was, at least on

1    those logs, movement at around 2 o'clock in the

2    afternoon until 4:30 in the afternoon on April 21st

3    taking the truck supposedly from Riverside,

4    California, to Irvine, California; correct?

5    A.    That is correct.  That is reflected in

6    Government Exhibit No. 25.  It shows some time

7    after 2:00 p.m. some movement, and then after 4:00

8    p.m. them being present in Irvine, California.

9    Q.    And so then to connect the questions that

10   I've asked you today, earlier about five questions

11   ago you agreed with me that on that sheet from the

12   Countryside Baking Company that the Countryside

13   Baking Company's address on that sheet is Irvine,

14   California?

15   A.    Yes.

16   Q.    Okay.  And the last -- the previous question

17   and the answer you gave me was at least according

18   to the driver logs, on April 21st the truck was --

19   of these two gentlemen, the one they were driving,

20   is in Irvine, California?

21   A.    That is noted here on Government Exhibit 25.

22   Q.    Okay.

23   A.    Necessarily on Government Exhibit 24.  But

24   on Government 25, yes, Irvine, California, on the

25   21st.

1     Q.    And that would be apparently the same

2    Irvine, California, that Countryside Baking Company

3    is located then according to that sheet?

4    A.    I have no reason to believe otherwise.

5    Q.    Okay.  Now, I think you may have misspoke.

6    On that same sheet --

7           MR. CHALELA:  Your Honor, may I have

8    that brought up, the Government's 30?

9           THE COURT:  Yes, if you have --

10          MR. PRESTON:  We'll produce it.

11          MR. CHELALA:  Thank you.  Thank you so

12    much.

13    BY MR. CHELALA:

14    Q.    On Government's 30 I think you misspoke.

15    Can you tell us who is -- up there on the top you

16    see where it says sold to?

17    A.    Yes.

18           MR. CHALELA:  And thank you for -- for

19    amplifying it for me.

20    BY MR. CHALELA:

21    Q.    Can you tell the jury who it's sold to?

22    A.    Walmart.

23    Q.    Walmart Stores, Incorporated, specifically;

24    correct?

25    A.    Yes.  What did I testify to previously?

1    Q.     No.  No.  And it has Walmart Stores,

2    Incorporated.  That means it's a company; right?

3    Not a -- Walmart, Incorporated, is a -- it's a

4    corporation.  It's a legal corporation; right?

5    That's what INC means, you would agree with me?

6    A.     Okay.

7    Q.     Okay.  And you testified earlier that that

8    company of Walmart Stores, Incorporated was in

9    Bentonville, Arizona.  And I think that that's

10   where you made a mistake?

11   A.     Yes, you may be right.

12   Q.     Is that Arkansas?

13   A.     Right.  Exactly.  I apologize.  I did

14   misspeak.

15   Q.     I get that confused myself.  But so the jury

16   understands, it was sold to Walmart Stores,

17   Incorporated, in Bentonville, Arkansas, not

18   Arizona; correct?

19   A.     I believe so.

20   Q.     Okay.  Or at least that's what that sheet

21   says?

22   A.     Okay.

23   Q.     Okay.  Now, it says that it's going to be

24   shipped to a specific place in Florida, Winter

25   Haven, Florida?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.     Yes.

Q.     Okay.  And we can see that right to the
right of that.

       Now, up above on the top right hand corner
it says ship date 4/21/2008.  That would be
April 21st, 2008; correct?

A.     Correct.

Q.     Now, let's talk about what that sheet tells
you about who is actually doing the shipping.
Would that be that Countryside Baking,
Incorporated, at the top left-hand corner?

A.     It would be an assumption on my part, but
that's what I would gather from this document.

Q.     Okay.  That's what you would conclude from
that document; correct?

A.     Yes.

Q.     And this is Government's 30?

A.     Government Exhibit 30.

Q.     Okay.

       MR. CHALELA:  Could you please put that
back up amplified, please?  Thank you.

BY MR. CHALELA:

Q.     Okay.  On the top left-hand corner it says
Countryside Baking, Incorporated -- INC.  Again, a
company.  And then what does it say there?  A what?

A.    I believe it says a Dawn Food Products
company.

Q.    Okay.  And where is the address listed for
that company?

A.    Directly underneath where it states a Dawn
Food Products company.

Q.    And what is that address, please?

A.    As I testified to before, it's 1722
Kettering Street, Irvine, California, a zip code
of 92614.

Q.    Okay.  So we have a ship date of April 21st
from a company located in Irvine, California, that
would be consistent with those driver logs you
talked about where it says that the truck went to
Irvine, California on April 21st; right?

A.    Yes.

Q.    Now, under the ship date in the top
right-hand corner we see apparently an order
number; correct?

A.    Correct.

Q.    And in fact, additionally we see a customer
number listed; correct?

A.    Yes.

Q.    And above that we have a phone number and a
fax number apparently for that baking company in

1    the 949 area code?

2    A.    Yes.

3    Q.    Okay.  And now, we go down -- the reader

4    goes down and sees the first column that says

5    customer P.O.  And then there's a long number.  And

6    it says ship via coastal.  What does FOB mean?

7    A.    I do not know.

8    Q.    Okay.  And then it says terms two percent

9    15, net 30.  Do you know what that means?

10   A.    I do not.

11   Q.    Okay.  Back to the left-hand vertical area

12   in the bottom, it says -- of the top -- on the

13   bottom of the top, it says item number; correct?

14   A.    Yes, it does.

15   Q.    And then unit is a case?

16   A.    Yes.

17   Q.    Okay.  And you talked about one of the

18   government's exhibits being a series of boxes;

19   correct?

20   A.    Which exhibit are you referring to?

21   Q.    I think it's -- it's the -- it says -- if an

22   onlooker is looking at the back of the trailer that

23   was stopped on April 24th with boxes in front of

24   the viewer.

25   A.    I'm sorry.  You saying that's been presented

1    to me already?

2    Q.    I think you've testified to that.

3          MR. PRESTON:  It hasn't been identified,

4    Your Honor, through this witness.  But I have no

5    objection to its use if it's identified by the

6    defense.

7          MR. CHELALA:  May I please use this

8    ELMO?

9    BY MR. CHALELA:

10   Q.    That picture where the viewer of the camera

11   is looking at the back of the trailer.

12   A.    Yes.

13   Q.    Okay.  And -- and you testified earlier

14   about there being -- I think the question by the

15   government was a whole bunch of boxes; correct?

16   A.    I said there were numerous boxes in the

17   truck.

18   Q.    And for the average day citizen seeing that,

19   that would be apparently a whole bunch of boxes;

20   correct?

21   A.    I would agree.

22   Q.    Okay.  Thank you.

23         MR. CHALELA:  Can you please put on that

24   shipping sheet again, the shipping sheet that we

25   were talking about earlier.

1          THE COURT:  Exhibit 30.

2          MR. CHELALA:  Government's 30.  Thank

3    you.  Could you amplify that top area about which

4    we were speaking?  Thank you.

5    BY MR. CHALELA:

6    Q.     You see where it -- you would agree with me

7    that there under item number, next to that it says

8    unit, and it says case; correct?

9    A.     Yes.

10   Q.     It does not say box there, does it?

11   A.     It says case.

12   Q.     Thank you.  And then under the description

13   of the unit, case -- or case units, it would say --

14   it does say oatmeal raisin cookie dough; correct?

15   A.     Yes, it does.

16   Q.     And next it says the amount ordered is 77,

17   and the amount shipped is 77; correct?

18   A.     I would agree.

19   Q.     Thank you.  And in those boxes did you have

20   a chance to verify that indeed there were cookie

21   dough or some kind of dough?

22   A.     I personally did not cut into the boxes, but

23   I believe somebody did and did confirm that.

24   Q.     Okay.  No marijuana, nothing like contraband

25   or anything else like that; right?

1    A.    No.

2    Q.    Okay.

3          MR. CHALELA:  And could you please

4 amplify the whole sheet so I can just see it.

5 Thank you.

6 BY MR. CHALELA:

7    Q.    On the bottom left-hand corner you did

8 testify earlier about --

9          MR. CHALELA:  Thank you for amplifying

10 that.

11 BY MR. CHALELA:

12    Q.    You had testified about a seal number.  And

13 there's that number that we can now see on the left

14 bottom hand corner of Government's 30; correct?

15    A.    You're referring to the seal number?

16    Q.    Yes, yes.

17    A.    Yes, I see that there.

18    Q.    Now, do you know what a seal is in trucker

19 terms?

20    A.    Yes, I do.

21    Q.    It's not like a heavy sheet of plastic that

22 closes the back of a truck, is it?

23    A.    I don't believe so.

24    Q.    It's a mechanism that locks with stainless

25 steel bolts or some kind of locking steel mechanism

1    the back of a trailer; correct?

2    A.    That's not my understanding.

3    Q.    What is your understanding?

4    A.    I'm not familiar with the trucking industry

5    that much, but from my limited experience I know

6    the one particular type of seal that I have seen

7    it's several inches long; it's made of a flexible

8    type of plastic.  It basically connects into

9    itself so it's not actually a locking mechanism.

10          It's simply something that can be put on the

11   door that whoever is receiving it can see if it's

12   been taken off.

13   Q.    Oh, okay.  Let me back up.  I think we're

14   talking about the same thing.  That seal, the

15   literal seal about which you just testified, is put

16   on the lock, the closing mechanism that locks

17   closed the trailer so it doesn't pop open during

18   the trip?

19   A.    That steel rod you said, that's not actually

20   part of the seal.  I believe it's part of the

21   actual back door to the tractor.

22   Q.    The point of that is unless that seal is

23   broken, one wouldn't be able to use the normal

24   opening mechanism of that door; correct?

25   A.    I don't know.

1    Q.    Okay.  Fair enough.

2          Now, on the bottom left-hand corner again we

3    see the word "case" but this time it's in the

4    plurality.  It says total cases 77; correct?

5    A.    Yes it does.

6    Q.    And it does not say "boxes," does it?

7    A.    It does not.

8    Q.    Okay.  Thank you.  And also somebody

9    apparently signed it on April 21st, '08, at the

10   bottom right-hand corner of that whole sheet we

11   just reviewed; correct?

12   A.    I see the signature and I see the date.

13   Q.    Okay.  Thank you.

14         Now, you testified that the actual bundles

15   of marijuana in that trailer that was stopped by

16   Trooper Lanese from the Florida Highway Patrol, had

17   inside of those bundles of marijuana that we saw in

18   a government exhibit; correct?

19   A.    I'm sorry.  Repeat your question.

20   Q.    Earlier in your direct testimony by the

21   government in Government's Exhibit No. Four, we saw

22   a whole bunch of bundles of wrapped marijuana that

23   were seized from a trailer by Trooper Lanese on

24   April 24th; correct?

25   A.    Yes.

Q.     Okay.  Now, I think you testified on direct,
while I was listening, that those bundles of what
you've determined to be marijuana were all the way
in the front of the trailer?

A.     Yes.

Q.     And I think the question from Mr. Preston
was that there were a whole bunch of boxes of
cookie dough -- a whole bunch of boxes before one
could even get to the front of the trailer where
the marijuana was?

A.     That is correct.

Q.     In Government's Exhibit No. 4 that we have
seen and about which you've testified, those
bundles, I think you said, contained over
1500 pounds of marijuana?

A.     Yes.

Q.     Those were all in that same trailer;
correct?

A.     Yes, they were.

Q.     You would agree with me the manner in which
the bundles were wrapped doesn't allow the causal
or -- the casual onlooker who comes upon those
bundles of marijuana to know that there's marijuana
inside it?  In other words, they're not see-thru
wrapping, are they?

1  A.    No, I don't believe they were.

2  Q.    You testified earlier about the

3  investigation launched primarily based on your --

4  the arrest of Ramiro Parra and his willingness to

5  cooperate with you to help reveal the whole

6  conspiracy about which we're here.

7        And he did that about April 3rd; correct?

8  A.    Yeah.  I believe April 3rd was the first

9  time I spoke to him, within a day or two.

10 Q.    And you testified earlier today that one of

11 those things about which he told you was he was

12 expecting, given the habit of his industry, he was

13 expecting probably another shipment by tractor

14 trailer to this 118th Avenue warehouse in Largo,

15 Florida; correct?

16 A.    That is correct.

17 Q.    Okay.  And then so this is how you explained

18 --  this is how we end up having Mr. Parra on the

19 phone on April 24 talking to some truck drivers;

20 correct?

21 A.    Yes.

22 Q.    Okay.  Now, you testified earlier that on

23 one occasion prior to April 24th Mr. Parra himself

24 told you that he would expect a blue cab --  blue

25 truck, a white trailer with blue letters S-W-I-F-T,

1  in other words, Swift on the side of trailer;

2  correct?

3  A.    Not entirely correct.  He gave that in

4  response to a question from me.  He explained what

5  had happened in the past.  Told me about these

6  past deliveries.

7       Anticipating this next one I wanted to have

8  as much as information as possible.  Clearly, I'm

9  attempting to locate a truck I had never seen

10 before.  It was going to make my job that much

11 easier.  I asked him, based on your past

12 experience, could you describe trucks you have

13 seen in the past, hoping one of the trucks from

14 before would also deliver this time.

15      It was a response to a question that he

16 provided me with that description.

17 Q.    Okay.

18      In fact, in response to that question,

19 that's the only --  based on his prior experience

20 with truckers, that was the only description he

21 gave you; correct?

22 A.    Yes, it was.  I believe I asked him to give

23 me one of the more recent deliveries, thinking it

24 was more likely it was a truck used recently, more

25 likely it would show up again as opposed to a

1  truck shown up a year ago.  I asked for one of the

2  more recent delivery descriptions.

3  Q.    You also testified on direct earlier about

4  U.S. 19 and Ulmerton being at least a couple miles

5  away from the 118th Avenue and Belcher Road address

6  where this warehouse of Parra's was; correct?

7  A.    That's a rough statement.  I don't know if

8  exactly two miles, but roughly.

9  Q.    The situation here is that you are talking

10  to a 18-wheeler that's going to be delivering this

11  load?

12  A.    Yes.

13  Q.    A big old semi-truck; right?

14  A.    Big tractor trailer.

15  Q.    Are you familiar with when one comes off the

16  Howard Franklin on April 24th last year, when one

17  comes off the Howard Franklin one can be on an

18  avenue which is Ulmerton Road; correct?

19  A.    If you take that exit, yes.

20  Q.    Very good.  And as one approaches this major

21  artery with which you're familiar, having been

22  Largo PD, one sees U.S. 19 in front crossing over

23  the Ulmerton Road; correct?

24  A.    Yes.  As you exit off of Interstate 275 and

25  continue west bound on Ulmerton, eventually you

1  would reach the intersection of Ulmerton and U.S.

2  19.

3  Q.    And one would be able to turn left on

4  Belcher Road thereafter, at some point thereafter?

5  A.    Yes.  You would continue through the

6  intersection of U.S. 19 and then you'd continue

7  west so that you would reach Belcher Road and you

8  could turn left to put you southbound on Belcher.

9  Q.    Okay.  Now, you know that there were at

10  least two areas of major construction back on

11  Ulmerton Road back on April 24th at this incident

12  date?

13  A.    No, I don't recall.

14  Q.    And also you would know that U.S. 19 is an

15  overpass; it's actually above my head as I'm

16  traveling westbound on Ulmerton Road?

17  A.    I believe so.

18         MR. CHELALA:  May I have one moment,

19  Your Honor?

20         THE COURT: You may.

21         MR. CHELALA:  Thank you, Your Honor.  No

22  further questions.

23         THE COURT: We're going to take our noon

24  recess at this time.  We will reconvene at 1:30.

25         Please do not discuss the case among

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  yourselves or with anyone else or permit anyone to

2  discuss it with you or in your presence.  Do not

3  make up your minds about any of the issues yet.

4  You may take the jury.

5  COURT SECURITY OFFICER:  All rise for

6  the jury.

7  (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

8  THE COURT:  Mr. Duralia, you may come

9  down.

10  THE COURT:  Please be seated.  Mr.

11  Crawford?

12  MR. CRAWFORD:  Your Honor, I have a

13  matter.  Mr. Volcy's cousin that is down from out

14  of town and staying with him during this trial did

15  not bring his driver's license.  And it's

16  difficult -- impossible for me to get him into the

17  courtroom.

18  He'd like to come watch for this

19  afternoon.  Is there any way I could work with the

20  CSOs with the Court's permission and clear him to

21  come in and watch the trial this afternoon?

22  THE COURT:  Does he have some

23  identification?

24  MR. CRAWFORD:  No, sir.  I don't believe

25  so.  Now, he is with Mr. Volcy's brother who does

1    have identification.  They both -- and I can vouch

2    for him.  He just doesn't have any I D.

3              THE COURT:  Do you know the individual?

4              MR. CRAWFORD:  I have met him on two

5    prior occasions.

6              THE COURT:  You know he is who he says

7    he is?

8              MR. CRAWFORD:  I believe he is.

9              THE COURT:  Well, what do you know?

10             MR. CRAWFORD:  I know he's a nice guy.

11             THE COURT:  Mr. Volcy, who is this

12    individual that Mr. Crawford is talking about?

13             THE DEFENDANT:  He is my cousin.

14             THE COURT:  Your cousin?  Where does he

15    live?

16             THE DEFENDANT:  In Trenton, New Jersey.

17             THE COURT:  Pardon?

18             THE INTERPRETER:  In Trenton, New

19    Jersey.

20             THE COURT:  Do you have an address for

21    him?

22             THE DEFENDANT:  Yes.  I will give you an

23    address for him.  1618 Greenwood Avenue, Trenton,

24    New Jersey.

25             THE INTERPRETER: 1618 Greenwood Avenue

1    in Trenton, New Jersey.

2            THE COURT:  Is there anyone else here

3    that can vouch for him that he is who he says he

4    is?

5            THE DEFENDANT:  Yeah.  My brother, he is

6    outside.

7            THE COURT:  Ask him to come in, please.

8            MR. CRAWFORD:  Judge, when we say

9    outside, he is outside the courthouse out on the

10   street.

11           THE COURT:  This is the brother of

12   Mr. Volcy?

13           MR. CRAWFORD:  That's correct.

14           THE COURT:  Does he have an

15   identification?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Let's have your brother come

18   in with your cousin so your brother can identify

19   him and assure the Court that he is who he says he

20   is.  And your brother has produced his

21   identification to come into the courtroom?

22           THE DEFENDANT:  Yes.

23           THE COURT:  All right.

24           MR. CRAWFORD:  Thank you, Your Honor.

25   We'll reconvene at 1:30.

1          THE COURT:  Procedurally, I think what

2     we need to do is have Mr. Volcy's brother come

3     downstairs to the court --  to the courthouse with

4     the cousin, and Mr. Swanson, can you take care of

5     this situation for us.

6          DEPUTY U.S. MARSHAL:  May I approach the

7     bench, Your Honor?

8          THE COURT:  Yes, please do.

9          (DEPUTY U.S. MARSHAL SPEAKING TO THE

10    COURT OFF THE RECORD.)

11         THE COURT: We'll reconvene at 1:45 --

12    excuse me, 1:30.

13      (THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND

14       THEN THE PROCEEDINGS CONTINUED AS FOLLOWS:)

15         COURT SECURITY OFFICER:  Please rise for

16    the jurors.

17     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

18         COURT SECURITY OFFICER:  All rise.  This

19    Honorable Court is again in session.  Please be

20    seated.

21         THE COURT:  Good afternoon, ladies and

22    gentlemen.

23         MEMBERS OF THE JURY:  Good afternoon.

24         MR. PRESTON:  Good afternoon, Your

25    Honor.

1          THE COURT:  Mr. Rodriguez.

2          MR. RODRIGUEZ:  Yes, Your Honor, may I

3    proceed, please?

4          THE COURT:  You may.

5          MR. RODRIGUEZ:  Thank you.

6                   CROSS-EXAMINATION

7    BY MR. RODRIGUEZ:

8    Q.    Agent Duralia, I'm going to ask you some

9    questions about your direct examination that you

10   did earlier this morning, and I'm going to ask your

11   assistance to help us with some exhibits.  All

12   right?

13   A.    Okay.

14   Q.    During the course of your investigation you

15   had contact with, interaction, or interviewed

16   Ramiro Parra dozens of times; is that accurate?

17   A.    Yes, it is.

18   Q.    And if not all the time, the majority of

19   times you wrote some type of a report?

20   A.    Yes.  Not every time, but most times.

21   Q.    Fine.  And do you have those with you or

22   somewhere you can access them?  I want to ask you

23   some questions.

24   A.    I do not.

25   Q.    Okay.  If you need them I don't have any

1    problem with you refreshing your recollection

2    because I know you did a lot of work.  Okay?  But

3    I'm going to direct you to not your first contact

4    and probably not your tenth contact, but now

5    Mr. Parra is out of jail, he's in -- he's in your

6    office, and it's approximately May 12th.  And the

7    subject matter is the Dodge car that you described

8    earlier.  Okay?

9    A.    Okay.

10   Q.    If you recall, on that same day Mr. Parra

11   told you he received a phone call from Cleo

12   Mitchell.  Do you recall that?

13   A.    I don't recall that specifically, no.

14   Q.    Excuse me.  We'll try it this way.  Do you

15   recall him telling you he received a call from Cleo

16   Mitchell on May 12th, 2008, and giving you a

17   specific number for Cleo Mitchell?  It's not a

18   test.  We're just trying to do this legally.

19   A.    I know.  And I'm trying to recall that

20   specific phone call, but I do not.  There were

21   times where Ramiro Parra gave me phone numbers for

22   Cleo Mitchell.

23   Q.    If I showed you your report, may it refresh

24   your recollection?

25   A.    It may.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. RODRIGUEZ:  May I approach the

2     witness, Your Honor?

3               THE COURT:  You may.

4     BY MR. RODRIGUEZ:

5     Q.    Have you had sufficient time to review it?

6     A.    Just give me another moment, please.

7     Q.    No problem.

8     A.    Okay.

9     Q.    Does looking at your report of that day

10    refresh your recollection, Agent?

11    A.    It does.

12    Q.    Mr. Parra told you on May 12th that he

13    received a phone call from Cleo Mitchell?

14    A.    Yes.

15    Q.    Gave you a telephone number?

16    A.    Yes.

17    Q.    During that conversation Mitchell told Parra

18    that Parra still owes money from a previous

19    marijuana delivery; isn't that correct?

20    A.    Correct.

21    Q.    And that Mitchell insisted that Parra

22    provide him with one of his cars as partial

23    payment; correct?

24    A.    Yes.  That Parra was going to have to turn

25    over one if his cars as payment for that debt.

1    Q.    That's what Mitchell -- excuse me.   That's

2    what Cleo Mitchell told Parra?

3    A.    Correct.

4    Q.    Okay.   And that Mitchell also said to Parra

5    that he would be receiving a phone call later from

6    Mr. Shorter?

7    A.    Correct.

8    Q.    And that he did later receive a phone call

9    from Mr. Shorter?

10   A.    Correct.

11   Q.    That was on the 12th?

12   A.    Yes.

13   Q.    Now, that is the conversation that initially

14   sets up the scenario that you created in order to

15   continue your investigation; is that correct?

16   A.    Which scenario are you referring to?

17   Q.    Scenario of delivery of the car and who was

18   going to pick up the car and who you were going to

19   identify.

20   A.    It wasn't exactly a scenario that we

21   created.   It was one that was pretty much forced

22   upon us.

23   Q.    But then you went with it I'm saying because

24   you had testified before you wanted to

25   infiltrate -- excuse me.   You wanted to identify

SANDRA K. LEE, RPR   OFFICIAL UNITED STATES COURT REPORTER

1  other people?

2  A.    Well, when I testified to identifying other

3  people in the organization, that was when we were

4  speaking about the $70,000 in sham currency that

5  was turned over.

6  Q.    Right.

7  A.    That wasn't my testimony regarding the

8  vehicle.

9  Q.    Okay.  But this is a preclude to the 70,000,

10  is it not?

11  A.    Yes.

12  Q.    Okay.  That's what I'm trying to say.  This

13  was a -- the foundation for which later on came the

14  $70,000 --

15  A.    Right.

16  Q.    -- because we were talking approximately --

17  Cleo telling Parra that he owed him a hundred

18  thousand dollars?

19  A.    Yes.  This vehicle was going to go towards

20  the same debt --

21  Q.    Okay.

22  A.    -- that the $70,000 was going towards.

23  Q.    So just to have a chronology, on May 12th is

24  the day that Mitch -- that Mitchell calls Cleo and

25  says I want one of your cars as partial payment,

1  May 12th?

2  A.   Yes, May -- I don't know if it was the first

3  time it ever came up in conversation, but there

4  was a conversation regarding the vehicle.

5       THE COURT:  Excuse me, Counsel.  I think

6  you said Mitchell calls Cleo.

7       MR. RODRIGUEZ:  Excuse me, Your Honor.

8  Thank you for catching that.

9  BY MR. RODRIGUEZ:

10  Q.   Cleo calls Parra?

11  A.   Correct.

12  Q.   Thank you.  Okay.  So that's May 12th?

13  A.   Yes.

14  Q.   On May 20th, six days later, now Parra is

15  instructed to have a prearranged meeting with Cleo;

16  correct?

17  A.   That's not my recollection.

18  Q.   Okay.

19       MR. RODRIGUEZ:  May I approach Your

20  Honor?

21       THE COURT:  You may.

22  BY MR. RODRIGUEZ:

23  Q.   Again, I'll show you your report of May

24  20th.

25  A.   Yeah.

1    Q.    Does that help you refresh your

2    recollection, Agent?

3    A.    Yes, it does.

4    Q.    Okay.  Just so that we understand -- and

5    again, we have to go through this process -- I'm

6    sorry -- because your reports -- uhm, after the

7    May 12th conversation, you meet with Mr. Parra and

8    set up a scenario -- those are your terms -- do you

9    not, to have a prearranged meeting with someone

10   who's going to turn over the car, which is partial

11   payment?

12   A.    On the May 20th date that you're referring

13   to I believe it was the vehicle title that was

14   being provided to Mr. Mitchell, not the vehicle

15   itself.

16   Q.    Okay.

17   A.    I don't recall the chronology.

18   Q.    Okay.

19   A.    I think the car at this point may have

20   already been turned over.

21   Q.    All right.

22   A.    But I don't --

23   Q.    Okay.

24   A.    -- specifically recall.  But on the

25   particular date you're asking about it was the

1   vehicle title --

2   Q.      Okay.

3   A.      -- that was being turned over to Cleo

4   Mitchell.

5   Q.      We'll get back to the turning over of the

6   car.  But let's get -- let's get to May 20th.  May

7   20th you instructed Mr. Parra to arrange a meeting

8   with Mr. Mitchell, did you not?

9   A.      Yes.

10  Q.      And it's because Mitchell or Cleo was

11  demanding the title to Parra's car?

12  A.      Yes.  Cleo Mitchell told Ramiro Parra to

13  turn over the title to the car.

14  Q.      Okay.  And this was part of the payment

15  towards the payment that Parra owed Cleo; correct?

16  A.      Well, I would argue that it was a payment

17  that Parra owed to the organization, Cleo Mitchell

18  and Sheldon Shorter.

19  Q.      I'm not asking you for your impressions, I'm

20  asking you what Parra told you.  Didn't Mitchell

21  previously call him and say you owe me the money,

22  and you're going to give me one of your cars for

23  the money that you owe me?

24  A.      No.  My understanding was this was going

25  towards Sheldon Shorter.

1    Q.    Well, again, Agent, I know your efforts, but

2    I'm not asking you that.  Do you want to read your

3    report of the 12th again?

4    A.    Okay.

5            MR. RODRIGUEZ:  Excuse me a second.  I

6    put it away.

7            MR. PRESTON:  May 12th?

8            MR. RODRIGUEZ:  May 12th.  Do you have

9    it?

10            MR. PRESTON:  I have a copy.

11            THE COURT:  There's a copy behind you,

12    Counselor.

13            MR. RODRIGUEZ:  Oh, thank you.  Do you

14    have the 20th also?

15            MR. PRESTON:  I'm looking for it.

16            MR. RODRIGUEZ:  He's going to provide

17    it.

18    BY MR. RODRIGUEZ:

19    Q.    Look at this and tell us if this is your

20    report of the 12th.

21    A.    It's in my report.  I explained that

22    Mitchell --

23    Q.    Let me -- let me -- I'll ask you.  Okay?  It

24    says right here --

25    A.    I was going to answer your last question,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    but continue.

2    Q.    Well, go ahead.  It's your report.  You

3    correct me.

4    A.    In -- in the report it states that --

5    Q.    Paragraph 3.

6    A.    Well, I would go to Paragraph 2 to make it

7    more clear where Mitchell explains that he and

8    Shorter were discussing -- he and Shorter being

9    Mitchell and Shorter were discussing the fact that

10   the confidential source, being Parra, still owes

11   the organization a great deal of money.

12   Q.    Whoa.  Whoa.  Let's go back.  Let's go back.

13   These are your words, are they not?

14   A.    Yes.  I authored this report.

15   Q.    This is the authored report.  This is a

16   synopsis of what Parra told you?

17   A.    Correct.

18   Q.    Okay.  This is not a conversation that you

19   listened to nor that you were involved in; right?

20   A.    Correct.

21   Q.    So and Parra used the words "organization,"

22   correct, or are those your words?

23   A.    This is a synopsis of a conversation between

24   myself and Ramiro Parra.

25   Q.    This is your -- excuse me.  I apologize.  Go

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    ahead.

2    A.    It's not a transcript.  It's not word for

3    word what Ramiro Parra told me.  It's a synopsis

4    of an interview.

5    Q.    So you infuse your own verbiage, your

6    terminology, your nomenclature in what your trying

7    to develop into these records?

8    A.    I prepared a synopsis of the interview.

9    Q.    This is not -- this is not a verbatim of

10   what someone told you, is it?

11   A.    Correct.  This is not a transcript.

12   Q.    So in that prior paragraph it says during a

13   meeting Mitchell advised that he spoke with, quote,

14   Big Homey; correct?

15   A.    Correct.

16   Q.    Now, this meeting occurred on May 6, 2008;

17   correct?

18   A.    That's correct.

19   Q.    Parra began cooperating with you at least

20   one month prior to that?

21   A.    Yes.

22   Q.    Okay.  You were his control agent; correct?

23   A.    He worked with other agents in the group,

24   but I was the case agent on this investigation.

25   Q.    You were the case agent.  You're -- you're

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    the one that provided him with recording equipment;

2    correct?

3    A.    The majority of the time.

4    Q.    Do you have a recording of the meeting

5    between Mitchell and Parra where allegedly Mitchell

6    advised him that he spoke to Big Homey?  Do you

7    have such a recording?

8    A.    A recording of the meeting that occurred on

9    May 6th?

10   Q.    Yes.  One month after he was cooperating

11   with you.

12   A.    I do not remember we specifically covered

13   that meeting or if we have a recording of it.

14   Q.    Okay.  Let's go back and talk about it.  You

15   either do or you don't.

16   A.    Yes.  And I answered I do not know if we

17   have a recording of that conversation.

18   Q.    Is it possible you have a recording of that

19   conversation?

20   A.    It's possible.  We have recordings of many

21   meeting between Parra and Mitchell.

22   Q.    Okay.  Why wouldn't -- why didn't you

23   provide it already then if it's so significant and

24   it says Big Homey in it?

25   A.    If we have a recording, it would have been

1  provided to yourself and other defense counsel as

2  part of discovery.

3  Q.    Isn't it true that there is no such

4  recording, Agent?

5  A.    I just answered the question.  I do not

6  know.

7  Q.    You don't know?

8  A.    I do not recall specifically if there's a

9  recording from that date.

10  Q.    So you don't know whether he was lying to

11  you when he even said any of this to you, do you?

12  You don't know whether he made it up?

13  A.    All that I can tell you is what Ramiro Parra

14  told me on that date.

15  Q.    What is the purpose of giving an informant

16  recording equipment?

17  A.    So he can record conversations.

18  Q.    For what purpose?

19  A.    Evidentiary purposes.

20  Q.    And for you to listen to it and validate

21  what's going on; correct?

22  A.    Correct.

23  Q.    And if they don't record, what does that

24  tell you, Agent?

25  A.    Oftentimes in these investigations --

1  Q.    Excuse me.  I'm sorry.

2  A.    While it would be ideal to record every

3  face-to-face meeting, every telephone

4  conversation, it's oftentimes not practical.

5  Sometimes meetings occur spur of the moment where

6  I cannot organize a surveillance and get people

7  out there, and sometimes telephone calls occur

8  when the person making the conversation doesn't

9  actually have the device in hand to return --

10 record that phone call.

11 Q.    And on May 6th --

12 A.    I'm sorry, Counselor, I'm not done with the

13 question.  As far as the face-to-face meetings are

14 concerned, Ramiro Parra was not in a position in

15 this organization to be able to say no.  No.  No.

16 I can't meet with you today.  I'm going to have to

17 meet with you next week.

18     Oftentimes when Cleo Mitchell would want a

19 meeting, I would direct him to go meet him.  The

20 majority of the time I would say we were able to

21 cover those, but there were probably a few

22 occasions where I would direct him to go meet and

23 we didn't have a recording.

24 Q.    Did you direct Ramiro Parra on May 6, 2008,

25 to meet with Cleo Mitchell at the Radisson hotel?

A.     While I was the primary agent working with
Cleo Mitchell, there were other agents that would
give him direction while I was either tied up on
another investigation or out of town.  I don't
recall if I specifically directed him to do this
meet.

Q.     As the case agent, who in the Drug
Enforcement Administration authorized him to meet
with Cleo Mitchell at the Radisson hotel on
May 8th, 2008?

A.     Are you referring to the meeting on May 6th,
2008?

Q.     May 6th.  Excuse me.

A.     As I just testified, I don't recall if it
was myself or another agent.  There was a period
of time in May of '08 where I was in Washington,
D.C., and there was another agent in the group
that was handling things in my absence.  It may
have been while I was in town.  Or if I were out
of town, it may have been that agent.

Q.     Either way, we don't know if it was an
authorized meeting.  We don't know -- and we know
it wasn't -- if it was recorded, you've never
reviewed a recording of it; is that safe to say?

A.     No.  I'm stating that I don't specifically

1   remember if that particular meeting was recorded.

2   Q.      And just while we're on the subject, there

3   were other occasions, either meetings or alleged

4   telephone calls that Parra didn't record also;

5   isn't that true?

6   A.      There were some.  The vast majority were

7   recorded.  But as I explained before, it's not

8   always practical to record 100 percent of the

9   telephone conversations.

10  Q.      Agent --

11  A.      But the majority were recorded.

12  Q.      How do you know?

13  A.      I know based on talking to Ramiro Parra and

14  based on my investigation.

15  Q.      You know what he's told you.  Do you know

16  how many telephones he had?  Do you know how many

17  throw away phones he had?  Do you know what he did

18  after hours when you went home?  Did you surveil

19  him at home, Agent?

20  A.      No, I did not.

21  Q.      Do you know what he did or who he called?

22  A.      When he was outside of my presence.

23  Q.      Yes, sir.

24  A.      No, I do not except for the recorded

25  conversations that I have that occurred outside my

1    presence.

2    Q.    And you know that there were unrecorded

3    conversations outside your presence?

4    A.    Yes.  He would advise me when there were

5    conversations and he was unable to record those.

6    Q.    You know what Parra's told you; right?

7    A.    That's correct.

8    Q.    Let's get back to the 12th of May.  Mitchell

9    reminded Parra that Parra still owes money from a

10    previous marijuana delivery?

11    A.    Yes.

12    Q.    Mitchell told Parra that he owes from a

13    previously marijuana delivery.  Parra delivered his

14    car and later the title to Mitchell for monies that

15    Parra previously owed; is that correct?

16    A.    He delivered the title to Cleo Mitchell.  I

17    believe when the vehicle delivery occurred it was

18    to Cleo Mitchell and another individual.

19    Q.    Okay.  Just so we get it right, Mitchell

20    calls him and says you owe us money.  Give me your

21    car.  Cleo Mitchell is one of the people that picks

22    up the car.  And on the 12th of May you arrange for

23    Parra to turn over the title of that car to

24    Mitchell.  Safe?

25    A.    I would want to back up a moment.  You -- as

1   far as the telephone conversation regarding who

2   insisted that that car be given up as payment,

3   it's my understanding that Ramiro Parra had

4   conversations with both Cleo Mitchell and Sheldon

5   Shorter.  They were both telling him that car

6   needed to be turned over as partial payment for

7   that debt.

8   Q.     Okay.  Your report said Mitchell also

9   advised Parra that he would be receiving a call

10  from Shorter; correct?

11  A.     I'm sorry.  Repeat that.

12  Q.     The report basically says that Mitchell told

13  him that he would later be receiving a call from

14  Shorter.

15  A.     Correct.

16  Q.     And that Shorter later did call him and told

17  Parra that he was providing the Charger as partial

18  payment for the debt, and Parra agreed.  Is that a

19  safe analysis of what you put in your report?

20  A.     Yeah.  My report is that Shorter instructed

21  Parra to provide the Dodge Charger as partial

22  payment for that debt.

23  Q.     Okay.  This is after Mitchell came down on

24  Parra for owing the money?

25  A.     There was the initial phone call with Cleo

Mitchell where Cleo Mitchell told him he needs to
turn over the car as payment.  Then followed up by
telling him you'll be receiving a call from
Shorter.

Q.    Okay.

A.    Then there was a follow-up call with Shorter
where Shorter reiterated the fact that Parra was
going to have to turn over that car as partial
payment for that debt.

Q.    Subsequently Cleo Mitchell and someone else
picked up that car?

A.    Correct.

Q.    And after that Cleo Mitchell picked up from
Parra the title to that car?

A.    That is correct.

Q.    Okay.  One second.  Now, just to go back a
little bit, you said it briefly that you provided
Mr. Parra with two types of recording devices; is
that correct?

A.    At least two.  One was provided to him what
I would call a full-time basis.  It was a small
digital recorder which is -- you would use
exclusively for telephone conversations.

When he came to face-to-face meetings, I
would provide him with a recording device simply

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   to be used for that meeting.  So I'd give him the

2   device.  Upon conclusion of that meeting I would

3   take it back.

4   Q.    Okay.  Let's go back and discuss the digital

5   recorder that he had full-time.

6   A.    Okay.

7   Q.    Just for our purposes so that they have a

8   better understanding, and I want to get into the

9   logistics.  How does it work, and how does someone

10  turn it on, and how does someone turn it off?

11  A.    Without having it in front of me it'd be

12  hard to give a step by step process.  But there's

13  a switch to turn it on.  And then there's a button

14  that you press, and that will allow it to record.

15  Q.    Right.  It's not very sophisticated, is it?

16  A.    It is not.

17  Q.    I'm sure if you had young kids, they could

18  operate it?

19  A.    Yes.

20  Q.    Okay.  And it's batteried up?

21  A.    Yes, it's battery operated.

22  Q.    Okay.  And this is something that the agency

23  provided Parra early on in his cooperation?

24  A.    Yes.  I provided him with the recorder.

25  Q.    And you gave him instructions on how to use

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    it, did you not?

2    A.    Yes.

3    Q.    Okay.  And what he had to do with it;

4    correct?

5    A.    Correct.

6    Q.    And the instructions you gave him was that

7    if he was making any calls related to this case he

8    was to record it?

9    A.    Yes.  I instructed him that when practical

10   and when possible to record telephone

11   conversations.

12   Q.    Okay.

13   A.    All the while understanding that it's not

14   always practical, but do your best.

15   Q.    And the same would apply for any incoming

16   calls.  If practical, record the conversation?

17   A.    Yes.

18   Q.    And he carried that with him or he was -- he

19   had it that you gave to him to use at all times?

20   A.    Yes.

21   Q.    Okay.  Let's go now to the face-to-face

22   recorder.  That is something he did not have

23   full-time; right?

24   A.    Correct.

25   Q.    And you didn't want him or any other source

1   to have that type of equipment full-time.  Is that

2   a correct assessment?

3   A.     Correct.

4   Q.     Okay.  So you would provide it to him when

5   you had these, quote, prearranged meetings or

6   scenarios?

7   A.     Correct.

8   Q.     All right.  And basically tell the jury how

9   that works.

10   A.     As it pertains to the recorder?

11   Q.     As it pertains to the particular recorders

12   that you provided to Mr. Parra in this case.

13   A.     Once again, they're -- well, I would turn

14   them on and turn them off.  So clearly all he

15   would have to do is have it on his person.

16   Q.     Okay.  And he carried it where?  Did you

17   instruct him where to carry it?

18   A.     Yes.  It would depend on the device.

19   Sometimes in a pocket, sometimes in his hand.

20   Q.     Were all the devices similar in nature?

21   A.     Well, they were similar in nature in the

22   fact that they were digital audio recorders.

23   Q.     How big were they?

24   A.     The one that he utilized to record telephone

25   calls was no more than a couple inches high and an

1    inch wide.

2    Q.    No.  Not the -- not the digital.  Let's talk

3    about the face-to-face recorders.

4    A.    Oh, those were small.  Both of them could

5    fit into the palm of your hand.

6    Q.    Palm of your hand?

7    A.    Yes.

8    Q.    And where do you instruct -- where did you

9    instruct him to carry it?

10   A.    It would depend on the device.  Like I

11   testified before, either in his hand, in his

12   pocket.  It would just depend on the situation and

13   the type of device that he was using.

14   Q.    And if he carried it in his pocket, the

15   microphone in that recorder is sufficient to record

16   all the conversations, is it not?

17   A.    Yes, it is.

18   Q.    And as a matter of fact, as you were

19   listening to these conversations that you were

20   putting up, Mr. Parra's voice is much clearer, is

21   it not?

22   A.    Recalling the recordings that have been

23   played in court, I believe those were all

24   telephone conversations.

25   Q.    Let's just use those.  They're much clearer

1  because he's got the device that's accomplishing

2  the recording; right?

3  A.    Both sides are clear.  I mean if his is a

4  little clearer, that would explain why it would

5  be.

6  Q.    Okay.  And that would be the same thing for

7  any face-to-face meetings that he recorded?

8  A.    How do you mean the same?

9  Q.    That his voice would be clearer?

10  A.    Not necessarily.

11  Q.    Okay.  That's fine.  Now, how many

12  telephones did Mr. Parra have that you knew of?

13  A.    Well, obviously I knew of one because that

14  was the one I called him on.

15  Q.    Uh-huh.

16  A.    He had changed his telephone number at some

17  point during the investigation.  So that would

18  have been a second.  So I know of at least two.

19  One at a time, but, you know, two numbers that I

20  had during that time period.

21  Q.    How many throw away telephones did Mr. Parra

22  have during this period?

23  A.    I do not know.

24  Q.    You have no way of knowing, do you?

25  A.    I do not.

Q.     And it's totally possible that he had other
telephones that you're not aware of; isn't that
true?

A.     It could be.

Q.     Okay.  The same way it's totally possible
that he made calls to other people that you're not
aware of?

A.     Calls to other people?

Q.     Yeah.

A.     Yes.

Q.     Possible that received calls from other
people that you're not aware of?

A.     Possible.

Q.     Possible that he didn't record every call
the way you asked him to?

A.     All that I can tell you is he was instructed
to do is best, and he notified me when calls took
place.

Q.     Okay.  Let me shift the subject a little
bit.  During the course of your investigation the
name Pingy came up, did it not?

A.     It did.

Q.     And Pingy is Paul Watson; isn't that
correct?

A.     That is one name that we know him by, yes.

Q.    Okay.  And Mr. Parra told you that in 2007
during the course of this conspiracy, 2007, that he
met with Pingy in a parking lot, and that Pingy was
driving a pewter silver colored Cadillac.  Do you
recall that?

A.    Yes.  As far as where they met that
particular evening I do not recall, but I do
remember the fact that he was driving a pewter
colored Cadillac.

Q.    And that car, that peter silver colored
Cadillac is registered to Cleo Mitchell's mother,
is it not?

A.    Yes.

Q.    And Cleo Mitchell's mother is Kathleen
Crowley Mitchell?

A.    That's correct.

Q.    And her date of birth is August 27th, 1953;
correct?

A.    I do not recall her date of birth.

Q.    Do how did you feel earlier today when Cleo
Mitchell said that none of his cars were registered
to his mother?

A.    I remember when you asked the question and
he gave his answer.  I think when you asked the
question it gave Cleo Mitchell the impression you

1  were talking about currently.  This --

2  Q.    Oh --

3  A.    -- date that this occurred was back in '07,

4  if not earlier.

5  Q.    -- so he was mistaken?

6  A.    I don't know.  I can't speak for Cleo

7  Mitchell.  You asked how I felt.

8  Q.    Okay.  So Cleo Mitchell -- better yet, Cleo

9  Mitchell's mother had a car registered in her name

10  that was used at least one time to the best of your

11  knowledge during a drug transaction.  Is that safe

12  to say?

13  A.    Yes.

14  Q.    The particular drug transaction that we're

15  talking about that he described to you in 2007,

16  Parra was given some drug proceeds by Pingy; isn't

17  that true?

18  A.    There was more than one interaction with

19  Pingy.  I don't -- the -- the one you just talked

20  about involving a pewter Cadillac, my recollection

21  that that involved the delivery of marijuana to

22  one of Parra's customers.

23  Q.    To one of Parra's customers.  And then later

24  on there was some monies.  But that -- all -- all

25  the monies -- let me put it this way:  All the

1    monies that Parra and Cleo were involved with that

2    they received went back to their apartment; is that

3    correct?

4    A.    Yes.  The way it was explained to me was

5    they would collect the drug proceeds, and they

6    would be stored in the safe or one of two safes at

7    the Rocky Point apartment.

8    Q.    And that Rocky Point apartment was rented --

9    was leased by who?

10   A.    I believe Ramiro Parra's sister.  It was in

11   her name.

12   Q.    Isabella Parra?

13   A.    I don't recall the name, but I believe it

14   was his sister.

15   Q.    All right.  I think we've clarified, Agent,

16   that there have been -- do you know how many total

17   phone calls or face-to-face meetings were recorded

18   during the course of this investigation?

19   A.    No, I don't.

20   Q.    Would it be safe to say there were over a

21   hundred?

22   A.    I know there were numerous meetings and

23   telephone conversations recorded, but I couldn't

24   even guess at a number.

25   Q.    As the case agent have you listened to each

1    of the recordings made in this case?

2    A.    I'd say I've listened to if not every one,

3    the vast majority.

4    Q.    Okay.  That would include telephone

5    conversations and any face-to-face meetings?

6    A.    Correct.

7    Q.    Okay.  I just want to talk to you a little

8    bit about some of the transcripts that you have in

9    front of you that have been previously introduced

10   by the government.  All right?

11              MR. RODRIGUEZ:  Excuse me.  Could I have

12   the ELMO, please.

13              THE WITNESS:  Could you clarify as to

14   which transcripts you're referring to.  The only

15   transcripts I have in front of me are Government

16   Exhibits 12A through 12E.

17   BY MR. RODRIGUEZ:

18   Q.    Okay.  Maybe you don't have it.  I'm going

19   to put it up on the ELMO.  We'll all have it.

20         You've been here for the testimony of all

21   the government's witnesses, have you not?

22   A.    Yes, I have.

23   Q.    And you heard Mr. Parra state that he

24   referred to Sheldon Shorter as Big Homey?

25   A.    Yes.

Q.    I don't know if you can see that clear or
what I'm doing wrong.  I don't know if the ladies
and gentlemen of the jury can see that.

Can you see that transcript of April 11th,
2008.  Can you see that, Agent?

A.    Yes.

Q.    And this would be Government's Exhibit 11A.
By the way, Agent, did you transcribe these
conversations?

A.    I transcribed most of them.  I had the
assistance of others to transcribe some.  And I
reviewed most of them, if not all of them.

Q.    That's what I was going to say.  Even though
that you didn't have an opportunity to transcribe
all of them, you later went back, reviewed them for
clarity and to correct any incorrections?

A.    That's correct.

Q.    So you're familiar with them; right?

A.    Yes.

Q.    Okay.  And in Government's Exhibit 11A, we
all know that CS is Parra; right?

A.    That's correct.  If we could just back up.
When you refer to government exhibits, I don't
have the actual exhibit in front of me.  I'm
looking at what's on your screen.  So I'm going to

1    have to take your word for it that it's 11A.  I

2    don't have that in front of me.

3    Q.    We'll do it that way.

4    A.    We'll do that.

5    Q.    Okay.  11A --

6    A.    And to answer your question, yes.  When I

7    refer to CS in all of these transcripts, I am

8    referring to Ramiro Parra.

9    Q.    The first words spoken on this recording are

10   from Ramiro Parra.  And this is a call that you put

11   up there on top with Shorter; correct?  You wrote

12   that there on top in the heading?

13   A.    If this is one of the ones that I prepared,

14   then yes.

15   Q.    Okay.  And the first words to Ramiro Parra

16   are what?  Can you read those to the jury.

17   A.    Yes.  It says, "Hey, what up, big pimp."

18   Q.    Is Big Homey anywhere in this transcript?

19   And I'll give you the entire transcript if you want

20   to review it.

21   A.    If you would like me to testify as to that.

22   I'd have to review the whole thing.

23   Q.    Let me go through all of them, then I'll

24   give them all to you.  You can do it at one time.

25   A.    Okay.

1   Q.    Let me show you what is Government's Exhibit

2  No. 11D.  Would you please read the first three

3  lines.  Who was initiating the first conversation?

4  Just read the first three lines for the jury.

5  A.    Yes.  The conversation starts out with Parra

6  saying, "hello."

7         Sheldon Shorter responds, "Yo."

8         Then Ramiro Parra states or asks, "Hey, what

9  up, pimp."

10  Q.    Thank you.  Let me show you Government

11  Exhibit 11F.  I want to ask you to please read the

12  first three lines to the jury.

13  A.    First line is Parra --

14  Q.    First three.

15  A.    I'm sorry?

16  Q.    First three, please.

17  A.    Yes.  First line is Parra saying, "Hello."

18         Shorter says, "Yo."

19         And Ramiro Parra asks, "Pimp, what up."

20  Q.    I'll show you what's been marked and

21  previously introduced as Government's Exhibit 11G,

22  another phone call.  Would you please read the

23  first two lines to the jury.

24  A.    Yes.  The first line is Parra saying, "Hey,

25  pimp."

1    And the next line is Shorter saying, "Yo."

2    Q.    I'll let you look at Government's Exhibit

3    11H.  Would you be kind enough to read the first

4    two lines.

5    A.    First line is Parra saying.  "Yo."

6          The next line is Shorter saying "Yo."

7    Q.    And if you want to read the entire

8    paragraph, the next one, you can.  But I'm just

9    interested in the first three comments that I have

10   highlighted.

11   A.    The highlighted section reads, "Big pimp,

12   what up.  What up."

13   Q.    And those words are said by who?

14   A.    Those words are stated by Ramiro Parra.

15   Q.    I'll show you what's been marked and

16   previously introduced as Government's Exhibit 11I.

17   If you would please read to the jury the first

18   words in this telephone conversation.

19   A.    This conversation starts off with Ramiro

20   Parra saying, "Pimp."

21   Q.    Thank you.  I'll show you what's been marked

22   and previously introduced as Government's Exhibit

23   11J.  Would you please read the first three lines

24   for the jury.

25   A.    First line has Ramiro Parra saying, "Hello."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          Second line has Sheldon Shorter saying.

2     "Yo."

3          And the third line has Ramiro Parra saying,

4     "What up, pimp.  What up."

5               MR. RODRIGUEZ:  Your Honor, may I just

6     take a moment?

7               THE COURT:  You may.

8     BY MR. RODRIGUEZ:

9     Q.     I'm going to hand you transcripts that have

10    previously been introduced by the government, 11

11    through 11N, and ask you to review them and please

12    tell the jury if anywhere in these transcripts

13    Ramiro Parra refers to the person who he is talking

14    to, Sheldon Shorter, as Big Homey.  Take your time.

15    A.     (Witness complies.)  And just to clarify,

16    you're looking for any reference to only Big

17    Homey?  That's the only thing you're interested

18    in?

19    Q.     Yes, sir.

20    A.     Okay.

21    Q.     Now, we know he refers to him as Big Pimp or

22    Pimp.  You've read that.  My question to you

23    previously is since you've reviewed all of these

24    recordings, transcribed and otherwise, is there any

25    recording that you have where Mr. Parra refers to

1  Sheldon Shorter as Big Homey?

2  A.    No.  The answer to that question, aside from

3  these conversations I do recall that there were

4  conversations between Ramiro Parra and Cleo

5  Mitchell where at least one or possibly both of

6  them do refer to Big Homey.

7  Q.    Okay.  Now --

8  A.    But if you'd like me to finish reviewing

9  these transcripts, I will.

10  Q.    Let me -- let me -- let me ask you some

11  questions.  Was my question about a conversation

12  that Parra had with -- with Mitchell or was my

13  question whether Parra in any recordings -- any

14  recordings that you have, face-to-face, all the 90

15  or whatever refer to Sheldon Shorter as Big Homey?

16  A.    I believe your question was any recordings

17  that we have.

18  Q.    With Sheldon Shorter.  Excuse me if I didn't

19  clarify.

20  A.    Recordings with Sheldon Shorter, I

21  believe --

22  Q.    He's talking to Sheldon Shorter.  At any

23  time, face-to-face, over the phone, when you told

24  him to call him, when you set up a scenario, has he

25  ever referred to Sheldon Shorter when he's talking

1  to him as Big Homey?

2  A.    If you're asking specifically about

3  conversations with Sheldon Shorter, I'd have to

4  finish going through these transcripts.

5        To answer your other question there are

6  recordings where he refers to him as Big Homey.

7        But I'll go through these to answer that

8  question.

9  Q.    Let's go there.  But those are conversations

10 between Cleo Mitchell and -- and Ramiro Parra?

11 A.    Yes.

12 Q.    Cleo Mitchell, who testifies because he's

13 trying to get out of jail earlier in cooperating

14 with you, correct, and Mr. Parra who's cooperating

15 with you in order to get out jail --

16        MR. PRESTON:  Object to the form of the

17 question.  It's argumentative.

18        THE COURT:  Sustained.

19 BY MR. RODRIGUEZ:

20 Q.    The two people that are talking together

21 that you just referred to not in response to my

22 question are the two --

23        MR. PRESTON:  There's still a question

24 on the table regarding the transcripts, Your

25 Honor.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE COURT:  Yes.

2     BY MR. RODRIGUEZ:

3     Q.     Why don't you review the transcripts, Agent.

4     Take your time.

5               (PAUSE IN PROCEEDING.)

6          THE COURT:  How far are you along,

7     Mr. Duralia?

8          THE WITNESS:  Judge, I would guess I'm

9     about halfway through.  I'm currently reviewing

10    Government Exhibit 11I.  I believe this continues

11    through to 11N, as in November.  And then there's

12    an Exhibit 31A.

13         THE COURT:  Come to sidebar, counsel.

14         (AT WHICH TIME THE FOLLOWING SIDEBAR

15    DISCUSSION WAS HELD:)

16         THE COURT:  What is the relevance of

17    this, Mr. Rodriguez?

18         MR. RODRIGUEZ:  The relevance is the

19    government wants to say that my client is known as

20    Big Homey.  He's not.  And there is no reference

21    to him.  That agent knows that in none of the

22    transcripts and in none of the conversations his

23    two cooperators when talking to my client ever

24    referred to him as Big Homey.  And he wants to sit

25    there and go through them.  He knows the answer to

1  the question, but I have no other way of asking

2  him that.  I asked him.  He said I wouldn't know

3  unless I could review them all.

4          THE COURT:  Well, he doesn't know

5  whether -- or what reference was made to them

6  unless he reads all of those.

7          As far as the conversations between the

8  first witness, Ramiro, and Shorter is concerned --

9          MR. RODRIGUEZ:  I didn't ask him that

10  question.  He volunteered.  What I'm trying to

11  tell the Court is he prepared the majority, if not

12  all those transcripts.  He knows the answer to my

13  question, and he doesn't want to give it to me.

14          THE COURT:  Well, that may be, but I

15  don't see the relevance of it to take the time

16  that it is obviously taking to do this.  I think

17  that's an imposition on the Court.

18          MR. RODRIGUEZ:  I accept that, Your

19  Honor.  And I'm going to give a suggestion.

20          THE COURT:  Go ahead.

21          MR. RODRIGUEZ:  I'm going to tell him to

22  take those transcripts and review them on his own,

23  and for Mr. Preston tomorrow to announce

24  whether -- what the answer is or I'll put him on

25  for one question.  We don't have to waste the

1    Court's time.  It wasn't my purpose to do that.

2    But when he said to me I don't know, I had no

3    other way of doing it.

4            THE COURT:  Well, what he said in his

5    testimony was that there was reference made to the

6    defendant Shorter as being Homey in conversations

7    between Mitchell and Parra, and --

8            MR. RODRIGUEZ:  I agree with that

9    wholeheartedly.  Those are not the transcripts

10   that the government has introduced and put before

11   the jury.  I'm just using what the transcripts are

12   that are before the jury so that when he has the

13   control and he could have -- he could have very

14   easily told us they referred to him as Big Homey.

15   We want to know if this guy is Big Homey.  There

16   is none of that.

17           But I appreciate and I understand what

18   the Court's saying.  I don't need to go through

19   this process either.  If there's some other way

20   that I could ask him the question first thing in

21   the morning, I'll ask him one question.

22   Mr. Preston can say he's had an opportunity to

23   review it, and that's it.  Let me move on.

24           THE COURT:  All right.  We'll -- we'll

25   start with the continuation on your

cross-examination, and leave the answer to this

question tomorrow.

          MR. RODRIGUEZ:  One question.  That's

it.  And we'll just continue.  We don't have to

say a word.  I'll just go onto something else.

          THE COURT:  All right.

          (AT WHICH TIME THE SIDEBAR DISCUSSION

WAS CONCLUDED AND THE PROCEEDING RESUMED AS

FOLLOWS:)

          THE COURT:  Mark where you are,

Mr. Duralia, and we'll go on to some other

subject.

          THE WITNESS:  Yes, Judge.

BY MR. RODRIGUEZ:

Q.    Mr. Duralia, just mark where you're at now

so you'll have an opportunity at the end of the day

to review the remainder.  But just stay right there

on the transcripts.

          I have one question before you do that.  Of

the transcripts you have reviewed, do any of those

transcripts reflect that Ramiro Parra refers to

Sheldon Shorter in conversations with him as Big

Homey?

A.    No, they do not.

Q.    Okay.  This evening I would ask if you have

1    an opportunity to review the remainder of those

2    transcripts, and I will inquire from you tomorrow

3    morning.  But we'll move on to a different subject

4    matter now.  Okay?

5    A.    Okay.

6    Q.    Thank you.  I want to finish out the

7    scenario that the agency created for the completion

8    of the $100,000 debt that we've talked about.  Do

9    you understand what I'm referring to?

10   A.    I believe you're referring to the $70,000

11   sham currency delivery.

12   Q.    You testified earlier that you had set up a

13   certain scenario, and the purpose of that scenario

14   was to identify Sheldon Shorter.  Do you recall

15   that?

16   A.    Yes.  Either Sheldon Shorter or somebody

17   else in the organization who would retrieve those

18   funds.

19   Q.    And just to cut to the chase, the scenario

20   that you set up was the delivery of what you

21   referred to as sham money.  In other words, it was

22   a package, but wasn't real money?

23   A.    That's correct.

24   Q.    Okay.  And before that you meet with Parra

25   and you explain to him what you want, in essence

1   what you want him to say, where you want him to

2   tell people to go, and in essence you're control

3   ling the situation; correct?

4   A.    I'm controlling as much as I can.  Obviously

5   we can only control so much because the targets of

6   the investigation are going to have their demands

7   as well.

8   Q.    And the purpose of that, one, is to identify

9   people; correct?

10   A.    Yes.

11   Q.    To have evidence of their illegal activity?

12   A.    Correct.

13   Q.    And for your own protection also?

14   A.    Yes.

15   Q.    So the agency must be as best they can in

16   control?

17   A.    As best as we can, yes.

18   Q.    Okay.  So that way you have certain places

19   that you've utilized before that you feel

20   comfortable with your agents being in place

21   surveilling?

22   A.    Not necessarily used before, but a location

23   that we feel comfortable that we can surveil and

24   accomplish what we need to accomplish.

25   Q.    After you set up this scenario, trap, or --

1    or whatever you want to refer to it, who came with

2    the -- who went to pick up the $70,000?

3    A.    Cleo Mitchell arrived to pick up those

4    funds.

5    Q.    Okay.  Briefly as to the transcripts -- and

6    this will apply somewhat to the face-to-face

7    meetings.  Okay?  The person who is doing the

8    recording, in this case Parra -- you don't have any

9    recordings with Cleo Mitchell, do you, where he on

10   your behalf called anyone?

11   A.    No.

12   Q.    Okay.  So we're just referring to Parra?

13   A.    Yes.

14   Q.    When he's calling out and he is recording

15   that conversation, the person on the other end

16   doesn't know that he's recording that conversation;

17   correct?

18   A.    That's correct.

19   Q.    Okay.  And you have already created a basic

20   scenario for him, so he's controlling the contents

21   of what he's saying for your purposes; is that

22   correct?

23   A.    I don't think I understand the question.

24   Q.    He knows what he has to say to accomplish

25   the scenarios that you have created for him?

A.     Yes, especially pertaining to the $70,000.
I provide him -- him, being Ramiro Parra, with
instructions and directions on how to proceed.

Q.     You tell him -- you told him what to say?

A.     More or less.  I don't give him a script.  I
give him an outline.

Q.     You -- you were in essence controlling the
outline or the subject or the contents of what's
going on?

A.     Correct.

Q.     So he knows what to stay, but the other
person on the other end of the phone doesn't
basically know that he's being recorded and the
purpose of what his call's about; is that correct?
In other words the recorded --

A.     I don't think it's a hundred percent
correct.  I believe it's correct that they do not
know they're being recorded --

Q.     Okay.

A.     -- but they're going to know the purpose for
the conversation.

Q.     Oh.  Let's say they're talking about
narcotics.  I'm not trying to avoid that at all,
but the whole purpose is to lure that person in, as
you said before, and get them to say something so

1    that you can use it against them later?  That's the

2    purpose that's Parra's recording the call; right?

3    A.    Well, we record these calls for evidentiary

4    purposes, as you've seen in court here this week.

5    Q.    Speaking of that, about 25 to 30 -- how many

6    CDs did -- did you produce in this case?

7    A.    I don't recall the specific number.

8    Q.    But each of these CDs have multiple and

9    numerous conversations; right?

10   A.    Not each of them.  But there are numerous

11   CDs that have several conversations on them.

12   Q.    So what the government has shown now is a

13   small representation -- or let me just put it this

14   way:  Eliminate small.  It's only a representation

15   of the calls and/or face-to-face meetings that

16   occurred in this investigation?

17   A.    What we have shown thus far are the

18   recordings with the defendant Sheldon Shorter.

19   These are not all of the recordings that were made

20   during the entire investigation.

21   Q.    Now, during the course of this case we've

22   referred to the three people who are accused here.

23   But in this case there were other people that have

24   been indicted, pled guilty, and have been

25   sentenced; correct?

1   A.      Correct.

2   Q.      And who are they?

3   A.      As far as the ones that were indicted in

4   this particular Indictment?

5   Q.      Yes.

6   A.      There was Sheldon Shorter --

7   Q.      Uh-huh.

8   A.      -- John Evens Baptiste, Hardaway Volcy --

9   Q.      Okay.

10  A.      -- Cleo Mitchell, Seth Clemens --

11  Q.      Okay.

12  A.      -- Richard Parker, James Kurmay, James

13  Cooney, and Jermaine Hopkins.

14  Q.      Okay.  Thank you.  Now, to a different

15  subject.

16          When you were talking about being the case

17  agent, it was after you met with Mr. Parra and his

18  lawyer that you recommended to Mr. Preston that the

19  government agree to let him out on bond; is that a

20  correct assessment?

21  A.      Yes.  Because at that point -- he was

22  arrested on April 1st.  At his initial

23  appearance -- I don't believe there was a

24  detention hearing.  I think he was -- they waived

25  the detention hearing at that point.  So it was

1    after I met with Ramiro Parra and I realized that
2    it had some possible investigative significance I
3    talked to Mr. Preston, stated that we were
4    considering using him as a confidential source.
5    Q.    Right.  And when you met with Mr. Parra --
6    and I don't know your exact words.  I weren't
7    there -- wasn't there.  But you in essence told him
8    that if he was to cooperate with you, he'd have to
9    tell you the truth?
10   A.    Yes.
11   Q.    That he couldn't violate the law?
12   A.    Correct.
13   Q.    And that he was responsible to you and the
14   agencies for all of his actions?
15   A.    What do you mean by that last part?
16   Q.    What I'm saying to you is that you are in
17   essence walking a criminal out of jail and putting
18   him on the street, so you need to somehow convey to
19   him that he can't be doing anything that would
20   jeopardize that.  Is that a safe way to say it?
21   A.    Yes.
22   Q.    You walked him out of the jail, because but
23   for that he'd -- he would have still stayed in
24   jail; correct?
25   A.    I don't know what would have been the result

1  of the detention hearing.  That would have

2  happened subsequent to that.

3  Q.    You put him on the street.  Is that a safe

4  way to say it?  And I'm not trying to be

5  derogatory.

6  A.    No, I didn't put him on the street.  I

7  talked to Mr. Preston and said that I would like

8  to utilize him as a confidential source, and I

9  obviously would not object to him getting a bond.

10 Q.    Okay.  So you wanted him to be on the

11 street?

12 A.    Yes.

13 Q.    And he subsequently got on the street?

14 A.    Yes.

15 Q.    And that's when he started working with you?

16 A.    Yes.

17 Q.    But to work with DEA he had to sign a

18 contract, did he not?

19 A.    We refer to it as a confidential source

20 agreement.

21 Q.    Confidential source agreement.  Is an

22 agreement in your world the same as a contract?

23 A.    I don't know what the legal definition would

24 be, but that's what we refer to it as, an

25 agreement.  It basically lays out for the

1 confidential source basically what the rules are
2 that you can and cannot do.
3 Q.    Right.  And he can't do anything that's
4 illegal?
5 A.    Correct.
6 Q.    And sometimes confidential sources do things
7 that are illegal, but they have to do it your
8 permission; isn't that correct?
9 A.    Yes.  For example, if they were buying a
10 controlled substance, that would be under our
11 direction as part of our case.
12 Q.    If they were -- anything they did, if it was
13 going to be proper, it had to be under your
14 direction or they would be violating the law;
15 correct?
16 A.    Yes.  If they were going out and doing
17 illegal activity that was not part of our
18 investigation, then yes.
19 Q.    As a matter of fact, they can't even record
20 one conversation without your permission because
21 that's against the law; isn't that true?
22 A.    If he's doing it as part of a law
23 enforcement investigation, that would not be
24 against the law.
25 Q.    Right.  That's what I said.  He can only

1  record a conversation with your permission because

2  if he doesn't, he would be violating the law?

3  A.    I believe so.

4  Q.    Okay.  Now, you have been the case agent --

5  the controlling agent for Mr. Parra from

6  approximately April 3rd through the present time;

7  is that safe to say?

8  A.    That's correct.

9  Q.    Okay.  And you said that at some time you

10 had almost daily contact with him?

11 A.    For a period of time, yes.

12 Q.    But you weren't with him all the time?

13 A.    No.

14 Q.    Nor were your other agents?

15 A.    No, they were not.

16 Q.    You don't know who he met with when you

17 weren't with him?

18 A.    That's correct.  I was not with him at all

19 times, so I would not know who he's meeting with

20 when obviously I wasn't there.

21 Q.    You don't know who he possibly called unless

22 he told you about it; right?

23 A.    Correct.

24 Q.    You don't know where he went at night;

25 correct?

1    A.    If he told me I did.  But otherwise, no.

2    Q.    Nor did you ask him where he went at night,

3    did you?

4    A.    It may have come up in conversations during

5    debriefings, but not on a regular basis.  I would

6    not ask him that.

7    Q.    Agent, to cut to the chase, you're not with

8    an informant 24/7, are you?

9    A.    No, I'm not.

10   Q.    You're with a very, very limited time with

11   that informant; isn't that true?

12   A.    Yes.  Out of a 24-hour day I would say I'm

13   not with him the majority of that.  Correct.

14   Q.    Out of a 24-hour day, not the days you had

15   scenarios, but the days where he either made calls

16   or didn't make calls, how much time within that

17   24-hour day did you spent with him?

18   A.    Well, there were times when I didn't have

19   actual contact with him except on the telephone.

20   Q.    So someone like Ramiro Parra could do

21   whatever he wanted to because you wouldn't be aware

22   of it during the times he wasn't with you and the

23   agencies; correct?

24   A.    Yes.  I'm not aware of what he's doing when

25   he's not in my presence.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    And when you tell or when Parra tells you

2    that he received a phone call but he didn't have an

3    opportunity to record it, how do you know that's

4    true?

5    A.    I think in a situation like that you're

6    never going to know with a hundred percent

7    certainty that it's true.  With a confidential

8    source if there's a pattern of that obviously

9    you're going to be concerned.  And there's even

10   more concern if the recordings that he does have,

11   if they don't corroborate what he's telling me and

12   there's discrepancies there, then I'm definitely

13   going to be concerned.

14        But if he's giving me certain information,

15   and then at the same time he's recording

16   conversations which is consistent with what he

17   tells me and corroborates everything else, then

18   obviously the concerns aren't going to be as high.

19   Q.    You've been out of the DEA academy what,

20   seven and a half years?

21   A.    I've been out of academy now for almost nine

22   years.

23   Q.    Nine years.  And the academy you went to was

24   at Quantico?

25   A.    Quantico, Virginia, that's correct.

1    Q.    Have you gone back since your initial

2    training for any specialized training dealing with

3    informants or drug investigations?

4    A.    Well, all of my training has been involving

5    drug investigations.  I've -- I've not been back

6    for training specifically for confidential

7    sources.

8    Q.    And a certain block of your training during

9    the time you were at Quantico was in the

10   development of informants, was it not?

11   A.    Yes, it was.

12   Q.    It was a significant block because some of

13   the backbone of your investigations in DEA are

14   based on informants; isn't that correct?

15   A.    That is correct.

16   Q.    And a portion of that block deals with the

17   motivation of informants, does it not?

18   A.    It does.

19   Q.    It deals with them being possibly very

20   deceptive at times; isn't that true?

21   A.    It addresses the possibility that

22   confidential sources can be deceptive, yes.

23   Q.    That most of them are criminals?

24   A.    I would say a large percentage are

25   criminals.

1  Q.     Does large percentage and most mean the same

2  to you?

3          THE COURT:  Next question, Counsel.

4          MR. RODRIGUEZ:  Okay.

5  BY MR. RODRIGUEZ:

6  Q.     In that block of training you're told about

7  their motivation, the fact that they could lie to

8  you, the fact that they could deceive you.  And

9  you're trained on how to possibly look for that,

10 are you not?

11         MR. PRESTON:  Objection, relevancy.

12         THE COURT:  Overruled.  Continue.

13         THE WITNESS:  Yes.  For example, like I

14 stated before, recording conversations, it helps

15 to corroborate what a confidential source is

16 telling you.  That's one of the main ways that we

17 use to help determine whether or not they're

18 telling us the truth.

19 BY MR. RODRIGUEZ:

20 Q.     Back to my question.  You're trained on the

21 fact that many informants are deceptive and

22 manipulators, and you're taught how to look for

23 that; isn't that true?

24 A.     I stated yes.  And one way in which we do

25 that is record those conversations.

Q.    And you're taught that they have a unique motivation, especially those that don't want to spend any time in jail; isn't that true?

A.    I don't know if that's unique, but that is a motivation.

Q.    That is a motivation.  So if someone has pending charges, you don't believe that that's a unique motivation.  Is it a motivation?

A.    Well, as far as the realm of confidential sources that's not a unique scenario.

Q.    Okay.

A.    Many of them are defendant confidential sources.

Q.    Defendant -- and then you have sources that -- that you just pay money to straight out?

A.    Correct.

Q.    Okay.  And you did pay some expense money to Mr. Parra in this case; right?

A.    Yes, I did.

Q.    But his motivation in this case is reducing his exposure to jail; is that safe to say?

A.    That is correct.

Q.    Okay.  Now, whatever you reported and whatever you're testifying to other than what you actually saw and heard is what Mr. Parra told you;

1    correct?

2    A.    Yes.  Unless I -- well, yeah.  I'm looking

3    through what I've just testified to.  I believe

4    unless I personally did it, observed it, or

5    participated, it would be information I received

6    from him --

7    Q.    Did you --

8    A.    -- or information I received from Cleo

9    Mitchell.

10   Q.    Did you or any agents ever surveil Mr. Parra

11   when he wasn't aware of it?

12   A.    After his cooperation?

13   Q.    At any time.

14   A.    Well, prior to his arrest, yes.

15   Q.    Not prior.  After his cooperation is what I

16   meant.  But I didn't want to -- after he started

17   cooperating with you --

18   A.    No.

19   Q.    -- did you ever verify that he wasn't doing

20   something illegal on his own?

21   A.    No.

22   Q.    Did you ever verify that he didn't have any

23   burnt out telephones?

24   A.    No.  We didn't conduct any searches of his

25   home -- or searched his vehicle.  Anytime that he

1   would meet with somebody, I would search him and

2   his car both before and afterwards.  But as far as

3   independent searches of his house to check for

4   additional phones, no, I did not do that.

5   Q.    So you don't know -- just for example, today

6   is Wednesday.  You don't know where he was at

7   Saturday night prior to trial, do you.

8         MR. PRESTON:  Objection, these questions

9   have been asked and answered, Your Honor.

10        THE COURT:  Yes, they have.  Let's move

11  on.

12  BY MR. RODRIGUEZ:

13  Q.    Prior to his testimony -- testifying, you

14  did meet with him, as did Mr. Preston numerous

15  times; correct?

16  A.    I met with Mr. Parra numerous times, yes.

17  Q.    And you discussed with him not only the

18  information that you had, but the other information

19  that other people had provided to you; isn't that

20  correct?

21  A.    When we sat down with Ramiro Parra it was

22  simply to find out what he knew as far.  As

23  discussing other people's potential testimony, no.

24  Q.    Okay.  Let me shift our conversation to Cleo

25  Mitchell.  All right?

1    A.    Okay.

2    Q.    Cleo Mitchell told you that he went to

3    Arizona four or five trips; correct?

4    A.    He wasn't sure the specific number, but I

5    believe it was approximately three is what he told

6    me initially.  It could have been as many as five.

7    Q.    And he told you that in some of those trips

8    he traveled commercially, correct, and he traveled

9    on Southwest Airlines?

10   A.    I believe all of the trips that he described

11   were by commercial air.

12   Q.    Okay.  And he -- he also mentioned it was on

13   Southwest Airlines?

14   A.    He stated that he could not recall, but he

15   believed one of the times would have been on

16   Southwest.  But he wasn't sure if all of the trips

17   were on Southwest Air.

18   Q.    And all those times that he travelled to

19   Arizona to buy his weed, he travelled with someone

20   by the name of Jacko; isn't that true?

21   A.    That was not my understanding.  I believe he

22   met Jacko upon his arrival, but I don't believe he

23   actually travelled to Arizona with him.  Jacko

24   would have already been in place when he arrived.

25   Q.    What did you and the agency do to verify his

1    story that he travelled to Arizona three, four, or

2    five times by himself or with someone else?

3    A.    Since receiving that information, I have

4    delivered administrative subpoenas to different

5    airlines, first one being Southwest, because that

6    was the one he remembered.  There are some travel

7    to Las Vegas, which would have been consistent

8    with what he said the organization's desire was.

9         It was explained to me by Cleo Mitchell that

10   they did not want him flying directly into Phoenix

11   since Arizona is a source state for marijuana.

12   They felt it was safer to fly to say neighboring

13   Las Vegas and travel via rental car.  So I was

14   able to confirm some travel Las Vegas.

15        And he also gave me some information

16   regarding a trip -- or he did in fact fly into

17   Phoenix and was stopped by the police.  He had a

18   quantity of money seized.

19        I was able to contact the airport task

20   force, which I believe is run by the Phoenix

21   police department, and obtain a copy of the police

22   report which discussed that interaction and

23   confirm that they did in fact stop him and seized

24   a quantity of currency from him on that date.

25   Q.    Let's go back and break down your long

1    answer.  Cleo Mitchell had been stopped by the

2    police in Phoenix?

3    A.    Yes.

4    Q.    So if Cleo Mitchell tells you that, then

5    that's something you can verify; correct?

6    A.    Correct.

7    Q.    Okay.  You keep stating that the

8    organization wanted him to do that; right?

9    A.    Yes.

10   Q.    Other than Cleo Mitchell and Ramiro Parra,

11   who in the organization has told you that the

12   organization wanted him to do that?

13   A.    I'm sorry.  Did you ask besides Cleo

14   Mitchell and Ramiro Parra?  Those were the two

15   individuals who provided me with that information.

16   Q.    So Cleo Parra is telling you that someone

17   else is telling him what to do; correct?

18   A.    You said Cleo Parra.  You mean Cleo

19   Mitchell?

20   Q.    You're getting mixed up with me.

21         Cleo is telling you someone else has told

22   him these things; right?

23   A.    Correct.

24   Q.    And that's all you have to rely upon is what

25   he's telling you?

A.    Well, I mean there's other evidence in this

case.  For example, some of the telephone

conversations we have heard which corroborate

things that are being told to me by both Ramiro

Parra and Cleo Mitchell.  So it's not just their

words, there's other evidence in the case that

points to that that corroborates what they tell

me.

Q.    And when Cleo Mitchell was telling you that,

you were interviewing him -- oh, did you interview

him at the jail or did you bring him out of the

jail to interview him?

A.    I've done both.

Q.    Okay.  So you would take him out at times

from the jail?

A.    Yes.

Q.    Okay.  Let's shift now to Mr. Parra.

Mr. Parra said that he had four trips somewhere to

deliver money to Mr. Shorter do you recall that

testimony and your reports?

A.    I do.

Q.    Okay.  The first one was he says that he met

Mr. Shorter outside a club, and that Mr. Shorter

was with a lady.  Do you recall that?

A.    I don't remember if he was outside a club,

1    but I do remember him describing one meeting with

2    Sheldon Shorter where Shorter was accompanied by a

3    female.

4    Q.    When did that happen?

5    A.    Oh, I don't -- I don't know.

6    Q.    Where did it happen?

7    A.    In Miami.

8    Q.    What club?

9    A.    I do not know.

10   Q.    How do you know he's telling you the truth?

11   A.    Like I described before, how do you ever

12   know if anybody is telling you the truth.  I don't

13   know if you ever know that with a hundred percent

14   certainty.  That's why we take the steps that we

15   take to corroborate what people are telling us.

16   And as I testified a couple of times already,

17   these telephone conversations that we record go a

18   long way to corroborate things that people tell

19   us.

20   Q.    What did your agency do to corroborate that

21   Mr. Parra said that he met with Mr. Shorter outside

22   a club in Miami, and that Mr. Shorter was with a

23   lady?

24   A.    That would be a difficult fact to

25   corroborate.  I don't know where you would begin

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    with trying to corroborate somebody's recollection

2    of one brief meeting that occurred along the side

3    of the street in Miami.

4    Q.    It's important if he wants to send my client

5    to jail though, isn't it?

6    A.    Oh, if there's a way to do that, I'd very

7    much like to try and corroborate that.  We can't

8    corroborate everything that a cooperating

9    defendant or confidential source tells us, but at

10    the same time we try to corroborate as much as we

11    can.

12    Like if when you asked me about what did I

13    do to corroborate what Cleo Mitchell told me about

14    his trips to Arizona, that's why I explained I

15    served subpoenas to the airlines, contact other

16    police departments.  I try to gather as much

17    information to corroborate as much as I can.

18    Q.    Anything else as to that -- that situation?

19    A.    Regarding the meeting in Miami?

20    Q.    Yes.

21    A.    What do you mean anything else regarding

22    that?

23    Q.    Fine.  Let me go on to the next one that he

24    described where he says that he gave a package to

25    Mr. Shorter.  He testified that -- and he gave to

you in your report that it was to Mr. Shorter in a
parking lot of Walgreen's.  When did that happen?

A.    I believe it was some time in '07, but I do
not -- I don't remember.

Q.    And how do you know it was in '07?

A.    I'm just thinking back to my conversation
with him.  I believe that's when it was, but I
don't recall.

Q.    What Walgreen's?

A.    I do not know.

Q.    Where?

A.    I believe in south Florida.

Q.    South Florida?

A.    I believe so.

Q.    What have you and the agency done to verify
his story?

A.    Very much like the roadside meeting in
Miami, that's a difficult thing to corroborate.

Q.    Like you said, how do you know when
someone's lying to you; correct?

A.    I think what I said was you can never know a
hundred percent of the time if somebody's telling
the truth.  But once again, as I testified to a
few times, you do what you can to corroborate
that.  Some facts you can easily, and some things

1    are much more difficult, very much like the

2    examples you're trying to point out now.

3    Q.    I'm not trying to use examples, I'm trying

4    to use the words of your witness.  Let me go back

5    and ask you the question again.

6          Is there anything that you or the agency did

7    to verify his story that he met with Mr. Shorter in

8    a parking lot in a Walgreen's and gave him money?

9    A.    I stated no.

10   Q.    Thank you.  Let's go on to the third one

11   where he says that he met Mr. Shorter in the

12   parking lot of a Holiday Inn.  When did that

13   happen?

14   A.    I do not know specifically.

15   Q.    Where did it happen?

16   A.    I believe at a Holiday Inn.

17   Q.    What Holiday Inn?

18   A.    I do not know.

19   Q.    And again, your answer would be the same;

20   right?

21   A.    It would be.

22   Q.    That you never know 100 percent when someone

23   is telling you the truth?

24   A.    My answer would be the same, that I didn't

25   take extra steps to corroborate that particular

1    meeting.

2    Q.    And the fourth meeting is that he met with

3    Mr. Shorter at Sawgrass Mall and gave him money.

4    Do you recall that?

5    A.    I do.

6    Q.    Now, can we assume that Mr. Parra was on the

7    west coast of Florida when he went to the Sawgrass

8    Mall, which is on the east coast of Florida?  Is

9    that a safe assumption?

10   A.    I'm sorry.  Ask that question again.

11   Q.    Where's Sawgrass Mall, Agent?

12   A.    Sawgrass Mall that I'm familiar with is in

13   Sunrise, Florida, in Broward County.

14   Q.    Is there another -- which Sawgrass Mall was

15   Mr. Parra referring to when he gave you that

16   information?

17   A.    The one in Sunrise, Florida, in Broward

18   county.

19   Q.    Mr. Parra lives where?

20   A.    Mr. Parra lives in the Tampa Bay area.

21   Q.    Mr. Parra's apartment where he kept money

22   was where?

23   A.    Tampa, Florida.

24   Q.    What did -- when did this meeting occur?

25   A.    I do not know specifically.

Q.      What did you or the agency do to verify or
corroborate that this meeting even ever happened?

A.      There were no steps that I could think to
take to corroborate that.  So the answer to your
question, no steps.

Q.      I know that you've driven across I-75 each
way; correct?

A.      Numerous times.

Q.      The agency give you a SunPass?

A.      They do.

Q.      Goes click, click, takes a photo?

A.      Yes.  I believe it takes a photograph if you
do not pay your toll.  I know it obviously
registers when you go through if you use a
SunPass.  But the photograph I believe is only
taken if you do not pay the toll.

Q.      Did you ever check with them to see if any
car that you know that Mr. Parra used either went
or came back through any of those tolls during any
of this time when you believe that he might have
gone to meet Mr. Shorter to give him money?

A.      I served no subpoenas to the SunPass.

Q.      When you were meeting with the Florida
Highway Patrol, which you've done extensively, did
you check any records to see if they pulled anyone

1    over during that relevant period and didn't provide

2    a ticket to see if Mr. Parra drove in either

3    direction from the Sawgrass Mall during whatever

4    time he says he did it?

5    A.    No, I did not attempt to see if he was

6    issued a traffic citation.

7    Q.    Let's change subjects for a second.

8          MR. RODRIGUEZ:  May I approach the witness,

9    Your Honor?

10         THE COURT:  You may.

11   BY MR. RODRIGUEZ:

12   Q.    Let me show you what I have marked as S1,

13   Shorter 1, and ask you to look at it, please.  Have

14   you seen that before?

15   A.    I do not believe I have.

16         MR. RODRIGUEZ:  Your Honor, S1 is a

17   docket entry in Case No. 0850, United States

18   versus Ramiro Parra.  Government's Information and

19   Notice of Prior Conviction.  At this time I would

20   move its introduction as Shorter No. 1.

21         MR. PRESTON:  No objection.

22         THE COURT:  It is received.

23         (EXHIBIT 1 ADMITTED INTO EVIDENCE.)

24   BY MR. RODRIGUEZ:

25   Q.    Agent, in our vernacular what is an 851?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

                    MR. PRESTON:  Objection.  Outside the
scope of direct.

                    THE COURT:  Sustained.

                    MR. RODRIGUEZ:  Your Honor, would you
like me to bring this witness back?

                    THE COURT:  If you wish.

                    MR. RODRIGUEZ:  I'd like to continue
my -- I'd like to go along very shortly, less than
three minutes on some -- and I'll finish up.

                    THE COURT:  The objection is sustained.

                    MR. RODRIGUEZ:  Okay.  May I approach?

                    THE COURT:  You may.

                    MR. RODRIGUEZ:  I'll show you what's
been marked as Shorter number 2.

                    THE COURT:  What is the document Shorter
F1?

                    MR. RODRIGUEZ:  S1, Your Honor.

                    THE COURT:  S?  S, as in --

                    MR. RODRIGUEZ:  S, as in Shorter, 1 is
Government's Information and Notice of Prior
Conviction.  It should be on my exhibit list at
S1.

                    May I proceed?

                    THE COURT:  You may.

BY MR. RODRIGUEZ:

1    Q.    Let me show you what has been marked as S2.

2    Docket entry in 08-50, United States of America

3    versus Ramiro Parra, Government's Motion to

4    Continue Sentencing.

5         MR. RODRIGUEZ:  Your Honor, at this time I

6    move for its introduction.

7            MR. PRESTON:  No objection.

8            THE COURT:  It is received.

9            (EXHIBIT S2 ADMITTED INTO EVIDENCE.)

10   BY MR. RODRIGUEZ:

11   Q.    And let me hand you what has been previously

12   marked as S5.  A docket entry in 08-270, this case,

13   Government's Information and Notice of Prior

14   Conviction.

15        MR. RODRIGUEZ:  And at this time I move for

16   the introduction of S5.

17           MR. PRESTON:  No objection.

18           MR. RODRIGUEZ:  Thank you.

19           THE COURT:  It is received.

20           (EXHIBIT S5 ADMITTED INTO EVIDENCE.)

21           MR. RODRIGUEZ:  Thank you.

22   BY MR. RODRIGUEZ:

23   Q.    Agent, I have put on the ELMO here what has

24   been accepted into evidence as S2.  Are you

25   familiar with this document?  Have you seen it

1  before?

2  A.    Not before now, no.

3  Q.    Mr. Parra previously pled guilty in Case

4  08-50; is that correct?

5  A.    I don't believe I can see the case number on

6  top, but he did plead guilty regarding the charge

7  coming out of this investigation.

8  Q.    And he was supposed to have been sentenced

9  in September of this year; correct?

10  A.    I believe his original sentencing was late

11  '07.  I don't recall the date.

12  Q.    Okay.  And Mr. Preston filed a motion with

13  the Court.  And can you read Paragraph 3 to the

14  jury, please.

15  A.    Yes.  Paragraph 3 states:  "The defendant's

16  cooperation will not be complete before the

17  Shorter case is resolved, and therefore the

18  government would be unable to address that

19  cooperation at the presently scheduled

20  sentencing."

21  Q.    Last paragraph.

22  A.    Last paragraph reads:  "As a result the

23  government respectfully requests with the

24  defendant's concurrence in an initial continuance

25  of 60 days.

1    Q.    To this date Mr. Parra has not been

2    sentenced; right?

3    A.    No, he has not.

4    Q.    Let me show you what has been introduced

5    into evidence as Shorter 1.  Would you just please

6    take a moment --

7              MR. PRESTON:  Objection, Your Honor.

8    This witness says he's not familiar with this

9    document, and it's outside the scope of direct

10    examination.

11              THE COURT:  It is outside the scope of

12    the direct examination, but I'll permit the

13    examination to continue.

14              Proceed.

15              MR. RODRIGUEZ:  Briefly, Your Honor.

16    BY MR. RODRIGUEZ:

17    Q.    Would you please read this document to the

18    jury starting where it says the United States of

19    America.

20              THE COURT:  I don't think that's

21    necessary, Counsel.

22              Can you all see that document?

23              MEMBERS OF THE JURY:  (Nods.)

24              THE COURT:  All right.

25    BY MR. RODRIGUEZ:

1    Q.    This is the government's notice that Ramiro

2    Parra is a convicted felon, and therefore he's

3    going to receive an enhanced sentence; is that

4    correct?

5    A.    That's my understanding of this document,

6    yes.

7    Q.    Thank you.  Let me show you what's been and

8    introduced as S5.  This is a similar document for

9    Cleo Mitchell filed by the government basically

10   saying that he's a prior drug felon and he will be

11   enhanced at sentencing?

12   A.    That is correct.

13   Q.    Thank you.

14        MR. RODRIGUEZ:  One second, Your Honor.

15   I think I'm done.

16        THE COURT:  All right.

17        MR. RODRIGUEZ:  May I approach the

18   witness, Your Honor?

19        THE COURT:  You may.

20   BY MR. RODRIGUEZ:

21   Q.    Agent, do you recognize this person?

22   A.    I do.

23   Q.    Who is it?

24   A.    Santorio Williams.

25   Q.    Known as?

A.     Big Bo.

Q.     Big Bo is a drug dealer in Pinellas County?

A.     Yes.

Q.     Is and has been?

A.     Yes.

Q.     On April 29th of this year Ramiro Parra was working and cooperating with the DEA?

A.     April 29th of -- I'm sorry.  Did you say this year or last year?

Q.     2008.

A.     2008.

Q.     We haven't gotten to this year yet.

A.     Yes.  That's what I was going to state.

Q.     Last year -- in other words, he started -- so we're clear, April 3rd he signed on?

A.     Yes.

Q.     April 29th he was still with you as he is today?

A.     Yes.

Q.     And on April 25th he went in with someone else to a jewelry store and sold some stolen jewelry; true?  And that jewelry belonged to this man; right?

A.     I'm trying to remember the specifics surrounding that.  I know there was an individual

who had jewelry.  I don't recall if Ramiro Parra

actually went to the store, but he did provide

information regarding the jewelry that was sold

and where he believed it came from.

Q.    The jewelry was stolen jewelry --

            MR. PRESTON:  Objection, Your Honor.

BY MR. RODRIGUEZ:

Q.    -- from this man.  You reported it.  And

Ramiro Parra reported it to you that he was either

there or knew about it while he was an informant of

the DEA; correct?

A.    Yes.  My understanding is that he knew that

somebody had sold jewelry that had belonged to

Mr. Williams.

Q.    He accompanied someone who sold the stolen

jewelry that belonged to this drug dealer, didn't

he?

A.    As I testified before, I know that he was

supposed to give recommendations as to where the

jewelry was sold.  But if you have a report that

you'd like me to review to refresh my memory, I'd

be happy to do that.

Q.    No.  On April 25th, 2008, he, Parra,

accompanied --

            MR. PRESTON:  Objection, Your Honor.

BY MR. RODRIGUEZ:

Q.     -- last name unknown --

          MR. PRESTON:  Objection.  Using the
report in an improper fashion.

          THE COURT:  Sustained.

          MR. PRESTON:  Reading from the report.

BY MR. RODRIGUEZ:

Q.     You wrote in a report that he accompanied
that?

          MR. PRESTON:  Objection, foundation.

          THE COURT:  All right.

BY MR. RODRIGUEZ:

Q.     You previously testified that you have no
idea whether he went or he didn't.  Isn't it true
that you previously --

          MR. PRESTON:  Objection, misstates the
testimony.

BY MR. RODRIGUEZ:

Q.     Did he go and sell stolen jewelry?

A.     I testified before I don't specifically
recall, and I'd asked if I could review my report
and refresh my memory.

          MR. RODRIGUEZ:  May I approach, Your
Honor?

          THE COURT:  You may approach.

1   BY MR. RODRIGUEZ:

2   Q.    Had sufficient time?

3   A.    Yes.

4   Q.    What does the word "accompany" mean?

5   A.    Accompany is when you go somewhere with

6   somebody.

7   Q.    Did he go with -- with someone to a jewelry

8   store located in Town and Country Mall?

9   A.    According to what I was told by the people

10  who spoke to Mr. Parra, yes.

11  Q.    Thank you.

12          MR. RODRIGUEZ:  No further questions.

13          THE COURT:  Mr. Chalela.

14          MR. CHELALA:  No further questions, Your

15  Honor.  Thank you.

16          THE COURT:  Mr. Crawford.

17          MR. CRAWFORD:  Thank you, Your Honor.

18                  CROSS-EXAMINATION

19  BY MR. CRAWFORD:

20  Q.    Special Agent Duralia, let me ask you again

21  to look at Government's Exhibit No. 30.  And ask

22  you the seal number that is down in the bottom left

23  corner.  Would you read that out to us?

24  A.    Yes.  It's Seal No. 0000082.

25  Q.    All right.  Now, the date that the tractor

1   trailer was stopped was August 24th of 2008;

2   correct?

3   A.    Correct.

4   Q.    And after the truck -- tractor trailer truck

5   was stopped, you went to the arrest scene; correct?

6   A.    I -- I did not immediately after it was

7   stopped.  But a period of time had elapsed and I

8   drove to the scene of the traffic stop.

9   Q.    All right.  If I showed you some photographs

10  that were taken at or near about that time, would

11  you be able to recognize the tractor trailer truck

12  again?

13  A.    The truck itself, yes.

14  Q.    Okay.

15        MR. CRAWFORD:  Your Honor, if I could

16  approach.

17  BY MR. CRAWFORD:

18  Q.    Let me show you what's been previously

19  marked for identification as Volcy Exhibits

20  No. 37A, B, C, and D, and ask if you would look at

21  those.  Do you recognize those as photographs of

22  the tractor trailer?

23  A.    Yes, I do.

24        MR. CRAWFORD:  Your Honor, we would

25  offer those as evidence at this time.

1          MR. PRESTON:  No objection.

2          THE COURT:  They are received.

3          (EXHIBITS 37A, B, C, and D ADMITTED INTO

4    EVIDENCE.)

5          MR. CRAWFORD:  Thank you.

6          Miss Thomas, if I could put that on the

7    ELMO.  Let me publish 37A if I might.

8    BY MR. CRAWFORD:

9    Q.    That is the gold cab -- or as you called it

10   the orange colored cab from August 24th; right?

11   A.    It appears to be, yes.

12   Q.    All right.  37B, this was obviously taken in

13   the daytime, maybe the next day or so.  That is the

14   gold cab; correct?

15   A.    Yes.

16   Q.    All right.  37C is a photograph of what was

17   on the side of the gold cab; correct?

18   A.    That is correct.

19   Q.    And it's Cool Carriers of Florida, Inc.,

20   Pompano Beach, Florida; correct?

21   A.    Yes.

22   Q.    And it has the VIN number and other numbers

23   that we'll find out what all that means later;

24   right?

25   A.    Yes.

1    Q.    Okay.  And finally back to the night of the

2    seizure, this is a photograph of the trailer that

3    was being pulled by that particular cab.  This is

4    37B; correct?

5    A.    Yes.

6    Q.    Thank you, sir.

7          Now, going back to -- I'll just use a copy

8    of Government's Exhibit No. 30, this receipt, a

9    picking sheet as it's called here.  The seal number

10   there, did you ever see the seal on the back of the

11   trailer depicted in 37D?

12   A.    No, I did not.

13   Q.    You didn't see it that night?

14   A.    I did not.

15   Q.    Did you look for it?

16   A.    I didn't.

17   Q.    Okay.  Now, after the tractor trailer was

18   stopped and searched, it was eventually driven back

19   to the other side of the bay back to Tampa;

20   correct?

21   A.    That's correct.

22   Q.    By one of the detectives with the Tampa

23   police department?

24   A.    Yes.

25   Q.    Because he knows how to drive these things;

1  right?

2  A.    That's correct.

3  Q.    Okay.  Now, part of the investigation after

4  the tractor trailer was stopped and searched was to

5  look in the cab and to collect all of the paperwork

6  that was in the cab; correct?

7  A.    Yes.

8  Q.    And while you didn't maybe necessarily do

9  that, as the case agent, all of that paperwork

10 would have flown through you; correct?

11 A.    Correct.

12 Q.    Part of your duties and responsibilities is

13 to collect that paperwork and to make notes of it

14 and organize it and see what may be of evidentiary

15 value and what may not be; correct?

16 A.    Correct.

17 Q.    All right.  You had already mentioned on

18 direct that there was a second bill of lading or

19 shipping order or picking sheet, whatever phrase we

20 want to use, that dealt with this particular pick

21 up at Countryside, which is Government's

22 Exhibit 30; is that correct?

23 A.    Yes.  I believe from what I can remember, I

24 believe it did refer to the same load, the same

25 pick up from the same company.

1    Q.    All right.  Let me show you what I believe

2    is what you recall.  Your memory is pretty good.

3    I'll show you what's been previously marked as

4    Volcy Exhibit No. 23 and ask if you'll look at that

5    wonderful copy.

6    A.    Yes, this is the document I was referring

7    to.

8    Q.    All right.

9          MR. CRAWFORD:  Your Honor, if I could

10   offer Volcy Exhibit No. 23 as evidence.

11         MR. PRESTON:  No objection.

12   BY THE COURT:

13   Q.    All right.  Now --

14         THE COURT:  It is received.

15         (EXHIBIT 23 ADMITTED INTO EVIDENCE.)

16         MR. CRAWFORD:  Thank you.

17   BY MR. CRAWFORD:

18   Q.    The problem with this one is it's not real

19   readable, is it?

20   A.    I would agree.

21   Q.    Okay.  But we can see on here 000082, which

22   is a seal number; correct?

23   A.    Correct.

24   Q.    And that is the same number that is on this

25   Countryside, Exhibit No. 30; right?

1    A.    I would agree.

2    Q.    Okay.  Now, -- well, go blind.  Let me ask

3    this:  Do you have the original of that document

4    back in your paperwork either over at your office

5    or at the U.S. Attorney's Office?

6    A.    I do not -- I may or may not.  What had

7    happened was the agent who seized documents from

8    the cab, there were certain documents that were in

9    there that the company who actually owns the truck

10   claimed ownership to, legitimate trucking

11   documents as I understand would be.

12         What that agent did was photocopy certain

13   documents and let the trucking company have their

14   originals back.

15   Q.    I see.

16   A.    I'm not sure if that document was included

17   with those documents.  I would have to check.

18   Q.    Okay.  And then so maybe some of the

19   originals were sent back to Cool Carriers?

20   A.    Yes.

21   Q.    Okay.  So I -- I guess what I need to ask

22   you is this -- and please check with Mr. Preston.

23   But if you could, would you check your records

24   tonight and see if we have either the original,

25   maybe a little better copy of Exhibit No. 23 that's

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  now in evidence, and bring it tomorrow so we can do

2  a substitution?

3  A.     Yeah.  We will not have a better copy than

4  that.  Because from what I remember what I

5  reviewed, it was just as bad.  But if we have an

6  original, I will bring that to court.

7  Q.     Okay.  Please do.  Thank you, sir.

8          MR. PRESTON:  Judge, the government

9  would not object to substituting the original if

10  in fact it's in the documentary evidence.

11          THE COURT:  Thank you.

12  BY MR. CRAWFORD:

13  Q.     All right.  Now, there were, of course,

14  additional documents that were seized from this

15  cab.  There was a lot of paperwork in there;

16  correct?

17  A.     There was.

18  Q.     All right.  Let me show you what's been

19  previously marked for identification as Volcy

20  Exhibit No. 16.  And I've lumped these together.

21  If you would take off the clip and see if those are

22  the drivers daily log for Mr. Baptiste.

23  A.     (Witness complies.)  Out of all these sheets

24  there's one that does not have a name, but the

25  rest of them do appear to be for Mr. Baptiste.

```
1    Q.    All right.

2              MR. CRAWFORD:  Let me offer Exhibit 16

3    as evidence.

4              MR. PRESTON:  No objection.  Same

5    stipulation.

6              THE COURT:  Is that 16 or 60?

7              MR. CRAWFORD:  16, as in 1-6.

8              THE COURT:  All right.  It is received.

9              (EXHIBIT 16 ADMITTED INTO EVIDENCE.)

10   BY MR. CRAWFORD:

11   Q.    And to help the jury understand, these

12   documents that are seized, you have the originals.

13   You make some photocopies.  And at some point

14   during the procedure you and Mr. Preston turn them

15   over to defense counsel for us to have our own

16   copies; right?

17   A.    Correct.

18   Q.    Okay.  And let me show you one as an

19   example.  Let's look at April 21st, '08.  That is

20   the date.  Cool Carriers of Florida is the name of

21   the carrier; correct?

22   A.    Correct.

23   Q.    Okay.  And it says here that the drivers

24   full signature would be J. Evens B.; right?

25   A.    Correct.
```

Q.    Okay.  And it says the co-driver is
H. Volcy?

A.    That's correct.

Q.    Now, also in your accumulation of these
documents there would be a sheet -- a drivers daily
log, same date, April 21st, '08, but where Mr.
Volcy's name appears as the drivers full signature
and Mr. Baptiste's name appears as the co-driver;
right?

A.    Yes.  From what I reviewed, I believe they
both completed driver logs for particular days.

Q.    So they kept their own logs?

A.    Correct.

Q.    And, of course, since they were riding
together, then they would -- one of them would be
driving, and one of them would either be sleeping
or as a passenger or off duty, and it would match
up; right?

A.    I don't know how the logs work, but --

Q.    Okay.

A.    -- they did -- both did complete logs.

Q.    And again, as Mr. Preston has graciously
agreed, you will see if you have the originals of
those so that we can substitute those for the
copies?

```
1    A.      For the logs as well?

2    Q.      Yes, sir.

3    A.      I will check.

4    Q.      Thank you, sir.

5            And let me now show you the same drivers

6    daily logs for Mr. Volcy, additional ones and the

7    ones that you've already introduced.  And if you'll

8    look through that and make sure that I'm correctly

9    identifying it.

10               THE COURT:  What exhibit is that,

11   Mr. Crawford?

12               MR. CRAWFORD:  Exhibit No. 15, Your

13   Honor, on our exhibit list, Volcy Exhibit 15.

14               THE WITNESS:  Yes, I would agree that

15   these are photocopies of the driver logs for

16   Hardaway Volcy.

17               MR. CRAWFORD:  Okay.  Judge, we would

18   offer Volcy Exhibit 15 as evidence at this time.

19               MR. PRESTON:  No objection.  Same

20   stipulation.

21               (EXHIBIT 15 ADMITTED INTO EVIDENCE.)

22   BY MR. RODRIGUEZ:

23   Q.      All right.  There were additional bills of

24   lading that were also taken from the cab; is that

25   correct?
```

```
1    A.      Yes, that's correct.
2    Q.      All right.  I'm going to show you what's
3    been previously marked for identification as Volcy
4    Exhibit No. 20, that's 2-0, and ask if you
5    recognize that particular document as a copy of one
6    that was seized from the cab?
7    A.      Yes, I do recognize it.
8            MR. CRAWFORD:  Judge, we would offer
9    Volcy Exhibit 20 as evidence.
10           MR. PRESTON:  No objection.
11           THE COURT:  It is received.
12           (EXHIBIT 20 ADMITTED INTO EVIDENCE.)
13           MR. CRAWFORD:  All right.  I'll put it
14   on the overhead, and let's see if we can read it.
15   BY MR. CRAWFORD:
16   Q.      This is a bill of lading; correct?
17   A.      Yes.
18   Q.      And the date is March 21st, '08?
19   A.      Yes.
20   Q.      So this is -- this is more than a month then
21   before the tractor trailer was seized and Mr. Volcy
22   and Mr. Baptiste was arrested; right?
23   A.      That is correct.
24   Q.      But this paperwork was in the cab?
25   A.      Yes.
```

1   Q.    Can you read who the shipper is?  Can you

2   read that at all.

3   A.    I might be able to read it better if it were

4   in front of me.  But on the screen, I apologize, I

5   cannot.

6   Q.    Well, I'll give you a hint.  Look over here

7   and look and see this agricultural stamp.  Tells

8   you who the shipper is.

9   A.    That I can read, and that states Del Ray

10  Plants Company.

11  Q.    And where is -- where are they out of it?

12  A.    Look like they're based out of Venus,

13  Florida.

14  Q.    Okay.  And if you can, tell us where the

15  consignee is.  Where's it going?  Can you read that

16  at all?

17  A.    I'm sorry.  I cannot.

18  Q.    Let's see if you can look at this.

19  A.    Looks like it's destined for Home Depot.  I

20  believe in Washington state, best I can tell.

21  Q.    All right.  Good.  Okay.  And then just to

22  not belabor the point, get the rest of them in --

23          MR. PRESTON:  For the rest the objection

24  is relevancy and hearsay.

25          MR. CRAWFORD:  I think I can clear that

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

up when you see the date on them.

    THE COURT:  Pass the documents up,

please.  Come to sidebar, counsel.

    (AT WHICH TIME THE FOLLOWING SIDEBAR

DISCUSSION WAS HELD:)

    THE COURT:  To what are these relevant,

Mr. Crawford?

    MR. CRAWFORD:  Judge, you'll note that

the dates on all of these bill of ladings in this

stack are 4/15 or later.  That is the trip that

both Volcy and Baptiste are on as they are coming

from the east coast over to the west coast.  It

shows picking up flowers, dropping off flowers at

various locations in Kansas and in Illinois and in

Arizona.

    And it's going to be important when the

government argues when exactly we picked up the

marijuana.  So I'm trying to show legitimate

trucking activity by these individuals right at

the time that they're alledgedly shipping

marijuana.

    THE COURT:  All right.  And how do you

propose to get them in over the objection of the

AUSA?

    MR. CRAWFORD:  Well, I haven't heard a

1 hearsay objection yet.

2       THE COURT: The counsel made one.

3       MR. PRESTON: I made one.

4       MR. CRAWFORD: Oh, I'm sorry. I thought

5 he said relevancy. I can't. All I can is say

6 these are documents that are found in the cab.

7 And I would conclude that the hearsay concerns

8 would go to the weight that they are to be given

9 as opposed to whether they're admissible or not.

10 They were provided by the government to us in

11 discovery.

12       THE COURT: They do not meet the

13 criteria for admissibility simply because they

14 exist.

15       MR. CRAWFORD: I understand. And

16 I'll -- I guess I'll attempt to lay the foundation

17 with another witness later.

18       THE COURT: All right.

19       MR. CRAWFORD: Thank you, sir.

20       (AT WHICH TIME THE SIDEBAR DISCUSSION

21 WAS CONCLUDED AND THE PROCEEDING RESUMED AS

22 FOLLOWS:)

23 BY MR. CRAWFORD:

24 Q.    Special Agent Duralia, is it your -- is it

25 the government's position that the marijuana found

1    in the tractor trailer truck was placed in the

2    trailer before the Walmart shipment of cookie dough

3    was placed in the truck?

4    A.    I think that's a good possibility.

5    Q.    Okay.  Fair to say you don't know, do you?

6    A.    I wasn't there unfortunately.

7    Q.    All right.  We do know that on the 21st of

8    April of 2008, that 77 boxes of oatmeal raisin

9    cookie dough was picked up in Irvine, California;

10   correct?

11   A.    Seventy-seven cases I believe is the

12   terminology they use.

13   Q.    Okay.

14   A.    But that appears to be the case based on

15   this document.

16   Q.    All right.  So tell me what you found out

17   when you went to interview the dock workers of

18   Countryside Baking in Irvine, California.

19   A.    I have not spoken to anybody at Countryside

20   Baking.

21   Q.    Well, the people that loaded the 77 boxes or

22   cases of oatmeal raisin cookie dough would be able

23   to tell you whether or not there were other items

24   in the truck before they put the cookie dough in;

25   right?

1    A.      They may be able to.

2    Q.      But you never did attempt to call them?

3    A.      No, did not conduct an interview with them.

4            MR. CRAWFORD:  Special Agent Duralia,

5    thank you, sir.

6            THE COURT:  Redirect.

7            MR. PRESTON:  Yes.  Thank you, Your

8    Honor.

9            THE COURT:  Let's take our afternoon

10   recess at this point, Mr. Preston.

11           MR. PRESTON:  Yes, Your Honor.

12           THE COURT:  We'll reconvene at 3:30.  Do

13   not discuss the case, ladies and gentlemen.

14           COURT SECURITY OFFICER:  Please rise for

15   the jurors.

16     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

17      (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

18          PROCEEDINGS CONTINUED AS FOLLOWS:)

19           COURT SECURITY OFFICER:  Jury's coming

20   in.

21     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

22           COURT SECURITY OFFICER:  Please be

23   seated.

24           THE COURT:  Anything further from this

25   witness?

1    MR. PRESTON: Yes, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. PRESTON:

4    Q.    Agent Duralia, Mr. Chalela spent some time

5    with you reviewing the logs in regard to April 19th

6    and the 20th referring to the off duty location,

7    Riverside, California, that was reflected in those

8    exhibits; correct?

9    A.    Yes.

10   Q.    All right.  Now, when you say that the logs

11   showed it as Riverside, California, you're only

12   able to tell us what the logs reflect and not that

13   the truck was actually in Riverside, California, on

14   those days; correct?

15   A.    Yeah.  All I can tell you is what the actual

16   driver writes on his log for that date.

17   Q.    Now, in regard to Government's Exhibit

18   No. 30, up at the top we have the ship to address

19   of a Walmart in Winter Haven, Florida; correct?

20   A.    That's correct.

21   Q.    Is Winter Haven the same as State Road 60 in

22   Brandon?

23   A.    No.  State Road 60 would be, like you

24   stated, the Brandon area.  Winter Haven would be

25   further to the east.  I believe Winter Haven is in

1    Polk County.

2    Q.    Some distance away from Brandon; correct?

3    A.    Yes.

4    Q.    Then you had the conversation with

5    Mr. Rodriguez about Big Homey.  You did indicate

6    that you are aware at least that Big Homey was

7    referred to in conversations between Ramiro Parra

8    and Cleo Mitchell; correct?

9    A.    That is correct.

10   Q.    When those recordings were made -- when

11   those recordings were made, was Cleo Mitchell

12   cooperating with law enforcement?

13   A.    No, he was not.

14   Q.    Was Cleo Mitchell a target of the

15   investigation at that time?

16   A.    Yes, he was.

17   Q.    Was Ramiro Parra cooperating also against

18   Cleo Mitchell's interest at that time?

19   A.    Yes, he was.

20         MR. PRESTON:  That's all I have, Your

21   Honor.

22         THE COURT:  You may come down,

23   Mr. Duralia.

24         Your next witness.

25         MR. PRESTON:  Robert Quinn.

1                    COURTROOM DEPUTY CLERK:  Sir, if you'll

2      raise your right hand.

3                    Do you solemnly swear or affirm that the

4      testimony you shall give in this cause will be the

5      truth, the whole truth, and nothing but the truth,

6      so help you God?

7                    THE WITNESS:  I do.

8                          **ROBERT QUINN,**

9      a witness, having been duly sworn to tell the

10     truth, the whole truth and nothing but the truth,

11     was examined and testified as follows:

12                   COURTROOM DEPUTY CLERK:  Please be

13     seated in the witness stand.

14                   Sir, if you'll state your name and spell

15     your last name for the record, please.

16                   THE WITNESS:  Robert Quinn, Q-U-I-N-N.

17                   THE COURT:  You may inquire, Counsel.

18                   MR. PRESTON:  Thank you, Your Honor.

19                       DIRECT EXAMINATION

20     BY MR. PRESTON:

21     Q.    Sir, you are a Special Agent with the Drug

22     Enforcement Administration; correct?

23     A.    Yes, sir.

24     Q.    How long have you been with DEA?

25     A.    Twenty-two years.

Q.   Did you assist Special Agent Justin Duralia

at times during his investigation of a marijuana

trafficking organization in the spring of 2008?

A.   Yes, I did.

Q.   As part of your assistance did you travel to

south Florida to conduct surveillance in the area

of 17185 Northwest 30 -- 23rd Street in Pembroke

Pines?

A.   Yes, sir.

Q.   Conducting surveillance there, could you

tell us how many times you travelled to that

location or how many days that you did

surveillance?

A.   I was actually in Miami on another case.

There was another agent that was assigned to come

down and conduct surveillance at 17185 Northwest

23rd.  So I was just basically spot checking to

assist him while he was there.

     I believe I arrived on June 2nd.  I think I

went by the target location when I arrived in

town.  I think I went by one more time later that

night on the 3rd.  I was -- I probably checked

four times on the 3rd.  And again on the 4th

twice.

Q.   Were you looking for -- were you trying to

1    spot any particular individual in the area of that

2    residence?

3    A.    Well, we were -- actually, we were looking

4    for -- there was a couple targets in the area.

5    The defendant, Mr. Shorter, being one of them that

6    we knew was related to that location.  There was

7    another individual named Archer that was related

8    to that location.  And we were looking for a

9    vehicle in particular.  That was really what we

10   were looking for.

11   Q.    What sort of vehicle were you looking for?

12   A.    It was a green -- was a really strange color

13   green Dodge Charger that belonged to an informant

14   that was working in this case that had been taken

15   from him as a drug payment the week -- or I think

16   it was a week or two weeks prior.

17   Q.    During the surveillance would any of the

18   subjects that you were tasked to spot actually

19   spotted by surveillance?

20   A.    Yes.  Surveillance saw Mr. Archer on I

21   believe the afternoon of the 2nd.

22   Q.    As far as the defendant Shorter, was he ever

23   seen in that area?

24   A.    No, sir.

25   Q.    Were photographs taken in the area?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.     Yes.

          MR. PRESTON:  May I approach the
witness, Your Honor?

          THE COURT:  You may.

BY MR. PRESTON:

Q.     Do you recognize Government's Exhibits 20
and 21?

A.     Yes, I do.

Q.     What is Government's Exhibit No. 20?

A.     Government Exhibit No. 20 is a photograph of
the front of 17185 Northwest 23rd Street in
Pembroke Pines.  The garage door is open.  It's a
townhouse that was attached.  This was like a
cul-de-sac.  There were buildings all the way --
townhouses all the way around this.  This was back
in the corner.

Q.     So that's a specific entrance to the
residence that was the subject of the surveillance?

A.     It appeared to be, yes, sir.  The garage
door appeared to be attached to the residence that
we were looking at.

Q.     And Government's Exhibit No. 21?

A.     That is a picture of the vehicle that I just
spoke about, the green Charger.

Q.     Where was that parked in relationship to the

 1    particular residence entrance?

 2    A.    It was parked around the side.

 3    Q.    If you could use the screen in front of you,

 4    you might be able to designate.

 5    A.    Sure.

 6    Q.    If you touch it, it actually will draw a

 7    line for you.

 8    A.    The residence was this way.

 9          MR. PRESTON:  I have no additional

10    questions of the witness at this time, Your Honor.

11          THE COURT:  Cross-examination.

12          MR. CHELALA:  No, Your Honor.

13          MR. CRAWFORD:  No, Your Honor.

14          THE COURT:  Mr. Rodriguez.

15          MR. RODRIGUEZ:  No, Your Honor.

16          THE COURT:  You may come down, sir.

17          THE WITNESS:  Thank you, Judge.

18          THE COURT:  Your next witness.

19          MR. PRESTON:  David Sherwood, please.

20          COURTROOM DEPUTY CLERK:  Sir, if you'll

21    raise your right hand.

22          Do you solemnly swear or affirm that the

23    testimony you shall give in this cause shall be

24    the truth, the whole truth, and nothing but the

25    truth, so help you God?

1    THE WITNESS:  I do.

2    **DAVID SHERWOOD,**

3    a witness, having been duly sworn to tell the

4    truth, the whole truth and nothing but the truth,

5    was examined and testified as follows:

6    COURTROOM DEPUTY CLERK:  Please be

7    seated in the witness stand.

8    Sir, if you'll state your name and spell

9    your last name for the record, please.

10    THE WITNESS:  Yes.  David Sherwood,

11    S-H-E-R-W-O-O-D.

12    THE COURT:  You may inquire, Counsel.

13    MR. PRESTON:  Thank you, Your Honor.

14    DIRECT EXAMINATION

15    BY MR. PRESTON:

16    Q.    Good afternoon, Mr. Sherwood.

17    A.    Good afternoon.

18    Q.    We met yesterday evening; is that correct?

19    A.    That's correct.

20    Q.    And you have also spoken to Special Agent

21    Justin Duralia on an earlier occasion; correct?

22    A.    Yes.

23    Q.    Who do you work for?

24    A.    I work for Hop-A-Jet in Fort Lauderdale.

25    Q.    What is Hop-A-Jet?

1   A.    We're a private charter outfit.  We have

2  Challenger jets and Leer jets.

3   Q.    What is your job with Hop-A-Jet?

4   A.    I'm a pilot on the Challenger jet.

5   Q.    What sort of a jet is a Challenger?

6   A.    It's a wide body business jet.  We have a

7  10-seater and a 12-seater, and it's made by

8  Canadair.  And we fly all over the world basically

9  with that plane.

10   Q.    What sort of services does Hop-A-Jet provide

11  to its clients?

12   A.    We fly basically all clients, namely who

13  like to charter the aircraft.  We fly them

14  anywhere they want to go any time of the day or

15  night basically.  So a full service charter is

16  what we offer.

17   Q.    Is your client list exclusive or can anyone

18  hire your services?

19   A.    Anyone can hire us.

20   Q.    Okay.  Were you performing your duty as a

21  pilot for Hop-A-Jet between the date April 18th and

22  April 20th of 2007?

23   A.    Yes.

24   Q.    On those dates were you the first officer

25  for a flight that traveled to California and back

1  with an outbound stop in Tampa, Florida?

2  A.    That's correct.

3  Q.    And which of the Challenger aircraft was

4  used for that particular flight?

5  A.    I don't recall if it was the 10-seater or

6  the 12-seater.  I'm not really sure which one it

7  was.

8  Q.    Did you have enough seats for the

9  passengers?

10 A.    Yes, we did.

11 Q.    How many passengers took that flight?

12 A.    We had three.

13 Q.    Now, does Hop-A-Jet maintain records in

14 regard to its chartering of flights?

15 A.    Yes, they do.

16 Q.    Are these records kept as a normal practice

17 in their business?

18 A.    That is correct.

19 Q.    And is it the business's practice also to

20 maintain these records for a period of time?

21 A.    Yes, it is.

22 Q.    All right.  Have you reviewed records in

23 regard to the particular flight that we're talking

24 about now, the April of 2007 flight?

25 A.    Yes, I have.

1    Q.    I'd like to show you what's been marked for

2    identification purposes as Government's Exhibit

3    No. 32 and ask you if you've seen those records.

4    A.    Yes, sir, I've seen all of these.

5    Q.    Are these the records of Hop-A-Jet

6    pertaining to the flight in question?

7    A.    Yes, they are.

8            MR. PRESTON:  I would move 32 into

9    evidence, Your Honor.

10           MR. RODRIGUEZ:  Just one second.  Excuse

11    me, Your Honor.

12           MR. PRESTON:  A moment, please.

13           MR. RODRIGUEZ:  No objection, Your

14    Honor.

15           THE COURT:  It is received.

16           (EXHIBIT 32 ADMITTED INTO EVIDENCE.)

17           MR. PRESTON:  Your Honor, may I take

18    some of these exhibits off the witness stand that

19    were left up here?

20           THE COURT:  Pardon?

21           MR. PRESTON:  May I remove some of these

22    exhibits that were left here?

23           THE COURT:  Yes.  You can put them on

24    the exhibit table here.

25    BY MR. PRESTON:

1    Q.    Now, in regard to a chartered airline are

2    you given a passenger list or is a passenger list

3    kept in the records before the flight takes off?

4    A.    Yes, we do have a passenger list.  And we

5    must in fact to verify the passengers with their

6    ID before we can board them and take off.

7    Q.    How many people were originally scheduled to

8    take this flight?

9    A.    There were two originally.

10   Q.    Could you please turn to the sixth page of

11   that exhibit.

12   A.    Okay.

13   Q.    Now, does that page -- does that page

14   reflect the passenger list?

15   A.    Yes, the original two passengers.  And then

16   one was added on.

17   Q.    Who were the two original passengers?

18   A.    It was Wayne Gopie and Anthony Dubois.

19   Q.    Did you check the identification for the

20   third passenger that joined the flight?

21   A.    I believe the other pilot did, Anthony.

22   Q.    And do you remember the name of that third

23   individual?

24   A.    No, I do not.

25   Q.    Do you see either of the individuals from

the original passenger list in court today?

A.    I do -- the one gentleman over here, the defendant, I do recognize him as one of the passengers.  I don't know which one he was though.

Q.    And which -- which person are you referring to in the courtroom?

A.    The gentleman over here next to the lawyer.

MR. RODRIGUEZ:  Your Honor, we will stipulate that he is referring to the gentleman Sheldon Shorter, Your Honor.

THE COURT:  The record will reflect that stipulation.

BY MR. PRESTON:

Q.    When the individuals boarded your aircraft in Fort Lauderdale -- was it Fort Lauderdale, by the way?

A.    That's correct.

Q.    In Fort Lauderdale, what was the baggage situation at that time?

A.    I don't recall.  I believe they each -- they each had at least -- at least one bag each as I recall.

Q.    Was there any mention of additional baggage?

A.    Well, they did say we were going -- the next leg going to Tampa that they would have to get one

1  of the passenger's luggage they needed to pick up

2  there.

3  Q.     They were picking up additional luggage in

4  Tampa?

5  A.     That's correct.

6  Q.     And did that in fact take place?

7  A.     Yes, it did.

8  Q.     After landing in Tampa was there an absence

9  of those passengers from your aircraft for a period

10  of time?

11  A.     Yes.

12  Q.     How long?

13  A.     Approximately 45 minutes to an hour perhaps.

14  Q.     When they returned did they have that

15  additional baggage?

16  A.     Yes, they did.

17  Q.     Could you describe that for the jury,

18  please.

19  A.     There were two bags, two rather long sports

20  athletic bags, black in color, with a Nike emblem

21  on it as I recall.

22  Q.     Did you handle either of those bags?

23  A.     The one passenger was coming up the steps

24  with the bags.  I offered to help carry the bags

25  into the back.

1    Q.    What was his initial response?

2    A.    Initially he just -- he said that's okay.

3    I can handle them myself.  And I offered to carry

4    them in the back.  That's where the luggage

5    compartment is, in the back of the aircraft.

6    Q.    Did you in fact carry either of those bags?

7    A.    Yes, I did.  I carried both of them back

8    there.

9    Q.    Did your handling of the bags cause you to

10   report the condition of those bags to your pilot?

11   A.    Yes, they did.

12   Q.    What did you tell your pilot about your

13   concerns?

14   A.    Basically that the -- the bags just felt a

15   little bulky and just -- just kind of caught my

16   attention there basically.

17   Q.    Have you assisted passengers in your career

18   with their baggage in that rear baggage

19   compartment?

20   A.    Yes.

21   Q.    Are you familiar with what a duffle bag

22   containing clothing feels like?

23   A.    Yes, I have.

24   Q.    Was it your impression that these duffle

25   bags did or did not contain clothing?

```
1    A.    I felt that they did not contain clothing.

2    Q.    Okay.  Upon arrival in California were you

3    able to observe the -- the type of ground

4    transportation your passengers used?

5    A.    Yes.

6    Q.    And departing from the airport how did they

7    do that?

8    A.    I'm pretty sure they departed with a limo.

9    Q.    Did you have the same three passengers on

10   your return flight to Florida?

11   A.    Yes.

12   Q.    Upon arrival -- did they arrive back at the

13   airport on time for their flight back?

14   A.    No.  Actually, they were about at least six

15   hours late than our departure time.

16   Q.    When they arrived for the return flight, was

17   anyone carrying the duffle bags that you had seen

18   brought to California?

19   A.    No, they were not there.

20   Q.    What was the total cost of this round trip

21   flight?

22   A.    Fifty-four thousand, nine hundred ninety-two

23   dollars.

24          MR. PRESTON:  I have no additional

25   questions at this time, Your Honor.
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. RODRIGUEZ:  May I, Your Honor?

2          THE COURT:  Cross-examination,

3    Mr. Rodriguez.

4          MR. RODRIGUEZ:  Thank you, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. RODRIGUEZ:

7    Q.    Good afternoon, Mr. Sherwood.

8    A.    Good afternoon, sir.

9    Q.    Do you have Government's Exhibit No. 32 in

10   front of you?

11   A.    Yes.

12   Q.    Okay.  Just ask you some brief questions

13   about that.  I think government referred you to

14   Page 6.

15         Would you put that up for us, please.  Is

16   there any way you could zoom in a little bit more?

17         MS. TEJERA:  Where?

18         MR. PRESTON:  Which part?

19         MR. RODRIGUEZ:  I would say the bottom

20   of it right there.  No.  No.  Above it.  Above it.

21   Not the catering.  We'll come back to that.  The

22   last portion, that portion right there.  Right

23   there.

24   BY MR. RODRIGUEZ:

25   Q.    You're looking at the entire document in

1  front of you, Mr. Sherwood?

2  A.    Yes.

3  Q.    Okay.  And just tell us, this flight

4  departed on 4/18/07; correct?

5  A.    Correct.

6  Q.    And returned on April 20th, '07; correct?

7  A.    That's right.

8  Q.    But here this in itinerary shows 3/07.

9  That's just a mistake; correct?

10  A.    Yes, that's correct.

11  Q.    A mistake.  No problem.

12        Below that if you could on the right-hand

13  side, the passenger list there shows -- could you

14  please read those names?  Wayne Gopie and Anthony

15  Dubois or Dubois?

16  A.    Uh-huh.

17  Q.    Correct?

18  A.    Yes.

19  Q.    All right.

20        MR. RODRIGUEZ:  And if you could go to

21  what would be Page 8, Counsel, please.  If you

22  could highlight up to the top, please, the credit

23  card authorization.

24        THE WITNESS:  Okay.  Yes, I see it.  Oh,

25  sorry.

BY MR. RODRIGUEZ:

Q.    And a Mr. Adam Hertz paid for this trip; isn't that correct?

A.    Yes, sir.

Q.    Okay.  Just one more -- a couple other questions.  Mr. Preston asked you a question about what you described as gym bags with a Nike emblem -- or I mean some gym bags with a Nike emblem.

A.    Yes.

Q.    You said you didn't believe they contained clothes.

A.    That was just -- just what I guessed.

Q.    Yeah, I understand.  But you don't know what was in those bags?

A.    No, I do not.

Q.    And one of those passengers -- are you aware Wayne Gopie is in the entertainment business?

A.    No, I was not aware of that.

Q.    All Star Entertainment, Excel Entertainment, are you aware of that?

A.    No.

Q.    And have you ever taken passengers that have either equipment, other items that are not closed and carried --

```
1    A.      Sure.

2    Q.      -- different items that would be bulky or

3    whatever?

4    A.      Yes.

5    Q.      So we have no clue; right?

6    A.      Right.

7            MR. RODRIGUEZ:  Thank you very much.

8            THE WITNESS:  You're welcome.

9            THE COURT:  Any further inquiry by

10   defense counsel?

11           MR. CHELALA:  No, Your Honor, thank you.

12           THE COURT:  Mr. Crawford.

13           MR. CRAWFORD:  No, sir.

14           THE COURT:  Redirect.

15           MR. PRESTON:  No, Your Honor, thank you.

16           THE COURT:  You may come down,

17   Mr. Sherwood.  You are excused from further

18   attendance.

19           Next witness.

20           MR. PRESTON:  Robert Lanese.

21           COURTROOM DEPUTY CLERK:  If you'll raise

22   your right hand.

23           Do you solemnly swear or affirm that the

24   testimony you shall give in this cause will be the

25   truth, the whole truth, and nothing but the truth,
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   so help you God?

2           THE WITNESS:  I do.

3                   **ROBERT LANESE,**

4   a witness, having been duly sworn to tell the

5   truth, the whole truth and nothing but the truth,

6   was examined and testified as follows:

7           COURTROOM DEPUTY CLERK:  Please be

8   seated.

9           Sir, if you'll state your name and spell

10  your last name for the record, please.

11          THE WITNESS:  Trooper Robert L. Lanese.

12  My last name is spelled L-A-N-E-S-E.

13          THE COURT:  You may inquire, Counsel.

14          MR. PRESTON:  Thank you, Your Honor.

15                  <u>DIRECT EXAMINATION</u>

16  BY MR. PRESTON:

17  Q.      Trooper Lanese, you are employed by the

18  Florida Highway Patrol; correct?

19  A.      Yes, sir.

20  Q.      How long have you been employed in that

21  capacity?

22  A.      For approximately 27 years.

23  Q.      What are your duties with the Florida

24  Highway Patrol?

25  A.      I'm a trooper assigned to the contraband

1    interdiction program.  And my primary mission is

2    to provide the motoring public with a level of

3    protection out there.  And -- and my secondary

4    duties are to interdict fugitives and contraband.

5    Q.    During your term of service with the Florida

6    Highway Patrol have you participated in narcotics

7    investigations?

8    A.    Yes, sir.

9    Q.    Over how many years of that career have you

10   actually participated in that area of law

11   enforcement?

12   A.    Ever since the beginning of my career.  I

13   started interdicting drugs back in the early '80s.

14   I've -- I was assigned a police K-9 narcotics

15   detection dog, attended numerous schools and been

16   cross designated by Customs as an ICE officer.

17         I actually provide training around the

18   country for the multi jurisdictional county drug

19   task force as an instructor in highway

20   interdiction techniques and so forth.  And I've

21   been doing that in the Tampa Bay area most of my

22   career.

23   Q.    Could I ask you just to swing that

24   microphone just a little bit closer to you.

25   A.    Sure.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

Q.    Trooper Lanese, some -- based on this -- the
special duties that you're called upon from time to
time, are you also contacted by other agencies to
assist them in their investigations?

A.    Yes, sir.

Q.    Some days prior to April 24th of 2008, were
you asked by the Drug Enforcement Administration to
be available for an enforcement action regarding an
anticipated load of marijuana?

A.    Yes, sir.

Q.    And were you actually called to act on that
request on April 24th of 2008?

A.    Yes, sir.

Q.    Where were you first asked to and where did
you first respond in regard to that call?

A.    It was -- it was approximately 4:45 p.m. in
the afternoon on the 24th.  I was contacted via
cell phone by an Agent Duralia with DEA.  And he
wanted me to go to the west end of the Howard
Franklin bridge on I-275 to intercept a load of
narcotics that was coming into Pinellas County.

Q.    Were you also advised in your discussions
leading up to this surveillance of any potential
target vehicles to be on the lookout for?

A.    Yes, sir.  It was supposed to be a late

1    model blue semi with the word "Swift" on the side.

2    Q.    While you were waiting at that vantage point

3    at the Howard Franklin bridge, were you -- did you

4    maintain communications with the Drug Enforcement

5    Administration, specifically Special Agent Duralia?

6    A.    Yes, sir.

7    Q.    Were you advised that DEA had learned the

8    truck was in fact crossing the Howard Franklin

9    bridge at a certain point in time?

10   A.    Yes, sirs.

11   Q.    Did you observe a tractor trailer passing

12   your vantage point at the time -- or close in time

13   to that communication being received?

14   A.    Yes, sir.

15   Q.    Was it a blue truck with a white trailer

16   carrying Swift on its side?

17   A.    No, sir.

18   Q.    What did you observe?

19   A.    I observed a gold colored semi tractor

20   trailer with the words "Cool Carriers" on the

21   side, and it was occupied by two black males.

22   Q.    Did you relay that information to Special

23   Agent Duralia?

24   A.    Yes, sir.

25   Q.    At the time you observed this tractor

1    trailer pass you, were there any other tractor

2    trailers coming over the Howard Franklin bridge?

3    A.    No, sir.

4    Q.    Based on that did you move to a second

5    location?

6    A.    Yes, sir.

7    Q.    Were you aware from your conversations with

8    Agent Duralia or the Drug Enforcement

9    Administration in regard to a potential site where

10   this truck might be headed?

11   A.    Yes, sir.

12   Q.    And where was that?

13   A.    The vehicle was to turn southbound onto

14   Belcher Road from westbound Ulmerton Road.  And

15   for me to get to that location prior to the

16   vehicle I simply went to the next off ramp past

17   the Ulmerton road exit, got off at 118th Avenue,

18   which is a newer exit from the interstate.  It's

19   got less traffic lights.  There wasn't any

20   construction at all at the time on 118th Avenue.

21   I was able to parallel Ulmerton Road and get ahead

22   to the load vehicle prior to the load vehicle

23   getting to Belcher and Ulmerton Road.

24   Q.    I have to ask the obvious, but did you get

25   ahead of the load vehicle?

1    A.    Yes, sir.

2    Q.    What was your next vantage point?

3    A.    My next vantage point was south of Ulmerton

4    Road on the west shoulder of Belcher Road.

5    Q.    Did you see the vehicle, the tractor trailer

6    in question from that vantage point?

7    A.    Yes, sir.

8    Q.    Could you describe for the jury what your

9    next observations were and what you did.

10   A.    Well, I actually observed the vehicle make a

11   left turn from Ulmerton Road to proceed southbound

12   on Belcher Road.  And it appeared that the driver

13   was on a cell phone.  He was traveling in the

14   right two lanes.  There's three southbound lanes

15   on Belcher Road south of Ulmerton, and he was

16   straddling the middle lane and the right line with

17   his -- his rig, not maintaining a single lane.

18   Q.    How many lanes is a tractor trailer allowed

19   to use on the highway?

20   A.    Just one.

21   Q.    Please continue.

22   A.    He was using two, and he was going at a very

23   slow speed for the 45 mile zone that he was

24   southbound in.

25   Q.    What did you do?

A.     I simply got behind the rig and followed him

for probably 500 or so yards, and then attempted

to stop him.

Q.     And how did you attempt to stop him?

A.     I put my overhead lights on and my siren on.

Q.     And did the tractor trailer pull over at

that point?

A.     No.  He continued southbound at a reduced

speed now at about ten miles per hour, and he

continued southbound instead of pulling over.

Upon the arrival at 118th Avenue he -- he swung

left to make the turn and made a right turn to

proceed westbound on 118th Avenue.

He continued westbound on 118th Avenue and

then pulled into like a driveway of a -- I believe

there's a school administration building or

something there, and he pulled into the driveway

of the -- of that was closed.

Q.     You didn't feel he was trying to get away

from you doing ten miles an hour; correct?

A.     No, sir.

Q.     How close was this stopping point to the

actual warehouse or offload site that you were told

they were heading to?

A.     It was -- it was fairly close.

1  Q.    After the vehicle stopped did you come in

2  contact with a Jean Evens Baptiste and a Hardaway

3  Volcy as a result of the stop?

4  A.    Yes, sir, I did.

5  Q.    Did you see Mr. Baptiste in court today?

6  A.    Yes, sir.

7  Q.    Could you please identify him by location

8  and clothing description.

9  A.    He's sitting in the front row.  A white

10  T-shirt or white shirt on, long sleeved shirt.

11  Sitting next to a gentleman with a red shirt and

12  blue tie.

13        MR. PRESTON:  Identifying the defendant

14  Jean Baptiste Evens, Your Honor -- or Jean Evens

15  Baptiste.

16        THE COURT:  The record will reflect that

17  the witness has identified the defendant Baptiste.

18  BY MR. PRESTON:

19  Q.    Do you see a person who became known to you

20  as Hardaway Volcy in court today?

21  A.    Yes, sir.

22  Q.    Could you please identify him in the same

23  fashion?

24  A.    He is sitting directly behind Mr. Baptiste

25  with the gray shirt and tie.

1    Q.    Standing up?

2    A.    Yes, sir.

3          MR. PRESTON:  Identifying the defendant

4    Hardaway Volcy, Your Honor.

5          THE COURT:  The record will so reflect.

6    BY MR. PRESTON:

7    Q.    What were your initial observations -- or

8    please describe your initial encounter with

9    Mr. Baptiste?

10    A.    Most people when they get pulled over, I

11    approach the vehicle and ask for their drivers

12    license, registration.  In this particular

13    situation the driver, Mr. Baptiste, exited the

14    vehicle and actually walked back to me.  He was

15    smiling, which was very, very odd to me in that

16    most people aren't smiling when they get pulled

17    over.  He was overly nervous for some reason.

18    Q.    Did you speak to him and ask him where he

19    was going?

20    A.    Yes, sir.

21    Q.    What did he tell you?

22    A.    He told me he was going to drop a load at a

23    Walmart at State Road 60 near Brandon.

24    Q.    Did you ask Mr. Volcy why they were in the

25    area?

A.    Yes, sir.

Q.    What did Mr. Volcy tell you in regard to why they were driving in that area?

A.    I asked Baptiste why they were there in Pinellas County, and he could never ask me why he was there, so I had him stand with another trooper that arrived at the scene.  And then I walked over to the passenger side of the rig and met with Mr. Volcy.

Mr. Volcy then informed me that they were going to a strip club called Os.

Q.    Is there a strip club in that area with a similar name as Os?

A.    Yes, it's -- it's called Oz.  And it's -- it's approximately -- they would have driven right by it on Ulmerton Road.  It's -- it's approximately -- from where the stop occurred, it's probably two and a half miles back.

Q.    Was a narcotics dog used during this encounter?

A.    Yes, sir.

Q.    And the result of that?

A.    The dog gave a positive indication of the presence of narcotics in the trailer.  He actually alerted two separate places to the front

1  refrigerator area of the trailer of the rig.

2  Q.    Trooper Lanese, was Mr. Baptiste asked for a

3  consent to search the truck?

4  A.    Yes, sir.

5  Q.    Did you participate in that search?

6  A.    Yes, sir.

7  Q.    Did you participate in the opening of the

8  doors?

9  A.    Yes, sir.

10  Q.    Do you recall whether you broke a seal when

11  you opened to doors?

12  A.    I can't remember if I broke a seal on this

13  particular truck.

14  Q.    Can a truck door be opened -- or not

15  necessarily in the situation where you're opening

16  it, but can a truck door actually be opened without

17  breaking a seal?

18  A.    Yes, sir.

19  Q.    Did you participate in the search of the

20  rig?

21  A.    Yes, sir.

22  Q.    Was the suspected marijuana actually

23  located?

24  A.    Yes, sir.

25  Q.    Where was it located?

A.     The marijuana -- as soon as I opened up the doors, the first thing I observed were boxes that were actually sitting on the floor of the trailer itself.  And that's very uncommon to see boxes actually sitting on the floor of a trailer, especially a refrigerated trailer.  They're generally going to be on pallets so the air has the chance of circulating around the load.  It -- it was -- it wasn't loaded professionally.  The boxes were actually laying on the floor.

       And upon climbing up into the trailer itself, I observed dirt and footprints on top of the boxes, which is very uncommon to see.  Usually they're clean because they're loaded with forklifts into a trailer.  And I simply walked to the back of the trailer or actually where the refrigerator unit is where the dog --

Q.     You put more footprints on there now; right?

A.     Yes, sir.

Q.     Okay.

A.     To the front.  And under a layer of boxes right in the front where the dog alerted took one box up and there was the -- the load of marijuana.

Q.     What was the temperature of the refrigerated part of this rig?

A.    I looked at the -- before I -- I did the

search, that was one of the things that I saw on

the rig before I actually went into it.  I saw

that the temperature was -- it was running at the

wrong temperature for a frozen load.  It was

actually a little over 35 degrees.

          MR. PRESTON:  May I approach the

witness, Your Honor?

          THE COURT:  Yes.

BY MR. PRESTON:

Q.    Trooper Lanese, I'd like you to please take

a look at Government's Exhibit 7A, 7B, 35, and 7C.

A.    Yes, sir.  (Witness complies.)  Yes, sir.

Q.    Do you recognize those photographs?

A.    Yes, sir.

Q.    And do they fairly and accurately show the

vehicle as well as the certain conditions of the

vehicle that you observed on April 24th of 2008?

A.    Yes, sir.

          MR. PRESTON:  Your Honor, I would move

into evidence Government's Exhibit 7A, 7B, 35, and

7C.

          THE COURT:  Any objection?  Any

objection, gentlemen?

          MR. CHELALA:  No objection, Your Honor.

1          THE COURT:  They are received.

2          (EXHIBITS 7A, 7B, 7C, and 35 ADMITTED

3    INTO EVIDENCE.)

4    BY MR. PRESTON:

5    Q.     Starting with Government's Exhibit 7A, what

6    do we see here?

7    A.     This is the front end of the tractor that I

8    stopped that night.

9          MR. PRESTON:  7B, please.

10   BY MR. PRESTON:

11   Q.     What does 7B show us?

12   A.     That's the open trailer door.  And it -- it

13   shows the bracing against the loose boxes that

14   were piled up on the floor.

15   Q.     These loose boxes, are -- are they on a

16   pallet of any form?

17   A.     In that picture it's a little difficult to

18   tell.

19          MR. PRESTON:  Let's go to Exhibit 35

20   then, please.

21          THE WITNESS:  35 does show exactly how

22   those boxes were actually sitting on the floor.

23   BY MR. PRESTON:

24   Q.     Now, in 35, some of them have now shifted to

25   the right; is that correct?  And the bracing pole

1  is no longer there?

2  A.    Yes, sir.  That's probably from me climbing

3  ing up on them.

4  Q.    So to the right side it may be a little bit

5  moved and the bracing pole is no longer there, but

6  at least the first five sets of boxes are

7  consistent with what you originally observed?

8  A.    Yes, sir.

9  Q.    Those boxes are sitting on the floor;

10  correct?

11  A.    Yes, sir.

12  Q.    And behind those boxes there are

13  shrink-wrapped containers of similar boxes which

14  are on pallets; correct?

15  A.    Yes, sir.

16  Q.    What did you do in regard to getting into

17  this load?

18  A.    I -- I just climbed up over the boxes over

19  the brace there, and then just simply walked to

20  the nose of the trailer.

21  Q.    Essentially you headed back into the

22  trailer?

23  A.    Yes, sir.

24  Q.    On top of the boxes?

25  A.    Yes, sir.

1    Q.    And in Government's Exhibit 7C, could you

2    describe what we're observing here?

3    A.    This is after I moved the first layer of

4    boxes off of the marijuana.  The marijuana is --

5    is -- is inside the gray duct tape wrapped bundles

6    underneath the easy bake boxes.

7         The plastic wrap that was on the -- on the

8    top is the shrink wrap that's on a normal load

9    which was supposed to be wrapped around those

10   boxes.

11   Q.    When you look at that particular item which

12   you described marijuana, we don't see a green,

13   leafy substance, do we?

14   A.    No, sir.

15   Q.    Okay.  What does your experience tell you

16   that is?

17   A.    Generally, this is what we see commonly the

18   way marijuana is smuggled all over the country.

19   It's wrapped in a layer of cellophane and then

20   duct taped.  And you can simply cut through it

21   and -- and actually be right into the marijuana.

22   Q.    Did you take one of these bales and actually

23   cut into it to examine --

24   A.    Yes, sir.

25   Q.    -- what was contained therein?

1    A.    Yes, sir.

2    Q.    Did you conduct a field test on it?

3    A.    Yes, sir.

4    Q.    And based on those observations and the

5    tests, what did you believe you had found?

6    A.    A large load of marijuana.

7    Q.    Now, Florida Highway Patrol wasn't

8    responsible for the offload of that truck after the

9    discovery; is that correct?

10    A.    That's correct.

11    Q.    Who did that?

12    A.    It was turned over to DEA.

13    Q.    While the search was being conducted where

14    were Mr. Baptiste and Mr. Volcy?

15    A.    They were seated in the back of my patrol

16    car.

17    Q.    And when placed in the back of the patrol

18    car was a recorder activated in the patrol car

19    during the course of the search?

20    A.    Yes.

21    Q.    Was a recording made and turned over to the

22    Drug Enforcement Administration?

23    A.    Yes, sir, it was.

24    Q.    What type of seals have you seen on

25    different tractor trailer rigs you've examined?

A.     I've seen meat seals and regular commodity
seals.  They're both plastic and metal generally.
And they have some new ones out that are locks,
actual locks that are locked into the bolt of
the -- where the handle is popped up to open the
back door of a -- of a rig.

Q.     With a plastic seal, what would you do to
break a seal if it was plastic?

A.     I would just pull it and it would break near
the top of the seal.

Q.     A metal seal or a locked seal, would you be
able to just pull on that?

A.     No, sir.

Q.     Do you think you'd remember if you broke a
metal seal or a lock seal in this particular
instance?

A.     Yes, sir.  You'd have to cut it -- cut it.

Q.     Do you recall using any tools to cut a seal
on that --

A.     I -- I don't recall a seal on that -- on
that rig.

Q.     But you recall -- or do you think you'd
recall if you had to use any tools to actually get
into the rig?

A.     Yes, sir.

Q.    Okay.

MR. PRESTON:  May I have a moment, Your
Honor?

THE COURT:  You may.

MR. PRESTON:  Thank you, Your Honor.  No
additional questions at this time.

THE COURT:  Cross-examination.

MR. CRAWFORD:  Your Honor, with your
permission I'd like to go first and allow
Mr. Chalela to go next.

THE COURT:  You may.

MR. CRAWFORD:  Thank you, sir.

                CROSS-EXAMINATION

BY MR. CRAWFORD:

Q.    Trooper Lanese, you had indicated that when
you first saw the tractor trailer truck -- well,
let me ask you this:  What are you looking at in
front of you?

A.    I've got some reports in front of me here
and I've got a -- a typed paperwork from a
suppression hearing.

Q.    Okay.  Let's close those up for a minute.

A.    Okay.

Q.    And if you need to look at your report or a
particular transcript, then just ask and we'll go

1    from there.  Okay?

2    A.    Great.

3    Q.    All right.

4    A.    Thank you.

5    Q.    The -- you indicated that when the tractor

6    trailer truck first went by, this was the gold cab

7    with the white trailer, that you noticed two what

8    you called two black males or African-American

9    males -- black males driving; is that correct?

10   A.    Yes, sir.

11   Q.    Okay.  And you said that the driver was on

12   the phone.  Is that what you recall?

13   A.    That be would the second time I saw him.

14   Q.    The second time you saw him?

15   A.    Yes, sir.

16   Q.    Okay.  So when you went around to Ulmerton

17   and Belcher, that's the second time you saw them as

18   they were taking a left off of Ulmerton on --

19   heading south on Belcher, you noticed two black

20   males, and the driver was on his phone?

21   A.    Yes, sir.

22   Q.    And you indicated that when you effectuated

23   your stop that the driver, Mr. Baptiste, got out of

24   the cab and came back to meet you; is that correct?

25   A.    Yes, sir.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.    And you exited your vehicle and you met

2   about halfway; is that correct?

3   A.    Yes, sir.

4   Q.    And it was your opinion that Mr. Baptiste

5   was smiling inappropriately.  Is that your phrase?

6   A.    Yes, sir.

7   Q.    Okay.  Have you ever been to Haiti?

8   A.    No, sir.

9   Q.    Okay.  You realize that there are certain

10   cultures that smiling has a -- plays a particular

11   role.  Are you familiar with this at all?

12   A.    Not -- no, not that, no.  Sorry.

13   Q.    Have you seen the movie Gran Torino?

14   A.    No, sir.

15   Q.    All right.  Let's walk through this.

16   Earlier today I had the opportunity to show you a

17   number of photographs, and you looked through them

18   and we basically agreed with what they were.

19   A.    Yes, sir.

20   Q.    All right.

21         MR. CRAWFORD:  Judge, at this time I

22   would offer Volcy Exhibits No. 33A through and

23   including Volcy Exhibit 33Y.

24         THE COURT:  Any objection?

25         MR. PRESTON:  No, Your Honor.

1          THE COURT:  They are received.

2          (EXHIBITS 33A through 33Y ADMITTED INTO

3  EVIDENCE.)

4          MR. CRAWFORD:  Thank you.

5          I think it would be easier and we might

6  expedite matters if I could just use the ELMO.

7  They'll appear on the screen in front of you, and

8  I'll ask you about the photographs.

9  BY MR. CRAWFORD:

10 Q.    Is that okay?

11 A.    That's fine.

12 Q.    Thank you.  All right.  Let me show you the

13 first photograph, 33A, and ask you is this the

14 signage that's on I-75 right after you cross the

15 Howard Franklin bridge heading south into Pinellas

16 County?

17 A.    Yes, sir.

18 Q.    Okay.  And the first exit that you come to

19 is this 1st Street North sign; is that right?

20          MR. PRESTON:  I'm sorry.  Is that 75 or

21 275?

22          THE WITNESS:  That's -- that's actually

23 275 there.  If you could just move the picture up

24 a little bit more, I could actually see the off

25 ramp there.  There you go.

BY MR. CRAWFORD:

Q.    Is that --

A.    Yes, sir.  That -- that is the first off
ramp you come to west of the Howard Franklin
bridge.

Q.    And it's 275.

A.    It's 275, right.

Q.    You and I've been around long enough to know
that it used to just be 75.  This is 275 at this
point; right?

A.    I don't think I've been on that long.

Q.    All right.  Let me show you then Photograph
33B and ask you then as you keep -- as you continue
south on 275, this is then the next sign you come
to, Martin Luther King, Jr., and also Ulmerton
Road; correct?

A.    Yes, sir.

Q.    All right.  Of course, this is Ulmerton
Road.  I'll show you 32C.  You have the signs that
say Ulmerton; right?

A.    Yes, sir.

Q.    That's typical.  When we get to 33D -- and
this is a photograph if you are looking down
Ulmerton, and at the very end down here you can see
an overpass.  And that's U.S. 19; is that correct?

1   A.    Yes, sir.

2   Q.    Okay. Then 33E, still on Ulmerton looking

3 south. We're getting closer to 19; correct?

4   A.    Actually, that's actually looking westbound

5 there coming up to 19, yes, sir.

6   Q.    Okay. The road's curved a little bit.

7 You're right.

8         33F, same thing; right?

9   A.    Yes, sir.

10   Q.    And we've got some signage now. We have one

11 of these -- what do you call these, billboards,

12 whatever they are that give the traffic -- to let

13 you know what the road conditions are; correct?

14   A.    Yes, sir.

15         THE COURT: Overhead sign.

16         MR. CRAWFORD: Thank you.

17 BY MR. CRAWFORD:

18   Q.    An overhead sign.

19   A.    Thank you.

20   Q.    And you will see two additional directional

21 signs as you get closer to 19; right?

22   A.    Yes, sir.

23   Q.    Okay. 33G, we're still heading in the same

24 direction; correct?

25   A.    Yes, sir.

Q.    And 33H, same direction.  And this is the
direction that the particular tractor trailer truck
on that particular day was headed; correct?

A.    Yes, sir.

Q.    Okay.  So now we can see that if we take a
right, we'll head north to Clearwater on U.S. 19.
And if we go left, we'll go to Pinellas Park in
St. Petersburg; correct?

A.    Correct.

Q.    Okay.  Now, this one is taking it from the
same area, but we're trying to look towards our
right like we're heading towards Clearwater.  And
at this particular point you cannot see the club
Oz, can you?

A.    Not yet.

Q.    All right.  Then let me show you 33J.  Here
if we get a further angle from across Ulmerton, now
we can see where the club Oz is located; correct?

A.    Yes, sir.

Q.    All right.  And again looking at it, 33K,
from the truckers' point of view as they're heading
this direction on Ulmerton, you cannot see the club
on the right-hand side, can you?

A.    Well, I don't think this photograph really
depicts where a trucker would be.  Hopefully he

1    won't be on the sidewalk but in one of these

2    left -- the left lanes up there, not even the turn

3    lane, and you can clearly see Oz from -- from the

4    road as you come up to the intersection there.

5    Q.    All right.  As you come up the intersection?

6    A.    Yes, sir.

7    Q.    Right.  And here's an example again taken

8    from the sidewalk area.  But you can see Oz is

9    around the corner?

10   A.    Yes, sir.

11   Q.    Sort of down -- there's an access road that

12   runs along 19 around here; correct?

13   A.    I believe you can get into that parking lot

14   from this parking lot here.

15   Q.    Okay.  But there is an access road that runs

16   there; correct?

17   A.    Yes, sir, there's a frontage road next to

18   U.S. 19.

19   Q.    Okay.  And looking at 33M, now directly

20   across the street you can see the club; correct?

21   A.    Yes, sir.

22   Q.    All right.  And the signage in front of club

23   the, the buildings before it that are right on 19

24   is this Bally's Total Fitness; correct?

25   A.    Yes, sir.  This photograph looks like it was

1    taken from the center median of -- of Ulmerton

2    Road.  You can see the barricades in the middle

3    there and then the traffic and then the signage,

4    yes, sir.

5    Q.    All right.  And 33O, pretty much the same

6    shot, just a little closer; correct?

7    A.    Yes, sir.

8    Q.    All right.  And then we see 33P, as in Paul.

9    This is taken from the parking area of the Bally

10    Total Fitness.  That is the club in front of it?

11    A.    Yes, sir.

12    Q.    And there's the sign for Oz, 33Q; correct?

13    A.    Yes, sir.

14    Q.    All right.  Now, as you get past 19 -- and

15    this photograph is taken recently, but this is an

16    example of heading down Ulmerton past 19; correct?

17    A.    This would be actually west of 66th Street

18    and east of Belcher Road on Ulmerton Road, yes,

19    sir.

20    Q.    Okay.  And you'll notice there's a number of

21    barrels because they were adding a center median;

22    correct?

23    A.    Yes, sir.

24    Q.    Now, going back a year ago almost,

25    April 24th of '08, there was this type of

1    construction just further east on Ulmerton; right?

2    A.    Yes, sir.

3    Q.    Okay.  And looking at Photograph 33U, this

4    is the type of barrels that was up now, but that's

5    what it looked like back then just further down the

6    road; right?  If you can remember?

7    A.    This looks like the area east of -- of U.S.

8    19 facing westbound on Ulmerton.

9    Q.    Oh, you're right.  Okay.  So this is the

10    construction that there is now -- that's there now?

11    A.    I believe that construction is just about

12    done now.  But back on this particular date it

13    was -- it was all torn up there and under

14    construction.

15    Q.    Which is one of the reasons that you were

16    able to go down to 118 and -- and double back and

17    catch up with the tractor trailer because you

18    didn't have to fight all the construction that was

19    on Ulmerton; correct?

20    A.    Exactly.

21    Q.    Now, eventually after oh, a mile or so, you

22    come to an intersection of Belcher; correct?

23    Ulmerton and Belcher?

24    A.    Yes, sir.

25    Q.    And then let me show you photograph 33W.

1  This is, if you'll accept my representation, about

2  noon.  Fair to say that that kind of looks like the

3  traffic you would have at 5 o'clock also?

4  A.    That would be westbound Ulmerton left turn

5  lane or through lane at Belcher Road, yes, sir.

6  Q.    Okay.  And is it at this intersection that

7  you again picked up the tractor trailer truck;

8  correct?

9  A.    I was just south of this intersection here

10  on the west side of Belcher.

11  Q.    Okay.  Just south.  So you weren't at the

12  McDonald's over here.  You were on this side of the

13  road?

14  A.    Yes, sir.

15  Q.    And it's your recollection that the tractor

16  trailer truck took a left and headed south on

17  Belcher; correct?

18  A.    Yes, sir.

19  Q.    And then went down you say approximately a

20  mile, and was -- and pulled over on 118th Avenue

21  North; correct?

22  A.    Yes, sir, that's where he stopped.

23  Q.    Okay.  And that's depicted in Photograph

24  33X; correct?

25  A.    Yes, sir.

1    Q.    And then finally pulled over, Photograph

2    33Y, in this particular driveway.  You said 7901

3    118th Avenue.  That's what's on the mailbox; right?

4    And you recall it's a Pinellas County School Board

5    transportation training center?

6    A.    Yes, sir.

7    Q.    Okay.  Thank you for doing that with us.

8          All right.  So after you pulled over the

9    tractor trailer truck, Mr. Baptiste got out, came

10   up to you.  You interviewed him.  You then

11   interviewed Mr. Volcy separately?

12   A.    Yes, sir.

13   Q.    And that's part of your training is to

14   interview two to see if you get the same story, if

15   you get an inconsistent story; right?

16   A.    Yes, sir.

17   Q.    Okay.  And then you put them both in the

18   back of your patrol car?

19   A.    Yes, sir.

20   Q.    And they were handcuffed at that time?

21   A.    No, sir.

22   Q.    They were not handcuffed?

23   A.    They were not.

24   Q.    Okay.  And the purpose of putting them in

25   your -- the back of your patrol car is to

1  surreptitiously tape record them; correct?

2  A.    No.  It's basically for officer safety at

3  that point.  That I had -- I had a reasonable

4  suspicion they were up to some type of criminal

5  activity.  And I had also had probable cause that

6  they were smuggling drugs.  So I put them in the

7  back of the car for my protection, their

8  protection, everyone's protection at the scene.

9       And we were also bringing a police dog out.

10  And some people are -- are intimidated by police

11  dogs, so we put them in the back seat of the car.

12  Q.    All right.

13  A.    But that was the secondary objective, to

14  surreptitiously re record them in the back.

15  Q.    Okay.  So you had two goals?

16  A.    Sure.

17  Q.    To protect them, protect you all, keep them

18  away from the dog, and also to tape record them?

19  A.    Yes, sir.

20  Q.    See what they say; right?

21  A.    Exactly.

22  Q.    Okay.  At some point you go up to

23  Mr. Baptiste and you ask him can we search the cab

24  and the trailer; correct?

25  A.    Yes, sir.  It was after the drug dog alerted

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    on the vehicle.

2    Q.    All right.  And he said fine, go ahead;

3    correct?

4    A.    If I could refer to my notes.

5    Q.    Sure.  As a matter of fact, if you'll look

6    at that transcript it might be quicker.

7    A.    He might have said yeah, go ahead.

8    Q.    Page 13.  Look down at the very bottom of

9    the page, Line 25.  Page 13.

10   A.    I've got it circled here somewhere.

11   Q.    Page 13.

12   A.    Okay.

13   Q.    Okay.  You with me?

14   A.    Yes, sir.

15   Q.    Down at the very bottom do you see --

16   A.    Yes, sir.

17   Q.    Okay.  Does that refresh your recollection

18   as to what --

19   A.    Yes, sir.

20   Q.    -- Mr. Baptiste's response was?

21   A.    That was me asking him for consent to search

22   the tractor and the trailer.

23   Q.    And he said fine, go ahead; right?

24   A.    Yes, sir.

25   Q.    Okay.  Now, you indicated that the

1   temperature of the trailer was at approximately

2   35 degrees?

3   A.    It was above 35 degrees.  I'm not sure what

4   exactly it was.

5   Q.    And how did you determine that?

6   A.    There's a refrigerator on the very side of

7   the front of the trailer, and right on the side of

8   that it's got the temperature that you can

9   actually walk over to and look and see what it's

10  being run at.

11  Q.    So you based your opinion solely on what an

12  instrument told you at that time?

13  A.    Yes, sir.

14  Q.    Okay.  Let's talk for a moment about this

15  seal.  You are familiar that at times trailers as

16  part of a tractor trailer rig will have a seal on a

17  particular back that is put there by one warehouse

18  to try and make sure that the trailer is not opened

19  until it gets to its destination; correct?

20  A.    Yes, sir.

21  Q.    And you are aware that truckers have to keep

22  careful paperwork on those particular seals;

23  correct?

24  A.    Yes, sir.

25  Q.    And you are aware that the seals have a

1    particular number on them so that you can't take

2    the seal off and then just put another seal on

3    because you won't have the same number; right?

4    A.    Yes, sir.

5    Q.    Okay.  And you know as part of your duties

6    and responsibilities as a Florida Highway Patrolman

7    that when you do stop a trucker and you do break

8    the seal, that at times if you don't find anything

9    you will do paperwork that will enable the truck

10   driver to tell the warehouseman where they take the

11   load that you broke the seal; right?

12   A.    Yes, sir.

13   Q.    And that's all -- that's always worked as

14   far as you know?

15   A.    Yes, sir.

16   Q.    Okay.  And you don't remember doing that in

17   this particular case; right?

18   A.    We didn't get that far.

19   Q.    Right.  Because normally if you find

20   contraband then you're not worried about the seal

21   or where the load's going, are you?

22   A.    Correct.

23   Q.    Okay.  And Mr. Preston asked you if you

24   remember the seal in this case, and you just don't

25   remember, do you?

1    A.    I don't remember.

2    Q.    Okay.  Are you aware that the bill of lading

3    or the shipping orders on trucks generally have the

4    seal number on it?

5    A.    Yes, sir.

6    Q.    Okay.  Did you ever see the bill of lading

7    for the boxes of cookie dough?  Did you ever see

8    that during this investigation?

9    A.    No, sir.

10   Q.    Now, did you participate in the search of

11   the cab or the truck portion of the tractor trailer

12   rig?

13   A.    No, sir.

14   Q.    Who did?

15   A.    I believe agents did that.

16   Q.    Okay.  If they had found any weapons or

17   contraband, would you make -- been made aware of

18   that?

19   A.    Yes, sir.

20   Q.    And did they find any contraband or drugs in

21   the cab?

22   A.    I don't recall.  No, sir.

23        MR. CRAWFORD:  If I could have just a

24   moment, Your Honor.

25        Trooper Lanese, thank you, sir.

1          THE WITNESS:  Thank you.

2          THE COURT:  It's -- we're going to

3     recess a little early today, ladies and gentlemen.

4     We'll reconvene tomorrow morning at 9:30.  I again

5     remind you not to discuss the case or make up your

6     minds about any of the issues yet.

7          You may take the jury.

8          COURT SECURITY OFFICER:  Please rise for

9     the jury.

10      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

11          THE COURT:  We'll reconvene tomorrow

12     morning at 9:30.

13          MR. CRAWFORD:  Judge, could we discuss

14     scheduling for just a moment?

15          THE COURT:  Be happy to.

16          MR. CRAWFORD:  I understand that the

17     government is getting close to the end.  If we

18     could have an estimation as to when they think

19     they might rest.

20          THE COURT:  Mr. Preston, could you tell

21     us?

22          MR. PRESTON:  I don't anticipate that

23     I'll be finished before lunch tomorrow.  But I do

24     anticipate based on the way things are going -- or

25     I hope that before the mid afternoon break

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    tomorrow.  But in any event I think we can have

2    all our witnesses out of here tomorrow, Judge.

3              THE COURT:  All right.  That will, of

4    course, depend on the extent of cross-examination.

5              MR. PRESTON:  I'm a couple hours behind

6    the road map that I planned out, but a couple

7    hours isn't too bad in the trial I would say.

8              THE COURT:  All right.

9              MR. CRAWFORD:  Judge, if I -- I may need

10   some guidance from you.  I know that I'm going to

11   have a few witnesses.  And I'm actually going

12   last -- maybe not.  Are we going to do jury

13   instructions maybe the rest of Thursday afternoon

14   or do I need to have witnesses here after the

15   afternoon break?

16             THE COURT:  Yes, you need to have

17   witnesses here.

18             MR. CRAWFORD:  Thank you, sir.

19             THE COURT:  We'll do the instructions at

20   any convenient time.  And that will probably be

21   before your witnesses testify.  But whenever we

22   have a -- looks like we're going to have a break,

23   we'll do that -- we'll fit in the jury

24   instructions review.

25             MR. CRAWFORD:  All right.  I'll put them

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    on standby to be here.  And I may want to ask the

2    Court to re visit this right at the lunchtime or

3    at the mid-morning break because they're expert

4    witnesses and I have to pay them when they're just

5    sitting around.  So I want to try and minimize

6    that as best I can.  But we'll revisit it in the

7    morning.  Thank you, sir.

8              THE COURT:  We'll try to cooperate to

9    the extent that we can.  All right?

10              Tomorrow morning at 9:30.

11              Officer Lanese, you may come down, sir.

12    We'll see you tomorrow.

13              THE WITNESS:  Thank you, Your Honor.

14              COURT SECURITY OFFICER:  All rise.

15              (Proceeding adjourned.)

16              I CERTIFY that the foregoing is a

17    true and accurate transcription of my stenographic

18    notes.

19    Dated:  07/23/2009.

20

21              ___s/ Sandra K. Lee_____
                   SANDRA K. LEE, RPR
22                 Official Court Reporter

23

24

25

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

# $

**$10,000** [1] - 89:18
**$100,000** [1] - 164:8
**$150,000** [2] - 16:10, 18:13
**$30,000** [2] - 89:16, 89:17
**$7,000** [3] - 33:23, 42:25, 43:3
**$70,000** [10] - 8:18, 9:23, 86:1, 89:18, 128:4, 128:14, 128:22, 164:10, 166:2, 167:1
**$80,000** [3] - 79:22, 79:23, 84:10
**$9,000** [2] - 14:8, 14:14

# '

**'07** [5] - 150:3, 187:3, 187:5, 194:11, 234:6
**'08** [6] - 114:9, 138:16, 208:19, 209:6, 211:18, 263:25
**'80s** [1] - 238:13

# 0

**0000082** [1] - 79:10, 200:24
**000082** [1] - 205:21
**07/23/2009** [1] - 274:19
**08-270** [1] - 193:12
**08-50** [2] - 193:2, 194:4
**0850** [1] - 191:17

# 1

**1** [13] - 4:7, 4:12, 55:15, 55:18, 56:1, 56:6, 83:11, 83:15, 191:13, 191:20, 191:23, 192:19, 195:5
**1-6** [1] - 208:7
**10** [6] - 4:10, 88:21, 89:6, 89:9, 89:14, 89:17
**10-seater** [1] - 225:7, 226:5
**100** [3] - 1:23, 139:8, 188:22
**101** [1] - 3:12

**10:00** [1] - 73:10
**11** [1] - 157:10
**118** [1] - 264:16
**118th** [10] - 68:22, 116:14, 118:5, 241:17, 241:20, 243:11, 243:13, 243:14, 265:20, 266:3
**11:20** [1] - 82:5
**11A** [4] - 153:7, 153:20, 154:1, 154:5
**11D** [1] - 155:2
**11F** [1] - 155:11
**11G** [1] - 155:21
**11H** [1] - 156:3
**11I** [2] - 156:16, 160:10
**11J** [1] - 156:23
**11N** [2] - 157:11, 160:11
**11th** [1] - 153:4
**12** [1] - 97:20
**12-seater** [2] - 225:7, 226:6
**1210** [1] - 1:20
**1238** [3] - 73:14, 73:17, 73:25
**124** [1] - 3:13
**1299** [1] - 58:25
**12A** [3] - 97:20, 98:1, 152:16
**12E** [3] - 97:21, 98:1, 152:16
**12th** [14] - 125:6, 125:16, 126:12, 127:11, 128:23, 129:1, 129:12, 130:7, 132:3, 132:7, 132:8, 132:20, 140:8, 140:22
**13** [4] - 99:14, 268:8, 268:9, 268:11
**13A** [1] - 99:14
**141,9** [1] - 49:25
**15** [6] - 4:15, 109:9, 210:12, 210:13, 210:18, 210:21
**150** [1] - 50:2
**1500** [1] - 115:15
**1561** [3] - 69:16, 70:18, 83:23
**16** [6] - 4:15, 207:20, 208:2, 208:6, 208:7, 208:9
**1618** [2] - 121:23, 121:25
**17** [3] - 4:6, 15:1, 15:8
**17185** [3] - 220:7, 220:16, 222:11
**1722** [2] - 102:14,

108:8
**173407** [1] - 1:23
**18** [2] - 71:22, 102:24
**18-wheeler** [1] - 118:10
**18th** [6] - 72:9, 72:14, 72:25, 73:9, 102:22, 225:21
**19** [21] - 69:10, 71:23, 75:20, 76:3, 103:6, 118:4, 118:22, 119:2, 119:6, 119:14, 259:25, 260:3, 260:5, 260:21, 261:6, 262:12, 262:18, 262:23, 263:14, 263:16, 264:8
**191** [1] - 4:12
**193** [2] - 4:13, 4:13
**1953** [1] - 149:17
**19th** [8] - 72:9, 74:14, 76:1, 103:3, 103:7, 103:14, 103:20, 217:5
**1:30** [3] - 119:24, 122:25, 123:12
**1:45** [1] - 123:11
**1st** [5] - 9:20, 53:18, 63:18, 169:22, 258:19

# 2

**2** [6] - 76:18, 83:10, 104:1, 133:6, 192:14
**2-0** [1] - 211:4
**20** [11] - 3:5, 4:16, 21:7, 21:9, 103:6, 211:4, 211:9, 211:12, 222:6, 222:9, 222:10
**200** [1] - 3:14
**2007** [6] - 46:6, 149:1, 149:2, 150:15, 225:22, 226:24
**2008** [38] - 53:19, 63:6, 64:24, 65:1, 70:19, 71:22, 71:23, 71:24, 72:9, 72:10, 72:14, 73:9, 74:14, 74:20, 75:1, 75:20, 75:21, 75:24, 79:2, 102:24, 102:25, 107:6, 125:16, 134:16, 137:24, 138:10, 138:12, 153:5, 197:10, 197:11, 198:23, 201:1, 215:8, 220:3, 239:6, 239:12, 249:18
**2009** [1] - 1:6

**202** [1] - 4:14
**2024** [1] - 73:25
**205** [1] - 4:14
**208** [1] - 4:15
**20th** [23] - 72:14, 72:25, 74:20, 75:21, 75:23, 75:25, 76:3, 102:23, 103:3, 103:11, 103:12, 103:14, 103:20, 103:24, 129:14, 129:24, 130:12, 131:6, 131:7, 132:14, 217:6, 225:22, 234:6
**21** [2] - 222:7, 222:22
**210** [1] - 4:15
**211** [1] - 4:16
**217** [1] - 3:15
**219** [2] - 3:16, 3:16
**21st** [12] - 75:1, 79:2, 102:24, 104:18, 104:25, 107:6, 108:11, 108:15, 114:9, 208:19, 209:6, 215:7
**2200** [1] - 101:15
**224** [2] - 3:17, 3:18
**227** [1] - 4:16
**23** [5] - 4:14, 205:4, 205:10, 205:15, 206:25
**233** [1] - 3:19
**237** [2] - 3:20, 3:20
**23rd** [3] - 220:7, 220:17, 222:11
**24** [16] - 1:2, 4:9, 65:1, 70:19, 71:17, 71:20, 71:21, 72:1, 72:18, 73:3, 73:6, 73:10, 73:22, 102:17, 104:23, 116:19
**24-hour** [3] - 174:12, 174:14, 174:17
**24/7** [1] - 174:8
**245** [1] - 1:20
**24th** [16] - 40:15, 64:24, 65:20, 73:1, 109:23, 114:24, 116:23, 118:16, 119:11, 201:1, 202:10, 239:6, 239:12, 239:17, 249:18, 263:25
**25** [17] - 4:9, 71:18, 72:5, 72:18, 73:6, 73:20, 73:24, 75:16, 75:17, 75:22, 76:5, 102:17, 104:6, 104:21, 104:24, 168:5, 268:9

**250** [1] - 4:17
**255** [1] - 3:21
**258** [1] - 4:18
**25th** [2] - 197:20, 198:23
**27** [13] - 4:6, 4:7, 16:24, 17:5, 17:10, 17:11, 17:14, 17:22, 49:2, 49:7, 49:10, 51:6, 237:22
**270** [1] - 1:2
**275** [7] - 118:24, 258:21, 258:23, 259:6, 259:7, 259:9, 259:14
**27th** [1] - 149:17
**28** [1] - 1:6
**29th** [3] - 197:6, 197:8, 197:17
**2:00** [2] - 76:16, 104:7
**2:30** [1] - 75:8
**2A** [1] - 57:17
**2A1** [4] - 4:8, 57:10, 57:24, 58:9, 58:15, 83:10
**2A2** [5] - 4:8, 57:10, 58:2, 58:9, 58:15
**2lst** [5] - 71:24, 72:10, 102:23, 104:2, 211:18
**2nd** [2] - 220:19, 221:21

# 3

**3** [7] - 4:9, 71:5, 96:23, 97:5, 133:5, 194:13, 194:15
**3/07** [1] - 234:8
**30** [26] - 4:10, 77:11, 77:14, 78:1, 78:4, 89:13, 89:14, 89:16, 102:5, 102:8, 105:8, 105:14, 107:17, 107:18, 109:9, 111:1, 111:2, 112:14, 168:5, 200:21, 203:8, 204:22, 205:25, 217:18, 220:7
**300** [1] - 37:13
**301-5699** [1] - 2:7
**3111** [1] - 1:23
**31A** [1] - 160:12
**32** [5] - 4:16, 227:3, 227:8, 227:16, 233:9
**3200** [1] - 1:18
**32C** [1] - 259:19
**33** [5] - 4:11, 93:7,

93:9, 93:22, 93:23
**33139** [1] - 1:21
**33602** [2] - 1:18, 2:6
**33606** [1] - 2:3
**33672-0407** [1] - 1:24
**33A** [4] - 4:18, 257:22, 258:2, 258:13
**33B** [1] - 259:13
**33D** [1] - 259:22
**33E** [1] - 260:2
**33F** [1] - 260:8
**33G** [1] - 260:23
**33H** [1] - 261:1
**33J** [1] - 261:16
**33K** [1] - 261:20
**33M** [1] - 262:19
**33O** [1] - 263:5
**33P** [1] - 263:8
**33Q** [1] - 263:12
**33U** [1] - 264:3
**33W** [1] - 264:25
**33X** [1] - 265:24
**33Y** [4] - 4:18, 257:23, 258:2, 266:2
**35** [10] - 4:17, 249:6, 249:12, 249:21, 250:2, 250:19, 250:21, 250:24, 269:2, 269:3
**37** [5] - 4:12, 95:14, 95:21, 95:24, 96:3
**37A** [4] - 4:14, 201:20, 202:3, 202:7
**37B** [2] - 202:12, 203:4
**37C** [1] - 202:16
**37D** [1] - 203:11
**39** [1] - 4:2
**3:30** [1] - 216:12
**3A** [4] - 70:13, 70:16, 70:25, 83:18
**3rd** [7] - 63:22, 116:7, 116:8, 173:6, 197:15, 220:22, 220:23

**4**

**4** [8] - 4:8, 69:21, 69:23, 70:5, 70:8, 83:19, 83:23, 115:12
**4,000** [1] - 37:15
**4/15** [1] - 213:10
**4/18/07** [1] - 234:4
**4/21/2008** [1] - 107:5
**40** [1] - 3:6
**400** [1] - 1:17
**42** [1] - 3:7
**44** [1] - 3:8

**45** [3] - 3:8, 230:13, 242:23
**49** [1] - 4:7
**4:00** [2] - 76:10, 104:7
**4:30** [5] - 76:11, 76:17, 76:19, 81:12, 104:2
**4:45** [5] - 80:19, 80:24, 81:2, 81:14, 239:16
**4th** [2] - 63:22, 220:23

**5**

**5** [2] - 83:6, 265:3
**50** [1] - 3:9
**500** [1] - 243:2
**52** [1] - 3:10
**53** [1] - 3:11
**544** [1] - 77:19
**56** [1] - 4:7
**5600** [1] - 77:19
**58** [1] - 4:8

**6**

**6** [8] - 4:11, 91:6, 91:8, 91:12, 91:16, 134:16, 137:24, 233:14
**60** [5] - 194:25, 208:6, 217:21, 217:23, 245:23
**610** [1] - 2:2
**66th** [1] - 263:17
**6:00** [1] - 80:17
**6th** [4] - 135:9, 137:11, 138:11, 138:13

**7**

**7** [7] - 3:3, 3:4, 4:2, 37:24, 38:25, 39:1, 39:2
**70** [1] - 4:8
**70,000** [1] - 128:9
**71** [1] - 4:9
**73** [1] - 4:9
**75** [2] - 258:20, 259:9
**77** [12] - 77:23, 77:24, 78:9, 78:16, 78:19, 111:16, 111:17, 114:4, 215:8, 215:21
**77.00** [1] - 78:12

**78** [1] - 4:10
**7901** [1] - 266:2
**7A** [5] - 4:17, 249:12, 249:21, 250:2, 250:5
**7B** [6] - 4:17, 249:12, 249:21, 250:2, 250:9, 250:11
**7C** [5] - 4:17, 249:12, 249:22, 250:2, 252:1

**8**

**8** [1] - 234:21
**80** [3] - 79:19, 83:16, 84:7
**801** [1] - 2:6
**813** [1] - 2:7
**851** [1] - 191:25
**88** [1] - 55:9
**89** [1] - 4:10
**8:08** [1] - 1:2
**8th** [1] - 138:10

**9**

**9** [1] - 19:20
**90** [1] - 158:14
**91** [1] - 4:11
**92614** [1] - 108:10
**93** [1] - 4:11
**949** [1] - 109:1
**96** [1] - 4:12
**9:30** [3] - 272:4, 272:12, 274:10
**9:40** [1] - 1:6

**A**

**a.m** [1] - 1:6
**abbreviation** [1] - 98:12
**able** [25] - 51:2, 60:23, 60:25, 66:20, 79:13, 100:2, 100:4, 100:7, 100:11, 113:23, 119:3, 137:15, 137:20, 182:14, 182:19, 201:11, 212:3, 215:22, 216:1, 217:12, 223:4, 232:3, 241:21, 254:12, 264:16
**absence** [2] - 138:18, 230:8
**academy** [3] - 175:19, 175:21, 175:23

**accept** [3] - 29:17, 161:18, 265:1
**accepted** [1] - 193:24
**access** [1] - 124:22, 262:11, 262:15
**accompanied** [5] - 55:6, 185:2, 198:15, 198:24, 199:8
**accompany** [2] - 200:4, 200:5
**accomplish** [3] - 165:24, 166:24
**accomplished** [1] - 35:9
**accomplishing** [1] - 147:1
**according** [9] - 74:18, 74:23, 75:7, 76:15, 103:4, 103:16, 104:17, 105:3, 200:9
**account** [4] - 15:9, 15:10, 15:13, 46:3
**accounts** [7] - 13:25, 14:4, 14:9, 14:10, 14:12, 14:14, 14:17
**accumulation** [1] - 209:4
**accurate** [2] - 124:16, 274:17
**accurately** [6] - 55:22, 70:1, 89:1, 89:2, 91:9, 249:16
**accused** [1] - 168:22
**acknowledge** [1] - 48:4
**act** [2] - 7:2, 239:11
**action** [1] - 239:8
**actions** [1] - 170:14
**activated** [1] - 253:18
**activity** [6] - 54:9, 75:7, 165:11, 172:17, 213:19, 267:5
**actual** [7] - 113:21, 114:14, 153:24, 174:19, 217:15, 243:23, 254:4
**Adam** [1] - 235:2
**added** [2] - 50:1, 228:16
**adding** [1] - 263:21
**addition** [1] - 99:4
**additional** [15] - 6:18, 20:10, 79:17, 100:8, 180:4, 207:14, 210:6, 210:23, 223:9, 229:23, 230:3, 230:15, 232:24, 255:6, 260:20

**additionally** [1] - 108:21
**address** [8] - 104:13, 108:3, 108:7, 118:5, 121:20, 121:23, 194:18, 217:18
**addresses** [1] - 176:21
**addressing** [1] - 38:12
**adjourned** [1] - 274:15
**administration** [1] - 243:16
**Administration** [13] - 53:9, 53:14, 55:3, 60:4, 64:18, 83:13, 83:21, 138:8, 219:22, 239:7, 240:5, 241:9, 253:22
**administrative** [1] - 182:4
**admissibility** [1] - 214:13
**admissible** [1] - 214:9
**admit** [1] - 17:13
**admitted** [1] - 97:16
**ADMITTED** [23] - 17:22, 49:10, 56:6, 58:15, 70:8, 71:5, 73:6, 78:4, 89:9, 91:16, 93:22, 96:3, 191:23, 193:9, 193:20, 202:3, 205:15, 208:9, 210:21, 211:12, 227:16, 250:2, 258:2
**advance** [1] - 63:17
**advise** [7] - 54:4, 62:25, 63:5, 63:10, 63:19, 63:23, 140:4
**advised** [10] - 42:8, 43:13, 55:4, 63:10, 68:6, 134:13, 135:6, 141:9, 239:22, 240:7
**affirm** [5] - 44:13, 52:13, 219:3, 223:22, 236:23
**African** [1] - 256:8
**African-American** [1] - 256:8
**afternoon** [19] - 45:9, 102:1, 104:2, 120:19, 120:21, 123:21, 123:23, 123:24, 216:9, 221:21, 224:16, 224:17, 233:7, 233:8, 239:17, 272:25, 273:13,

**afterwards** [1] - 180:2

**agencies** [3] - 170:14, 174:23, 239:3

**agency** [9] - 143:22, 164:7, 165:15, 181:25, 185:20, 187:15, 188:6, 190:1, 190:9

**Agent** [36] - 43:19, 43:21, 52:7, 55:14, 57:1, 57:12, 71:7, 79:19, 84:6, 94:9, 97:8, 101:7, 101:19, 124:8, 126:10, 130:2, 132:1, 136:4, 136:24, 139:19, 151:15, 153:5, 153:8, 160:3, 189:11, 200:20, 214:24, 216:4, 217:4, 219:21, 220:1, 224:20, 239:18, 240:5, 240:23, 241:8

**agent** [29] - 54:2, 54:5, 54:8, 60:9, 88:5, 88:14, 99:12, 134:22, 134:24, 134:25, 138:1, 138:7, 138:15, 138:17, 138:20, 139:10, 151:25, 160:21, 169:17, 173:4, 173:5, 174:7, 191:25, 193:23, 196:21, 204:9, 206:7, 206:12, 220:15

**agents** [12] - 23:11, 54:7, 61:21, 66:15, 66:19, 86:19, 134:23, 138:2, 165:20, 173:14, 179:10, 271:15

**ago** [4] - 76:2, 104:11, 118:1, 263:24

**agree** [1] - 103:19, 106:5, 110:21, 111:6, 111:18, 115:20, 162:8, 169:19, 205:20, 206:1, 210:14

**agreed** [9] - 65:15, 66:1, 82:25, 83:8, 84:1, 104:11, 141:18, 209:23, 257:18

**agreement** [4] - 171:20, 171:21, 171:22, 171:25

**agricultural** [1] - 212:7

**ahead** [9] - 88:7, 133:2, 134:1, 161:20,

241:21, 241:25, 268:2, 268:7, 268:23

**AIDED** [1] - 2:8

**ain't** [6] - 28:7, 28:8, 31:25, 34:25, 37:17, 41:25

**air** [3] - 11:13, 181:11, 248:7

**Air** [1] - 181:17

**aircraft** [2] - 96:10, 225:13, 226:3, 229:14, 230:9, 231:5

**airline** [1] - 228:1

**Airlines** [2] - 181:9, 181:13

**airlines** [2] - 182:5, 186:15

**airport** [9] - 13:10, 13:15, 13:18, 18:24, 24:22, 33:20, 182:19, 232:6, 232:13

**airports** [1] - 33:15

**alerted** [2] - 246:25, 248:22, 267:25

**Alex** [1] - 7:8

**alledgedly** [1] - 213:20

**alleged** [1] - 139:3

**allegedly** [1] - 135:5

**allow** [3] - 115:21, 143:14, 255:9

**allowed** [3] - 81:5, 89:23, 242:18

**almost** [5] - 62:23, 85:25, 173:10, 175:21, 263:24

**AMERICA** [1] - 1:3

**America** [2] - 193:2, 195:19

**American** [1] - 256:8

**amount** [7] - 15:9, 49:21, 79:23, 89:15, 90:12, 111:16, 111:17

**amplified** [1] - 107:21

**amplify** [2] - 111:3, 112:4

**amplifying** [2] - 105:19, 112:9

**analysis** [2] - 58:4, 141:19

**AND** [6] - 82:2, 82:11, 123:13, 163:8, 214:21, 216:17

**angle** [1] - 261:17

**Anne** [1] - 35:8

**announce** [1] - 161:23

**answer** [16] - 30:8, 104:17, 132:25,

149:24, 154:6, 158:2, 159:5, 159:7, 160:25, 161:12, 161:24, 163:1, 183:1, 188:19, 188:24, 190:4

**answered** [2] - 135:16, 136:5, 180:9

**anteroom** [1] - 81:5

**Anthony** [10] - 46:7, 47:9, 47:17, 47:23, 48:4, 49:4, 94:4, 228:18, 228:21, 234:14

**anticipate** [2] - 272:22, 272:24

**anticipated** [3] - 46:15, 67:8, 239:9

**anticipating** [1] - 117:7

**anytime** [1] - 179:25

**apartment** [14] - 27:11, 42:19, 42:23, 60:2, 61:12, 65:4, 90:18, 90:25, 91:2, 91:22, 151:2, 151:7, 151:8, 189:21

**apologize** [5] - 73:16, 86:24, 106:13, 133:25, 212:4

**appear** [4] - 45:17, 75:11, 207:25, 258:7

**appearance** [1] - 169:23

**APPEARANCES** [1] - 1:15

**appearances** [1] - 98:21

**appeared** [4] - 64:22, 222:19, 222:20, 242:12

**apply** [2] - 144:15, 166:6

**appreciate** [1] - 162:17

**approach** [18] - 14:21, 16:25, 37:19, 48:21, 55:10, 80:2, 123:6, 126:1, 129:19, 191:8, 192:11, 196:17, 199:23, 195:25, 201:16, 222:2, 245:11, 249:7

**approached** [1] - 46:4

**approaches** [1] - 118:20

**approaching** [1] - 65:23

**appropriately** [2] - 84:3, 101:4

**approval** [1] - 60:25

**approximate** [1] - 84:9

**April** [81] - 9:20, 40:15, 53:18, 63:6, 63:11, 63:18, 63:22, 64:24, 65:1, 65:20, 70:19, 71:22, 71:23, 71:24, 72:8, 72:9, 72:10, 72:14, 72:25, 73:1, 73:9, 74:14, 74:20, 75:1, 75:20, 75:21, 75:23, 75:25, 76:1, 79:2, 102:22, 102:23, 102:24, 103:2, 103:3, 103:6, 103:7, 103:12, 103:14, 103:20, 103:24, 104:2, 104:18, 107:6, 108:11, 108:15, 109:23, 114:9, 114:24, 116:7, 116:8, 116:19, 116:23, 118:16, 119:11, 153:4, 169:22, 173:6, 197:6, 197:8, 197:15, 197:17, 197:20, 198:23, 208:19, 209:6, 215:8, 217:5, 225:21, 225:22, 226:24, 234:6, 239:6, 239:12, 249:18, 263:25

**Archer** [1] - 221:7

**archer** [1] - 221:20

**area** [30] - 40:15, 64:1, 65:23, 66:18, 68:21, 69:9, 77:24, 80:2, 85:24, 86:15, 109:1, 109:11, 111:3, 189:20, 217:24, 220:6, 221:1, 221:4, 221:23, 221:25, 238:10, 238:21, 245:25, 246:3, 246:12, 247:1, 261:11, 262:8, 263:9, 264:7

**areas** [1] - 119:10

**argue** [1] - 131:16

**argues** [1] - 213:17

**argumentative** [1] - 159:17

**Arizona** [17] - 24:12, 24:15, 25:4, 25:7, 32:21, 33:4, 43:8, 77:18, 106:9, 106:18, 181:3, 181:19, 181:23, 182:1,

182:11, 186:14, 213:15

**Arkansas** [2] - 106:12, 106:17

**arrange** [2] - 131:7, 140:22

**arrest** [8] - 9:20, 9:22, 53:18, 55:1, 63:18, 116:4, 179:14, 201:5

**arrested** [3] - 25:17, 169:22, 211:22

**arrival** [4] - 181:22, 232:2, 232:12, 243:11

**arrive** [3] - 11:15, 66:20, 232:12

**arrived** [7] - 86:18, 166:3, 181:24, 220:19, 220:20, 232:16, 246:7

**arriving** [1] - 64:2

**artery** [1] - 118:21

**AS** [6] - 82:2, 82:12, 123:14, 163:8, 214:21, 216:18

**aside** [4] - 11:3, 75:13, 76:23, 158:2

**aspects** [1] - 67:11

**assessment** [2] - 145:2, 169:20

**assigned** [3] - 220:15, 237:25, 238:14

**assist** [4] - 65:15, 220:1, 220:18, 239:4

**assistance** [6] - 36:11, 38:11, 53:23, 124:11, 153:11, 220:5

**Assistant** [1] - 1:16

**assisted** [2] - 87:22, 231:17

**assisting** [1] - 52:6

**associate** [1] - 85:17

**assume** [1] - 189:6

**assumption** [2] - 107:12, 189:9

**assure** [1] - 122:19

**AT** [5] - 80:4, 160:14, 163:7, 213:4, 214:20

**athletic** [1] - 230:20

**Atkinson** [1] - 47:2

**atkinson** [4] - 47:3, 47:6, 47:12, 47:13

**Atlanta** [1] - 85:24

**attached** [2] - 222:13, 222:20

**attempt** [7] - 66:2, 68:8, 85:12, 191:5, 214:16, 216:2, 243:4

**attempted** [1] - 243:2

**attempting** [2] - 73:17, 117:9
**attendance** [2] - 52:1, 236:18
**attended** [1] - 238:15
**attention** [1] - 231:16
**Attorney** [1] - 1:16
**Attorney's** [3] - 1:17, 52:6, 206:5
**audio** [2] - 62:6, 145:22
**August** [3] - 149:17, 201:1, 202:10
**AUSA** [1] - 213:24
**authored** [2] - 133:14, 133:15
**authorization** [1] - 234:23
**authorized** [2] - 138:8, 138:22
**automobile** [2] - 15:19, 15:23
**available** [2] - 80:18, 239:8
**Avenue** [14] - 1:20, 2:6, 68:22, 116:14, 118:5, 121:23, 121:25, 241:17, 241:20, 243:11, 243:13, 243:14, 265:20, 266:3
**avenue** [1] - 118:18
**average** [1] - 110:18
**avoid** [1] - 167:23
**aware** [20] - 9:19, 10:17, 14:16, 65:3, 80:21, 148:2, 148:7, 148:12, 174:21, 174:24, 179:11, 218:6, 235:17, 235:19, 235:21, 241:7, 269:21, 269:25, 271:2, 271:17
**awhile** [1] - 8:9

**B**

**backbone** [1] - 176:13
**background** [1] - 100:25
**bad** [6] - 25:16, 39:12, 39:13, 39:18, 207:5, 273:7
**bag** [11] - 13:24, 57:23, 57:25, 58:1, 86:6, 87:17, 87:19, 87:24, 229:21, 231:21
**baggage** [5] -

229:18, 229:23, 230:15, 231:18
**bags** [15] - 57:21, 230:19, 230:20, 230:22, 230:24, 231:6, 231:9, 231:10, 231:14, 231:25, 232:17, 235:7, 235:8, 235:15
**bake** [1] - 252:6
**baking** [1] - 108:25
**Baking** [11] - 77:15, 102:6, 102:9, 102:11, 104:12, 104:13, 105:2, 107:10, 107:24, 215:18, 215:20
**bales** [8] - 55:19, 55:23, 56:9, 56:12, 56:14, 58:18, 69:25, 252:22
**Bally** [1] - 263:9
**Bally's** [1] - 262:24
**bank** [3] - 13:25, 14:3, 14:14
**baptiste** [1] - 1:22
**Baptiste** [29] - 8:12, 8:13, 72:23, 100:12, 100:13, 100:15, 100:18, 100:19, 102:19, 169:8, 207:22, 207:25, 211:22, 213:11, 244:2, 244:5, 244:14, 244:15, 244:17, 244:24, 245:9, 245:13, 246:4, 247:2, 253:14, 256:23, 257:4, 266:9, 267:23
**BAPTISTE** [1] - 1:7
**Baptiste's** [2] - 209:8, 268:20
**barrels** [2] - 263:21, 264:4
**barricades** [1] - 263:2
**based** [21] - 59:13, 63:25, 67:7, 67:10, 67:13, 99:1, 99:7, 100:14, 116:3, 117:11, 117:19, 139:13, 139:14, 176:14, 212:12, 215:14, 239:1, 241:4, 253:4, 269:11, 272:24
**basic** [1] - 166:19
**basis** [2] - 142:21, 174:5
**batteried** [1] - 143:20
**battery** [1] - 143:21

**Bay** [5] - 2:2, 64:1, 65:23, 189:20, 238:21
**bay** [1] - 203:19
**Beach** [2] - 1:21, 202:20
**became** [2] - 87:4, 244:19
**BEFORE** [1] - 1:13
**began** [4] - 7:23, 59:1, 90:22, 134:19
**begin** [1] - 185:25
**beginning** [2] - 73:10, 238:12
**behalf** [2] - 15:20, 166:10
**behind** [6] - 8:12, 132:11, 243:1, 244:24, 251:12, 273:5
**belabor** [1] - 212:22
**Belcher** [18] - 68:22, 118:5, 119:4, 119:7, 119:8, 241:14, 241:23, 242:4, 242:12, 242:15, 256:17, 256:19, 263:18, 264:22, 264:23, 265:5, 265:10, 265:17
**belonged** [4] - 197:22, 198:13, 198:16, 221:13
**below** [1] - 234:12
**bench** [1] - 123:7
**Bentonville** [3] - 77:18, 106:9, 106:17
**Benz** [15] - 16:18, 16:19, 16:21, 18:7, 18:11, 45:23, 46:1, 46:5, 46:11, 46:16, 48:10, 48:15, 50:3, 92:5, 93:13
**Berrault** [2] - 7:8, 7:11
**berth** [2] - 75:10, 76:20
**best** [8] - 67:25, 144:14, 148:17, 150:10, 165:15, 165:17, 212:20, 274:6
**better** [5] - 143:8, 150:8, 206:25, 207:3, 212:3
**between** [14] - 9:22, 67:8, 72:14, 83:8, 84:14, 133:23, 135:5, 135:21, 158:4, 159:10, 161:7, 162:7, 218:7, 225:21
**big** [7] - 32:6, 39:15, 39:16, 118:13,

118:14, 145:23, 154:17
**Big** [43] - 36:20, 36:24, 37:1, 37:3, 37:6, 37:9, 38:6, 39:4, 39:6, 39:9, 39:12, 39:20, 40:1, 40:2, 43:11, 43:19, 43:22, 43:24, 84:25, 134:14, 135:6, 135:24, 152:24, 154:18, 156:11, 157:14, 157:16, 157:21, 158:1, 158:6, 158:15, 159:1, 159:6, 160:20, 160:24, 162:14, 162:15, 163:22, 197:1, 197:2, 218:5, 218:6
**bigger** [1] - 31:18
**bill** [5] - 204:18, 211:16, 213:9, 271:2, 271:6
**billboards** [1] - 260:11
**bills** [1] - 210:23
**birth** [2] - 149:17, 149:19
**bit** [8] - 142:17, 148:20, 152:8, 233:16, 238:24, 251:4, 258:24, 260:6
**black** [8] - 86:6, 92:18, 92:21, 230:20, 240:21, 256:8, 256:9, 256:19
**blind** [1] - 206:2
**block** [6] - 73:15, 73:18, 176:8, 176:12, 176:16, 177:6
**blocks** [1] - 69:4
**blue** [8] - 67:16, 67:17, 116:24, 116:25, 240:1, 240:15, 244:12
**Blvd** [1] - 1:23
**Bo** [21] - 36:20, 36:24, 37:1, 37:3, 37:6, 37:9, 38:3, 38:6, 39:4, 39:6, 39:9, 39:20, 40:1, 40:2, 43:24, 197:1, 197:2
**bo** [1] - 38:4
**Bo's** [1] - 39:12
**Board** [1] - 266:4
**board** [1] - 228:6
**boarded** [1] - 229:14
**Bob** [1] - 65:14
**body** [1] - 225:6

**bolt** [1] - 254:4
**bolts** [1] - 112:25
**bond** [3] - 64:4, 169:19, 171:9
**bottom** [13] - 78:10, 78:11, 79:1, 109:12, 109:13, 112:7, 112:14, 114:2, 114:10, 200:22, 233:19, 268:8, 268:15
**bound** [1] - 118:25
**Box** [1] - 1:23
**box** [2] - 111:10, 248:23
**boxes** [36] - 11:15, 57:13, 57:17, 77:4, 78:19, 78:20, 109:18, 109:23, 110:15, 110:16, 110:19, 111:19, 111:22, 114:6, 115:7, 115:8, 215:8, 215:21, 248:2, 248:4, 248:10, 248:13, 248:21, 250:13, 250:15, 250:22, 251:6, 251:9, 251:12, 251:13, 251:18, 251:24, 252:4, 252:6, 252:10, 271:7
**boy** [2] - 25:16, 31:14
**brace** [1] - 251:19
**bracing** [3] - 250:13, 250:25, 251:5
**Brandon** [4] - 217:22, 217:24, 218:2, 245:23
**break** [9] - 80:8, 182:25, 254:8, 254:9, 270:7, 272:25, 273:15, 273:22, 274:3
**breaking** [1] - 247:17
**bridge** [12] - 66:1, 67:1, 67:5, 67:9, 68:2, 68:5, 239:20, 240:3, 240:9, 241:2, 258:15, 259:5
**brief** [2] - 186:2, 233:12
**briefly** [5] - 91:17, 93:20, 142:17, 166:5, 195:15
**bring** [11] - 12:13, 15:5, 34:10, 57:1, 60:1, 81:6, 120:15, 184:11, 192:5, 207:1, 207:6
**bringing** [3] - 8:5, 8:8, 267:9

broke [5] - 84:6, 247:10, 247:12, 254:14, 270:11
broken [2] - 42:9, 113:23
brother [7] - 120:25, 122:5, 122:11, 122:17, 122:18, 122:20, 123:2
brought [5] - 26:17, 29:11, 31:8, 105:8, 232:18
Broward [2] - 189:13, 189:17
buddy [2] - 15:24, 18:5
building [1] - 243:16
buildings [2] - 222:14, 262:23
bulk [1] - 88:19
bulky [2] - 231:15, 236:2
bunch [5] - 110:15, 110:19, 114:22, 115:7, 115:8
bundles [8] - 114:14, 114:17, 114:22, 115:2, 115:14, 115:21, 115:23, 252:5
burnt [1] - 179:23
Burrell [1] - 15:11
business [9] - 14:1, 45:20, 48:12, 48:15, 49:2, 92:11, 225:6, 226:17, 235:18
business's [1] - 226:19
businessman [1] - 35:10
button [1] - 143:13
buy [1] - 181:19
buying [2] - 51:11, 172:9
BY [121] - 3:4, 3:5, 3:6, 3:7, 3:9, 3:10, 3:11, 3:12, 3:13, 3:14, 3:15, 3:17, 3:18, 3:19, 3:21, 3:22, 7:20, 14:24, 15:7, 17:3, 17:23, 19:9, 20:18, 30:11, 37:22, 39:3, 40:14, 42:6, 45:6, 48:9, 48:24, 49:11, 51:1, 53:6, 54:25, 55:13, 56:7, 56:25, 57:11, 58:17, 59:9, 70:9, 71:6, 73:8, 74:15, 76:6, 78:7, 84:5, 88:9, 89:12, 91:20, 94:1, 95:19,

96:4, 97:4, 99:11, 101:25, 105:13, 105:20, 107:22, 110:9, 111:5, 112:6, 112:11, 124:7, 126:4, 129:9, 129:22, 132:18, 152:17, 157:8, 159:19, 160:2, 163:14, 177:5, 177:19, 180:12, 191:11, 191:24, 192:25, 193:10, 193:22, 195:16, 195:25, 196:20, 198:7, 199:1, 199:7, 199:12, 199:18, 200:1, 200:19, 201:17, 202:8, 205:12, 205:17, 207:12, 208:10, 210:22, 211:15, 214:23, 217:3, 219:20, 222:5, 224:15, 227:25, 229:13, 233:6, 233:24, 235:1, 237:16, 244:18, 246:9, 249:10, 250:4, 250:10, 250:23, 255:14, 258:9, 259:1, 260:17

# C

cab [22] - 67:16, 68:13, 68:14, 116:24, 202:9, 202:10, 202:14, 202:17, 203:3, 204:5, 204:6, 206:8, 207:15, 210:24, 211:6, 211:24, 214:6, 256:6, 256:24, 267:23, 271:11, 271:21
Cadillac [5] - 34:23, 149:4, 149:9, 149:11, 150:20
California [31] - 73:11, 74:19, 74:24, 75:3, 75:6, 75:20, 76:3, 76:10, 76:12, 102:15, 103:6, 103:16, 103:25, 104:4, 104:8, 104:14, 104:20, 104:24, 105:2, 108:9, 108:12, 108:15, 215:9, 215:18, 217:7, 217:11, 217:13, 225:25, 232:2, 232:18

call's [1] - 167:14
camera [1] - 110:10
Canadair [1] - 225:8
cannot [6] - 137:6, 172:2, 212:5, 212:17, 261:13, 261:22
capacity [1] - 237:21
captured [1] - 99:6
car [37] - 16:16, 16:17, 25:4, 47:20, 47:21, 51:11, 87:23, 125:7, 127:17, 127:18, 130:10, 130:19, 131:6, 131:11, 131:13, 140:14, 140:21, 140:22, 140:23, 141:2, 141:5, 142:2, 142:8, 142:11, 142:14, 149:10, 150:9, 180:2, 182:13, 190:18, 253:16, 253:18, 266:18, 266:25, 267:7, 267:11
card [1] - 234:23
care [1] - 123:4
career [4] - 231:17, 238:9, 238:12, 238:22
careful [1] - 269:22
carried [6] - 57:14, 144:18, 145:16, 146:14, 231:7, 235:25
carrier [4] - 12:18, 12:19, 208:21
Carriers [5] - 68:19, 202:19, 206:19, 208:20, 240:20
carry [6] - 12:19, 145:17, 146:9, 230:24, 231:3, 231:6
carrying [3] - 61:16, 232:17, 240:16
cars [5] - 126:22, 126:25, 128:25, 131:22, 149:21
CASE [1] - 1:2
Case [2] - 191:17, 194:3
case [59] - 7:3, 21:11, 22:20, 22:21, 22:22, 23:21, 45:12, 52:7, 54:2, 54:5, 61:2, 61:6, 61:18, 61:19, 61:24, 78:19, 80:20, 81:15, 82:5, 82:23, 88:4, 94:24, 96:22, 109:15, 111:8, 111:11, 111:13, 114:3, 119:25, 134:24, 134:25,

138:7, 144:7, 145:12, 151:25, 152:1, 166:8, 168:6, 168:21, 168:23, 169:16, 172:11, 173:4, 178:18, 178:20, 184:2, 184:6, 193:12, 194:5, 194:17, 204:9, 215:14, 216:13, 220:14, 221:14, 270:17, 270:24, 272:5
cases [6] - 78:12, 78:13, 78:16, 114:4, 215:11, 215:22
cash [3] - 16:10, 18:15, 49:13
cashier [3] - 15:24, 16:2, 17:8
cashier's [8] - 16:1, 16:10, 16:12, 17:4, 17:24, 49:13, 49:18, 51:7
CASTAGNA [1] - 1:13
Castagna [1] - 6:7
casual [1] - 115:22
catch [2] - 68:8, 264:17
catching [1] - 129:8
catering [1] - 233:21
caught [13] - 25:10, 25:14, 25:20, 25:24, 26:6, 27:2, 27:22, 29:23, 32:14, 33:13, 33:18, 35:21, 231:15
causal [1] - 115:21
CDs [3] - 168:6, 168:8, 168:11
cell [3] - 81:6, 239:18, 242:13
cellophane [1] - 252:19
cellular [1] - 65:4
center [3] - 263:1, 263:21, 266:5
certain [11] - 41:16, 67:23, 164:13, 165:18, 175:14, 176:8, 206:8, 206:12, 240:9, 249:17, 257:9
certainty [2] - 175:7, 185:14
certified [1] - 7:9
CERTIFY [1] - 274:16
CHALELA [15] - 40:9, 72:22, 78:2, 105:7, 105:18, 105:20, 107:20, 107:22, 110:9,

110:23, 111:5, 112:3, 112:6, 112:9, 112:11
Chalela [5] - 1:22, 40:8, 200:13, 217:4, 255:10
Challenger [4] - 225:2, 225:4, 225:5, 226:3
chance [2] - 111:20, 248:8
change [2] - 75:9, 191:7
changed [1] - 147:16
characteristics [1] - 95:1
charge [1] - 194:6
Charger [9] - 19:15, 19:18, 19:22, 20:1, 141:17, 141:21, 221:13, 222:24
charges [1] - 178:7
charter [5] - 12:19, 94:11, 225:1, 225:13, 225:15
chartered [1] - 228:1
chartering [1] - 226:14
chase [2] - 164:19, 174:7
check [23] - 16:1, 16:2, 16:10, 16:12, 17:4, 17:8, 17:24, 18:10, 18:16, 49:14, 49:18, 49:21, 50:3, 51:7, 51:13, 180:3, 190:17, 190:25, 206:17, 206:22, 206:23, 210:3, 228:19
checked [1] - 220:22
checking [1] - 220:17
checks [1] - 15:25
CHELALA [26] - 1:22, 3:12, 6:16, 30:11, 37:22, 39:3, 51:20, 58:10, 70:6, 71:3, 72:19, 83:2, 89:7, 91:14, 101:23, 101:25, 105:11, 105:13, 110:7, 111:2, 119:18, 119:21, 200:14, 223:12, 236:11, 249:25
chemist [2] - 83:12, 83:20
chip [1] - 42:9
choose [1] - 95:7
chronology [2] - 128:23, 130:17
circle [2] - 73:17,

96:17
**circled** [2] - 96:23, 268:10
**circulating** [1] - 248:8
**citation** [1] - 191:6
**citizen** [1] - 110:18
**City** [1] - 53:16
**CL63** [2] - 16:20, 46:11
**claim** [1] - 9:10
**claimed** [1] - 206:10
**clarified** [1] - 151:15
**clarify** [3] - 152:13, 157:15, 158:19
**clarity** [1] - 153:16
**clean** [1] - 248:14
**clear** [8] - 41:14, 42:1, 120:20, 133:7, 147:3, 153:1, 197:15, 212:25
**clearer** [4] - 146:20, 146:25, 147:4, 147:9
**clearly** [3] - 117:8, 145:14, 262:3
**Clearwater** [2] - 261:6, 261:12
**Clemens** [1] - 169:10
**CLEO** [2] - 3:3, 7:15
**Cleo** [73] - 53:22, 65:10, 86:19, 87:4, 87:9, 87:10, 87:13, 87:17, 87:23, 89:19, 89:23, 125:11, 125:15, 125:17, 125:22, 126:13, 127:2, 128:17, 128:24, 129:6, 129:10, 129:15, 131:3, 131:10, 131:12, 131:15, 131:17, 137:18, 137:25, 138:2, 138:9, 140:16, 140:18, 140:21, 141:4, 141:25, 142:1, 142:10, 142:13, 149:11, 149:14, 149:20, 149:25, 150:6, 150:8, 151:1, 158:4, 159:10, 159:12, 166:3, 166:9, 169:10, 179:8, 180:24, 181:2, 182:9, 183:1, 183:4, 183:10, 183:13, 183:16, 183:18, 183:21, 184:5, 184:9, 186:13, 196:9, 218:8, 218:11, 218:14, 218:18

**CLERK** [12] - 6:24, 7:6, 44:11, 44:22, 52:11, 52:22, 219:1, 219:12, 223:20, 224:6, 236:21, 237:7
**click** [2] - 190:11
**client** [4] - 160:19, 160:23, 186:4, 225:17
**clients** [2] - 225:11, 225:12
**climbed** [1] - 251:18
**climbing** [2] - 248:11, 251:2
**clip** [1] - 207:21
**close** [7] - 63:18, 68:23, 240:12, 243:22, 243:25, 255:22, 272:17
**closed** [3] - 113:17, 235:24, 243:18
**closer** [4] - 238:24, 260:3, 260:21, 263:6
**closes** [1] - 112:22
**closet** [1] - 91:3
**closets** [1] - 91:1
**closing** [1] - 113:16
**clothes** [1] - 235:12
**clothing** [4] - 231:22, 231:25, 232:1, 244:8
**club** [13] - 69:6, 184:23, 184:25, 185:8, 185:22, 246:11, 246:12, 261:13, 261:18, 261:22, 262:20, 262:22, 263:10
**clue** [1] - 236:5
**co** [4] - 72:4, 72:12, 209:1, 209:8
**co-driver** [2] - 209:1, 209:8
**co-driver's** [2] - 72:4, 72:12
**coast** [4] - 189:7, 189:8, 213:12
**coastal** [1] - 109:6
**code** [2] - 108:9, 109:1
**collect** [6] - 31:6, 59:25, 86:10, 151:5, 204:5, 204:13
**collected** [9] - 56:17, 60:16, 61:6, 61:7, 70:11, 84:17, 85:25, 91:25, 92:1
**collecting** [1] - 34:6
**collection** [2] - 42:18, 94:24
**color** [5] - 68:11, 68:14, 92:22, 221:12,

230:20
**colored** [7] - 54:19, 68:13, 149:4, 149:9, 149:10, 202:10, 240:19
**column** [1] - 109:4
**Column** [1] - 76:17
**combination** [6] - 31:13, 31:14, 31:15, 32:8, 32:10, 32:13
**combinations** [1] - 28:24
**comfortable** [3] - 87:11, 165:20, 165:23
**coming** [15] - 22:8, 63:15, 64:15, 66:2, 66:13, 67:7, 77:12, 81:20, 194:7, 213:11, 216:19, 230:23, 239:21, 241:2, 260:5
**comments** [1] - 156:9
**commercial** [1] - 181:11
**commercially** [2] - 33:8, 181:8
**commodity** [1] - 254:1
**common** [2] - 84:16, 88:16
**commonly** [1] - 252:17
**communicate** [1] - 65:7
**communication** [2] - 41:8, 240:13
**communications** [1] - 240:4
**Company** [4] - 102:9, 104:12, 105:2, 212:10
**company** [15] - 47:7, 68:17, 68:18, 94:11, 106:2, 106:8, 107:25, 108:2, 108:4, 108:6, 108:12, 108:25, 204:25, 206:9, 206:13
**Company's** [1] - 104:13
**compartment** [2] - 231:5, 231:19
**complete** [2] - 194:16, 209:21
**completed** [1] - 209:11
**completion** [1] - 164:7
**complies** [4] - 57:20, 157:15, 207:23, 249:13

**computer** [1] - 93:10
**COMPUTER** [1] - 2:8
**COMPUTER-AIDED** [1] - 2:8
**computerized** [1] - 52:8
**computers** [1] - 38:11
**concern** [1] - 175:10
**concerned** [4] - 137:14, 161:8, 175:9, 175:13
**concerning** [7] - 8:17, 9:24, 10:19, 12:23, 36:11, 43:15, 45:12
**concerns** [3] - 175:18, 214:7, 231:13
**conclude** [2] - 107:14, 214:7
**CONCLUDED** [3] - 82:2, 163:8, 214:21
**conclusion** [1] - 143:2
**concurrence** [1] - 194:24
**condition** [1] - 231:10
**conditions** [2] - 249:17, 260:13
**conduct** [5] - 179:24, 216:3, 220:6, 220:16, 253:2
**conducted** [1] - 253:13
**conducting** [3] - 64:18, 87:22, 220:10
**conference** [3] - 80:19, 81:7
**confidential** [17] - 60:10, 98:12, 98:14, 133:10, 170:4, 171:8, 171:19, 171:21, 172:1, 172:6, 175:7, 176:6, 176:22, 177:15, 178:9, 178:12, 186:9
**confirm** [4] - 99:24, 111:23, 182:14, 182:23
**confused** [1] - 106:15
**connect** [1] - 104:9
**connects** [1] - 113:8
**consent** [2] - 247:3, 268:21
**consider** [1] - 84:2
**consideration** [1] - 84:4
**considering** [1] -

170:4
**consignee** [1] - 212:15
**consistent** [7] - 74:1, 74:11, 88:18, 108:13, 175:16, 182:7, 251:7
**conspiracy** [3] - 28:15, 116:6, 149:2
**constructed** [2] - 88:4, 88:15
**construction** [7] - 119:10, 241:20, 264:1, 264:10, 264:11, 264:14, 264:18
**contact** [19] - 8:3, 8:4, 62:5, 62:16, 62:20, 62:23, 66:6, 86:8, 87:8, 100:6, 100:14, 124:15, 125:3, 125:4, 173:10, 174:19, 182:19, 186:15, 244:2
**contacted** [7] - 10:18, 64:19, 65:12, 65:20, 87:20, 239:3, 239:17
**contacts** [1] - 62:25
**contain** [6] - 58:6, 70:23, 83:14, 83:21, 231:25, 232:1
**contained** [9] - 11:17, 57:13, 86:6, 92:23, 97:19, 102:17, 115:14, 235:11, 252:25
**containers** [1] - 251:13
**containing** [1] - 231:22
**contents** [3] - 70:2, 166:20, 167:8
**continuance** [1] - 194:24
**continuation** [1] - 162:25
**Continue** [1] - 193:4
**continue** [11] - 118:25, 119:5, 119:6, 127:15, 133:1, 163:4, 177:12, 192:7, 195:13, 242:21, 259:13
**CONTINUED** [3] - 82:12, 123:14, 216:18
**continued** [3] - 243:8, 243:10, 243:14
**continues** [1] - 160:10
**continuing** [1] -

62:20
  contraband [6] - 111:24, 237:25, 238:4, 270:20, 271:17, 271:20
  contract [2] - 171:18, 171:22
  control [5] - 134:22, 162:13, 165:2, 165:5, 165:16
  controlled [1] - 172:10
  controlling [4] - 165:4, 166:20, 167:7, 173:5
  convenient [1] - 273:20
  conversation [31] - 51:10, 59:24, 99:15, 99:17, 99:25, 126:17, 127:13, 129:3, 129:4, 130:7, 133:18, 133:23, 135:17, 135:19, 137:4, 137:8, 141:1, 144:16, 155:3, 155:5, 156:18, 156:19, 158:11, 166:15, 166:16, 167:21, 172:20, 173:1, 180:24, 187:6, 218:4
  conversations [43] - 8:7, 9:24, 10:2, 10:4, 10:8, 62:8, 62:19, 67:13, 84:13, 84:16, 99:3, 136:17, 139:9, 139:25, 140:3, 140:5, 141:4, 142:23, 144:11, 146:16, 146:19, 146:24, 151:23, 152:5, 153:9, 158:3, 158:4, 159:3, 159:9, 160:22, 161:7, 162:6, 163:22, 168:9, 168:11, 174:4, 175:16, 177:14, 177:25, 184:3, 185:17, 218:7, 241:7
  conversion [1] - 101:8
  convey [2] - 10:13, 170:18
  convicted [2] - 21:12, 196:2
  conviction [1] - 23:18
  Conviction [3] - 191:19, 192:21, 193:14
  cookie [14] - 77:4,

77:7, 77:22, 78:17, 78:21, 79:12, 111:14, 111:20, 115:8, 215:2, 215:9, 215:22, 215:24, 271:7
  Cool [5] - 68:19, 202:19, 206:19, 208:20, 240:20
  Cooney [1] - 169:13
  cooperate [3] - 116:5, 170:8, 274:8
  cooperating [11] - 90:14, 90:22, 134:19, 135:10, 159:13, 159:14, 179:17, 186:8, 197:7, 218:12, 218:17
  cooperation [7] - 59:2, 64:6, 143:23, 179:12, 179:15, 194:16, 194:19
  cooperators [1] - 160:23
  coordinates [1] - 54:8
  copies [3] - 97:24, 208:16, 209:25
  copy [14] - 92:14, 92:18, 92:20, 92:21, 92:22, 99:20, 132:10, 132:11, 182:21, 203:7, 205:5, 206:25, 207:3, 211:5
  corner [12] - 78:11, 107:4, 107:11, 107:23, 108:18, 112:7, 112:14, 114:2, 114:10, 200:23, 222:16, 262:9
  corporation [2] - 106:4
  correct [267] - 8:19, 9:20, 18:8, 21:16, 23:7, 24:10, 25:14, 27:18, 27:24, 28:3, 30:24, 33:6, 33:13, 36:12, 36:18, 41:1, 41:24, 42:9, 42:12, 43:11, 43:16, 43:22, 45:9, 45:13, 45:14, 45:20, 54:12, 72:15, 72:16, 73:11, 73:12, 75:12, 75:24, 76:21, 78:10, 78:14, 78:23, 79:8, 79:10, 92:19, 93:2, 97:7, 98:7, 102:19, 102:20, 102:23, 104:4, 104:5, 105:24, 106:18, 107:6, 107:7, 107:15,

108:19, 108:20, 108:22, 109:13, 109:19, 110:15, 110:20, 111:8, 111:14, 111:17, 112:14, 113:1, 113:24, 114:4, 114:11, 114:18, 114:24, 115:11, 115:18, 116:7, 116:15, 116:16, 116:20, 117:2, 117:3, 117:21, 118:6, 118:18, 118:23, 122:13, 126:19, 126:20, 126:23, 127:3, 127:7, 127:10, 127:15, 129:11, 129:16, 131:15, 133:3, 133:17, 133:20, 133:22, 134:11, 134:14, 134:15, 134:17, 134:18, 134:22, 135:2, 136:21, 136:22, 140:7, 140:15, 141:10, 141:15, 142:12, 142:15, 142:19, 144:4, 144:5, 144:24, 145:2, 145:3, 145:7, 148:24, 149:16, 149:18, 151:3, 152:6, 153:16, 153:17, 153:22, 154:11, 159:14, 164:23, 165:3, 165:9, 165:12, 166:17, 166:18, 166:22, 167:10, 167:14, 167:17, 168:25, 169:1, 169:20, 170:12, 170:24, 172:5, 172:8, 172:15, 173:8, 173:18, 173:23, 173:25, 174:13, 174:23, 175:25, 176:14, 176:15, 178:16, 178:22, 179:1, 180:15, 180:20, 181:3, 181:8, 183:5, 183:6, 183:17, 183:23, 187:20, 190:7, 194:4, 194:9, 196:4, 196:12, 198:11, 201:2, 201:3, 201:5, 202:14, 202:17, 202:18, 202:20, 203:4, 203:20, 203:21, 204:2, 204:6, 204:10,

204:11, 204:15, 204:16, 204:22, 205:22, 205:23, 207:16, 208:17, 208:21, 208:22, 208:25, 209:3, 209:13, 210:25, 211:1, 211:16, 211:23, 215:10, 217:8, 217:14, 217:19, 217:20, 218:2, 218:8, 218:9, 219:22, 224:18, 224:19, 224:21, 226:2, 226:18, 229:17, 230:5, 234:4, 234:5, 234:6, 234:9, 234:10, 234:17, 235:3, 237:18, 243:20, 250:25, 251:10, 251:14, 253:9, 253:10, 256:9, 256:24, 257:2, 259:16, 259:25, 260:3, 260:13, 260:24, 261:3, 261:8, 261:9, 261:18, 262:12, 262:16, 262:20, 262:24, 263:6, 263:12, 263:16, 263:22, 264:19, 264:22, 265:8, 265:17, 265:21, 265:24, 267:1, 267:24, 268:3, 269:19, 269:23, 270:22
  correctly [3] - 40:20, 41:12, 210:8
  corroborate [18] - 175:11, 177:15, 184:3, 185:15, 185:18, 185:20, 185:25, 186:1, 186:7, 186:8, 186:10, 186:13, 186:17, 187:18, 187:24, 188:25, 190:2, 190:4
  corroborates [2] - 175:17, 184:7
  cost [1] - 232:20
  counsel [12] - 17:9, 51:19, 54:18, 82:25, 84:1, 95:16, 136:1, 160:13, 208:15, 213:3, 214:2, 236:10
  Counsel [9] - 45:3, 53:3, 129:5, 177:3, 195:21, 219:17, 224:12, 234:21,

237:13
  Counselor [2] - 132:12, 137:12
  count [1] - 91:24
  counted [1] - 61:9
  counter [5] - 90:24, 91:2, 91:10, 91:22, 91:24
  Country [1] - 200:8
  country [2] - 238:18, 252:18
  Countryside [13] - 77:15, 102:6, 102:9, 102:11, 104:12, 105:2, 107:10, 107:24, 204:21, 205:25, 215:18, 215:19
  County [11] - 40:17, 66:3, 67:2, 69:10, 189:13, 197:2, 218:1, 239:21, 246:5, 258:16, 266:4
  county [2] - 189:18, 238:18
  couple [11] - 50:10, 63:16, 66:21, 69:14, 118:4, 145:25, 185:16, 221:4, 235:5, 273:5, 273:6
  course [14] - 48:12, 63:2, 92:3, 97:9, 124:14, 148:20, 149:2, 151:18, 168:21, 207:13, 209:14, 253:19, 259:18, 273:4
  Court [14] - 2:5, 2:5, 6:8, 7:3, 21:16, 36:2, 38:13, 122:19, 123:19, 161:11, 161:17, 194:13, 274:2, 274:22
  court [16] - 7:9, 30:8, 45:17, 47:23, 54:14, 57:2, 98:20, 98:24, 100:19, 123:3, 146:23, 168:4, 207:6, 229:1, 244:5, 244:20
  COURT [218] - 1:1, 1:13, 6:2, 6:6, 6:9, 6:13, 6:17, 6:21, 6:23, 7:10, 7:13, 14:23, 17:2, 17:18, 17:20, 19:8, 20:12, 20:16, 30:7, 37:21, 38:12, 38:16, 38:19, 38:24, 39:1, 40:7, 40:11, 42:4, 44:6, 45:3, 48:7, 48:23, 49:9, 50:24,

51:18, 51:21, 51:23, 51:25, 52:9, 53:3, 54:24, 55:12, 56:3, 56:5, 57:6, 58:11, 58:14, 59:8, 70:7, 71:2, 71:4, 72:21, 73:2, 73:5, 78:3, 78:6, 80:3, 80:9, 80:12, 80:24, 81:3, 81:8, 81:11, 81:15, 81:18, 81:24, 82:3, 82:8, 82:13, 82:16, 82:19, 82:25, 83:4, 84:2, 86:21, 87:2, 89:8, 89:11, 91:15, 91:19, 93:18, 93:21, 95:17, 96:2, 97:3, 101:21, 105:9, 111:1, 119:20, 119:23, 120:5, 120:8, 120:10, 120:22, 121:3, 121:6, 121:9, 121:11, 121:14, 121:17, 121:20, 122:2, 122:7, 122:11, 122:14, 122:17, 122:23, 123:1, 123:8, 123:10, 123:11, 123:15, 123:18, 123:21, 124:1, 124:4, 126:3, 129:5, 129:21, 132:11, 157:7, 159:18, 160:1, 160:6, 160:13, 160:16, 161:4, 161:14, 161:20, 162:4, 162:24, 163:6, 163:10, 177:3, 177:12, 180:10, 191:10, 191:22, 192:3, 192:6, 192:10, 192:12, 192:15, 192:18, 192:24, 193:8, 193:19, 195:11, 195:20, 195:24, 196:16, 196:19, 199:5, 199:11, 199:25, 200:13, 200:16, 202:2, 205:12, 205:14, 207:11, 208:6, 208:8, 210:10, 211:11, 213:2, 213:6, 213:22, 214:2, 214:12, 214:18, 216:6, 216:9, 216:12, 216:14, 216:19, 216:22, 216:24, 218:22, 219:17, 222:4, 223:11, 223:14, 223:16, 223:18, 224:12,

227:15, 227:20, 227:23, 229:11, 233:2, 236:9, 236:12, 236:14, 236:16, 237:13, 244:16, 245:5, 249:9, 249:23, 250:1, 255:4, 255:7, 255:11, 257:24, 258:1, 260:15, 272:2, 272:8, 272:11, 272:15, 272:20, 273:3, 273:8, 273:16, 273:19, 274:8, 274:14
**Court's** [4] - 52:4, 120:20, 162:1, 162:18
**courthouse** [2] - 122:9, 123:3
**courtroom** [8] - 57:3, 80:16, 80:21, 80:22, 120:17, 122:21, 229:6
**COURTROOM** [16] - 6:4, 6:24, 7:6, 44:11, 44:22, 52:11, 52:22, 82:15, 123:17, 216:21, 219:1, 219:12, 223:20, 224:6, 236:21, 237:7
**cousin** [8] - 28:5, 28:7, 28:8, 120:13, 121:13, 121:14, 122:18, 123:4
**cover** [2] - 84:9, 137:21
**covered** [2] - 73:16, 135:12
**covering** [1] - 79:22
**CR** [1] - 1:2
**crate** [1] - 11:18
**crated** [1] - 11:23
**crates** [2] - 11:16
**crawford** [1] - 210:11
**CRAWFORD** [64] - 2:1, 3:6, 3:14, 3:22, 40:12, 40:14, 51:22, 79:25, 80:6, 80:10, 83:3, 93:17, 120:12, 120:24, 121:4, 121:8, 121:10, 122:8, 122:13, 122:24, 200:17, 200:19, 201:15, 201:17, 201:24, 202:5, 202:8, 205:9, 205:16, 205:17, 207:12, 208:2, 208:7, 208:10, 210:12, 210:17, 211:8, 211:13, 211:15, 212:25, 213:8, 213:25, 214:4, 214:15, 214:19,

214:23, 216:4, 223:13, 236:13, 255:8, 255:12, 255:14, 257:21, 258:4, 258:9, 259:1, 260:16, 260:17, 271:23, 272:13, 272:16, 273:9, 273:18, 273:25
**Crawford** [8] - 2:2, 40:11, 51:21, 120:11, 121:12, 200:16, 213:7, 236:12
**created** [5] - 127:14, 127:21, 164:7, 166:19, 166:25
**credit** [1] - 234:22
**Creole** [2] - 99:16, 99:18
**criminal** [2] - 170:17, 267:4
**criminals** [2] - 176:23, 176:25
**criteria** [1] - 214:13
**cross** [10] - 20:12, 40:7, 101:22, 163:1, 223:11, 233:2, 238:16, 255:7, 258:14, 273:4
**CROSS** [16] - 3:5, 3:6, 3:9, 3:12, 3:13, 3:14, 3:19, 3:21, 20:17, 40:13, 50:25, 101:24, 124:6, 200:18, 233:5, 255:13
**cross-examination** [8] - 20:12, 40:7, 101:22, 163:1, 223:11, 233:2, 255:7, 273:4
**CROSS-EXAMINATION** [16] - 3:5, 3:6, 3:9, 3:12, 3:13, 3:14, 3:19, 3:21, 20:17, 40:13, 50:25, 101:24, 124:6, 200:18, 233:5, 255:13
**crossing** [2] - 118:22, 240:8
**Crowley** [1] - 149:15
**CS** [4] - 98:10, 98:11, 153:21, 154:7
**CSOs** [1] - 120:20
**cul** [1] - 222:14
**cul-de-sac** [1] - 222:14
**cultures** [1] - 257:10
**currency** [9] - 85:8, 85:11, 86:6, 88:19, 88:25, 90:6, 128:4,

164:11, 182:24
**curved** [1] - 260:6
**customer** [4] - 47:3, 85:24, 108:21, 109:5
**customers** [7] - 59:21, 59:23, 60:17, 62:10, 64:13, 150:22, 150:23
**Customs** [1] - 238:16
**cut** [12] - 81:1, 85:12, 90:5, 90:10, 111:22, 164:19, 174:7, 252:20, 252:23, 254:17, 254:18

# D

**D-U-R-A-L-I-A** [1] - 53:2
**D.C** [1] - 138:17
**daily** [8] - 62:23, 71:14, 72:7, 75:23, 173:10, 207:22, 209:5, 210:6
**Daily** [1] - 71:22
**dark** [2] - 54:19, 67:17
**data** [1] - 74:3
**database** [1] - 93:3
**date** [30] - 13:21, 74:13, 74:16, 74:22, 78:24, 79:2, 88:25, 107:5, 108:11, 108:17, 114:12, 119:12, 130:12, 130:25, 136:9, 136:14, 149:17, 149:19, 150:3, 182:24, 194:11, 195:1, 200:25, 208:20, 209:6, 211:18, 213:1, 217:16, 225:21, 264:12
**date's** [1] - 72:8
**Dated** [1] - 274:19
**dated** [3] - 71:22, 71:23, 71:24
**dates** [3] - 74:4, 213:9, 225:24
**DAVID** [2] - 3:17, 224:2
**David** [4] - 94:16, 94:17, 223:19, 224:10
**Dawn** [2] - 108:1, 108:5
**days** [10] - 63:13, 65:2, 129:14, 174:14,

174:15, 194:25, 209:11, 217:14, 220:12, 239:6
**daytime** [1] - 202:13
**de** [1] - 222:14
**DEA** [15] - 22:2, 22:7, 45:11, 53:10, 61:14, 66:18, 171:17, 175:19, 176:13, 197:7, 198:11, 219:24, 239:18, 240:7, 253:12
**deal** [3] - 23:25, 24:4, 133:11
**dealer** [5] - 23:14, 23:19, 40:2, 197:2, 198:16
**dealers** [1] - 28:11
**dealing** [2] - 37:15, 176:2
**deals** [2] - 176:16, 176:19
**dealt** [1] - 204:20
**debriefings** [2] - 22:2, 174:5
**debt** [18] - 9:24, 10:5, 10:20, 19:11, 19:18, 20:6, 59:18, 59:19, 79:23, 84:7, 84:10, 126:25, 128:20, 141:7, 141:18, 141:22, 142:9, 164:8
**debts** [2] - 20:4, 59:21
**deceive** [1] - 177:8
**deceptive** [3] - 176:20, 176:22, 177:21
**DEFENDANT** [6] - 121:13, 121:16, 121:22, 122:5, 122:16, 122:22
**defendant** [40] - 9:11, 9:17, 10:5, 10:14, 10:17, 10:18, 10:25, 11:25, 13:14, 14:1, 15:20, 18:22, 38:24, 43:1, 43:25, 44:2, 50:7, 54:22, 84:19, 85:4, 86:3, 86:5, 86:8, 86:14, 86:22, 86:25, 94:7, 96:8, 162:6, 168:18, 178:12, 178:14, 186:9, 221:5, 221:22, 229:3, 244:13, 244:17, 245:3
**Defendant** [3] - 1:19, 1:22, 2:1
**defendant's** [2] -

194:15, 194:24

**Defendant's** [1] - 37:24

**Defendants** [1] - 1:9

**defense** [7] - 43:16, 51:19, 54:18, 110:6, 136:1, 208:15, 236:10

**define** [1] - 78:18

**definitely** [1] - 175:12

**definition** [1] - 171:23

**degrees** [4] - 79:6, 249:6, 269:2, 269:3

**Del** [1] - 212:9

**delay** [1] - 67:7

**deliver** [7] - 11:4, 31:3, 85:13, 86:3, 86:4, 117:14, 184:19

**delivered** [8] - 13:20, 46:16, 84:17, 87:17, 87:19, 140:13, 140:16, 182:4

**deliveries** [4] - 67:11, 71:14, 117:6, 117:23

**delivering** [2] - 34:7, 118:10

**delivery** [14] - 11:12, 29:17, 67:15, 67:23, 67:25, 118:2, 126:19, 127:17, 140:10, 140:13, 140:17, 150:21, 164:11, 164:20

**demanding** [1] - 131:11

**demands** [1] - 165:6

**departed** [2] - 232:8, 234:4

**departing** [1] - 232:6

**Department** [1] - 93:1

**department** [2] - 182:21, 203:23

**departments** [1] - 186:16

**departure** [1] - 232:15

**depicted** [2] - 203:11, 265:23

**depicts** [1] - 261:25

**deposit** [1] - 14:13

**deposits** [1] - 14:14

**Depot** [1] - 212:19

**DEPUTY** [13] - 6:24, 7:6, 44:11, 44:22, 52:11, 52:22, 123:6, 219:1, 219:12, 223:20, 224:6,

236:21, 237:7

**deputy** [4] - 80:16, 80:21, 80:22, 123:9

**deputy's** [1] - 80:16

**derogatory** [1] - 171:5

**describe** [13] - 11:9, 13:1, 14:3, 43:6, 59:16, 61:4, 91:9, 94:21, 117:12, 230:17, 242:8, 245:8, 252:2

**described** [10] - 67:15, 86:7, 99:7, 125:7, 150:15, 181:10, 185:11, 186:24, 235:7, 252:12

**describes** [1] - 77:21

**describing** [2] - 68:4, 185:1

**description** [8] - 67:18, 67:22, 67:24, 68:11, 111:12, 117:16, 117:20, 244:8

**descriptions** [2] - 88:10, 118:2

**design** [1] - 88:2

**designate** [2] - 103:8, 223:4

**designated** [1] - 238:16

**designation** [3] - 89:13, 96:15, 100:21

**designed** [1] - 85:3

**desire** [1] - 182:8

**destination** [1] - 269:19

**destined** [1] - 212:19

**detection** [1] - 238:15

**detectives** [1] - 203:22

**detention** [3] - 169:24, 169:25, 171:1

**determination** [2] - 99:8, 101:1

**determine** [4] - 85:11, 90:5, 177:17, 269:5

**determined** [1] - 115:3

**develop** [1] - 134:7

**developed** [3] - 59:17, 85:21, 85:22

**development** [1] - 176:10

**device** [7] - 137:9, 142:25, 143:2, 145:18, 146:10, 146:13, 147:1

**devices** [2] - 142:18, 145:20

**different** [14] - 14:8, 14:10, 14:11, 14:14, 62:12, 73:21, 73:23, 87:10, 164:3, 169:14, 182:4, 236:2, 253:25

**difficult** [5] - 120:16, 185:24, 187:18, 188:1, 250:17

**digital** [5] - 62:6, 142:22, 143:4, 145:22, 146:2

**DIRECT** [12] - 3:4, 3:8, 3:11, 3:16, 3:18, 3:20, 7:19, 45:5, 53:5, 219:19, 224:14, 237:15

**direct** [13] - 8:3, 114:20, 115:1, 118:3, 124:9, 125:3, 137:19, 137:22, 137:24, 192:2, 195:9, 195:12, 204:18

**directed** [9] - 8:21, 60:5, 60:8, 60:15, 60:18, 60:20, 61:5, 62:3, 138:5

**direction** [9] - 88:1, 138:3, 172:11, 172:14, 191:3, 260:24, 261:1, 261:2, 261:22

**directional** [1] - 260:20

**directions** [2] - 68:25, 167:3

**directly** [5] - 10:19, 108:5, 182:10, 244:24, 262:19

**dirt** [1] - 248:12

**dirty** [1] - 26:18

**discount** [1] - 50:21

**discovery** [3] - 136:2, 214:11, 253:9

**discrepancies** [1] - 175:12

**discuss** [8] - 9:2, 82:5, 119:25, 120:2, 143:4, 216:13, 272:5, 272:13

**discussed** [5] - 9:7, 42:17, 92:12, 180:17, 182:22

**discussing** [4] - 49:3, 133:8, 133:9, 180:23

**DISCUSSION** [6] - 80:5, 82:1, 160:15, 163:7, 213:5, 214:20

**discussion** [1] - 8:17

**discussions** [3] - 46:10, 90:17, 239:22

**distance** [3] - 69:3, 69:13, 218:2

**distributed** [1] - 37:6

**distributing** [1] - 34:6

**distribution** [1] - 42:18

**District** [2] - 2:5, 12:24

**DISTRICT** [3] - 1:1, 1:1, 1:13

**dock** [1] - 215:17

**docket** [3] - 191:17, 193:2, 193:12

**document** [32] - 73:13, 74:16, 74:18, 74:23, 75:1, 76:14, 76:15, 76:21, 77:6, 77:12, 77:15, 79:4, 79:5, 79:15, 79:17, 96:12, 107:13, 107:15, 192:15, 193:25, 195:9, 195:17, 195:22, 196:5, 196:8, 205:6, 206:3, 206:16, 211:5, 215:15, 233:25

**documentary** [1] - 207:10

**documents** [16] - 71:7, 71:10, 71:12, 74:5, 79:12, 79:14, 206:7, 206:8, 206:11, 206:13, 206:17, 207:14, 208:12, 209:5, 213:2, 214:6

**Dodge** [3] - 125:7, 141:21, 221:13

**dog** [8] - 238:15, 246:19, 246:23, 248:17, 248:22, 267:9, 267:18, 267:25

**dogs** [1] - 267:11

**dollars** [3] - 49:22, 128:18, 232:23

**done** [10] - 61:2, 61:5, 87:19, 88:1, 137:12, 184:13, 187:15, 190:24, 196:15, 264:12

**door** [9] - 113:11, 113:21, 113:24, 222:12, 222:20, 247:14, 247:16, 250:12, 254:6

**doors** [3] - 247:8, 247:11, 248:2

**dope** [5] - 24:16, 31:1, 36:22, 37:8, 40:1

**double** [1] - 264:16

**dough** [15] - 77:5, 77:8, 77:22, 78:17, 78:21, 79:12, 111:14, 111:21, 115:8, 215:2, 215:9, 215:22, 215:24, 271:7

**down** [32] - 20:4, 24:6, 30:4, 30:9, 33:23, 38:11, 44:6, 51:25, 56:24, 57:5, 109:3, 109:4, 120:9, 120:13, 141:23, 180:21, 182:25, 200:22, 218:22, 220:16, 223:16, 236:16, 259:23, 259:24, 262:11, 263:16, 264:5, 264:16, 265:19, 268:8, 268:15, 274:11

**downstairs** [1] - 123:3

**dozens** [1] - 124:16

**draw** [1] - 223:6

**drive** [2] - 25:4, 203:25

**driven** [3] - 190:6, 203:18, 246:15

**driver** [23] - 65:22, 66:7, 71:14, 71:25, 72:2, 72:24, 76:13, 102:17, 102:18, 102:22, 104:18, 108:13, 209:1, 209:8, 209:11, 210:15, 217:16, 242:12, 245:13, 256:11, 256:20, 256:23, 270:10

**Driver's** [1] - 71:21

**driver's** [12] - 72:2, 72:4, 72:7, 72:12, 75:23, 92:15, 92:23, 93:4, 93:11, 93:12, 94:3, 120:15

**drivers** [16] - 8:4, 8:8, 41:7, 41:9, 41:13, 41:23, 65:7, 72:11, 74:17, 116:19, 207:22, 208:23, 209:5, 209:7, 210:5, 245:11

**driveway** [3] - 243:15, 243:17, 266:2

**driving** [9] - 34:23, 87:14, 87:15, 104:19,

149:4, 149:8, 209:16, 246:3, 256:9
**drop** [1] - 245:22
**dropped** [1] - 62:1
**dropping** [1] - 213:13
**drove** [2] - 191:2, 201:8
**Drug** [16] - 53:8, 53:14, 55:2, 56:20, 58:4, 60:3, 64:17, 83:13, 83:20, 138:7, 219:21, 239:7, 240:4, 241:8, 253:22
**drug** [19] - 23:14, 23:18, 26:9, 54:6, 59:18, 59:19, 88:16, 150:11, 150:14, 150:16, 151:5, 176:3, 176:5, 196:10, 197:2, 198:16, 221:15, 238:18, 267:25
**drugs** [4] - 60:19, 238:13, 267:6, 271:20
**Dubois** [12] - 46:7, 46:10, 47:10, 47:17, 47:23, 48:5, 49:4, 50:7, 94:4, 228:18, 234:15
**duct** [2] - 252:5, 252:20
**dude** [9] - 16:1, 28:12, 28:13, 28:15, 28:17, 28:19, 34:18, 36:21, 36:22
**duffle** [5] - 13:24, 231:21, 231:24, 232:17
**duly** [5] - 44:19, 52:19, 219:9, 224:3, 237:4
**DURALIA** [2] - 3:10, 52:18
**Duralia** [33] - 43:19, 43:21, 52:3, 53:1, 55:14, 57:1, 57:12, 71:7, 78:8, 79:19, 84:6, 86:21, 94:9, 97:8, 99:12, 101:7, 101:19, 120:8, 124:8, 160:7, 163:11, 163:15, 200:20, 214:24, 216:4, 217:4, 218:23, 220:1, 224:21, 239:18, 240:5, 240:23, 241:8
**Duralia's** [1] - 52:7
**during** [42] - 10:19, 48:11, 51:12, 52:6, 55:11, 62:4, 62:22,

62:25, 63:1, 66:16, 92:3, 94:9, 97:8, 100:9, 113:17, 120:14, 124:14, 126:17, 134:12, 147:17, 147:20, 147:22, 148:20, 149:2, 150:11, 151:18, 168:20, 168:21, 174:4, 174:22, 176:8, 190:19, 191:1, 191:3, 208:14, 220:2, 221:17, 238:5, 246:19, 253:19, 271:8
**duties** [6] - 46:1, 204:12, 237:23, 238:4, 239:2, 270:5
**duty** [15] - 75:9, 75:11, 75:14, 75:15, 75:18, 75:19, 76:2, 76:16, 103:5, 103:8, 103:12, 103:15, 209:17, 217:6, 225:20

## E

**EAJ** [1] - 1:2
**early** [8] - 21:21, 63:11, 64:11, 66:17, 85:16, 143:23, 238:13, 272:3
**easier** [2] - 117:11, 258:5
**easily** [2] - 162:14, 187:25
**east** [7] - 69:1, 189:8, 213:12, 217:25, 263:18, 264:1, 264:7
**easy** [1] - 252:6
**educated** [2] - 103:1, 103:2
**effect** [1] - 51:14
**effectuated** [1] - 256:22
**effort** [1] - 65:18
**efforts** [1] - 132:1
**eight** [2] - 13:22, 14:8
**either** [23] - 8:13, 19:4, 33:2, 90:13, 90:15, 135:15, 138:3, 138:21, 139:3, 146:11, 162:19, 164:16, 174:15, 190:18, 191:2, 198:9, 206:4, 206:24, 209:16, 228:25, 230:22, 231:6, 235:24
**elapsed** [1] - 201:7

**eliminate** [1] - 168:14
**elimination** [1] - 100:16
**ELMO** [7] - 38:15, 110:8, 152:12, 152:19, 193:23, 202:7, 258:6
**emblem** [3] - 230:20, 235:8, 235:9
**employed** [2] - 237:17, 237:20
**employer** [1] - 51:8
**enable** [1] - 270:9
**encounter** [2] - 245:8, 246:20
**encounters** [1] - 98:25
**end** [10] - 42:23, 66:9, 116:18, 163:16, 166:15, 167:12, 239:19, 250:7, 259:24, 272:17
**ended** [1] - 46:23
**enforcement** [13] - 8:19, 43:11, 43:14, 46:4, 53:12, 61:14, 64:25, 88:6, 90:14, 172:23, 218:12, 238:11, 239:8
**Enforcement** [16] - 53:8, 53:14, 55:2, 56:20, 58:4, 60:3, 60:4, 64:17, 83:13, 83:21, 138:8, 219:22, 239:7, 240:4, 241:8, 253:22
**engage** [1] - 59:23
**enhanced** [2] - 196:3, 196:11
**entered** [1] - 56:8
**entering** [1] - 53:13
**enterprise** [1] - 42:15
**entertainment** [1] - 235:18
**Entertainment** [2] - 235:20
**entire** [6] - 74:19, 74:24, 154:19, 156:7, 168:20, 233:25
**entirely** [1] - 117:3
**entirety** [1] - 69:17
**entrance** [2] - 222:17, 223:1
**entry** [3] - 191:17, 193:2, 193:12
**equal** [1] - 101:12
**equipment** [5] - 100:1, 135:1, 136:16,

145:1, 235:24
**especially** [3] - 167:1, 178:2, 248:6
**essence** [5] - 164:25, 165:2, 167:7, 170:7, 170:17
**essentially** [1] - 251:21
**established** [1] - 84:23
**estimate** [1] - 69:3
**estimating** [1] - 64:2
**estimation** [1] - 272:18
**Ethon** [1] - 83:19
**evening** [5] - 149:7, 163:25, 224:18
**EVENS** [1] - 1:7
**Evens** [8] - 8:11, 72:4, 72:11, 169:8, 208:24, 244:2, 244:14
**event** [3] - 12:22, 13:1, 273:1
**eventually** [4] - 87:13, 118:25, 203:18, 264:21
**EVIDENCE** [23] - 17:22, 49:10, 56:6, 58:16, 70:8, 71:5, 73:7, 78:4, 89:9, 91:16, 93:22, 96:3, 191:23, 193:9, 193:20, 202:4, 205:15, 208:9, 210:21, 211:12, 227:16, 250:3, 258:3
**evidence** [32] - 22:16, 23:7, 49:7, 52:8, 56:1, 56:9, 57:15, 58:8, 70:5, 70:25, 72:18, 72:25, 78:1, 83:7, 87:4, 91:13, 93:16, 95:25, 165:11, 184:1, 184:6, 193:24, 195:5, 201:25, 205:10, 207:1, 207:10, 208:3, 210:18, 211:9, 227:9, 249:21
**evidentiary** [3] - 136:19, 168:3, 204:14
**exact** [3] - 69:13, 79:16, 170:6
**exactly** [9] - 50:11, 106:13, 118:8, 127:20, 213:17, 250:21, 264:20, 267:21, 269:4
**examination** [12] - 20:12, 40:7, 101:22,

124:9, 163:1, 195:10, 195:12, 195:13, 223:11, 233:2, 255:7, 273:4
**EXAMINATION** [32] - 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:11, 3:12, 3:13, 3:14, 3:15, 3:16, 3:18, 3:19, 3:20, 3:21, 7:19, 20:17, 40:13, 42:5, 45:5, 50:25, 53:5, 101:24, 124:6, 200:18, 217:2, 219:19, 224:14, 233:5, 237:15, 255:13
**examine** [1] - 252:23
**examined** [7] - 7:18, 44:21, 52:21, 219:11, 224:5, 237:6, 253:25
**examining** [1] - 79:13
**example** [7] - 172:9, 177:13, 180:5, 184:2, 208:19, 262:7, 263:16
**examples** [2] - 188:2, 188:3
**Excel** [1] - 235:20
**except** [2] - 139:24, 174:19
**exchange** [1] - 19:18
**exclusive** [1] - 225:17
**exclusively** [2] - 67:21, 142:23
**excuse** [18] - 32:22, 33:19, 86:21, 95:15, 103:2, 123:12, 125:14, 127:1, 127:25, 129:5, 129:7, 132:5, 133:25, 137:1, 138:13, 152:11, 158:18, 227:10
**excused** [2] - 52:1, 236:17
**executive** [1] - 46:3
**Exhibit** [97] - 4:2, 15:1, 16:24, 17:5, 17:14, 19:20, 37:24, 39:2, 49:1, 49:7, 51:6, 55:15, 55:18, 56:1, 57:17, 57:24, 58:2, 69:21, 69:23, 70:5, 70:13, 70:16, 71:17, 71:20, 71:21, 72:1, 72:5, 72:18, 73:9, 73:20, 73:22, 73:24, 75:16, 75:17, 75:22, 76:5, 77:11, 77:14, 83:6, 83:11, 83:15, 83:18, 83:19, 83:23,

88:21, 91:6, 91:8, 93:6, 93:9, 95:14, 95:20, 97:20, 98:1, 102:5, 102:8, 104:6, 104:21, 104:23, 107:18, 111:1, 114:21, 115:12, 153:7, 153:20, 155:1, 155:11, 155:21, 156:2, 156:16, 156:22, 160:10, 160:12, 200:21, 203:8, 204:22, 205:4, 205:10, 205:25, 206:25, 207:20, 208:2, 210:13, 210:18, 211:4, 211:9, 217:17, 222:9, 222:10, 222:22, 227:2, 233:9, 249:12, 249:21, 250:5, 250:19, 252:1, 257:23

**exhibit** [15] - 17:20, 49:16, 56:8, 57:18, 57:19, 102:7, 109:20, 114:18, 153:24, 192:21, 210:10, 210:12, 210:13, 227:24, 228:11

**EXHIBIT** [18] - 17:22, 49:10, 56:6, 70:8, 71:5, 78:4, 89:9, 91:16, 93:22, 96:3, 191:23, 193:9, 193:20, 205:15, 208:9, 210:21, 211:12, 227:16

**exhibits** [10] - 57:5, 58:3, 71:18, 82:23, 109:18, 124:11, 153:23, 217:8, 227:18, 227:22

**EXHIBITS** [7] - 4:1, 4:5, 58:15, 73:6, 202:3, 250:2, 258:2

**Exhibits** [9] - 57:10, 58:9, 83:10, 97:20, 99:14, 152:16, 201:19, 222:6, 257:22

**exist** [1] - 214:14

**exit** [5] - 118:19, 118:24, 241:17, 241:18, 258:18

**exited** [2] - 245:13, 257:1

**expect** [1] - 116:24

**expecting** [2] - 116:12, 116:13

**expedite** [1] - 258:6

**expense** [1] - 178:17

**experience** [6] - 53:13, 101:7, 113:5, 117:12, 117:19, 252:15

**expert** [1] - 274:3

**explain** [4] - 85:6, 96:19, 147:4, 164:25

**explained** [9] - 23:5, 30:21, 116:17, 117:4, 132:21, 139:7, 151:4, 182:9, 186:14

**explains** [1] - 133:7

**exposure** [1] - 178:21

**extensively** [1] - 190:24

**extent** [2] - 273:4, 274:9

**extra** [1] - 188:25

**eye** [1] - 30:2

## F

**F1** [1] - 192:16

**face** [28] - 8:4, 62:11, 137:3, 137:13, 142:24, 144:21, 146:3, 147:7, 151:17, 152:5, 158:14, 158:23, 166:6, 168:15

**face-to-face** [14] - 8:4, 62:11, 137:3, 137:13, 142:24, 144:21, 146:3, 147:7, 151:17, 152:5, 158:14, 158:23, 166:6, 168:15

**facility** [5] - 55:6, 55:21, 58:25, 68:24, 69:2

**facing** [1] - 264:8

**fact** [26] - 65:3, 65:8, 78:20, 85:14, 86:9, 90:6, 108:21, 117:18, 133:9, 142:7, 145:22, 146:18, 149:8, 172:19, 177:7, 177:8, 177:21, 182:16, 182:23, 185:24, 207:10, 228:5, 230:6, 231:6, 240:8, 268:5

**facts** [1] - 187:25

**Fahrenheit** [1] - 79:6

**fair** [3] - 114:1, 215:5, 265:2

**fairly** [11] - 7:2, 21:2, 21:4, 55:22, 66:5, 70:1, 89:1, 89:2, 91:8, 243:25, 249:16

**familiar** [22] - 9:23, 11:7, 15:18, 40:18, 56:10, 69:5, 97:15, 98:18, 98:21, 98:25, 99:12, 101:8, 113:4, 118:15, 118:21, 153:18, 189:12, 193:25, 195:8, 231:21, 257:11, 269:15

**familiarity** [1] - 99:1

**far** [22] - 8:10, 9:7, 69:11, 74:4, 84:20, 88:1, 89:23, 89:25, 97:16, 137:13, 141:1, 149:6, 160:6, 161:7, 168:17, 169:3, 178:9, 180:2, 180:22, 221:22, 270:14, 270:18

**fashion** [2] - 15:19, 77:8, 88:12, 199:4, 244:23

**fast** [1] - 81:16

**fax** [1] - 108:25

**federal** [1] - 7:9

**felon** [2] - 196:2, 196:10

**felt** [4] - 150:7, 182:12, 231:14, 232:1

**female** [1] - 185:3

**few** [3] - 137:21, 187:24, 273:11

**field** [1] - 253:2

**fifty** [3] - 16:4, 49:22, 232:22

**fifty-four** [1] - 232:22

**fight** [1] - 264:18

**figure** [1] - 25:10

**file** [2] - 36:2, 48:18

**filed** [2] - 194:12, 196:9

**finally** [2] - 203:1, 266:1

**financial** [1] - 15:17

**fine** [9] - 81:4, 81:8, 81:10, 124:21, 147:11, 186:23, 258:11, 268:2, 268:23

**finish** [5] - 66:7, 158:8, 159:4, 164:6, 192:9

**finished** [1] - 272:23

**finishing** [1] - 8:17

**first** [49] - 32:3, 37:11, 40:21, 49:15, 63:21, 66:16, 66:21, 71:22, 72:8, 73:16, 100:9, 109:4, 116:8, 125:3, 129:2, 154:9, 154:15, 155:2, 155:3, 155:4, 155:12, 155:13, 155:14, 155:16, 155:17, 155:23, 155:24, 156:3, 156:5, 156:9, 156:17, 156:23, 156:25, 161:8, 162:20, 182:5, 184:22, 225:24, 239:14, 239:15, 248:2, 251:6, 252:3, 255:9, 255:16, 256:6, 258:13, 258:18, 259:3

**fit** [2] - 146:5, 273:23

**Fitness** [2] - 262:24, 263:10

**five** [13] - 14:11, 22:4, 22:6, 24:13, 32:20, 96:16, 104:10, 181:3, 181:6, 182:2, 251:6

**FL** [5] - 1:18, 1:21, 1:24, 2:3, 2:6

**fleet** [1] - 46:3

**flew** [8] - 24:12, 24:22, 25:3, 32:19, 32:21, 33:2, 33:8

**flexible** [1] - 113:7

**flight** [15] - 94:11, 225:25, 226:4, 226:11, 226:23, 226:24, 227:6, 228:3, 228:8, 228:20, 232:10, 232:13, 232:16, 232:21, 234:3

**flights** [1] - 226:14

**floor** [7] - 56:16, 248:3, 248:5, 248:10, 250:14, 250:22, 251:9

**FLORIDA** [1] - 1:1

**Florida** [34] - 2:6, 12:24, 64:19, 65:13, 77:20, 87:17, 87:20, 89:22, 99:21, 106:24, 106:25, 114:16, 116:15, 187:12, 187:13, 189:7, 189:8, 189:13, 189:17, 189:23, 190:23, 202:19, 202:20, 208:20, 212:13, 217:19, 220:6, 226:1, 232:10, 237:18, 237:23, 238:5, 253:7, 270:6

**flowers** [2] - 213:13

**flown** [1] - 204:10

**fly** [11] - 12:18, 25:6, 25:21, 25:25, 33:15, 35:16, 182:12, 182:16, 225:8, 225:12, 225:13

**flying** [4] - 33:19, 43:8, 43:9, 182:10

**FOB** [1] - 109:6

**follow** [6] - 13:17, 53:21, 53:25, 59:14, 87:9, 142:6

**follow-up** [4] - 53:21, 53:25, 59:14, 142:6

**followed** [7] - 13:16, 18:22, 61:11, 87:13, 87:16, 142:2, 243:1

**following** [2] - 9:1, 55:1

**FOLLOWING** [3] - 80:4, 160:14, 213:4

**FOLLOWS** [6] - 82:2, 82:12, 123:14, 163:9, 214:22, 216:18

**follows** [6] - 7:18, 44:21, 52:21, 219:11, 224:5, 237:6

**Food** [2] - 108:1, 108:6

**footprints** [2] - 248:12, 248:18

**FOR** [1] - 1:1

**force** [2] - 182:20, 238:19

**forced** [1] - 127:21

**foregoing** [1] - 274:16

**forensic** [2] - 83:12, 83:20

**forfeited** [1] - 60:20

**forklifts** [1] - 248:15

**form** [7] - 74:1, 75:7, 75:13, 75:15, 76:1, 159:16, 250:16

**Fort** [16] - 18:7, 18:11, 45:23, 46:2, 46:16, 48:10, 48:15, 50:4, 51:3, 92:5, 93:13, 224:24, 229:15, 229:18

**forth** [2] - 84:14, 238:20

**forward** [3] - 6:13, 6:23, 44:12

**foundation** [3] - 128:13, 199:10, 214:16

**four** [13] - 24:12, 55:19, 55:23, 56:12, 56:14, 58:18, 96:16, 114:21, 181:3, 182:1, 184:18, 220:23, 232:22

**fourth** [1] - 189:2
**Franklin** [13] - 66:1, 67:1, 67:5, 68:2, 68:5, 118:16, 118:17, 239:20, 240:3, 240:8, 241:2, 258:15, 259:4
**freight** [4] - 11:8, 11:9, 11:23, 12:1
**frequency** [1] - 63:25
**friend** [2] - 16:9, 47:11
**front** [28] - 8:11, 95:6, 102:7, 109:23, 115:4, 115:9, 118:22, 143:11, 152:9, 152:15, 153:24, 154:2, 212:4, 222:11, 223:3, 233:10, 234:1, 244:9, 246:25, 248:21, 248:22, 250:7, 255:18, 255:19, 258:7, 262:22, 263:10, 269:7
**frontage** [1] - 262:17
**frozen** [2] - 77:4, 249:5
**fugitives** [1] - 238:4
**full** [9] - 72:2, 72:11, 142:21, 143:5, 144:23, 145:1, 208:24, 209:7, 225:15
**full-time** [4] - 142:21, 143:5, 144:23, 145:1
**function** [1] - 48:14
**funds** [12] - 59:25, 60:5, 60:8, 60:15, 60:18, 60:20, 61:5, 61:8, 61:12, 62:1, 164:18, 166:4
**future** [2] - 63:15, 64:3

## G

**game** [1] - 35:3
**garage** [2] - 222:12, 222:19
**gas** [3] - 86:15, 86:20, 87:11
**gate** [1] - 18:23
**gather** [2] - 107:13, 186:16
**gender** [1] - 95:1
**generally** [7] - 54:4, 59:16, 74:10, 248:7, 252:17, 254:2, 271:3
**gentleman** [5] - 50:9, 229:2, 229:7, 229:9, 244:11

**gentlemen** [11] - 6:10, 6:14, 47:1, 51:11, 82:4, 104:19, 123:22, 153:3, 216:13, 249:24, 272:3
**given** [9] - 60:8, 60:10, 60:12, 86:14, 116:12, 141:2, 150:16, 214:8, 228:2
**glad** [1] - 7:10
**glare** [1] - 97:5
**glaring** [1] - 74:8
**goal** [1] - 64:12
**goals** [1] - 267:15
**God** [6] - 7:4, 44:16, 52:16, 219:6, 223:25, 237:1
**gold** [5] - 202:9, 202:14, 202:17, 240:19, 256:6
**Gopie** [3] - 228:18, 234:14, 235:18
**government** [25] - 22:2, 31:20, 38:21, 57:18, 70:4, 77:25, 80:7, 110:15, 114:18, 114:21, 152:10, 153:23, 157:10, 160:19, 162:10, 168:12, 169:19, 194:18, 194:23, 196:9, 207:8, 213:17, 214:10, 233:13, 272:17
**Government** [22] - 1:16, 57:24, 58:1, 58:9, 71:21, 75:17, 83:9, 83:11, 83:15, 83:19, 83:22, 91:12, 102:8, 104:6, 104:21, 104:23, 104:24, 107:18, 152:15, 155:10, 160:10, 222:10
**government's** [6] - 109:18, 111:2, 152:21, 191:18, 196:1, 214:25
**Government's** [72] - 15:1, 15:8, 16:24, 17:5, 19:20, 49:1, 49:6, 51:5, 55:15, 55:18, 55:25, 57:9, 69:21, 69:23, 70:5, 70:13, 70:16, 71:17, 71:20, 71:25, 72:5, 72:17, 73:9, 73:20, 75:16, 75:22, 76:5, 77:10, 77:14, 83:6, 83:18, 88:21, 89:5,

91:6, 91:8, 93:6, 93:9, 95:14, 95:20, 97:25, 99:14, 102:5, 102:17, 105:8, 105:14, 107:17, 112:14, 114:21, 115:12, 153:7, 153:20, 155:1, 155:21, 156:2, 156:16, 156:22, 192:20, 193:3, 193:13, 200:21, 203:8, 204:21, 217:17, 222:6, 222:9, 222:22, 227:2, 233:9, 249:12, 249:21, 250:5, 252:1
**graciously** [1] - 209:22
**Graham** [1] - 80:20
**Graham's** [1] - 80:16
**Gran** [1] - 257:13
**gray** [2] - 244:25, 252:5
**great** [3] - 90:12, 133:11, 256:2
**green** [4] - 221:12, 221:13, 222:24, 252:12
**Greenwood** [2] - 121:23, 121:25
**grew** [2] - 36:24, 37:3
**ground** [1] - 232:3
**Group** [1] - 1:22
**group** [3] - 11:23, 134:23, 138:17
**grow** [1] - 39:8
**growing** [1] - 39:8
**guess** [10] - 11:12, 36:13, 67:25, 75:9, 78:18, 98:17, 151:24, 160:8, 206:21, 214:16
**guessed** [1] - 235:13
**guessing** [1] - 63:12
**guidance** [2] - 100:25, 273:10
**guilty** [5] - 23:23, 28:17, 168:24, 194:3, 194:6
**guy** [7] - 34:11, 34:18, 34:20, 39:12, 96:25, 121:10, 162:15
**guys** [5] - 27:22, 31:10, 32:23, 37:15, 90:15
**gym** [2] - 235:7, 235:8

## H

**habit** [1] - 116:12
**haggling** [1] - 50:15
**Haiti** [1] - 257:7
**half** [2] - 175:20, 246:18
**halfway** [2] - 160:9, 257:2
**hand** [27] - 6:25, 44:12, 52:12, 57:23, 78:11, 97:24, 107:4, 107:11, 107:23, 108:18, 109:11, 112:7, 112:14, 114:2, 114:10, 137:9, 145:19, 146:5, 146:6, 146:11, 157:9, 193:11, 219:2, 223:21, 234:12, 236:22, 261:23
**handcuffed** [2] - 266:20, 266:22
**handed** [2] - 48:25, 97:25
**handle** [3] - 230:22, 231:3, 254:5
**handling** [2] - 138:18, 231:9
**hands** [4] - 7:25, 34:11, 34:13, 42:24
**handwriting** [1] - 15:3
**handwritten** [1] - 75:18
**happy** [2] - 198:22, 272:15
**hard** [2] - 46:20, 143:12
**HARDAWAY** [1] - 1:8
**Hardaway** [7] - 8:12, 72:3, 169:8, 210:16, 244:2, 244:20, 245:4
**Haven** [6] - 77:19, 106:25, 217:19, 217:21, 217:24, 217:25
**head** [2] - 119:15, 261:6
**headed** [4] - 241:10, 251:21, 261:3, 265:16
**heading** [6] - 154:12, 243:24, 256:19, 258:15, 260:23, 261:12, 261:21, 263:16
**hear** [2] - 39:23, 100:18
**heard** [8] - 41:12,

88:10, 98:23, 100:19, 152:23, 178:25, 184:3, 213:25
**hearing** [5] - 72:21, 169:24, 169:25, 171:1, 255:21
**hearsay** [5] - 59:4, 59:7, 212:24, 214:1, 214:7
**heavy** [1] - 112:21
**HELD** [2] - 80:5, 160:15, 213:5
**hello** [1] - 155:6
**Hello** [2] - 155:17, 156:25
**help** [13] - 7:4, 18:18, 44:16, 52:16, 116:5, 124:11, 130:1, 177:17, 208:11, 219:6, 223:25, 230:24, 237:1
**helps** [1] - 177:14
**Hertz** [1] - 235:2
**hesitant** [1] - 81:12
**high** [3] - 90:2, 145:25, 175:18
**highlight** [1] - 234:22
**highlighted** [2] - 156:10, 156:11
**highway** [2] - 238:19, 242:19
**Highway** [14] - 64:19, 65:14, 69:10, 87:21, 89:22, 93:1, 99:21, 114:16, 190:24, 237:18, 237:24, 238:6, 253:7, 270:6
**hill** [1] - 81:21
**himself** [4] - 46:7, 66:22, 116:23, 182:2
**hint** [1] - 212:6
**hire** [2] - 225:18, 225:19
**historical** [1] - 67:10
**hold** [1] - 58:12
**Holiday** [3] - 188:12, 188:16, 188:17
**home** [3] - 139:18, 139:19, 179:25
**Home** [1] - 212:19
**Homey** [21] - 85:1, 134:14, 135:6, 135:24, 152:24, 154:18, 157:14, 157:17, 158:1, 158:6, 158:15, 159:1, 159:6, 160:20, 160:24, 162:6, 162:14, 162:15, 163:23, 218:5, 218:6

**Honor** [129] - 6:12, 7:14, 14:22, 17:1, 17:17, 19:7, 20:11, 20:14, 37:20, 38:8, 38:10, 38:14, 38:20, 40:5, 40:9, 40:12, 44:5, 45:4, 48:3, 48:6, 48:22, 49:7, 50:23, 51:20, 51:24, 54:23, 55:11, 56:1, 57:5, 58:9, 58:10, 58:13, 59:6, 70:5, 70:6, 71:1, 71:3, 72:18, 72:19, 72:23, 73:4, 78:1, 78:2, 82:20, 82:21, 83:1, 83:2, 83:5, 89:6, 89:7, 91:13, 91:18, 93:16, 93:19, 93:25, 95:15, 95:25, 97:2, 99:10, 101:18, 101:23, 105:7, 110:4, 119:19, 119:21, 120:12, 122:24, 123:7, 123:25, 124:2, 126:2, 129:7, 129:20, 157:5, 159:25, 161:19, 180:9, 191:9, 191:16, 192:4, 192:17, 193:5, 195:7, 195:15, 196:14, 196:18, 198:6, 198:25, 199:24, 200:15, 200:17, 201:15, 201:24, 205:9, 210:13, 216:8, 216:11, 217:1, 218:21, 219:18, 222:3, 223:10, 223:12, 223:13, 223:15, 224:13, 227:9, 227:11, 227:14, 227:17, 229:8, 229:10, 232:25, 233:1, 233:4, 236:11, 236:15, 237:14, 244:14, 245:4, 249:8, 249:20, 249:25, 255:3, 255:5, 255:8, 257:25, 271:24, 274:13

**HONORABLE** [1] - 1:13

**Honorable** [3] - 6:7, 6:8, 123:19

**Hop** [8] - 94:11, 224:24, 224:25, 225:3, 225:10, 225:21, 226:13, 227:5

**Hop-A-Jet** [8] - 94:11, 224:24, 224:25, 225:3, 225:10, 225:21, 226:13, 227:5

**hope** [2] - 80:11, 272:25

**hopefully** [3] - 21:7, 36:18, 261:25

**hopes** [1] - 85:13

**hoping** [3] - 21:2, 21:14, 117:13

**Hopkins** [5] - 28:6, 29:5, 29:6, 31:15, 169:13

**hotel** [2] - 137:25, 138:9

**hour** [3] - 230:13, 243:9, 243:20

**hours** [4] - 139:18, 232:15, 273:5, 273:7

**house** [2] - 24:20, 180:3

**Howard** [13] - 66:1, 67:1, 67:5, 68:2, 68:5, 118:16, 118:17, 239:19, 240:3, 240:8, 241:2, 258:15, 259:4

**HUGO** [1] - 1:19

**hump** [1] - 81:23

**hundred** [11] - 13:22, 16:4, 37:11, 49:22, 128:17, 151:21, 167:16, 175:6, 185:13, 187:22, 232:22

## I

**I-275** [1] - 239:20

**I-75** [2] - 190:6, 258:14

**ICE** [1] - 238:16

**ID** [1] - 228:6

**idea** [4] - 9:8, 9:11, 9:13, 199:14

**ideal** [2] - 90:1, 137:2

**ideas** [1] - 9:12

**identification** [19] - 39:2, 49:1, 55:16, 57:8, 57:9, 70:14, 71:17, 93:6, 95:14, 99:13, 120:23, 121:1, 122:15, 122:21, 201:19, 207:19, 211:3, 227:2, 228:19

**identified** [12] - 46:6, 54:13, 68:16, 68:18, 96:17, 98:7, 98:9, 98:10, 99:2, 110:3, 110:5, 244:17

**IDENTIFIED** [1] - 4:1

**identify** [12] - 64:12, 85:4, 100:3, 100:4, 100:7, 122:18, 127:19, 127:25, 164:14, 165:8, 244:7, 244:22

**identifying** [5] - 54:22, 128:2, 210:9, 244:13, 245:3

**identity** [1] - 84:20

**illegal** [5] - 165:11, 172:4, 172:7, 172:17, 179:20

**Illinois** [1] - 213:14

**immediately** [4] - 60:21, 61:8, 61:22, 201:6

**impartially** [1] - 7:2

**impending** [3] - 63:9, 63:11, 63:16

**implicate** [3] - 36:3, 36:6, 36:10

**important** [5] - 90:7, 90:9, 91:21, 186:4, 213:16

**imposition** [1] - 161:17

**impossible** [1] - 120:16

**impression** [2] - 149:25, 231:24

**impressions** [1] - 131:19

**imprinted** [1] - 67:17

**improper** [1] - 199:4

**IN** [2] - 6:5, 160:5

**inappropriately** [1] - 257:5

**inbound** [1] - 65:18

**INC** [2] - 106:5, 107:24

**Inc** [1] - 202:19

**inch** [1] - 146:1

**inches** [2] - 113:7, 145:25

**incident** [2] - 18:21, 119:11

**include** [2] - 71:13, 152:4

**included** [1] - 206:16

**including** [3] - 22:2, 93:10, 257:23

**incoming** [2] - 63:5, 144:15

**inconsistencies** [1] - 74:8

**inconsistent** [1] - 266:15

**Incorporated** [7] -

105:23, 106:2, 106:3, 106:8, 106:17, 107:11, 107:24

**incorrections** [1] - 153:16

**incorrectly** [1] - 75:19

**indeed** [1] - 111:20

**independent** [1] - 180:3

**INDEX** [1] - 3:1

**indicate** [6] - 42:7, 59:2, 59:10, 63:8, 96:5, 218:5

**indicated** [8] - 9:19, 76:14, 78:8, 103:4, 255:15, 256:5, 256:22, 268:25

**indication** [2] - 79:7, 246:23

**indications** [1] - 85:16

**indicted** [2] - 168:24, 169:3

**Indictment** [1] - 169:4

**individual** [10] - 86:2, 94:5, 94:14, 121:3, 121:12, 140:18, 197:25, 221:1, 221:7, 228:23

**individuals** [6] - 94:10, 100:7, 183:15, 213:19, 228:25, 229:14

**industry** [2] - 113:4, 116:12

**infiltrate** [1] - 127:25

**informant** [5] - 136:15, 174:8, 174:11, 198:10, 221:13

**informants** [6] - 61:19, 176:3, 176:10, 176:14, 176:17, 177:21

**Information** [3] - 191:18, 192:20, 193:13

**information** [29] - 9:14, 10:13, 14:19, 23:12, 41:18, 59:13, 67:3, 67:10, 74:9, 76:7, 77:17, 79:17, 84:3, 92:23, 93:11, 100:20, 117:8, 175:14, 179:5, 179:8, 180:18, 182:3, 182:15, 183:15, 186:17, 189:16,

198:3, 240:22

**informed** [1] - 246:10

**infuse** [1] - 134:5

**ing** [1] - 251:3

**initial** [9] - 59:19, 96:12, 141:25, 169:22, 176:1, 194:24, 231:1, 245:7, 245:8

**initials** [2] - 96:18, 96:24

**initiating** [1] - 155:3

**Inn** [3] - 188:12, 188:16, 188:17

**inquire** [7] - 45:3, 53:3, 80:6, 164:2, 219:17, 224:12, 237:13

**inquiry** [3] - 51:12, 51:18, 236:9

**inside** [7] - 60:2, 61:13, 65:4, 91:1, 114:17, 115:24, 252:5

**insisted** [2] - 126:21, 141:2

**inspection** [1] - 78:15

**instance** [1] - 254:16

**instead** [3] - 43:8, 93:24, 243:10

**instruct** [3] - 145:17, 146:8, 146:9

**instructed** [10] - 64:5, 66:18, 85:22, 86:16, 96:13, 129:15, 131:7, 141:20, 144:9, 148:16

**instruction** [1] - 25:25

**instructions** [8] - 25:21, 86:14, 143:25, 144:6, 167:3, 273:13, 273:19, 273:24

**instructor** [1] - 238:19

**instrument** [1] - 269:12

**interaction** [3] - 124:15, 150:18, 182:22

**intercept** [1] - 239:20

**interdict** [1] - 238:4

**interdicting** [1] - 238:13

**interdiction** [2] - 238:1, 238:20

**interest** [1] - 218:18

**interested** [2] - 156:9, 157:17

**International** [2] - 13:18, 18:22
**interpreter** [3] - 6:19, 7:3, 7:9
**INTERPRETER** [7] - 6:20, 6:22, 7:5, 7:8, 7:12, 121:18, 121:25
**interrupt** [1] - 80:1
**intersection** [7] - 119:1, 119:6, 262:4, 262:5, 264:22, 265:6, 265:9
**interstate** [1] - 241:18
**Interstate** [1] - 118:24
**interview** [7] - 134:4, 134:8, 184:10, 184:12, 215:17, 216:3, 266:14
**interviewed** [3] - 124:15, 266:10, 266:11
**interviewing** [1] - 184:10
**intimidated** [1] - 267:10
**INTO** [23] - 17:22, 49:10, 56:6, 58:15, 70:8, 71:5, 73:6, 78:4, 89:9, 91:16, 93:22, 96:3, 191:23, 193:9, 193:20, 202:3, 205:15, 208:9, 210:21, 211:12, 227:16, 250:3, 258:2
**introduce** [1] - 38:22
**introduced** [12] - 34:18, 34:20, 50:12, 152:9, 155:21, 156:16, 156:22, 157:10, 162:10, 195:4, 196:8, 210:7
**introduction** [3] - 191:20, 193:6, 193:16
**investigation** [44] - 53:17, 53:22, 54:1, 54:3, 54:10, 59:14, 60:14, 60:24, 61:1, 61:20, 62:9, 62:23, 63:3, 64:11, 64:18, 65:16, 69:5, 84:19, 92:3, 94:9, 94:19, 95:9, 97:9, 97:14, 97:16, 116:3, 124:14, 127:15, 134:24, 138:4, 139:14, 147:17, 148:20, 151:18, 165:6, 168:16, 168:20,

172:18, 172:23, 194:7, 204:3, 218:15, 220:2, 271:8
**investigations** [7] - 54:6, 136:25, 176:3, 176:5, 176:13, 238:7, 239:4
**investigative** [7] - 54:9, 59:22, 62:5, 64:8, 79:21, 84:8, 170:2
**involved** [8] - 14:13, 19:11, 54:7, 59:20, 64:13, 133:19, 150:21, 151:1
**involvement** [3] - 7:25, 12:1, 63:2
**involving** [3] - 61:19, 150:20, 176:4
**Irvine** [14] - 76:11, 102:15, 102:16, 104:4, 104:8, 104:13, 104:20, 104:24, 105:2, 108:9, 108:12, 108:15, 215:9, 215:18
**isabella** [1] - 151:12
**issued** [1] - 191:6
**issues** [3] - 82:6, 120:3, 272:6
**it'd** [1] - 143:11
**item** [4] - 46:12, 109:13, 111:7, 252:11
**items** [5] - 77:17, 77:21, 215:23, 235:24, 236:2
**itinerary** [1] - 234:8
**itself** [5] - 113:9, 130:15, 201:13, 248:4, 248:12
**Ivette** [1] - 83:11

## J

**Jacko** [2] - 181:20, 181:22
**jacko** [1] - 181:23
**jail** [19] - 31:23, 36:18, 41:4, 41:6, 41:14, 41:23, 41:25, 125:5, 159:13, 159:15, 170:17, 170:22, 170:24, 178:3, 178:21, 184:11, 184:12, 184:15, 186:5
**JAMES** [1] - 1:16
**James** [2] - 169:12
**January** [1] - 1:6
**Jean** [4] - 8:11,

244:2, 244:14
**jEAN** [1] - 1:7
**jeopardize** [1] - 170:20
**Jermaine** [1] - 169:13
**Jersey** [4] - 121:16, 121:19, 121:24, 122:1
**Jet** [8] - 94:11, 224:24, 224:25, 225:3, 225:10, 225:21, 226:13, 227:5
**jet** [3] - 225:4, 225:5, 225:6
**jets** [2] - 225:2
**jewelry** [12] - 197:21, 197:22, 198:1, 198:3, 198:5, 198:13, 198:16, 198:20, 199:19, 200:7
**Jim** [1] - 81:9
**job** [2] - 117:10, 225:3
**John** [1] - 169:8
**joined** [1] - 228:20
**Jolly** [1] - 83:20
**jolly** [1] - 83:25
**JORGE** [1] - 1:22
**Jr** [1] - 259:15
**Judge** [12] - 6:20, 6:22, 80:16, 80:20, 81:21, 86:24, 160:8, 163:13, 211:8, 223:17, 257:21, 273:2
**judge** [12] - 17:13, 52:4, 56:23, 79:25, 80:15, 122:8, 207:8, 210:17, 213:8, 272:13, 273:9
**JUDGE** [1] - 1:13
**June** [1] - 220:19
**jurisdictional** [1] - 238:18
**jurors** [3] - 82:9, 123:16, 216:15
**JURY** [16] - 1:12, 6:4, 6:11, 82:10, 82:15, 120:7, 123:17, 123:23, 195:23, 216:16, 216:21, 272:10
**jury** [44] - 6:3, 13:1, 14:5, 15:22, 22:23, 36:9, 45:22, 48:1, 54:4, 54:16, 58:13, 59:17, 61:4, 82:14, 85:20, 94:21, 102:18, 102:21, 103:1, 103:3, 105:21, 106:15, 120:4, 120:6, 145:8,

153:3, 154:16, 155:4, 155:12, 155:23, 156:17, 156:24, 157:12, 162:11, 162:12, 194:14, 195:18, 208:11, 230:17, 242:8, 272:7, 272:9, 273:12, 273:23
**jury's** [1] - 216:19
**JUSTIN** [2] - 3:10, 52:18
**justin** [1] - 52:3
**Justin** [3] - 53:1, 220:1, 224:21
**justly** [1] - 7:2

## K

**K-9** [1] - 238:14
**Kansas** [1] - 213:14
**Kaseem** [3] - 46:7, 49:4, 94:4
**Kathleen** [3] - 35:5, 35:8, 149:14
**Kathy** [1] - 35:4
**keep** [4] - 183:7, 259:13, 267:17, 269:21
**Kennedy** [1] - 86:15
**kept** [5] - 48:14, 189:21, 209:12, 226:16, 228:3
**Kettering** [2] - 102:14, 108:9
**Kevin** [9] - 16:11, 18:3, 18:4, 18:16, 18:18, 50:5, 50:13, 51:8
**kids** [1] - 143:17
**kilogram** [2] - 101:10, 101:12
**kilograms** [2] - 101:8, 101:14
**kind** [6] - 16:17, 68:13, 100:23, 111:21, 112:25, 156:3, 231:15, 265:2
**King** [1] - 259:15
**knock** [1] - 20:6
**knocked** [2] - 41:9, 41:21
**knowing** [3] - 28:21, 64:15, 147:24
**knowledge** [1] - 150:11
**known** [4] - 64:16, 160:19, 196:25, 244:19
**knows** [6] - 160:21,

160:25, 161:12, 166:24, 167:11, 203:25
**Kurmay** [1] - 169:12

## L

**L-A-N-E-S-E** [1] - 237:12
**labeled** [6] - 57:17, 71:21, 72:7, 77:4, 77:16, 102:8
**laboratory** [3] - 56:21, 58:4, 70:22
**ladies** [6] - 6:9, 82:4, 123:21, 153:2, 216:13, 272:3
**lading** [5] - 204:18, 210:24, 211:16, 271:2, 271:6
**ladings** [1] - 213:9
**lady** [2] - 184:24, 185:23
**laid** [1] - 56:15
**LANCE** [2] - 3:8, 44:18
**Lance** [3] - 44:9, 45:1, 92:4
**landing** [1] - 230:8
**lane** [5] - 242:16, 242:17, 262:3, 265:5
**lanes** [4] - 242:14, 242:18, 262:2
**Lanese** [20] - 65:14, 65:25, 66:10, 67:4, 67:12, 67:19, 67:20, 68:2, 87:22, 114:16, 114:23, 236:20, 237:11, 237:17, 239:1, 247:2, 249:11, 255:15, 271:25, 274:11
**LANESE** [2] - 3:20, 237:3
**Lanese's** [1] - 100:5
**large** [3] - 176:24, 177:1, 253:6
**Largo** [4] - 53:16, 58:25, 116:14, 118:22
**Las** [11] - 25:1, 25:3, 25:6, 25:22, 25:25, 26:2, 33:2, 43:9, 182:7, 182:13, 182:14
**last** [20] - 44:25, 52:25, 53:2, 80:17, 103:21, 104:16, 118:16, 132:25, 170:15, 194:21, 194:22, 197:9,

197:14, 199:2, 219:15, 224:9, 233:22, 237:10, 237:12, 273:12

**late** [4] - 102:3, 194:10, 232:15, 239:25

**Lauderdale** [16] - 18:8, 18:11, 45:23, 46:2, 46:16, 48:10, 48:15, 50:4, 51:3, 92:5, 92:6, 93:13, 224:24, 229:15, 229:18

**launched** [1] - 116:3

**Law** [2] - 1:22, 2:1

**law** [16] - 8:19, 43:11, 43:14, 46:4, 53:12, 61:14, 64:25, 90:14, 170:11, 172:14, 172:21, 172:22, 172:24, 173:2, 218:12, 238:10

**lawyer** [4] - 32:3, 169:18, 229:7

**lay** [1] - 214:16

**layer** [3] - 248:21, 252:3, 252:19

**laying** [1] - 248:10

**lays** [1] - 171:25

**lead** [1] - 96:25

**leading** [2] - 53:18, 239:23

**leafy** [1] - 252:13

**learn** [2] - 10:22, 68:1

**learned** [5] - 40:21, 41:3, 41:18, 42:8, 240:7

**leased** [1] - 151:9

**least** [21] - 32:20, 67:14, 69:14, 90:12, 103:4, 103:16, 103:25, 104:17, 106:20, 118:4, 119:10, 134:19, 142:20, 147:18, 150:10, 158:5, 218:6, 229:21, 232:14, 251:6

**leave** [1] - 163:1

**ledgers** [1] - 30:22

**Lee** [1] - 274:21

**lee** [1] - 2:4

**LEE** [1] - 274:21

**Leer** [1] - 225:2

**left** [22] - 8:10, 8:16, 78:11, 107:11, 107:23, 109:11, 112:7, 112:13, 114:2, 119:3, 119:8, 200:22,

227:19, 227:22, 242:11, 243:12, 256:18, 261:7, 262:2, 265:4, 265:16

**left-hand** [6] - 78:11, 107:11, 107:23, 109:11, 112:7, 114:2

**leg** [1] - 229:25

**legal** [2] - 106:4, 171:23

**legally** [1] - 125:18

**legitimate** [2] - 206:10, 213:18

**less** [4] - 36:18, 167:5, 192:8, 241:19

**letters** [2] - 67:18, 116:25

**level** [1] - 238:2

**license** [8] - 92:15, 92:23, 93:4, 93:11, 93:12, 94:3, 120:15, 245:12

**lie** [1] - 177:7

**lieu** [1] - 83:24

**lights** [2] - 241:19, 243:5

**likely** [2] - 117:24, 117:25

**limited** [2] - 113:5, 174:10

**limo** [1] - 232:8

**line** [12] - 76:14, 155:13, 155:17, 155:24, 156:1, 156:5, 156:6, 156:25, 157:1, 157:3, 223:7, 242:16

**Line** [1] - 268:9

**lines** [6] - 155:3, 155:4, 155:12, 155:23, 156:4, 156:23

**lineup** [5] - 94:23, 95:12, 95:22, 96:6, 96:7

**ling** [1] - 165:3

**list** [9] - 192:21, 210:13, 225:17, 228:2, 228:4, 228:14, 229:1, 234:13

**listed** [2] - 108:3, 108:22

**listen** [2] - 99:23, 136:20

**listened** [7] - 99:4, 99:6, 99:24, 100:10, 133:19, 151:25, 152:2

**listening** [2] - 115:2, 146:19

**litany** [1] - 42:11

**literal** [1] - 113:15

**live** [1] - 121:15

**lived** [1] - 28:5

**lives** [2] - 189:19, 189:20

**load** [31] - 30:17, 34:4, 40:17, 41:1, 63:5, 63:9, 63:11, 63:16, 64:6, 64:9, 64:15, 64:22, 69:18, 70:2, 70:11, 76:24, 118:11, 204:24, 239:9, 239:20, 241:22, 241:25, 245:22, 248:8, 248:23, 249:5, 251:17, 252:8, 253:6, 270:11

**load's** [1] - 270:21

**loaded** [3] - 215:21, 248:9, 248:14

**loads** [1] - 7:24

**locate** [2] - 66:2, 75:25, 117:9

**located** [11] - 58:25, 60:2, 69:8, 74:21, 102:14, 105:3, 108:12, 200:8, 247:23, 247:25, 261:18

**location** [20] - 68:7, 68:8, 68:23, 69:6, 73:10, 86:17, 87:10, 87:16, 90:22, 91:9, 97:6, 165:22, 217:6, 220:12, 220:20, 221:6, 221:8, 241:5, 241:15, 244:7

**locations** [2] - 74:4, 213:14

**lock** [2] - 113:16, 254:15

**locked** [2] - 254:4, 254:11

**locking** [2] - 112:25, 113:9

**locks** [4] - 112:24, 113:16, 254:3, 254:4

**Log** [1] - 71:22

**log** [5] - 72:8, 75:23, 207:22, 209:6, 217:16

**logistics** [1] - 143:9

**logs** [23] - 71:15, 72:24, 102:17, 102:18, 102:22, 103:4, 103:5, 103:8, 103:15, 103:17, 104:1, 104:18, 108:13, 209:11, 209:12, 209:19, 209:21, 210:1, 210:6, 210:15, 217:5,

217:10, 217:12

**look** [32] - 37:24, 48:18, 55:14, 67:12, 67:20, 73:20, 77:10, 85:9, 95:13, 132:19, 156:2, 177:9, 177:22, 191:13, 200:21, 201:20, 203:15, 204:5, 205:4, 208:19, 210:8, 212:6, 212:7, 212:12, 212:18, 249:12, 252:11, 255:24, 261:11, 268:5, 268:8, 269:9

**looked** [5] - 39:9, 96:7, 249:1, 257:17, 264:5

**looking** [24] - 30:12, 73:22, 102:4, 109:22, 110:11, 126:9, 132:15, 153:25, 157:16, 179:2, 220:25, 221:3, 221:8, 221:10, 221:11, 222:21, 233:25, 255:17, 259:23, 260:2, 260:4, 261:20, 262:19, 264:3

**lookout** [1] - 239:24

**Looks** [1] - 96:25

**looks** [8] - 75:6, 76:11, 96:9, 212:19, 262:25, 264:7, 265:2, 273:22

**loose** [2] - 250:13, 250:15

**losing** [2] - 43:3, 90:3

**lost** [1] - 42:25

**luggage** [3] - 230:1, 230:3, 231:4

**lumped** [1] - 207:20

**lunch** [1] - 272:23

**LUNCHEON** [1] - 123:13

**lunchtime** [1] - 274:2

**lure** [1] - 167:24

**Luther** [1] - 259:15

**lying** [2] - 136:10, 187:20

## M

**mad** [1] - 43:8

**Madeline** [1] - 52:5

**mailbox** [1] - 266:3

**main** [1] - 177:16

**maintain** [7] - 48:11, 62:15, 62:20, 93:4,

226:13, 226:20, 240:4

**maintained** [1] - 62:7

**maintaining** [1] - 242:17

**major** [2] - 118:20, 119:10

**majority** [8] - 124:18, 135:3, 137:20, 139:6, 139:11, 152:3, 161:11, 174:13

**males** [5] - 240:21, 256:8, 256:9, 256:20

**mall** [1] - 13:12

**Mall** [9] - 13:19, 18:22, 189:3, 189:8, 189:11, 189:12, 189:14, 191:3, 200:8

**mama** [2] - 34:24, 34:25

**man** [3] - 40:2, 197:23, 198:8

**manifests** [1] - 71:13

**manipulators** [1] - 177:22

**manner** [1] - 115:20

**map** [1] - 273:6

**March** [1] - 211:18

**Maria** [1] - 83:11

**marijuana** [82] - 7:24, 8:1, 8:5, 8:8, 11:4, 11:5, 11:10, 11:17, 11:23, 12:2, 12:11, 12:14, 12:17, 12:23, 13:25, 16:8, 20:9, 24:17, 29:11, 29:12, 37:6, 37:9, 40:18, 42:14, 43:21, 55:2, 55:5, 55:7, 55:8, 55:20, 56:9, 56:18, 58:6, 58:19, 59:3, 59:11, 63:6, 64:9, 69:15, 69:18, 69:24, 70:10, 70:23, 76:23, 77:2, 78:22, 79:20, 79:24, 82:23, 83:14, 83:22, 84:7, 91:25, 111:24, 114:15, 114:17, 114:22, 115:3, 115:10, 115:15, 115:23, 126:19, 140:10, 140:13, 150:21, 182:11, 213:18, 213:21, 214:25, 220:2, 239:9, 247:22, 248:1, 248:23, 252:4, 252:12, 252:18, 252:21, 253:6

**mark** [4] - 38:24, 96:18, 163:10, 163:15

marked [24] - 37:23,
48:25, 55:15, 57:8,
57:18, 57:22, 57:23,
58:1, 71:16, 93:5,
96:24, 99:13, 155:20,
156:15, 156:21,
191:12, 192:14,
193:1, 193:12,
201:19, 205:3,
207:19, 211:3, 227:1
marking [1] - 38:22
markings [1] - 68:17
MARSHAL [2] -
123:6, 123:9
Martin [1] - 259:15
match [1] - 209:17
matches [1] - 93:12
material [1] - 85:9
matter [7] - 59:6,
120:13, 125:7,
146:18, 164:4,
172:19, 268:5
matters [1] - 258:6
McDonald's [1] -
265:12
mean [22] - 16:19,
20:22, 20:23, 21:6,
22:21, 25:21, 32:21,
39:13, 43:9, 50:19,
50:20, 60:7, 109:6,
147:3, 147:8, 170:15,
177:1, 183:18, 184:1,
186:21, 200:4, 235:8
means [5] - 54:5,
106:2, 106:5, 109:9,
202:23
meant [2] - 86:25,
179:16
meat [1] - 254:1
mechanism [5] -
112:24, 112:25,
113:9, 113:16, 113:24
median [2] - 263:1,
263:21
meet [27] - 8:21,
13:8, 13:11, 22:1,
47:9, 47:16, 59:23,
61:8, 61:21, 86:1,
86:9, 86:11, 86:14,
130:7, 137:16,
137:17, 137:19,
137:22, 137:25,
138:6, 138:8, 164:24,
180:1, 180:14,
190:21, 214:12,
256:24
meeting [31] - 61:19,
61:22, 62:11, 62:13,
98:20, 129:15, 130:9,
131:7, 134:13,

134:16, 135:4, 135:8,
135:13, 135:21,
137:3, 137:19,
138:11, 138:22,
139:1, 143:1, 143:2,
173:19, 185:1, 186:2,
186:19, 187:17,
189:1, 189:2, 189:24,
190:2, 190:23
meetings [15] -
47:19, 62:4, 62:15,
62:18, 137:5, 137:13,
139:3, 142:24, 145:5,
147:7, 151:17,
151:22, 152:5, 166:7,
168:15
MEMBERS [3] -
6:11, 123:23, 195:23
memory [4] - 97:22,
198:21, 199:22, 205:2
mention [1] - 229:23
mentioned [4] -
18:21, 80:13, 181:12,
204:17
Mercedes [13] -
16:21, 18:7, 18:11,
45:23, 46:1, 46:5,
46:11, 46:16, 48:10,
48:15, 50:3, 92:5,
93:13
mere [1] - 69:4
met [24] - 21:22,
32:22, 45:9, 45:11,
66:19, 86:5, 98:22,
121:4, 149:3, 149:6,
169:17, 170:1, 170:5,
173:16, 180:16,
181:22, 184:22,
185:21, 188:7,
188:11, 189:2,
224:18, 246:8, 257:1
metal [3] - 254:2,
254:11, 254:15
methods [2] - 11:4,
11:7
Mexican [1] - 32:23
Mexico [2] - 29:13,
32:21
Miami [9] - 1:21,
70:22, 80:17, 185:7,
185:22, 186:3,
186:19, 187:18,
220:14
microphone [2] -
146:15, 238:24
mid [2] - 272:25,
274:3
mid-morning [1] -
274:3
Middle [1] - 12:24

middle [3] - 35:7,
242:16, 263:2
MIDDLE [1] - 1:1
might [11] - 67:12,
74:9, 190:20, 202:7,
212:3, 223:4, 241:10,
258:5, 268:6, 268:7,
272:19
mile [3] - 242:23,
264:21, 265:20
miles [6] - 69:14,
118:4, 118:8, 243:9,
243:20, 246:18
minds [3] - 82:6,
120:3, 272:6
mine [1] - 15:4
minimize [1] - 274:5
minute [2] - 76:2,
255:22
minutes [2] - 192:9,
230:13
Miss [1] - 83:25
miss [1] - 202:6
mission [1] - 238:1
misspeak [1] -
106:14
misspoke [2] -
105:5, 105:14
misstates [1] -
199:16
mistake [3] - 106:10,
234:9, 234:11
mistaken [1] - 150:5
Mitch [1] - 128:24
MITCHELL [2] - 3:3,
7:15
Mitchell [95] - 7:21,
7:23, 14:25, 19:10,
20:19, 30:7, 35:6,
40:15, 44:7, 53:22,
65:10, 84:14, 86:19,
87:4, 87:9, 87:10,
87:14, 87:18, 89:20,
89:23, 125:12,
125:16, 125:17,
125:22, 126:13,
126:17, 126:21,
127:1, 127:2, 127:4,
128:24, 129:6,
130:14, 131:4, 131:8,
131:10, 131:12,
131:17, 131:20,
132:22, 133:7, 133:9,
134:13, 135:5,
135:21, 137:18,
137:25, 138:2, 138:9,
140:8, 140:12,
140:14, 140:16,
140:18, 140:19,
140:21, 140:24,

141:4, 141:8, 141:12,
141:23, 142:1,
142:10, 142:13,
149:15, 149:21,
149:25, 150:7, 150:8,
158:5, 158:12,
159:10, 159:12,
162:7, 166:3, 166:9,
169:10, 179:9,
180:25, 181:2, 182:9,
183:1, 183:4, 183:10,
183:14, 183:19,
184:5, 184:9, 186:13,
196:9, 218:8, 218:11,
218:14
Mitchell's [5] - 87:23,
149:11, 149:14,
150:9, 218:18
mixed [1] - 183:20
MLK [1] - 1:23
model [1] - 240:1
moment [16] - 19:6,
80:2, 95:16, 99:9,
103:10, 119:18,
126:6, 137:5, 140:25,
157:6, 195:6, 227:12,
255:2, 269:14,
271:24, 272:14
Monday [1] - 103:20
money [79] - 8:22,
9:3, 9:10, 10:10,
11:11, 12:3, 12:4,
12:9, 12:19, 12:23,
13:4, 13:7, 13:9,
13:15, 13:20, 15:9,
15:25, 16:5, 16:7,
19:16, 20:7, 20:8,
31:6, 31:10, 35:14,
42:18, 42:20, 42:22,
59:2, 59:10, 59:20,
59:24, 60:8, 60:11,
60:12, 60:16, 61:7,
61:9, 61:16, 61:24,
84:17, 85:3, 85:9,
85:15, 85:25, 86:2,
86:10, 86:12, 87:5,
87:11, 87:25, 88:11,
88:17, 89:15, 90:11,
90:24, 91:2, 91:9,
91:22, 91:23, 91:24,
126:18, 131:21,
131:23, 133:11,
140:9, 140:20,
141:24, 164:21,
164:22, 178:15,
178:17, 182:18,
184:19, 188:8, 189:3,
189:21, 190:21
monies [6] - 12:16,
14:17, 140:14,

150:24, 150:25, 151:1
month [3] - 134:20,
135:10, 211:20
morning [20] - 6:9,
6:11, 6:12, 6:20, 7:21,
7:22, 45:7, 45:8, 82:3,
92:8, 102:2, 102:3,
124:10, 162:21,
164:3, 272:4, 272:12,
274:3, 274:7, 274:10
most [9] - 85:17,
124:20, 153:10,
153:12, 176:23,
177:1, 238:21,
245:10, 245:16
mother [4] - 149:11,
149:14, 149:22, 150:9
mother's [1] - 35:3
Motion [1] - 193:3
motion [3] - 21:15,
36:2, 194:12
motivation [8] -
176:17, 177:7, 178:2,
178:5, 178:6, 178:8,
178:20
Motor [1] - 93:2
motoring [1] - 238:2
move [20] - 17:13,
17:19, 49:6, 55:25,
58:8, 70:4, 72:17,
89:5, 93:15, 95:24,
162:23, 164:3,
180:10, 191:20,
193:6, 193:15, 227:8,
241:4, 249:20, 258:23
moved [8] - 68:2,
68:7, 72:24, 75:3,
76:9, 251:5, 252:3
movement [4] -
12:23, 76:8, 104:1,
104:7
moves [1] - 77:25
movie [1] - 257:13
moving [5] - 70:25,
81:15, 81:18, 83:6,
91:12
MR [381] - 3:4, 3:5,
3:6, 3:7, 3:9, 3:10,
3:11, 3:12, 3:13, 3:14,
3:15, 3:17, 3:18, 3:19,
3:21, 3:22, 6:12, 6:15,
6:16, 7:14, 7:20,
14:21, 14:24, 15:5,
15:7, 16:25, 17:3,
17:9, 17:11, 17:12,
17:13, 17:16, 17:19,
17:23, 19:6, 19:9,
20:10, 20:14, 20:18,
30:11, 37:19, 37:22,
38:8, 38:14, 38:17,

38:20, 38:25, 39:3, 40:5, 40:9, 40:12, 40:14, 42:6, 44:4, 44:9, 45:4, 45:6, 48:3, 48:9, 48:21, 48:24, 49:6, 49:8, 49:11, 50:22, 51:1, 51:16, 51:20, 51:22, 51:24, 52:3, 52:10, 53:4, 53:6, 54:22, 54:25, 55:10, 55:13, 55:25, 56:2, 56:4, 56:7, 56:23, 56:25, 57:4, 57:7, 57:11, 58:8, 58:10, 58:12, 58:17, 59:4, 59:5, 59:7, 59:9, 70:4, 70:6, 70:9, 70:25, 71:3, 71:6, 72:17, 72:19, 72:22, 73:3, 73:8, 74:12, 74:15, 76:4, 76:6, 77:25, 78:2, 78:5, 78:7, 79:25, 80:6, 80:10, 80:15, 81:1, 81:4, 81:9, 81:10, 81:14, 81:17, 81:20, 81:22, 81:25, 82:20, 83:1, 83:2, 83:3, 83:5, 84:5, 88:9, 89:5, 89:7, 89:10, 89:12, 91:12, 91:14, 91:17, 91:20, 93:15, 93:17, 93:19, 93:23, 94:1, 95:15, 95:18, 95:19, 95:24, 96:1, 96:4, 97:1, 97:4, 99:9, 99:11, 101:17, 101:23, 101:25, 105:7, 105:10, 105:11, 105:13, 105:18, 105:20, 107:20, 107:22, 110:3, 110:7, 110:9, 110:23, 111:2, 111:5, 112:3, 112:6, 112:9, 112:11, 119:18, 119:21, 120:12, 120:24, 121:4, 121:10, 122:8, 122:13, 122:24, 123:24, 124:2, 124:5, 124:7, 126:1, 126:4, 129:7, 129:9, 129:19, 129:22, 132:5, 132:7, 132:8, 132:10, 132:13, 132:15, 132:16, 132:18, 152:11, 152:17, 157:5, 157:8, 159:16, 159:19, 159:23, 160:2, 160:18, 161:9, 161:18, 161:21,

162:8, 163:3, 163:14, 177:4, 177:5, 177:11, 177:19, 180:8, 180:12, 191:8, 191:11, 191:16, 191:21, 191:24, 192:1, 192:4, 192:7, 192:11, 192:13, 192:17, 192:19, 192:25, 193:5, 193:7, 193:10, 193:15, 193:17, 193:18, 193:21, 193:22, 195:7, 195:15, 195:16, 195:25, 196:14, 196:17, 196:20, 198:6, 198:7, 198:25, 199:1, 199:3, 199:6, 199:7, 199:10, 199:12, 199:16, 199:18, 199:23, 200:1, 200:12, 200:14, 200:17, 200:19, 201:15, 201:17, 201:24, 202:1, 202:5, 202:8, 205:9, 205:11, 205:16, 205:17, 207:8, 207:12, 208:2, 208:4, 208:7, 208:10, 210:12, 210:17, 210:19, 210:22, 211:8, 211:10, 211:13, 211:15, 212:23, 212:25, 213:8, 213:25, 214:3, 214:4, 214:15, 214:19, 214:23, 216:4, 216:7, 216:11, 217:1, 217:3, 218:20, 218:25, 219:18, 219:20, 222:2, 222:5, 223:9, 223:12, 223:13, 223:15, 223:19, 224:13, 224:15, 227:8, 227:10, 227:12, 227:13, 227:17, 227:21, 227:25, 229:8, 229:13, 232:24, 233:1, 233:4, 233:6, 233:18, 233:19, 233:24, 234:20, 235:1, 236:7, 236:11, 236:13, 236:15, 236:20, 237:14, 237:16, 244:13, 244:18, 245:3, 245:6, 249:7, 249:10, 249:20, 249:25, 250:4, 250:9,

250:10, 250:19, 250:23, 255:2, 255:5, 255:8, 255:12, 255:14, 257:21, 257:25, 258:4, 258:9, 258:20, 259:1, 260:16, 260:17, 271:23, 272:13, 272:16, 272:22, 273:5, 273:9, 273:18, 273:25
**MS** [1] - 233:17
**multi** [1] - 238:18
**multiple** [1] - 168:8
**must** [2] - 165:15, 228:5

# N

**N-O-E-L** [1] - 45:2
**nada** [1] - 36:12
**nah** [2] - 18:20, 33:1
**name** [50] - 7:7, 15:11, 15:13, 26:25, 27:9, 27:19, 27:20, 33:11, 35:7, 44:24, 44:25, 45:1, 47:1, 50:4, 50:13, 52:24, 52:25, 53:1, 53:2, 72:4, 72:12, 84:23, 84:24, 94:2, 94:4, 94:14, 98:7, 98:9, 148:21, 148:25, 150:9, 151:11, 151:13, 181:20, 199:2, 207:24, 208:20, 209:7, 209:8, 219:14, 219:15, 224:8, 224:9, 228:22, 237:9, 237:10, 237:12, 246:13
**named** [2] - 68:19, 221:7
**namely** [1] - 225:12
**names** [1] - 234:14
**narcotics** [6] - 167:23, 238:6, 238:14, 239:21, 246:19, 246:24
**nature** [5] - 10:7, 47:19, 74:5, 145:20, 145:21
**near** [5] - 63:15, 64:3, 201:10, 245:23, 254:9
**necessarily** [5] - 104:23, 147:10, 165:22, 204:8, 247:15
**necessary** [2] - 101:20, 195:21

**necessity** [1] - 88:11
**need** [13] - 38:10, 38:17, 52:7, 123:2, 124:25, 162:18, 165:24, 170:18, 206:21, 255:24, 273:9, 273:14, 273:16
**needed** [4] - 10:9, 80:18, 141:6, 230:1
**needs** [2] - 88:6, 142:1
**negative** [1] - 79:6
**negotiations** [1] - 46:10
**neighborhood** [1] - 37:3
**neighboring** [1] - 182:12
**nervous** [1] - 245:17
**net** [1] - 109:9
**never** [8] - 37:17, 117:9, 138:23, 175:6, 187:21, 188:22, 216:2, 246:5
**New** [4] - 121:16, 121:18, 121:24, 122:1
**new** [1] - 254:3
**newer** [1] - 241:18
**next** [32] - 13:18, 44:8, 52:2, 66:23, 74:12, 74:20, 76:4, 79:1, 80:1, 111:7, 111:16, 117:7, 137:17, 156:1, 156:6, 156:8, 177:3, 186:23, 202:13, 218:24, 223:18, 229:7, 229:24, 236:19, 241:16, 242:2, 242:3, 242:9, 244:11, 255:10, 259:14, 262:17
**nice** [1] - 121:10
**nicknames** [1] - 84:25
**night** [8] - 173:24, 174:2, 180:7, 203:1, 203:13, 220:22, 225:15, 250:8
**nights** [1] - 80:17
**Nike** [4] - 13:24, 230:20, 235:7, 235:8
**nine** [4] - 53:11, 175:21, 175:23, 232:22
**ninety** [1] - 232:22
**ninety-two** [1] - 232:22
**nobody** [2] - 25:8, 25:10

**necessity** [1] - 88:11
**NOEL** [2] - 3:8, 44:18
**Noel** [9] - 44:9, 45:1, 45:7, 45:15, 51:2, 51:5, 51:25, 92:4, 92:8
**nomenclature** [1] - 134:6
**none** [4] - 149:21, 160:21, 160:22, 162:16
**noon** [2] - 119:23, 265:2
**normal** [4] - 48:12, 113:23, 226:16, 252:8
**normally** [2] - 60:1, 270:19
**North** [5] - 1:17, 2:6, 68:22, 258:19, 265:21
**north** [1] - 261:6
**Northwest** [3] - 220:7, 220:16, 222:11
**nose** [2] - 78:21, 251:20
**note** [2] - 91:21, 213:8
**noted** [1] - 104:21
**notes** [3] - 204:13, 268:4, 274:18
**nothing** [15] - 7:17, 37:17, 44:4, 44:15, 44:20, 52:15, 52:20, 74:8, 111:24, 219:5, 219:10, 223:24, 224:4, 236:25, 237:5
**Notice** [3] - 191:19, 192:20, 193:13
**notice** [1] - 196:1, 263:20
**noticed** [2] - 256:7, 256:19
**notified** [4] - 65:11, 66:17, 67:6, 148:17
**notify** [1] - 65:16
**November** [1] - 160:11
**number** [38] - 15:9, 15:14, 17:9, 73:14, 77:23, 78:9, 80:17, 96:15, 96:17, 108:19, 108:22, 108:24, 108:25, 109:5, 109:13, 111:7, 112:12, 112:13, 112:15, 125:17, 126:15, 147:16, 151:24, 168:7, 181:4, 192:14, 194:5, 200:22, 202:22, 203:9, 205:22, 205:24, 257:17,

263:20, 270:1, 270:3, 271:4

**numbers** [5] - 73:16, 74:1, 125:21, 147:19, 202:22

**numerous** [11] - 77:3, 84:13, 110:16, 151:22, 168:9, 168:10, 180:14, 180:16, 190:8, 238:15

## O

**o'clock** [2] - 104:1, 265:3

**oatmeal** [4] - 77:21, 111:14, 215:8, 215:22

**object** [5] - 72:19, 72:23, 159:16, 171:9, 207:9

**objection** [43] - 17:16, 38:21, 49:8, 56:2, 58:10, 59:4, 59:8, 70:6, 71:2, 71:3, 73:2, 78:2, 89:7, 91:14, 93:17, 96:1, 110:5, 177:11, 180:8, 191:21, 192:1, 192:10, 193:7, 193:17, 195:7, 198:6, 198:25, 199:3, 199:10, 199:16, 202:1, 205:11, 208:4, 210:19, 211:10, 212:23, 213:23, 214:1, 227:13, 249:23, 249:24, 249:25, 257:24

**objective** [1] - 267:13

**objects** [1] - 72:23

**observations** [3] - 242:9, 245:7, 253:4

**observe** [4] - 76:24, 232:3, 240:11, 240:18

**observed** [9] - 86:19, 179:4, 240:19, 240:25, 242:10, 248:2, 248:12, 249:18, 251:7

**observing** [1] - 252:2

**obtain** [5] - 58:23, 65:6, 92:22, 99:20, 182:21

**obtained** [1] - 58:24

**obtaining** [1] - 86:12

**obvious** [2] - 98:17, 241:24

**obviously** [13] -

56:15, 64:16, 90:3, 100:15, 147:13, 161:16, 165:4, 171:9, 173:20, 175:8, 175:18, 190:13, 202:12

**occasion** [4] - 98:23, 100:17, 116:23, 224:21

**occasions** [3] - 121:5, 137:22, 139:3

**occupied** [1] - 240:21

**occur** [3] - 137:5, 137:7, 189:24

**occurred** [10] - 68:21, 69:1, 134:16, 135:8, 139:25, 140:17, 150:3, 168:16, 186:2, 246:17

**odd** [1] - 245:15

**OF** [6] - 1:1, 1:3, 1:12, 6:11, 123:23, 195:23

**OFF** [1] - 123:10

**offer** [7] - 201:25, 205:10, 208:2, 210:18, 211:8, 225:16, 257:22

**offered** [2] - 230:24, 231:3

**Office** [4] - 1:17, 2:1, 52:6, 206:5

**office** [5] - 66:18, 88:5, 88:15, 125:6, 206:4

**officer** [6] - 53:15, 80:13, 225:24, 238:16, 267:2, 274:11

**OFFICER** [13] - 6:2, 6:6, 82:8, 82:13, 82:16, 120:5, 123:15, 123:18, 216:14, 216:19, 216:22, 272:8, 274:14

**Official** [2] - 2:5, 274:22

**offload** [3] - 68:23, 243:23, 253:8

**offloaded** [1] - 69:25

**oftentimes** [4] - 54:6, 136:25, 137:4, 137:18

**old** [1] - 118:13

**once** [10] - 8:9, 30:17, 61:7, 66:7, 74:23, 87:20, 87:21, 90:10, 145:13, 187:23

**one** [137] - 13:16, 20:15, 27:4, 28:5, 28:10, 32:6, 32:9,

33:18, 33:19, 40:1, 40:15, 42:19, 47:20, 47:21, 54:7, 57:17, 60:10, 64:2, 66:24, 67:14, 70:17, 71:22, 71:23, 71:24, 72:8, 72:9, 72:10, 74:9, 75:25, 79:15, 83:9, 86:13, 87:4, 88:14, 91:1, 95:6, 96:9, 96:16, 98:8, 98:23, 101:12, 103:5, 103:7, 104:19, 109:17, 113:6, 113:23, 115:8, 116:10, 116:23, 117:7, 117:13, 117:23, 118:1, 118:15, 118:16, 118:17, 118:20, 118:22, 119:3, 119:18, 126:22, 126:25, 127:21, 128:25, 131:22, 134:20, 135:1, 135:10, 140:21, 142:16, 142:20, 145:24, 147:13, 147:14, 147:19, 148:25, 150:10, 150:18, 150:19, 150:22, 150:23, 151:6, 152:2, 154:13, 154:24, 156:8, 158:5, 161:25, 162:21, 163:3, 163:19, 165:8, 172:20, 177:16, 177:24, 181:15, 182:5, 182:6, 184:22, 185:1, 186:2, 186:23, 188:10, 189:17, 196:14, 203:22, 205:18, 207:24, 208:18, 209:15, 209:16, 211:5, 214:2, 214:3, 220:21, 221:5, 226:6, 227:10, 228:16, 229:2, 229:3, 229:4, 229:21, 229:25, 230:23, 235:5, 235:17, 242:20, 248:22, 249:2, 252:22, 260:10, 261:10, 262:1, 264:15, 269:17

**ones** [5] - 154:13, 169:3, 210:6, 210:7, 254:3

**onlooker** [2] - 109:22, 115:22

**open** [4] - 113:17, 222:12, 250:12, 254:5

**opened** [5] - 247:11, 247:14, 247:16, 248:1, 269:18

**opening** [3] - 113:24, 247:7, 247:15

**operate** [1] - 143:18

**operated** [1] - 143:21

**operation** [4] - 26:8, 26:9, 26:17, 88:6

**opinion** [2] - 257:4, 269:11

**opportunity** [10] - 48:18, 90:8, 90:21, 92:4, 153:14, 162:22, 163:16, 164:1, 175:3, 257:16

**opposed** [4] - 73:23, 95:5, 117:25, 214:9

**orange** [1] - 202:10

**orangeish** [1] - 68:13

**order** [6] - 18:7, 46:20, 108:18, 127:14, 159:15, 204:19

**ordered** [8] - 29:16, 30:17, 30:20, 46:22, 46:25, 47:1, 77:23, 111:16

**orders** [1] - 271:3

**organization** [13] - 46:13, 64:14, 88:13, 128:3, 131:17, 133:11, 133:21, 137:15, 164:17, 183:8, 183:11, 183:12, 220:3

**organization's** [1] - 182:8

**organize** [2] - 137:6, 204:14

**original** [8] - 194:10, 206:3, 206:24, 207:6, 207:9, 228:15, 228:17, 229:1

**originally** [3] - 228:7, 228:9, 251:7

**originals** [4] - 206:14, 206:19, 208:12, 209:23

**Os** [2] - 246:11, 246:13

**otherwise** [3] - 105:4, 157:24, 174:1

**outbound** [1] - 226:1

**outfit** [1] - 225:1

**outline** [2] - 167:6, 167:8

**outside** [14] - 29:25, 30:12, 122:6, 122:9, 139:22, 139:25,

140:3, 184:23, 184:25, 185:21, 192:1, 195:9, 195:11

**outstanding** [1] - 59:21

**overall** [1] - 74:3

**overhead** [5] - 93:24, 211:14, 243:5, 260:15, 260:18

**overly** [2] - 95:5, 245:17

**overpass** [2] - 119:15, 259:25

**overruled** [3] - 59:8, 73:2, 177:12

**owe** [3] - 131:21, 131:23, 140:20

**owed** [19] - 9:24, 10:2, 10:5, 10:20, 19:11, 19:16, 20:7, 20:8, 59:2, 59:10, 59:18, 59:20, 59:24, 79:23, 84:7, 128:17, 131:15, 131:17, 140:15

**owes** [4] - 126:18, 133:10, 140:9, 140:12

**owing** [1] - 141:24

**own** [8] - 33:11, 61:16, 134:5, 161:22, 165:13, 179:20, 208:15, 209:12

**ownership** [1] - 206:10

**owns** [1] - 206:9

**Oz** [7] - 69:6, 246:14, 261:14, 261:18, 262:3, 262:8, 263:12

## P

**p.m** [10] - 73:10, 75:8, 76:11, 76:16, 76:19, 80:19, 104:7, 104:8, 239:16

**P.O** [1] - 109:5

**pack** [4] - 94:18, 94:22, 94:23, 95:9

**package** [6] - 86:12, 88:16, 89:15, 92:14, 164:22, 186:24

**packaged** [2] - 13:23, 88:12

**packages** [11] - 11:14, 87:25, 88:2, 88:3, 88:20, 88:24, 89:2, 89:13, 89:19, 90:5, 90:11

**Page** [2] - 233:14,

234:21
page [17] - 16:23,
17:15, 49:16, 74:9,
74:13, 74:20, 75:16,
76:5, 78:10, 103:14,
228:10, 228:13,
268:8, 268:9, 268:11
PAGE [1] - 3:2
paid [5] - 18:7,
18:18, 49:12, 49:13,
235:2
pallet [1] - 250:16
pallets [3] - 78:20,
248:7, 251:14
palm [2] - 146:5,
146:6
paperwork [9] -
204:5, 204:9, 204:13,
206:4, 207:15,
211:24, 255:20,
269:22, 270:9
paragraph [6] -
133:5, 134:12, 156:8,
194:15, 194:21,
194:22
Paragraph [2] -
133:6, 194:13
parallel [1] - 241:21
pardon [2] - 121:17,
227:20
Park [1] - 261:7
parked [2] - 222:25,
223:2
Parker [1] - 169:12
parking [10] - 13:12,
86:20, 87:12, 149:3,
187:2, 188:8, 188:12,
262:13, 262:14, 263:9
parra [1] - 116:23
Parra [196] - 7:23,
8:18, 8:22, 9:15, 9:20,
9:25, 10:3, 10:5,
10:12, 10:14, 10:18,
10:20, 11:1, 14:13,
14:16, 19:12, 19:25,
25:16, 26:20, 26:22,
27:19, 28:2, 29:8,
29:16, 30:18, 42:12,
53:18, 59:1, 59:10,
59:18, 59:20, 59:23,
59:25, 61:6, 61:8,
61:10, 61:15, 61:25,
62:3, 62:15, 62:19,
62:24, 63:5, 63:19,
64:5, 65:3, 65:20,
66:5, 66:12, 66:24,
67:14, 68:24, 79:23,
84:8, 84:14, 84:15,
85:7, 85:23, 86:10,
86:11, 86:13, 86:17,

87:8, 87:14, 87:17,
87:24, 88:10, 90:13,
90:21, 91:23, 98:16,
116:4, 116:18,
124:16, 125:5,
125:10, 125:21,
126:12, 126:17,
126:18, 126:21,
126:24, 127:2, 127:4,
128:17, 129:10,
129:14, 130:7, 131:7,
131:12, 131:15,
131:17, 131:20,
133:10, 133:16,
133:21, 133:24,
134:3, 134:19, 135:5,
135:21, 136:13,
137:14, 137:24,
139:4, 139:13, 140:9,
140:12, 140:13,
140:15, 140:23,
141:3, 141:9, 141:17,
141:18, 141:21,
141:24, 142:7,
142:14, 142:18,
143:23, 145:12,
147:12, 147:21,
149:1, 150:16, 151:1,
151:12, 152:23,
153:21, 154:8,
154:10, 154:15,
155:5, 155:8, 155:13,
155:17, 155:19,
155:24, 156:5,
156:14, 156:20,
156:25, 157:3,
157:13, 157:25,
158:4, 158:12,
158:13, 159:10,
159:14, 162:7,
163:21, 164:24,
166:8, 166:12, 167:2,
169:17, 170:1, 170:5,
173:5, 174:20, 175:1,
178:18, 178:25,
179:10, 180:16,
180:21, 183:10,
183:14, 183:16,
183:18, 184:5,
184:17, 184:18,
185:21, 189:6,
189:15, 189:19,
189:20, 190:18,
191:2, 191:18, 193:3,
194:3, 195:1, 196:2,
197:6, 198:1, 198:9,
198:23, 200:10,
218:7, 218:17
Parra's [15] - 42:17,
53:23, 55:1, 60:17,
64:13, 98:18, 118:6,

131:11, 140:6,
146:20, 150:22,
150:23, 151:10,
168:2, 189:21
part [22] - 18:23,
19:18, 59:19, 65:15,
75:13, 107:12,
113:20, 131:14,
136:2, 170:15,
172:11, 172:17,
172:22, 204:3,
204:12, 220:5,
233:18, 248:25,
266:13, 269:16, 270:5
partial [7] - 126:22,
128:25, 130:10,
141:6, 141:17,
141:21, 142:8
participant [1] - 99:2
participate [10] -
12:22, 15:19, 19:17,
53:17, 53:21, 64:5,
247:5, 247:7, 247:19,
271:10
participated [3] -
179:5, 238:6, 238:10
participation [1] -
64:20
particular [42] - 41:1,
48:19, 49:12, 54:8,
67:21, 76:14, 94:2,
96:6, 96:12, 100:22,
113:6, 130:25, 139:1,
145:11, 149:7,
150:14, 169:4,
188:25, 203:3,
204:20, 209:11,
211:5, 221:1, 221:9,
223:1, 226:4, 226:23,
245:12, 247:13,
252:11, 254:15,
255:25, 257:10,
261:2, 261:3, 261:13,
264:12, 266:2,
269:17, 269:22,
270:1, 270:17
parties [3] - 82:22,
83:8, 84:1
pass [2] - 213:2,
241:1
passed [1] - 9:14
passenger [10] -
209:17, 228:2, 228:4,
228:14, 228:20,
229:1, 230:23,
234:13, 246:8
passenger's [1] -
230:1
passengers [12] -
226:9, 226:11, 228:5,

228:15, 228:17,
229:4, 230:9, 231:17,
232:4, 232:9, 235:17,
235:23
passing [1] - 240:11
past [8] - 88:13,
117:5, 117:6, 117:11,
117:13, 241:16,
263:14, 263:16
patrol [5] - 253:15,
253:17, 253:18,
266:18, 266:25
Patrol [11] - 64:19,
65:14, 87:21, 89:22,
99:21, 114:16,
190:24, 237:18,
237:24, 238:6, 253:7
Patrolman [1] -
270:6
pattern [1] - 175:8
Paul [2] - 148:23,
263:8
PAUSE [2] - 6:5,
160:5
pay [6] - 34:1,
178:15, 178:17,
190:13, 190:16, 274:4
payment [17] - 19:11,
79:21, 85:2, 126:23,
126:25, 128:25,
130:11, 131:14,
131:15, 131:16,
141:2, 141:6, 141:18,
141:22, 142:2, 142:9,
221:15
payments [1] - 84:9
PD [1] - 118:22
Pembroke [2] -
220:7, 222:12
pending [1] - 178:7
people [21] - 19:2,
19:3, 19:4, 26:13,
35:19, 50:10, 62:10,
64:14, 88:18, 94:25,
128:1, 128:3, 137:6,
140:21, 148:6, 148:8,
148:12, 159:20,
165:2, 165:9, 168:22,
168:23, 180:19,
185:15, 185:18,
200:9, 215:21, 228:7,
245:10, 245:16,
267:10
people's [1] - 180:23
per [1] - 243:9
percent [7] - 109:8,
139:8, 167:16, 175:6,
185:13, 187:22,
188:22
percentage [2] -

176:24, 177:1
perform [1] - 63:1
performing [1] -
225:20
perhaps [1] - 230:13
period [11] - 10:19,
62:22, 72:13, 138:15,
147:20, 147:22,
173:11, 191:1, 201:7,
226:20, 230:9
permission [6] -
52:4, 120:20, 172:8,
172:20, 173:1, 255:9
permit [2] - 120:1,
195:12
person [17] - 36:12,
46:6, 46:22, 54:13,
95:3, 98:3, 98:5,
137:8, 145:15,
157:13, 166:7,
166:15, 167:12,
167:24, 196:21,
229:5, 244:19
personally [2] -
111:22, 179:4
persons [1] - 62:4
pertain [1] - 97:23
pertaining [2] -
167:1, 227:6
pertains [2] - 145:10,
145:11
peter [1] - 149:10
Petersburg [2] -
87:16, 261:8
pewter [3] - 149:4,
149:8, 150:20
Phoenix [8] - 25:1,
33:3, 33:20, 42:25,
182:10, 182:17,
182:20, 183:2
phone [35] - 8:7,
41:4, 41:13, 42:9,
62:4, 62:14, 62:19,
65:6, 65:11, 65:12,
66:10, 66:16, 66:21,
67:8, 80:14, 81:6,
108:24, 116:19,
125:11, 125:20,
125:21, 126:13,
127:5, 127:8, 137:10,
141:25, 151:17,
155:22, 158:23,
167:12, 175:2,
239:18, 242:13,
256:12, 256:20
phones [2] - 139:17,
180:4
photo [12] - 94:18,
94:22, 94:23, 95:9,
95:11, 95:22, 96:6,

96:17, 190:11

**photocopied** [1] - 92:24

**photocopies** [2] - 208:13, 210:15

**photocopy** [1] - 206:12

**photograph** [23] - 55:16, 55:19, 69:17, 69:24, 88:21, 89:2, 91:21, 93:11, 96:8, 96:14, 96:20, 96:23, 190:12, 190:15, 202:16, 203:2, 222:10, 258:13, 259:23, 261:24, 262:25, 263:15, 264:25

**Photograph** [4] - 259:12, 264:3, 265:23, 266:1

**photographed** [2] - 61:10, 91:4

**photographs** [11] - 22:10, 94:24, 94:25, 95:4, 95:7, 201:9, 201:21, 221:25, 249:14, 257:17, 258:8

**photos** [2] - 39:6, 94:25

**phrase** [2] - 204:19, 257:5

**pick** [8] - 24:16, 85:13, 127:18, 166:2, 166:3, 204:20, 204:25, 230:1

**picked** [7] - 29:13, 47:21, 142:11, 142:13, 213:17, 215:9, 265:7

**picking** [7] - 77:16, 78:24, 102:8, 203:9, 204:19, 213:13, 230:3

**picks** [1] - 140:21

**picture** [4] - 110:10, 222:23, 250:17, 258:23

**pictures** [3] - 31:20, 32:2, 32:5

**piled** [1] - 250:14

**pilot** [6] - 96:10, 225:4, 225:21, 228:21, 231:10, 231:12

**pimp** [5] - 154:17, 155:9, 155:25, 156:11, 157:4

**Pimp** [4] - 155:19, 156:20, 157:21, 157:22

**Pinellas** [10] - 40:17, 66:3, 67:2, 69:10, 197:2, 239:21, 246:5, 258:15, 261:7, 266:4

**Pines** [2] - 220:8, 222:12

**Pingy** [9] - 34:17, 34:21, 35:8, 148:21, 148:23, 149:3, 150:16, 150:19

**Pingy's** [1] - 34:23

**place** [12] - 44:2, 59:14, 59:22, 62:14, 62:19, 68:20, 89:24, 106:24, 148:18, 165:20, 181:24, 230:6

**placed** [5] - 74:17, 101:4, 215:1, 215:3, 253:17

**places** [2] - 165:18, 246:25

**Plaintiff** [1] - 1:5

**plan** [15] - 9:1, 9:2, 9:7, 59:14, 59:17, 59:22, 64:8, 79:21, 84:9, 84:12, 85:2, 85:7, 85:12, 85:20, 85:22

**plane** [3] - 12:5, 225:9

**planned** [1] - 273:6

**Plants** [1] - 212:10

**plastic** [7] - 85:10, 112:21, 113:8, 252:7, 254:2, 254:7, 254:8

**played** [1] - 146:23

**plays** [1] - 257:10

**plead** [1] - 194:6

**pled** [4] - 23:23, 28:17, 168:24, 194:3

**plurality** [1] - 114:4

**PO** [1] - 1:23

**pocket** [3] - 145:19, 146:12, 146:14

**point** [43] - 20:2, 64:10, 64:21, 65:24, 66:5, 66:9, 66:24, 67:6, 68:1, 68:3, 69:11, 82:4, 84:18, 84:22, 86:7, 86:13, 86:16, 87:3, 87:7, 101:13, 113:22, 119:4, 130:19, 147:17, 169:21, 169:25, 188:2, 208:13, 212:22, 216:10, 240:2, 240:9, 240:12, 242:2, 242:3, 242:6, 243:7, 243:22, 259:10, 261:13,

261:21, 267:3, 267:22

**Point** [9] - 27:14, 31:11, 65:5, 90:18, 90:19, 90:20, 151:7, 151:8

**points** [1] - 184:7

**pole** [2] - 250:25, 251:5

**police** [13] - 9:10, 33:21, 40:25, 53:15, 182:17, 182:21, 183:2, 186:16, 203:23, 238:14, 267:9, 267:10

**Polk** [1] - 218:1

**Pompano** [1] - 202:20

**pop** [1] - 113:17

**popped** [1] - 254:5

**portion** [5] - 17:14, 176:16, 233:22, 271:11

**Position** [1] - 96:23

**position** [5] - 90:4, 96:15, 97:5, 137:14, 214:25

**positive** [1] - 246:23

**possession** [1] - 62:7

**possibility** [2] - 176:21, 215:4

**possible** [10] - 117:8, 135:18, 135:20, 144:10, 148:1, 148:5, 148:11, 148:13, 148:14, 170:2

**possibly** [5] - 85:17, 158:5, 173:21, 176:19, 177:9

**Post** [1] - 90:19

**post** [1] - 90:20

**potential** [7] - 45:12, 63:24, 64:9, 64:22, 180:23, 239:23, 241:9

**pound** [1] - 101:11

**pounds** [15] - 11:20, 37:11, 37:13, 37:15, 55:9, 69:16, 70:18, 79:20, 83:16, 83:23, 84:7, 101:8, 101:13, 101:15, 115:15

**practical** [5] - 137:4, 139:8, 144:9, 144:14, 144:16

**practice** [2] - 226:16, 226:19

**prearranged** [3] - 129:15, 130:9, 145:5

**preclude** [1] - 128:9

**preliminary** [1] -

101:3

**prepare** [2] - 97:21, 97:24

**prepared** [6] - 6:13, 97:11, 97:13, 134:8, 154:13, 161:11

**presence** [2] - 120:2, 139:22, 140:1, 140:3, 174:25, 246:24

**present** [4] - 22:22, 23:6, 104:8, 173:6

**presented** [4] - 84:3, 93:13, 95:23, 109:25

**presently** [1] - 194:19

**presiding** [1] - 6:7

**press** [1] - 143:14

**Preston** [26] - 7:13, 21:15, 21:19, 21:21, 22:7, 34:13, 36:2, 44:8, 52:2, 80:1, 82:19, 115:6, 161:23, 162:22, 169:18, 170:3, 171:7, 180:14, 194:12, 206:22, 208:14, 209:22, 216:10, 235:6, 270:23, 272:20

**PRESTON** [170] - 1:16, 3:4, 3:7, 3:9, 3:11, 3:15, 3:17, 3:18, 3:21, 6:12, 6:15, 7:14, 7:20, 14:21, 14:24, 15:5, 15:7, 16:25, 17:3, 17:11, 17:13, 17:19, 17:23, 19:6, 19:9, 20:10, 42:6, 44:4, 44:9, 45:4, 45:6, 48:9, 48:21, 48:24, 49:6, 49:11, 50:22, 51:24, 52:3, 52:10, 53:4, 53:6, 54:22, 54:25, 55:10, 55:13, 55:25, 56:4, 56:7, 56:23, 56:25, 57:4, 57:7, 57:11, 58:8, 58:12, 58:17, 59:5, 59:9, 70:4, 70:9, 70:25, 71:6, 72:17, 73:3, 73:8, 74:12, 74:15, 76:4, 76:6, 77:25, 78:5, 78:7, 81:10, 81:20, 82:20, 83:5, 84:5, 88:9, 89:5, 89:10, 89:12, 91:12, 91:17, 91:20, 93:15, 93:19, 93:23, 94:1, 95:19, 95:24, 96:4, 97:1, 97:4, 99:9, 99:11, 101:17,

105:10, 110:3, 123:24, 132:7, 132:10, 132:15, 159:16, 159:23, 177:11, 180:8, 191:21, 192:1, 193:7, 193:17, 195:7, 198:6, 198:25, 199:3, 199:6, 199:10, 199:16, 202:1, 205:11, 207:8, 208:4, 210:19, 211:10, 212:23, 214:3, 216:7, 216:11, 217:1, 217:3, 218:20, 218:25, 219:18, 219:20, 222:2, 222:5, 223:9, 223:19, 224:13, 224:15, 227:8, 227:12, 227:17, 227:21, 227:25, 229:13, 232:24, 233:18, 236:15, 236:20, 237:14, 237:16, 244:13, 244:18, 245:3, 245:6, 249:7, 249:10, 249:20, 250:4, 250:9, 250:10, 250:19, 250:23, 255:2, 255:5, 257:25, 258:20, 272:22, 273:5

**pretty** [6] - 35:9, 39:12, 127:21, 205:2, 232:8, 263:5

**previous** [8] - 23:18, 67:14, 67:23, 71:14, 88:5, 104:16, 126:18, 140:10

**previously** [20] - 7:16, 86:7, 105:25, 131:21, 140:13, 140:15, 152:9, 155:21, 156:16, 156:22, 157:10, 157:23, 193:11, 194:3, 199:13, 199:15, 201:18, 205:3, 207:19, 211:3

**price** [2] - 49:23, 50:15

**primarily** [1] - 116:3

**primary** [2] - 138:1, 238:1

**printout** [1] - 93:10

**private** [6] - 12:18, 12:19, 13:10, 13:18, 18:23, 225:1

**probable** [1] - 267:5

**problem** [5] - 80:25, 125:1, 126:7, 205:18,

234:11
  **procedurally** [1] - 123:1
  **procedure** [1] - 208:14
  **proceed** [8] - 6:17, 83:4, 124:3, 167:3, 192:23, 195:14, 242:11, 243:13
  **proceeding** [1] - 274:15
  **PROCEEDING** [5] - 6:5, 82:2, 160:5, 163:8, 214:21
  **PROCEEDINGS** [3] - 82:12, 123:14, 216:18
  **proceeds** [3] - 91:25, 150:16, 151:5
  **process** [4] - 100:16, 130:5, 143:12, 162:19
  **produce** [2] - 105:10, 168:6
  **produced** [2] - 92:11, 122:20
  **Products** [2] - 108:1, 108:6
  **professionally** [1] - 248:9
  **program** [1] - 238:1
  **proper** [2] - 60:25, 172:13
  **propose** [1] - 213:23
  **prosecute** [2] - 22:20, 22:21
  **protect** [2] - 267:17
  **protection** [5] - 165:13, 238:3, 267:7, 267:8
  **provide** [16] - 36:10, 76:7, 85:7, 100:20, 126:22, 132:16, 135:23, 141:21, 142:25, 145:4, 167:2, 191:1, 198:2, 225:10, 238:2, 238:17
  **provided** [17] - 50:3, 62:6, 62:12, 67:18, 86:5, 117:16, 130:14, 135:1, 136:1, 142:17, 142:20, 143:23, 143:24, 145:12, 180:19, 183:15, 214:10
  **providing** [2] - 68:24, 141:17
  **public** [1] - 238:2
  **publish** [11] - 17:19, 56:4, 73:3, 78:5, 78:6, 82:24, 89:10, 91:17, 93:20, 97:1, 202:7

  **published** [1] - 89:11
  **pull** [3] - 243:6, 254:9, 254:12
  **pulled** [9] - 190:25, 203:3, 243:15, 243:17, 245:10, 245:16, 265:20, 266:1, 266:8
  **pulling** [1] - 243:10
  **purchase** [7] - 15:23, 18:16, 46:5, 48:5, 49:23, 50:8, 92:16
  **purchased** [1] - 93:14
  **purchases** [1] - 15:20
  **purchasing** [1] - 46:23
  **purpose** [16] - 14:3, 14:6, 48:5, 57:8, 60:11, 60:13, 136:15, 136:18, 162:1, 164:13, 165:8, 167:14, 167:20, 167:24, 168:2, 266:24
  **purposes** [16] - 49:1, 56:18, 56:21, 57:9, 57:15, 70:11, 70:20, 71:17, 88:7, 93:6, 99:13, 136:19, 143:7, 166:21, 168:4, 227:2
  **pursuant** [3] - 45:15, 64:6, 89:21
  **put** [42] - 14:7, 14:17, 15:10, 27:19, 28:2, 28:3, 31:10, 39:23, 59:14, 59:22, 87:25, 95:2, 95:9, 107:20, 110:23, 113:10, 113:15, 119:8, 132:6, 141:19, 150:25, 152:19, 154:10, 161:24, 162:10, 168:13, 171:3, 171:6, 193:23, 202:6, 211:13, 215:24, 227:23, 233:15, 243:5, 248:18, 266:17, 267:6, 267:11, 269:17, 270:2, 273:25
  **putting** [4] - 30:2, 146:20, 170:17, 266:24

  **Q**

  **Q-U-I-N-N** [1] - 219:16
  **Quantico** [3] -

  175:24, 175:25, 176:9
  **quantities** [1] - 101:11
  **quantity** [4] - 55:5, 77:23, 182:18, 182:24
  **questioning** [2] - 55:11, 82:21
  **questions** [19] - 20:11, 30:8, 40:6, 40:9, 51:17, 104:9, 104:10, 119:22, 124:9, 124:23, 158:11, 180:8, 200:12, 200:14, 223:10, 232:25, 233:12, 235:6, 255:6
  **quick** [1] - 51:3
  **quicker** [1] - 268:6
  **Quinn** [2] - 218:25, 219:16
  **QUINN** [2] - 3:16, 219:8
  **quite** [1] - 50:11
  **quote** [2] - 134:13, 145:5

  **R**

  **race** [1] - 95:2
  **radar** [1] - 35:16
  **Radisson** [2] - 137:25, 138:9
  **raise** [5] - 6:24, 52:12, 219:2, 223:21, 236:21
  **Raise** [1] - 44:12
  **raisin** [4] - 77:21, 111:14, 215:8, 215:22
  **Ramiro** [65] - 7:23, 8:18, 8:22, 9:14, 9:20, 10:14, 10:18, 11:1, 14:13, 14:16, 19:11, 19:25, 42:12, 42:17, 53:18, 59:18, 61:6, 62:3, 63:18, 64:4, 84:8, 87:14, 98:16, 98:18, 116:4, 124:16, 125:21, 131:12, 133:24, 134:3, 136:13, 137:14, 137:24, 139:13, 141:3, 151:10, 154:8, 154:10, 154:15, 155:19, 156:14, 156:19, 156:25, 157:3, 157:13, 158:4, 159:10, 161:8, 163:21, 167:2, 170:1,

  174:20, 180:21, 183:10, 183:14, 184:4, 191:18, 193:3, 196:1, 197:6, 198:1, 198:9, 218:7, 218:17
  **ramp** [3] - 241:16, 258:25, 259:4
  **rare** [1] - 46:19
  **rather** [2] - 102:23, 230:19
  **Ray** [1] - 212:9
  **re** [2] - 267:14, 274:2
  **reach** [2] - 119:1, 119:7
  **reached** [1] - 82:22
  **react** [1] - 43:3
  **read** [21] - 132:2, 154:16, 155:2, 155:4, 155:11, 155:22, 156:3, 156:7, 156:17, 156:23, 157:22, 194:13, 195:17, 200:23, 211:14, 212:1, 212:2, 212:3, 212:9, 212:15, 234:14
  **readable** [1] - 205:19
  **reader** [1] - 109:3
  **reading** [1] - 199:6
  **reads** [4] - 83:7, 156:11, 161:6, 194:22
  **ready** [2] - 13:4, 13:7
  **real** [5] - 41:14, 51:3, 90:6, 164:22, 205:18
  **realize** [1] - 257:9
  **realized** [2] - 90:11, 170:1
  **really** [8] - 14:6, 50:17, 50:18, 67:23, 221:9, 221:12, 226:6, 261:24
  **realm** [1] - 178:9
  **rear** [1] - 231:18
  **reason** [3] - 29:22, 105:4, 245:17
  **reasonable** [1] - 267:3
  **reasons** [2] - 88:14, 264:15
  **recalling** [1] - 146:22
  **receipt** [9] - 8:18, 42:17, 64:5, 64:9, 85:15, 86:2, 87:5, 87:24, 203:8
  **receive** [7] - 8:22, 11:5, 11:10, 11:22, 11:23, 127:8, 196:3
  **received** [34] - 17:21, 41:4, 45:16, 45:19, 49:9, 56:3, 58:11, 60:19, 70:7, 71:4,

  78:3, 89:8, 91:15, 93:18, 96:2, 125:11, 125:15, 126:13, 148:11, 151:2, 175:2, 179:5, 179:8, 191:22, 193:8, 193:19, 202:2, 205:14, 208:8, 211:11, 227:15, 240:13, 250:1, 258:1
  **RECEIVED** [1] - 4:5
  **receiving** [8] - 7:24, 10:14, 113:11, 127:5, 141:9, 141:13, 142:3, 182:3
  **recent** [2] - 117:23, 118:2
  **recently** [2] - 117:24, 263:15
  **recess** [4] - 82:4, 119:24, 216:10, 272:3
  **RECESS** [3] - 82:11, 123:13, 216:17
  **recognize** [25] - 14:25, 15:8, 17:4, 19:20, 37:25, 55:16, 69:20, 70:13, 71:18, 77:11, 88:20, 91:6, 93:7, 94:5, 94:7, 95:3, 95:20, 196:21, 201:11, 201:21, 211:5, 211:7, 222:6, 229:3, 249:14
  **recognized** [2] - 96:5, 96:14
  **recollection** [9] - 125:1, 125:24, 126:10, 129:17, 130:2, 150:20, 186:1, 265:15, 268:17
  **recommendations** [1] - 198:19
  **recommended** [1] - 169:18
  **reconvene** [7] - 82:5, 119:24, 122:25, 123:11, 216:12, 272:4, 272:11
  **RECORD** [1] - 123:10
  **record** [36] - 7:7, 44:25, 48:7, 52:25, 54:24, 62:13, 92:20, 136:17, 136:23, 137:2, 137:10, 139:4, 139:8, 140:5, 143:14, 144:8, 144:10, 144:16, 145:24, 146:15, 148:14, 168:3, 172:19, 173:1, 175:3, 177:25,

185:17, 219:15, 224:9, 229:11, 237:10, 244:16, 245:5, 267:1, 267:14, 267:18

**recorded** [13] - 74:3, 99:17, 138:23, 139:1, 139:7, 139:11, 139:24, 147:7, 151:17, 151:23, 167:13, 167:15, 167:18

**recorder** [9] - 62:7, 62:13, 142:22, 143:5, 143:24, 144:22, 145:10, 146:15, 253:18

**recorders** [3] - 145:11, 145:22, 146:3

**recording** [33] - 97:14, 98:4, 99:5, 99:20, 99:25, 100:2, 100:22, 100:24, 135:1, 135:4, 135:7, 135:8, 135:13, 135:17, 135:18, 135:25, 136:4, 136:9, 136:16, 137:23, 138:24, 142:18, 142:25, 147:2, 154:9, 157:25, 166:8, 166:14, 166:16, 168:2, 175:15, 177:14, 253:21

**recordings** [20] - 62:3, 97:8, 97:12, 98:5, 98:15, 135:20, 146:22, 152:1, 157:24, 158:13, 158:14, 158:16, 158:20, 159:6, 166:9, 168:18, 168:19, 175:10, 218:10, 218:11

**records** [16] - 48:11, 48:14, 49:2, 72:13, 92:10, 93:4, 134:7, 190:25, 206:23, 226:13, 226:16, 226:20, 226:22, 227:3, 227:5, 228:3

**red** [1] - 244:11

**redirect** [4] - 42:4, 51:23, 216:6, 236:14

**REDIRECT** [4] - 3:7, 3:15, 42:5, 217:2

**reduce** [2] - 21:16, 21:18

**reduced** [1] - 243:8

**reducing** [1] - 178:20

**reduction** [1] - 36:6

**refer** [13] - 52:7, 85:8, 86:22, 97:18, 153:23, 154:7, 158:6, 158:15, 166:1, 171:19, 171:24, 204:24, 268:4

**reference** [4] - 157:16, 160:20, 161:5, 162:5

**referral** [1] - 47:14

**referrals** [1] - 47:6

**referred** [13] - 17:15, 17:25, 77:7, 86:25, 152:24, 158:25, 159:21, 160:24, 162:14, 164:21, 168:22, 218:7, 233:13

**referring** [21] - 49:19, 51:5, 57:7, 86:23, 98:16, 99:15, 109:20, 112:15, 127:16, 130:12, 138:11, 152:14, 154:8, 164:9, 164:10, 166:12, 189:15, 205:6, 217:6, 229:5, 229:9

**refers** [1] - 157:13, 157:21, 157:25, 159:6, 163:21

**reflect** [13] - 48:8, 49:3, 54:24, 72:13, 73:13, 74:13, 75:2, 163:21, 217:12, 228:14, 229:11, 244:16, 245:5

**reflected** [6] - 78:10, 79:3, 79:5, 98:6, 104:5, 217:7

**reflecting** [1] - 103:15

**reflects** [2] - 50:4, 76:21

**refresh** [7] - 97:22, 125:23, 126:10, 130:1, 198:21, 199:22, 268:17

**refreshing** [1] - 125:1

**refrigerated** [2] - 248:6, 248:24

**refrigerator** [3] - 247:1, 248:17, 269:6

**regard** [32] - 12:10, 15:17, 15:23, 46:5, 48:18, 49:4, 59:17, 61:5, 64:8, 65:1, 69:3, 73:22, 76:8, 79:7, 79:22, 82:22, 84:19, 85:2, 86:12, 92:11,

94:18, 100:21, 101:5, 217:5, 217:17, 226:14, 226:23, 228:1, 239:15, 241:9, 246:2, 251:16

**regarding** [11] - 10:4, 128:7, 129:4, 141:1, 159:24, 182:16, 186:19, 186:21, 194:6, 198:3, 239:8

**regards** [2] - 47:10, 78:8

**registered** [5] - 34:24, 34:25, 149:11, 149:21, 150:9

**registers** [1] - 190:14

**registration** [1] - 245:12

**regular** [4] - 47:3, 66:6, 174:5, 254:1

**reiterated** [1] - 142:7

**related** [4] - 71:12, 144:7, 221:6, 221:7

**relationship** [2] - 43:22, 222:25

**relatively** [1] - 64:10

**relay** [1] - 240:22

**released** [1] - 64:4

**relevance** [6] - 72:20, 72:24, 73:1, 160:16, 160:18, 161:15

**relevancy** [3] - 177:11, 212:24, 214:5

**relevant** [2] - 191:1, 213:6

**rely** [1] - 183:24

**remainder** [2] - 163:17, 164:1

**remark** [1] - 76:1

**remarks** [1] - 75:18

**remember** [27] - 16:2, 16:17, 21:22, 40:20, 41:11, 41:20, 50:12, 79:18, 84:22, 135:12, 139:1, 149:8, 149:23, 184:25, 185:1, 187:4, 197:24, 204:23, 207:4, 228:22, 247:12, 254:14, 264:6, 270:16, 270:24, 270:25, 271:1

**remembered** [1] - 182:6

**remind** [1] - 272:5

**reminded** [1] - 140:9

**remitter** [1] - 18:6, 50:4

**remove** [2] - 57:19,

227:21

**removed** [3] - 56:15, 57:15, 79:14

**rent** [3] - 12:5, 26:22, 27:11

**rental** [1] - 182:13

**rented** [2] - 27:4, 151:8

**repeat** [3] - 62:17, 114:19, 141:11

**rephrase** [1] - 76:25

**report** [24] - 124:19, 125:23, 126:9, 129:23, 132:3, 132:20, 132:21, 133:2, 133:4, 133:14, 133:15, 141:8, 141:12, 141:19, 141:20, 182:22, 187:1, 198:20, 199:4, 199:6, 199:8, 199:21, 231:10, 255:24

**reported** [5] - 2:4, 62:10, 178:23, 198:8, 198:9

**REPORTED** [1] - 2:8

**reporter** [1] - 30:9

**Reporter** [2] - 2:5, 274:22

**reporting** [1] - 43:14

**reports** [4] - 22:14, 130:6, 184:20, 255:19

**represent** [4] - 17:7, 56:12, 89:14, 98:11

**representation** [3] - 168:13, 168:14, 265:1

**representative** [8] - 56:17, 57:2, 57:12, 57:16, 70:10, 70:17, 83:9, 83:17

**represented** [1] - 71:25

**representing** [4] - 20:1, 89:16, 89:17

**request** [2] - 21:19, 239:12

**requests** [1] - 194:23

**reserve** [1] - 101:19

**residence** [5] - 221:2, 222:18, 222:20, 223:1, 223:8

**resolved** [1] - 194:17

**respectfully** [1] - 194:23

**respond** [1] - 239:15

**responds** [1] - 155:7

**response** [6] - 117:4, 117:15, 117:18, 159:21, 231:1, 268:20

**responsibilities** [2] -

204:12, 270:6

**responsible** [2] - 170:13, 253:8

**rest** [5] - 207:25, 212:22, 212:23, 272:19, 273:13

**resting** [1] - 91:2

**result** [4] - 170:25, 194:22, 244:3, 246:22

**RESUMED** [3] - 82:2, 163:8, 214:21

**RETIRED** [4] - 82:10, 120:7, 216:16, 272:10

**retrieve** [1] - 164:17

**return** [1] - 137:9, 232:10, 232:16

**returned** [3] - 61:10, 230:14, 234:6

**RETURNED** [4] - 6:4, 82:15, 123:17, 216:21

**reveal** [1] - 116:5

**revealed** [1] - 84:19

**review** [18] - 92:10, 100:11, 101:2, 101:3, 103:23, 126:5, 154:20, 154:22, 157:11, 160:3, 161:3, 161:22, 162:23, 163:17, 164:1, 198:21, 199:21, 273:24

**reviewed** [10] - 100:10, 114:11, 138:24, 153:12, 153:15, 157:23, 163:20, 207:5, 209:10, 226:22

**reviewing** [5] - 102:16, 102:21, 158:8, 160:9, 217:5

**revisit** [1] - 274:6

**Richard** [1] - 169:12

**Richey** [2] - 47:2, 47:11

**ride** [1] - 36:17

**riding** [1] - 209:14

**rig** [12] - 242:17, 243:1, 246:8, 247:1, 247:20, 248:25, 249:3, 254:6, 254:21, 254:24, 269:16, 271:12

**right-hand** [4] - 108:18, 114:10, 234:12, 261:23

**rigs** [1] - 253:25

**rip** [1] - 90:14

**rise** [11] - 6:2, 6:6, 82:8, 82:13, 82:18, 120:5, 123:15,

123:18, 216:14, 272:8, 274:14

**risk** [1] - 90:2

**Riverside** [15] - 73:11, 74:19, 74:24, 75:3, 75:6, 75:20, 76:3, 76:10, 103:6, 103:16, 103:25, 104:3, 217:7, 217:11, 217:13

**Ro** [5] - 10:12, 10:24, 29:3, 32:10, 34:1

**road** [10] - 13:13, 241:17, 260:13, 262:4, 262:11, 262:15, 262:17, 264:6, 265:13, 273:6

**Road** [31] - 55:21, 58:25, 68:22, 69:9, 77:19, 118:5, 118:18, 118:23, 119:4, 119:7, 119:11, 119:16, 217:21, 217:23, 241:14, 241:21, 241:23, 242:4, 242:11, 242:12, 242:15, 245:23, 246:16, 259:16, 259:19, 263:2, 263:18, 265:5

**road's** [1] - 260:6

**roadside** [1] - 187:17

**Robert** [4] - 218:25, 219:16, 236:20, 237:11

**ROBERT** [4] - 3:16, 3:20, 219:8, 237:3

**Rocky** [3] - 27:14, 31:11, 65:4, 90:18, 90:19, 90:20, 151:7, 151:8

**rod** [1] - 113:19

**Rodriguez** [11] - 20:13, 38:13, 42:11, 43:10, 50:24, 54:21, 124:1, 160:17, 218:5, 223:14, 233:3

**RODRIGUEZ** [111] - 1:19, 3:5, 3:10, 3:13, 3:19, 17:9, 17:12, 17:16, 20:14, 20:18, 37:19, 38:8, 38:14, 38:17, 38:20, 38:25, 40:5, 48:3, 49:8, 51:1, 51:16, 56:2, 59:4, 59:7, 80:15, 81:1, 81:4, 81:9, 81:14, 81:17, 81:22, 81:25, 83:1, 95:15, 95:18, 96:1, 124:2, 124:5,

124:7, 126:1, 126:4, 129:7, 129:9, 129:19, 129:22, 132:5, 132:8, 132:13, 132:16, 132:18, 152:11, 152:17, 157:5, 157:8, 159:19, 160:2, 160:18, 161:9, 161:18, 161:21, 162:8, 163:3, 163:14, 177:4, 177:5, 177:19, 180:12, 191:8, 191:11, 191:16, 191:24, 192:4, 192:7, 192:11, 192:13, 192:17, 192:19, 192:25, 193:5, 193:10, 193:15, 193:18, 193:21, 193:22, 195:15, 195:16, 195:25, 196:14, 196:17, 196:20, 198:7, 199:1, 199:7, 199:12, 199:18, 199:23, 200:1, 200:12, 210:22, 223:15, 227:10, 227:13, 229:8, 233:1, 233:4, 233:6, 233:19, 233:24, 234:20, 235:1, 236:7

**role** [4] - 9:9, 22:25, 53:25, 257:11

**ROOM** [4] - 82:10, 120:7, 216:16, 272:10

**rough** [1] - 118:7

**roughly** [3] - 101:9, 101:10, 118:8

**round** [1] - 232:20

**row** [1] - 244:9

**Row** [1] - 76:18

**RPR** [2] - 2:4, 274:21

**rules** [1] - 172:1

**run** [2] - 182:20, 269:10

**running** [1] - 249:4

**runs** [2] - 262:12, 262:15

**rust** [1] - 68:13

---

# S

**S-H-E-R-W-O-O-D** [1] - 224:11

**S1** [4] - 191:12, 191:16, 192:17, 192:22

**S2** [4] - 4:13, 193:1, 193:9, 193:24

**S5** [5] - 4:13, 193:12, 193:16, 193:20, 196:8

**S7** [1] - 38:22

**sac** [1] - 222:14

**safe** [30] - 27:16, 27:25, 28:2, 28:3, 28:25, 29:1, 31:11, 31:13, 31:18, 31:21, 32:2, 32:6, 42:23, 56:9, 56:13, 56:15, 60:2, 61:13, 62:2, 138:24, 140:24, 141:19, 150:11, 151:6, 151:20, 170:20, 171:3, 173:7, 178:21, 189:9

**safer** [1] - 182:12

**safes** [1] - 151:6

**safety** [1] - 267:2

**Safety** [1] - 93:2

**salesman** [1] - 46:3

**sample** [1] - 70:10

**samples** [7] - 56:17, 57:2, 57:13, 57:16, 70:17, 83:9, 83:17

**Sandra** [3] - 2:4, 15:11, 274:21

**SANDRA** [1] - 274:21

**Santorio** [1] - 196:24

**sat** [1] - 180:21

**Saturday** [1] - 180:7

**saw** [11] - 23:9, 114:17, 114:21, 178:25, 221:20, 249:2, 249:3, 255:16, 256:13, 256:14, 256:17

**Sawgrass** [5] - 189:3, 189:7, 189:11, 189:14, 191:3

**sawgrass** [1] - 189:12

**scenario** [13] - 127:14, 127:16, 127:17, 127:20, 130:8, 158:24, 164:7, 164:13, 164:19, 165:25, 166:20, 178:10

**scenarios** [3] - 145:6, 166:25, 174:15

**scene** [4] - 201:5, 201:8, 246:7, 267:8

**scheduled** [4] - 62:15, 62:18, 194:19, 228:7

**scheduling** [1] - 272:14

**school** [2] - 37:1, 243:16

**School** [1] - 266:4

**schools** [1] - 238:15

**scope** [3] - 192:2, 195:9, 195:11

**screen** [2] - 51:7, 73:24, 74:2, 153:25, 212:4, 223:3, 258:7

**script** [1] - 167:5

**seal** [34] - 79:8, 112:12, 112:15, 112:18, 113:6, 113:14, 113:15, 113:20, 113:22, 200:22, 203:9, 203:10, 205:22, 247:10, 247:12, 247:17, 254:7, 254:8, 254:10, 254:11, 254:15, 254:18, 254:20, 269:15, 269:16, 270:2, 270:8, 270:11, 270:20, 270:24, 271:4

**Seal** [2] - 79:10, 200:24

**sealed** [3] - 85:9, 88:17, 88:24

**seals** [5] - 253:24, 254:1, 254:2, 269:22, 269:25

**search** [10] - 180:1, 247:3, 247:5, 247:19, 249:2, 253:13, 253:19, 267:23, 268:21, 271:10

**searched** [7] - 61:20, 61:23, 61:25, 62:1, 179:25, 203:18, 204:4

**searches** [2] - 179:24, 180:3

**seat** [1] - 267:11

**seated** [14] - 8:10, 44:23, 48:2, 52:23, 54:17, 54:18, 82:17, 120:10, 123:20, 216:23, 219:13, 224:7, 237:8, 253:15

**seats** [1] - 226:8

**second** [21] - 20:15, 27:9, 38:9, 57:25, 58:1, 71:23, 72:9, 75:16, 89:16, 132:5, 142:16, 147:18, 157:1, 191:7, 196:14, 204:18, 227:10, 241:4, 256:13, 256:14, 256:17

**secondary** [2] - 238:3, 267:13

**section** [3] - 75:18,

77:22, 156:11

**secure** [3] - 57:5, 58:18, 61:12

**secured** [1] - 77:7

**security** [1] - 80:13

**SECURITY** [13] - 6:2, 6:6, 82:8, 82:13, 82:16, 120:5, 123:15, 123:18, 216:14, 216:19, 216:22, 272:8, 274:14

**see** [74] - 47:20, 47:23, 54:13, 73:21, 75:13, 88:23, 89:13, 90:24, 95:3, 105:16, 107:2, 108:18, 108:21, 111:6, 112:4, 112:13, 112:17, 113:11, 114:3, 114:12, 115:24, 153:1, 153:3, 153:4, 153:5, 161:15, 190:17, 190:25, 191:2, 191:5, 194:5, 195:22, 203:10, 203:13, 204:14, 205:21, 206:15, 206:24, 207:21, 209:23, 211:14, 212:7, 212:18, 213:1, 228:25, 234:24, 242:5, 244:5, 244:19, 248:4, 248:13, 250:6, 252:12, 252:17, 258:24, 259:24, 260:20, 261:5, 261:13, 261:18, 261:22, 262:3, 262:8, 262:20, 263:2, 263:8, 266:14, 267:20, 268:15, 269:9, 271:6, 271:7, 274:12

**see-thru** [1] - 115:24

**seeing** [1] - 110:18

**sees** [2] - 109:4, 118:22

**seized** [21] - 8:19, 9:2, 40:25, 55:7, 55:20, 58:20, 60:12, 69:15, 70:18, 71:7, 71:10, 79:20, 89:19, 114:23, 182:18, 182:23, 206:7, 207:14, 208:12, 211:6, 211:21

**seizure** [5] - 9:1, 9:23, 63:14, 89:24, 203:2

**selected** [1] - 24:20

**sell** [1] - 199:19

selling [2] - 26:10, 26:12
semi [3] - 118:13, 240:1, 240:19
semi-truck [1] - 118:13
send [3] - 19:19, 19:25, 186:4
senior [2] - 83:12, 83:20
sent [4] - 56:20, 70:20, 70:21, 206:19
sentence [3] - 21:16, 21:19, 196:3
sentenced [4] - 28:19, 168:25, 194:8, 195:2
Sentencing [1] - 193:4
sentencing [3] - 194:10, 194:20, 196:11
separate [2] - 87:15, 246:25
separately [1] - 266:11
September [1] - 194:9
series [3] - 95:4, 95:6, 109:18
served [2] - 186:15, 190:22
service [4] - 11:12, 53:13, 225:15, 238:5
services [2] - 225:10, 225:18
session [2] - 6:8, 123:19
set [13] - 25:12, 25:13, 25:19, 25:23, 26:5, 30:22, 66:1, 67:4, 130:8, 158:24, 164:12, 164:20, 165:25
Seth [1] - 169:10
sets [3] - 72:13, 127:14, 251:6
seven [4] - 11:24, 13:22, 175:20, 215:11
seventh [1] - 49:15
seventy [1] - 215:11
seventy-seven [1] - 215:11
several [4] - 54:6, 57:16, 113:7, 168:11
shall [1] - 44:14, 52:14, 219:4, 223:23, 236:24
sham [8] - 85:8, 86:6, 86:12, 87:25,

88:24, 128:4, 164:11, 164:21
sheet [19] - 77:16, 78:24, 102:5, 102:9, 102:10, 104:11, 104:13, 105:3, 105:6, 106:20, 107:8, 110:24, 112:4, 112:21, 114:10, 203:9, 204:19, 209:5
sheets [1] - 207:23
Sheldon [36] - 35:24, 36:14, 36:17, 39:23, 50:7, 53:22, 54:13, 84:23, 87:1, 87:6, 92:1, 94:7, 95:11, 96:8, 96:22, 131:18, 131:25, 141:4, 152:24, 155:7, 157:1, 157:14, 158:1, 158:15, 158:18, 158:20, 158:22, 158:25, 159:3, 163:22, 164:14, 164:16, 168:18, 169:6, 185:2, 229:10
SHELDON [1] - 1:7
shelf [1] - 91:3
shell [1] - 78:21
SHERWOOD [2] - 3:17, 224:2
Sherwood [11] - 94:15, 94:16, 94:17, 95:23, 96:5, 223:19, 224:10, 224:16, 233:7, 234:1, 236:17
shift [3] - 148:19, 180:24, 184:17
shifted [1] - 250:24
ship [5] - 107:5, 108:11, 108:17, 109:6, 217:18
shipment [2] - 116:13, 215:2
shipments [3] - 12:1, 12:10, 64:1
shipped [4] - 77:18, 77:24, 106:24, 111:17
shipper [2] - 212:1, 212:8
shipping [6] - 107:9, 110:24, 204:19, 213:20, 271:3
shirt [5] - 244:10, 244:11, 244:25
shook [1] - 33:23
short [1] - 42:19
SHORTER [1] - 1:7
shorter [3] - 40:22, 85:23, 184:19

Shorter [108] - 1:20, 8:23, 8:25, 9:6, 9:17, 10:5, 10:15, 10:18, 10:25, 13:6, 13:14, 14:1, 14:20, 15:15, 16:6, 16:14, 18:12, 19:16, 34:19, 34:20, 35:24, 36:14, 36:17, 38:23, 38:24, 39:24, 40:24, 41:12, 41:15, 42:7, 42:16, 42:21, 43:1, 43:25, 44:2, 50:8, 53:22, 54:14, 84:15, 84:20, 84:23, 85:4, 85:14, 86:11, 87:1, 87:6, 92:2, 94:8, 95:11, 127:6, 127:9, 131:18, 131:25, 133:8, 133:9, 141:5, 141:10, 141:14, 141:16, 141:20, 142:4, 142:6, 142:7, 152:24, 154:11, 155:7, 155:18, 156:1, 156:6, 157:1, 157:14, 158:1, 158:15, 158:18, 158:20, 158:22, 158:25, 159:3, 161:8, 162:6, 163:22, 164:14, 164:16, 168:18, 169:6, 184:23, 185:2, 185:21, 185:22, 186:25, 187:1, 188:7, 188:11, 189:3, 190:21, 191:13, 191:20, 192:14, 192:15, 192:19, 194:17, 195:5, 221:5, 221:22, 229:10
Shorter'd [1] - 13:6
Shorter's [6] - 9:12, 9:13, 11:25, 42:24, 96:8, 96:22
shortly [1] - 192:8
shot [1] - 263:6
shoulder [1] - 242:4
show [41] - 16:23, 32:1, 37:23, 55:22, 70:1, 71:16, 89:2, 93:5, 94:18, 95:2, 103:12, 117:25, 129:23, 155:1, 155:10, 155:20, 156:15, 156:21, 191:12, 192:13, 193:1, 195:4, 196:7, 201:18, 205:1, 205:3, 207:18, 208:18, 210:5, 211:2, 213:18,

227:1, 249:16, 250:11, 250:21, 257:16, 258:12, 259:12, 259:19, 261:16, 264:25
showed [12] - 22:10, 22:12, 22:14, 22:16, 23:6, 31:20, 31:24, 31:25, 32:3, 125:23, 201:9, 217:11
showing [1] - 102:18
shown [10] - 69:20, 75:15, 83:10, 83:14, 83:18, 83:22, 88:20, 118:1, 168:12, 168:17
shows [13] - 73:10, 73:21, 74:18, 74:24, 75:8, 76:15, 77:22, 77:24, 104:6, 213:13, 234:8, 234:13, 250:13
shrink [3] - 88:17, 251:13, 252:8
shrink-wrapped [2] - 88:17, 251:13
side [21] - 13:12, 67:5, 67:9, 67:17, 81:20, 117:1, 186:2, 202:17, 203:19, 223:2, 234:13, 240:1, 240:16, 240:21, 246:8, 251:4, 261:23, 265:10, 265:12, 269:6, 269:7
sidebar [3] - 80:2, 160:13, 213:3
SIDEBAR [6] - 80:4, 82:1, 160:14, 163:7, 213:4, 214:20
sides [1] - 147:3
sidewalk [2] - 262:1, 262:8
sign [6] - 171:17, 258:19, 259:14, 260:15, 260:18, 263:12
signage [4] - 258:14, 260:10, 262:22, 263:3
signature [7] - 72:2, 72:3, 72:11, 79:1, 114:12, 208:24, 209:7
signed [3] - 78:25, 114:9, 197:15
significance [1] - 170:2
significant [3] - 96:20, 135:23, 176:12
signs [2] - 259:19, 260:21
silver [2] - 149:4, 149:10

similar [7] - 79:16, 95:1, 145:20, 145:21, 196:8, 246:13, 251:13
simply [9] - 113:10, 142:25, 180:22, 214:13, 241:16, 243:1, 248:15, 251:19, 252:20
single [1] - 242:17
siren [1] - 243:5
sirs [1] - 240:10
sister [2] - 151:10, 151:14
sister's [1] - 27:20
sit [1] - 160:24
site [2] - 241:9, 243:23
sitting [8] - 54:21, 244:9, 244:11, 244:24, 248:3, 248:5, 250:22, 251:9, 274:5
situation [13] - 43:5, 43:7, 61:15, 90:16, 118:9, 123:5, 146:12, 165:3, 175:5, 186:18, 229:19, 245:13, 247:15
six [8] - 11:24, 22:4, 22:6, 53:16, 94:25, 96:16, 129:14, 232:14
sixth [1] - 228:10
sleeper [2] - 75:10, 76:20
sleeping [1] - 209:16
sleeved [1] - 244:10
slow [1] - 242:23
small [4] - 142:21, 146:4, 168:13, 168:14
smiling [4] - 245:15, 245:16, 257:5, 257:10
smuggled [1] - 252:18
smuggling [1] - 267:6
sold [11] - 36:22, 40:1, 77:17, 105:16, 105:21, 106:16, 197:21, 198:3, 198:13, 198:15, 198:20
solely [1] - 269:11
solemnly [6] - 7:1, 44:13, 52:13, 219:3, 223:22, 236:23
someone [19] - 21:11, 36:6, 42:8, 51:12, 130:9, 134:10, 142:10, 143:9, 143:10, 174:20, 178:6, 181:19, 182:2,

183:16, 183:21, 188:22, 197:20, 198:15, 200:7
**sometimes** [8] - 31:3, 33:15, 34:10, 137:5, 137:7, 145:19, 172:6
**somewhat** [2] - 73:23, 166:6
**somewhere** [5] - 33:3, 124:22, 184:18, 200:5, 268:10
**soon** [3] - 65:17, 66:17, 248:1
**sophisticated** [1] - 143:15
**sorry** [23] - 8:24, 10:3, 20:5, 49:15, 58:22, 62:17, 72:22, 109:25, 114:19, 130:6, 137:1, 137:12, 141:11, 155:15, 183:13, 189:10, 197:8, 212:17, 214:4, 234:25, 257:12, 258:20
**sort** [9] - 11:14, 15:23, 71:10, 100:25, 221:11, 225:5, 225:10, 262:11
**source** [16] - 16:7, 43:24, 60:10, 98:13, 98:14, 133:10, 144:25, 170:4, 171:8, 171:19, 171:21, 172:1, 175:8, 177:15, 182:11, 186:9
**sources** [6] - 172:6, 176:7, 176:22, 178:10, 178:13, 178:14
**south** [12] - 187:12, 187:13, 220:6, 242:3, 242:15, 256:19, 258:15, 259:14, 260:3, 265:9, 265:11, 265:16
**southbound** [7] - 119:8, 241:13, 242:11, 242:14, 242:24, 243:8, 243:10
**southeast** [1] - 70:21
**Southwest** [6] - 24:24, 181:9, 181:13, 181:16, 181:17, 182:5
**speaker** [1] - 98:10
**speakers** [2] - 98:8, 101:5
**speaking** [9] - 54:11, 74:10, 91:23, 94:17,

98:3, 98:5, 111:4, 128:4, 168:5
**SPEAKING** [1] - 123:9
**Special** [8] - 200:20, 214:24, 216:4, 219:21, 220:1, 224:20, 240:5, 240:22
**special** [1] - 239:2
**specialist** [1] - 52:5
**specialized** [1] - 176:2
**specific** [14] - 54:20, 60:11, 60:13, 68:16, 75:23, 76:7, 79:23, 88:3, 106:24, 125:17, 125:20, 168:7, 181:4, 222:17
**specifically** [18] - 41:19, 46:22, 94:13, 97:18, 103:1, 105:23, 125:13, 130:24, 135:12, 136:8, 138:5, 138:25, 159:2, 176:6, 188:14, 189:25, 199:20, 240:5
**specifics** [1] - 197:24
**speed** [2] - 242:23, 243:9
**spell** [5] - 44:24, 52:24, 219:14, 224:8, 237:9
**spelled** [3] - 53:2, 75:19, 237:12
**spend** [1] - 178:3
**spent** [2] - 174:17, 217:4
**spoken** [4] - 66:25, 154:9, 215:19, 224:20
**sports** [1] - 230:19
**spot** [3] - 220:17, 221:1, 221:18
**spotted** [1] - 221:19
**spread** [2] - 94:22, 94:23
**spring** [1] - 220:3
**spur** [1] - 137:5
**squeal** [1] - 40:3
**St** [4] - 1:17, 2:2, 87:16, 261:8
**stack** [1] - 213:10
**stacked** [1] - 56:13
**stages** [1] - 64:11
**stainless** [1] - 112:24
**stamp** [1] - 212:7
**stand** [7] - 44:23, 52:23, 57:14, 219:13, 224:7, 227:18, 246:6

**standard** [1] - 46:12
**standby** [1] - 274:1
**standing** [2] - 8:11, 245:1
**Star** [1] - 235:20
**Starkey** [2] - 55:21, 58:25
**start** [2] - 98:4, 162:25
**started** [4] - 171:15, 179:16, 197:14, 238:13
**starting** [2] - 195:18, 250:5
**starts** [2] - 155:5, 156:19
**State** [3] - 77:19, 217:21, 245:23
**state** [11] - 7:6, 44:24, 52:24, 152:23, 182:11, 197:13, 212:20, 217:23, 219:14, 224:8, 237:9
**statement** [1] - 118:7
**statements** [3] - 43:13, 43:18, 43:20
**STATES** [3] - 1:1, 1:3, 1:13
**states** [5] - 108:5, 133:4, 155:8, 194:15, 212:9
**States** [6] - 45:17, 83:12, 83:20, 191:17, 193:2, 195:18
**stating** [3] - 98:17, 138:25, 183:7
**station** [3] - 86:15, 86:20, 87:12
**status** [9] - 75:9, 75:10, 76:13, 76:16, 76:20, 80:19, 103:8, 103:12, 103:15
**stay** [2] - 163:17, 167:11
**stayed** [1] - 170:23
**staying** [1] - 120:14
**Ste** [2] - 1:18, 1:23
**steel** [3] - 112:25, 113:19
**stenographic** [1] - 274:17
**STENOGRAPHICALLY** [1] - 2:8
**step** [5] - 42:19, 56:24, 57:4, 143:12
**STEPHEN** [1] - 2:1
**Stephen** [1] - 2:1
**steps** [6] - 64:25, 185:14, 188:25, 190:3, 190:5, 230:23

**still** [12] - 59:21, 75:6, 102:3, 102:7, 126:18, 133:10, 140:9, 159:23, 170:23, 197:17, 260:2, 260:23
**stipulate** [2] - 48:4, 229:9
**stipulated** [1] - 83:8
**stipulation** [6] - 82:22, 83:7, 83:24, 208:5, 210:20, 229:12
**stock** [1] - 46:12
**stolen** [4] - 197:21, 198:5, 198:15, 199:19
**stop** [10] - 40:16, 40:21, 65:18, 68:20, 68:21, 69:1, 69:11, 87:23, 89:21, 90:7, 182:23, 201:8, 226:1, 243:3, 243:4, 244:3, 246:17, 256:23, 270:7
**stopped** [16] - 33:20, 40:25, 42:19, 68:9, 109:23, 114:15, 182:17, 183:1, 201:1, 201:5, 201:7, 203:18, 204:4, 244:1, 250:8, 265:22
**stopping** [1] - 243:22
**storage** [1] - 68:24
**store** [4] - 24:19, 197:21, 198:2, 200:8
**stored** [2] - 55:5, 151:6
**Stores** [5] - 77:18, 105:23, 106:1, 106:8, 106:16
**story** [5] - 182:1, 187:16, 188:7, 266:14, 266:15
**straddling** [1] - 242:16
**straight** [1] - 178:15
**strange** [1] - 221:12
**street** [9] - 69:2, 122:10, 170:18, 171:3, 171:6, 171:11, 171:13, 186:3, 262:20
**Street** [6] - 102:14, 108:9, 220:7, 222:11, 258:19, 263:17
**strip** [3] - 69:6, 246:11, 246:12
**stuff** [1] - 34:1
**subject** [9] - 46:9, 125:7, 139:2, 148:19, 163:12, 164:3, 167:8, 169:15, 222:18
**subjects** [5] - 60:11,

95:8, 96:9, 191:7, 221:18
**submit** [1] - 100:23
**submitted** [3] - 58:3, 83:24, 92:15
**subpoena** [1] - 45:16
**subpoenas** [4] - 45:19, 182:4, 186:15, 190:22
**subsequent** [1] - 171:2
**subsequently** [2] - 142:10, 171:13
**substance** [4] - 83:14, 83:22, 172:10, 252:13
**substances** [2] - 83:10, 83:18
**substantial** [1] - 36:11
**substantially** [2] - 74:5, 74:7
**substitute** [1] - 209:24
**substituting** [1] - 207:9
**substitution** [1] - 207:2
**successful** [1] - 35:12
**sufficient** [3] - 126:5, 146:15, 200:2
**suggestion** [2] - 81:13, 161:19
**suggestive** [1] - 95:5
**suit** [1] - 54:19
**Suite** [1] - 1:20
**suited** [1] - 88:6
**Sunday** [1] - 103:20
**SunPass** [3] - 190:9, 190:15, 190:22
**Sunrise** [2] - 189:13, 189:17
**supervising** [1] - 30:6
**supply** [2] - 43:24, 56:18
**support** [1] - 52:5
**supposed** [7] - 65:6, 74:21, 80:23, 194:8, 198:19, 239:25, 252:9
**supposedly** [1] - 104:3
**suppression** [1] - 255:21
**surrender** [1] - 55:2
**surreptitiously** [2] - 267:1, 267:14
**surrounding** [1] - 197:25

**surveil** [3] - 139:18, 165:23, 179:10

**surveillance** [14] - 61:11, 86:18, 86:19, 90:3, 137:6, 220:6, 220:10, 220:13, 220:16, 221:17, 221:19, 221:20, 222:18, 239:23

**surveilling** [1] - 165:21

**suspect** [1] - 67:12

**suspected** [1] - 247:22

**suspicion** [2] - 90:13, 267:4

**sustained** [4] - 159:18, 192:3, 192:10, 199:5

**Swanson** [1] - 123:4

**swear** [6] - 7:1, 44:13, 52:13, 219:3, 223:22, 236:23

**SWIFT** [1] - 116:25

**Swift** [4] - 67:17, 117:1, 240:1, 240:16

**swing** [1] - 238:23

**switch** [1] - 143:13

**sworn** [8] - 6:21, 7:16, 44:12, 44:19, 52:19, 219:9, 224:3, 237:4

**swung** [1] - 243:11

**synopsis** [4] - 133:16, 133:23, 134:3, 134:8

**system** [1] - 24:10

### T

**T-shirt** [1] - 244:10

**table** [3] - 54:18, 159:24, 227:24

**tables** [1] - 8:10

**tag** [1] - 57:18

**tagged** [1] - 57:15

**TAKEN** [3] - 82:11, 123:13, 216:17

**Tampa** [21] - 1:17, 1:18, 1:24, 2:3, 2:6, 24:22, 33:2, 60:2, 64:1, 65:23, 66:19, 86:16, 189:20, 189:23, 203:19, 203:22, 226:1, 229:25, 230:4, 230:8, 238:21

**tandem** [1] - 87:15

**tape** [3] - 252:5,

267:1, 267:18

**taped** [1] - 252:20

**target** [3] - 218:14, 220:20, 239:24

**targets** [4] - 61:20, 63:3, 165:5, 221:4

**task** [2] - 182:19, 238:19

**tasked** [1] - 221:18

**tasks** [1] - 63:1

**taught** [2] - 177:22, 178:1

**tax** [3] - 49:23, 50:1, 50:2

**technical** [1] - 38:10

**techniques** [1] - 238:20

**TEJERA** [1] - 233:17

**Tejera** [1] - 52:5

**telephone** [23] - 40:22, 62:8, 65:4, 66:8, 80:18, 98:23, 126:15, 137:3, 137:7, 139:4, 139:9, 141:1, 142:23, 144:10, 145:24, 146:24, 147:16, 151:23, 152:4, 156:18, 174:19, 184:2, 185:17

**telephones** [5] - 139:16, 147:12, 147:21, 148:2, 179:23

**telephonic** [3] - 66:6, 86:8, 87:8

**temperature** [7] - 79:3, 79:5, 248:24, 249:4, 249:5, 269:1, 269:8

**ten** [6] - 34:3, 34:4, 45:25, 79:6, 243:9, 243:20

**tenth** [1] - 125:4

**term** [2] - 60:4, 238:5

**terminology** [2] - 134:6, 215:12

**terms** [3] - 109:8, 112:19, 130:8

**test** [2] - 125:18, 253:2

**tested** [2] - 83:11, 83:19

**testified** [36] - 7:18, 24:12, 40:21, 41:22, 44:21, 52:21, 76:2, 92:8, 106:7, 108:8, 110:2, 110:13, 112:12, 113:15, 114:14, 115:1, 115:13, 116:2, 116:10, 116:22,

118:3, 127:24, 128:2, 138:14, 146:11, 164:12, 179:3, 185:16, 186:25, 187:23, 198:18, 199:13, 199:20, 219:11, 224:5, 237:6

**testifies** [1] - 159:12

**testify** [5] - 20:24, 105:25, 112:8, 154:21, 273:21

**testifying** [5] - 21:14, 39:20, 48:17, 178:24, 180:13

**testimony** [19] - 41:3, 43:15, 44:14, 45:12, 52:7, 52:14, 83:25, 90:17, 114:20, 128:7, 152:20, 162:5, 180:13, 180:23, 184:20, 199:17, 219:4, 223:23, 236:24

**testing** [4] - 56:18, 56:21, 70:11, 70:20

**tests** [1] - 253:5

**text** [1] - 80:17

**that'll** [1] - 81:8

**THE** [276] - 1:1, 1:1, 1:13, 6:4, 6:9, 6:11, 6:13, 6:17, 6:20, 6:21, 6:22, 6:23, 7:5, 7:8, 7:10, 7:12, 7:13, 14:23, 17:2, 17:18, 17:20, 19:8, 20:12, 20:16, 30:7, 30:10, 37:21, 38:12, 38:16, 38:19, 38:24, 39:1, 40:7, 40:11, 42:4, 44:6, 44:17, 45:1, 45:3, 48:7, 48:23, 49:9, 50:24, 51:18, 51:21, 51:23, 51:25, 52:9, 52:17, 53:1, 53:3, 54:24, 55:12, 56:3, 56:5, 57:6, 58:11, 58:14, 59:8, 70:7, 71:2, 71:4, 72:21, 73:2, 73:5, 78:3, 78:6, 80:3, 80:4, 80:9, 80:12, 80:24, 81:3, 81:8, 81:11, 81:15, 81:18, 81:24, 82:1, 82:2, 82:3, 82:10, 82:11, 82:15, 82:19, 82:25, 83:4, 84:2, 86:21, 86:24, 87:2, 87:3, 89:8, 89:11, 91:15, 91:19, 93:18, 93:21, 95:17, 96:2, 97:3, 101:21,

105:9, 111:1, 119:20, 119:23, 120:7, 120:8, 120:10, 120:22, 121:3, 121:6, 121:9, 121:13, 121:14, 121:16, 121:17, 121:18, 121:20, 121:22, 121:25, 122:2, 122:5, 122:7, 122:11, 122:14, 122:16, 122:17, 122:22, 122:23, 123:1, 123:8, 123:9, 123:10, 123:11, 123:13, 123:14, 123:17, 123:21, 123:23, 124:1, 124:4, 126:3, 129:5, 129:21, 132:11, 152:13, 157:7, 159:18, 160:1, 160:6, 160:8, 160:13, 160:14, 160:16, 161:4, 161:14, 161:20, 162:4, 162:24, 163:6, 163:7, 163:8, 163:10, 163:13, 177:3, 177:12, 177:13, 180:10, 191:10, 191:22, 192:3, 192:6, 192:10, 192:12, 192:15, 192:18, 192:24, 193:8, 193:19, 195:11, 195:20, 195:23, 195:24, 196:16, 196:19, 199:5, 199:11, 199:25, 200:13, 200:16, 202:2, 205:12, 205:14, 207:11, 208:6, 208:8, 210:10, 210:14, 211:11, 213:2, 213:4, 213:6, 213:22, 214:2, 214:12, 214:18, 214:20, 214:21, 216:6, 216:9, 216:12, 216:16, 216:17, 216:21, 216:24, 218:22, 219:7, 219:16, 219:17, 222:4, 223:11, 223:14, 223:16, 223:17, 223:18, 224:1, 224:10, 224:12, 227:15, 227:20, 227:23, 229:11, 233:2, 234:24, 236:8, 236:9, 236:12, 236:14,

236:16, 237:2, 237:11, 237:13, 244:16, 245:5, 249:9, 249:23, 250:1, 250:21, 255:4, 255:7, 255:11, 257:24, 258:1, 258:22, 260:15, 272:1, 272:2, 272:10, 272:11, 272:15, 272:20, 273:3, 273:8, 273:16, 273:19, 274:8, 274:13

**theme** [1] - 84:16

**THEN** [2] - 82:11, 123:14, 216:17

**thereafter** [2] - 119:4

**therefore** [2] - 194:17, 196:2

**therein** [1] - 252:25

**THEREUPON** [11] - 6:4, 82:10, 82:11, 82:15, 120:7, 123:13, 123:17, 216:16, 216:17, 216:21, 272:10

**thinking** [2] - 117:23, 187:6

**third** [6] - 71:23, 72:10, 157:3, 188:10, 228:20, 228:22

**Thomas** [1] - 202:6

**thousand** [10] - 11:19, 11:20, 13:22, 16:4, 34:3, 34:4, 49:22, 101:14, 128:18, 232:22

**three** [19] - 21:24, 22:7, 63:13, 96:16, 96:24, 155:2, 155:4, 155:12, 155:14, 155:16, 156:9, 156:23, 168:22, 181:5, 182:1, 192:9, 226:12, 232:9, 242:14

**throw** [2] - 139:17, 147:21

**throwing** [1] - 95:5

**Thursday** [1] - 273:13

**ticket** [1] - 191:2

**tie** [2] - 244:12, 244:25

**tied** [1] - 138:3

**TIME** [5] - 80:4, 160:14, 163:7, 213:4, 214:20

**title** [11] - 49:24, 50:1, 50:2, 130:13, 131:1, 131:11, 131:13, 140:14,

140:16, 140:23,
142:14

**TL** [1] - 73:25

**TO** [9] - 6:4, 82:10,
82:15, 120:7, 123:9,
123:17, 216:16,
216:21, 272:10

**today** [20] - 20:21,
20:22, 20:24, 21:15,
35:23, 47:24, 48:17,
54:14, 57:2, 104:10,
116:10, 137:16,
149:20, 180:5,
197:18, 229:1, 244:5,
244:20, 257:16, 272:3

**together** [6] - 88:1,
95:2, 95:10, 159:20,
207:20, 209:15

**toll** [2] - 190:13,
190:16

**tolls** [1] - 190:19

**tomorrow** [11] -
161:23, 163:2, 164:2,
207:1, 272:4, 272:11,
272:23, 273:1, 273:2,
274:10, 274:12

**tonight** [1] - 206:24

**took** [11] - 31:10,
31:23, 33:23, 62:14,
62:19, 69:24, 89:24,
148:17, 226:11,
248:22, 265:16

**tools** [2] - 254:18,
254:23

**top** [19] - 72:8, 91:3,
105:15, 107:4,
107:11, 107:23,
108:17, 109:12,
109:13, 111:3,
154:11, 154:12,
194:6, 217:18,
234:22, 248:12,
251:24, 252:8, 254:10

**Torino** [1] - 257:13

**torn** [1] - 264:13

**total** [8] - 22:2,
49:23, 78:12, 78:13,
89:18, 114:4, 151:16,
232:20

**Total** [2] - 262:24,
263:10

**totally** [2] - 148:1,
148:5

**touch** [1] - 223:6

**towards** [6] - 128:19,
128:22, 131:15,
131:25, 261:11,
261:12

**Town** [1] - 200:8

**town** [6] - 13:8,

120:14, 138:4,
138:19, 138:20,
220:21

**townhouse** [1] -
222:13

**townhouses** [1] -
222:15

**TR** [1] - 73:25

**tractor** [44] - 8:5,
11:3, 12:10, 12:12,
12:13, 40:16, 65:18,
67:21, 68:5, 68:6,
69:12, 76:24, 78:16,
78:17, 113:21,
116:13, 118:14,
200:25, 201:4,
201:11, 201:22,
203:17, 204:4,
211:21, 215:1,
240:11, 240:19,
240:25, 241:1, 242:5,
242:18, 243:6, 250:7,
253:25, 255:16,
256:5, 261:2, 264:17,
265:7, 265:15, 266:9,
268:22, 269:16,
271:11

**traffic** [9] - 68:21,
87:22, 89:21, 191:6,
201:8, 241:19,
260:12, 263:3, 265:3

**trafficker** [6] - 60:4,
60:8, 60:15, 60:17,
60:19, 61:5

**traffickers** [1] - 88:16

**trafficking** [1] -
220:3

**trailer** [73] - 12:10,
12:12, 40:16, 40:17,
65:19, 67:16, 67:21,
68:5, 68:6, 68:14,
69:12, 73:14, 76:24,
78:16, 78:17, 109:22,
110:11, 113:1,
113:17, 114:15,
114:23, 115:4, 115:9,
115:17, 116:14,
116:25, 117:1,
118:14, 201:1, 201:4,
201:11, 201:22,
203:2, 203:11,
203:17, 204:4,
211:21, 215:1, 215:2,
240:11, 240:15,
240:20, 241:1, 242:5,
242:18, 243:6,
246:24, 247:1, 248:3,
248:5, 248:6, 248:11,
248:15, 248:16,
250:12, 251:20,

251:22, 253:25,
255:16, 256:6, 256:7,
261:2, 264:17, 265:7,
265:16, 266:9,
267:24, 268:22,
269:1, 269:7, 269:16,
269:18, 271:11

**trailers** [5] - 8:5,
11:3, 12:13, 241:2,
269:15

**trained** [2] - 177:9,
177:20

**training** [9] - 176:2,
176:4, 176:6, 176:8,
177:6, 238:17, 266:5,
266:13

**transaction** [5] -
48:19, 49:3, 92:12,
150:11, 150:14

**transactions** [3] -
15:18, 48:11, 61:17

**transcribe** [3] -
153:8, 153:11, 153:14

**transcribed** [2] -
153:10, 157:24

**TRANSCRIPT** [1] -
1:12

**transcript** [10] -
99:14, 101:2, 101:4,
134:2, 134:11, 153:4,
154:18, 154:19,
255:25, 268:6

**transcription** [1] -
274:17

**TRANSCRIPTION** [1]
- 2:8

**transcripts** [30] -
22:12, 97:11, 97:13,
97:15, 97:19, 97:21,
97:23, 97:25, 98:3,
98:6, 152:8, 152:14,
152:15, 154:7, 157:9,
157:12, 158:9, 159:4,
159:24, 160:3,
160:22, 161:12,
161:22, 162:9,
162:11, 163:18,
163:20, 163:21,
164:2, 166:5

**translation** [1] -
100:24

**translators** [1] -
100:21

**transport** [1] - 88:18

**transportation** [2] -
232:4, 266:5

**transported** [1] -
12:9

**trap** [1] - 165:25

**travel** [8] - 85:14,

86:17, 89:23, 90:1,
182:6, 182:13,
182:14, 220:5

**traveled** [3] - 181:8,
225:25

**traveling** [3] - 67:2,
119:16, 242:13

**travelled** [5] -
181:18, 181:19,
181:23, 182:1, 220:11

**treated** [3] - 21:2,
21:4, 60:17

**Trenton** [4] - 121:16,
121:18, 121:23, 122:1

**TRIAL** [1] - 1:12

**trial** [7] - 22:8, 23:21,
80:21, 120:14,
120:21, 180:7, 273:7

**tried** [1] - 35:16

**trip** [5] - 113:18,
182:16, 213:10,
232:20, 235:2

**trips** [6] - 181:3,
181:7, 181:10,
181:16, 184:18,
186:14

**Trooper** [16] - 65:14,
65:24, 66:10, 67:4,
67:11, 67:19, 67:20,
68:1, 87:21, 100:4,
114:16, 114:23,
247:2, 249:11,
255:15, 271:25

**trooper** [5] - 237:11,
237:17, 237:25,
239:1, 246:6

**truck** [62] - 41:7,
41:9, 41:13, 41:23,
65:7, 65:17, 65:22,
66:2, 66:7, 66:11,
66:25, 67:7, 67:15,
68:8, 68:9, 68:12,
69:15, 69:25, 70:19,
71:8, 71:11, 74:21,
77:1, 77:7, 77:12,
79:14, 104:3, 104:18,
108:14, 110:17,
112:22, 116:19,
116:25, 117:9,
117:24, 118:1,
118:13, 201:4,
201:11, 201:13,
206:9, 215:1, 215:3,
215:24, 217:13,
240:8, 240:15,
241:10, 247:3,
247:13, 247:14,
247:16, 253:8,
255:16, 256:6, 261:2,
265:7, 265:16, 266:9,

270:9, 271:11

**trucker** [3] - 112:18,
261:25, 270:7

**truckers** [2] - 117:20,
269:21

**truckers'** [1] - 261:21

**trucking** [5] - 71:12,
113:4, 206:10,
206:13, 213:19

**trucks** [3] - 117:12,
117:13, 271:3

**true** [21] - 21:9,
21:12, 23:12, 36:3,
36:7, 36:15, 136:3,
139:5, 148:3, 150:17,
172:21, 174:11,
175:4, 175:7, 176:20,
177:23, 178:3,
181:20, 197:22,
199:14, 274:17

**truly** [1] - 7:2

**truth** [43] - 7:17,
7:18, 36:4, 36:5, 36:8,
44:15, 44:16, 44:20,
52:15, 52:20, 59:5,
97:9, 177:18,
185:10, 185:12,
187:23, 188:23,
219:5, 219:10,
223:24, 223:25,
224:4, 236:25, 237:5

**try** [9] - 64:12, 85:3,
125:14, 186:7,
186:10, 186:16,
269:18, 274:5, 274:8

**trying** [20] - 24:6,
84:22, 90:14, 125:18,
125:19, 128:12,
134:6, 159:13,
161:10, 167:23,
171:4, 186:1, 188:2,
188:3, 197:24,
213:18, 220:25,
243:19, 261:11

**turn** [22] - 86:3,
119:3, 119:8, 126:24,
130:10, 131:13,
140:23, 142:2, 142:8,
143:10, 143:13,
145:13, 145:14,
208:14, 228:10,
241:13, 242:1,
243:12, 262:2, 265:4

**turned** [9] - 38:17,
43:15, 92:1, 128:5,
130:20, 131:3, 141:6,
253:12, 253:21

**turning** [1] - 131:5

**twenty** [1] - 219:25

**twenty-two** [1] -

**twice** [2] - 47:18, 220:24

**two** [48] - 19:3, 22:4, 27:4, 47:19, 57:21, 61:21, 63:13, 73:16, 83:17, 96:16, 101:12, 101:13, 104:19, 109:8, 116:9, 118:8, 119:10, 121:4, 142:18, 142:20, 147:18, 147:19, 151:6, 155:23, 156:4, 159:20, 159:22, 160:23, 183:14, 219:25, 221:16, 228:9, 228:15, 228:17, 230:19, 232:22, 240:21, 242:14, 242:22, 246:18, 246:25, 256:7, 256:8, 256:19, 260:20, 266:14, 267:15

**type** [12] - 46:9, 62:12, 113:6, 113:8, 124:19, 145:1, 146:13, 232:3, 253:24, 263:25, 264:4, 267:4

**typed** [1] - 255:20

**types** [1] - 142:18

**typical** [1] - 259:22

**U**

**U.S** [17] - 1:16, 1:17, 2:5, 52:6, 69:9, 118:4, 118:22, 119:1, 119:6, 119:14, 123:6, 123:9, 206:5, 259:25, 261:6, 262:18, 264:7

**Ulmerton** [33] - 69:9, 118:4, 118:18, 118:23, 118:25, 119:1, 119:11, 119:16, 241:14, 241:17, 241:21, 241:23, 242:3, 242:11, 242:15, 246:16, 256:16, 256:18, 259:15, 259:18, 259:20, 259:24, 260:2, 261:17, 261:22, 263:1, 263:16, 263:18, 264:1, 264:8, 264:19, 264:23, 265:4

**ultimately** [3] - 42:13, 68:9, 100:7

**unable** [2] - 140:5, 194:18

**uncommon** [2] - 248:4, 248:13

**under** [11] - 21:7, 35:16, 61:11, 86:18, 108:17, 111:7, 111:12, 172:10, 172:13, 248:21, 264:13

**undercover** [2] - 60:9, 63:2

**underneath** [2] - 108:5, 252:6

**unfortunately** [2] - 89:25, 215:6

**unique** [4] - 178:1, 178:4, 178:8, 178:10

**unit** [4] - 109:15, 111:8, 111:13, 248:17

**UNITED** [3] - 1:1, 1:3, 1:13

**United** [6] - 45:16, 83:12, 83:20, 191:17, 193:2, 195:18

**units** [1] - 111:13

**unknown** [1] - 199:2

**unless** [7] - 36:10, 113:22, 161:3, 161:6, 173:21, 179:2, 179:4

**unrecorded** [1] - 140:2

**up** [114] - 10:9, 15:5, 19:15, 25:12, 25:13, 25:19, 25:24, 26:5, 30:22, 31:10, 34:10, 36:24, 37:3, 37:13, 39:8, 42:1, 42:23, 46:23, 47:22, 53:21, 53:25, 57:14, 58:12, 59:14, 61:8, 63:15, 66:1, 67:5, 68:8, 73:19, 82:6, 85:13, 105:8, 105:15, 107:4, 107:21, 113:13, 116:18, 117:25, 118:1, 120:3, 127:14, 127:18, 129:3, 130:8, 136:12, 138:3, 140:22, 140:25, 141:2, 142:2, 142:6, 142:11, 142:13, 143:20, 146:20, 148:21, 152:19, 153:22, 154:11, 154:17, 155:9, 155:19, 156:12, 157:4, 158:24, 164:12, 164:20, 165:25, 166:2, 166:3,

174:4, 183:20, 192:9, 204:21, 204:25, 209:18, 213:1, 213:2, 213:13, 213:17, 215:9, 217:18, 227:19, 230:1, 230:3, 230:23, 233:15, 234:22, 239:23, 245:1, 248:1, 248:11, 248:23, 250:14, 251:3, 251:18, 254:5, 255:22, 258:23, 260:5, 262:2, 262:4, 262:5, 264:4, 264:13, 264:17, 265:7, 266:10, 267:4, 267:22, 272:5

**update** [2] - 66:9, 66:11

**upset** [2] - 43:4, 43:7

**utilize** [1] - 171:8

**utilized** [2] - 145:24, 165:19

**V**

**vacuum** [2] - 85:9, 88:17, 88:24

**validate** [1] - 136:20

**Vallejo** [2] - 83:12, 83:25

**value** [1] - 204:15

**vantage** [6] - 68:3, 240:2, 240:12, 242:2, 242:3, 242:6

**various** [3] - 71:12, 98:6, 213:14

**vast** [2] - 139:6, 152:3

**Vegas** [11] - 25:1, 25:3, 25:6, 25:22, 26:1, 26:2, 33:3, 43:9, 182:7, 182:13, 182:14

**vehicle** [41] - 19:10, 46:9, 46:15, 46:19, 47:10, 49:12, 50:16, 67:12, 67:18, 67:24, 69:12, 74:17, 75:2, 76:8, 90:3, 93:14, 128:8, 128:19, 129:4, 130:13, 130:14, 131:1, 140:17, 179:25, 221:9, 221:11, 222:23, 241:13, 241:16, 241:22, 241:25, 242:5, 242:10, 244:1, 245:11, 245:14, 249:17, 249:18, 257:1, 268:1

**Vehicles** [1] - 93:2

**vehicles** [2] - 87:15, 239:24

**Venus** [1] - 212:12

**verbatim** [1] - 134:9

**verbiage** [1] - 134:5

**verify** [9] - 111:20, 179:19, 179:22, 181:25, 183:5, 187:15, 188:7, 190:1, 228:5

**vernacular** [1] - 191:25

**versus** [2] - 191:18, 193:3

**vertical** [1] - 109:11

**via** [3] - 109:6, 182:13, 239:17

**view** [1] - 261:21

**viewer** [2] - 109:24, 110:10

**viewing** [1] - 96:7

**VIN** [1] - 202:22

**violate** [1] - 170:11

**violating** [2] - 172:14, 173:2

**violators** [1] - 64:17

**Virginia** [1] - 175:25

**visit** [1] - 274:2

**voice** [8] - 98:18, 98:21, 98:24, 98:25, 99:5, 100:5, 146:20, 147:9

**voices** [1] - 100:2, 100:8, 100:21, 101:3, 101:4

**Volcy** [40] - 2:1, 8:13, 8:14, 72:3, 72:12, 98:9, 98:20, 98:22, 99:2, 100:11, 100:13, 100:14, 102:19, 121:11, 122:12, 169:8, 201:19, 205:4, 205:10, 207:19, 209:2, 210:6, 210:13, 210:16, 210:18, 211:3, 211:9, 211:21, 213:11, 244:3, 244:20, 245:4, 245:24, 246:2, 246:9, 246:10, 253:14, 257:22, 257:23, 266:11

**VOLCY** [1] - 1:8

**Volcy's** [5] - 99:5, 120:13, 120:25, 123:2, 209:7

**volunteered** [1] - 161:10

**vouch** [2] - 121:1,

**Vehicles** [1] - 93:2

**vehicles** [2] - 87:15, 239:24

122:3

**W**

**wait** [1] - 46:21

**waiting** [1] - 240:2

**waived** [1] - 169:24

**Walgreen's** [3] - 187:2, 187:9, 188:8

**walk** [2] - 257:15, 269:9

**walked** [5] - 170:22, 245:14, 246:7, 248:15, 251:19

**walking** [1] - 170:17

**Walmart** [11] - 77:17, 77:19, 105:22, 105:23, 106:1, 106:3, 106:8, 106:16, 215:2, 217:19, 245:23

**wants** [3] - 160:19, 160:24, 186:4

**warehouse** [17] - 7:24, 26:22, 27:4, 27:9, 29:10, 29:16, 31:17, 55:5, 55:6, 55:20, 58:20, 58:24, 69:2, 116:14, 118:6, 243:23, 269:17

**warehouseman** [1] - 270:10

**warehouses** [1] - 27:5

**WAS** [9] - 80:5, 82:1, 82:11, 123:13, 160:15, 163:8, 213:5, 214:21, 216:17

**Washington** [3] - 1:20, 138:16, 212:20

**waste** [1] - 161:25

**watch** [2] - 120:18, 120:21

**Watson** [1] - 148:23

**Wayne** [3] - 228:18, 234:14, 235:18

**ways** [1] - 177:16

**weapons** [1] - 271:16

**wearing** [3] - 48:2, 54:17, 54:18

**Wednesday** [1] - 180:6

**weed** [4] - 26:10, 26:12, 26:13, 181:19

**week** [4] - 137:17, 168:4, 221:15, 221:16

**weeks** [2] - 63:16, 221:16

**weighed** [1] - 83:15,

83:23
**weight** [1] - 214:8
**welcome** [1] - 236:8
**Wells** [9] - 16:11, 18:3, 18:4, 18:16, 18:18, 50:5, 50:13, 51:8
**west** [18] - 11:11, 12:3, 12:4, 12:9, 12:16, 12:20, 12:24, 67:5, 67:9, 118:25, 119:7, 189:7, 213:12, 239:19, 242:4, 259:4, 263:17, 265:10
**westbound** [8] - 67:2, 119:16, 241:14, 243:13, 243:14, 260:4, 264:8, 265:4
**Westshore** [1] - 86:15
**WHEREUPON** [1] - 82:1
**WHICH** [5] - 80:4, 160:14, 163:7, 213:4, 214:20
**white** [9] - 67:16, 68:14, 92:18, 92:21, 116:25, 240:15, 244:9, 244:10, 256:7
**whoa** [2] - 133:12
**whole** [24] - 7:17, 26:13, 43:5, 43:7, 44:15, 44:20, 52:15, 52:20, 110:15, 110:19, 112:4, 114:10, 114:22, 115:7, 115:8, 116:5, 154:22, 167:24, 219:5, 219:10, 223:24, 224:4, 236:25, 237:5
**wholeheartedly** [1] - 162:9
**wide** [2] - 146:1, 225:6
**WILLIAM** [1] - 1:13
**William** [1] - 6:7
**Williams** [2] - 196:24, 198:14
**willingness** [1] - 116:4
**Winter** [6] - 77:19, 106:24, 217:19, 217:21, 217:24, 217:25
**wish** [1] - 192:6
**Witness** [4] - 57:20, 157:15, 207:23, 249:13
**witness** [38] - 7:16,

14:22, 37:20, 44:8, 44:19, 44:23, 48:22, 52:2, 52:19, 52:23, 55:10, 56:24, 57:4, 57:14, 95:3, 110:4, 126:2, 161:8, 188:4, 191:8, 192:5, 195:8, 196:18, 214:17, 216:25, 218:24, 219:9, 219:13, 222:3, 223:10, 223:18, 224:3, 224:7, 227:18, 236:19, 237:4, 244:17, 249:8
**WITNESS** [26] - 3:2, 30:10, 44:17, 45:1, 52:17, 53:1, 86:24, 87:3, 152:13, 160:8, 163:13, 177:13, 210:14, 219:7, 219:16, 223:17, 224:1, 224:10, 234:24, 236:8, 237:2, 237:11, 250:21, 258:22, 272:1, 274:13
**witnesses** [7] - 152:21, 273:2, 273:11, 273:14, 273:17, 273:21, 274:4
**wonderful** [1] - 205:5
**wooden** [2] - 11:16, 11:18
**word** [10] - 39:23, 67:16, 75:11, 114:3, 134:2, 134:3, 154:1, 163:5, 200:4, 240:1
**words** [17] - 115:24, 117:1, 133:13, 133:21, 133:22, 154:9, 154:15, 156:13, 156:14, 156:18, 164:21, 167:15, 170:6, 184:6, 188:4, 197:14, 240:20
**workers** [1] - 215:17
**works** [3] - 24:10, 63:20, 145:9
**world** [3] - 90:1, 171:22, 225:8
**worried** [1] - 270:20
**wrap** [2] - 252:7, 252:8
**wrapped** [7] - 88:17, 114:22, 115:21, 251:13, 252:5, 252:9, 252:19
**wrapping** [2] - 88:11, 115:25
**write** [3] - 96:11, 96:18, 96:19

**writes** [1] - 217:16
**written** [2] - 73:23, 75:14
**wrote** [4] - 96:24, 124:19, 154:11, 199:8

## Y

**yards** [1] - 243:2
**year** [10] - 103:21, 118:1, 118:16, 194:9, 197:6, 197:9, 197:12, 197:14, 263:24
**years** [11] - 21:7, 21:9, 45:25, 53:11, 53:16, 175:20, 175:22, 175:23, 219:25, 237:22, 238:9
**yeas** [1] - 68:18
**yesterday** [7] - 8:16, 40:20, 41:11, 41:22, 45:9, 56:8, 224:18
**Yo** [6] - 155:7, 155:18, 156:1, 156:5, 156:6, 157:2
**young** [1] - 143:17
**younger** [1] - 39:9
**yourself** [3] - 25:24, 26:5, 136:1
**yourselves** [1] - 120:1

## Z

**zip** [1] - 108:9
**zone** [1] - 242:23
**zoom** [1] - 233:16