IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:08 CR 270 T 24 EAJ

UNITED STATES OF AMERICA

      Plaintiff,

v.                  January 30, 2009
                   9:00 A.M.

SHELDON SHORTER
JEAN EVENS BAPTISTE
HARDAWAY VOLCY

      Defendants.
_____/

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM J. CASTAGNA
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:    JAMES PRESTON
                       Assistant U.S. Attorney
                       U.S. Attorney's Office
                       400 North Tampa St.,
                       Ste. 3200
                       Tampa, FL 33602

For the Defendant:    HUGO A. RODRIGUEZ
Shorter                1210 Washington Avenue
                       Suite 245
                       Miami Beach, FL  33139

For the Defendant:    JORGE CHELALA
Baptiste              Chalela Law Group
                       3111 W MLK Blvd - Ste 100
                       PO Box 173407
                       Tampa, FL 33672-0407

```
For the Defendant:     STEPHEN CRAWFORD
Volcy                  Law Office of Stephen M.
                       Crawford
                       610 W Bay St
                       Tampa, FL 33606


Reported By:           Sandra K. Lee, RPR
                       Official Court Reporter
                       U.S. District Court
                       801 North Florida Avenue
                       Tampa, FL 33602
                       (813) 301-5699


STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION
```

INDEX

WITNESS:                                          PAGE:

**JEAN EVENS BAPTISTE**                              4
    DIRECT EXAMINATION                          4
BY MR. CHALELA
    CROSS-EXAMINATION                          29
BY MR. PRESTON
    CROSS-EXAMINATION                          98
BY MR. CRAWFORD:
**HARDAWAY VOLCY**                                 104
    DIRECT EXAMINATION                        104
BY MR. CRAWFORD:
    CROSS-EXAMINATION                        148
BY MR. PRESTON
    REDIRECT EXAMINATION                     166
BY MR. CRAWFORD:

\* \* \* \* \*

EXHIBITS:                    IDENTIFIED:

EXHIBITS:                    RECEIVED:

59                           17
1                            20
2                            22
25                           25
45                           28
39                           72
41                           160

                    P R O C E E D I N G

          COURT SECURITY OFFICER:  Please rise for

the jury.

  (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

          COURT SECURITY OFFICER:  Please be

seated.

                (PAUSE IN PROCEEDING.)

          COURT SECURITY OFFICER:  All rise.  The

Honorable William J. Castagna presiding.  This

Honorable Court is in session.

          THE COURT:  Good morning, ladies and

gentlemen.

          MEMBERS OF THE JURY:  Good morning,

Your Honor.

          THE COURT:  My thanks to you for coming

in promptly at 9:00.  We can get started

immediately, and we will do so.

          Counsel.

          MR. CHALELA:  Thank you, Your Honor.

                JEAN EVENS BAPTISTE,

a witness, having been previously sworn to tell

the truth, the whole truth and nothing but the

truth, was examined and testified as follows:

                DIRECT EXAMINATION

BY MR. CHALELA:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Mr. Baptiste, we finished yesterday having

2    started the transcript of the conversation between

3    you and Mr. Volcy in the back of the cruiser.  I'd

4    like to kind of pick up from where we left off

5    yesterday.

6              MR. CHALELA:  May I please use the ELMO.

7    Is this -- am I -- can Your Honor hear me?

8              THE COURT:  Yes.

9              MR. CHALELA:  Okay.  It's a little

10   difficult to see.  Thank you.  Oh, I see.  Okay.

11   Very good.  Thank you.  Thank you, sir.

12   BY MR. CHALELA:

13   Q.    Mr. Baptiste, if we go here, this is early

14   on on Page 9.  If you take a look at the screen in

15   front of your face over here, after the Leo -- you

16   see where it says L-E-O 495?

17   A.    Yes.

18   Q.    Okay.  Again, that's law enforcement

19   officer.  That's the police officer.  Do you see

20   where the police officer says, "This smoke

21   marijuana?"

22   A.    (Nods head.)

23   Q.    And both you and Mr. Volcy say, "Smoke" or

24   "smoke."

25              And the police officer says, "Anybody smoke,

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   huh?"

2       Mr. Baptiste says, "No."

3       Mr. Volcy says, "No."

4       And then the police officer says, "No.  A

5   little bit of marijuana inside the -- the

6   floorboard of -- on the car over there on your

7   side.  Why did you take your cell phone apart?"

8       Tell us what's going on there.

9   A.    The officer asked us if we smoked inside the

10   car.  And I said no.  First I said no.  Then Volcy

11   said no.  We said no.

12   Q.    So you under -- did you under -- excuse me.

13       You understood this officer to be telling

14   you that he found marijuana in the car?

15   A.    That's what he said.  But we have no such

16   thing in there.

17   Q.    If we go to Page 10, you'll see on your

18   screen you say, "Marijuana?"

19       We hear some voices overlap.  There's the

20   background police radio.  And then the police

21   dispatcher on the radio says something.  The

22   trooper says something.  And then the trooper says,

23   "See marijuana?"

24       If we go to Page 11 --

25       MR. PRESTON:  Objection, Your Honor.

1    I'm not hearing any questions.  And this was

2    already read into the record by Mr. Chalela

3    yesterday during his direct examination.  I object

4    to redundancy.

5              THE COURT:  Proceed on, Mr. Chalela.

6              MR. CHALELA:  Thank you, Your Honor.

7    BY MR. CHALELA:

8    Q.    Here on the top of Page 14 the third line

9    down you say, "He is lying about the marijuana.

10   The phone is broken?"

11         What marijuana were you talking about?

12   A.    When he said he found marijuana in the front

13   and I told him what marijuana were you talking

14   about.

15   Q.    A little further down -- a little farther

16   down in that same Page 14 we see that Mr. Volcy

17   says to you, "If the freezer was working, man, they

18   wouldn't be able to see anything in the car."

19         How did -- how did you understand that

20   comment to you?

21   A.    The freezer when you put it at minus 10,

22   even if you open the back of the truck you cannot

23   see anything in there.  It's on automatic.  As

24   soon as you open it, it's going to be normal.

25   Q.    You say, "It's working."

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1      What was working?

2  A.    The freezer was working.

3  Q.    If we go to 16 halfway down you say, "Thing

4  are going -- things are going to work out for us."

5      What did you mean by that?

6  A.    What I meant by this was that if he said if

7  he found marijuana in the front of the truck,

8  well, I know I had nothing up there.  Things are

9  going to work for us.

10  Q.    At the top of Page 18 Mr. Volcy says to you,

11  "Nothing -- no.  No, nobody.  We cannot be scared.

12  They guys are in the back."

13      What -- what -- how did you interpret they

14  guys are in the back to mean?

15  A.    It means to me that I have nothing in the

16  truck, why should I worry.

17  Q.    What does they guys are in the back --

18  what -- what are you seeing at this point in the

19  conversation?

20  A.    The police are standing behind.  They're

21  speaking.

22  Q.    The police that you see, are they outside of

23  the car that you're inside of?

24  A.    Yes, they're standing behind the car.

25  Q.    You say halfway down, "Uh, some of the guys

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   is in the cooler, and the other one is in the

2   truck."

3          Who are you talking about?

4   A.    I mean that one of the officers is looking

5   inside the truck, and the other one is in the

6   front in the cabin.

7   Q.    What do you mean by truck?

8   A.    The truck by itself is the front, the cabin.

9   Q.    At the bottom of Page 18 you say, "Now, he

10  is on a cell phone."

11         Mr. Volcy says, "The guy who stopped us

12  out?"

13         What guy are you talking about?

14  A.    About the police who are on the phone.  I'm

15  talking about them.

16  Q.    Halfway down on Page 18 you say, "Uh-huh,

17  they are sitting down talking.  Even the guy that

18  was hot is on the telephone.  The other guys are

19  standing around talk."

20         Who are you talking about there?

21  A.    The first officer.  I'm talking about the

22  first one who stopped me.  This is who I'm talking

23  about.

24  Q.    Then you say, "Uh, some of the guys is in

25  the cooler, and the other one is in the truck."

1    What guys are you talking about in the

2 cooler?

3 A.    About the police.

4 Q.    Mr. Volcy says, "Yeah, that's him.  These

5 guys may be drug enforcement."

6    Who are you talking -- who is Mr. Volcy

7 talking about?

8 A.    About the police with the dog.

9 Q.    At the bottom of Page 18 you say, "Now he is

10 on a cell phone."

11    Volcy says, "The guy who stopped us out?"

12    You say, "Uh-huh."

13    What guy are you speaking of?

14 A.    About the police.

15         THE COURT:  Counsel, come to sidebar,

16 please.

17         (AT WHICH TIME THE FOLLOWING SIDEBAR

18 DISCUSSION WAS HELD:)

19         THE COURT:  What is your intention,

20 Mr. Chalela, as far as the progress of this

21 interrogation is concerned?

22         MR. CHALELA:  To clarify the recording

23 admitted into evidence by the government so he can

24 explain the meaning of the conversation, only

25 limited portions of which were enunciated out loud

1  by the government.

2  　　　　　THE COURT:  Is it your intention to go

3  line by line in this 65-page transcript and ask

4  him what his intention was as to each response?

5  　　　　　MR. CHALELA:  No, Your Honor, only --

6  only to the pertinent portions.

7  　　　　　THE COURT:  Well, it appears to me that

8  your inquiry is simply to ask him what he meant by

9  what he said.  And the words that are in the

10  transcript are not the kind of language that

11  leads -- lends itself to interpretation.

12  　　　　　When there are police officers that stop

13  him and the inquiry that you just went through

14  with regard to who are you talking about, it's

15  quite obvious that he's talking about these

16  policemen who are outside the truck.

17  　　　　　MR. CHALELA:  I'll move it along.

18  　　　　　THE COURT:  I would appreciate it if you

19  would do so, and I'm sure everyone else will.

20  　　　　　MR. CHALELA:  Yes, sir, Your Honor.

21  　　　　　THE COURT:  All right.

22  　　　　　MR. CHALELA:  Thank you.

23  　　　　　(WHEREUPON, THE SIDEBAR DISCUSSION WAS

24  CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

25  BY MR. CHALELA:

1    Q.    At the top of Page 19 Mr. Volcy says, "Uhm,

2    what's going on?"

3         You say, "A cop dog."

4         Volcy says, "Uhm, you are scared now."

5    Volcy says, "We are shit out of luck."  Volcy says,

6    "Uhm, with what?"

7         You say, "They are going to put the dogs up

8    there; right?"

9         "Uh-huh."

10        Tell us what you're seeing at this point in

11   the conversation.

12   A.    You know what I'm thinking is dogs, these

13   are not things that we are used to.  And as soon

14   as I see a dog and I'm thinking, oh, they must be

15   looking for drugs or something.  But I know I have

16   nothing in there, and I have no reason to worry.

17   Q.    Going up to Page 21 then from 18, there on

18   the screen it says, "The" -- Mr. Volcy says, "The

19   dog may find something that we don't know about."

20        You say, "Cocaine is messing up your brain.

21   He may be waiting for a warrant so he can open the

22   trailer."

23        Tell us what you meant when you said,

24   "Cocaine is messing up your brain."

25   A.    Can you ask me the question again?

Q.    In Creole what does it mean when one says cocaine is messing up your brain?

A.    People -- that cocaine, this is going to drive you crazy.

Q.    Did you tell Volcy that cocaine was messing up his brain because he was using cocaine?

A.    No, he does not use cocaine.  Volcy doesn't use cocaine.

Q.    What did you mean by saying this to him then?

A.    What I'm thinking there is that if the dog is going to go up in the truck, it's probably going to be looking for something that's not supposed to be there, something bad.

Q.    On Page 22, Mr. -- excuse me -- the law enforcement officers about -- almost at the end there, comes to the car, opens the car door and says, "Uhm, the dog -- you know the drug dog that walked around the truck?  He alerted on the truck himself."

       If we go up to Page 23, the next page --

       THE INTERPRETER:  The interpreter had no time to read this in English for the defendant.  If you could go back to Page 22.

       MR. CHALELA:  Sorry.

1    THE WITNESS: The drug -- the dog went

2  up the truck. It's the police who helped the dog

3  on top.

4  BY MR. CHALELA:

5  Q.    At the top of the next page the officer asks

6  after sighing, "You guys never loaded the truck?"

7       Mr. Volcy says, "No."

8       You say, "Out of the warehouse?"

9       The trooper says, "At a warehouse?"

10      Volcy says, "Yeah."

11      The officer says, "Where they loaded at?"

12      You say, "Ah, California."

13      The trooper says, "In California?"

14      And you say, "Yes, sir."

15      What load are you talking about there?

16 A.    We're talking about the load that was put on

17 the truck. We did not load the truck. We backed

18 up -- I backed up the truck to the dock, and the

19 people from the warehouse loaded the truck.

20 Q.    The officer on the bottom of that page says,

21 "Were you present when they loaded this tractor,

22 this trailer?"

23      You say, "No."

24      Volcy says, "No."

25      The officer says -- asks, "So you really

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   don't know what's inside of it?"

2          And at the top of Page 24 you say, "I know.

3   I know.  Uh, bread.  Uh, uh, frozen.  That's it."

4          Are you talking about the frozen bread about

5   which we've heard in the trailer?

6   A.     Yes.

7   Q.     Halfway down 24 the trooper asks, "We going

8   to be -- we going to be searching the truck."

9          You say, "Uh-huh."

10         Volcy says, "Okay?"

11         And the officer asks you, "You understand?"

12         And you say, "Okay."

13         Did you have a problem giving him permission

14  to search the trailer?

15  A.     No.  He asked me to search the truck, I said

16  yes.  The only thing I said, you need to give me

17  authorization to say that you're going to cut the

18  seal.

19  Q.     The officer on the bottom of 24 says, "All

20  right.  Uh, make sure there's nothing in there.

21  The dog -- the dog is alerting on the truck, sir.

22  There's obviously going to be something in there.

23  That's why I'm asking if anybody smoke any

24  marijuana."

25         And you say, "No, I don't smoke."

1          Mr. Volcy at the top of 25 says, "No, I

2     don't."

3          You say, "I don't smoke at all."

4          How did you understand the police officer,

5     his question about searching the trailer?  Did you

6     understand that that was what he was asking you to

7     do?

8     A.    Yeah.  He asked me if he could go and search

9     the truck.  I said yes, he could.

10              MR. CHALELA:  May I approach the

11    witness, Your Honor?

12              THE COURT:  You may.

13    BY MR. CHALELA:

14    Q.    Yesterday you testified about picking up

15    what you remembered to be Tyson chicken in Kansas

16    before driving out to California to deliver.

17    The -- the piece of paper I just handed you, do you

18    recognize that?

19    A.    Yes.

20    Q.    And tell the jury what you recognize that to

21    be.

22    A.    When you go pick up a load, this is what

23    they give you so you can put in the truck to drive

24    with.

25              MR. CHALELA:  I move at this time, Your

Honor, Defense Exhibit 59.

            MR. PRESTON:  No objection.

            MR. CHALELA:  May I publish Your Honor.

            THE COURT:  Yes.

            Any objection, Counsel?

            MR. PRESTON:  Without objection.

            THE COURT:  It is received.  You may

publish the exhibit.

            (EXHIBIT 59 ADMITTED INTO EVIDENCE.)

BY MR. CHALELA:

Q.    Was this chicken that was being picked up?

A.    I went to pick up a frozen load.  What I

went to pick up was beef back rib, frozen.

Q.    And here does it -- the temperature is minus

ten.  Tell us what that means.

A.    Because it is frozen it's supposed to be at

minus ten.

Q.    Now, something a little difficult to see,

but there seems to be a date stamp there, April 21,

a.m. 11:23.  What does that mean to you?

A.    This is the day and the time for us to

unload the shipment.

Q.    To unload or to pick up?

A.    To drop it.

Q.    And what is this here, Emporia, Kansas?

1   What does that mean?

2   A.     It's a city, a small locality in Kansas.

3   Q.     How many years have you been a long haul

4   trucker?

5   A.     I started since '95, but I was solo in '97.

6   Q.     So for over ten years is it fair to say your

7   job in making a living is as a long haul trucker?

8   A.     Yes.

9   Q.     In your truck are there very important

10  documents that you have to have with you at all

11  times in the cab?

12  A.     Yes.

13  Q.     And from time to time will you be ordered to

14  pull over while you're in your hauling truck by the

15  Department of Transportation in any given state?

16  A.     Ever since 9/11 as long as you are

17  transporting food products from time to time you

18  get stopped.

19  Q.     And what do they -- when they stop you at

20  these places around the country, do they inspect

21  your paperwork?

22  A.     Yes.

23  Q.     So they inspect your truck?

24  A.     Yes.

25  Q.     Did you have all the paperwork that you were

1  required to have in the cab when you were stopped

2  on April 24th by the trooper?

3  A.     Yes, all papers.

4  Q.     The paperwork about which we've spoken, is

5  that kept in your normal course of business?

6  A.     Yes, because all trucks you're supposed to

7  have all the papers in the truck.

8          MR. CHALELA:  May I have continuing

9  permission to approach this witness?

10          THE COURT:  Yes, you may.

11          MR. CHALELA:  Thank you, Your Honor.

12  BY MR. CHALELA:

13  Q.     Did you look at what I just handed you?

14  Tell the jury what that is.

15          THE COURT:  Is this an exhibit, Counsel?

16          MR. CHALELA:  Yes, it will be.

17          THE COURT:  What number?

18          MR. CHALELA:  Defense Exhibit 1, Your

19  Honor.

20  BY MR. CHALELA:

21  Q.     What did you recognize this to be?

22  A.     This is a paper that DOT gives you to go

23  through all the states that are listed on this

24  paper.

25          MR. CHALELA:  May I -- no, excuse me.  I

1  move this Defense Exhibit 1 into evidence, Your

2  Honor.

3          MR. PRESTON:  Without objection.

4          MR. CHALELA:  And may I publish it, Your

5  Honor?

6          THE COURT:  It is received.  And you may

7  publish it.

8          And for the interpreter, would you

9  please use the microphone.

10          THE INTERPRETER:  Certainly, Your Honor.

11          THE COURT:  All right.

12          (EXHIBIT 1 ADMITTED INTO EVIDENCE.)

13  BY MR. CHALELA:

14  Q.     Is this the paper that you just talked

15  about?

16  A.     Yes.

17  Q.     And tell the jury what that is.

18  A.     This is a paper that tells you that you can

19  go to all those states that are listed there.

20  Q.     Let's take a look at that.  All these

21  abbreviations, are those abbreviations different

22  states in our union?

23  A.     Yes.

24  Q.     And this piece of paper is giving

25  certification that you are allowed to go in those

```
1   states and long haul?

2   A.    Yes.

3   Q.    What is that we see here that -- the weight?

4   Usually it's 80,000, but for the District of

5   Columbia it looks like 80,999.  What does that

6   mean?

7   A.    Each state has a measure of weight that you

8   can use to cross over.  Like, for example, you can

9   go with 80,000 in some states, and in D.C. you go

10  with 80,999.

11  Q.    Okay.  There is something that looks like

12  the vehicle type is TR.  What does that mean?

13  A.    This signifies tractor.

14  Q.    And what is the year here?

15  A.    2006.

16  Q.    Now, the certificate looks like State of

17  Florida at the top.

18  A.    Yeah, State of Florida issued it.

19  Q.    Okay.  And over here we have -- it looks

20  like it's been issued for one year, to expire on

21  October 31 of last year; is that right?

22  A.    Yes.

23  Q.    If you could look at this piece of paper and

24  see what it is.  Tell us what that is.

25  A.    It's something in the truck called IFTA, and
```

1    it's international tax that you put in the truck.

2              MR. CHALELA:  I move defense Exhibit 2

3    into evidence, Your Honor.

4              MR. PRESTON:  No objection.

5              THE COURT:  Is that document which you

6    just showed to the witness Exhibit 2?

7              MR. CHALELA:  Yes, sir, Your Honor.

8              THE COURT:  All right.

9              (EXHIBIT 2 ADMITTED INTO EVIDENCE.)

10             THE COURT:  And what is it?

11             MR. CHALELA:  May I publish it?

12             THE COURT:  Yes.

13             MR. CHALELA:  An International Fuel Tax

14   Agreement license.

15   BY MR. CHALELA:

16   Q.    This is from the State of Florida,

17   Department -- Division of Motor Vehicles?

18   A.    Yes.

19             THE COURT:  Come to sidebar, counsel,

20   please.

21             (AT WHICH TIME THE FOLLOWING SIDEBAR

22   DISCUSSION WAS HELD:)

23             THE COURT:  What is the relevance,

24   Mr. Chalela, of the last two documents which you

25   have offered into evidence?

MR. CHALELA:  The government seized
several documents that we've listed as exhibits
pretrial.  And they're going to establish that
both Mr. Baptiste and Mr. Volcy have independent
documentation to explain their whereabouts on this
week-long period leading up to April 24th.

And it's a fundamental part of our
defense to explain independent legitimacy of their
whereabouts to rebut the government's allegation
that we picked up marijuana in Arizona before
going to the Countryside Bakery in California, and
bringing back 1500 pounds of marijuana.

THE COURT:  I don't understand this last
document, for instance, as even relating to that
circumstance.  What does it have to do with
anything that is relevant in this case?

MR. CHALELA:  Well, the preliminary
documents which will -- with other documents I'm
preparing to show to show how heavily regulated
and watched these two gentlemen are during their
assignment and duty to take goods and deliver
goods.  And it will lead -- it's laying the
predicate for the introduction of those documents
and the importance of our fundamental defense
which is we were legitimate truckers and we have

1    legitimate places we can say where we were.

2          This is to rebut the GPS and the

3    government's opening statements that are

4    alleging --

5          THE COURT:  The government has not

6    suggested in anything that I have heard that the

7    defendants had no right to be where they were.

8    That is not an issue in the case.

9          And your offer of this item of evidence

10   simply shows that they had authorization to drive

11   their vehicle where they were.  It does not go

12   into any issue in this case.

13         MR. CHALELA:  I can cut to the chase and

14   go to the more pertinent documents.

15         THE COURT:  I'm going to recommend,

16   Mr. Chalela, that you do that vigorously.

17         MR. CHALELA:  Yes, sir, Your Honor.  I

18   understand.

19         THE COURT:  Thank you.

20         MR. CHALELA:  Thank you, Your Honor.

21         (WHEREUPON, THE SIDEBAR DISCUSSION WAS

22   CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

23         MR. CHALELA:  May I have a moment with

24   my counsel?

25         THE COURT:  Yes.

1          (PAUSE IN PROCEEDING.)

2          THE COURT:  Next question, Mr. Chalela.

3          MR. CHALELA:  Yes, Your Honor.

4   BY MR. CHALELA:

5   Q.    I'm handing you a document.  Could you take

6   a look at it.  Do you recognize it?

7   A.    Yes.

8   Q.    Would that have been a part of the paperwork

9   that was in your cab?

10  A.    Yes.

11         THE COURT:  What exhibit number,

12  Counsel?

13         MR. CHALELA:  Exhibit No. 25.  I move 25

14  into evidence, Your Honor.

15         THE COURT:  What is it?

16         MR. CHALELA:  It's a driver's manifest

17  showing the assignments and the location of the

18  truck from 4/15.

19         THE COURT:  Any objection, Counsel?

20         MR. PRESTON:  No, Your Honor.

21         THE COURT:  It is received.

22         (EXHIBIT 25 ADMITTED INTO EVIDENCE.)

23         MR. CHALELA:  May I have permission to

24  publish it?

25         THE COURT:  You may.

1  BY MR. CHALELA:

2  Q.    Is this a driver's manifest?

3  A.    Yes.

4  Q.    Tell the jury what that means.

5  A.    This is something that they give you after

6  you pick up the load.  For example, this one has

7  seven stops.  They give you the phone numbers and

8  things of the sort.

9  Q.    Over here where it says pieces with various

10  differing numbers, what does that mean?

11  A.    For example, the first one states 195.  For

12  example, that would be the first stop.  It has 195

13  trees that we have to give to them.

14  Q.    Okay.  Now, these locations, Ozark,

15  Missouri; Springfield, Missouri; Boulevard,

16  Missouri; Nevada, Missouri; Fort Scott, Kansas;

17  Ottawa, Kansas; and Paola, Kansas, are those the

18  different places you were to go?

19  A.    Yes.

20        THE COURT:  What is the relevance of

21  that information, Mr. Chalela?

22        MR. CHALELA:  This is the trip about

23  which -- during the time period about which this

24  trial's discussed.

25        THE COURT:  And?

         MR. CHALELA:  It's showing where they

were supposed to be and where they went.

         THE COURT:  All right.  Proceed.

BY MR. CHALELA:

Q.    I'm showing you a piece of paper.  Will you

please look at it.

A.    Okay.

         MR. CHALELA:  Your Honor, at this time I

move Defense 45 into evidence.

         THE COURT:  What is that number?

         MR. CHALELA:  45 of the defense.

         THE COURT:  Come to sidebar, please,

Counsel.

         (AT WHICH TIME THE FOLLOWING SIDEBAR

DISCUSSION WAS HELD:)

         THE COURT:  Mr. Chalela, when you wish

to introduce an item in evidence, you hand it to

the witness and state for the record that you are

handing to the witness Defendant's Exhibit No.

whatever that number may be.  You do that as you

hand the document to the witness.

         Then you may inquire about whatever you

want to inquire about so that the record reflects

that we're talking about that specific exhibit.

Then you may either offer it into evidence or not

1    offer it into evidence, depending on --

2            MR. CHALELA:  Thank you.

3            THE COURT:  All right.

4            MR. CHALELA:  Do I describe the document

5    when I hand it to the witness or just state the --

6            THE COURT:  No.  Just ask him what it is

7    so there's some statement as to what the document

8    contains.

9            MR. CHALELA:  Thank you, Your Honor.

10           THE COURT:  All right.

11           (AT WHICH TIME THE SIDEBAR DISCUSSION

12   WAS CONCLUDED AND THE PROCEEDING RESUMED AS

13   FOLLOWS:)

14           MR. CHALELA:  May I publish, Your Honor?

15           THE COURT:  You may.

16           (EXHIBIT 45 ADMITTED INTO EVIDENCE.)

17   BY MR. CHALELA:

18   Q.    This document is a violation report from the

19   Arizona Department of Public Safety.  Do you

20   remember this document?

21   A.    Yes.

22   Q.    And at the top right-hand corner of this

23   document it says that there's a driver vehicle

24   examination report with an Arizona report number.

25   Was that because you were inspected in Arizona?

A.     Yes.  As soon as we get into Arizona they

check you out.

Q.     Okay.  And the date here, it says inspection

date April 18th.

A.     Yes.

Q.     Would that be the day that you were

inspected in Arizona?

A.     Yes.

Q.     And the start time says 12:50, the end time

1335 hours or 1:35 p.m.  Is that the time that you

were inspected by that department?

A.     Yes.

        MR. CHALELA:  Could I have just one

moment?

        THE COURT:  You may.

BY MR. CHALELA:

Q.     Mr. Baptiste, on April 24th did you know

that there were over 1500 pounds of marijuana in

your tractor trailer?

A.     No.

        MR. CHALELA:  I pass the witness, Your

Honor.

        THE COURT:  Cross-examination.

                CROSS-EXAMINATION

BY MR. PRESTON:

1    Q.    Good morning, Mr. Baptiste.

2    A.    Good morning.

3    Q.    Do you go by Evens or Baptiste?

4    A.    Jean Evens Baptiste is my name.

5    Q.    Mr. Evens Baptiste, you just concluded your

6    direct examination by telling the jury that you did

7    not know that there were over 1500 pounds of

8    marijuana in the load which you transported to

9    Florida on April 24th of 2008; correct?

10   A.    I did not know.

11   Q.    That's why you're here?

12   A.    Yes.

13   Q.    Mr. Baptiste, when did you arrive in

14   Riverside, California, in order to secure this

15   load?

16   A.    I arrived in California on the 19th.

17   Q.    The 19th of April of 2008?

18   A.    Yes, that's when I got there.

19   Q.    Actually, it was the late evening of

20   April 18th of 2008; correct?

21   A.    April 18th, yes.

22   Q.    At least according to your records?

23   A.    I arrived in California on the 19th.  19th.

24   Q.    Were you early -- were you early in regard

25   to the load of cookie dough that you had contracted

1    to pick up?

2    A.    I arrived on time.

3    Q.    So when you went to Riverside, California,

4    you went directly to Countryside Baking to pick up

5    your load of cookie dough?

6    A.    I didn't pick up the load in Riverside.

7    Q.    The area of Riverside.

8    A.    I dropped off at Riverside.

9    Q.    Where was Countryside Baking located?

10   A.    In Irvine, California.

11   Q.    In what document did you show that you

12   dropped off a load in Riverside, California?

13   A.    The document was inside of the truck.

14   Q.    What document did you show that you were --

15   that you had dropped off a load in Riverside,

16   California, on April 18th or 19th?

17   A.    My log book shows it.

18   Q.    What document did you show that you dropped

19   off a load in Riverside, California, on April 18th

20   or April 19th?

21           THE INTERPRETER:  With your permission,

22   Your Honor, which document did you show, could we

23   have some time or the person to whom it was shown

24   so that the interpreter could properly translate

25   it to the respondent?

BY MR. PRESTON:

Q.    The question just is what document did you show that established that you dropped off a load in Riverside, California, on April 18th or 19th?

A.    I have receipt of papers that were given to me.  I dropped off the load on the 21st.

Q.    You dropped off the load on the 21st?

A.    Yes.

Q.    What were you doing between -- you didn't show any papers to show you even dropped off a load on the 21st, did you?

A.    Yes, I do have paper for it.

Q.    That's the shipping order that you introduced into evidence?

A.    That's the one that was given to me, yes.

Q.    Does that shipping order show a delivery date for that particular shipment?

A.    Yes.

Q.    And that is the 21st?

A.    Yes.

Q.    So what did you do between arriving in Riverside, California, or that area and the delivery of this load some days later?

A.    As usual if you arrive early -- because as normal there was a time -- a specific time, an

1   appointment time for you to go and deliver the

2   load.

3   Q.    What did you do during that time if that was

4   normal delay time?  We'll use that word.

5   A.    I parked the truck.  I went to hotel.

6   Q.    What hotel did you stay at?

7   A.    Hotel 6.

8   Q.    And you stayed there with Mr. Volcy?

9   A.    We each were in a separate room.

10  Q.    And where are your records that you stayed

11  at Hotel 6 during that period of time?

12  A.    I don't recall if I kept the receipt or not.

13  Q.    Did you ask the hotel to send you a new

14  receipt knowing how important that issue was to

15  your defense in this case?

16  A.    If one had been given to me, it would be in

17  the truck.

18  Q.    My question was:  Knowing how important such

19  documentation would be to the defense that you are

20  presenting to the jury in this case, did you

21  contact the hotel -- did you subpoena the hotel?

22          MR. CHALELA:  Excuse me, Your Honor.

23  Excuse me.  Sorry.  Objection, shifting the

24  burden.

25          THE COURT:  Overruled.

BY MR. PRESTON:

Q.    Did you contact the hotel or subpoena the hotel to obtain documentation showing that you stayed at this Hotel 6 during that period of time?

A.    No, I don't recall it.  I didn't do it, no.

Q.    Because there is no such record, there would be no such record; correct?

A.    It exists because I stayed at the hotel.

Q.    During your trip, if we take a starting point as Kansas -- during your trip from Kansas to California and back to Florida, are you telling this jury that the only time that your tractor trailer rig was out of your custody and control was when you and Hardaway Volcy parked it and went to the Motel 6 in the Riverside area for that two and a half day period?

A.    Yes.

Q.    The only time?

A.    Yes.

        MR. PRESTON:  Let's take a look at Government's Exhibit No. 24, please.  Miss Thomas, please.

BY MR. PRESTON:

Q.    Do you recognize this document even though Mr. Hardaway Volcy is noted as the driver; correct?

1    A.    Yes.

2    Q.    And this indicates an off duty status

3    beginning in Riverside, California, at 10 o'clock

4    p.m. on April 18th of 2008; correct?

5    A.    Okay.  It shows that he's off duty.  He

6    drives and arrives at NM.  That's not California.

7    Q.    My question pertained to 10:00 p.m.  Towards

8    the far right of the column at 10 o'clock p.m., the

9    last two hours of April 18th of 2008, document

10   Government's Exhibit 24 reflects an off duty status

11   at 10:00 p.m., April 28th of 2008, in Riverside,

12   California; correct?

13   A.    Yes.

14   Q.    And if we go to the next page, we see the

15   same off duty status for 24 hours for April 19th of

16   2008; correct?

17   A.    Yes.

18   Q.    The next page --

19          THE COURT:  Excuse me, Counsel.  You

20   mentioned the date April 28th.  Did you mean to

21   say that?

22          MR. PRESTON:  As to this I meant to say

23   April 19th, Your Honor.

24          THE COURT:  You said April 28th.

25          MR. PRESTON:  Thank you for correcting

1    me, Your Honor.

2           THE COURT:  At least that's what I

3    heard.

4           MR. PRESTON:  Thank you for correcting

5    me, Your Honor.

6    BY MR. PRESTON:

7    Q.    April 19th of 2008; correct?

8    A.    Yes.

9    Q.    We go to the next page for April 20th of

10   2008, we see the same off duty status for that

11   24-hour period; correct?

12   A.    Yes.

13   Q.    And then the next page reflects that at

14   approximately 2:30 p.m. off duty status in

15   Riverside, California, ended; is that correct?

16   A.    Yes.

17   Q.    Now, Mr. Hardaway Volcy's daily -- driver's

18   daily log would have to match up to your driver's

19   daily log since you were co-drivers; correct?

20   A.    Yes.

21   Q.    And that would be on Government's Exhibit

22   No. 25.

23          MR. PRESTON:  We'll take a look at that

24   now, please.

25   BY MR. PRESTON:

Q.     In Government's Exhibit No. 25 we likewise
see you reporting that you went off duty in
Riverside, California, at 10 o'clock p.m.; correct?

A.     Yes.

Q.     And is 10 o'clock p.m. -- does 10 o'clock
p.m. reflect the time that you parked your tractor
trailer to head for the hotel?

A.     Yes.

Q.     And at that time, according to your
testimony, your parked tractor trailer had a frozen
load of beef; correct?

A.     Yes.

Q.     So you had to leave your tractor trailer
running for the next 64 and a half hours that you
were in off duty status; correct?

A.     Yes.

Q.     Now, it's important for you to maintain an
accurate driver's daily log to comply with both
your employer's and the various states'
regulations; correct?

A.     Yes.

Q.     So you are telling anyone who would examine
this particular document that you had that tractor
trailer and put it in off duty status on April 18th
of 2008, at 10 o'clock p.m.; correct?

```
 1    A.      Yes.

 2    Q.      But you did that not focusing on the fact

 3    that a GPS device says otherwise; correct?

 4    A.      That's what I have in my log book.

 5    Q.      But you did that without taking into account

 6    that a GPS device affixed to Trailer No. 1238, your

 7    trailer, would tell us otherwise; correct?

 8    A.      Yes.  I don't know about the GPS.

 9    Q.      You didn't think of everything, did you?

10    A.      I didn't have anywhere else to go.  I

11    parked.

12    Q.      Because April 18th of 2008, at 9:58 p.m.

13    your trailer was in the area of Phoenix, Arizona,

14    wasn't it?

15    A.      It wasn't my trailer.

16    Q.      The trailer that you were responsible for;

17    correct?

18    A.      I parked my trailer at 10 o'clock.  It

19    couldn't have been my trailer.

20    Q.      You're not telling this jury that between

21    9:58 p.m., when that trailer was in Phoenix,

22    Arizona, and 10 o'clock p.m., when it supposedly

23    was in Riverside, California, that somehow you got

24    that trailer over that five-hour drive in two

25    minutes, are you?
```

A.    My trailer was parked at Riverside at

10 o'clock.  That's what I know.

Q.    And you're the only one who's telling us

that now; right?

A.    Because I am the one who parked it at

10 o'clock.

Q.    Who parked it in Phoenix, Arizona, at 9:58?

A.    I don't know.  My trailer was at Riverside

at 10 o'clock.

Q.    You can't explain your way out of this one,

can you?

A.    I cannot explain anything else except that

my trailer was parked in Riverside at 10 o'clock.

Q.    Couldn't think up anything on that one,

could you?

A.    There is nothing for me to think about.

Q.    Let's talk about your trip to Florida.

       Somewhere along the trip -- let's take

Kansas as a starting point -- you knew that you

were going to pick up a load of cookie dough in

California -- Irvine, California; correct?

A.    No.

Q.    When did you learn about the cookie dough?

A.    After I dropped off the load from Kansas to

Riverside, I called my dispatcher.  He gave me

1    that load to go pick up in Irvine.

2    Q.    The same day?

3    A.    That same day on the 21st.

4    Q.    Your trip to Riverside, you're saying that

5    you went directly from Kansas to Riverside without

6    stopping in Phoenix, Arizona; correct?

7    A.    I stopped at --  I stopped at Exit 1, filled

8    up, and I continued.

9    Q.    And then you say you stayed at Riverside,

10   California, for almost three days before receiving

11   the load of cookie dough; right?

12   A.    Yes.  I arrived early.  I had to drop off on

13   the 21st.  I had to stay, yes.

14   Q.    Actually, you stayed in the Phoenix area to

15   pick up your load of marijuana though; right?

16   A.    I didn't stop in Phoenix.  I stopped in

17   California.

18   Q.    At Countryside Baking in Irvine, California,

19   you receive and you sign for a sealed load of

20   cookie dough to be delivered to a Walmart in

21   Florida; correct?

22   A.    Yes.

23   Q.    Where was that Walmart located?

24   A.    It's like --  the Walmart is as you are

25   heading south of Tampa.

Q.    You're a truck driver.  Tell us where you were supposed to deliver your load.

A.    I am a truck driver, but I don't know every location.  It was south -- I think it might have been Bradenton.  I don't recall the name of the place.

Q.    So when you told the trooper that you were to deliver a load at State Road 60 in Brandon, you were just guessing?

A.    No, I wasn't guessing.  It's been a year.

Q.    A very important year in regard to details though; correct?

A.    Yes.

Q.    Because you've been able to answer a lot of other questions about things you have heard or said or did during this trip, but you can't tell this jury where you were going?

A.    I was going to Walmart.

Q.    You were going to a Walmart in Florida?

A.    Yes, south of Tampa.

Q.    Actually there were two destinations, two Walmarts that that cookie dough was going to; correct?

A.    I -- I don't know if they were going to spread it into something else, but I knew I had

1   the one that was going to go to the warehouse.

2   Q.    You signed paperwork that you were going to

3   deliver one pallet of cookie dough to a Walmart in

4   Winter Haven, Florida, and 24 or 25 pallets of

5   cookie dough that you were going to deliver to

6   Arcadia, Florida; right?

7   A.    When they give you the stack of paper, they

8   say sign here, sign here, sign here.  You look at

9   it, and you know you're going to the main

10  warehouse, the big warehouse.

11  Q.    We'll get back to the paperwork in a little

12  while.

13        After receiving the cookie dough, at some

14  point after leaving Countryside Baking you stopped,

15  you opened the doors so that you could cover the

16  load with some of the boxes off of one of the

17  pallets; correct?

18  A.    No.

19  Q.    Well, in any event, you travel all the way

20  back to Florida using two drivers because time is

21  money, and you want to make up as much time as

22  possible; correct?

23  A.    It doesn't work like that.

24  Q.    You're using two drivers; correct?

25  A.    Many times I have used two drivers.

1  Q.    And the importance of using two drivers, as

2  you've discussed, is to try to make up as much time

3  as possible.  One driver can sleep while the other

4  drives; correct?

5  A.    That's the way it works.  One of them is

6  sleeping and the other one is driving.

7            THE COURT:  Excuse me, Counsel.

8            Mr. Baptiste, on what date did you pick

9  up the cookie dough in California?

10            THE WITNESS:  On the 21st.

11            THE COURT:  Thank you.

12  BY MR. PRESTON:

13  Q.    You and Mr. Volcy are heading back to

14  Florida, and somewhere along the line you learn

15  that you're going to be early for your Walmart

16  deliveries; correct?

17  A.    I didn't know -- I wasn't aware of that at

18  the time.

19  Q.    At some point along your travel you did

20  learn of that though; correct?

21  A.    The dispatcher called me and said that the

22  time for my delivery had been changed.

23  Q.    That was during the time that you were

24  traveling from California to Florida; correct?

25  A.    Yes.

Q.    And before you entered into the State of
Florida, you stopped at a truck stop; correct?

A.    Yes.

Q.    Was fuel a little bit cheaper in Georgia
than it was in Florida?

A.    Much -- very much.

Q.    And so you stopped at Exit 2, which is just
before the Florida border; correct?

A.    Yes.

Q.    Didn't tell anyone you were stopping there
except for Mr. Volcy; right?

A.    No.

Q.    Just a random stop to pick up fuel and other
necessities and to rest a little bit; right?

A.    Yes, it is a truck stop.

Q.    And at a truck stop truckers hang out
together; right?

A.    Oh, yes.

Q.    And it happened in this case?

A.    Yes.  I had stopped at Exit 2.  We were all
seated eating.

Q.    And how many people were sitting around
eating in this group of truckers hanging out
together?

A.    I wouldn't know.  There were many people.

Q.      Just a bunch of random guys that were doing the same job as you; right?

A.      If I'm sitting somewhere, there's no way for me to know that everybody there is involved in the same business as I am.

Q.      They were truckers; right?

A.      I don't know if everyone there was a truck driver.  I was at a restaurant.

Q.      But you described during your direct examination talking with a bunch of truckers; right?

A.      Yes.

Q.      And guys on the road have a variety of interests; right?

A.      I don't understand what you mean by a variety of interests.

Q.      Well, a topic of conversation came up, for instance, of one of the interests of your associates at that time, and that was strip clubs; right?

A.      Yes, we spoke of that.

Q.      And somehow in this conversation about strip clubs a particular establishment in the Tampa Bay area came up right?

A.      Yes.

Q.    And that was Oz?

A.    Yes.

Q.    And when you heard people talking about Oz,
you became interested in it; correct?

A.    It didn't happen quite like that.

Q.    Tell us how it happened.

A.    We were sitting down eating, telling jokes.
I knew at the time that I had been -- that I was
supposed to have made the delivery had been
changed to another day, but I knew that I was
going to be south Tampa area.  So I asked which
club or what club could someone go to and spend an
evening near Tampa.

        And in talking, someone amongst the people
who are sitting there at the place at the
restaurant said oh, I'll tell you a place you can
go to.  There's a place called Oz.

Q.    So this random person volunteered Oz to you
based on your inquiry about clubs in the Tampa Bay
area; correct?

A.    Yes.

Q.    Because you already said it had been a long
time since you'd been to such a club; right?

A.    That's not what I had said, no.

Q.    During your direct testimony you did not say

1   it had been a long time since you'd been to a club?

2   A.     I didn't say that.  I said I had -- I would

3   have wanted to go to a club in Tampa.  I said I

4   would have like -- I would like to go to a club,

5   and the guy said there's a club named Oz.

6   Q.     The question was:  Did you say in your

7   direct examination that it had been a long time

8   since you had been to a club?

9   A.     I don't recall saying that.

10  Q.     So when this random person volunteers Oz as

11  a destination, does he tell you how to get there?

12  A.     No.  He told me -- no.

13  Q.     Did you tell him we don't know where that

14  is?

15  A.     Yes.  I told him I don't know where it is

16  because I'm not familiar with Tampa.

17  Q.     Now, Mr. Volcy had his computer in this

18  truck, right?

19  A.     Yes.

20  Q.     And the truck stops have Internet access;

21  right?

22  A.     Yes, if you wanted to, yes.

23  Q.     It would be easy to find the address on your

24  own; correct?

25  A.     That didn't come to my mind.  We were seated

1    in a restaurant just talking.

2    Q.    And you're a truck driver.  You spent a lot

3    of time on the road.  You know highways; right?

4    A.    I know the highways.

5    Q.    You know how to find things?

6    A.    Yes.

7    Q.    Do you have a GPS in your truck?

8    A.    No.

9    Q.    In any event, the discussion then goes to

10   directions for Oz; right?

11   A.    I talked to him.  He explained to me.

12   Q.    Because you told him you didn't know where

13   Oz was?

14   A.    Yes, I did not know where Oz was.

15   Q.    So based on your prompting to this random

16   individual, he gives you a phone number; right?

17   A.    Yes.

18   Q.    This is a guy that you can get directions to

19   Oz from?

20   A.    Yes.  He told me call that number.

21   Q.    So this begins your journey to Oz; correct?

22         THE INTERPRETER:  Could the question be

23   repeated, please.

24   BY MR. PRESTON:

25   Q.    This begins your journey to Oz; correct?

1    A.    Yes.

2    Q.    And on that journey to Oz heading south on

3    Interstate 75 through Florida, you pass any number

4    of truck stops that advertise the form of

5    entertainment that you are looking for; correct?

6    A.    I stopped at the truck stop in Exit 2, and I

7    took 75 headed south.

8    Q.    But you were looking for the entertainment

9    that Oz offered, and you passed a number of those

10   establishments right on the interstate that served

11   truckers; right?

12   A.    Yes.  But I knew that the place Oz was not

13   too far from where I was -- where I would have to

14   go to, so I decided to go to Oz.

15   Q.    Oz is approximately 73 miles from Winter

16   Haven, Florida, is it not?

17   A.    I don't know how many miles it is.

18   Q.    Well, you just told the jury that it was

19   close to where you were going.  How close are you

20   telling them it was?

21   A.    I don't know.  If I'm leaving Exit 2 and I'm

22   going to drive 460 miles, I'm going to go to the

23   place that's nearest.  73 miles is not that far.

24   Q.    Doesn't it cost almost $2 a mile to operate

25   a fully loaded tractor trailer?

```
1    A.    No.
2    Q.    How much does it cost per mile?
3    A.    Some places pay $1.25, some pay $1.20, some
4    pay $1.10.  It depends on the company.
5    Q.    So at $1.25 per mile, is that what your
6    company paid?
7    A.    The company pays $1.25 per mile.
8    Q.    So at $1.25 per mile, if Oz was 70 miles
9    from Winter Haven, then your journey to Oz was
10   going to cost you a significant additional amount
11   of money or you would lose that based on the extra
12   miles you were putting on your truck because your
13   carrier sure isn't going to pay for your journey to
14   Oz; correct?
15   A.    75 and 275 pretty much turn the same way.
16   Q.    Not if you're going to Winter Haven; right?
17   A.    75 goes to Winter Haven.
18   Q.    I-4 goes to Winter Haven, which is in Polk
19   County; correct?
20   A.    I-4?
21   Q.    In any event --
22   A.    I-4 -- I'm heading south on 75.  That's
23   where my drop off was.
24   Q.    Yes, it was; correct?
25   A.    Yes.  South on 75, south of Tampa.
```

1   Q.    South being Largo, Florida; right?

2         THE INTERPRETER:  Would you repeat that

3   please, sir.

4   BY MR. PRESTON:

5   Q.    South being Largo Florida?

6   A.    No.

7   Q.    In any event, based on this phone number

8   that this random person at this random truck stop

9   gives you for directions to complete your journey

10  to Oz, you have communications with an individual

11  who gives you directions -- or Mr. Volcy does in

12  your presence; correct?

13  A.    Yes.

14  Q.    How many days do you have to kill at this

15  point in time?

16  A.    I would have a day and a half.

17  Q.    What does one do with a day and a half at a

18  strip club?

19  A.    We would not spend a day and a half in a

20  strip club.

21  Q.    So you continue on your journey to Oz, even

22  though it's taking you away from the area where you

23  are to deliver your load of cookie dough; correct?

24        MR. CHALELA:  Excuse me.  Objection,

25  compound nature of the question.

```
 1              THE COURT:  Want to rephrase it,
 2   counsel.
 3   BY MR. PRESTON:
 4   Q.    You continue on your journey to Oz; correct?
 5   A.    Yes.
 6   Q.    Despite the fact that it's not in the
 7   direction of your appointment for the drop off of
 8   the load; correct?
 9   A.    If you're heading down south 75, 75 goes
10   this way, 275 goes that way.  They meet.  I don't
11   see too far off.  75 goes straight down.
12   Q.    It's nowhere near State Road 60 in Brandon,
13   right?
14   A.    I don't know.
15   Q.    Because if you were going to get off
16   Interstate 75 at State Road 60 in Brandon, you
17   would have continued on Interstate 75 and gone
18   nowhere near 275 because that would pick up 75
19   south of Sarasota; correct?  I'll break it down.
20         If you're traveling south on I-75, before
21   you come down to the metropolitan Tampa area or
22   downtown Tampa, 75 becomes -- or has an exit for
23   275 south; correct?
24   A.    Yes.
25   Q.    You took 275 south?
```

1    A.    Yes.

2    Q.    If you had continued on 75 south, then you

3    would have come to an exit that would have placed

4    you in the area of State Road 60 in Brandon where

5    you told Trooper Lanese your destination was;

6    correct?

7    A.    I have told the police -- I told the police

8    that I was heading south of Tampa off of 75.

9    Q.    You told Trooper Lanese that you were going

10   to a Walmart on State Road 60 in Brandon; correct?

11   A.    I don't recall if I had told him that I was

12   going on State Road 60, but I told -- I had told

13   him that I was going in the area of Tampa.

14   Q.    You would agree with me that 275 south

15   proceeds down through Manatee County where it

16   becomes 75 south again; correct?

17   A.    Yes.

18   Q.    In order to go to State Road 60 in Brandon

19   using 275 south, you would in fact have to turn

20   back north onto I-75; correct?

21   A.    You don't need to head back, turn around if

22   you want to take 75 from 275.

23   Q.    If you stayed south, you'd be heading all

24   the way down to Alligator Alley; right?

25   A.    From 75 to 275, the next exit you can take

1    it.  It will take you anywhere you want to go to.

2    Q.    Even to Oz?

3    A.    No, it won't bring you to Oz.

4    Q.    Now, Mr. Baptiste, you perhaps didn't

5    understand what I was asking you, so I'm going to

6    ask it as best I can.

7         Once you commit to proceed on 275 south,

8    okay, you are not going to see an exit for Brandon;

9    correct?

10   A.    At that time I was not looking for Brandon.

11   Q.    If you proceed south on 275, you are not

12   going to see an exit for Brandon; correct?

13   A.    No.

14   Q.    In fact, you were going miles away from

15   Brandon; correct?

16   A.    Yes.

17   Q.    And the only way to get back to Brandon is

18   to head back north; correct?

19   A.    You can head south and you still can get --

20   go anywhere you want to, yes.

21   Q.    Explain to the jury how you get back to

22   Brandon -- State Road 60 in Brandon from 275 south

23   without going north.

24   A.    Okay.  You take 275.  75 and 275 do this

25   (indicating).  The first exit that you get off

1    that you find from 75, you take it.  You can go

2    west or east.  You can go to Brandon, the first

3    exit on 75.

4    Q.     If after crossing the Sunshine Skyway Bridge

5    where 275 merges back with 75, if you go north on

6    75 from that merge then you'll be heading back to

7    the Brandon exit; correct?

8    A.     When you go where 75 and 275 meet, you can

9    go either north or south.  If you want to go to

10   Brandon, you can go north.  If you go south, you

11   can also go to Brandon off of 75.

12   Q.     Brandon and Oz are miles apart; correct?

13   A.     Like you said before, 73 miles I guess.

14   Q.     That was the Winter Haven location.  We're

15   just talking about what you told Trooper Lanese.

16   A.     Okay.

17   Q.     And when you're running a full load of

18   frozen cargo, miles means money; correct?

19   A.     Yes, it costs money.

20   Q.     But that doesn't discourage you from

21   continuing on your journey to Oz; correct?

22   A.     Because I had time.  I want to enjoy myself.

23   Q.     So in your endeavor to enjoy yourself for

24   the day and a half you have off, don't you follow

25   the directions that are being given to you by this

1   person over the phone from the phone number given

2   to you by the random person at the random truck

3   stop in Georgia; correct?

4   A.    Yes.

5   Q.    And you continue to follow those

6   directions despite the fact that those directions

7   have taken you past the point of your desires to

8   spend time at Oz; correct?

9   A.    No.  The directions that were given to me

10  were given to me to get to Oz.  I took the route

11  to get to Oz.

12  Q.    The directions that you were given or that

13  were given to Mr. Volcy that he was giving to you

14  were to proceed on Ulmerton and make a left on

15  Belcher; correct?

16  A.    The reason why I went that route is because

17  I had passed the place.  I was -- I got -- I was

18  lost, so I had to find the next intersection so I

19  could turn left to make a U-turn.

20  Q.    The directions you were being given by

21  Mr. Volcy, who was on the phone with the person who

22  you said was to give you directions to Oz, the

23  directions that Mr. Volcy was giving you was to

24  proceed on Ulmerton and make a left on Belcher.

25  And we heard that on the tape; right?

1    A.    No, those are not the directions.

2    Q.    Do you need to listen to them again?

3    A.    I have no problem with that.  The directions

4    were for me to go forward, and they told me where

5    to turn.

6    Q.    Let's go to Government's Exhibit No. 12C.

7    Let's listen to this conversation.

8          (Playing audio as follows, Government's

9    Exhibit No. 12C.)

10                CS:  Yo, where you at now?

11                VOLCY:  I'm on the bridge.

12                CS:  On the bridge?

13                VOLCY:  Yeah.

14                CS:  All right.  When you -- when you

15    come over the bridge, not the first exit at 4th

16    Street.  The second exit you come to is Ulmerton

17    Largo.  You get off Ulmerton Largo and you come

18    all the way down Ulmerton to Belcher.  There'll be

19    a 7-Eleven and an IHOP.  You make a left.

20                VOLCY:  Okay.  You say get off on the

21    second exit?

22                CS:  The second exit is Ulmerton and

23    Largo Road.  You -- you -- when you get off the

24    exit, you stay to your right.

25                VOLCY:  Okay.  Stay right and then go

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    west?

2           CS:  Yeah.  And -- okay.  When you

3    get -- when you stay to your right and you come to

4    Ulmerton, you take Ulmerton Road all the way down

5    for about 15 minutes, 20 minutes because you're

6    going to be in traffic.  You take it for about 20

7    minutes down the road to a road called Belcher

8    Road.

9           VOLCY:  Belcher?

10           CS:  Belcher.

11           VOLCY:  Belcher?

12           CS:  Yeah.  At Belcher there'll be a

13    7-11 on your left and an IHOP restaurant on your

14    left.  You make a left on Belcher.

15           VOLCY:  Belcher.  Okay.

16           CS:  All right?

17           VOLCY:  Okay.  All right.

18           CS:  All right."

19    BY MR. PRESTON:

20    Q.    Now, having listened to that, do you have

21    any change in your testimony about whether

22    Mr. Volcy told you that you were going to be

23    turning on Belcher?

24    A.    I went to the place and I passed it, and I

25    went to Belcher to try to make a left turn.  It

1  was at the other intersection.

2  Q.    When you were on the Howard Franklin bridge,

3  you heard Mr. Volcy say the word Belcher at least

4  three times when he was on the phone; correct?

5  A.    I heard it here.

6  Q.    And Mr. Volcy was giving you directions

7  because you were driving; correct?

8  A.    Yes, because we were heading to the club.

9  We were coming up, and he was giving me directions

10  to the club.

11  Q.    And as you proceeded along, did he give you

12  additional directions with regard to turning on

13  Belcher?

14  A.    No.

15  Q.    No, or you don't remember?

16  A.    No.  We were just heading along, and he told

17  me -- we passed the place, and he told me the next

18  intersection.  I don't even remember the name of

19  this street.

20  Q.    As you were receiving additional directions

21  from the person on the other end of the phone, you

22  heard Mr. Volcy talking to that person; correct?

23  A.    Yeah.  I heard, but I could not hear

24  everything because I'm driving.

25  Q.    Well, it's important for you to know what's

1    going on because he's giving you directions; right?

2    A.    Yes, I heard.

3    Q.    So you heard him say Belcher Road in the

4    next conversation; correct?

5    A.    No, I didn't.  It's here that I heard the

6    Belcher Road.

7    Q.    Let's listen to 12D again.  Okay?

8         THE COURT:  We've heard it, Counsel.

9    The witness says he doesn't recollect saying it --

10   or hearing it.  I think we've exhausted that

11   subject.  Let's move on.

12        And we'll do so by taking our morning

13   recess at this point.  We'll reconvene at 11:15.

14   Do not discuss the case, counsel.

15        COURT SECURITY OFFICER:  Please rise for

16   the jury.

17   (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

18    (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

19        PROCEEDINGS CONTINUED AS FOLLOWS:)

20        COURT SECURITY OFFICER:  Please rise for

21   the jury.

22   (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

23             (PAUSE IN PROCEEDING.)

24        COURT SECURITY OFFICER:  All rise.  This

25   Honorable Court is again in session.  Please be

seated.

                THE COURT:  Mr. Preston.

                MR. PRESTON:  Thank you, Your Honor.

BY MR. PRESTON:

Q.     Mr. Baptiste, as you're proceeding down
Ulmerton, your testimony is you realize you've just
passed the end of your journey, Oz; correct?

A.     Yes.

Q.     And yet you did not tell Mr. Volcy to tell
the person on the other side of the phone tell them
we passed it, did you?

A.     No.

Q.     You never told him tell him we're lost, did
you?

A.     I don't remember that.

Q.     And you don't remember telling Mr. Volcy
tell him we have to make a U-turn?

A.     No, I don't remember that.

Q.     You continued to follow the exact directions
that we heard on the recordings, turning left on
Belcher heading to 118th where you were to make a
right; correct?

A.     No one told me to turn to Belcher.  I passed
the place, and the next exit I was just trying to
make a U-turn to come back.

1   Q.    You didn't turn at the very next exit, did

2   you?

3   A.    The next light because I had a 53-foot truck

4   in my hand.  I cannot just stop and turn.

5   Q.    The very next light -- and you were in the

6   left-hand -- by the way, you are saying that you

7   were in the left-hand lane; correct?

8   A.    Yes.

9   Q.    The next light was 66; right?

10  A.    I don't know.

11  Q.    You passed through -- were you finished?

12  A.    I said I was lost and I was looking for a

13  place to turn.  I have 53 feet to turn around.

14  Q.    You passed a major intersection of 66th

15  Street in Largo after going under U.S. 19; correct?

16  A.    I don't remember.

17  Q.    Absolutely no reason that you could not have

18  made a left-hand turn at a major intersection like

19  66th; right?

20          THE INTERPRETER:  Could I have the

21  question again.

22  BY MR. PRESTON:

23  Q.    There was absolutely no reason you could not

24  have made a left hand turn at a major intersection

25  before Belcher; correct?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

A.     I couldn't because of construction on the
road.

Q.     66th Street wasn't closed by construction,
was it, sir?

A.     Yes, as I was going up there there was
construction in that area.

Q.     You proceeded to Belcher; correct?

A.     I continued, but I did not know that was the
name I was going to find.

Q.     Coincidentally you turned on Belcher Road,
the same road that was provided in the directions
that we heard then, correct?

A.     It could just be it.  But I was -- I was
looking and then I was turning.  Could just be
that street.  Didn't look at the name.

Q.     And then coincidentally you traveled south
towards 118th, which was also provided to you from
Mr. Volcy in the directions that we heard; correct?

A.     No.  Mr. Volcy didn't give me this
instruction.

Q.     And you didn't ask Mr. Volcy to tell the
person on the other side of the phone or any of the
persons that he talked to during that travel that
you were lost; correct?

A.     I don't remember that.

Q.    And you didn't remember hearing in any of
those conversations dealing with directions the
destination Oz being discussed, did you?

A.    I don't remember that.  I just knew that I
was going to Oz.

Q.    Of all things, you learned that this random
guy who was giving you directions who became your
point of contact from a random person at a random
truck stop was actually a person cooperating with
law enforcement in regard to an anticipated load of
marijuana; correct?

A.    No.

Q.    You didn't learn that the person who was
providing directions based on a random person at a
random truck stop giving you a phone number to give
you directions to Oz was waiting for a load of
marijuana, is that what you're telling us?

A.    No.

Q.    Is it a coincidence then -- strike that.

      And it turned out that you had a load of
marijuana hidden in the load on your tractor
trailer; correct?

A.    I never knew that.

Q.    During your career as a long haul truck
driver, have you hauled food products?

A.    Yes.

Q.    And is it a trucking standard that food products are now transported on food grade pallets?

A.    Depends on the company.  If they have a lot, they may put it down.  They put it on pallets.  But if they have too many, they can put it on the ground.

Q.    You know that if a load you receive comes on a food grade pallet but arrives at its destination not on that pallet, that that load would not be accepted; correct?

A.    In my experience, no.

Q.    So if that cookie dough was supposed to be on pallets, and it was delivered to Walmart the way it was discovered by the trooper, Walmart would reject the load; correct?

A.    In my experience, yes, they would accept it if it's their merchandise.

Q.    Even if it appeared to have been removed from a pallet?

A.    Well, if it's closed and the seal is on, how am I going to know if it's on the pallet or not?

Q.    Because the doors can be opened without removing the seal; correct?

A.    No.  In my experience, no.

1          MR. PRESTON:  Could I see Government's

2    Exhibit No. 30.

3    BY MR. PRESTON:

4    Q.    Mr. Evens, this is the picking sheet that's

5    in evidence in this case.  You're familiar with

6    this; correct?

7    A.    Yes.

8    Q.    And this reflects one of the pallets that

9    was on your truck; correct?

10   A.    Yeah, this is the merchandise that was on

11   the truck.

12   Q.    And that is your signature at the bottom of

13   the page; correct?

14   A.    Yes.

15          MR. PRESTON:  May I approach the

16   witness, Your Honor?

17          THE COURT:  You may.

18   BY MR. PRESTON:

19   Q.    Mr. Evens, would you please take a look at

20   Government's Exhibit No. 39.  Documents from

21   Countryside Baking, Incorporated, Irvine,

22   California.  And it's a four-page composite

23   exhibit.  Would you take a look at that.  Would you

24   examine those four pages and tell me if your

25   signature and the date April 21, 2008, appears on

1    those four pages.

2    A.    Yes.

3    Q.    Does that document represent the load that

4    you signed for -- Government's Exhibit 39, does

5    that represent the load that you signed for on

6    April 21st of 2008?

7                MR. CRAWFORD:  Your Honor, if I could

8    interrupt just a moment and see if this exhibit --

9    I'm not -- I can't match it up with what we've

10   got.

11               If I can approach.

12               THE COURT:  Come to sidebar, counsel.

13               (AT WHICH TIME THE FOLLOWING SIDEBAR

14   DISCUSSION WAS HELD:)

15               MR. CRAWFORD:  Well, the first and the

16   last pages of this four-page document I have seen,

17   sort of.  The copy that we were given and that the

18   government has had until obviously recently was so

19   light that it was very difficult to read.

20               We did introduce this document to show

21   the seal number, but we couldn't see the rest.

22   The other two pages that are in the middle we've

23   never seen before, and I'm assuming that

24   Mr. Preston just recently got these from

25   Countryside.

1      THE COURT:  What are the other two

2  pages, and for what purpose?

3      MR. PRESTON:  It was to show that it was

4  an order of one pallet of cookie dough that

5  Mr. Evens Baptiste has signed for.  His signature

6  is dated the date that he says he received these

7  particular packages.

8      I also intend to introduce other

9  documents which line up with the item numbers that

10 Mr. Baptiste signed for showing the value of the

11 cookie dough that was contained in that particular

12 invoice that he signed for.

13     THE COURT:  All right.  What do -- what

14 do these two interior documents show -- what do

15 these two interior pages show that is in addition

16 to the first and last page?

17     MR. PRESTON:  The first and last page

18 only refer to the cookie dough that was to be

19 delivered to Winter Haven, Florida, which

20 consisted of one pallet holding 77 cases of cookie

21 dough.

22     In addition, I believe there are a

23 number -- there's another 24 pallets of cookie

24 dough that were to be delivered to Walmart in

25 Arcadia, Florida, which there are no documents in

1    evidence in regard to that at this point in time.

2         THE COURT:  Has this witness denied the

3    existence of those additional items?

4         MR. PRESTON:  He said he didn't know

5    what was on his truck, Judge.

6         THE COURT:  They're admissible for

7    impeachment purposes.

8         MR. CRAWFORD:  All right.  But we've

9    never seen them.

10        THE COURT:  You see them now.

11        MR. CRAWFORD:  Right.  If we could have

12   some copies, it would be helpful.

13        THE COURT:  You can furnish counsel with

14   copies of these.

15        MR. PRESTON:  During the break, yes,

16   sir.

17        THE COURT:  Yes.  All right.

18        MR. PRESTON:  And here are the other

19   documents which coincide with the ones that

20   Mr. Evens Baptiste signed for that show values of

21   the lots that were provided.

22        THE COURT:  How do you associate these

23   with the defendant?

24        MR. PRESTON:  Based on the fact that he

25   signed for receiving these various item numbers,

1  Judge, that appear on his invoices that he signed

2  for.

3         THE COURT:  All right.  And what do

4  these documents -- for what purpose are these

5  documents offered?

6         MR. PRESTON:  They show the value of the

7  particular load in question, Judge, as far as what

8  the cookie dough was worth, which pales in

9  comparison to the value of the marijuana that was

10  being transported by this organization.

11         THE COURT:  All right.

12         MR. CRAWFORD:  Again, we've not seen any

13  of these documents.  We believe that it's a Rule

14  16 discovery violation for these now to be shown

15  during cross-examination of one of the defendants.

16         Now, we've got to scramble to assess

17  these documents, perhaps to call Countryside

18  and -- and find out what additional documents they

19  might be that are there, where these came from,

20  what they mean.  If you want to go ahead and

21  adjourn now.

22         THE COURT:  No, we're not going to

23  adjourn now.  We'll adjourn at noontime.

24         The government has no way of knowing

25  what testimony will be given by the defendants.

1    And they are not obliged to furnish to you

2    everything they have in their possession.  These

3    are for purposes of cross-examination.  And I'm

4    sure counsel will provide copies for you.  It

5    doesn't look like there's anything in there that

6    is of real issue, do you think?

7              MR. CRAWFORD:  Yeah.

8              THE COURT:  Well, I mean there's no --

9    no question about the load consisting of cookie

10   dough coming from California to Florida, does it?

11             MR. CRAWFORD:  That's true.  It is

12   consistent with that.  All right.  We'll deal with

13   it as best we can.

14             THE COURT:  All right.

15             MR. CRAWFORD:  If you'll give us a

16   little time over the noon break.

17             THE COURT:  Sure.

18             MR. CRAWFORD:  Thank you, sir.

19             MR. RODRIGUEZ:  Your Honor, before we

20   get off the bench could we just have a minute to

21   discuss some scheduling after we break for lunch?

22             THE COURT:  Yes, we'll do that.

23             (WHEREUPON, THE SIDEBAR DISCUSSION WAS

24   CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

25   BY MR. PRESTON:

1    Q.    Mr. Evens, did you confirm that your

2    signature appears on all four pages of Government's

3    Exhibit 39 dated -- and the signature is dated

4    April 21st of 2008?

5    A.    I hadn't finished looking at it.

6    Q.    Please look at it again.

7    A.    Yes.

8              MR. PRESTON:  I move into evidence

9    Government's Exhibit No. 39?

10             THE COURT:  Any objection, counsel?

11             MR. CHALELA:  Other than previously

12   noted, no, Your Honor.

13             THE COURT:  Government's Exhibit 39 is

14   received.

15             MR. PRESTON:  May I publish and question

16   the witness, Your Honor?

17             THE COURT:  Pardon?

18             MR. PRESTON:  May I publish and question

19   the witness in regard to --

20             THE COURT:  You may.

21             (EXHIBIT 39 ADMITTED INTO EVIDENCE.)

22   BY MR. PRESTON:

23   Q.    Now, Mr. Evens, this particular document was

24   already admitted in a much more faded version.  Are

25   you familiar with that?

1    A.    Yes.

2    Q.    This reflects that you signed on April 21st

3    for 77 cases of cookie dough; correct?

4    A.    Yes.

5    Q.    I stand corrected.  This -- this is a

6    similar form than the one that was already

7    admitted.  We can compare them later.

8         But in any event, this form shows a load --

9    or a portion of a load of cookie dough going to

10   Arcadia, Florida; correct?

11   A.    Yes.

12   Q.    A similar bill of lading appears on Page 2

13   reflecting a delivery to Arcadia, Florida, of

14   1320 cases of cookie dough on six different

15   identified items; correct?

16   A.    Yes.

17   Q.    And those numbers -- those items are also

18   identified by numbers beginning with the prefixes

19   either 922 or 923, and there are six such numbers

20   on that page; correct?

21   A.    Yes.

22   Q.    You signed for that on April 21st of 2008;

23   correct?

24   A.    Yes.

25   Q.    No reason to believe that these pallets of

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  cookie dough were not on your truck when you left

2  Countryside Baking; correct?

3  A.    I don't know because the back my truck is

4  closed and I don't know.

5  Q.    You had no reason to believe that something

6  you signed for was not on your truck; right?

7  A.    Doors are closed, the company gives you

8  papers to sign.  I don't know what's inside the

9  truck.

10  Q.    Would you have any reason to suspect that

11  something that you signed for would not in fact be

12  there?

13  A.    To have any suspicions, I would have to see.

14  I don't know what's in there, so I don't know.

15  Q.    Would you have any reason to suspect that

16  what you signed for was not on there?

17  A.    There's no reason.

18  Q.    On the next page of the exhibit we see as

19  noted by item numbers the similar designations that

20  we saw on the previous page further outlining what

21  was signed for by you on April 21st of 2008;

22  correct?

23  A.    I'm the one who signed for this.

24  Q.    And this is an additional picking sheet for

25  different kinds of cookie dough; correct?

A.      That's what they gave me to sign.  I don't

know anything about cookie dough.  That's the

paper I signed.

Q.      This cookie dough was destined for Walmart

in Arcadia, Florida; correct?

A.      Yes.

Q.      This cookie dough -- these pallets of cookie

dough were, in fact, sealed under a different seal

number than the one pallet that was talked about

during the government's case in chief; correct?

A.      That's what I see there.

Q.      And then to correct our earlier discussion

in regard to the first page of the exhibit, the

final page of the exhibit reflects Seal No. 82,

destination Winter Haven, Florida, the 77 cases

which was already part of a government exhibit

introduced earlier in the case; correct?  I'm

sorry.

        May I approach the exhibit table, Your

Honor?

                THE COURT:  Yes.

BY MR. PRESTON:

Q.      Would you please look at defendant Volcy's

Exhibit No. 23.  And comparing that to the last

page of Government's Exhibit No. 39 which is before

```
1    you, does that appear to you to be the same
2    document, just a better copy?
3              MR. CHALELA:  Your Honor, excuse me.
4    May Counsel please state the exhibit of Volcy
5    number.
6              MR. PRESTON:  I already did.  That's
7    Volcy --
8              THE COURT:  23.
9              MR. PRESTON:  -- 23.
10             MR. CHALELA:  Thank you.
11   BY MR. PRESTON:
12   Q.    Does that appear to be a better copy of the
13   same exhibit?
14   A.    Yes.
15   Q.    That refers to Seal No. 82 and the 77 cases
16   of cookie dough that was discussed earlier; is that
17   correct?
18   A.    Yes.
19   Q.    Could you please take a look at Government's
20   Exhibit No. 42 and compare the item numbers which
21   are listed in that exhibit with the items numbers
22   notated in Government's Exhibit no. 39, which I
23   will give back to you, specifically any numbers
24   beginning with the prefix 922 or 923.
25   A.    Your question, sir?
```

```
1    Q.    Do you see the same numbers appearing on
2    both of those exhibits?
3    A.    No.
4    Q.    Did you see those same numbers, sir?
5    A.    No.
6    Q.    Would you please take a look at Government's
7    Exhibit No. 39, the second page, please.  Do you
8    see a column of numbers -- do you have Government's
9    Exhibit No. 39 in front of you?  Do you see a
10   column of numbers just before the item descriptions
11   that begin with the numbers 923 or 922?
12   A.    Yes.
13   Q.    Is the number 923045 on Government's
14   Exhibit 39?
15   A.    923 --
16   Q.    045.
17   A.    Yes.
18   Q.    Is the number 922650 that page?
19   A.    Yes.
20   Q.    Is the number 923066 on that page?
21   A.    Yes.
22   Q.    Is the number 923052 on that page?
23   A.    Yes.
24   Q.    Is the number 923086 on that page?
25   A.    Yes.
```

1    Q.    And is the number 923075 on that page?

2    A.    Yes.

3    Q.    And that is a page that you signed in regard

4    to various lots of cookie dough; correct?

5    A.    Yes.

6          MR. PRESTON:  May I approach the

7    witness, Your Honor?

8    BY MR. PRESTON:

9    Q.    Mr. Evens, I would like to direct your

10   attention now to the final page of Government's

11   Exhibit No. 39.

12         Could you tell me if the number 975 -- I'm

13   sorry -- 971550 appears on that page?

14   A.    971570, yes.

15   Q.    1550?

16   A.    1570.

17   Q.    Thank you.

18         Could you please examine the first page of

19   Government's Exhibit 39.

20   A.    Yes.

21   Q.    Does the number 971550 appear on that page?

22   A.    Yes.

23   Q.    So I'll ask you again to please look at

24   Government's Exhibit No. 42 and tell me if the item

25   numbers that you see on Government's Exhibit 42 are

1    the same item numbers that we just confirmed as

2    appearing on Government Exhibit No. 39.

3            MR. CRAWFORD:  Your Honor, I'm going to

4    object to any testimony concerning Exhibit 42

5    until it's received in evidence.

6            THE COURT:  You what?

7            MR. CRAWFORD:  Until 42 is received in

8    evidence and the appropriate foundation has been

9    laid.

10           THE COURT:  Has it been offered?

11           MR. PRESTON:  Not yet, Judge.  I'm just

12   finishing the foundation.

13           THE COURT:  All right.

14   BY MR. PRESTON:

15   Q.    Do you confirm that those are the numbers

16   that we just discussed?

17   A.    Yes.

18           MR. PRESTON:  The government would move

19   Government's 42 into evidence at this time, Your

20   Honor.

21           MR. CRAWFORD:  If I could see the

22   document.

23           THE COURT:  You may.

24           MR. CRAWFORD:  Judge, if we could

25   approach for just a moment.

1          THE COURT:  Come to sidebar.

2          (AT WHICH TIME THE FOLLOWING SIDEBAR

3     DISCUSSION WAS HELD:)

4          MR. CRAWFORD:  I don't believe there's

5     been sufficient foundation established to

6     introduce this document.  We don't know where it

7     came from, we don't know who generated it.  It's

8     not signed by Mr. Baptiste or anyone else.  All

9     the government has done is shown that Government's

10    Exhibit 39 has numbers that match up with these

11    particular numbers.

12         This was not found in the cab of the

13    truck.  This is obviously --

14         THE COURT:  Where did this come from,

15    Mr. Preston?

16         MR. PRESTON:  It was e-mailed by

17    Countryside Baking, Your Honor.

18         THE COURT:  Pardon?

19         MR. PRESTON:  It was e-mailed by

20    Countryside Baking.

21         THE COURT:  That's interesting, but it

22    doesn't lay a predicate for its admission.

23         MR. PRESTON:  I would submit to the

24    Court that the document can be received as a

25    reliable document despite what I think is a

hearsay objection.  And that is based on its

reliability in the catch all exception, which --

and it would be reliable, Your Honor, due to the

fact that it has all the identifying information

that the documents which Mr. Evens signed in

regard to the.

THE COURT:  But what -- for what purpose

is it being used?

MR. PRESTON:  Because it matches by lot

numbers all the -- all the items which Mr. Evens

signed for.

THE COURT:  Well, he is not denying

that, is he.

MR. PRESTON:  No, Your Honor.  This

particular document shows the value of the items

which he signed for, and the government is

introducing it for that purpose.

THE COURT:  That's up to Countryside and

you to establish, but not simply by offering this

document because it's -- because it exists.  You

need a predicate for it.

MR. PRESTON:  I submit to the Court that

I've laid a predicate that indicates that there's

a sufficient indicia of reliability in regard to

this document so that it should be admissible.

1          THE COURT:  Not simply because it's a --

2    because it's been e-mailed to you as a photocopy.

3    That's not a sufficient predicate, Counsel.

4          MR. PRESTON:  Yes, Your Honor.

5          THE COURT:  So the objection is

6    sustained.

7          MR. PRESTON:  Thank you.

8          (WHEREUPON, THE SIDEBAR DISCUSSION WAS

9    CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

10          THE COURT:  We're just about reaching

11   the noon hour, Mr. Preston.  We'll take our noon

12   recess.

13          I'm going to again impose on you ladies

14   and gentlemen and ask you to come back by

15   1 o'clock.  We'll be in recess until 1 o'clock.

16          COURT SECURITY OFFICER:  All rise for

17   the jury.

18          THE COURT:  You may come down,

19   Mr. Baptiste.

20     (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

21          THE COURT:  Please be seated.  Where are

22   we going, gentlemen?

23          MR. CRAWFORD:  I'll try and answer.  I'm

24   assuming Mr. Preston might be able to give us an

25   estimation as to how much longer cross will be.

1          THE COURT:  Can you, Mr. Preston?

2          MR. PRESTON:  Judge, I hope it will be

3    less than an hour.  I do have some areas of the

4    transcript I would like to address with this

5    witness.

6          THE COURT:  All right.

7          MR. CRAWFORD:  And I do not believe

8    Mr. Chalela has any additional evidence, but I can

9    tell the court that Mr. Volcy will testify and

10   that his direct examination will be quite lengthy.

11         THE COURT:  What you're saying is we're

12   not going to finish today?

13         MR. CRAWFORD:  I think that's a safe

14   assumption, yes, sir.

15         THE COURT:  All right.  That means we

16   will reconvene on Monday.

17         MR. RODRIGUEZ:  Judge, can I have --

18         THE COURT:  Mr. Rodriguez.

19         MR. RODRIGUEZ:  Judge, I think I'm the

20   only counsel that's from out of town.  And I just

21   have two questions.  What time -- with that

22   information, what time would the Court be

23   finishing today, and what time are we starting

24   Monday morning?

25         THE COURT:  We'll finish today at

1    5 o'clock.  We'll start Monday morning at 9:30.

2           MR. RODRIGUEZ:  Thank you, Your Honor.

3    That's all I needed to know.

4           THE COURT:  All right.  We'll be in

5    recess.

6      (THEREUPON, THE LUNCHEON RECESS WAS TAKEN, AND

7        THEN THE PROCEEDINGS CONTINUED AS FOLLOWS:)

8           COURT SECURITY OFFICER:  All rise for

9    the jury.

10     (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

11          THE COURT:  Good afternoon, ladies and

12   gentlemen.

13          Counsel.

14   BY MR. PRESTON:

15   Q.     Mr. Baptiste, you have before you

16   Government's Exhibit 13A; is that correct?

17   A.     Yes.

18   Q.     And this is the transcript which has been

19   discussed as the conversation in the rear of the

20   patrol car; correct?

21   A.     Yes.

22   Q.     I'd like to address some additional portions

23   of the transcript with you during this part of my

24   questioning.

25          Before we get to that though, when you're

1  carrying a refrigerated load, it's already been

2  indicated that you have to keep your trailer at a

3  certain temperature; correct?

4  A.     Yes.

5  Q.     In this case it was at minus ten degrees;

6  correct?

7  A.     Yes.

8  Q.     Now, if you're carrying a load of food

9  products that's produced to be kept at a certain

10 temperature and your unit fails, that load becomes

11 undeliverable; correct?

12 A.     No.

13 Q.     You still deliver a -- a spoiled shipment if

14 your refrigeration failed?

15 A.     You can't.

16 Q.     What do you do with a spoiled shipment if

17 your refrigeration fails?

18 A.     You call the shipper or you go to a shop and

19 have the refrigeration repaired.

20 Q.     But as far as the spoiled items in the back

21 of your truck, you have to call somebody with

22 regard to disposal instructions; correct?

23 A.     You call the shipper.

24 Q.     And then insurance takes care of the rest;

25 right?

1    A.    Yeah, the company's insurance, yes.

2    Q.    A load of cookie dough that's supposed to be

3    kept at minus ten degrees is undeliverable if your

4    trailer is at 35 degrees; correct?

5    A.    They won't accept it.

6    Q.    So at this point the seal's of no

7    consequence anyhow, is it?  At this point with your

8    trailer at 35 degrees, a seal on the trailer is of

9    no consequence anyhow, is it?

10   A.    It's still important because you have to go

11   to the company with it.

12   Q.    In this case at the time of the traffic stop

13   your trailer was not at minus ten degrees, was it?

14   A.    It was at minus ten.

15   Q.    Well, at minus ten degrees if the trailer

16   doors were opened you could not see anything in

17   that trailer; correct?

18   A.    There's a difference.  If you put it on

19   minus ten continuously, when you open the back

20   there's a flame that will come to you.  If you put

21   it on automatic, it will stay normal.

22   Q.    Well, you and Mr. Volcy discussed the fact

23   that if the freezer was working the trooper would

24   not be able to see the load; correct?

25   A.    We did not discuss that.  I just spoke about

1    it, and minus ten is minus ten.

2    Q.    Well, let's took at Page 14 of Government's

3    Exhibit 14A.  We'll put it up on the screen as well

4    if you'd like to look at it there.

5          MR. PRESTON:  Miss Thomas, please.

6    BY MR. PRESTON:

7    Q.    Mr. Volcy tells you the freezer wasn't

8    working.  "If the freezer was working, man, they

9    wouldn't be able to see anything in the car;"

10   correct?

11         You said, "It's working."

12         Mr. Volcy responded, "Yeah, but when I left

13   it working you can't see anything inside, man."

14         And then you said, "What are you talking

15   about?  If you left the freezer running, they will

16   go inside and they wouldn't be able to see anything

17   at all, man;" correct?

18         So you and Mr. Volcy did discuss what the

19   trooper might or might not be able see based on the

20   condition of the freezer; correct?

21   A.    I discussed -- I discussed with Mr. Volcy

22   that at minus ten all you -- you leave the thing

23   at minus ten, once you open the back you would see

24   fumes coming out, but you wouldn't see anything.

25         And that's why I ask him what are we talking

1    about.

2    Q.    That's not what you said, is it?

3    A.    That's what I said here.

4    Q.    You were talking about the trooper in the

5    truck not being able to see if the freezer was

6    where it should have been; correct?

7    A.    I'm not talking about the trooper.

8    Q.    Shortly after you were put in the patrol

9    car, you were speaking to one of the troopers and

10   you told him, I'm going to Roosevelt.  Do you

11   remember that?

12   A.    No, I never said that.

13   Q.    Do you need to see that?

14   A.    Yes.

15        MR. PRESTON:  Page 3, please.

16   BY MR. PRESTON:

17   Q.    This was in English; correct?  This was not

18   a translation; is that correct?

19   A.    I don't remember telling him that.  I only

20   spoke with the police that stopped me, and

21   nobody -- no one else asked me questions.

22        And he asked me where I was going.  I said I

23   was going to Oz.  And where I was going to drop

24   it, I said I was going to drop things at Walmart.

25   Q.    In this portion of the conversation you say,

"No, No, No.  I said, we -- uhm, we are going to
Walmart, but I'm going to Roosevelt."

    Are you denying you made that statement?

A.    I don't remember telling him I was going to
Roosevelt.  Where's Roosevelt?

Q.    Well, that's a fair question to ask you,
Mr. Evens, since you told the trooper you were
going to Roosevelt.

    Where's Roosevelt?

    THE COURT:  The witness said he does not
remember doing so.  Next question.

    MR. PRESTON:  Page 31, please.

BY MR. PRESTON:

Q.    At the top of the page -- near the top of
the page you indicate, "All that marijuana, we are
in trouble;" correct?

A.    I did not know anything about marijuana.
When the police came to tell me about marijuana, I
said all that marijuana?  Well, then there's a
problem.

Q.    This is you talking to Mr. Volcy; correct?

A.    The police asked the question and --

    MR. PRESTON:  Well, let's look at the
whole page, please.

BY MR. PRESTON:

1  Q.    This is in Haitian Creole originally, and

2  this is only you and Mr. Volcy talking on this

3  page; correct?

4  A.    Yeah, myself and Volcy in the back.

5  Q.    And you ultimately say, "Uh-Huh, they see it

6  man."

7       To which Mr. Volcy replies, "Everything was

8  in there.  We are gone.  They will see the thing

9  easily if they go all the way up front, man;"

10 correct?

11       MR. CHALELA:  Excuse me, Your Honor.  I

12 move to have the Creole portion before the witness

13 instead of simply the translation in English.

14       MR. PRESTON:  Witness has the entire

15 page in front of him, Your Honor.

16       THE COURT:  The witness has the

17 information before him Mr. Chalela.

18       MR. CHALELA:  Thank you, Your Honor.

19 BY MR. PRESTON:

20 Q.    That's what Mr. Volcy told you; correct?

21 A.    Mr. Volcy and I were speaking about the head

22 of the truck where the police said he's found

23 marijuana.

24 Q.    While we're on this page, that's where the

25 marijuana was located; correct?

1   A.      Say that again.

2   Q.      The whole thing all the way up front, that's

3   where the marijuana was located; correct?

4   A.      I don't know there was marijuana in there.

5   I can't tell.

6   Q.      We can look at Government's Exhibit 7C;

7   correct?  And that's the nose of your trailer where

8   the marijuana was discovered; correct?

9   A.      That's where they saw it.

10  Q.      And when we're talking about your

11  conversation on Page 31 that we were just

12  addressing, that applied not to any small amount of

13  marijuana in the cab of the truck which you

14  indicate that didn't exist, but to the marijuana in

15  the trailer which did exist; correct?

16  A.      I never knew there was marijuana in the

17  truck, in the trailer.  It's when the police went

18  in and searched and came to tell me that they

19  found marijuana on the front side of the trailer,

20  up front.

21  Q.      Just so the jury understands what we're

22  talking about in regard to Page 31, when Mr. Volcy

23  says, "They will see this thing easily if they go

24  all the way up front, man," and you say, "If he

25  goes all the way to the front," you're telling this

1  jury now that those statements were made after law

2  enforcement told you that they had found the

3  marijuana on the truck.  Is that what you're

4  telling the jury?

5  A.    When the police came to tell me that there

6  was marijuana in the truck, I was shocked because

7  I did not know there was marijuana in there.

8  Q.    Did you understand my question?  Did you not

9  just tell the jury that this particular

10  conversation or portion of the conversation took

11  place after the police told you that they had found

12  the marijuana?

13  A.    When the trooper came to tell me, that's

14  when I told him you found marijuana on the front

15  of the truck.

16  Q.    So you're telling the jury that before the

17  police told you there was marijuana on the front of

18  the truck, you and Hardaway Volcy had not discussed

19  marijuana on the front of the truck?

20  A.    No.

21  Q.    Well, isn't it a fact that this conversation

22  talks about marijuana on the front of the truck?

23  A.    It's when the police came to tell us that

24  they -- he had found marijuana on the front of the

25  truck.  That's when I knew about it.  We don't

1    smoke.  I don't know what that was.

2    Q.    Isn't it a fact that the police told you

3    that they found a whole bunch of marijuana after

4    you and Mr. Volcy talked about them finding it if

5    they went all the way up front?

6    A.    The police went on the front cabin first.

7    It's after that he went in the back.

8              MR. PRESTON:  Page 34, please.

9    BY MR. PRESTON:

10   Q.    This is after Page 31, obviously,

11   Mr. Baptiste; correct?

12   A.    Yes.

13   Q.    And after Page 31 we have Page 34 where

14   despite your earlier testimony is when the police

15   put the handcuffs on you; correct?

16   A.    No.  He put handcuffs on me as I got out the

17   car.  I went to him and he put the cuffs on me.

18   Q.    When you're told to keep your hands behind

19   your back here, how could you do that -- how could

20   you do anything but that if you were already

21   handcuffed?

22   A.    When he had put the handcuffs on me at first

23   they were very tight.  And when I'm trying to move

24   them, then they told me no, keep your hands there.

25   Don't move them.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1    Q.    The import -- the important part of this I
2    would like you to look at here is where you are
3    told -- you and Mr. Volcy are told by a law
4    enforcement officer, "Uh, we found a whole bunch of
5    marijuana in their, man, a whole -- a bunch of them
6    in there."
7    A.    That's when I was shocked.  I did not know I
8    was carrying marijuana.
9    Q.    You were shocked here.  But earlier in the
10   conversation with Mr. Volcy, you and he were
11   telling each other where the police were going to
12   find the marijuana; correct?
13   A.    No.
14   Q.    Your previous testimony that when you were
15   discussing the front of the trailer with Mr. Volcy
16   is inconsistent with the timing of that --
17           THE COURT:  Counsel, this is argument.
18           MR. PRESTON:  Yes, Your Honor.
19   BY MR. PRESTON:
20   Q.    Will you please look at Page 49.  At the top
21   of Page 49 we see yourself and Mr. Volcy discussing
22   turning into that street; correct?
23   A.    Can you repeat the question please.
24   Q.    At the top of this page you and Mr. Volcy
25   are discussing turning into that street.  Mr. Volcy
```

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    indicating, "I think they were going to have us

2    turn in that street;" correct?

3    A.    I'm talking to Mr. Volcy.  I'm driving and

4    I'm lost and I'm looking for places to turn.

5    Q.    That street would have been 118th; correct?

6    A.    No.

7    Q.    Because Mr. Parra, the person giving

8    directions, had indicated to come down to 118th,

9    call and come down the street, and I'm on the

10   left-hand side.  Call and you'll see me; correct?

11   A.    I never heard of 118th.

12   Q.    And it was?

13   A.    I was looking for places to turn.

14   Q.    It was based on that comment in Government's

15   Exhibit 12D by Mr. Parra that you told Mr. Volcy

16   they said once you make the turn, call them.  They

17   will follow you.  Slow motion; right?

18   A.    Never spoke of such thing with Mr. Volcy.

19   Q.    So this conversation never took place?

20   A.    I don't see in that conversation that it

21   tells me to turn on 118.

22   Q.    That street, what did that represent?

23   A.    Doesn't represent anything to me.  It's when

24   I was stopped.  It was in the area where I had to

25   stop.

Q.      It does not say Oz there, does it?

A.      I see pause, but I don't see Oz.

Q.      Mr. Chalela and yourself had some
conversation about the term "kraze;" correct?

A.      Yes.

Q.      And during that part of the examination you
and Mr. Chalela discussed kraze in relationship to
dropping a telephone; correct?

A.      The word "kraze" has a lot of meanings.

Q.      Kill, break, drop.  Those are words that you
used; correct?

A.      Yeah.  If you are going to kill somebody,
you say you're going to kraze.  If you have an
accident, you kraze.  That Creole word "Kraze"
means a lot of words, a lot of things.

Q.      But you and Mr. Chalela talked about kraze
in relationship to a telephone; correct?

A.      Yes.  That's when he asked me many meanings
of the word kraze.

Q.      But you and Mr. Volcy used kraze in regard
to a chip; correct?

A.      No.

        MR. PRESTON:  Page 55, please.

BY MR. PRESTON:

Q.      Let's look at both the Haitian Creole as

1    well as the translation as highlighted here.  In

2    Haitian Creole, excuse my pronunciation, you

3    kotchip-la; correct?

4    A.      Kotchip-la.  Where's the chip.

5    Q.      It's right in front of you.  Read it,

6    please.  Is that what you said?

7    A.      I don't remember saying things like that.

8    Q.      Kotchip-la, it translates where is the chip;

9    correct?

10   A.      I don't remember saying things like that.

11   Q.      And then the response was I smash it with my

12   teeth and I throw it away; correct?

13   A.      Don't remember saying things like that.  I

14   don't remember hearing something like that.

15   Q.      But you have reviewed the recording that's

16   in evidence, and you've reviewed this transcript;

17   correct?

18   A.      Yes, I see it.

19   Q.      And that conversation isn't about a phone

20   specifically; it's about a chip; correct?

21   A.      Yeah, there's the word "chip" there.

22   There's no telephone there.

23   Q.      And if this will refresh your memory, you

24   were talking to Mr. Volcy about him removing the

25   SIM card from his cellular telephone so it couldn't

1  be tracked; correct?

2  A.    I didn't talk about smashing things.  I know

3  that he has a phone that works and one that

4  doesn't work.  Sometimes he changes the chip to go

5  from one phone to the other, but I didn't talk

6  about smashing.

7  Q.    And you didn't park your trailer in Phoenix

8  Arizona for 64 and a half hours either, did you?

9  A.    No.

10  MR. PRESTON:  Thank you, Your Honor.

11  THE COURT:  Mr. Crawford.

12  MR. CRAWFORD:  Thank you.

13  CROSS-EXAMINATION

14  BY MR. CRAWFORD:

15  Q.    Mr. Baptiste, let's address something that

16  the government was recently asking you about on

17  Page 31 of the transcript -- I forget what number

18  that is --

19  MR. PRESTON:  Government's 13A.

20  BY MR. CRAWFORD:

21  Q.    -- Exhibit No. 13A.  Do you remember that

22  line of questioning about what you knew and when

23  you knew it?

24  A.    Could you repeat the question again, please.

25  Q.    Sure.  Do you remember a line of questioning

1   that Mr. Preston just finished a minute ago

2   discussing statements you made on Page 31 about all

3   that marijuana, we are in trouble?

4   A.    Yes.

5   Q.    Now, isn't it a fact that before you made

6   that statement you already knew that the dog had

7   alerted on the trailer?

8   A.    Yes.

9   Q.    So tell us then when you say on Page 31 all

10  that marijuana, we're in trouble, what did you mean

11  by that?

12  A.    Well, we know that once the dog would have

13  gone up there and the man said that there was

14  marijuana, we knew that then we would be in

15  trouble.

16  Q.    Okay.  And you -- are you a United States

17  citizen?

18  A.    No.

19  Q.    Are you aware or were you aware back then

20  that if you are convicted of a drug crime in this

21  country, that after you serve your prison time, if

22  any, then you --

23          MR. PRESTON:  Objection, relevancy.

24          THE COURT:  What is the relevance,

25  Counsel?

1        MR. CRAWFORD:  It'll show his state of

2   mind at the time and why he may have said some of

3   these statements.

4        THE COURT:  You may answer.

5   BY MR. CRAWFORD:

6   Q.    Did you know you could have been subject to

7   deportation?

8   A.    Yes.

9   Q.    All right.  And do you recall that before

10   these statements on 31 that you were asked about

11   that back on statements made on Page 25 that the

12   police had come to you and told you that they --

13   the dog had alerted on the trailer?

14   A.    Yes.

15   Q.    So it's fair to say that these conversations

16   there are captured on Page 31 are happening after

17   you've already seen or already been told by the

18   police that the dog has alerted on the trailer;

19   correct?

20   A.    Yes.  As soon as the dog went in there and

21   came back down, he came and told us that.

22   Q.    All right.  One more area.  The government

23   has today introduced an exhibit -- and I have lost

24   the number.  Excuse me.  Exhibit No. 39.

25        MR. CRAWFORD:  And I'm going to ask if I

1    can put it up on the screen for you.

2    BY MR. CRAWFORD:

3    Q.    All right.  You remember that this is

4    another bill of lading from Countryside Baking on

5    April 21st; right?

6    A.    Yes.

7    Q.    Okay.  Now, earlier in this trial we had

8    seen repeatedly Government's Exhibit No. 30 which

9    is this bill of lading -- well, I take that back.

10   That was a Volcy exhibit.  But anyway, it reflects

11   that on the same day, April 21st, they had the

12   oatmeal raisin cookie dough; right?

13   A.    Yes.

14   Q.    And this one shows that the 77 cases is

15   going to Winter Haven, Florida --

16   A.    Yes.

17   Q.    -- correct?

18   A.    Yes.

19   Q.    And has Seal No. 0000082.

20   A.    Yes.

21   Q.    Other one on the same date on the same place

22   is going to Arcadia, Florida; correct?

23   A.    Yes.  Yes.

24   Q.    And it has the different seal number,

25   0000071.

A.    Yes.

Q.    Now, was it unusual for you as a trucker to pick up product from a warehouse and deliver it to different locations?

A.    It depends on the company.  They could give you a particular type of merchandise.  You might have to distribute it or deliver it in two places, five places.

Q.    All right.  Well, let's take this example. You're picking up cookie dough at Countryside Bakery; correct?

A.    Yes.

Q.    And you're picking it up for Walmart; right?

A.    Yes.

Q.    And you're dropping part of the load off at Winter Haven?

A.    Yes.

Q.    And part of the load off at Arcadia?

A.    Yes.

Q.    And they're going to seal the trailer; right?

A.    Yes.

Q.    But the problem is that when you drop the load off -- let's say you go to Winter Haven first -- or Arcadia first, they're going to have to

1   break the seal --

2   A.      Yes.

3   Q.      -- to unload part of that load; right?

4   A.      Yes.

5   Q.      So are you given a second seal by Walmart or

6   Countryside in California to then reseal and go to

7   Winter Haven?

8   A.      They give you two seals.  After you take off

9   the first, the second one will be put on the truck

10  by security.  It would not be by you.  It would be

11  by security.

12          MR. CRAWFORD:  Mr. Baptiste, thank you

13  sir.

14          THE COURT:  Mr. Preston.

15          MR. PRESTON:  Nothing further.

16          THE COURT:  You may come down,

17  Mr. Baptiste.

18          Mr. Chalela.

19          MR. CHALELA:  Mr. Baptiste rests.

20          THE COURT:  All right.  Mr. Crawford.

21          MR. CRAWFORD:  Yes, Your Honor.  At this

22  time Mr. Hardaway Volcy.

23          COURTROOM DEPUTY CLERK:  Sir, if you'll

24  raise your right hand.

25          Do you solemnly swear or affirm that the

1   testimony you shall give in this cause shall be

2   the truth, the whole truth, and nothing but the

3   truth, so help you God?

4          THE WITNESS:  Yes, I do.

5                     **HARDAWAY VOLCY,**

6   a witness, having been duly sworn to tell the

7   truth, the whole truth and nothing but the truth,

8   was examined and testified as follows:

9          COURTROOM DEPUTY CLERK:  Please be

10  seated in the witness stand.

11         Sir, if you'll state your name and spell

12  your last name for the record, please.

13         THE WITNESS:  Hardaway Volcy, V-O-L-C-Y.

14                   <u>DIRECT EXAMINATION</u>

15  BY MR. CRAWFORD:

16  Q.    What's your date of birth, Mr. Volcy?

17  A.    September 10, 1971.

18  Q.    Mr. Volcy, I know you understand English

19  pretty well, but listen to the translation in

20  Creole before you respond.

21  A.    Yes.

22  Q.    Where were you born?

23  A.    In Haiti.

24  Q.    And what is your native language?

25  A.    Creole.

1    Q.    Do you speak English?

2    A.    Yes.

3    Q.    On important matters such as this court

4    proceeding are you more comfortable asking

5    questions in Creole?

6    A.    Yes.

7    Q.    How many brothers and sisters do you have?

8              MR. PRESTON:  Objection, relevancy.

9              THE COURT:  Overruled.

10             THE WITNESS:  I have five sisters and

11   three brothers.

12   BY MR. CRAWFORD:

13   Q.    Did there come a time when you and your

14   family migrated to the United States?

15             MR. PRESTON:  Objection, relevancy.

16             THE COURT:  This is just preliminary

17   inquiry.  Counsel may do so.

18             THE WITNESS:  Yes.

19   BY MR. CRAWFORD:

20   Q.    What year was that?

21   A.    In 1990.

22   Q.    And why did you come to the United States?

23   A.    For better opportunities.

24   Q.    How old were you when you came to the United

25   States?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1    A.      Seventeen years old.

2    Q.      And where did you and your family settle at

3    that time?

4    A.      In Trenton, New Jersey.

5    Q.      Did you attend high school in Trenton?

6    A.      Yes.

7           MR. CRAWFORD:  You guys okay?

8           THE INTERPRETER:  We're fine.

9           MR. CRAWFORD:  Okay.

10   BY MR. CRAWFORD:

11   Q.      Did you graduate from high school in New

12   Jersey?

13   A.      Yes.

14   Q.      What year did you graduate?

15   A.      1993.

16   Q.      And after you graduated from high school in

17   1993, did you attend college?

18   A.      Yes.

19   Q.      Tell us where.

20   A.      Mercer County Community College.

21   Q.      And is that in New Jersey?

22   A.      Yes.

23   Q.      Any other significant schooling after high

24   school?

25   A.      Yes.
```

```
1    Q.     Where?

2    A.     Citton Institute.

3    Q.     And what type of certification or degree did

4    you get from Citton Institute?

5    A.     Computerized accounting.

6              THE COURT:  Did you graduate from

7    college?

8              THE WITNESS:  No.  I was short quite a

9    few credits, which is why I did not graduate from

10   Mercer College.

11   BY MR. CRAWFORD:

12   Q.     Did you work while you were in school,

13   Mr. Volcy?

14   A.     Yes.

15   Q.     What did you do?

16   A.     I was driving a school bus.

17   Q.     Now, what was your first significant place

18   of employment after you finished up your

19   certification?

20   A.     I worked at McGraw-Hill Company.

21   Q.     And when did you work for McGraw-Hill?

22   A.     From '97 to 2002.

23   Q.     And what did you do specifically for

24   McGraw-Hill?

25   A.     I was working in accounts payable
```

1  processing -- processing checks.

2  Q.    After you left McGraw-Hill in 2002, what did

3  you do next?

4  A.    I got laid off and I -- that was when I went

5  to drive the school bus.  And while driving the

6  school bus, that's when I went to get my CDL.

7  Q.    And CDL stands for what?

8  A.    Commercial driver's license.

9  Q.    All right and did you get -- well, tell us

10  when you got your commercial driver's license.

11  A.    February 2003.

12  Q.    And what did you need to do to get that type

13  of license?

14  A.    I had to go through some training, and I had

15  to go to school, a trucking school.

16  Q.    Did you have to pass a written exam?

17  A.    Yes.

18  Q.    Did you also have to pass a driving exam?

19  A.    Yes.

20  Q.    So is that where you first learned how to

21  drive a tractor trailer?

22  A.    Yes.

23  Q.    So after getting your license, did you

24  become a truck driver?

25  A.    Yes.

1 Q. All right.  Let's step back for a second and

2 let me ask this:  Are you presently married?

3 A. Yes, separated.

4 Q. Are you living together or separated?

5 A. Separated for a few years.

6 Q. What is your wife's name?

7 A. Myra Volcy.

8 Q. Any children?

9 A. No.

10 Q. And where does your wife, Myra Volcy, live

11 now?

12 A. In New Jersey.

13 Q. Do you have additional family members that

14 live in New jersey?

15 A. My entire family.

16 Q. Is your father still living?

17 A. Yes.

18 Q. Does he also live in New Jersey?

19 A. Yes.

20 Q. Where does your mother primarily live?

21 A. She lives in New Jersey, but right now she's

22 in Haiti -- she lives in Haiti, but now she's in

23 New Jersey.

24 Q. Okay.  Now, after coming to America, did you

25 apply and receive United States citizenship?

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    A.    Yes.

2    Q.    And when did you become a United States

3    citizen?

4    A.    In '95.

5    Q.    Did there come a time when you moved to

6    south Florida?

7    A.    Yes.

8    Q.    When?

9    A.    July 2007.

10    Q.    Why?

11    A.    I wanted to start all over.  I wanted to

12    have a restart.

13    Q.    Is there a large Haitian community in south

14    Florida?

15    A.    Yes.

16    Q.    Where did you live in south Florida?

17    A.    In Miramar.

18    Q.    And what type of work did you do?

19    A.    I drove a truck.

20    Q.    And did you -- well, did you work for a

21    particular trucking company?

22    A.    Yes.

23    Q.    And what was the name of that company?

24    A.    Cool Carriers.

25    Q.    How did you come to drive for Cool Carriers?

A.    I had a friend who drove a truck, and he told me I could go and lease one through Cool Carriers.

Q.    All right.  And after that introduction did you become a long haul or short haul driver for Cool Carriers?

A.    Long distance.

Q.    Tell us briefly how would you get paid by Cool Carriers when you would drive a particular load.

A.    Afterward we go back to them, you turn over the documentation, the papers, and then they pay you from that.

Q.    All right.  As a driver for Cool Carriers, did you ever lose a load?

A.    No.

Q.    What would have happened to your payment from Cool Carriers if you had lost a load?

A.    First, Cool Carrier would not pay you for the trip.  They are -- they are likely also to charge you for their loss even though they would turn the loss into the insurance company and would cover most of it.

Q.    Do you know a gentleman by a name of Jean Evens Baptiste?

1    A.     Yes.

2    Q.     Is this Mr. Baptiste over here?

3    A.     Yes.

4    Q.     How did you come to meet Mr. Baptiste?

5    A.     We met at Cool Carriers since we were both

6 drivers there.

7    Q.     Do you consider him a close personal friend?

8    A.     We talk to each other, yes.

9    Q.     Is he much older than you?

10   A.     Yes.

11   Q.     Let me ask you about a few other

12 individuals.  In this particular Indictment there

13 are a number of individuals that are listed.  First

14 let me ask you, have you ever met Mr. Shorter, that

15 has been on trial with us during this past week?

16   A.     No.

17   Q.     Before this case started, had you ever seen

18 him before?

19   A.     No.

20   Q.     Cleo Emmanual Mitchell, do you recall him

21 testifying the second or third day of trial?

22   A.     I had seen him.

23   Q.     Had you ever seen him before?

24   A.     No, never.

25   Q.     Do you know who Jermaine Hopkins is?

1    A.    No.

2    Q.    Do you know who Set Clemens is?

3    A.    No.

4    Q.    Do you know who James Kurmay is?

5    A.    No.

6    Q.    Do you know who James Lamar Cooney is?

7    A.    No.

8    Q.    Do you know a Richard Preston Parker?

9    A.    No.

10   Q.    And, of course, you do know Jean Evens

11   Baptiste?

12   A.    Yes.

13   Q.    The first witness in this case was a

14   gentleman whose last name was Parra.  Have you ever

15   met him before?

16   A.    No.

17   Q.    Now, going back to 2007, you and

18   Mr. Baptiste were both driving for Cool Carriers;

19   is that correct?

20   A.    Yes.

21   Q.    Were there times that you would drive

22   together?

23   A.    When I stopped working for Cool Carriers, I

24   didn't have a truck of my own.  Sometimes when he

25   would be going out on a trip I would sometimes go

out with him.

Q.     All right.

THE COURT:  Mr. Interpreter, would you pull that microphone closer to you.

THE INTERPRETER:  Yes, sir.

THE COURT:  Thank you.

BY MR. CRAWFORD:

Q.     Was there ever a time when Mr. Baptiste would go out of town and allow you to use his truck?

A.     Yes, that's -- that's what had happened.  We had met, and he had told me that sometimes he might be going away.  I could drive on -- on his -- for him.

Q.     Where's Mr. Baptiste from?  Where was he born?

A.     Haiti.

Q.     And were you ever aware of times he would take a trip to Haiti?

A.     Yes.

Q.     And on any occasions would he then let you drive his truck?

A.     Yes.

Q.     Is he a good truck driver?

A.     Yes.  I trust him as a driver.  I trust him

1   because I sleep while he's driving.

2   Q.     All right.  Let me focus your attention now

3   on mid April of 2008.  Where were you -- where were

4   you living at that time?

5   A.     I was in the process of going back to live

6   in New Jersey because things were not working out

7   for me in Florida.

8   Q.     Directing your attention then to mid

9   April 2008, do you recall receiving a phone call

10  from Jean Baptiste with a business opportunity?

11  A.     Yes.

12  Q.     Tell us what you remember about that phone

13  call.

14  A.     He said that he was going to Haiti.  He had

15  a load that he had to go to deliver, and -- and I

16  could go with him.  And once he be going to Haiti,

17  he'd leave the truck with me until he come back

18  from Haiti.

19  Q.     Do you recall him saying during this initial

20  phone call where the delivery load was to?

21  A.     No, I don't recall that.

22  Q.     Did you agree to go with him on this trip as

23  a co-driver?

24  A.     Yes.

25  Q.     And were you to be paid for your services in

1  this capacity?

2  A.    Yes, although I never got paid.

3  Q.    All right.  Let's now focus on this April

4  trip.  Where did you all first get together?

5  A.    In New Jersey he picked me up.

6  Q.    All right.  Let's -- well, do you remember

7  about what day?

8  A.    No, I cannot recall exactly what date.

9  Q.    All right.  But there came a point where the

10 trip officially started?

11 A.    Uh-huh.

12 Q.    And is that when you began to keep your

13 driver's daily logs?

14 A.    Let me see.  Wait a minute.  Could you

15 repeat the question for me, please?

16 Q.    Sure.  Would it help you remember what days

17 you were driving and where you were if you could

18 look at your driver daily logs?

19 A.    Yes.

20 Q.    All right.  I'm going to show you on the

21 overhead what's already been introduced into

22 evidence as Volcy Exhibit No. 15.

23 A.    Okay.

24 Q.    And this indicates that on April 15th, '08,

25 you signed here as the driver's full signature;

1    correct?

2    A.    Yes.

3    Q.    This is the co-driver?

4    A.    Yes.

5    Q.    And this shows that for the previous two

6    weeks almost you were off duty?

7    A.    Yes, I was not working.  I was off duty.

8    Q.    And the truck was down in south Florida?

9    A.    Even if you're not working for a year, you

10   have to show the log as to what you were doing

11   seven days prior.

12   Q.    Why?

13   A.    Because you start driving.

14   Q.    Why?

15   A.    For the police, for the authorities.

16   Q.    All right.  And let's go to the next entry

17   on Volcy Exhibit No. 15, which is also April 15th,

18   '08.  Now, is this line what you are doing during

19   this time frame?

20   A.    I -- I had not as yet gotten in the truck.

21   Once I got on the truck, I put the -- I put myself

22   in the sleeping berth.  I went in the back.

23   Q.    So does this indicate then at 4:30 p.m. the

24   trip officially starts?

25   A.    Yes.

```
1    Q.    Okay.  Tell us what off duty means.
2    A.    Off duty means that you're not on the truck;
3    you have nothing to do with it.
4    Q.    All right.  What does sleeper berth mean?
5    A.    When you are behind in the rear part of the
6    cabin.
7    Q.    All right.  So if I understand this
8    correctly, there's a driver's seat and there's a
9    passenger seat, and then behind those seats there's
10   a small cot where you can lay down and rest?
11   A.    Okay.
12   Q.    Does the sleeper berth indicate that you are
13   either in the passenger seat or in the cot behind
14   you?
15   A.    You shouldn't be in the passenger seat.
16   Because if you get stopped by the police -- well,
17   sometimes you're there, sometimes you're not.  But
18   if you sit there -- if you're supposed to be in
19   the back, you got to be in the back.
20   Q.    Okay.  And then the third category is
21   driving?
22   A.    Yes.
23   Q.    And this is the way to keep track of the
24   hours that you're actually driving the rig?
25   A.    Correct.
```

1  Q.    And then finally there's on duty, and in

2  parentheses it says not driving.  And what does

3  that mean?

4  A.    There may be other things that you're doing

5  in the truck.  You may -- you -- you are not

6  driving at that time.  You could be even in the

7  warehouse, you could be doing some work.

8  Q.    Could you be gas -- getting gas?

9  A.    Getting gas.

10 Q.    All right.  Let's go then to the next day,

11 which is 4/16/08.  And starting at midnight until

12 3:15 in the morning what are you doing?

13 A.    I got out then.  I got off then and I

14 started driving.

15 Q.    All right.

16 A.    I did 15 minutes of trip inspection.

17 Q.    Well, let's -- let's look at that.  From

18 3:15 to 3:30 it says on duty but not driving.

19 A.    Yes, because that's the time you -- you

20 doing your inspection around the truck.

21 Q.    What does that mean, inspection around the

22 truck?

23 A.    Before you -- before you take the wheel, you

24 check the oil, you check the gasoline, you check

25 the tires, you check the lights, everything.  It

1    takes you 15 minutes to go around the truck and do

2    that.

3    Q.    And are you required to do that every so

4    often?

5    A.    Each time before you go on duty, each time

6    each day before you start driving.

7    Q.    All right.  It also seems to indicate under

8    the section remarks that at 3:15 when you began

9    your inspection you were at this location?

10   A.    Yes.

11   Q.    Okay.  And then from 3:30 until 10:15 at

12   night -- I'm sorry, 10:15 a.m., what are you doing?

13   A.    I'm driving.

14   Q.    And you make it all the way to where?

15   A.    Cartersville.

16   Q.    All right.  And that's in Georgia?

17   A.    Yes.

18   Q.    Okay.  And then at 10:15 until the rest of

19   the evening, midnight, where are you?

20   A.    I was asleep.

21   Q.    Is it safe to assume that during that time

22   Mr. Baptiste was driving?

23   A.    Yes, he was driving.

24   Q.    All right.  The next day, the 17th of April,

25   what did you do all day?

A.    I was not the driver.  We were delivering the load, so for that whole day I really had nothing that I was supposed to do.  So for that time there I was in the sleeper bed -- berth.

Q.    All right.  So to know what the -- where the truck was or was doing that particular day, April 17th, we would need to look at the driver log of Jean Baptiste?

A.    Yes.

Q.    But this was an easy day for you?

A.    Yes.

Q.    Let's walk through the 18th.  It appears that at midnight to 12:15 a.m. you were doing the inspection or getting gas or something; right?

A.    I was on pretrip check.

Q.    All right.  And where were you?

A.    In Kansas.

Q.    What does PTI mean?

A.    Pretrip inspection.

Q.    All right.  And from a little after midnight, 12:15 in the morning until 9:00 in the morning what were you doing?

A.    I was driving.

Q.    And you made it all the way to where?

A.    New Mexico, Santa Rosa.

```
 1    Q.    And then at 9:00 until 10:00 that night what
 2    were you doing?
 3    A.    It was then that Mr. Baptiste was driving.
 4    And he drove to the destination.  When we got
 5    there, that was when we stopped and went into the
 6    hotel, and I went off duty.
 7    Q.    And from 10:00 until 2:00 -- until midnight
 8    you were off duty; correct?
 9    A.    Yes.  We had arrived early for the -- for
10    the delivery.  You know, with two drivers, you
11    know, it's fast.
12    Q.    Do you recall what type of load you were
13    hauling to California?
14    A.    We took a load from Tyson.
15    Q.    Do you remember whether it was chicken or
16    beef?
17    A.    Some type of meat.  Chicken or -- we got it
18    from Tyson.
19    Q.    Did you ever see the shipping order for this
20    particular --
21    A.    No.
22    Q.    You never saw it?
23    A.    No.
24    Q.    Okay.  In fact, let me ask you, this whole
25    trip who was in charge of the paperwork?
```

A.     Mr. Baptiste.  He's the one who signs when we have the paperwork to sign.

Q.     All right.  So you really didn't need to pay much attention to the paperwork, did you?

A.     No.

Q.     All right.  Now, did it come to your attention that when you arrived in California you had arrived a couple days early?

A.     Yes.

Q.     All right.  So having arrived in California, what was the name of the hotel, if you can remember?

A.     I think it's Super 6.  It's off Route 60.

Q.     Did you pay for the accommodations with a credit card or cash?

A.     Cash.

Q.     So was this the type of motel that gives you a delineated bill at the end of your stay like the Hyatt Regency?

A.     No.  You pay each day.  You go in and you pay.

Q.     So there really was no paperwork from your stay?

          MR. PRESTON:  Objection, leading.

          THE WITNESS:  No.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

THE COURT: Ask your questions, Counsel.

BY MR. CRAWFORD:

Q.    Was there any paperwork from your stay?

A.    There might have been, but I don't have
anything at all.  I don't have any.

Q.    Where --

A.    I never thought that I would need it anyway.

Q.    Where was the truck when you were staying in
the hotel?

A.    We parked it at Walmart.

Q.    What did you do all day?

A.    Resting, laying down, watching T.V.

Q.    Did you spend much time with Mr. Baptiste?

A.    We each had our own room.  But when we'd go
to eat, we'd go together.

Q.    All right.  Again, let me show you a portion
of Volcy Exhibit No. 15.  This is the 19th of
April.  What does it show you did that day?

A.    Off duty.  I could be -- I could do whatever
I would want to.

Q.    And the next day, the 20th, what does that
show?

A.    Same thing, off duty.

Q.    Now, Mr. Volcy, if you were attempting to
make a side trip to Phoenix, Arizona, and pick up

marijuana, could you not have made a driver's log

showing --

       MR. PRESTON: Objection, this is leading

all the way, Judge.

       THE COURT: It is.

BY MR. CRAWFORD:

Q.    All right. Did you go anywhere from

Riverside, California, those two days?

A.    No.

Q.    If you take the truck somewhere else, would

your driver's logs have reflected that?

A.    Yes, because if the police stops me.

Q.    Was it unusual for you to leave your truck

for a few days in a parking lot?

A.    If it was not normal?

Q.    I'm asking you was it normal?

A.    Yeah, we do that all the time.

Q.    If it is a refrigerator truck, and is

required to keep it at a certain temperature, could

you still leave it?

A.    Yes, we'd leave it. You leave it on

automatic control. If it stops, it will get to a

point where it starts over again. It will stop

and go. And it doesn't burn a lot of fuel either.

Q.    Now, Mr. Volcy, the GPS coordinates that

1   we've seen in this case seem to indicate that

2   either you -- either your truck cab or the trailer

3   or both were in Arizona on the 19th and 20th of

4   April.  Can you tell us how that could be?

5   A.    It's not possible.  Only if somebody had

6   stolen it.  It's not possible.

7   Q.    Did you take the truck to Phoenix during

8   that time frame?

9   A.    No.

10  Q.    All right.  On the 21st did you leave

11  Riverside, California?

12  A.    After we had made the delivery we left, yes.

13  Q.    And head to Irvine, California?

14  A.    As soon as we had finished doing the

15  delivery, it was dispatched to go to Irvine,

16  California.

17  Q.    All right.  So let me show you driver's log

18  from April 21st.

19        THE COURT:  What delivery was made on

20  the 21st?

21        THE WITNESS:  Delivery of the items that

22  we had picked up in Kansas from Tyson company.

23        THE COURT:  Delivered to who?

24        THE WITNESS:  To a big food company.  A

25  big market company.  It should be on the invoices.

BY MR. CRAWFORD:

Q.    All right.  But you haven't seen the invoice?

A.    No.

Q.    All right.  Then looking at April 21st, do you recall leaving Riverside, California, at about 2:30?

A.    Yes.

Q.    And what did you do until --

A.    At that time that was when we went to do the delivery.  In California at that time it's very early in the morning, so we got up in the morning. I was off duty.

And I -- and I went right back on duty, and I got on the truck.  I was off duty.  Came out of the hotel and got on duty.

Q.    All right.  And then the next day, April the 22nd -- and you got to remember the day starts at midnight?

A.    Yes.

Q.    You started off in the sleeper's berth?

A.    Yes.

THE COURT:  Mr. Crawford, use the microphone, please.

BY MR. CRAWFORD:

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1   Q.      Then you walked around 15 minutes and did
2   the inspection?
3   A.      Yes.
4   Q.      And then you drove for the next couple
5   hours, and you made it to Las Vegas?
6   A.      We went to Vegas.
7   Q.      Now, when you got to Irvine, California, is
8   this where you went to the Countryside Bakery and
9   picked up the cookie dough?
10  A.      Correct.
11  Q.      Mr. Volcy, have you as a truck driver ever
12  been given two seals --
13  A.      Yes.
14  Q.      -- at the same dock?
15  A.      Yes.
16  Q.      Tell the jury why.
17  A.      Like, for example, you go do the first
18  delivery.  After making the first delivery when
19  you are leaving the dock, the gate, you give the
20  seal and your paperwork to the security attesting
21  as to where you're going to deliver the next load.
22  You give the id seal to them, and then they seal
23  it themselves so that you can go and make the
24  second delivery.
25  Q.      Now, going back to this picking up the
```

1   cookie dough at Countryside Bakery in Irvine,

2   California, what role, if any, did you play in

3   loading the cookie dough?

4   A.    I didn't do anything.  I was on my computer

5   at the time.

6   Q.    Where were you?

7   A.    I was in the back of the truck, and then I

8   went to sit in front.  I was on the computer at

9   the time.

10  Q.    Did you ever go back to the loading dock?

11  A.    No.

12  Q.    Who handled the paperwork at this time?

13  A.    Well, after they had finished loading they

14  banged on the truck and they want to talk to

15  Mr. Baptiste.  And they had him sign the paper to

16  give him the paper and they had the seal put on,

17  and then we left.

18  Q.    Now, at some point during the trip from

19  California to Florida, did you come to learn that

20  you were hauling frozen bread?

21  A.    Yes.

22  Q.    And how did you learn you were hauling

23  frozen bread?

24  A.    I had to look at the bill of lading.

25  Q.    And why did you look at the bill of lading?

A.    At the time I looked at it was when we were
going through the Florida agriculture place.  You
have to tell them what you're carrying.

Q.    All right.  Had the trailer been sealed
since when you left California?

A.    Yes.

Q.    Since you were team driving, was the truck
pretty much in constant motion back and forth all
across the country?

A.    From the time we left Las Vegas we never
stopped.

Q.    At any time during the trip did you try and
get inside of the sealed trailer?

A.    No.

Q.    Until yesterday when we saw the video, were
you even aware that you might get in the trailer by
removing the door mechanism?

A.    I never even thought something like that
could be possible.

Q.    Do you remember, Mr. Volcy, on this
particular trailer which is from 2006, whether or
not the back door locking mechanisms were bolted or
riveted in?

A.    I never paid attention to that.

Q.    When you would do your walk around

1    inspection of the trailer did you ever notice any

2    scrape marks or tool marks around the locking

3    mechanism?

4    A.    No.

5    Q.    All right.  Let's jump ahead to Florida.  Do

6    you remember where you were on the 24th of April at

7    7:30 in the morning?

8    A.    We were somewhere in Georgia.

9    Q.    If I showed you your driver's log could you

10   be a little more specific?

11   A.    Yes.

12   Q.    All right.  Let me show you what's the last

13   page of Volcy Exhibit No. 15.  This is your driver

14   daily log from April 24th?

15   A.    Yes.

16   Q.    So where were you at 7:30?

17   A.    Can you bring it up for me, please, so I can

18   see it.  Oh, I cannot read it, but I was in

19   Georgia.  I was driving.

20   Q.    That's good enough.

21   A.    Somewhere after Atlanta.

22   Q.    Now, it shows that you originally had put

23   sleeper berth and crossed it out.

24   A.    That was a mistake.

25   Q.    Now, during this trip back to Florida, and

1    actually from Georgia to California, who was

2    responsible for finding the loads to carry?

3    A.    The dispatcher of Mr. Baptiste.

4    Q.    Tell us how that would work.  How would

5    Mr. Baptiste talk to the dispatcher and know where

6    to go next?

7    A.    If you have a load to deliver, before you

8    get to the delivery place you call the dispatcher

9    and you tell the person that you are pretty much

10    arrived at your delivery place.  To find you

11    another load, to start looking for another load

12    that you can pick up and go someplace else.

13    Q.    All right.  And Mr. Baptiste handled that on

14    this trip?

15    A.    Yes.

16    Q.    All right.  And coming back from Georgia, I

17    believe Mr. Baptiste testified that he had made

18    inquiries at a truck stop about an either strip

19    club or men's club, whatever you want to call it.

20    A.    He told me that that was happening because

21    they were fixing the car for him -- the truck for

22    him when we went to eat.

23    Q.    All right.  But were you there when he had

24    that conversation?

25    A.    No, I don't recall being there.

1    Q.    At some point when driving to Florida, did

2    you realize that you were going to be several days

3    early?

4    A.    Yes.  We were -- we were hurrying.  We knew

5    we wanted to deliver -- we were to deliver on

6    Friday morning, and the -- but the dispatcher said

7    it would be one day later.

8    Q.    All right.  So what did you decide to do

9    with your extra time?

10   A.    I wanted to get to Miami as soon as

11   possible, but we had to get the delivery made.

12   And somebody had given him a telephone number.

13   Like since we didn't deliver the load, somebody

14   had given us -- had given us a telephone so we

15   could go to a strip club near here.  So we tried

16   to call him.  He didn't answer.  But he called

17   back.

18   Q.    All right.  And when he called back, did he

19   call back on Baptiste's cell phone?

20   A.    I'm pretty sure it was because it was his.

21   Because he gave me the phone for me to get the

22   directions as to where we were going.

23   Q.    Okay.  You're kind of lapsing into English

24   and Creole, which happens.  All right.  So let's

25   get -- let me make sure I heard you right.

1          So the phone call came to Mr. Baptiste's

2    cell phone.  He gave it to you?

3    A.     Yes.

4    Q.     What happens next?

5    A.     I was seeking the directions, asking the

6    person where we were supposed to go.

7    Q.     And where did you want to go to?

8    A.     We were going to a club, a club named Oz.

9    That's what the person that said would be best for

10   us because it's near the road, the highway.  So we

11   got off, and he gave us directions.

12   Q.     All right.  In your mind you were getting

13   directions to go to what?

14   A.     To go to a club.

15   Q.     Who was driving the tractor trailer at the

16   time?

17   A.     Mr. Baptiste.

18   Q.     Do you remember getting off -- do you

19   remember going over the bridge, the Howard Franklin

20   bridge?

21   A.     Yes.  The person had said when we get

22   there -- , when we get on the bridge to call so we

23   could get more directions.

24   Q.     Did you do that?

25   A.     Yes.

Q.    And is that one of the transcripts and tapes
that we've heard during this trial?

A.    Yes.

Q.    Do you remember getting off on Ulmerton
Road?

A.    Yes, I think.  I believe so, yes.

Q.    All right.  Now, as you were driving down
Ulmerton, did you ever see the Oz club onto your
right by U.S. 19?

A.    I haven't seen it.  I was on the computer.
As we went past, Mr. Baptiste saw it.  I was on
the computer.  Mr. Baptiste saw the club and he
says uh, we just passed it.  We just passed the
club.

Q.    What happened next?

A.    We kept on going.  We were trying to see how
we would be able to turn around and turn back.

Q.    Describe the traffic at 5:30 on Ulmerton
Road.

A.    Traffic was heavy.

Q.    All right.  And do you recall whether or not
you were able to finally take a left off Ulmerton?

A.    To tell the truth, I was on the computer at
the time.  When I saw Baptiste turn, I said this
is the direction the person was giving to us.  I

1    said how come we passed the club.

2         The person had given us directions for that

3    street, so we turned there.  It was right then and

4    there that the police stopped us.

5    Q.    Now, after you were pulled over by the

6    Florida Highway Patrol.  What did you do?

7    A.    I was on my laptop.  He called Mr. Baptiste,

8    told him to get out.  I sat with my computer.  The

9    phone rang.  I told the person that the police had

10   stopped us.  I don't know if -- right then and

11   there the person hung up.

12   Q.    All right.  And --

13   A.    I don't recall like anything in particular.

14   Q.    You have told us about -- that Mr. Baptiste

15   had a cell phone.  Did you also have a cell phone

16   on this trip?

17   A.    I had three phones.  Two of them worked, one

18   didn't.  One of them did not work.

19   Q.    Was one of those phones kraze?

20   A.    Yes.

21   Q.    All right.  Tell us how you would use the

22   kraze phone.

23   A.    I have two phones that are the same.  I

24   could be using one, and I -- and I put the other

25   one to -- for the battery -- on the battery

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   charger.  And when the battery is charged and I

2   changed it from one and I bring it to the other

3   one, and I charge the other one now.

4   Q.    All right.  So when the highway patrolman

5   was talking to Mr. Baptiste, what, if anything,

6   were you doing with your cell phones?

7   A.    I was changing my batteries.  One of the

8   batteries had gone dead.  When he came, he saw the

9   phone that I was changing batteries.  That's what

10  he saw.

11  Q.    At any time were you attempting to smash

12  your cell phone?

13  A.    No.  He saw me with the phones, and he had

14  me get out of -- out of the truck with the phone

15  in my hand.

16  Q.    At any time were you trying to smash the SIM

17  card or whatever it is in your teeth?

18  A.    No.

19  Q.    Where are the phones now?

20  A.    They were on the truck.  I don't know what

21  happened to them.  They must be in the police's

22  custody right now.

23  Q.    All right.  Now, let's go forward to when

24  you're interviewed.

25            MR. CRAWFORD:  Changing of the guards.

BY MR. CRAWFORD:

Q.    After the Florida Highway Patrolman was finished talking to Mr. Baptiste, did he come to you?

A.    Yeah.  After 15, 20 minutes he came out and told me to get out.  Then he came asking me questions.

Q.    And did he ask you what you were pulling or hauling in the trailer?

A.    He either asked where we were going or what we were carrying.

Q.    All right.  Well, let's break those down. What did you tell him you were hauling?

A.    Well, I thought we were carrying bread. That's what I told him we were carrying.

Q.    Okay.  Is that what you told him?

A.    Yes.

Q.    All right.  And where did you tell him you were going?

A.    I told him we were going to a club called Oz or O-Z or something like this.

Q.    All right.  After answering the trooper's questions, where did you go?

A.    He took my wallet and the phones, and he put my handcuffs on and put me in the back of the car.

1    Q.    And who else was with you in the back of the
2    car, if anyone?
3    A.    That's when I went to sit back next to
4    Mr. Baptiste.
5    Q.    Okay.  Approximately how close was the
6    Florida Highway Patrol car that you and Baptiste
7    were in to the tractor trailer truck?
8    A.    Very close.
9    Q.    Give me an estimate.  From me to you?
10   A.    Not that much.  Not that far.
11   Q.    So you were pretty close?
12   A.    (Nods head.)
13   Q.    And could you and Mr. Baptiste easily see
14   what was going on around the tractor trailer truck?
15   A.    Yes, that's what we were looking at.
16   Q.    All right.  So after you were placed in the
17   patrol car, what did you watch Trooper Lanese do?
18   A.    Get on the phone.  He went to search into
19   the head of the tractor, into the cabin.
20   Q.    You're talking about the truck part?
21   A.    Yes, on the front in the cabin.
22   Q.    Okay.  At some point did another trooper
23   arrive?
24   A.    After awhile another one showed up.
25   Q.    And what did he do?

A.      He stood next to us.  And the other one was

on the phone and searching through the truck.

Q.      At some point did Trooper Lanese come back

to the car where you and Baptiste were and accuse

you of having marijuana in the truck?

A.      Yes.

Q.      And after he left, did you and Baptiste talk

about his false allegation?

A.      Yes.  We were surprised because we don't

smoke.  And we heard that he found marijuana next

to the door, so we were very shocked.

Q.      All right.  Later on did another law

enforcement official arrive with the dog?

A.      Yes, a police.  A local police.

Q.      And could you see and watch the dog?

A.      Yes.

Q.      Did you and Baptiste then speculate and

discuss about why the police dog had arrived?

            MR. PRESTON:  Objection, leading.

            THE COURT:  It is.

BY MR. CRAWFORD:

Q.      All right.  Once the dog arrived, what, if

anything, did you and Baptiste talk about?

A.      The gentleman came and told us that he had

seen drug in the front of the truck.  And we saw a

1   dog.  We were very shocked.  We did not know what

2   was going on.

3   Q.    All right.  At this time did you, if at all,

4   discuss with Baptiste the possibility that there

5   may be something illegal in your trailer?

6   A.    Yes.

7   Q.    Did you know or were you just speculating?

8   A.    No, we didn't know.  We just said that he

9   said he found something in the truck and he came

10  with the dog, so we said that maybe there's

11  something there.

12  Q.    Did you see the police dog do anything

13  unusual as he was walking around or she was walking

14  around the tractor trailer?

15  A.    I was just looking what the dog was doing.

16  I don't know what they're supposed to be doing,

17  but I just saw the dog going through the sleeping

18  compartment, going back in and out and things like

19  this.  I did not know.  Went underneath all around

20  the truck.

21  Q.    Okay.  So after the dog did its thing, did

22  the trooper come back and talk to you and Baptiste?

23  A.    Yes.

24  Q.    At this time did he accuse you of

25  transporting drugs?

1    A.     No.  He said the dog found something illegal

2    in the truck.  And then he said he is going to

3    search the truck.

4    Q.     Do you recall him asking permission?

5    A.     I think he asked Mr. Baptiste permission.

6    Q.     And what did Mr. Baptiste say?

7    A.     I don't remember what he said.

8    Q.     All right.  But then they searched the

9    trailer; right?

10    A.     Yes.

11    Q.     And while they were searching the trailer,

12    did you and Mr. Baptiste watch them?

13    A.     Yes, we were looking to see what was

14    happening.  We were very surprised.

15    Q.     And what, if any, speculation did you and

16    Mr. Baptiste engage in as you were watching them

17    search the trailer?

18    A.     We were thinking of all these things that if

19    they find something illegal in the trailer we

20    would be in serious trouble because we were

21    driving.  We knew nothing.

22    Q.     Did you expect them to find anything in the

23    trailer?

24    A.     No.

25    Q.     But if they did, you knew you were in

1  trouble?

2          MR. PRESTON:  Objection, leading.

3          THE WITNESS:  Yes.

4          THE COURT:  Do not lead the witness,

5  Counsel.

6          MR. CRAWFORD:  My mistake.  I get

7  carried away.  I'm sorry.

8  BY MR. CRAWFORD:

9  Q.     All right.  When the trooper came up to talk

10  to you about the dog, did he take you out at that

11  time and readjust your handcuffs?

12  A.     No, I don't remember that.

13  Q.     Did he do it for Baptiste?

14  A.     Yes.

15  Q.     All right.  So later on that day, you were

16  ultimately taken to where?  If you can't remember

17  the location, what's it called?

18  A.     Pinellas -- Pinellas.

19  Q.     Pinellas what?

20  A.     County jail.

21  Q.     Right.  Okay.  You were taken to jail?

22  A.     Yes.

23  Q.     How long did you stay in the Pinellas County

24  jail?

25  A.     Three weeks.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
1   Q.    And did you ultimately post bond?

2   A.    Yes.

3   Q.    And what was your bond?

4         MR. PRESTON:  Objection, relevancy.

5         THE COURT:  Sustained.

6   BY MR. CRAWFORD:

7   Q.    All right.  After you got out of jail, where

8   did you go?

9   A.    My cousin came to pick me up, and I went

10  back to New Jersey.

11  Q.    All right.  And did you subsequently have

12  court appearances at the Pinellas County

13  courthouse?

14        MR. PRESTON:  Objection, relevancy.

15        THE COURT:  What is the relevancy,

16  Counsel?

17        MR. CRAWFORD:  Judge, I'm trying to

18  establish that my client, despite being charged

19  with a serious offense, traveled on his own nickel

20  from New Jersey to Florida on five or six

21  occasions to attend court.

22        THE COURT:  This is not time for that.

23  Objection is sustained.

24  BY MR. CRAWFORD:

25  Q.    Later on did there come a time when you
```

1    learned that the U.S. Marshals were looking for you

2    in Miramar, Florida?

3                MR. PRESTON:  Objection, relevancy.

4                THE COURT:  Is it relevant?

5                MR. CRAWFORD:  I certainly believe so.

6    That's why I asked it.  Do you want me to approach

7    and explain?

8                THE COURT:  Please do.

9                (AT WHICH TIME THE FOLLOWING SIDEBAR

10   DISCUSSION WAS HELD:)

11               MR. CRAWFORD:  The good news --

12               THE COURT:  Because you are going to ask

13   does not automatically mean it is relevant.  You

14   think it may be relevant.

15               MR. CRAWFORD:  I would -- I would

16   concede that, Judge.

17               THE COURT:  All right.

18               MR. CRAWFORD:  All right.  First of all,

19   this is my last line of inquiry so I'm almost

20   done.

21               Second of all, I believe that this case

22   is a circumstantial case where consciousness of

23   guilt evidence is -- is going to be key for both

24   the government and for the defense.

25               I believe the fact that my client gets

1   out of jail and comes to and from Florida from New

2   Jersey on five or six different occasions, later

3   on learns that the U.S. Marshals have left a card

4   in his former residence in Miramar, and he

5   personally again comes down to -- to Pinellas

6   County, checks in there, finds out that his state

7   charges have been dismissed, comes over here to

8   the federal courthouse, checks with the U.S.

9   Marshals to see why they want him.  They're told

10   they don't know.

11         So he goes back to New Jersey where he's

12   a couple weeks later finally arrested on a traffic

13   stop, and they find the warrant in the system.  I

14   think that shows consciousness of innocence that I

15   should be able to establish in this record --

16         THE COURT:  I don't know of any such

17   theory.

18         MR. CRAWFORD:  But it's a good one,

19   don't you think?

20         THE COURT:  Well, consciousness of guilt

21   is one thing.  Consciousness of innocence is

22   another apparatus altogether, and I don't see a

23   parallel between them.

24         MR. CRAWFORD:  All right.  I'll see if I

25   can find any case law.  Otherwise, I'll wrap it

1    up.

2              THE COURT:  Okay.

3              MR. CRAWFORD:  Thank you, sir.

4              (WHEREUPON, THE SIDEBAR DISCUSSION WAS

5    CONCLUDED AND THE PROCEEDING RESUMED AS FOLLOWS:)

6    BY MR. CRAWFORD:

7    Q.    All right.  Mr. Volcy, let me conclude by

8    asking you this:  On April 24th of '08, when you

9    were stopped by the Florida Highway Patrol, did you

10    know that the trailer that you were pulling

11    contained marijuana?

12    A.    No.

13              MR. CRAWFORD:  Thank you, sir.

14              THE COURT:  Cross-examination.

15              Well, let's take our recess at this

16    point.  We'll reconvene at five past 3:00 and

17    continue.

18              Do not discuss the case, ladies and

19    gentlemen.

20              COURT SECURITY OFFICER:  Rise for the

21    jury.

22    (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)

23    (THEREUPON, A RECESS WAS TAKEN, AND THEN THE

24        PROCEEDINGS CONTINUED AS FOLLOWS:)

25              COURT SECURITY OFFICER:  Please rise for

1 the jury.

2 (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

3 (PAUSE IN PROCEEDING.)

4 COURT SECURITY OFFICER:  All rise.

5 THE COURT:  Mr. Preston.

6 MR. PRESTON:  Thank you, Your Honor.

7 <u>CROSS-EXAMINATION</u>

8 BY MR. PRESTON:

9 Q. Good afternoon, Mr. Volcy.

10 A. Good afternoon.

11 Q. Mr. Volcy, would it be fair to say that you

12 were a passenger on this journey to Oz?

13 A. Yes.

14 Q. But in that last stage you were responsible

15 for communications and navigation; correct?

16 MR. PRESTON:  I'm sorry.  Judge, we'll

17 wait for the -- we'll wait for the microphone.

18 Sorry.

19 THE WITNESS:  Yes.  If I sit in front of

20 the car, yes.

21 BY MR. PRESTON:

22 Q. Referring specifically to the communications

23 with the individual who was giving you directions,

24 that was your responsibility during April 24th of

25 2008, as you came down 75 into the Tampa Bay area;

1  correct?

2  A.    Yes, because Mr. Baptiste couldn't take the

3  directions as he was driving, and I was taking the

4  directions for him.

5  Q.    As you were taking the directions, you were

6  telling Mr. Baptiste where to go; correct?

7  A.    Yes.

8  Q.    So you were in charge of communications and

9  navigation?

10  A.    Say it again.

11  Q.    So you were in charge at that phase with

12  communications and navigation; right?

13  A.    Yes.  And if he did not know where to go, he

14  would ask me and I would tell him where to go.

15  And when he knew, he would not ask me.  He would

16  go directly.

17  Q.    So when you were told by the person on the

18  phone that you were to head down Ulmerton and make

19  a left on Belcher, that is exactly what you told

20  Mr. Baptiste; correct?

21  A.    I had not told him that yet.  It was on my

22  computer.  It's when he passed the location that

23  he had told me that he had passed the place.

24  Q.    You were talking to someone on the phone,

25  and you repeated the word "Belcher" several times

1    during conversations with that person; correct?

2    A.    Yes.

3    Q.    And as directed, you didn't pass Belcher.

4    You went to Belcher and made the left-hand turn

5    there; correct?

6    A.    No.  I had not told him.  After we had

7    passed the club and he was going to make a turn,

8    and I told him this is where we should turn.  We

9    have passed the location.  We should turn there.

10   Q.    So coincidentally, you decide to turn on the

11   same road that the person giving you directions

12   told you to turn on.  Is that what you're telling

13   the jury?

14   A.    I wasn't driving.  I wasn't even looking.

15   Q.    Once you passed Oz, all the directions you

16   had already been given were of no consequence, is

17   that what you're saying?

18   A.    That is a consequence, yeah.

19   Q.    Why would the person who was giving you

20   that -- those directions be important enough to be

21   told that you'd been stopped by the police?

22   A.    Because we have a meeting to meet somewhere,

23   the same place.

24   Q.    The person that was giving you directions to

25   Oz was simply giving you directions; you didn't

1    plan on meeting that person at Oz, did you?

2    A.    That person was giving us direction to Oz

3    and also was heading to Oz.

4    Q.    I'd like to talk with you just for a moment

5    about your stay or your reported stay in Riverside,

6    California.

7    A.    Yes.

8          MR. PRESTON:  Let's look again at

9    Government's Exhibit No. 24.

10         THE WITNESS:  Okay.

11   BY MR. PRESTON:

12   Q.    Government's Exhibit 24 shows you in an off

13   duty status beginning on April 18th of 2008,

14   10 p.m. in Riverside, California; correct?

15   A.    Yes.

16   Q.    And without looking at the other pages,

17   you've seen them several times, it would reflect

18   that that off duty status was over 60 hours of off

19   duty status at that location; correct?

20   A.    Yes.

21   Q.    And it's your testimony that the tractor

22   trailer rig was left in a parking place for that 64

23   and a half hour period; correct?  Right?

24   A.    Well, I don't know because we left it and I

25   went to the hotel.

1    Q.    Where was it left?

2    A.    We left it at Walmart.

3    Q.    In a parking lot?

4    A.    Yes.

5    Q.    Was it a truck parking lot?

6    A.    Several trucks park there.

7    Q.    Trucks coming and going regularly?

8    A.    I don't know.  I found a place to park, and

9    I don't know if trucks were coming in and leaving.

10   Q.    In your experience, such a location where

11   truckers would park their trucks, they come and go;

12   correct?

13   A.    Yes.

14   Q.    And when you, according to your testimony,

15   returned to that parking lot on April 21st of 2008,

16   64 and a half hours later, the tractor trailer that

17   you and Mr. Baptiste had left there was in the

18   exact same location as where you left it.  Is that

19   your testimony?

20   A.    I can't tell -- we came and found the truck

21   where we parked it.  I couldn't tell if it was in

22   the same position.  We came and found it in the

23   same place, same location.

24   Q.    Same parking space?

25   A.    Yes.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   Q.      Pointed in the same direction?

2   A.      Yes.

3   Q.      Same amount of fuel in the tank?

4   A.      I don't know.  I wasn't driving.  I wasn't

5   watching that.

6   Q.      Before leaving, a pretravel inspection would

7   have been conducted right?

8   A.      It's when I'm driving.  I wasn't driving.

9   Q.      Who conducted the pretravel inspection

10  before you left Riverside, California?

11  A.      Mr. Baptiste.

12  Q.      And Mr. Baptiste didn't tell you we lost

13  half our tank of gas or anything of that nature,

14  did he?

15  A.      No.

16  Q.      Mr. Baptiste didn't say there's an

17  unexplained 500 to a thousand miles on our

18  odometer, did he?

19  A.      No.

20  Q.      You and I can agree on one thing, and that

21  is that that trailer could not have been in two

22  places at the same time; correct?

23  A.      No.

24  Q.      So when you say it's impossible for that

25  truck to have been in Phoenix, Arizona, for that

1    period of time, the other side of that was it was

2    impossible for it to be in Riverside, California,

3    if the GPS puts it in Phoenix, Arizona; correct?

4    A.    I don't understand the question.

5    Q.    It is impossible for the vehicle to be where

6    you said it was and to be where the GPS said it

7    was; correct?

8    A.    I don't know how the GPS works.  Where I

9    was, that's where I knew that we were parked.

10   Q.    Between you and the GPS, which one would

11   have a reason to make up a story?

12          MR. CRAWFORD:  Objection, argumentative.

13          THE COURT:  Sustained.

14   BY MR. PRESTON:

15   Q.    You indicated when Mr. Crawford talked to

16   you about hotel records from the Super 6 that you

17   didn't think it was important; is that correct?

18   A.    I did not know I needed a receipt.

19   Q.    The time that you stayed at the Super 6

20   hotel was the only time that you and Mr. Baptiste

21   were away from that tractor trailer during this

22   entire haul; correct?

23   A.    Would you ask the question again, please.

24   Q.    The time that you were at the Super 6 hotel

25   was the only time that you and Mr. Baptiste were

1   away from that tractor trailer, and I'll add for

2   any significant period of time; correct?

3   A.    Yes.

4   Q.    And you know that the trip's conclusion

5   resulted in your arrest for the marijuana that was

6   found in the trailer; correct?

7   A.    Yes.

8   Q.    So it would have been important for you to

9   establish where you were during the time that that

10  truck was out of your possession if you didn't know

11  the marijuana was on it; correct?

12  A.    My attorney would have asked me for things

13  like this.  He didn't ask me.

14  Q.    We have no record from Super 6 because none

15  ever existed; correct?

16  A.    That's where we stayed.

17  Q.    Now, you indicate -- or indicated during

18  your remarks to Mr. Crawford that in regard to

19  learning about Oz and going to Oz that you didn't

20  participate in those conversations at the truck

21  stop; is that correct?

22  A.    No.

23  Q.    At what point did you learn you were on a

24  journey to Oz?

25  A.    It's when we get back in the truck and he

1  said that we were not ready to deliver the load

2  yet, and that somebody gave him indications to a

3  place.  If we wanted to go hang out, we could

4  spend some time there that night.

5  Q.    Who told you that?

6  A.    Mr. Baptiste.

7  Q.    What did he call the place?

8  A.    He called it Oz, O-Z, Oz.  I don't know.

9  Q.    You don't know or you don't remember?

10 A.    I don't know it.  I say it Oz.  I don't

11 exactly the name of the place.

12 Q.    Isn't it a fact that you just came up with

13 this name because you had passed that location on

14 Ulmerton before making the turn on Belcher, and you

15 were the one who initially told Trooper Lanese that

16 was your destination?

17 A.    I was on the computer.  I wasn't even

18 looking.

19 Q.    And you called it Os; correct?

20 A.    Oz, O-Z.  I don't remember what I call it.

21 Q.    According to Mr. Baptiste, he was told about

22 a club called Oz; correct?

23 A.    This was the same club.  I just didn't

24 pronounce it right.

25 Q.    Because you had just seen the sign, and

1  that's how you thought it was pronounced when you

2  talked to Trooper Lanese; correct?

3  A.     I did not see the sign.

4  Q.     You indicated that you used Mr. Baptiste's

5  phone to communicate.  Whose phone did you take the

6  chip out of?

7  A.     I did not remove a chip.

8  Q.     And you say you did not smash a chip?

9  A.     No.

10  Q.     Or break a chip in your teeth?

11  A.     No.

12  Q.     But you talked a bit about that in the back

13  of the patrol car?

14  A.     Yes.

15  Q.     So you talked in the back of the patrol car

16  about a chip that you broke or smashed or put in

17  your mouth between your teeth and threw away, but

18  you never did any of those acts.  Is that what

19  you're telling us?

20  A.     No.  The police saw when I got out off the

21  car with the phones in my hand.  I talked about

22  the phone that I had in the car that was already

23  broken.

24  Q.     Didn't you tell Mr. Baptiste that you

25  smashed the chip in your teeth?

A.     I wasn't talking about the telephone.  I was talking about the phone that I have in the truck that was broken.

Q.     You put a phone in your teeth and smashed it?

A.     No.  No.  I cannot do that.

Q.     You were talking about a chip.  Which means a SIM card; correct?

A.     I don't know.  What is the SIM card?  I don't know.  What is a SIM card?

Q.     What is a chip then?

A.     The telephone was broken.

Q.     So you just told this jury you have no idea what a SIM card is?

A.     No, I know.

Q.     Now, you know --

         MR. PRESTON:  May I approach the witness, Your Honor?

         THE COURT:  You may.

BY MR. PRESTON:

Q.     Mr. Volcy, please take a look at Government's Exhibit No. 41.  Do you recognize those phones?

A.     Yes.

         MR. CRAWFORD:  Judge, if I could see the

1  exhibit.  Thank you, Your Honor.

2  BY MR. PRESTON:

3  Q.    Now, first, Mr. Volcy, these are your

4  phones; correct?

5  A.    Yes.

6  Q.    And you told this jury earlier today that

7  you had no idea where your phones were, but you

8  suspected the police had them; correct?

9  A.    Yeah.  I left them in the truck.  When I was

10  arrested, I left them in the truck.

11  Q.    Did you forget that you were with

12  Mr. Crawford on a visit to view discovery at the

13  Drug Enforcement Administration offices, and you

14  actually looked at those telephones?

15  A.    Yes.

16  Q.    You forgot about that?

17  A.    I had forgotten that.

18  Q.    So now you know where the phones have been;

19  right?

20  A.    Yes.

21  Q.    Now, you've indicated that --

22        MR. PRESTON:  Judge, may I introduce

23  these into evidence at this time?

24        MR. CRAWFORD:  No objection.

25        THE COURT:  You may.

1           (EXHIBIT 41 ADMITTED INTO EVIDENCE.)

2      BY MR. PRESTON:

3      Q.      These are the two phones that you were

4      discussing as far as changing out the battery;

5      correct?

6      A.      Yes.

7      Q.      Only one of those phones is missing a SIM

8      card; correct?

9      A.      Yeah, that's -- that's because that one

10     wasn't good.  It didn't have a SIM card in it.

11     Q.      And the SIM card isn't in it because you

12     took it out and discarded it before Trooper Lanese

13     reached your position; correct?

14     A.      No.

15     Q.      And that's why it was an important point for

16     you and Mr. Baptiste to discuss the chip during

17     your conversations in the back of the patrol car;

18     right?

19     A.      No.  First he asked me if I had picked up my

20     phone.  I told Mr. Baptiste that I got off with

21     the phone that is broken.  I had not taken my

22     own -- my other phone.  That's why we were talking

23     about this.  We didn't have the phone.

24     Q.      In the back of the patrol car do you

25     remember a portion of your conversation with

1    Mr. Baptiste where you discussed the guys?

2    A.    Yes.

3    Q.    And in that conversation you were referring

4    the co-conspirators; correct?

5    A.    No.  I was thinking about the people that

6    give us the direction.

7    Q.    How many people gave you direction?

8    A.    One person.

9    Q.    And one person now was the guys?

10              THE INTERPRETER:  Interpreter needs to

11   say something, Your Honor.  Concerning the word

12   "people" that interpreter used, that word that the

13   defendant says was moon in Creole.  And moon is

14   translated to one person or several people, and --

15              MR. PRESTON:  Well, could we please go

16   to Page 40 of the transcript.  Right after the

17   unintelligibles, please.

18   BY MR. PRESTON:

19   Q.    Mr. Baptiste asks you, translated from

20   Haitian Creole, "You think the guys are going to

21   help us get out, man?"  That's a correct

22   translation; correct?

23   A.    Yes.

24   Q.    So what guys are you talking about?

25   A.    Talking about friends.  People I know.

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    What friends?

2    A.    I didn't say specifically any person.  I

3    don't know who he was talking about.

4    Q.    So the guys is just friends to help you get

5    out.  Is that what you're telling us?

6    A.    People.  Friends.

7    Q.    Not the person who gave you directions;

8    correct?

9    A.    No.

10   Q.    Did you think your friends, the guys, set

11   you up?

12   A.    No.  I didn't think that the people set me

13   up.  The only person I thought who set me up was

14   the person who gave me directions.

15   Q.    That's not what you said to Mr. Baptiste

16   when he asked you is this thing a set up.  Because

17   you told Mr. Baptiste it looked like a set up, man.

18   Well, one of the guys -- one of the three guys that

19   set us up; correct?

20         Because in this process you knew that there

21   was a person who ordered the load, correct, which

22   from the government exhibit of the conversation

23   between Ramiro Parra and Sheldon Shorter you know

24   is Sheldon Shorter; correct?

25             MR. CRAWFORD:  Your Honor, objection.

1   The prosecutor is not giving my client the

2   opportunity to answer.

3               THE COURT:  We'll see that he gets such

4   an opportunity.

5               MR. CRAWFORD:  Thank you, sir.

6               THE COURT:  One question at a time.

7   BY MR. PRESTON:

8   Q.      The person that ordered the load, who we see

9   from the conversation between Ramiro Parra and

10  Sheldon Shorter, was Sheldon Shorter; correct?

11              MR. RODRIGUEZ:  Objection to the

12  foundation and leading form of the question.  No

13  basis for that.

14              THE COURT:  Sustained.

15  BY MR. PRESTON:

16  Q.      Did you have a conversation with an

17  individual other than the person who was giving you

18  directions as you were traveling into Pinellas

19  County, Florida?

20  A.      No, I don't recall that.

21  Q.      Do you remember telling another person other

22  than the person giving you directions that you were

23  right there?

24  A.      No, I don't recall such a thing.

25  Q.      Let's go back to Page 40 again.  That same

1   comment about three guys.  You were referring to

2   three specific people that you knew were involved

3   in this with you; correct?

4   A.    No.

5   Q.    The person that ordered the load; correct?

6   A.    No.  I know the place where we picked up the

7   load that was in the trailer.

8   Q.    We're talking about the load of marijuana?

9   A.    No, I don't know anything about that.

10  Q.    Another one of these three guys was the

11  people or person that gave you the marijuana;

12  correct?

13  A.    No one gave me marijuana.

14  Q.    And the third person that could have set you

15  up would have been the person ready to receive the

16  marijuana; correct?

17  A.    I don't know anything about marijuana.

18  Q.    Mr. Volcy, I'd like to refer you to the

19  bottom of Page 4 of the transcript.  The last two

20  lines is Mr. Baptiste asking you about what you

21  told the police; correct?

22  A.    No, we were not talking about this -- about

23  the police.

24  Q.    Well, Mr. Baptiste says, "What do you -- did

25  you tell them, you were going up to this club?"

1          And you respond, "Yes."

2          You were talking about information that each

3     of you had provided to the police; correct?

4     A.     Yes.

5     Q.     And you talked about what you told the

6     police at least one other time during that

7     conversation.  Part of that appears on Page 47.

8     Would you refer to that.

9          And at the top of page and continuing on,

10    initially Mr. Baptiste says, "You don't know what

11    was in the truck.  You are in here and that you

12    don't know anything.  You know something, man."

13         And there's more discussion about the seal

14    and how far you got; correct?  And what you and

15    Mr. Baptiste were doing here is continuation of

16    what you started on Page 4 of this discussion.  You

17    were trying to get your stories straight; correct?

18    A.     No.

19    Q.     That's the conversation that you had on

20    April 24th of 2004; correct?

21    A.     Yes.

22    Q.     And since April 24th of 2004, until January

23    of 2008, both of you have been trying to get your

24    stories straight; correct?

25              MR. CRAWFORD:  Objection, argumentative.

1          THE COURT:  Overruled.

2          THE WITNESS:  I have never seen

3     Mr. Baptiste.  It's only when I came -- I'm in New

4     Jersey.  It's when I came back to court that I saw

5     him.

6          MR. PRESTON:  Thank you, Your Honor.  No

7     additional questions.

8          THE COURT:  Redirect.

9          MR. CRAWFORD:  If I could have just a

10    moment, Your Honor.

11                REDIRECT EXAMINATION

12    BY MR. CRAWFORD:

13    Q.    Mr. Volcy, you will recall that as you were

14    driving through Tampa across the Howard Franklin

15    bridge you had a series of phone calls from someone

16    with giving that was you directions?

17    A.    Yes.

18    Q.    And did you indicate that the person you

19    were talking to said he would see you at the club?

20          MR. PRESTON:  Objection, leading.

21          THE COURT:  Sustained.

22          MR. CRAWFORD:  Judge, I'm just trying to

23    focus in.

24          THE COURT:  I understand.  It's a

25    leading question.

1          MR. CRAWFORD:  All right.

2     BY MR. CRAWFORD:

3     Q.     What indications, if any, did the speaker

4     give you that he would meet you at the club?

5     A.     From the time Mr. Baptiste had spoken to

6     him --

7               THE COURT:  Please use the hand mic.

8               THE INTERPRETER:  Yes, Your Honor.

9               THE WITNESS:  From the time

10    Mr. Baptiste had spoken with him, he had indicated

11    that he would be hanging out at a club, and that

12    he would be there, too.

13    BY MR. CRAWFORD:

14    Q.     Do you remember him saying anything during

15    these conversations that gave you reason to believe

16    he would meet you there?

17    A.     Yes.  The way he was giving the directions,

18    yes.

19    Q.     All right.  Did -- do you remember exactly

20    what he said?

21    A.     He said first to turn and to turn again.

22    That he'd been standing front and waiting for us.

23    I was -- I thought for sure it was the club.

24    Q.     Do you recall whether or not he said to you

25    call me --

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1              MR. PRESTON:  Objection, leading.

 2              THE COURT:  It is.  It is.

 3              MR. CRAWFORD:  Yeah.  I'm trying to get

 4    it not to be.

 5              THE COURT:  All right.  Work on it.

 6    BY MR. CRAWFORD:

 7    Q.    Do you remember the specific language that

 8    he said to you that caused you to think that he

 9    would meet you at the club?

10    A.    He didn't say anything specific that would

11    make you think so.  But the way that Mr. Baptiste

12    had been talking to me -- that he had been talking

13    to this other person, he said that he was going to

14    the club.  When I was getting the directions, I

15    was under the impression that he was meeting us at

16    the club.

17    Q.    If I showed you a copy of the transcript,

18    might it refresh your recollection as to what he

19    specifically said?

20    A.    Yes.

21    Q.    All right.  Let me show you what's already

22    been received in evidence as Government's

23    Exhibit 12D.

24              MR. CRAWFORD:  Is the zoom button

25    working, do we know Miss Thomas?
```

```
1              COURTROOM DEPUTY CLERK:  Should be.
2              MR. CRAWFORD:  Does it work if somebody
3    competent pushes it?
4    BY MR. CRAWFORD:
5    Q.    All right directing your attention to the
6    last line here, after seeing that, do you recall
7    what, if anything, did he say specifically that led
8    you to believe that he would meet you at club Oz?
9    A.    He said for me to call him when I see the
10   street.  To call him, that he would meet with us.
11   Q.    Thank you, Mr. Volcy.
12             MR. CRAWFORD:  Judge, if I could have
13   just a moment, please.
14             Mr. Volcy thank you.
15             THE COURT:  Have you concluded?
16             MR. CRAWFORD:  Yes, sir.
17             THE COURT:  Are you resting,
18   Mr. Crawford?
19             MR. CRAWFORD:  If I could approach for
20   just a moment.
21             THE COURT:  You may.
22             (AT WHICH TIME THE FOLLOWING SIDEBAR
23   DISCUSSION WAS HELD:)
24             MR. CRAWFORD:  If you are going to
25   adjourn for the week, then I'd like to keep my
```

1   case open in case I think up something over the

2   weekend.  If you are going to require the

3   government to go forward with rebuttal now, then I

4   will rest.

5           THE COURT:  I think this is an

6   appropriate time for rebuttal

7               Are you prepared to do that?

8           MR. PRESTON:  I have no rebuttal case to

9   put on, Judge.

10          THE COURT:  All right.

11          MR. CRAWFORD:  Then let's all rest and

12  we can start arguing Monday morning.

13          THE COURT:  All right.  While we're at

14  sidebar, and I mention this to you just as a

15  matter of procedure, be more attentive to

16  requesting leave to approach a witness on the

17  witness stand.

18          MR. CRAWFORD:  Understood.  I apologize

19  if I haven't done that.

20          THE COURT:  Okay.

21          MR. CRAWFORD:  Thank you, sir.

22          MR. RODRIGUEZ:  Inquiry.  Are we going

23  to rest for the day now or is the government going

24  to begin closings?

25          THE COURT:  How long will you want for

1    closings?

2         MR. PRESTON:  Two hours for me, Judge.

3         MR. RODRIGUEZ:  Thirty-five, forty

4    minutes.

5         MR. CRAWFORD:  Thirty-five, forty

6    minutes.

7         MR. CHALELA:  Forty-five.

8         THE COURT:  All right.  So we've got a

9    good day's worth of argument.  I don't want to

10   split up the arguments, and I don't want to give

11   the closing instructions to the jury.  I think

12   it's best we just recess at this point.  What do

13   you think?

14        MR. PRESTON:  All right.

15        MR. RODRIGUEZ:  One other matter.  I

16   think I rested before the Court.  Do I need to do

17   it before the jury?  I mean I did it at sidebar.

18        THE COURT:  Well, you may do so.  And

19   I'll ask each of you individually again so we'll

20   have it on the record.

21        MR. RODRIGUEZ:  Thank you, sir.

22        (AT WHICH TIME THE SIDEBAR DISCUSSION

23   WAS CONCLUDED AND THE PROCEEDING RESUMED AS

24   FOLLOWS:)

25        THE COURT:  Anything further from the

1  government, Mr. Preston?

2          MR. PRESTON:  No, Your Honor.

3          THE COURT:  Mr. Rodriguez?

4          MR. RODRIGUEZ:  No, Your Honor.  If I

5  haven't done it before the jury, on behalf of

6  Sheldon Shorter we rest.

7          THE COURT:  Mr. Chalela?

8          MR. CHALELA:  Mr. Baptiste also rests,

9  Your Honor.

10         THE COURT:  Mr. Crawford?

11         MR. CRAWFORD:  Yes, Your Honor,

12 Mr. Volcy rests at this time.  Thank you, sir.

13         THE COURT:  With the announcement of

14 rest by the government and defense counsel, that

15 brings to a close the testimony and the evidence

16 that will be presented for your consideration

17 during your deliberations on this case.

18         The next development in the case would

19 be the presentation to you of the closing

20 arguments by the lawyers, and at the conclusion of

21 which I would instruct you on the rules of law

22 that you must consider and apply in reaching and

23 in deliberating on your verdict.

24         The -- we have been at trial all week

25 thus far, so you can anticipate that the arguments

of counsel would be rather lengthy.  There's a lot
of material to cover.  It is now 4 o'clock.  We
could not reasonably have the presentation of
closing arguments of counsel and my instructions
to you on the law before it would be time to
recess.

So it'll be best that we recess at this
point.  I will give you some further instructions
before we part company today.  But then we will
return on Monday at 9:30 to hear the closing
arguments and close out the case generally.

My instructions to you at this point are
to remind you not to discuss the case among
yourselves or with anyone else, and I know that
that's a rather severe admonition because I'm sure
your respective spouses or friends will be anxious
to know all about this case.

But you'll have to tell them that you've
been instructed by the Court not to discuss it
with anybody, including them.  But after the case
is over you'll be glad to tell them all that you
can remember about it.  And you will be at liberty
to do so at that time.

So with that admonition from me and to
keep yourselves insulated from the receipt of any

1    information about this case from any source
2    outside of this courtroom, we're going to recess.
3    And we'll reconvene Monday morning at 9:30.
4            You may take the jury.
5            COURT SECURITY OFFICER:  All rise for
6    the jury.
7      (THEREUPON, THE JURY RETIRED TO THE JURY ROOM.)
8            THE COURT:  Anything further we need to
9    discuss, counsel?
10           MR. PRESTON:  Nothing from the
11   government, Your Honor.
12           MR. RODRIGUEZ:  Nothing, Your Honor.
13   Thank you very much.
14           MR. CHALELA:  Thank you, Your Honor.
15           THE COURT:  There was some question
16   about the Indictment and whether the names of the
17   other persons should be redacted from the
18   Indictment.  Ordinarily we do so.  If there is an
19   issue about that --
20           MR. CRAWFORD:  Judge, I would prefer
21   that it not be.
22           MR. RODRIGUEZ:  You want the names in?
23           MR. PRESTON:  Judge, it's the
24   government's position that all the names have been
25   mentioned during the trial.  The Indictment has

1   already been shown to the jury, at least the face

2   page, including the other names.  But whatever the

3   Court's pleasure at this point in time.

4           THE COURT:  We'll leave it alone without

5   redacting those names.

6           MR. RODRIGUEZ:  I think that would be

7   proper, Your Honor.  We concur with that.

8           THE COURT:  All right.  Everybody

9   satisfied with that?

10          MR. CHALELA:  Also concur for

11  Mr. Baptiste, Your Honor.

12          THE COURT:  All right.  See you Monday

13  at 9:30.  Have a nice weekend.

14          MR. CHALELA:  You too, Your Honor.

15             (PROCEEDINGS ADJOURNED.)

16          I CERTIFY that the foregoing is a true

17  and accurate transcription of my stenographic

18  notes.

19  Dated:  07/25/2009.

20

21          ___s/ Sandra K. Lee_____
                SANDRA K. LEE, RPR
22              Official Court Reporter

23

24

25

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER

## $

**$1.10** [1] - 50:4
**$1.20** [1] - 50:3
**$1.25** [4] - 50:3, 50:5, 50:7, 50:8

## '

**'08** [3] - 116:24, 117:18, 147:8
**'95** [2] - 18:5, 110:4
**'97** [2] - 18:5, 107:22

## 0

**0000071** [1] - 101:25
**0000082** [1] - 101:19
**045** [1] - 77:16
**07/25/2009** [1] - 175:19

## 1

**1** [7] - 3:19, 19:18, 20:1, 20:12, 40:7, 82:15
**10** [16] - 6:17, 7:21, 35:3, 35:8, 37:3, 37:5, 37:25, 38:18, 38:22, 39:2, 39:6, 39:9, 39:13, 104:17, 151:14
**100** [1] - 1:23
**104** [2] - 3:7, 3:7
**10:00** [4] - 35:7, 35:11, 122:1, 122:7
**10:15** [3] - 120:11, 120:12, 120:18
**11** [1] - 6:24
**118** [1] - 95:21
**118th** [5] - 61:21, 63:17, 95:5, 95:8, 95:11
**11:15** [1] - 60:13
**11:23** [1] - 17:20
**1210** [1] - 1:20
**1238** [1] - 38:6
**12:15** [2] - 121:13, 121:21
**12:50** [1] - 29:9
**12C** [2] - 57:6, 57:9
**12D** [3] - 60:7, 95:15, 168:23
**1320** [1] - 73:14
**1335** [1] - 29:10
**13A** [3] - 84:16, 98:19, 98:21

**14** [3] - 7:8, 7:16, 87:2
**148** [1] - 3:8
**14A** [1] - 87:3
**15** [9] - 58:5, 116:22, 117:17, 119:16, 120:1, 124:17, 128:1, 131:13, 138:5
**1500** [3] - 23:12, 29:18, 30:7
**1550** [1] - 78:15
**1570** [1] - 78:16
**15th** [2] - 116:24, 117:17
**16** [2] - 8:3, 70:14
**160** [1] - 3:21
**166** [1] - 3:9
**17** [1] - 3:18
**173407** [1] - 1:23
**17th** [2] - 120:24, 121:7
**18** [5] - 8:10, 9:9, 9:16, 10:9, 12:17
**18th** [12] - 29:4, 30:20, 30:21, 31:16, 31:19, 32:4, 35:4, 35:9, 37:24, 38:12, 121:12, 151:13
**19** [3] - 12:1, 62:15, 135:9
**195** [2] - 26:11, 26:12
**1971** [1] - 104:17
**1990** [1] - 105:21
**1993** [2] - 106:15, 106:17
**19th** [12] - 30:16, 30:17, 30:23, 31:16, 31:20, 32:4, 35:15, 35:23, 36:7, 124:17, 126:3
**1:35** [1] - 29:10

## 2

**2** [10] - 3:19, 22:2, 22:6, 22:9, 44:7, 44:20, 49:6, 49:21, 49:24, 73:12
**20** [4] - 3:19, 58:5, 58:6, 138:5
**2002** [2] - 107:22, 108:2
**2003** [1] - 108:11
**2004** [2] - 165:20, 165:22
**2006** [2] - 21:15, 130:21
**2007** [2] - 110:9, 113:17

**2008** [22] - 30:9, 30:17, 30:20, 35:4, 35:9, 35:11, 35:16, 36:7, 36:10, 37:25, 38:12, 66:25, 67:6, 72:4, 73:22, 74:21, 115:3, 115:9, 148:25, 151:13, 152:15, 165:23
**2009** [1] - 1:5
**20th** [3] - 36:9, 124:21, 126:3
**21** [3] - 12:17, 17:19, 66:25
**21st** [6] - 73:2, 101:5, 101:11, 126:20, 127:5, 152:15
**22** [3] - 3:19, 13:15, 13:24
**22nd** [1] - 127:18
**23** [4] - 13:21, 75:24, 76:8, 76:9
**24** [11] - 1:2, 15:2, 15:7, 15:19, 34:21, 35:10, 35:15, 42:4, 68:23, 151:9, 151:12
**24-hour** [1] - 36:11
**245** [1] - 12:20
**24th** [10] - 19:2, 23:6, 29:17, 30:9, 131:6, 131:14, 147:8, 148:24, 165:20, 165:22
**25** [10] - 3:20, 16:1, 25:13, 25:22, 36:22, 37:1, 42:4, 100:11
**270** [1] - 1:2
**275** [16] - 50:15, 52:10, 52:18, 52:23, 52:25, 53:14, 53:19, 53:22, 53:25, 54:7, 54:11, 54:22, 54:24, 55:5, 55:8
**28** [1] - 3:20
**28th** [3] - 35:11, 35:20, 35:24
**29** [1] - 3:5
**2:00** [1] - 122:7
**2:30** [2] - 36:14, 127:7
**2lst** [13] - 32:6, 32:7, 32:11, 32:19, 40:3, 40:13, 43:10, 67:6, 72:4, 73:22, 74:21, 126:10, 126:18

## 3

**3** [1] - 88:15

**30** [3] - 1:5, 66:2, 101:8
**301-5699** [1] - 2:7
**31** [11] - 21:21, 89:12, 91:11, 91:22, 93:10, 93:13, 98:17, 99:2, 99:9, 100:10, 100:16
**3111** [1] - 1:23
**3200** [1] - 1:18
**33139** [1] - 1:17
**33602** [2] - 1:18, 2:6
**33606** [1] - 2:3
**33672-0407** [1] - 1:24
**34** [2] - 93:8, 93:13
**35** [2] - 86:4, 86:8
**39** [17] - 3:21, 66:20, 67:4, 72:3, 72:9, 72:13, 72:21, 75:25, 76:22, 77:7, 77:9, 77:14, 78:11, 78:19, 79:2, 80:10, 100:24
**3:00** [1] - 147:16
**3:15** [3] - 119:12, 119:18, 120:8
**3:30** [2] - 119:18, 120:11

## 4

**4** [5] - 3:3, 3:4, 164:19, 165:16, 173:2
**4/15** [1] - 25:18
**4/16/08** [1] - 119:11
**40** [2] - 161:16, 163:25
**400** [1] - 1:17
**41** [3] - 3:21, 158:22, 160:1
**42** [6] - 76:20, 78:24, 78:25, 79:4, 79:7, 79:19
**45** [4] - 3:20, 27:9, 27:11, 28:16
**460** [1] - 49:22
**47** [1] - 165:7
**49** [2] - 94:20, 94:21
**495** [1] - 5:16
**4:30** [1] - 117:23
**4th** [1] - 57:15

## 5

**5** [1] - 84:1
**500** [1] - 153:17
**53** [1] - 62:13
**53-foot** [1] - 62:3
**55** [1] - 96:23

**59** [3] - 3:18, 17:1, 17:9
**5:30** [1] - 135:18

## 6

**6** [9] - 33:7, 33:11, 34:4, 34:15, 123:13, 154:16, 154:19, 154:24, 155:14
**60** [10] - 41:8, 52:12, 52:16, 53:4, 53:10, 53:12, 53:18, 54:22, 123:13, 151:18
**610** [1] - 2:2
**64** [4] - 37:14, 98:8, 151:22, 152:16
**65-page** [1] - 11:3
**66** [1] - 62:9
**66th** [3] - 62:14, 62:19, 63:3

## 7

**7-11** [1] - 58:13
**7-Eleven** [1] - 57:19
**70** [1] - 50:8
**72** [1] - 3:21
**73** [3] - 49:15, 49:23, 55:13
**75** [26] - 49:3, 49:7, 50:15, 50:17, 50:22, 50:25, 52:9, 52:11, 52:16, 52:17, 52:18, 52:22, 53:2, 53:8, 53:16, 53:22, 53:25, 54:24, 55:1, 55:3, 55:5, 55:6, 55:8, 55:11, 148:25
**77** [5] - 68:20, 73:3, 75:15, 76:15, 101:14
**7:30** [2] - 131:7, 131:16
**7C** [1] - 91:6

## 8

**80,000** [2] - 21:4, 21:9
**80,999** [2] - 21:5, 21:10
**801** [1] - 2:6
**813** [1] - 2:7
**82** [2] - 75:14, 76:15
**8:08** [1] - 1:2

## 9

**9** [1] - 5:14
**9/11** [1] - 18:16
**922** [3] - 73:19, 76:24, 77:11
**922650** [1] - 77:18
**923** [4] - 73:19, 76:24, 77:11, 77:15
**923045** [1] - 77:13
**923052** [1] - 77:22
**923066** [1] - 77:20
**923075** [1] - 78:1
**923086** [1] - 77:24
**971550** [2] - 78:13, 78:21
**971570** [1] - 78:21
**975** [1] - 78:12
**98** [1] - 3:6
**9:00** [4] - 1:6, 4:16, 121:21, 122:1
**9:30** [4] - 84:1, 173:10, 174:3, 175:13
**9:58** [3] - 38:12, 38:21, 39:7

## A

**A.M** [1] - 1:6
**a.m** [3] - 17:20, 120:12, 121:13
**abbreviations** [2] - 20:21
**able** [11] - 7:18, 41:14, 82:24, 86:24, 87:9, 87:16, 87:19, 88:5, 135:17, 135:22, 146:15
**absolutely** [2] - 62:17, 62:23
**accept** [2] - 65:17, 86:5
**accepted** [1] - 65:11
**access** [1] - 47:20
**accident** [1] - 96:14
**accommodations** [1] - 123:14
**according** [4] - 30:22, 37:9, 152:14, 156:21
**account** [1] - 38:5
**accounting** [1] - 107:5
**accounts** [1] - 107:25
**accurate** [2] - 37:18, 175:17
**accuse** [2] - 140:4,

141:24
**acts** [1] - 157:18
**add** [1] - 155:1
**addition** [2] - 68:15, 68:22
**additional** [10] - 50:10, 59:12, 59:20, 69:3, 70:18, 74:24, 83:8, 84:22, 109:13, 166:7
**address** [4] - 47:23, 83:4, 84:22, 98:15
**addressing** [1] - 91:12
**adjourn** [4] - 70:21, 70:23, 169:25
**ADJOURNED** [1] - 175:15
**Administration** [1] - 159:13
**admissible** [2] - 69:6, 81:25
**admission** [1] - 80:22
**admitted** [3] - 10:23, 72:24, 73:7
**ADMITTED** [7] - 17:9, 20:12, 22:9, 25:22, 28:16, 72:21, 160:1
**admonition** [2] - 173:15, 173:24
**advertise** [1] - 49:4
**affirm** [1] - 103:25
**affixed** [1] - 38:6
**afternoon** [3] - 84:11, 148:9, 148:10
**ago** [1] - 99:1
**agree** [3] - 53:14, 115:22, 153:20
**Agreement** [1] - 22:14
**agriculture** [1] - 130:2
**ahead** [2] - 70:20, 131:5
**AIDED** [1] - 2:8
**alerted** [4] - 13:19, 99:7, 100:13, 100:18
**alerting** [1] - 15:21
**allegation** [2] - 23:9, 140:8
**alleging** [1] - 24:4
**Alley** [1] - 53:24
**Alligator** [1] - 53:24
**allow** [1] - 114:9
**allowed** [1] - 20:25
**almost** [4] - 13:16, 40:10, 49:24, 117:6, 145:19

**alone** [1] - 175:4
**altogether** [1] - 146:22
**AMERICA** [1] - 1:3
**America** [1] - 109:24
**amount** [3] - 50:10, 91:12, 153:3
**AND** [10] - 11:24, 24:22, 28:12, 60:18, 71:24, 82:9, 84:6, 147:5, 147:23, 171:23
**announcement** [1] - 172:13
**answer** [5] - 41:14, 82:23, 100:4, 133:16, 163:2
**answering** [1] - 138:22
**anticipate** [1] - 172:25
**anticipated** [1] - 64:10
**anxious** [1] - 173:16
**anyhow** [2] - 86:7, 86:9
**anyway** [2] - 101:10, 124:7
**apart** [2] - 6:7, 55:12
**apologize** [1] - 170:18
**apparatus** [1] - 146:22
**appear** [4] - 70:1, 76:1, 76:12, 78:21
**appearances** [1] - 144:12
**APPEARANCES** [1] - 1:15
**appeared** [1] - 65:19
**appearing** [2] - 77:1, 79:2
**applied** [1] - 91:12
**apply** [2] - 109:25, 172:22
**appointment** [2] - 33:1, 52:7
**appreciate** [1] - 11:18
**approach** [11] - 16:10, 19:9, 66:15, 67:11, 75:19, 78:6, 79:25, 145:6, 158:17, 169:19, 170:16
**appropriate** [2] - 79:8, 170:6
**April** [52] - 17:19, 19:2, 23:6, 29:4, 29:17, 30:9, 30:17, 30:20, 30:21, 31:16, 31:19, 31:20, 32:4,

35:4, 35:9, 35:11, 35:15, 35:20, 35:23, 35:24, 36:7, 36:9, 37:24, 38:12, 66:25, 67:6, 72:4, 73:2, 73:22, 74:21, 101:5, 101:11, 115:3, 115:9, 116:3, 116:24, 117:17, 120:24, 121:7, 124:18, 126:4, 126:18, 127:5, 127:17, 131:6, 131:14, 147:8, 148:24, 151:13, 152:15, 165:20, 165:22
**Arcadia** [8] - 42:6, 68:25, 73:10, 73:13, 75:5, 101:22, 102:18, 102:25
**area** [16] - 31:7, 32:22, 34:15, 38:13, 40:14, 45:24, 46:11, 46:20, 51:22, 52:21, 53:4, 53:13, 63:6, 95:24, 100:22, 148:25
**areas** [1] - 83:3
**arguing** [1] - 170:12
**argument** [2] - 94:17, 171:9
**argumentative** [2] - 154:12, 165:25
**arguments** [5] - 171:10, 172:20, 172:25, 173:4, 173:11
**Arizona** [15] - 23:10, 28:19, 28:24, 28:25, 29:1, 29:7, 38:13, 38:22, 39:7, 40:6, 98:8, 124:25, 126:3, 153:25, 154:3
**arrest** [1] - 155:5
**arrested** [2] - 146:12, 159:10
**arrive** [4] - 30:13, 32:24, 139:23, 140:13
**arrived** [11] - 30:16, 30:23, 31:2, 40:12, 122:9, 123:7, 123:8, 123:10, 132:10, 140:18, 140:22
**arrives** [2] - 35:6, 65:9
**arriving** [1] - 32:21
**AS** [10] - 11:24, 24:22, 28:12, 60:19, 71:24, 82:9, 84:7, 147:5, 147:24, 171:23
**asleep** [1] - 120:20
**assess** [1] - 70:16

**assignment** [1] - 23:21
**assignments** [1] - 25:17
**Assistant** [1] - 1:16
**associate** [1] - 69:22
**associates** [1] - 45:19
**assume** [1] - 120:21
**assuming** [2] - 67:23, 82:24
**assumption** [1] - 83:14
**AT** [9] - 10:17, 22:21, 27:14, 28:11, 67:13, 80:2, 145:9, 169:22, 171:22
**Atlanta** [1] - 131:21
**attempting** [2] - 124:24, 137:11
**attend** [3] - 106:5, 106:17, 144:21
**attention** [7] - 78:10, 115:2, 115:8, 123:4, 123:7, 130:24, 169:5
**attentive** [1] - 170:15
**attesting** [1] - 128:20
**Attorney** [1] - 155:12
**attorney** [1] - 155:12
**Attorney's** [1] - 1:17
**audio** [1] - 57:8
**authorities** [1] - 117:15
**authorization** [2] - 15:17, 24:10
**automatic** [3] - 7:23, 86:21, 125:22
**automatically** [1] - 145:13
**Avenue** [2] - 1:20, 2:6
**aware** [5] - 43:17, 99:19, 114:18, 130:16
**awhile** [1] - 139:24

## B

**backed** [2] - 14:17, 14:18
**background** [1] - 6:20
**bad** [1] - 13:14
**Bakery** [4] - 23:11, 102:11, 128:8, 129:1
**Baking** [9] - 31:4, 31:9, 40:18, 42:14, 66:21, 74:2, 80:17, 80:20, 101:4
**banged** [1] - 129:14

baptiste [1] - 1:22
BAPTISTE [3] - 1:7, 3:3, 4:20
Baptiste [92] - 5:1, 5:13, 6:2, 23:4, 29:17, 30:1, 30:3, 30:4, 30:5, 30:13, 43:8, 54:4, 61:5, 68:5, 68:10, 69:20, 80:8, 82:19, 84:15, 93:11, 98:15, 103:12, 103:17, 103:19, 111:25, 112:2, 112:4, 113:11, 113:18, 114:8, 114:15, 115:10, 120:22, 121:8, 122:3, 123:1, 124:13, 129:15, 132:3, 132:5, 132:13, 132:17, 134:17, 135:11, 135:12, 135:24, 136:7, 136:14, 137:5, 138:3, 139:4, 139:6, 139:13, 140:4, 140:7, 140:17, 140:23, 141:4, 141:22, 142:5, 142:6, 142:12, 142:16, 143:13, 149:2, 149:6, 149:20, 152:17, 153:11, 153:12, 153:16, 154:20, 154:25, 156:6, 156:21, 157:24, 160:16, 160:20, 161:1, 161:19, 162:15, 162:17, 164:20, 164:24, 165:10, 165:15, 166:3, 167:5, 167:10, 168:11, 172:8, 175:11
Baptiste's [3] - 133:19, 134:1, 157:4
based [9] - 46:19, 48:15, 50:11, 51:7, 64:14, 69:24, 81:1, 87:19, 95:14
basis [1] - 163:13
batteries [3] - 137:7, 137:8, 137:9
battery [4] - 136:25, 137:1, 160:4
Bay [4] - 2:2, 45:23, 46:19, 148:25
Beach [1] - 1:21
became [2] - 46:4, 64:7
become [3] - 108:24, 110:2, 111:5
becomes [3] - 52:22,

53:16, 85:10
bed [1] - 121:4
beef [3] - 17:13, 37:11, 122:16
BEFORE [1] - 1:13
began [2] - 116:12, 120:8
begin [2] - 77:11, 170:24
beginning [4] - 35:3, 73:18, 76:24, 151:13
begins [2] - 48:21, 48:25
behalf [1] - 172:5
behind [6] - 8:20, 8:24, 93:18, 118:5, 118:9, 118:13
Belcher [26] - 56:15, 56:24, 57:18, 58:7, 58:9, 58:10, 58:11, 58:12, 58:14, 58:15, 58:23, 58:25, 59:3, 59:13, 60:3, 60:6, 61:21, 61:23, 62:25, 63:7, 63:10, 149:19, 149:25, 150:3, 150:4, 156:14
bench [1] - 71:20
berth [6] - 117:22, 118:4, 118:12, 121:4, 127:21, 131:23
best [5] - 54:6, 71:13, 134:9, 171:12, 173:7
better [3] - 76:2, 76:12, 105:23
between [9] - 5:2, 32:9, 32:21, 38:20, 146:23, 154:10, 157:17, 162:23, 163:9
big [3] - 42:10, 126:24, 126:25
bill [6] - 73:12, 101:4, 101:9, 123:18, 129:24, 129:25
birth [1] - 104:16
bit [4] - 6:5, 44:4, 44:14, 157:12
Blvd [1] - 1:23
bolted [1] - 130:22
bond [2] - 144:1, 144:3
book [2] - 31:17, 38:4
border [1] - 44:8
born [2] - 104:22, 114:16
bottom [6] - 9:9, 10:9, 14:20, 15:19, 66:12, 164:19

Boulevard [1] - 26:15
Box [1] - 1:23
boxes [1] - 42:16
Bradenton [1] - 41:5
brain [4] - 12:20, 12:24, 13:2, 13:6
Brandon [18] - 41:8, 52:12, 52:16, 53:4, 53:10, 53:18, 54:8, 54:10, 54:12, 54:15, 54:17, 54:22, 55:2, 55:7, 55:10, 55:11, 55:12
bread [5] - 15:3, 15:4, 129:20, 129:23, 138:14
break [8] - 52:19, 69:15, 71:16, 71:21, 96:10, 103:1, 138:12, 157:10
Bridge [1] - 55:4
bridge [8] - 57:11, 57:12, 57:15, 59:2, 134:19, 134:20, 134:22, 166:15
briefly [1] - 111:8
bring [3] - 54:3, 131:17, 137:2
bringing [1] - 23:12
brings [1] - 172:15
broke [1] - 157:16
broken [5] - 7:10, 157:23, 158:3, 158:12, 160:21
brothers [2] - 105:7, 105:11
bunch [5] - 45:1, 45:10, 93:3, 94:4, 94:5
burden [1] - 33:24
burn [1] - 125:24
bus [3] - 107:16, 108:5, 108:6
business [3] - 19:5, 45:5, 115:10
button [1] - 168:24
BY [87] - 3:4, 3:5, 3:6, 3:8, 3:9, 3:10, 4:25, 5:12, 7:7, 11:25, 14:4, 16:13, 17:10, 19:12, 19:20, 20:13, 22:15, 25:4, 26:1, 27:4, 28:17, 29:16, 29:25, 32:1, 34:1, 34:23, 36:6, 36:25, 43:12, 48:24, 51:4, 52:3, 58:19, 61:4, 62:22, 66:3, 66:18, 71:25, 72:22, 75:22,

76:11, 78:8, 79:14, 84:14, 87:6, 88:16, 89:13, 89:25, 90:19, 93:9, 94:19, 96:24, 98:14, 98:20, 100:5, 101:2, 104:15, 105:12, 105:19, 106:10, 107:11, 114:7, 124:2, 125:6, 127:1, 127:25, 138:1, 140:21, 143:8, 144:6, 144:24, 147:6, 148:8, 148:21, 151:11, 154:14, 158:20, 159:2, 160:2, 161:18, 163:7, 163:15, 166:12, 167:2, 167:13, 168:6, 169:4

**C**

cab [6] - 18:11, 19:1, 25:9, 80:12, 91:13, 126:2
cabin [6] - 9:6, 9:8, 93:6, 118:6, 139:19, 139:21
California [49] - 14:12, 14:13, 16:16, 23:11, 30:14, 30:16, 30:23, 31:3, 31:10, 31:12, 31:16, 31:19, 32:4, 32:22, 34:11, 35:3, 35:6, 35:12, 36:15, 37:3, 38:23, 39:21, 40:10, 40:17, 40:18, 43:9, 43:24, 66:22, 71:10, 103:6, 122:13, 123:7, 123:10, 125:8, 126:11, 126:13, 126:16, 127:6, 127:11, 128:7, 129:2, 129:19, 130:5, 132:1, 151:6, 151:14, 153:10, 154:2
cannot [7] - 7:22, 8:11, 39:12, 62:4, 116:8, 131:18, 158:6
capacity [1] - 116:1
captured [1] - 100:16
car [25] - 6:6, 6:10, 6:14, 7:18, 8:23, 8:24, 13:17, 84:20, 87:9, 88:9, 93:17, 132:21, 138:25, 139:2, 139:6, 139:17, 140:4, 148:20, 157:13, 157:15, 157:21, 157:22, 160:17,

160:24
card [11] - 97:25, 123:15, 137:17, 146:3, 158:8, 158:9, 158:10, 158:14, 160:8, 160:10, 160:11
care [1] - 85:24
career [1] - 64:24
cargo [1] - 55:18
carried [2] - 143:7
carrier [1] - 50:13
Carrier [1] - 111:19
Carriers [10] - 110:24, 110:25, 111:3, 111:6, 111:9, 111:14, 111:18, 112:5, 113:18, 113:23
carry [1] - 132:2
carrying [7] - 85:1, 85:8, 94:8, 130:3, 138:11, 138:14, 138:15
cartersville [1] - 120:15
CASE [1] - 1:2
case [29] - 23:16, 24:8, 24:12, 33:15, 33:20, 44:19, 60:14, 66:5, 75:10, 75:17, 85:5, 86:12, 112:17, 113:13, 126:1, 145:21, 145:22, 146:25, 147:18, 170:1, 170:8, 172:17, 172:18, 173:11, 173:13, 173:17, 173:20, 174:1
cases [6] - 68:20, 73:3, 73:14, 75:15, 76:15, 101:14
cash [2] - 123:15, 123:16
Castagna [1] - 4:9
CASTAGNA [1] - 1:13
catch [1] - 81:2
category [1] - 118:20
caused [1] - 168:8
CDL [2] - 108:6, 108:7
cell [9] - 6:7, 9:10, 10:10, 133:19, 134:2, 136:15, 137:6, 137:12
cellular [1] - 97:25
certain [3] - 85:3, 85:9, 125:19
certainly [2] - 20:10, 145:5
certificate [1] - 21:16
certification [3] -

20:25, 107:3, 107:19

**CERTIFY** [1] - 175:16

**chalela** [1] - 90:17

**Chalela** [15] - 1:22, 7:2, 7:5, 10:20, 22:24, 24:16, 25:2, 26:21, 27:16, 83:8, 96:3, 96:7, 96:16, 103:18, 172:7

**CHALELA** [73] - 3:4, 4:19, 4:25, 5:6, 5:9, 5:12, 7:6, 7:7, 10:22, 11:5, 11:17, 11:20, 11:22, 11:25, 13:25, 14:4, 16:10, 16:13, 16:25, 17:3, 17:10, 19:8, 19:11, 19:12, 19:16, 19:18, 19:20, 19:25, 20:4, 20:13, 22:2, 22:7, 22:11, 22:13, 22:15, 23:1, 23:17, 24:13, 24:17, 24:20, 24:23, 25:3, 25:4, 25:13, 25:16, 25:23, 26:1, 26:22, 27:1, 27:4, 27:8, 27:11, 28:2, 28:4, 28:9, 28:14, 28:17, 29:13, 29:16, 29:21, 33:22, 51:24, 72:11, 76:3, 76:10, 90:11, 90:18, 103:19, 171:7, 172:8, 174:14, 175:10, 175:14

**change** [1] - 58:21

**changed** [3] - 43:22, 46:10, 137:2

**changes** [1] - 98:4

**changing** [4] - 137:7, 137:9, 137:25, 160:4

**charge** [5] - 111:21, 122:25, 137:3, 149:8, 149:11

**charged** [2] - 137:1, 144:18

**charger** [1] - 137:1

**charges** [1] - 146:7

**chase** [1] - 24:13

**cheaper** [1] - 44:4

**check** [6] - 29:2, 119:24, 119:25, 121:15

**checks** [3] - 108:1, 146:6, 146:8

**CHELALA** [1] - 1:22

**chicken** [4] - 16:15, 17:11, 122:15, 122:17

**chief** [1] - 75:10

**children** [1] - 109:8

**chip** [15] - 96:21, 97:4, 97:8, 97:20, 97:21, 98:4, 157:6, 157:7, 157:8, 157:10, 157:16, 157:25, 158:7, 158:11, 160:16

**circumstance** [1] - 23:15

**circumstantial** [1] - 145:22

**citizen** [2] - 99:17, 110:3

**citizenship** [1] - 109:25

**Citton** [2] - 107:2, 107:4

**city** [1] - 18:2

**clarify** [1] - 10:22

**Clemens** [1] - 113:2

**Cleo** [1] - 112:20

**CLERK** [3] - 103:23, 104:9, 169:1

**client** [3] - 144:18, 145:25, 163:1

**close** [8] - 49:19, 112:7, 139:5, 139:8, 139:11, 172:15, 173:11

**closed** [4] - 63:3, 65:21, 74:4, 74:7

**closer** [1] - 114:4

**closing** [4] - 171:11, 172:19, 173:4, 173:10

**closings** [2] - 170:24, 171:1

**club** [35] - 46:12, 46:23, 47:1, 47:3, 47:4, 47:5, 47:8, 51:18, 51:20, 59:8, 59:10, 132:19, 133:15, 134:8, 134:14, 135:8, 135:14, 136:1, 138:20, 150:7, 156:22, 156:23, 164:25, 166:19, 167:4, 167:11, 167:23, 168:9, 168:14, 168:16, 169:8

**clubs** [3] - 45:19, 45:23, 46:19

**co** [4] - 36:19, 115:23, 117:3, 161:4

**co-conspirators** [1] - 161:4

**co-driver** [2] - 115:23, 117:3

**co-drivers** [1] - 36:19

**Cocaine** [2] - 12:20, 12:24

**cocaine** [6] - 13:2, 13:3, 13:5, 13:6, 13:7, 13:8

**coincide** [1] - 69:19

**coincidence** [1] - 64:19

**coincidentally** [3] - 63:10, 63:16, 150:10

**college** [2] - 106:17, 107:7

**College** [2] - 106:20, 107:10

**Columbia** [1] - 21:5

**column** [2] - 35:8, 77:8, 77:10

**comfortable** [1] - 105:4

**coming** [4] - 4:15, 59:9, 71:10, 87:24, 109:24, 132:16, 152:7, 152:9

**comment** [3] - 7:20, 95:14, 146:1

**commercial** [2] - 108:8, 108:10

**commit** [1] - 54:7

**communicate** [1] - 157:5

**communications** [5] - 51:10, 148:15, 148:22, 149:8, 149:12

**community** [1] - 110:13

**Community** [1] - 106:20

**company** [14] - 50:4, 50:6, 50:7, 65:4, 74:7, 86:11, 102:5, 110:21, 110:23, 111:22, 126:22, 126:24, 126:25, 173:9

**Company** [1] - 107:20

**company's** [1] - 86:1

**compare** [2] - 73:7, 76:20

**comparing** [1] - 75:24

**comparison** [1] - 70:9

**compartment** [1] - 141:18

**competent** [1] - 169:3

**complete** [1] - 51:9

**comply** [1] - 37:18

**composite** [1] - 66:22

**compound** [1] - 51:25

**COMPUTER** [1] - 2:8

**computer** [9] - 47:17, 129:4, 129:8, 135:10, 135:12, 135:23, 136:8, 149:22, 156:17

**COMPUTER-AIDED** [1] - 2:8

**computerized** [1] - 107:5

**concede** [1] - 145:16

**concerned** [1] - 10:21

**concerning** [2] - 79:4, 161:11

**conclude** [1] - 147:7

**CONCLUDED** [7] - 11:24, 24:22, 28:12, 71:24, 82:9, 147:5, 171:23

**concluded** [2] - 30:5, 169:15

**conclusion** [2] - 155:4, 172:20

**concur** [2] - 175:7, 175:10

**condition** [1] - 87:20

**conducted** [2] - 153:7, 153:9

**confirm** [2] - 72:1, 79:15

**confirmed** [1] - 79:1

**consciousness** [4] - 145:22, 146:14, 146:20, 146:21

**consequence** [4] - 86:7, 86:9, 150:16, 150:18

**consider** [2] - 112:7, 172:22

**consideration** [1] - 172:16

**consisted** [1] - 68:20

**consistent** [1] - 71:12

**consisting** [1] - 71:9

**conspirators** [1] - 161:4

**constant** [1] - 130:8

**construction** [3] - 63:1, 63:3, 63:6

**contact** [3] - 33:21, 34:2, 64:8

**contained** [2] - 68:11, 147:11

**contains** [1] - 28:8

**continuation** [1] - 165:15

**continue** [4] - 51:21, 52:4, 56:5, 147:17

**continued** [5] - 40:8, 52:17, 53:2, 61:19, 63:8

**CONTINUED** [3] - 60:19, 84:7, 147:24

**continuing** [3] - 19:8, 55:21, 165:9

**continuously** [1] - 86:19

**contracted** [1] - 30:25

**control** [2] - 34:13, 125:22

**conversation** [27] - 5:2, 8:19, 10:24, 12:11, 45:17, 45:22, 57:7, 60:4, 84:19, 88:25, 91:11, 92:10, 92:21, 94:10, 95:19, 95:20, 96:4, 97:19, 132:24, 160:25, 161:3, 162:22, 163:9, 163:16, 165:7, 165:19

**conversations** [6] - 64:2, 100:15, 150:1, 155:20, 160:17, 167:15

**convicted** [1] - 99:20

**cookie** [37] - 30:25, 31:5, 39:20, 39:23, 40:11, 40:20, 41:22, 42:3, 42:5, 42:13, 43:9, 51:23, 65:13, 68:4, 68:11, 68:18, 68:20, 68:23, 70:8, 71:9, 73:3, 73:9, 73:14, 74:1, 74:25, 75:2, 75:4, 75:7, 76:16, 78:4, 86:2, 101:12, 102:10, 128:9, 129:1, 129:3

**Cool** [11] - 110:24, 110:25, 111:2, 111:6, 111:9, 111:14, 111:18, 111:19, 112:5, 113:18, 113:23

**cooler** [3] - 9:1, 9:25, 10:2

**Cooney** [1] - 113:6

**cooperating** [1] - 64:9

**coordinates** [1] - 125:25

**cop** [1] - 12:3

**copies** [3] - 69:12, 69:14, 71:4

**copy** [4] - 67:17, 76:2, 76:12, 168:17

**corner** [1] - 28:22

**correct** [197] - 30:9,

30:20, 34:7, 34:25,
35:4, 35:12, 35:16,
36:7, 36:11, 36:15,
36:19, 37:3, 37:11,
37:15, 37:20, 37:25,
38:3, 38:7, 38:17,
39:21, 40:6, 40:21,
41:12, 41:23, 42:17,
42:22, 42:24, 43:4,
43:16, 43:20, 43:24,
44:2, 44:8, 46:4,
46:20, 47:24, 48:21,
48:25, 49:5, 50:14,
50:19, 50:24, 51:12,
51:23, 52:4, 52:8,
52:19, 52:23, 53:6,
53:10, 53:16, 53:20,
54:9, 54:12, 54:15,
54:18, 55:7, 55:12,
55:18, 55:21, 56:3,
56:8, 56:15, 59:4,
59:7, 59:22, 60:4,
61:7, 61:22, 62:7,
62:15, 62:25, 63:7,
63:12, 63:18, 63:24,
64:11, 64:22, 65:11,
65:16, 65:24, 66:6,
66:9, 66:13, 73:3,
73:10, 73:15, 73:20,
73:23, 74:2, 74:22,
74:25, 75:5, 75:10,
75:12, 75:17, 76:17,
78:4, 84:16, 84:20,
85:3, 85:6, 85:11,
85:22, 86:4, 86:17,
86:24, 87:10, 87:17,
87:20, 88:6, 88:17,
88:18, 89:16, 89:21,
90:3, 90:10, 90:20,
90:25, 91:3, 91:7,
91:8, 91:15, 93:11,
93:15, 94:12, 94:22,
95:2, 95:5, 95:10,
96:4, 96:8, 96:11,
96:17, 96:21, 97:3,
97:9, 97:12, 97:17,
97:20, 98:1, 100:19,
101:17, 101:22,
102:11, 113:19,
117:1, 118:25, 122:8,
128:10, 148:15,
149:1, 149:6, 149:20,
150:1, 150:5, 151:14,
151:19, 151:23,
152:12, 153:22,
154:3, 154:7, 154:17,
154:22, 155:2, 155:6,
155:11, 155:15,
155:21, 156:19,
156:22, 157:2, 158:8,
159:4, 159:8, 160:5,

160:8, 160:13, 161:4,
161:21, 161:22,
162:8, 162:19,
162:21, 162:24,
163:10, 164:3, 164:5,
164:12, 164:16,
164:21, 165:3,
165:14, 165:17,
165:20, 165:24
**corrected** [1] - 73:5
**correcting** [2] -
35:25, 36:4
**correctly** [1] - 118:8
**cost** [3] - 49:24,
50:2, 50:10
**costs** [1] - 55:19
**cot** [2] - 118:10,
118:13
**counsel** [18] - 4:18,
10:15, 22:19, 24:24,
52:2, 60:14, 67:12,
69:13, 71:4, 72:10,
83:20, 84:13, 94:17,
105:17, 172:14,
173:1, 173:4, 174:9
**Counsel** [14] - 17:5,
19:15, 25:12, 25:19,
27:13, 35:19, 43:7,
60:8, 76:4, 82:3,
99:25, 124:1, 143:5,
144:16
**country** [3] - 18:20,
99:21, 130:9
**Countryside** [17] -
23:11, 31:4, 31:9,
40:18, 42:14, 66:21,
67:25, 70:17, 74:2,
80:17, 80:20, 81:18,
101:4, 102:10, 103:6,
128:8, 129:1
**County** [7] - 50:19,
53:15, 106:20,
143:23, 144:12,
146:6, 163:19
**county** [1] - 143:20
**couple** [3] - 123:8,
128:4, 146:12
**course** [2] - 19:5,
113:10
**court** [5] - 83:9,
105:3, 144:12,
144:21, 166:4
**COURT** [183] - 1:1,
1:13, 4:2, 4:5, 4:8,
4:11, 4:15, 5:8, 7:5,
10:15, 10:19, 11:2,
11:7, 11:18, 11:21,
16:12, 17:4, 17:7,
19:10, 19:15, 19:17,
20:6, 20:11, 22:5,

22:8, 22:10, 22:12,
22:19, 22:23, 23:13,
24:5, 24:15, 24:19,
24:25, 25:2, 25:11,
25:15, 25:19, 25:21,
25:25, 26:20, 26:25,
27:3, 27:10, 27:12,
27:16, 28:3, 28:6,
28:10, 28:15, 29:15,
29:23, 33:25, 35:19,
35:24, 36:2, 43:7,
43:11, 52:1, 60:8,
60:15, 60:20, 60:24,
61:2, 66:17, 67:12,
68:1, 68:13, 69:2,
69:6, 69:10, 69:13,
69:17, 69:22, 70:3,
70:11, 70:22, 71:8,
71:14, 71:17, 71:22,
72:10, 72:13, 72:17,
72:20, 75:21, 76:8,
79:6, 79:10, 79:13,
79:23, 80:1, 80:14,
80:18, 80:21, 81:7,
81:12, 81:18, 82:1,
82:5, 82:10, 82:16,
82:18, 82:21, 83:1,
83:6, 83:11, 83:15,
83:18, 83:25, 84:4,
84:8, 84:11, 89:10,
90:16, 94:17, 98:11,
99:24, 100:4, 103:14,
103:16, 103:20,
105:9, 105:16, 107:6,
114:3, 114:6, 124:1,
125:5, 126:19,
126:23, 127:23,
140:20, 143:4, 144:5,
144:15, 144:22,
145:4, 145:8, 145:12,
145:17, 146:16,
146:20, 147:2,
147:14, 147:20,
147:25, 148:4, 148:5,
154:13, 158:19,
159:25, 163:3, 163:6,
163:14, 166:1, 166:8,
166:21, 166:24,
167:7, 168:2, 168:5,
169:15, 169:17,
169:21, 170:5,
170:10, 170:13,
170:20, 170:25,
171:8, 171:18,
171:25, 172:3, 172:7,
172:10, 172:13,
174:5, 174:8, 174:15,
175:4, 175:8, 175:12
**Court** [10] - 2:5, 2:5,
4:10, 60:25, 80:24,
81:22, 83:22, 171:16,

173:19, 175:22
**Court's** [1] - 175:3
**courthouse** [2] -
144:13, 146:8
**courtroom** [1] -
174:2
**COURTROOM** [7] -
4:4, 60:22, 84:10,
103:23, 104:9, 148:2,
169:1
**cousin** [1] - 144:9
**cover** [3] - 42:15,
111:23, 173:2
**CR** [1] - 1:2
**CRAWFORD** [86] -
2:1, 3:6, 3:8, 3:10,
67:7, 67:15, 69:8,
69:11, 70:12, 71:7,
71:11, 71:15, 71:18,
79:3, 79:7, 79:21,
79:24, 80:4, 82:23,
83:7, 83:13, 98:12,
98:14, 98:20, 100:1,
100:5, 100:25, 101:2,
103:12, 103:21,
104:15, 105:12,
105:19, 106:7, 106:9,
106:10, 107:11,
114:7, 124:2, 125:6,
127:1, 127:25,
137:25, 138:1,
140:21, 143:6, 143:8,
144:6, 144:17,
144:24, 145:5,
145:11, 145:15,
145:18, 146:18,
146:24, 147:3, 147:6,
147:13, 154:12,
158:25, 159:24,
162:25, 163:5,
165:25, 166:9,
166:12, 166:22,
167:1, 167:2, 167:13,
168:3, 168:6, 168:24,
169:2, 169:4, 169:12,
169:16, 169:19,
169:24, 170:11,
170:18, 170:21,
171:5, 172:11, 174:20
**Crawford** [9] - 2:2,
98:11, 103:20,
127:23, 154:15,
155:18, 159:12,
169:18, 172:10
**crazy** [1] - 13:4
**credit** [1] - 123:15
**credits** [1] - 107:9
**Creole** [12] - 13:1,
90:1, 90:12, 96:14,
96:25, 97:2, 104:20,

104:25, 105:5,
133:24, 161:13,
161:20
**crime** [1] - 99:20
**cross** [6] - 21:8,
29:23, 70:15, 71:3,
82:25, 147:14
**CROSS** [6] - 3:5, 3:6,
3:8, 29:24, 98:13,
148:7
**cross-examination**
[4] - 29:23, 70:15,
71:3, 147:14
**CROSS-
EXAMINATION** [6] -
3:5, 3:6, 3:8, 29:24,
98:13, 148:7
**crossed** [1] - 131:23
**crossing** [1] - 55:4
**cruiser** [1] - 5:3
**CS** [7] - 57:10, 57:14,
57:22, 58:2, 58:12,
58:16, 58:18
**cS** [2] - 57:12, 58:10
**cuffs** [1] - 93:17
**custody** [2] - 34:13,
137:22
**cut** [2] - 15:17, 24:13

## D

**D.C** [1] - 21:9
**daily** [7] - 36:17,
36:18, 36:19, 37:18,
116:13, 116:18,
131:14
**date** [11] - 17:19,
29:3, 29:4, 32:17,
35:20, 43:8, 66:25,
68:6, 101:21, 104:16,
116:8
**Dated** [1] - 175:19
**dated** [3] - 68:6, 72:3
**day's** [1] - 171:9
**days** [9] - 32:23,
40:10, 51:14, 116:16,
117:11, 123:8, 125:8,
125:14, 133:2
**dead** [1] - 137:8
**deal** [1] - 71:12
**dealing** [1] - 64:2
**decide** [2] - 133:8,
150:10
**decided** [1] - 49:14
**defendant** [4] -
13:23, 69:23, 75:23,
161:13
**Defendant** [3] - 1:19,
1:22, 2:1

**Defendant's** [1] - 27:19

**Defendants** [1] - 1:9

**defendants** [3] - 24:7, 70:15, 70:25

**defense** [9] - 19:18, 22:2, 23:8, 23:24, 27:11, 33:15, 33:19, 145:24, 172:14

**Defense** [3] - 17:1, 20:1, 27:9

**degree** [1] - 107:3

**degrees** [6] - 85:5, 86:3, 86:4, 86:8, 86:13, 86:15

**delay** [1] - 33:4

**deliberating** [1] - 172:23

**deliberations** [1] - 172:17

**delineated** [1] - 123:18

**deliver** [18] - 16:16, 23:21, 33:1, 41:2, 41:8, 42:3, 42:5, 51:23, 85:13, 102:3, 102:7, 115:15, 128:21, 132:7, 133:5, 133:13, 156:1

**delivered** [5] - 40:20, 65:14, 68:19, 68:24, 126:23

**deliveries** [1] - 43:16

**delivering** [1] - 121:1

**delivery** [18] - 32:16, 32:23, 43:22, 46:9, 73:13, 115:20, 122:10, 126:12, 126:15, 126:19, 126:21, 127:11, 128:18, 128:24, 132:8, 132:10, 133:11

**denied** [1] - 69:2

**denying** [2] - 81:12, 89:3

**Department** [3] - 18:15, 22:17, 28:19

**department** [1] - 29:11

**deportation** [1] - 100:7

**DEPUTY** [3] - 103:23, 104:9, 169:1

**describe** [2] - 28:4, 135:18

**described** [1] - 45:9

**descriptions** [1] - 77:10

**designations** [1] - 74:19

**desires** [1] - 56:7

**despite** [5] - 52:6, 56:6, 80:25, 93:14, 144:18

**destination** [7] - 47:11, 53:5, 64:3, 65:9, 75:15, 122:4, 156:16

**destinations** [1] - 41:21

**destined** [1] - 75:4

**details** [1] - 41:11

**development** [1] - 172:18

**device** [2] - 38:3, 38:6

**difference** [1] - 86:18

**different** [8] - 20:21, 26:18, 73:14, 74:25, 75:8, 101:24, 102:4, 146:2

**differing** [1] - 26:10

**difficult** [3] - 5:10, 17:18, 67:19

**DIRECT** [4] - 3:4, 3:7, 4:24, 104:14

**direct** [7] - 7:3, 30:6, 45:9, 46:25, 47:7, 78:9, 83:10

**directed** [1] - 150:3

**directing** [2] - 115:8, 169:5

**direction** [6] - 52:7, 135:25, 151:2, 153:1, 161:6, 161:7

**directions** [49] - 48:10, 48:18, 51:9, 51:11, 55:25, 56:6, 56:9, 56:12, 56:20, 56:22, 56:23, 57:1, 57:3, 59:6, 59:9, 59:12, 59:20, 60:1, 61:9, 63:11, 63:18, 64:2, 64:7, 64:14, 64:16, 95:8, 133:22, 134:5, 134:11, 134:13, 134:23, 136:2, 148:23, 149:3, 149:4, 149:5, 150:11, 150:15, 150:20, 150:24, 150:25, 162:7, 162:14, 163:18, 163:22, 166:16, 167:17, 168:14

**directly** [3] - 31:4, 40:5, 149:16

**discarded** [1] - 160:12

**discourage** [1] - 55:20

**discovered** [2] - 65:15, 91:8

**discovery** [2] - 70:14, 159:12

**discuss** [11] - 60:14, 71:21, 86:25, 87:18, 140:18, 141:4, 147:18, 160:16, 173:13, 173:19, 174:9

**discussed** [12] - 26:24, 43:2, 64:3, 76:16, 79:16, 84:19, 86:22, 87:21, 92:18, 96:7, 161:1

**discussing** [5] - 94:15, 94:21, 94:25, 99:2, 160:4

**discussion** [4] - 48:9, 75:12, 165:13, 165:16

**DISCUSSION** [14] - 10:18, 11:23, 22:22, 24:21, 27:15, 28:11, 67:14, 71:23, 80:3, 82:8, 145:10, 147:4, 169:23, 171:22

**dismissed** [1] - 146:7

**dispatched** [1] - 126:15

**dispatcher** [7] - 6:21, 39:25, 43:21, 132:3, 132:5, 132:8, 133:6

**disposal** [1] - 85:22

**distance** [1] - 111:7

**distribute** [1] - 102:7

**DISTRICT** [3] - 1:1, 1:1, 1:13

**District** [2] - 2:5, 21:4

**Division** [1] - 22:17

**dock** [4] - 14:18, 128:14, 128:19, 129:10

**document** [30] - 22:5, 23:14, 25:5, 27:21, 28:4, 28:7, 28:18, 28:20, 28:23, 31:11, 31:13, 31:14, 31:18, 31:22, 32:2, 34:24, 35:9, 37:23, 67:3, 67:16, 67:20, 72:23, 76:2, 79:22, 80:24, 80:25, 81:15, 81:20, 81:25

**documentation** [4] - 23:5, 33:19, 34:3, 111:12

**documents** [18] -

**driver** [20] - 28:23, 34:25, 41:1, 41:3, 43:3, 45:8, 48:2, 64:25, 108:24, 111:5, 111:14, 114:24, 114:25, 115:23, 116:18, 117:3, 121:1, 121:7, 128:11, 131:13

**driver's** [14] - 25:16, 26:2, 36:17, 36:18, 37:18, 108:8, 108:10, 116:13, 116:25, 118:8, 125:1, 125:11, 126:17, 131:9

**drivers** [7] - 36:19, 42:20, 42:24, 42:25, 43:1, 112:6, 122:10

**drives** [2] - 35:6, 43:4

**driving** [36] - 16:16, 43:6, 59:7, 59:24, 95:3, 107:16, 108:5, 108:18, 113:18, 115:1, 116:17, 117:13, 118:21, 118:24, 119:2, 119:6, 119:14, 119:18, 120:6, 120:13, 120:22, 120:23, 121:23, 122:3, 130:7, 131:19, 133:1, 134:15, 135:7, 142:21, 149:3, 150:14, 153:4, 153:8, 166:14

**drop** [8] - 17:24, 40:12, 50:23, 52:7, 88:23, 88:24, 96:10, 102:23

**dropped** [9] - 31:8, 31:12, 31:15, 31:18, 32:3, 32:6, 32:7, 32:10, 39:24

**dropping** [2] - 96:8, 102:15

**drove** [4] - 110:19, 111:1, 122:4, 128:4

**Drug** [1] - 159:13

**drug** [5] - 10:5, 13:18, 14:1, 99:20, 140:25

**drugs** [2] - 12:15, 141:25

**due** [1] - 81:3

**duly** [1] - 104:6

**during** [38] - 7:3, 23:20, 26:23, 33:3, 33:11, 34:4, 34:9, 34:10, 41:16, 43:23, 45:9, 46:25, 63:23,

**destination** ...

**dog** [28] - 10:8, 12:3, 12:14, 12:19, 13:11, 13:18, 14:1, 14:2, 15:21, 99:6, 99:12, 100:13, 100:18, 100:20, 140:13, 140:15, 140:18, 140:22, 141:1, 141:10, 141:12, 141:15, 141:17, 141:21, 142:1, 143:10, 143:16

**dogs** [2] - 12:7, 12:12

**done** [4] - 80:9, 145:20, 170:19, 172:5

**door** [4] - 13:17, 130:17, 130:22, 140:11

**doors** [4] - 42:15, 65:23, 74:7, 86:16

**DOT** [1] - 19:22

**dough** [37] - 30:25, 31:5, 39:20, 39:23, 40:11, 40:20, 41:22, 42:3, 42:5, 42:13, 43:9, 51:23, 65:13, 68:4, 68:11, 68:18, 68:21, 68:24, 70:8, 71:10, 73:3, 73:9, 73:14, 74:1, 74:25, 75:2, 75:4, 75:7, 75:8, 76:16, 78:4, 86:2, 101:12, 102:10, 128:9, 129:1, 129:3

**down** [33] - 7:9, 7:15, 7:16, 8:3, 8:25, 9:16, 9:17, 15:7, 46:7, 52:9, 52:11, 52:19, 52:21, 53:15, 53:24, 57:18, 58:4, 58:7, 61:5, 65:5, 82:18, 95:8, 95:9, 100:21, 103:16, 117:8, 118:10, 124:12, 135:7, 138:12, 146:5, 148:25, 149:18

**downtown** [1] - 52:22

**drive** [12] - 13:4, 16:23, 24:10, 38:24, 49:22, 108:5, 108:21, 110:25, 111:9, 113:21, 114:13, 114:22

**desires** ...

**18:10, 22:24, 23:2, 23:18, 23:23, 24:14, 66:20, 68:9, 68:14, 68:25, 69:19, 70:4, 70:5, 70:13, 70:17, 70:18, 81:5**

64:24, 69:15, 70:15, 75:10, 84:23, 96:6, 112:15, 115:19, 117:18, 120:21, 126:7, 129:18, 130:12, 131:25, 135:2, 148:24, 150:1, 154:21, 155:9, 155:17, 160:16, 165:6, 167:14, 172:17, 174:25

**duty** [28] - 23:21, 35:2, 35:5, 35:10, 35:15, 36:10, 36:14, 37:2, 37:15, 37:24, 117:6, 117:7, 118:1, 118:2, 119:1, 119:18, 120:5, 122:6, 122:8, 124:19, 124:23, 127:13, 127:14, 127:15, 127:16, 151:13, 151:18, 151:19

## E

**e-mailed** [3] - 80:16, 80:19, 82:2
**EAJ** [1] - 1:2
**early** [10] - 5:13, 30:24, 32:24, 40:12, 43:15, 122:9, 123:8, 127:12, 133:3
**easily** [3] - 90:9, 91:23, 139:13
**east** [1] - 55:2
**easy** [2] - 47:23, 121:10
**eat** [2] - 124:15, 132:22
**eating** [3] - 44:21, 44:23, 46:7
**either** [10] - 27:25, 55:9, 73:19, 98:8, 118:13, 125:24, 126:2, 132:18, 138:10
**ELMO** [1] - 5:6
**Emmanual** [1] - 112:20
**employer's** [1] - 37:19
**employment** [1] - 107:18
**Emporia** [1] - 17:25
**end** [5] - 13:16, 29:9, 59:21, 61:7, 123:18
**endeavor** [1] - 55:23
**ended** [1] - 36:15
**enforcement** [7] -

5:18, 10:5, 13:16, 64:10, 92:2, 94:4, 140:13
**Enforcement** [1] - 159:13
**engage** [1] - 142:16
**English** [6] - 13:23, 88:17, 90:13, 104:18, 105:1, 133:23
**enjoy** [2] - 55:22, 55:23
**entered** [1] - 44:1
**entertainment** [2] - 49:5, 49:8
**entire** [3] - 90:14, 109:15, 154:22
**entry** [1] - 117:16
**enunciated** [1] - 10:25
**establish** [5] - 23:3, 81:19, 144:18, 146:15, 155:9
**established** [2] - 32:3, 80:5
**establishment** [1] - 45:23
**establishments** [1] - 49:10
**estimate** [1] - 139:9
**estimation** [1] - 82:25
**evening** [3] - 30:19, 46:13, 120:19
**EVENS** [3] - 1:7, 3:3, 4:20
**Evens** [15] - 30:3, 30:4, 30:5, 66:4, 66:19, 68:5, 69:20, 72:1, 72:23, 78:9, 81:5, 81:10, 89:7, 111:25, 113:10
**event** [5] - 42:19, 48:9, 50:21, 51:7, 73:8
**evidence** [24] - 10:23, 20:1, 22:3, 22:25, 24:9, 25:14, 27:9, 27:17, 27:25, 28:1, 32:14, 66:5, 69:1, 72:8, 79:5, 79:8, 79:19, 83:8, 97:16, 116:22, 145:23, 159:23, 168:22, 172:15
**EVIDENCE** [7] - 17:9, 20:12, 22:9, 25:22, 28:16, 72:21, 160:1
**exact** [2] - 61:19, 152:18

**exactly** [4] - 116:8, 149:19, 156:11, 167:19
**exam** [2] - 108:16, 108:18
**EXAMINATION** [12] - 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 4:24, 29:24, 98:13, 104:14, 148:7, 166:11
**examination** [11] - 7:3, 28:24, 29:23, 30:6, 45:10, 47:7, 70:15, 71:3, 83:10, 96:6, 147:14
**examine** [3] - 37:22, 66:24, 78:18
**examined** [2] - 4:23, 104:8
**example** [6] - 21:8, 26:6, 26:11, 26:12, 102:9, 128:17
**except** [2] - 39:12, 44:11
**exception** [1] - 81:2
**excuse** [12] - 6:12, 13:15, 19:25, 33:22, 33:23, 35:19, 43:7, 51:24, 76:3, 90:11, 97:2, 100:24
**exhausted** [1] - 60:10
**Exhibit** [46] - 17:1, 19:18, 20:1, 22:2, 22:6, 27:19, 34:21, 35:10, 36:21, 37:1, 57:6, 57:9, 66:2, 66:20, 67:4, 72:3, 72:9, 72:13, 75:24, 75:25, 76:20, 76:22, 77:7, 77:9, 77:14, 78:11, 78:19, 78:24, 78:25, 79:2, 79:4, 80:10, 84:16, 87:3, 91:6, 95:15, 98:21, 101:8, 116:22, 117:17, 124:17, 131:13, 151:9, 151:12, 158:22, 168:23
**exhibit** [20] - 17:8, 19:15, 25:11, 25:13, 27:24, 66:23, 67:8, 74:18, 75:13, 75:14, 75:16, 75:19, 76:4, 76:13, 76:21, 100:23, 100:24, 101:10, 159:1, 162:22
**EXHIBIT** [7] - 17:9, 20:12, 22:9, 25:22,

28:16, 72:21, 160:1
**exhibits** [2] - 23:2, 77:2
**EXHIBITS** [2] - 3:13, 3:17
**exist** [2] - 91:14, 91:15
**existed** [1] - 155:15
**existence** [1] - 69:3
**exists** [2] - 34:8, 81:20
**exit** [15] - 52:22, 53:3, 53:25, 54:8, 54:12, 54:25, 55:3, 55:7, 57:15, 57:16, 57:21, 57:22, 57:24, 61:24, 62:1
**Exit** [5] - 40:7, 44:7, 44:20, 49:6, 49:21
**expect** [1] - 142:22
**experience** [4] - 65:12, 65:17, 65:25, 152:10
**expire** [1] - 21:20
**explain** [7] - 10:24, 23:5, 23:8, 39:10, 39:12, 54:21, 145:7
**explained** [1] - 48:11
**extra** [2] - 50:11, 133:9

## F

**face** [2] - 5:15, 175:1
**fact** [16] - 38:2, 52:6, 53:19, 54:14, 56:6, 69:24, 74:11, 75:8, 81:4, 86:22, 92:21, 93:2, 99:5, 122:24, 145:25, 156:12
**faded** [1] - 72:24
**failed** [1] - 85:14
**fails** [2] - 85:10, 85:17
**fair** [4] - 18:6, 89:6, 100:15, 148:11
**false** [1] - 140:8
**familiar** [3] - 47:16, 66:5, 72:25
**family** [4] - 105:14, 106:2, 109:13, 109:15
**far** [11] - 10:20, 35:8, 49:13, 49:23, 52:11, 70:7, 85:20, 139:10, 160:4, 165:14, 172:25
**fast** [1] - 122:11
**father** [1] - 109:16
**February** [1] - 108:11
**federal** [1] - 146:8

**feet** [1] - 62:13
**few** [4] - 107:9, 109:5, 112:11, 125:14
**filled** [1] - 40:7
**final** [2] - 75:14, 78:10
**finally** [3] - 119:1, 135:22, 146:12
**fine** [1] - 106:8
**finish** [2] - 83:12, 83:25
**finished** [8] - 5:1, 62:11, 72:5, 99:1, 107:18, 126:14, 129:13, 138:3
**finishing** [2] - 79:12, 83:23
**first** [30] - 6:10, 9:21, 9:22, 26:11, 26:12, 54:25, 55:2, 57:15, 67:15, 68:16, 68:17, 75:13, 78:18, 93:6, 93:22, 102:25, 103:9, 107:17, 108:20, 111:19, 112:13, 113:13, 116:4, 128:17, 128:18, 145:18, 159:3, 160:19, 167:21
**five** [9] - 38:24, 102:8, 105:10, 144:20, 146:2, 147:16, 171:3, 171:5, 171:7
**five-hour** [1] - 38:24
**fixing** [1] - 132:21
**FL** [5] - 1:18, 1:21, 1:24, 2:3, 2:6
**flame** [1] - 86:20
**floorboard** [1] - 6:6
**Florida** [48] - 2:6, 21:17, 21:18, 22:16, 30:9, 34:11, 39:17, 40:21, 41:19, 42:4, 42:6, 42:20, 43:14, 43:24, 44:2, 44:5, 44:8, 49:3, 49:16, 51:1, 51:5, 68:19, 68:25, 71:10, 73:10, 73:13, 75:5, 75:15, 101:15, 101:22, 110:6, 110:14, 110:16, 115:7, 117:8, 129:19, 130:2, 131:5, 131:25, 133:1, 136:6, 138:2, 139:6, 144:20, 145:2, 146:1, 147:9, 163:19
**FLORIDA** [1] - 1:1
**focus** [3] - 115:2,

116:3, 166:23

**focusing** [1] - 38:2
**follow** [4] - 55:24,
56:5, 61:19, 95:17
**FOLLOWING** [7] -
10:17, 22:21, 27:14,
67:13, 80:2, 145:9,
169:22
**FOLLOWS** [10] -
11:24, 24:22, 28:13,
60:19, 71:24, 82:9,
84:7, 147:5, 147:24,
171:24
**follows** [3] - 4:23,
57:8, 104:8
**food** [7] - 18:17,
64:25, 65:2, 65:3,
65:9, 85:8, 126:24
**FOR** [1] - 1:1
**foregoing** [1] -
175:16
**forget** [2] - 98:17,
159:11
**forgot** [1] - 159:16
**forgotten** [1] -
159:17
**form** [4] - 49:4, 73:6,
73:8, 163:12
**former** [1] - 146:4
**Fort** [1] - 26:16
**forth** [1] - 130:8
**forty** [3] - 171:3,
171:5, 171:7
**forty-five** [1] - 171:7
**forward** [3] - 57:4,
137:23, 170:3
**foundation** [4] -
79:8, 79:12, 80:5,
163:12
**four** [5] - 66:22,
66:24, 67:1, 67:16,
72:2
**four-page** [2] -
66:22, 67:16
**frame** [2] - 117:19,
126:8
**Franklin** [3] - 59:2,
134:19, 166:14
**freezer** [9] - 7:17,
7:21, 8:2, 86:23, 87:7,
87:8, 87:15, 87:20,
88:5
**Friday** [1] - 133:6
**friend** [2] - 111:1,
112:7
**friends** [6] - 161:25,
162:1, 162:4, 162:6,
162:10, 173:16
**front** [27] - 5:15,
7:12, 8:7, 9:6, 9:8,

77:9, 90:9, 90:15,
91:2, 91:19, 91:20,
91:24, 91:25, 92:14,
92:17, 92:19, 92:22,
92:24, 93:5, 93:6,
94:15, 97:5, 129:8,
139:21, 140:25,
148:19, 167:22
**frozen** [9] - 15:3,
15:4, 17:12, 17:13,
17:16, 37:10, 55:18,
129:20, 129:23
**fuel** [4] - 44:4, 44:13,
125:24, 153:3
**Fuel** [1] - 22:13
**full** [2] - 55:17,
116:25
**fully** [1] - 49:25
**fumes** [1] - 87:24
**fundamental** [2] -
23:7, 23:24
**furnish** [2] - 69:13,
71:1

## G

**gas** [5] - 119:8,
119:9, 121:14, 153:13
**gasoline** [1] - 119:24
**gate** [1] - 128:19
**generally** [1] -
173:11
**generated** [1] - 80:7
**gentleman** [3] -
111:24, 113:14,
140:24
**gentlemen** [6] - 4:12,
23:20, 82:14, 82:22,
84:12, 147:19
**Georgia** [7] - 44:4,
56:3, 120:16, 131:8,
131:19, 132:1, 132:16
**given** [20] - 18:15,
32:5, 32:15, 33:16,
55:25, 56:1, 56:9,
56:10, 56:12, 56:13,
56:20, 67:17, 70:25,
103:5, 128:12,
133:12, 133:14,
136:2, 150:16
**glad** [1] - 173:21
**God** [1] - 104:3
**goods** [2] - 23:21,
23:22
**government** [19] -
10:23, 11:1, 23:1,
24:5, 67:18, 70:24,
75:16, 79:18, 80:9,
81:16, 98:16, 100:22,

145:24, 162:22,
170:3, 170:23, 172:1,
172:14, 174:11
**Government** [2] -
1:16, 79:2
**government's** [5] -
23:9, 24:3, 75:10,
98:19, 174:24
**Government's** [33] -
34:21, 35:10, 36:21,
37:1, 57:6, 57:8, 66:1,
66:20, 67:4, 72:2,
72:9, 72:13, 75:25,
76:19, 76:22, 77:6,
77:8, 77:13, 78:10,
78:19, 78:24, 78:25,
79:19, 80:9, 84:16,
87:2, 91:6, 95:14,
101:8, 151:9, 151:12,
158:22, 168:22
**GPS** [10] - 24:2, 38:3,
38:6, 38:8, 48:7,
125:25, 154:3, 154:6,
154:8, 154:10
**grade** [2] - 65:3, 65:9
**graduate** [4] -
106:11, 106:14,
107:6, 107:9
**graduated** [1] -
106:16
**ground** [1] - 65:7
**Group** [1] - 1:22
**group** [1] - 44:23
**guards** [1] - 137:25
**guess** [1] - 55:13
**guessing** [2] - 41:9,
41:10
**guilt** [2] - 145:23,
146:20
**guy** [8] - 9:11, 9:13,
9:17, 10:11, 10:13,
47:5, 48:18, 64:7
**guys** [2] - 8:12,
8:14, 8:17, 8:25, 9:18,
9:24, 10:1, 10:5, 14:6,
45:1, 45:13, 106:7,
161:1, 161:9, 161:20,
161:24, 162:4,
162:10, 162:18,
164:1, 164:10

## H

**Haiti** [8] - 104:23,
109:22, 114:17,
114:19, 115:14,
115:16, 115:18
**Haitian** [5] - 90:1,
96:25, 97:2, 110:13,

161:20
**half** [10] - 34:16,
37:14, 51:16, 51:17,
51:19, 55:24, 98:8,
151:23, 152:16,
153:13
**halfway** [4] - 8:3,
8:25, 9:16, 15:7
**hand** [15] - 27:17,
27:21, 28:5, 28:22,
62:4, 62:6, 62:7,
62:18, 62:24, 95:10,
103:24, 137:15,
150:4, 157:21, 167:7
**handcuffed** [1] -
93:21
**handcuffs** [5] -
93:15, 93:16, 93:22,
138:25, 143:11
**handed** [2] - 16:17,
19:13
**handing** [2] - 25:5,
27:19
**handled** [2] - 129:12,
132:13
**hands** [2] - 93:18,
93:24
**hang** [2] - 44:16,
156:3
**hanging** [2] - 44:23,
167:11
**HARDAWAY** [3] -
1:8, 3:7, 104:5
**Hardaway** [5] -
34:14, 34:25, 36:17,
92:18, 104:13
**hardaway** [1] -
103:22
**haul** [7] - 18:3, 18:7,
21:1, 64:24, 111:5,
154:22
**hauled** [1] - 64:25
**hauling** [8] - 18:14,
122:13, 129:20,
129:22, 138:9, 138:13
**Haven** [13] - 42:4,
49:16, 50:9, 50:16,
50:17, 50:18, 55:14,
68:19, 75:15, 101:15,
102:16, 102:24, 103:7
**head** [10] - 5:22,
37:7, 53:21, 54:18,
54:19, 90:21, 126:13,
139:12, 139:19,
149:18
**headed** [1] - 49:7
**heading** [12] - 40:25,
43:13, 49:2, 50:22,
52:9, 53:8, 53:23,
55:6, 59:8, 59:16,

61:21, 151:3
**hear** [4] - 5:7, 6:19,
59:23, 173:10
**heard** [21] - 15:5,
24:6, 36:3, 41:15,
46:3, 56:25, 59:3,
59:5, 59:22, 59:23,
60:2, 60:3, 60:5, 60:8,
61:20, 63:12, 63:18,
95:11, 133:25, 135:2,
140:10
**hearing** [4] - 7:1,
60:10, 64:1, 97:14
**hearsay** [1] - 81:1
**heavily** [1] - 23:19
**heavy** [1] - 135:20
**HELD** [7] - 10:18,
22:22, 27:15, 67:14,
80:3, 145:10, 169:23
**help** [4] - 104:3,
116:16, 161:21, 162:4
**helped** [1] - 14:2
**helpful** [1] - 69:12
**hidden** [1] - 64:21
**high** [4] - 106:5,
106:11, 106:16,
106:23
**highlighted** [1] -
97:1
**highway** [2] -
134:10, 137:4
**Highway** [4] - 136:6,
138:2, 139:6, 147:9
**highways** [2] - 48:3,
48:4
**Hill** [4] - 107:20,
107:21, 107:24, 108:2
**himself** [1] - 13:20
**holding** [1] - 68:20
**Honor** [71] - 4:14,
4:19, 5:7, 6:25, 7:6,
11:5, 11:20, 16:11,
17:1, 17:3, 19:11,
19:19, 20:2, 20:5,
20:10, 22:3, 22:7,
24:17, 24:20, 25:3,
25:14, 25:20, 27:8,
28:9, 28:14, 29:22,
31:22, 33:22, 35:23,
36:1, 36:5, 61:3,
66:16, 67:7, 71:19,
72:12, 72:16, 75:20,
76:3, 78:7, 79:3,
79:20, 80:17, 81:3,
81:14, 82:4, 84:2,
90:11, 90:15, 90:18,
94:18, 98:10, 103:21,
148:6, 158:18, 159:1,
161:11, 162:25,
166:6, 166:10, 167:8,

172:2, 172:4, 172:9, 172:11, 174:11, 174:12, 174:14, 175:7, 175:11, 175:14

**HONORABLE** [1] - 1:13

**Honorable** [4] - 4:9, 4:10, 60:25

**hope** [1] - 83:2

**Hopkins** [1] - 112:25

**hot** [1] - 9:18

**hotel** [18] - 33:5, 33:6, 33:7, 33:13, 33:21, 34:2, 34:3, 34:8, 37:7, 122:6, 123:11, 124:9, 127:16, 151:25, 154:16, 154:20, 154:24

**Hotel** [2] - 33:11, 34:4

**hour** [4] - 38:24, 82:11, 83:3, 151:23

**hours** [10] - 29:10, 35:9, 35:15, 37:14, 98:8, 118:24, 128:5, 151:18, 152:16, 171:2

**Howard** [3] - 59:2, 134:19, 166:14

**HUGO** [1] - 1:19

**hung** [1] - 136:11

**hurrying** [1] - 133:4

**Hyatt** [1] - 123:19

## I

**I-4** [3] - 50:18, 50:20, 50:22

**I-75** [2] - 52:20, 53:20

**id** [1] - 128:22

**idea** [2] - 158:13, 159:7

**identified** [2] - 73:15, 73:18

**IDENTIFIED** [1] - 3:13

**identifying** [1] - 81:4

**IFTA** [1] - 21:25

**IHOP** [1] - 57:19, 58:13

**illegal** [3] - 141:5, 142:1, 142:19

**immediately** [1] - 4:17

**impeachment** [1] - 69:7

**import** [1] - 94:1

**importance** [2] - 23:24, 43:1

**important** [13] - 18:9, 33:14, 33:18, 37:17, 41:11, 59:25, 86:10, 94:1, 105:3, 150:20, 154:17, 155:8, 160:15

**impose** [1] - 82:13

**impossible** [3] - 153:24, 154:2, 154:5

**impression** [1] - 168:15

**IN** [4] - 4:7, 25:1, 60:23, 148:3

**including** [2] - 173:20, 175:2

**inconsistent** [1] - 94:16

**Incorporated** [1] - 66:21

**independent** [2] - 23:4, 23:8

## INDEX [1] - 3:1

**indicate** [8] - 89:15, 91:14, 117:23, 118:12, 120:7, 126:1, 155:17, 166:18

**indicated** [7] - 85:2, 95:8, 154:15, 155:17, 157:4, 159:21, 167:10

**indicates** [3] - 35:2, 81:23, 116:24

**indicating** [1] - 95:1

**indicating)** [1] - 54:25

**indications** [2] - 156:2, 167:3

**indicia** [1] - 81:24

**Indictment** [4] - 112:12, 174:16, 174:18, 174:25

**individual** [4] - 48:16, 51:10, 148:23, 163:17

**individually** [1] - 171:19

**individuals** [2] - 112:12, 112:13

**information** [6] - 26:21, 81:4, 83:22, 90:17, 165:2, 174:1

**initial** [1] - 115:19

**innocence** [2] - 146:14, 146:21

**inquire** [2] - 27:22, 27:23

**inquiries** [1] - 132:18

**inquiry** [6] - 11:8, 11:13, 46:19, 105:17, 145:19, 170:22

**inside** [10] - 6:5, 6:9, 8:23, 9:5, 15:1, 31:13,

74:8, 87:13, 87:16, 130:13

**inspect** [2] - 18:20, 18:23

**inspected** [3] - 28:25, 29:7, 29:11

**inspection** [11] - 29:3, 119:16, 119:20, 119:21, 120:9, 121:14, 121:19, 128:2, 131:1, 153:6, 153:9

**instance** [2] - 23:14, 45:18

**instead** [1] - 90:13

**Institute** [1] - 107:2, 107:4

**instruct** [1] - 172:21

**instructed** [1] - 173:19

**instruction** [1] - 63:20

**instructions** [5] - 85:22, 171:11, 173:4, 173:8, 173:12

**insulated** [1] - 173:25

**insurance** [3] - 85:24, 86:1, 111:22

**intend** [1] - 68:8

**intention** [3] - 10:19, 11:2, 11:4

**interested** [1] - 46:4

**interesting** [1] - 80:21

**interests** [3] - 45:14, 45:16, 45:18

**interior** [2] - 68:14, 68:15

**international** [1] - 22:1

**International** [1] - 22:13

**Internet** [1] - 47:20

**interpret** [1] - 8:13

**interpretation** [1] - 11:11

**INTERPRETER** [10] - 13:22, 20:10, 31:21, 48:22, 51:2, 62:20, 106:8, 114:5, 161:10, 167:8

**interpreter** [4] - 13:22, 20:8, 31:24, 114:3, 161:10, 161:12

**interrogation** [1] - 10:21

**interrupt** [1] - 67:8

**intersection** [6] - 56:18, 59:1, 59:18,

62:14, 62:18, 62:24

**Interstate** [3] - 49:3, 52:16, 52:17

**interstate** [1] - 49:10

**interviewed** [1] - 137:24

**INTO** [7] - 17:9, 20:12, 22:9, 25:22, 28:16, 72:21, 160:1

**introduce** [5] - 27:17, 67:20, 68:8, 80:6, 159:22

**introduced** [4] - 32:14, 75:17, 100:23, 116:21

**introducing** [1] - 81:17

**introduction** [2] - 23:23, 111:4

**invoice** [2] - 68:12, 127:3

**invoices** [2] - 70:1, 126:25

**involved** [2] - 45:4, 164:2

**Irvine** [1] - 31:10, 39:21, 40:1, 40:18, 66:21, 126:13, 126:15, 128:7, 129:1

**issue** [5] - 24:8, 24:12, 33:14, 71:6, 174:19

**issued** [2] - 21:18, 21:20

**it'll** [2] - 100:1, 173:7

**item** [9] - 24:9, 27:17, 68:9, 69:25, 74:19, 76:20, 77:10, 78:24, 79:1

**items** [8] - 69:3, 73:15, 73:17, 76:21, 81:10, 81:15, 85:20, 126:21

**itself** [2] - 9:8, 11:11

## J

**jail** [5] - 143:20, 143:21, 143:24, 144:7, 146:1

**JAMES** [1] - 1:16

**James** [2] - 113:4, 113:6

**January** [2] - 1:5, 165:22

**Jean** [5] - 30:4, 111:24, 113:10, 115:10, 121:8

**jEAN** [1] - 1:7

**JEAN** [2] - 3:3, 4:20

**Jermaine** [1] - 112:25

**Jersey** [14] - 106:4, 106:12, 106:21, 109:12, 109:18, 109:21, 109:23, 115:6, 116:5, 144:10, 144:20, 146:2, 146:11, 166:4

**jersey** [1] - 109:14

**job** [2] - 18:7, 45:2

**jokes** [1] - 46:7

**JORGE** [1] - 1:22

**journey** [12] - 48:21, 48:25, 49:2, 50:9, 50:13, 51:9, 51:21, 52:4, 55:21, 61:7, 148:12, 155:24

**Judge** [11] - 69:5, 70:1, 70:7, 79:11, 83:19, 125:4, 145:16, 148:16, 166:22, 170:9, 171:2

**judge** [9] - 79:24, 83:2, 83:17, 144:17, 158:25, 159:22, 169:12, 174:20, 174:23

**JUDGE** [1] - 1:13

**July** [1] - 110:9

**jump** [1] - 131:5

**JURY** [14] - 1:12, 4:4, 4:13, 60:17, 60:22, 82:20, 84:10, 147:22, 148:2, 174:7

**jury** [33] - 4:3, 16:20, 19:14, 20:17, 26:4, 30:6, 33:20, 34:12, 38:20, 41:17, 49:18, 54:21, 60:16, 60:21, 82:17, 84:9, 91:21, 92:1, 92:4, 92:9, 92:16, 128:16, 147:21, 148:1, 150:13, 158:13, 159:6, 171:11, 171:17, 172:5, 174:4, 174:6, 175:1

## K

**Kansas** [13] - 16:15, 17:25, 18:2, 26:16, 26:17, 34:10, 39:19, 39:24, 40:5, 121:17, 126:22

**keep** [8] - 85:2, 93:18, 93:24, 116:12,

118:23, 125:19, 169:25, 173:25
**kept** [5] - 19:5, 33:12, 85:9, 86:3, 135:16
**key** [1] - 145:23
**kill** [3] - 51:14, 96:10, 96:12
**kind** [3] - 5:4, 11:10, 133:23
**kinds** [1] - 74:25
**knowing** [3] - 33:14, 33:18, 70:24
**kotchip** [3] - 97:3, 97:4, 97:8
**kotchip-la** [3] - 97:3, 97:4, 97:8
**kraze** [10] - 96:4, 96:7, 96:9, 96:13, 96:14, 96:16, 96:19, 96:20, 136:19, 136:22
**Kraze** [1] - 96:14
**Kurmay** [1] - 113:4

**L**

**ladies** [4] - 4:11, 82:13, 84:11, 147:18
**lading** [5] - 73:12, 101:4, 101:9, 129:24, 129:25
**laid** [3] - 79:9, 81:23, 108:4
**Lamar** [1] - 113:6
**lane** [1] - 62:7
**Lanese** [8] - 53:5, 53:9, 55:15, 139:17, 140:3, 156:15, 157:2, 160:12
**language** [3] - 11:10, 104:24, 168:7
**lapsing** [1] - 133:23
**laptop** [1] - 136:7
**large** [1] - 110:13
**Largo** [6] - 51:1, 51:5, 57:17, 57:23, 62:15
**Las** [2] - 128:5, 130:10
**last** [15] - 21:21, 22:24, 23:13, 35:9, 67:16, 68:16, 68:17, 75:24, 104:12, 113:14, 131:12, 145:19, 148:14, 164:19, 169:6
**late** [1] - 30:19
**law** [9] - 5:18, 13:15, 64:10, 92:1, 94:3,

140:12, 146:25, 172:21, 173:5
**Law** [2] - 1:22, 2:1
**lawyers** [1] - 172:20
**lay** [2] - 80:22, 118:10
**laying** [2] - 23:22, 124:12
**lead** [2] - 23:22, 143:4
**leading** [9] - 23:6, 123:24, 125:3, 140:19, 143:2, 163:12, 166:20, 166:25, 168:1
**leads** [1] - 11:11
**learn** [7] - 39:23, 43:14, 43:20, 64:13, 129:19, 129:22, 155:23
**learned** [4] - 64:6, 108:20, 145:1
**learning** [1] - 155:19
**learns** [1] - 146:3
**lease** [1] - 111:2
**least** [5] - 30:22, 36:2, 59:3, 165:6, 175:1
**leave** [10] - 37:13, 87:22, 115:17, 125:13, 125:20, 125:21, 126:10, 170:16, 175:4
**leaving** [6] - 42:14, 49:21, 127:6, 128:19, 152:9, 153:6
**led** [1] - 169:7
**Lee** [1] - 175:21
**lee** [1] - 2:4
**LEE** [1] - 175:21
**left** [37] - 5:4, 56:14, 56:19, 56:24, 57:19, 58:13, 58:14, 58:25, 61:20, 62:6, 62:7, 62:18, 62:24, 74:1, 87:12, 87:15, 95:10, 108:2, 126:12, 129:17, 130:5, 130:10, 135:22, 140:7, 146:3, 149:19, 150:4, 151:22, 151:24, 152:1, 152:2, 152:17, 152:18, 153:10, 159:9, 159:10
**left-hand** [5] - 62:6, 62:7, 62:18, 95:10, 150:4
**legitimacy** [1] - 23:8
**legitimate** [2] - 23:25, 24:1

**lends** [1] - 11:11
**lengthy** [2] - 83:10, 173:1
**Leo** [1] - 5:15
**LEO** [1] - 5:16
**less** [1] - 83:3
**liberty** [1] - 173:22
**license** [5] - 22:14, 108:8, 108:10, 108:13, 108:23
**light** [4] - 62:3, 62:5, 62:9, 67:19
**lights** [1] - 119:25
**likely** [1] - 111:20
**likewise** [1] - 37:1
**limited** [1] - 10:25
**line** [10] - 7:8, 11:3, 43:14, 68:9, 98:22, 98:25, 117:18, 145:19, 169:6
**lines** [1] - 164:20
**listed** [5] - 19:23, 20:19, 23:2, 76:21, 112:13
**listen** [4] - 57:2, 57:7, 60:7, 104:19
**listened** [1] - 58:20
**live** [6] - 109:10, 109:14, 109:18, 109:20, 110:16, 115:5
**lives** [2] - 109:21, 109:22
**living** [4] - 18:7, 109:4, 109:16, 115:4
**load** [74] - 14:15, 14:16, 14:17, 16:22, 17:12, 26:6, 30:8, 30:15, 30:25, 31:5, 31:6, 31:12, 31:15, 31:19, 32:3, 32:6, 32:7, 32:10, 32:23, 33:2, 37:11, 39:20, 39:24, 40:1, 40:11, 40:15, 40:19, 41:2, 41:8, 42:16, 51:23, 52:8, 55:17, 64:10, 64:16, 64:20, 64:21, 65:8, 65:10, 65:16, 67:3, 67:5, 70:7, 71:9, 73:8, 73:9, 85:1, 85:8, 85:10, 86:2, 86:24, 102:15, 102:18, 102:24, 103:3, 111:10, 111:15, 111:18, 115:15, 115:20, 121:2, 122:12, 122:14, 128:21, 132:7, 132:11, 133:13, 156:1, 162:21, 163:8,

164:5, 164:7, 164:8
**loaded** [5] - 14:6, 14:11, 14:19, 14:21, 49:25
**loading** [3] - 129:3, 129:10, 129:13
**loads** [1] - 132:2
**local** [1] - 140:14
**locality** [1] - 18:2
**located** [4] - 31:9, 40:23, 90:25, 91:3
**location** [12] - 25:17, 41:4, 55:14, 120:9, 143:17, 149:22, 150:9, 151:19, 152:10, 152:18, 152:23, 156:13
**locations** [2] - 26:14, 102:4
**locking** [2] - 130:22, 131:2
**log** [11] - 31:17, 36:18, 36:19, 37:18, 38:4, 117:10, 121:7, 125:1, 126:17, 131:9, 131:14
**logs** [3] - 116:13, 116:18, 125:11
**look** [31] - 5:14, 19:13, 20:20, 21:23, 25:6, 27:6, 34:20, 36:23, 42:8, 63:15, 66:19, 66:23, 71:5, 72:6, 75:23, 76:19, 77:6, 78:23, 87:4, 89:23, 91:6, 94:2, 94:20, 96:25, 116:18, 119:17, 121:7, 129:24, 129:25, 151:8, 158:21
**looked** [2] - 130:1, 159:14, 162:17
**looking** [20] - 9:4, 12:15, 13:13, 49:5, 49:8, 54:10, 62:12, 63:14, 72:5, 95:4, 95:13, 127:5, 132:11, 139:15, 141:15, 142:13, 145:1, 150:14, 151:16, 156:18
**looks** [4] - 21:5, 21:11, 21:16, 21:19
**lose** [2] - 50:11, 111:15
**loss** [2] - 111:21, 111:22
**lost** [8] - 56:18, 61:13, 62:12, 63:24, 95:4, 100:23, 111:18,

153:12
**loud** [1] - 10:25
**luck** [1] - 12:5
**lunch** [1] - 71:21
**LUNCHEON** [1] - 84:6
**lying** [1] - 7:9

**M**

**mailed** [3] - 80:16, 80:19, 82:2
**main** [1] - 42:9
**maintain** [1] - 37:17
**major** [2] - 62:14, 62:18, 62:24
**man** [12] - 7:17, 87:8, 87:13, 87:17, 90:6, 90:9, 91:24, 94:5, 99:13, 161:21, 162:17, 165:12
**Manatee** [1] - 53:15
**manifest** [2] - 25:16, 26:2
**marijuana** [59] - 5:21, 6:5, 6:14, 6:23, 7:9, 7:11, 7:12, 7:13, 8:7, 15:24, 23:10, 23:12, 29:18, 30:8, 40:15, 64:11, 64:17, 64:21, 70:9, 89:15, 89:17, 89:18, 89:19, 90:23, 90:25, 91:3, 91:4, 91:8, 91:13, 91:14, 91:16, 91:19, 92:3, 92:6, 92:7, 92:12, 92:14, 92:17, 92:19, 92:22, 92:24, 93:3, 94:5, 94:8, 94:12, 99:3, 99:10, 99:14, 125:1, 140:5, 140:10, 147:11, 155:5, 155:11, 164:8, 164:11, 164:13, 164:16, 164:17
**Marijuana** [1] - 6:18
**market** [1] - 126:25
**marks** [2] - 131:2
**married** [1] - 109:2
**Marshals** [3] - 145:1, 146:3, 146:9
**match** [3] - 36:18, 67:9, 80:10
**matches** [1] - 81:9
**material** [1] - 173:2
**matter** [2] - 170:15, 171:15
**matters** [1] - 105:3
**McGraw** [4] - 107:20,

107:21, 107:24, 108:2
**McGraw-Hill** [4] -
107:20, 107:21,
107:24, 108:2
**mean** [22] - 8:5, 8:14,
9:4, 9:7, 13:1, 13:9,
17:20, 18:1, 21:6,
21:12, 26:10, 35:20,
45:15, 70:20, 71:8,
99:10, 118:4, 119:3,
119:21, 121:18,
145:13, 171:17
**meaning** [1] - 10:24
**meanings** [2] - 96:9,
96:18
**means** [9] - 8:15,
17:15, 26:4, 55:18,
83:15, 96:15, 118:1,
118:2, 158:7
**meant** [4] - 8:6, 11:8,
12:23, 35:22
**measure** [1] - 21:7
**meat** [1] - 122:17
**mechanism** [2] -
130:17, 131:3
**mechanisms** [1] -
130:22
**meet** [9] - 52:10,
55:8, 112:4, 150:22,
167:4, 167:16, 168:9,
169:8, 169:10
**meeting** [3] - 150:22,
151:1, 168:15
**MEMBERS** [1] - 4:13
**members** [1] -
109:13
**memory** [1] - 97:23
**men's** [1] - 132:19
**mention** [1] - 170:14
**mentioned** [2] -
35:20, 174:25
**mercer** [1] - 106:20
**Mercer** [1] - 107:10
**merchandise** [3] -
65:18, 66:10, 102:6
**merge** [1] - 55:6
**merges** [1] - 55:5
**messing** [4] - 12:20,
12:24, 13:2, 13:5
**met** [4] - 112:5,
112:14, 113:15,
114:12
**metropolitan** [1] -
52:21
**Mexico** [1] - 121:25
**Miami** [2] - 1:21,
133:10
**mic** [1] - 167:7
**microphone** [4] -
20:9, 114:4, 127:24,

148:17
**mid** [2] - 115:3,
115:8
**middle** [1] - 67:22
**MIDDLE** [1] - 1:1
**midnight** [6] -
119:11, 120:19,
121:13, 121:21,
122:7, 127:19
**might** [10] - 41:4,
70:19, 82:24, 87:19,
102:6, 114:13, 124:4,
130:16, 168:18
**migrated** [1] - 105:14
**mile** [5] - 49:24, 50:2,
50:5, 50:7, 50:8
**miles** [11] - 49:15,
49:17, 49:22, 49:23,
50:8, 50:12, 54:14,
55:12, 55:13, 55:18,
153:17
**mind** [3] - 47:25,
100:2, 134:12
**minus** [13] - 7:21,
17:14, 17:17, 85:5,
86:3, 86:13, 86:14,
86:15, 86:19, 87:1,
87:22, 87:23
**minute** [3] - 71:20,
99:1, 116:14
**minutes** [10] - 38:25,
58:5, 58:7, 119:16,
120:1, 128:1, 138:5,
171:4, 171:6
**Miramar** [3] - 110:17,
145:2, 146:4
**miss** [1] - 34:21
**Miss** [2] - 87:5,
168:25
**missing** [1] - 160:7
**Missouri** [4] - 26:15,
26:16
**mistake** [2] - 131:24,
143:6
**Mitchell** [1] - 112:20
**MLK** [1] - 1:23
**moment** [8] - 24:23,
29:14, 67:8, 79:25,
151:4, 166:10,
169:13, 169:20
**Monday** [7] - 83:16,
83:24, 84:1, 170:12,
173:10, 174:3, 175:12
**money** [4] - 42:21,
50:11, 55:18, 55:19
**moon** [2] - 161:13
**morning** [16] - 4:11,
4:13, 30:1, 30:2,
60:12, 83:24, 84:1,
119:12, 121:21,

121:22, 127:12,
131:7, 133:6, 170:12,
174:3
**most** [1] - 111:23
**motel** [1] - 123:17
**Motel** [1] - 34:15
**mother** [1] - 109:20
**motion** [2] - 95:17,
130:8
**Motor** [1] - 22:17
**mouth** [1] - 157:17
**move** [12] - 11:17,
16:25, 20:1, 22:2,
25:13, 27:9, 60:11,
72:8, 79:18, 90:12,
93:23, 93:25
**moved** [1] - 110:5
**MR** [287] - 3:4, 3:5,
3:6, 3:8, 3:9, 3:10,
4:19, 4:25, 5:6, 5:9,
5:12, 6:25, 7:6, 7:7,
10:22, 11:5, 11:17,
11:20, 11:22, 11:25,
13:25, 14:4, 16:10,
16:13, 16:25, 17:2,
17:3, 17:6, 17:10,
19:8, 19:11, 19:12,
19:16, 19:18, 19:20,
19:25, 20:3, 20:4,
20:13, 22:2, 22:4,
22:7, 22:11, 22:13,
22:15, 23:1, 23:17,
24:13, 24:17, 24:20,
24:23, 25:3, 25:4,
25:13, 25:16, 25:20,
25:23, 26:1, 26:22,
27:1, 27:4, 27:8,
27:11, 28:2, 28:4,
28:9, 28:14, 28:17,
29:13, 29:16, 29:21,
29:25, 32:1, 33:22,
34:1, 34:20, 34:23,
35:22, 35:25, 36:4,
36:6, 36:23, 36:25,
43:12, 48:24, 51:4,
51:24, 52:3, 58:19,
61:3, 61:4, 62:22,
66:3, 66:13, 66:15,
66:18, 67:7, 67:15,
68:3, 68:17, 69:4,
69:8, 69:11, 69:15,
69:18, 69:24, 70:6,
70:12, 71:7, 71:11,
71:15, 71:18, 71:19,
71:25, 72:8, 72:11,
72:15, 72:18, 72:22,
75:22, 76:3, 76:6,
76:9, 76:10, 76:11,
78:6, 78:8, 79:3, 79:7,
79:11, 79:14, 79:18,

79:21, 79:24, 80:4,
80:16, 80:19, 80:23,
81:9, 81:14, 81:22,
82:4, 82:7, 82:23,
83:2, 83:7, 83:13,
83:17, 83:19, 84:2,
84:14, 87:5, 87:6,
88:15, 88:16, 89:12,
89:13, 89:23, 89:25,
90:11, 90:14, 90:18,
90:19, 93:8, 93:9,
94:18, 94:19, 96:23,
96:24, 98:10, 98:12,
98:14, 98:19, 98:20,
99:23, 100:1, 100:5,
100:25, 101:2,
103:12, 103:15,
103:19, 103:21,
104:15, 105:8,
105:12, 105:15,
105:19, 106:7, 106:9,
106:10, 107:11,
114:7, 123:24, 124:2,
125:3, 125:6, 127:1,
127:25, 137:25,
138:1, 140:19,
140:21, 143:2, 143:6,
143:8, 144:4, 144:6,
144:14, 144:17,
144:24, 145:3, 145:5,
145:11, 145:15,
145:18, 146:18,
146:24, 147:3, 147:6,
147:13, 148:6, 148:8,
148:16, 148:21,
151:8, 151:11,
154:12, 154:14,
158:17, 158:20,
158:25, 159:2,
159:22, 159:24,
160:2, 161:15,
161:18, 162:25,
163:5, 163:7, 163:11,
163:15, 165:25,
166:6, 166:9, 166:12,
166:20, 166:22,
167:1, 167:2, 167:13,
168:1, 168:3, 168:6,
168:24, 169:2, 169:4,
169:12, 169:16,
169:19, 169:24,
170:8, 170:11,
170:18, 170:21,
170:22, 171:2, 171:3,
171:5, 171:7, 171:14,
171:15, 171:21,
172:2, 172:4, 172:8,
172:11, 174:10,
174:12, 174:14,
174:20, 174:22,
174:23, 175:6,

175:10, 175:14
**must** [3] - 12:14,
137:21, 172:22
**myra** [1] - 109:7
**Myra** [1] - 109:10

**N**

**name** [14] - 30:4,
41:5, 59:18, 63:9,
63:15, 104:11,
104:12, 109:6,
110:23, 111:24,
113:14, 123:11,
156:11, 156:13
**named** [2] - 47:5,
134:8
**names** [5] - 174:16,
174:22, 174:24,
175:2, 175:5
**native** [1] - 104:24
**nature** [2] - 51:25,
153:13
**navigation** [3] -
148:15, 149:9, 149:12
**near** [6] - 46:13,
52:12, 52:18, 89:14,
133:15, 134:10
**nearest** [1] - 49:23
**necessities** [1] -
44:14
**need** [15] - 15:16,
53:21, 57:2, 81:21,
88:13, 108:12, 121:7,
123:3, 124:7, 171:16,
174:8
**needed** [2] - 84:3,
154:18
**needs** [1] - 161:10
**Nevada** [1] - 26:16
**never** [19] - 14:6,
61:13, 64:23, 67:23,
69:9, 88:12, 91:16,
95:11, 95:18, 95:19,
112:24, 116:2,
122:22, 124:7,
130:10, 130:18,
130:24, 157:18, 166:2
**new** [1] - 33:13
**New** [16] - 106:4,
106:11, 106:21,
109:12, 109:14,
109:18, 109:21,
109:23, 115:6, 116:5,
121:25, 144:10,
144:20, 146:1,
146:11, 166:3
**news** [1] - 145:11
**next** [34] - 13:21,

14:5, 25:2, 35:14, 35:18, 36:9, 36:13, 37:14, 53:25, 56:18, 59:17, 60:4, 61:24, 62:1, 62:3, 62:5, 62:9, 74:18, 89:11, 108:3, 117:16, 119:10, 120:24, 124:21, 127:17, 128:4, 128:21, 132:6, 134:4, 135:15, 139:3, 140:1, 140:10, 172:18
**nice** [1] - 175:13
**nickel** [1] - 144:19
**night** [3] - 120:12, 122:1, 156:4
**NM** [1] - 35:6
**nobody** [2] - 8:11, 88:21
**none** [1] - 155:14
**noon** [3] - 71:16, 82:11
**noontime** [1] - 70:23
**normal** [7] - 7:24, 19:5, 32:25, 33:4, 86:21, 125:15, 125:16
**North** [2] - 1:17, 2:6
**north** [6] - 53:20, 54:18, 54:23, 55:5, 55:9, 55:10
**nose** [1] - 91:7
**notated** [1] - 76:22
**noted** [3] - 34:25, 72:12, 74:19
**notes** [1] - 175:18
**Nothing** [2] - 8:11, 174:12
**nothing** [13] - 4:22, 8:8, 8:15, 12:16, 15:20, 39:16, 103:15, 104:2, 104:7, 118:3, 121:3, 142:21, 174:10
**notice** [1] - 131:1
**nowhere** [2] - 52:12, 52:18
**number** [29] - 19:17, 25:11, 27:10, 27:20, 28:24, 48:16, 48:20, 49:3, 49:9, 51:7, 56:1, 64:15, 67:21, 68:23, 75:9, 76:5, 77:13, 77:18, 77:20, 77:22, 77:24, 78:1, 78:12, 78:21, 98:17, 100:24, 101:24, 112:13, 133:12
**numbers** [22] - 26:7, 26:10, 68:9, 69:25, 73:17, 73:18, 73:19, 74:19, 76:20, 76:21,

76:23, 77:1, 77:4, 77:8, 77:10, 77:11, 78:25, 79:1, 79:15, 80:10, 80:11, 81:10

## O

**o'clock** [16] - 35:3, 35:8, 37:3, 37:5, 37:25, 38:18, 38:22, 39:2, 39:6, 39:9, 39:13, 82:15, 84:1, 173:2
**O-Z** [1] - 156:20
**oatmeal** [1] - 101:12
**object** [2] - 7:3, 79:4
**objection** [30] - 6:25, 17:2, 17:5, 17:6, 20:3, 22:4, 25:19, 33:23, 51:24, 72:10, 81:1, 82:5, 99:23, 105:8, 105:15, 123:24, 125:3, 140:19, 143:2, 144:4, 144:14, 144:23, 145:3, 154:12, 159:24, 162:25, 163:11, 165:25, 166:20, 168:1
**obliged** [1] - 71:1
**obtain** [1] - 34:3
**obvious** [1] - 11:15
**obviously** [4] - 15:22, 67:18, 80:13, 93:10
**occasions** [3] - 114:21, 144:21, 146:2
**October** [1] - 21:21
**odometer** [1] - 153:18
**OF** [4] - 1:1, 1:3, 1:12, 4:13
**offense** [1] - 144:19
**offer** [3] - 24:9, 27:25, 28:1
**offered** [4] - 22:25, 49:9, 70:5, 79:10
**offering** [1] - 81:19
**Office** [2] - 1:17, 2:1
**officer** [16] - 5:19, 5:20, 5:25, 6:4, 6:9, 6:13, 9:21, 14:5, 14:11, 14:20, 14:25, 15:11, 15:19, 16:4, 94:4
**OFFICER** [12] - 4:2, 4:5, 4:8, 60:15, 60:20, 60:24, 82:16, 84:8, 147:20, 147:25, 148:4, 174:5

**officers** [3] - 9:4, 11:12, 13:16
**offices** [1] - 159:13
**official** [1] - 140:13
**Official** [2] - 2:5, 175:22
**officially** [2] - 116:10, 117:24
**often** [1] - 120:4
**oil** [1] - 119:24
**old** [2] - 105:24, 106:1
**older** [1] - 112:9
**once** [8] - 54:7, 87:23, 95:16, 99:12, 115:16, 117:21, 140:22, 150:15
**one** [72] - 9:1, 9:4, 9:5, 9:22, 9:25, 13:1, 21:20, 26:6, 26:11, 29:13, 32:15, 33:16, 39:3, 39:5, 39:10, 39:14, 42:1, 42:3, 42:16, 43:3, 43:5, 43:6, 45:18, 51:17, 61:23, 66:8, 68:4, 68:20, 70:15, 73:6, 74:23, 75:9, 88:9, 88:21, 98:3, 98:5, 100:22, 101:14, 101:21, 103:9, 111:2, 123:1, 133:7, 135:1, 136:17, 136:18, 136:19, 136:24, 136:25, 137:2, 137:3, 137:7, 139:24, 140:1, 146:18, 146:21, 153:20, 154:10, 156:15, 160:7, 160:9, 161:8, 161:9, 161:14, 162:18, 163:6, 164:10, 164:13, 165:6, 171:15
**ones** [1] - 69:19
**open** [6] - 7:22, 7:24, 12:21, 86:19, 87:23, 170:1
**opened** [3] - 42:15, 65:23, 86:16
**opening** [1] - 24:3
**opens** [1] - 13:17
**operate** [1] - 49:24
**opportunities** [1] - 105:23
**opportunity** [3] - 115:10, 163:2, 163:4
**order** [6] - 30:14, 32:13, 32:16, 53:18, 68:4, 122:19
**ordered** [4] - 18:13,

162:21, 163:8, 164:5
**ordinarily** [1] - 174:18
**organization** [1] - 70:10
**originally** [2] - 90:1, 131:22
**Os** [1] - 156:19
**otherwise** [3] - 38:3, 38:7, 146:25
**Ottawa** [1] - 26:17
**outlining** [1] - 74:20
**outside** [3] - 8:22, 11:16, 174:2
**overhead** [1] - 116:21
**overlap** [1] - 6:19
**overruled** [3] - 33:25, 105:9, 166:1
**own** [5] - 47:24, 113:24, 124:14, 144:19, 160:22
**OZ** [2] - 138:21, 156:8
**Oz** [56] - 46:1, 46:3, 46:17, 46:18, 47:5, 47:10, 48:10, 48:13, 48:14, 48:19, 48:21, 48:25, 49:2, 49:9, 49:12, 49:14, 49:15, 50:8, 50:9, 50:14, 51:10, 51:21, 52:4, 54:2, 54:3, 55:12, 55:21, 56:8, 56:10, 56:11, 56:22, 61:7, 64:3, 64:5, 64:16, 88:23, 96:1, 96:2, 134:8, 135:8, 138:20, 148:12, 150:15, 150:25, 151:1, 151:2, 151:3, 155:19, 155:24, 156:8, 156:10, 156:20, 156:22, 169:8
**Ozark** [1] - 26:14

## P

**p.m** [15] - 29:10, 35:4, 35:7, 35:8, 35:11, 36:14, 37:3, 37:5, 37:6, 37:25, 38:12, 38:21, 38:22, 117:23, 151:14
**packages** [1] - 68:7
**Page** [34] - 5:14, 6:17, 6:24, 7:8, 7:16, 8:10, 9:9, 9:16, 10:9, 12:1, 12:17, 13:15,

13:21, 13:24, 15:2, 73:12, 87:2, 91:11, 91:22, 93:10, 93:13, 94:20, 94:21, 98:17, 99:2, 99:9, 100:11, 100:16, 161:16, 163:25, 164:19, 165:7, 165:16
**PAGE** [1] - 3:2
**page** [43] - 13:21, 14:5, 14:20, 35:14, 35:18, 36:9, 36:13, 66:13, 66:22, 67:16, 68:16, 68:17, 73:20, 74:18, 74:20, 75:13, 75:14, 75:25, 77:7, 77:18, 77:20, 77:22, 77:24, 78:1, 78:3, 78:10, 78:13, 78:18, 78:21, 88:15, 89:12, 89:14, 89:15, 89:24, 90:3, 90:15, 90:24, 93:8, 94:24, 96:23, 131:13, 165:9, 175:2
**pages** [8] - 66:24, 67:1, 67:16, 67:22, 68:2, 68:15, 72:2, 151:16
**paid** [5] - 50:6, 111:8, 115:25, 116:2, 130:24
**pales** [1] - 70:8
**pallet** [8] - 42:3, 65:9, 65:10, 65:20, 65:22, 68:4, 68:20, 75:9
**pallets** [9] - 42:4, 42:17, 65:3, 65:5, 65:14, 66:8, 68:23, 73:25, 75:7
**Paola** [1] - 26:17
**paper** [13] - 16:17, 19:22, 19:24, 20:14, 20:18, 20:24, 21:23, 27:5, 32:12, 42:7, 75:3, 129:15, 129:16
**papers** [6] - 19:3, 19:7, 32:5, 32:10, 74:8, 111:12
**paperwork** [13] - 18:21, 18:25, 19:4, 25:8, 42:2, 42:11, 122:25, 123:2, 123:4, 123:22, 124:3, 128:20, 129:12
**parallel** [1] - 146:23
**pardon** [2] - 72:17, 80:18
**parentheses** [1] - 119:2

SANDRA K. LEE, RPR    OFFICIAL UNITED STATES COURT REPORTER

**park** [4] - 98:7, 152:6, 152:8, 152:11
**parked** [13] - 33:5, 34:14, 37:6, 37:10, 38:11, 38:18, 39:1, 39:5, 39:7, 39:13, 124:10, 152:21, 154:9
**Parker** [1] - 113:8
**parking** [6] - 125:14, 151:22, 152:3, 152:5, 152:15, 152:24
**Parra** [5] - 95:7, 95:15, 113:14, 162:23, 163:9
**part** [13] - 23:7, 25:8, 75:16, 84:23, 94:1, 96:6, 102:15, 102:18, 103:3, 118:5, 139:20, 165:7, 173:9
**participate** [1] - 155:20
**particular** [18] - 32:17, 37:23, 45:23, 68:7, 68:11, 70:7, 72:23, 80:11, 81:15, 92:9, 102:6, 110:21, 111:9, 112:12, 121:6, 122:20, 130:21, 136:13
**pass** [5] - 29:21, 49:3, 108:16, 108:18, 150:3
**passed** [18] - 49:9, 56:17, 58:24, 59:17, 61:7, 61:11, 61:23, 62:11, 62:14, 135:13, 136:1, 149:22, 149:23, 150:7, 150:9, 150:15, 156:13
**passenger** [4] - 118:9, 118:13, 118:15, 148:12
**past** [4] - 56:7, 112:15, 135:11, 147:16
**Patrol** [3] - 136:6, 139:6, 147:9
**patrol** [7] - 84:20, 88:8, 139:17, 157:13, 157:15, 160:17, 160:24
**patrolman** [1] - 137:4
**Patrolman** [1] - 138:2
**pause** [1] - 96:2
**PAUSE** [4] - 4:7, 25:1, 60:23, 148:3
**pay** [10] - 50:3, 50:4, 50:13, 111:12,

111:19, 123:3, 123:14, 123:20, 123:21
**payable** [1] - 107:25
**payment** [1] - 111:17
**pays** [1] - 50:7
**people** [15] - 13:3, 14:19, 44:22, 44:25, 46:3, 46:14, 161:5, 161:7, 161:12, 161:14, 161:25, 162:6, 162:12, 164:2, 164:11
**per** [4] - 50:2, 50:5, 50:7, 50:8
**perhaps** [2] - 54:4, 70:17
**period** [9] - 23:6, 26:23, 33:11, 34:4, 34:16, 36:11, 151:23, 154:1, 155:2
**permission** [6] - 15:13, 19:9, 25:23, 31:21, 142:4, 142:5
**person** [49] - 31:23, 46:18, 47:10, 51:8, 56:1, 56:2, 56:21, 59:21, 59:22, 61:10, 63:22, 64:8, 64:9, 64:13, 64:14, 95:7, 132:9, 134:6, 134:9, 134:21, 135:25, 136:2, 136:9, 136:11, 149:17, 150:1, 150:11, 150:19, 150:24, 151:1, 151:2, 161:8, 161:9, 161:14, 162:7, 162:7, 162:13, 162:14, 162:21, 163:8, 163:17, 163:21, 163:22, 164:5, 164:11, 164:14, 164:15, 166:18, 168:13
**personal** [1] - 112:7
**personally** [1] - 146:5
**persons** [2] - 63:23, 174:17
**pertained** [1] - 35:7
**pertinent** [2] - 11:6, 24:14
**phase** [1] - 149:11
**Phoenix** [1] - 38:13, 38:21, 39:7, 40:6, 40:14, 40:16, 98:7, 124:25, 126:7, 153:25, 154:3
**phone** [47] - 6:7, 7:10, 9:10, 9:14,

10:10, 26:7, 48:16, 51:7, 56:1, 56:21, 59:4, 59:21, 61:10, 63:22, 64:15, 97:19, 98:3, 98:5, 115:9, 115:12, 115:20, 133:19, 133:21, 134:1, 134:2, 136:9, 136:15, 136:22, 137:9, 137:12, 137:14, 139:18, 140:2, 149:18, 149:24, 157:5, 157:22, 158:2, 158:4, 160:20, 160:21, 160:22, 160:23, 166:15
**phones** [14] - 136:17, 136:19, 136:23, 137:6, 137:13, 137:19, 138:24, 157:21, 158:23, 159:4, 159:7, 159:18, 160:3, 160:7
**photocopy** [1] - 82:2
**pick** [19] - 5:4, 16:22, 17:12, 17:13, 17:23, 26:6, 31:1, 31:4, 31:6, 39:20, 40:1, 40:15, 43:8, 44:13, 52:18, 102:3, 124:25, 132:12, 144:9
**picked** [7] - 17:11, 23:10, 116:5, 126:22, 128:9, 160:19, 164:6
**picking** [6] - 16:14, 66:4, 74:24, 102:10, 102:13, 128:25
**piece** [4] - 16:17, 20:24, 21:23, 27:5
**pieces** [1] - 26:9
**Pinellas** [7] - 143:18, 143:19, 143:23, 144:12, 146:5, 163:18
**place** [27] - 41:6, 46:15, 46:16, 46:17, 49:12, 49:23, 56:17, 58:24, 59:17, 61:24, 62:13, 92:11, 95:19, 101:21, 107:17, 130:2, 132:8, 132:10, 149:23, 150:23, 151:22, 152:8, 152:23, 156:3, 156:7, 156:11, 164:6
**placed** [2] - 53:3, 139:16
**places** [9] - 18:20, 24:1, 26:18, 50:3, 95:4, 95:13, 102:7,

102:8, 153:22
**Plaintiff** [1] - 1:5
**plan** [1] - 151:1
**play** [1] - 129:2
**playing** [1] - 57:8
**pleasure** [1] - 175:3
**PO** [1] - 1:23
**point** [26] - 8:18, 12:10, 34:10, 39:19, 42:14, 43:19, 51:15, 56:7, 60:13, 64:8, 69:1, 86:6, 86:7, 116:9, 125:23, 129:18, 133:1, 139:22, 140:3, 147:16, 155:23, 160:15, 171:12, 173:8, 173:12, 175:3
**pointed** [1] - 153:1
**police** [48] - 5:19, 5:20, 5:25, 6:4, 6:20, 8:20, 8:22, 9:14, 10:3, 10:8, 10:14, 11:12, 14:2, 16:4, 53:7, 88:20, 89:18, 89:22, 90:22, 91:17, 92:5, 92:11, 92:17, 92:23, 93:2, 93:6, 93:14, 94:11, 100:12, 100:18, 117:15, 118:16, 125:12, 136:4, 136:9, 140:14, 140:18, 141:12, 150:21, 157:20, 159:8, 164:21, 164:23, 165:3, 165:6
**police's** [1] - 137:21
**policemen** [1] - 11:16
**Polk** [1] - 50:18
**portion** [6] - 73:9, 88:25, 90:12, 92:10, 124:16, 160:25
**portions** [3] - 10:25, 11:6, 84:22
**position** [3] - 152:22, 160:13, 174:24
**possession** [2] - 71:2, 155:10
**possibility** [1] - 141:4
**possible** [6] - 42:22, 43:3, 126:5, 126:6, 130:19, 133:11
**post** [1] - 144:1
**pounds** [2] - 23:12, 29:18, 30:7
**predicate** [5] - 23:23, 80:22, 81:21, 81:23, 82:3

**prefer** [1] - 174:20
**prefix** [1] - 76:24
**prefixes** [1] - 73:18
**preliminary** [2] - 23:17, 105:16
**prepared** [1] - 170:7
**preparing** [1] - 23:19
**presence** [1] - 51:12
**present** [1] - 14:21
**presentation** [2] - 172:19, 173:3
**presented** [1] - 172:16
**presenting** [1] - 33:20
**presently** [1] - 109:2
**presiding** [1] - 4:9
**PRESTON** [117] - 1:16, 3:5, 3:9, 6:25, 17:2, 17:6, 20:3, 22:4, 25:20, 29:25, 32:1, 34:1, 34:20, 34:23, 35:22, 35:25, 36:4, 36:6, 36:23, 36:25, 43:12, 48:24, 51:4, 52:3, 58:19, 61:3, 61:4, 62:22, 66:1, 66:3, 66:15, 66:18, 68:3, 68:17, 69:4, 69:15, 69:18, 69:24, 70:6, 71:25, 72:8, 72:15, 72:18, 72:22, 75:22, 76:6, 76:9, 76:11, 78:6, 78:8, 79:11, 79:14, 79:18, 80:16, 80:19, 80:23, 81:9, 81:14, 81:22, 82:4, 82:7, 83:2, 84:14, 87:5, 87:6, 88:15, 88:16, 89:12, 89:13, 89:23, 89:25, 90:14, 90:19, 93:8, 93:9, 94:18, 94:19, 96:23, 96:24, 98:10, 98:19, 99:23, 103:15, 105:8, 105:15, 123:24, 125:3, 140:19, 143:2, 144:4, 144:14, 145:3, 148:6, 148:8, 148:16, 148:21, 151:8, 151:11, 154:14, 158:17, 158:20, 159:2, 159:22, 160:2, 161:15, 161:18, 163:7, 163:15, 166:6, 166:20, 168:1, 170:8, 171:2, 171:14, 172:2, 174:10, 174:23
**Preston** [11] - 61:2,

67:24, 80:15, 82:11, 82:24, 83:1, 99:1, 103:14, 113:8, 148:5, 172:1

**pretravel** [2] - 153:6, 153:9

**pretrial** [1] - 23:3

**pretrip** [2] - 121:15, 121:19

**pretty** [6] - 50:15, 104:19, 130:8, 132:9, 133:20, 139:11

**previous** [3] - 74:20, 94:14, 117:5

**previously** [2] - 4:21, 72:11

**primarily** [1] - 109:20

**prison** [1] - 99:21

**problem** [4] - 15:13, 57:3, 89:20, 102:23

**procedure** [1] - 170:15

**proceed** [6] - 7:5, 27:3, 54:7, 54:11, 56:14, 56:24

**proceeded** [2] - 59:11, 63:7

**PROCEEDING** [11] - 4:7, 11:24, 24:22, 25:1, 28:12, 60:23, 71:24, 82:9, 147:5, 148:3, 171:23

**proceeding** [2] - 61:5, 105:4

**PROCEEDINGS** [4] - 60:19, 84:7, 147:24, 175:15

**proceeds** [1] - 53:15

**process** [2] - 115:5, 162:20

**processing** [2] - 108:1

**produced** [1] - 85:9

**product** [1] - 102:3

**products** [4] - 18:17, 64:25, 65:3, 85:9

**progress** [1] - 10:20

**prompting** [1] - 48:15

**promptly** [1] - 4:16

**pronounce** [1] - 156:24

**pronounced** [1] - 157:1

**pronunciation** [1] - 97:2

**proper** [1] - 175:7

**properly** [1] - 31:24

**prosecutor** [1] - 163:1

**provide** [1] - 71:4

**provided** [4] - 63:11, 63:17, 69:21, 165:3

**providing** [1] - 64:14

**PTI** [1] - 121:18

**Public** [1] - 28:19

**publish** [9] - 17:3, 17:8, 20:4, 20:7, 22:11, 25:24, 28:14, 72:15, 72:18

**pull** [2] - 18:14, 114:4

**pulled** [1] - 136:5

**pulling** [2] - 138:8, 147:10

**purpose** [4] - 68:2, 70:4, 81:7, 81:17

**purposes** [2] - 69:7, 71:3

**pushes** [1] - 169:3

**put** [29] - 7:21, 12:7, 14:16, 16:23, 22:1, 37:24, 65:5, 65:6, 86:18, 86:20, 87:3, 88:8, 93:15, 93:16, 93:17, 93:22, 101:1, 103:9, 117:21, 129:16, 131:22, 136:24, 138:24, 138:25, 157:16, 158:4, 170:9

**puts** [1] - 154:3

**putting** [1] - 50:12

## Q

**questioning** [3] - 84:24, 98:22, 98:25

**questions** [9] - 7:1, 41:15, 83:21, 88:21, 105:5, 124:1, 138:7, 138:23, 166:7

**quite** [4] - 11:15, 46:5, 83:10, 107:8

## R

**radio** [2] - 6:20, 6:21

**raise** [1] - 103:24

**raisin** [1] - 101:12

**Ramiro** [2] - 162:23, 163:9

**random** [14] - 44:13, 45:1, 46:18, 47:10, 48:15, 51:8, 56:2, 64:6, 64:8, 64:14, 64:15

**rang** [1] - 136:9

**rather** [2] - 173:1,

173:15

**reached** [1] - 160:13

**reaching** [1] - 82:10, 172:22

**read** [5] - 7:2, 13:23, 67:19, 97:5, 131:18

**readjust** [1] - 143:11

**ready** [2] - 156:1, 164:15

**real** [1] - 71:6

**realize** [2] - 61:6, 133:2

**really** [4] - 14:25, 121:2, 123:3, 123:22

**rear** [2] - 84:19, 118:5

**reason** [7] - 12:16, 56:16, 62:17, 62:23, 73:25, 74:5, 74:10, 74:15, 74:17, 154:11, 167:15

**reasonably** [1] - 173:3

**rebut** [2] - 23:9, 24:2

**rebuttal** [3] - 170:3, 170:6, 170:8

**receipt** [5] - 32:5, 33:12, 33:14, 154:18, 173:25

**receive** [4] - 40:19, 65:8, 109:25, 164:15

**received** [9] - 17:7, 20:6, 25:21, 68:6, 72:14, 79:5, 79:7, 80:24, 168:22

**RECEIVED** [1] - 3:17

**receiving** [5] - 40:10, 42:13, 59:20, 69:25, 115:9

**recently** [3] - 67:18, 67:24, 98:16

**recess** [9] - 60:13, 82:12, 82:15, 84:5, 147:15, 171:12, 173:6, 173:7, 174:2

**RECESS** [3] - 60:18, 84:6, 147:23

**recognize** [6] - 16:18, 16:20, 19:21, 25:6, 34:24, 158:22

**recollect** [1] - 60:9

**recollection** [1] - 168:18

**recommend** [1] - 24:15

**reconvene** [4] - 60:13, 83:16, 147:16, 174:3

**record** [9] - 7:2, 27:18, 27:23, 34:6,

34:7, 104:12, 146:15, 155:14, 171:20

**recording** [2] - 10:22, 97:15

**recordings** [1] - 61:20

**records** [3] - 30:22, 33:10, 154:16

**redacted** [1] - 174:17

**redacting** [1] - 175:5

**redirect** [1] - 166:8

**REDIRECT** [2] - 3:9, 166:11

**redundancy** [1] - 7:4

**refer** [3] - 68:18, 164:18, 165:8

**referring** [3] - 148:22, 161:3, 164:1

**refers** [1] - 76:15

**reflect** [2] - 37:6, 151:17

**reflected** [1] - 125:11

**reflecting** [1] - 73:13

**reflects** [7] - 27:23, 35:10, 36:13, 66:8, 73:2, 75:14, 101:10

**refresh** [2] - 97:23, 168:18

**refrigerated** [1] - 85:1

**refrigeration** [3] - 85:14, 85:17, 85:19

**refrigerator** [1] - 125:18

**regard** [15] - 11:14, 30:24, 41:11, 59:12, 64:10, 69:1, 72:19, 75:13, 78:3, 81:6, 81:24, 85:22, 91:22, 96:20, 155:18

**Regency** [1] - 123:19

**regularly** [1] - 152:7

**regulated** [1] - 23:19

**regulations** [1] - 37:20

**reject** [1] - 65:16

**relating** [1] - 23:14

**relationship** [2] - 96:7, 96:17

**relevance** [3] - 22:23, 26:20, 99:24

**relevancy** [7] - 99:23, 105:8, 105:15, 144:4, 144:14, 144:15, 145:3

**relevant** [4] - 23:16, 145:4, 145:13, 145:14

**reliability** [2] - 81:2, 81:24

**reliable** [2] - 80:25,

81:3

**remarks** [2] - 120:8, 155:18

**remember** [43] - 28:20, 59:15, 59:18, 61:15, 61:16, 61:18, 62:16, 63:25, 64:1, 64:4, 88:11, 88:19, 89:4, 89:11, 97:7, 97:10, 97:13, 97:14, 98:21, 98:25, 101:3, 115:12, 116:6, 116:16, 122:15, 123:12, 127:18, 130:20, 131:6, 134:18, 134:19, 135:4, 142:7, 143:12, 143:16, 156:9, 156:20, 160:25, 163:21, 167:14, 167:19, 168:7, 173:22

**remembered** [1] - 16:15

**remind** [1] - 173:13

**remove** [1] - 157:7

**removed** [1] - 65:19

**removing** [3] - 65:24, 97:24, 130:17

**repaired** [1] - 85:19

**repeat** [4] - 51:2, 94:23, 98:24, 116:15

**repeated** [2] - 48:23, 149:25

**repeatedly** [1] - 101:8

**rephrase** [1] - 52:1

**replies** [1] - 90:7

**report** [3] - 28:18, 28:24

**reported** [2] - 2:4, 151:5

**REPORTED** [1] - 2:8

**Reporter** [2] - 2:5, 175:22

**reporting** [1] - 37:2

**represent** [4] - 67:3, 67:5, 95:22, 95:23

**requesting** [1] - 170:16

**require** [1] - 170:2

**required** [2] - 19:1, 120:3, 125:19

**reseal** [1] - 103:6

**residence** [1] - 146:4

**respective** [1] - 173:16

**respond** [2] - 104:20, 165:1

**responded** [1] - 87:12

**respondent** [1] - 31:25

**response** [2] - 11:4, 97:11

**responsibility** [1] - 148:24

**responsible** [3] - 38:16, 132:2, 148:14

**rest** [10] - 44:14, 67:21, 85:24, 118:10, 120:18, 170:4, 170:11, 170:23, 172:6, 172:14

**restart** [1] - 110:12

**restaurant** [4] - 45:8, 46:16, 48:1, 58:13

**rested** [1] - 171:16

**resting** [2] - 124:12, 169:17

**rests** [3] - 103:19, 172:8, 172:12

**resulted** [1] - 155:5

**RESUMED** [7] - 11:24, 24:22, 28:12, 71:24, 82:9, 147:5, 171:23

**RETIRED** [4] - 60:17, 82:20, 147:22, 174:7

**return** [1] - 173:10

**RETURNED** [4] - 4:4, 60:22, 84:10, 148:2

**returned** [1] - 152:15

**reviewed** [2] - 97:15, 97:16

**rib** [1] - 17:13

**Richard** [1] - 113:8

**rig** [3] - 34:13, 118:24, 151:22

**right-hand** [1] - 28:22

**rise** [11] - 4:2, 4:8, 60:15, 60:20, 60:24, 82:16, 84:8, 147:20, 147:25, 148:4, 174:5

**Riverside** [30] - 30:14, 31:3, 31:6, 31:7, 31:8, 31:12, 31:15, 31:19, 32:4, 32:22, 34:15, 35:3, 35:11, 36:15, 37:3, 38:23, 39:1, 39:8, 39:13, 39:25, 40:4, 40:5, 40:9, 125:8, 126:11, 127:6, 151:5, 151:14, 153:10, 154:2

**riveted** [1] - 130:23

**Road** [16] - 41:8, 52:12, 52:16, 53:4, 53:10, 53:12, 53:18, 54:22, 57:23, 58:4,

58:8, 60:3, 60:6, 63:10, 135:5, 135:19

**road** [8] - 45:13, 48:3, 58:7, 63:2, 63:11, 134:10, 150:11

**RODRIGUEZ** [14] - 1:19, 71:19, 83:17, 83:19, 84:2, 163:11, 170:22, 171:3, 171:15, 171:21, 172:4, 174:12, 174:22, 175:6

**Rodriguez** [2] - 83:18, 172:3

**role** [1] - 129:2

**ROOM** [4] - 60:17, 82:20, 147:22, 174:7

**room** [2] - 33:9, 124:14

**Roosevelt** [6] - 88:10, 89:2, 89:5, 89:8, 89:9

**Rosa** [1] - 121:25

**route** [2] - 56:10, 56:16

**Route** [1] - 123:13

**RPR** [2] - 2:4, 175:21

**Rule** [1] - 70:13

**rules** [1] - 172:21

**running** [3] - 37:14, 55:17, 87:15

## S

**safe** [2] - 83:13, 120:21

**Safety** [1] - 28:19

**Sandra** [2] - 2:4, 175:21

**SANDRA** [1] - 175:21

**Santa** [1] - 121:25

**Sarasota** [1] - 52:19

**sat** [1] - 136:8

**satisfied** [1] - 175:9

**saw** [14] - 74:20, 91:9, 122:22, 130:15, 135:11, 135:12, 135:24, 137:8, 137:10, 137:13, 140:25, 141:17, 157:20, 166:4

**scared** [2] - 8:11, 12:4

**scheduling** [1] - 71:21

**school** [10] - 106:5, 106:11, 106:16, 106:24, 107:12, 107:16, 108:5, 108:6,

108:15

**schooling** [1] - 106:23

**Scott** [1] - 26:16

**scramble** [1] - 70:16

**scrape** [1] - 131:2

**screen** [5] - 5:14, 6:18, 12:18, 87:3, 101:1

**Seal** [3] - 75:14, 76:15, 101:19

**seal** [15] - 15:18, 65:21, 65:24, 67:21, 75:8, 86:8, 101:24, 102:20, 103:1, 103:5, 128:20, 128:22, 129:16, 165:13

**seal's** [1] - 86:6

**sealed** [4] - 40:19, 75:8, 130:4, 130:13

**seals** [2] - 103:8, 128:12

**search** [6] - 15:14, 15:15, 16:8, 139:18, 142:3, 142:17

**searched** [2] - 91:18, 142:8

**searching** [4] - 15:8, 16:5, 140:2, 142:11

**seat** [4] - 118:8, 118:9, 118:13, 118:15

**seated** [6] - 4:6, 44:21, 47:25, 61:1, 82:21, 104:10

**seats** [1] - 118:9

**second** [10] - 57:16, 57:21, 57:22, 77:7, 103:5, 103:9, 109:1, 112:21, 128:24, 145:21

**section** [1] - 120:8

**secure** [1] - 30:14

**security** [3] - 103:10, 103:11, 128:20

**SECURITY** [12] - 4:2, 4:5, 4:8, 60:15, 60:20, 60:24, 82:16, 84:8, 147:20, 147:25, 148:4, 174:5

**See** [1] - 6:23

**see** [70] - 5:10, 5:16, 5:19, 6:17, 7:16, 7:18, 7:23, 8:22, 12:14, 17:18, 21:3, 21:24, 35:14, 36:10, 37:2, 52:11, 54:8, 54:12, 66:1, 67:8, 67:21, 69:10, 74:13, 74:18, 75:11, 77:1, 77:4, 77:8, 77:9, 78:25,

79:21, 86:16, 86:24, 87:9, 87:13, 87:16, 87:19, 87:23, 87:24, 88:5, 88:13, 90:5, 90:8, 91:23, 94:21, 95:10, 95:20, 96:2, 97:18, 116:14, 122:19, 131:18, 135:8, 135:16, 139:13, 140:15, 141:12, 142:13, 146:9, 146:22, 146:24, 157:3, 158:25, 163:3, 163:8, 166:19, 169:9, 175:12

**seeing** [3] - 8:18, 12:10, 169:6

**seeking** [1] - 134:5

**seem** [1] - 126:1

**seized** [1] - 23:1

**send** [1] - 33:13

**separate** [1] - 33:9

**separated** [3] - 109:3, 109:4, 109:5

**September** [1] - 104:17

**series** [1] - 166:15

**serious** [2] - 142:20, 144:19

**serve** [1] - 99:21

**served** [1] - 49:10

**services** [2] - 115:25

**session** [2] - 4:10, 60:25

**Set** [1] - 113:2

**set** [7] - 162:10, 162:12, 162:13, 162:16, 162:17, 162:19, 164:14

**settle** [1] - 106:2

**seven** [2] - 26:7, 117:11

**seventeen** [1] - 106:1

**several** [6] - 23:2, 133:2, 149:25, 151:17, 152:6, 161:14

**severe** [1] - 173:15

**shall** [2] - 104:1

**sheet** [2] - 66:4, 74:24

**Sheldon** [5] - 162:23, 162:24, 163:10, 172:6

**SHELDON** [1] - 1:7

**shifting** [1] - 33:23

**shipment** [4] - 17:22, 32:17, 85:13, 85:16

**shipper** [2] - 85:18, 85:23

**shipping** [3] - 32:13,

32:16, 122:19

**shit** [1] - 12:5

**shocked** [5] - 92:6, 94:7, 94:9, 140:11, 141:1

**shop** [1] - 85:18

**short** [2] - 107:8, 111:5

**SHORTER** [1] - 1:7

**Shorter** [7] - 1:20, 112:14, 162:23, 162:24, 163:10, 172:6

**shortly** [1] - 88:8

**show** [25] - 23:19, 31:11, 31:14, 31:18, 31:22, 32:3, 32:10, 32:16, 67:20, 68:3, 68:14, 68:15, 69:20, 70:6, 100:1, 116:20, 117:10, 124:16, 124:18, 124:22, 126:17, 131:12, 168:21

**showed** [4] - 22:6, 131:9, 139:24, 168:17

**showing** [6] - 25:17, 27:1, 27:5, 34:3, 68:10, 125:2

**shown** [4] - 31:23, 70:14, 80:9, 175:1

**shows** [10] - 24:10, 31:17, 35:5, 73:8, 81:15, 101:14, 117:5, 131:22, 146:14, 151:12

**side** [7] - 6:7, 61:10, 63:22, 91:19, 95:10, 124:25, 154:1

**sidebar** [7] - 10:15, 22:19, 27:12, 67:12, 80:1, 170:14, 171:17

**SIDEBAR** [14] - 10:17, 11:23, 22:21, 24:21, 27:14, 28:11, 67:13, 71:23, 80:2, 82:8, 145:9, 147:4, 169:22, 171:22

**sighing** [1] - 14:6

**sign** [10] - 40:19, 42:8, 74:8, 75:1, 123:2, 129:15, 156:25, 157:3

**signature** [6] - 66:12, 66:25, 68:5, 72:2, 72:3, 116:25

**signed** [23] - 42:2, 67:4, 67:5, 68:5, 68:10, 68:12, 69:20, 69:25, 70:1, 73:2, 73:22, 74:6, 74:11,

74:16, 74:21, 74:23, 75:3, 78:3, 80:8, 81:5, 81:11, 81:16, 116:25
**significant** [4] - 50:10, 106:23, 107:17, 155:2
**signifies** [1] - 21:13
**signs** [1] - 123:1
**SIM** [9] - 97:25, 137:16, 158:8, 158:9, 158:10, 158:14, 160:7, 160:10, 160:11
**similar** [3] - 73:6, 73:12, 74:19
**simply** [6] - 11:8, 24:10, 81:19, 82:1, 90:13, 150:25
**sisters** [2] - 105:7, 105:10
**sit** [4] - 118:18, 129:8, 139:3, 148:19
**sitting** [5] - 9:17, 44:22, 45:3, 46:7, 46:15
**six** [4] - 73:14, 73:19, 144:20, 146:2
**Skyway** [1] - 55:4
**sleep** [2] - 43:3, 115:1
**sleeper** [4] - 118:4, 118:12, 121:4, 131:23
**sleeper's** [1] - 127:21
**sleeping** [3] - 43:6, 117:22, 141:17
**slow** [1] - 95:17
**small** [3] - 18:2, 91:12, 118:10
**smash** [4] - 97:11, 137:11, 137:16, 157:8
**smashed** [3] - 157:16, 157:25, 158:4
**smashing** [2] - 98:2, 98:6
**smoke** [8] - 5:20, 5:24, 5:25, 15:23, 15:25, 16:3, 93:1, 140:10
**Smoke** [1] - 5:23
**smoked** [1] - 6:9
**solemnly** [1] - 103:25
**solo** [1] - 18:5
**someone** [4] - 46:12, 46:14, 149:24, 166:15
**someplace** [1] - 132:12
**sometimes** [6] - 98:4, 113:24, 113:25, 114:12, 118:17

**somewhere** [7] - 39:18, 43:14, 45:3, 125:10, 131:8, 131:21, 150:22
**soon** [6] - 7:24, 12:13, 29:1, 100:20, 126:14, 133:10
**sorry** [8] - 13:25, 33:23, 75:18, 78:13, 120:12, 143:7, 148:16, 148:18
**sort** [2] - 26:8, 67:17
**source** [1] - 174:1
**south** [33] - 40:25, 41:4, 41:20, 46:11, 49:2, 49:7, 50:22, 50:25, 51:1, 51:5, 52:9, 52:19, 52:20, 52:23, 52:25, 53:2, 53:8, 53:14, 53:16, 53:19, 53:23, 54:7, 54:11, 54:19, 54:22, 55:9, 55:10, 63:16, 110:6, 110:13, 110:16, 117:8
**space** [1] - 152:24
**speaker** [1] - 167:3
**speaking** [4] - 8:21, 10:13, 88:9, 90:21
**specific** [6] - 27:24, 32:25, 131:10, 164:2, 168:7, 168:10
**specifically** [7] - 76:23, 97:20, 107:23, 148:22, 162:2, 168:19, 169:7
**speculate** [1] - 140:17
**speculating** [1] - 141:7
**speculation** [1] - 142:15
**spell** [1] - 104:11
**spend** [5] - 46:12, 51:19, 56:8, 124:13, 156:4
**spent** [1] - 48:2
**split** [1] - 171:10
**spoiled** [3] - 85:13, 85:16, 85:20
**spoken** [3] - 19:4, 167:5, 167:10
**spouses** [1] - 173:16
**spread** [1] - 41:25
**Springfield** [1] - 26:15
**St** [2] - 1:17, 2:2
**stack** [1] - 42:7
**stage** [1] - 148:14
**stamp** [1] - 17:19

**stand** [3] - 73:5, 104:10, 170:17
**standard** [1] - 65:2
**standing** [4] - 8:20, 8:24, 9:19, 167:22
**stands** [1] - 108:7
**start** [7] - 29:9, 84:1, 110:11, 117:13, 120:6, 132:11, 170:12
**started** [8] - 4:16, 5:2, 18:5, 112:17, 116:10, 119:14, 127:21, 165:16
**starting** [4] - 34:9, 39:19, 83:23, 119:11
**starts** [3] - 117:24, 125:23, 127:18
**state** [8] - 18:15, 21:7, 27:18, 28:5, 76:4, 100:1, 104:11, 146:6
**State** [12] - 21:16, 21:18, 22:16, 41:8, 44:1, 52:12, 52:16, 53:4, 53:10, 53:12, 53:18, 54:22
**statement** [3] - 28:7, 89:3, 99:6
**statements** [6] - 24:3, 92:1, 99:2, 100:3, 100:10, 100:11
**States** [5] - 99:16, 105:14, 105:22, 105:25, 109:25, 110:2
**states** [6] - 19:23, 20:19, 20:22, 21:1, 21:9, 26:11
**STATES** [3] - 1:1, 1:3, 1:13
**states'** [1] - 37:19
**status** [10] - 35:2, 35:10, 35:15, 36:10, 36:14, 37:15, 37:24, 151:13, 151:18, 151:19
**stay** [11] - 33:6, 40:13, 57:24, 58:3, 86:21, 123:18, 123:23, 124:3, 143:23, 151:5
**Stay** [1] - 57:25
**stayed** [9] - 33:8, 33:10, 34:4, 34:8, 40:9, 40:14, 53:23, 154:19, 155:16
**staying** [1] - 124:8
**Ste** [2] - 1:18, 1:23
**stenographic** [1] - 175:17
**STENOGRAPHICA**

**LLY** [1] - 2:8
**step** [1] - 109:1
**STEPHEN** [1] - 2:1
**Stephen** [1] - 2:1
**still** [5] - 54:19, 85:13, 86:10, 109:16, 125:20
**stolen** [1] - 126:6
**stood** [1] - 140:1
**stop** [20] - 11:12, 18:19, 26:12, 40:16, 44:2, 44:13, 44:15, 44:16, 49:6, 51:8, 56:3, 62:4, 64:9, 64:15, 86:12, 95:25, 125:23, 132:18, 146:13, 155:21
**stopped** [23] - 9:11, 9:22, 10:11, 18:18, 19:1, 40:7, 40:16, 42:14, 44:2, 44:7, 44:20, 49:6, 88:20, 95:24, 113:23, 118:16, 122:5, 130:11, 136:4, 136:10, 147:9, 150:21
**stopping** [2] - 40:6, 44:10
**stops** [5] - 26:7, 47:20, 49:4, 125:12, 125:22
**stories** [2] - 165:17, 165:24
**story** [1] - 154:11
**straight** [3] - 52:11, 165:17, 165:24
**Street** [3] - 57:16, 62:15, 63:3
**street** [10] - 59:19, 63:15, 94:22, 94:25, 95:2, 95:5, 95:9, 95:22, 136:3, 169:10
**strike** [1] - 64:19
**strip** [6] - 45:19, 45:22, 51:18, 51:20, 132:18, 133:15
**subject** [2] - 60:11, 100:6
**submit** [2] - 80:23, 81:22
**subpoena** [2] - 33:21, 34:2
**subsequently** [1] - 144:11
**sufficient** [3] - 80:5, 81:24, 82:3
**suggested** [1] - 24:6
**Suite** [1] - 1:20
**Sunshine** [1] - 55:4
**Super** [5] - 123:13,

154:16, 154:19, 154:24, 155:14
**supposed** [12] - 13:14, 17:16, 19:6, 27:2, 41:2, 46:9, 65:13, 86:2, 118:18, 121:3, 134:6, 141:16
**supposedly** [1] - 38:22
**surprised** [2] - 140:9, 142:14
**suspect** [2] - 74:10, 74:15
**suspected** [1] - 159:8
**suspicions** [1] - 74:13
**sustained** [6] - 82:6, 144:5, 144:23, 154:13, 163:14, 166:21
**swear** [1] - 103:25
**sworn** [2] - 4:21, 104:6
**system** [1] - 146:13

**T**

**T.V** [1] - 124:12
**table** [1] - 75:19
**TAKEN** [3] - 60:18, 84:6, 147:23
**talks** [1] - 92:22
**Tampa** [20] - 1:17, 1:18, 1:24, 2:3, 2:6, 40:25, 41:20, 45:23, 46:11, 46:13, 46:19, 47:3, 47:16, 50:25, 52:21, 52:22, 53:8, 53:13, 148:25, 166:14
**tank** [2] - 153:3, 153:13
**tape** [1] - 56:25
**tapes** [1] - 135:1
**tax** [1] - 22:1
**Tax** [1] - 22:13
**team** [1] - 130:7
**teeth** [6] - 97:12, 137:17, 157:10, 157:17, 157:25, 158:4
**telephone** [9] - 9:18, 96:8, 96:17, 97:22, 97:25, 133:12, 133:14, 158:1, 158:12
**telephones** [1] - 159:14
**temperature** [4] - 17:14, 85:3, 85:10, 125:19

**ten** [13] - 17:15, 17:17, 18:6, 85:5, 86:3, 86:13, 86:14, 86:15, 86:19, 87:1, 87:22, 87:23

**term** [1] - 96:4

**testified** [4] - 4:23, 16:14, 104:8, 132:17

**testify** [1] - 83:9

**testifying** [1] - 112:21

**testimony** [13] - 37:10, 46:25, 58:21, 61:6, 70:25, 79:4, 93:14, 94:14, 104:1, 151:21, 152:14, 152:19, 172:15

**THE** [239] - 1:1, 1:1, 1:13, 4:4, 4:11, 4:13, 4:15, 5:8, 7:5, 10:15, 10:17, 10:19, 11:2, 11:7, 11:18, 11:21, 11:23, 11:24, 13:22, 14:1, 16:12, 17:4, 17:7, 19:10, 19:15, 19:17, 20:6, 20:10, 20:11, 22:5, 22:8, 22:10, 22:12, 22:19, 22:21, 22:23, 23:13, 24:5, 24:15, 24:19, 24:21, 24:22, 24:25, 25:2, 25:11, 25:15, 25:19, 25:21, 25:25, 26:20, 26:25, 27:3, 27:10, 27:12, 27:14, 27:16, 28:3, 28:6, 28:10, 28:11, 28:12, 28:15, 29:15, 29:23, 31:21, 33:25, 35:19, 35:24, 36:2, 43:7, 43:10, 43:11, 48:22, 51:2, 52:1, 60:8, 60:17, 60:18, 60:22, 61:2, 62:20, 66:17, 67:12, 67:13, 68:1, 68:13, 69:2, 69:6, 69:10, 69:13, 69:17, 69:22, 70:3, 70:11, 70:22, 71:8, 71:14, 71:17, 71:22, 71:23, 71:24, 72:10, 72:13, 72:17, 72:20, 75:21, 76:8, 79:6, 79:10, 79:13, 79:23, 80:1, 80:2, 80:14, 80:18, 80:21, 81:7, 81:12, 81:18, 82:1, 82:5, 82:8, 82:9, 82:10, 82:18, 82:20, 82:21, 83:1, 83:6, 83:11,

83:15, 83:18, 83:25, 84:4, 84:6, 84:7, 84:10, 84:11, 89:10, 90:16, 94:17, 98:11, 99:24, 100:4, 103:14, 103:16, 103:20, 104:4, 104:13, 105:9, 105:10, 105:16, 105:18, 106:8, 107:6, 107:8, 114:3, 114:5, 114:6, 123:25, 124:1, 125:5, 126:19, 126:21, 126:23, 126:24, 127:23, 140:20, 143:3, 143:4, 144:5, 144:15, 144:22, 145:4, 145:8, 145:9, 145:12, 145:17, 146:16, 146:20, 147:2, 147:4, 147:5, 147:14, 147:22, 147:23, 148:2, 148:5, 148:19, 151:10, 154:13, 158:19, 159:25, 161:10, 163:3, 163:6, 163:14, 166:1, 166:2, 166:8, 166:21, 166:24, 167:7, 167:8, 167:9, 168:2, 168:5, 169:15, 169:17, 169:21, 169:22, 170:5, 170:10, 170:13, 170:20, 170:25, 171:8, 171:18, 171:22, 171:23, 171:25, 172:3, 172:7, 172:10, 172:13, 174:7, 174:8, 174:15, 175:4, 175:8, 175:12

**themselves** [1] - 128:23

**THEN** [3] - 60:18, 84:7, 147:23

**theory** [1] - 146:17

**there'll** [2] - 57:18, 58:12

**THEREUPON** [11] - 4:4, 60:17, 60:18, 60:22, 82:20, 84:6, 84:10, 147:22, 147:23, 148:2, 174:7

**thinking** [5] - 12:12, 12:14, 13:11, 142:18, 161:5

**third** [4] - 7:8, 112:21, 118:20, 164:14

**thirty** [2] - 171:3,

171:5

**thirty-five** [2] - 171:3, 171:5

**Thomas** [3] - 34:21, 87:5, 168:25

**thousand** [1] - 153:17

**three** [9] - 40:10, 59:4, 105:11, 136:17, 143:25, 162:18, 164:1, 164:2, 164:10

**threw** [1] - 157:17

**throw** [1] - 97:12

**tight** [1] - 93:23

**TIME** [9] - 10:17, 22:21, 27:14, 28:11, 67:13, 80:2, 145:9, 169:22, 171:22

**timing** [1] - 94:16

**tires** [1] - 119:25

**TO** [8] - 4:4, 60:17, 60:22, 82:20, 84:10, 147:22, 148:2, 174:7

**today** [6] - 83:12, 83:23, 83:25, 100:23, 159:6, 173:9

**together** [1] - 44:17, 44:24, 109:4, 113:22, 116:4, 124:15

**took** [9] - 49:7, 52:25, 56:10, 87:2, 92:10, 95:19, 122:14, 138:24, 160:12

**tool** [1] - 131:2

**top** [14] - 7:8, 8:10, 12:1, 14:3, 14:5, 15:2, 16:1, 21:17, 28:22, 89:14, 94:20, 94:24, 165:9

**topic** [1] - 45:17

**towards** [1] - 63:17

**Towards** [1] - 35:7

**town** [2] - 83:20, 114:9

**TR** [1] - 21:12

**track** [1] - 118:23

**tracked** [1] - 98:1

**tractor** [20] - 14:21, 21:13, 29:19, 34:12, 37:6, 37:10, 37:13, 37:23, 49:25, 64:21, 108:21, 134:15, 139:7, 139:14, 139:19, 141:14, 151:21, 152:16, 154:21, 155:1

**traffic** [5] - 58:6, 86:12, 135:18, 135:20, 146:12

**Trailer** [1] - 38:6

**trailer** [67] - 12:22, 14:22, 15:5, 15:14, 16:5, 29:19, 34:13, 37:7, 37:10, 37:13, 37:24, 38:7, 38:13, 38:15, 38:16, 38:18, 38:19, 38:21, 38:24, 39:1, 39:8, 39:13, 49:25, 64:22, 85:2, 86:4, 86:8, 86:13, 86:15, 86:17, 91:7, 91:15, 91:17, 91:19, 94:15, 98:7, 99:7, 100:13, 100:18, 102:20, 108:21, 126:2, 130:4, 130:13, 130:16, 130:21, 131:1, 134:15, 138:9, 139:7, 139:14, 141:5, 141:14, 142:9, 142:11, 142:17, 142:19, 142:23, 147:10, 151:22, 152:16, 153:21, 154:21, 155:1, 155:6, 164:7

**training** [1] - 108:14

**TRANSCRIPT** [1] - 1:12

**transcript** [11] - 5:2, 11:3, 11:10, 83:4, 84:18, 84:23, 97:16, 98:17, 161:16, 164:19, 168:17

**transcription** [1] - 175:17

**TRANSCRIPTION** [1] - 2:8

**transcripts** [1] - 135:1

**translate** [1] - 31:24

**translated** [2] - 161:14, 161:19

**translates** [1] - 97:8

**translation** [5] - 88:18, 90:13, 97:1, 104:19, 161:22

**Transportation** [1] - 18:15

**transported** [3] - 30:8, 65:3, 70:10

**transporting** [2] - 18:17, 141:25

**travel** [3] - 42:19, 43:19, 63:23

**traveled** [2] - 63:16, 144:19

**traveling** [3] - 43:24, 52:20, 163:18

**trees** [1] - 26:13

**Trenton** [2] - 106:4, 106:5

**TRIAL** [1] - 1:12

**trial** [6] - 101:7, 112:15, 112:21, 135:2, 172:24, 174:25

**trial's** [1] - 26:24

**tried** [1] - 133:15

**trip** [22] - 26:22, 34:9, 34:10, 39:17, 39:18, 40:4, 41:16, 111:20, 113:25, 114:19, 115:22, 116:4, 116:10, 117:24, 119:16, 122:25, 124:25, 129:18, 130:12, 131:25, 132:14, 136:16

**trip's** [1] - 155:4

**trooper** [17] - 6:22, 14:9, 14:13, 15:7, 19:2, 41:7, 65:15, 86:23, 87:19, 88:4, 88:7, 89:7, 92:13, 139:22, 141:22, 143:9

**Trooper** [8] - 53:5, 53:9, 55:15, 139:17, 140:3, 156:15, 157:2, 160:12

**trooper's** [1] - 138:22

**troopers** [1] - 88:9

**trouble** [6] - 89:16, 99:3, 99:10, 99:15, 142:20, 143:1

**truck** [125] - 7:22, 8:7, 8:16, 9:2, 9:5, 9:7, 9:8, 9:25, 11:16, 13:12, 13:19, 14:2, 14:6, 14:17, 14:18, 14:19, 15:8, 15:15, 15:21, 16:9, 16:23, 18:9, 18:14, 18:23, 19:7, 21:25, 22:1, 25:18, 31:13, 33:5, 33:17, 41:1, 41:3, 44:2, 44:15, 44:16, 45:7, 47:18, 47:20, 48:2, 48:7, 49:4, 49:6, 50:12, 51:8, 56:2, 62:3, 64:9, 64:15, 64:24, 66:9, 66:11, 69:5, 74:1, 74:3, 74:6, 74:9, 80:13, 85:21, 88:5, 90:22, 91:13, 91:17, 92:3, 92:6, 92:15, 92:18, 92:19, 92:22, 92:25, 103:9, 108:24, 110:19,

111:1, 113:24,
114:10, 114:22,
114:24, 115:17,
117:8, 117:20,
117:21, 118:2, 119:5,
119:20, 119:22,
120:1, 121:6, 124:8,
125:10, 125:13,
125:18, 126:2, 126:7,
127:15, 128:11,
129:7, 129:14, 130:7,
132:18, 132:21,
137:14, 137:20,
139:7, 139:14,
139:20, 140:2, 140:5,
140:25, 141:9,
141:20, 142:2, 142:3,
152:5, 152:20,
153:25, 155:10,
155:20, 155:25,
158:2, 159:9, 159:10,
165:11

**trucker** [3] - 18:4,
18:7, 102:2

**truckers** [7] - 23:25,
44:16, 44:23, 45:6,
45:10, 49:11, 152:11

**trucking** [3] - 65:2,
108:15, 110:21

**trucks** [5] - 19:6,
152:6, 152:7, 152:9,
152:11

**true** [2] - 71:11,
175:16

**trust** [2] - 114:25

**truth** [10] - 4:22,
4:23, 104:2, 104:3,
104:7, 135:23

**try** [4] - 43:2, 58:25,
82:23, 130:12

**trying** [9] - 61:24,
93:23, 135:16,
137:16, 144:17,
165:17, 165:23,
166:22, 168:3

**turn** [35] - 50:15,
53:19, 53:21, 56:19,
57:5, 58:25, 61:17,
61:23, 61:25, 62:1,
62:4, 62:13, 62:18,
62:24, 95:2, 95:4,
95:13, 95:16, 95:21,
111:11, 111:22,
135:17, 135:24,
150:4, 150:7, 150:8,
150:9, 150:10,
150:12, 156:14,
167:21

**turned** [3] - 63:10,
64:20, 136:3

**turning** [6] - 58:23,
59:12, 61:20, 63:14,
94:22, 94:25

**two** [28] - 22:24,
23:20, 34:15, 35:9,
38:24, 41:21, 42:20,
42:24, 42:25, 43:1,
67:22, 68:1, 68:14,
68:15, 83:21, 102:7,
103:8, 117:5, 122:10,
125:8, 128:12,
136:17, 136:23,
153:21, 160:3,
164:19, 171:2

**type** [8] - 21:12,
102:6, 107:3, 108:12,
110:18, 122:12,
122:17, 123:17

**Tyson** [4] - 16:15,
122:14, 122:18,
126:22

## U

**U-turn** [3] - 56:19,
61:17, 61:25

**U.S** [8] - 1:16, 1:17,
2:5, 62:15, 135:9,
145:1, 146:3, 146:8

**Ulmerton** [15] -
56:14, 56:24, 57:16,
57:17, 57:18, 57:22,
58:4, 61:6, 135:4,
135:8, 135:18,
135:22, 149:18,
156:14

**ultimately** [3] - 90:5,
143:16, 144:1

**undeliverable** [2] -
85:11, 86:3

**under** [6] - 6:12,
62:15, 75:8, 120:7,
168:15

**underneath** [1] -
141:19

**understood** [2] -
6:13, 170:18

**unexplained** [1] -
153:17

**unintelligibles** [1] -
161:17

**union** [1] - 20:22

**unit** [1] - 85:10

**United** [6] - 99:16,
105:14, 105:22,
105:24, 109:25, 110:2

**UNITED** [3] - 1:1,
1:3, 1:13

**unload** [3] - 17:22,

17:23, 103:3

**unusual** [3] - 102:2,
125:13, 141:13

**up** [83] - 5:4, 8:8,
12:7, 12:17, 12:20,
12:24, 13:2, 13:6,
13:12, 13:21, 14:2,
14:18, 16:14, 16:22,
17:11, 17:12, 17:13,
17:23, 23:6, 23:10,
26:6, 31:1, 31:4, 31:6,
36:18, 39:14, 39:20,
40:1, 40:8, 40:15,
42:21, 43:2, 43:9,
44:13, 45:17, 45:24,
52:18, 59:9, 63:5,
67:9, 68:9, 80:10,
81:18, 87:3, 90:9,
91:2, 91:20, 91:24,
93:5, 99:13, 101:1,
102:3, 102:10,
102:13, 107:18,
116:5, 124:25,
126:22, 127:12,
128:9, 128:25,
131:17, 132:12,
136:11, 139:24,
143:9, 144:9, 147:1,
154:11, 156:12,
160:19, 162:11,
162:13, 162:16,
162:17, 162:19,
164:6, 164:15,
164:25, 170:1, 171:10

**usual** [1] - 32:24

## V

**V-O-L-C-Y** [1] -
104:13

**value** [4] - 68:10,
70:6, 70:9, 81:15

**values** [1] - 69:20

**variety** [2] - 45:13,
45:16

**various** [4] - 26:9,
37:19, 69:25, 78:4

**Vegas** [3] - 128:5,
128:6, 130:10

**vehicle** [4] - 21:12,
24:11, 28:23, 154:5

**Vehicles** [1] - 22:17

**verdict** [1] - 172:23

**version** [1] - 72:24

**video** [1] - 130:15

**view** [1] - 159:12

**vigorously** [1] -
24:16

**violation** [2] - 28:18,

70:14

**visit** [1] - 159:12

**voices** [1] - 6:19

**Volcy** [96] - 2:1, 5:3,
5:23, 6:3, 6:10, 7:16,
8:10, 9:11, 10:4, 10:6,
10:11, 12:1, 12:4,
12:5, 12:18, 13:5,
13:7, 14:7, 14:10,
14:24, 16:1, 23:4,
33:8, 34:14, 34:25,
43:13, 44:11, 47:17,
51:11, 56:13, 56:21,
56:23, 58:22, 59:3,
59:6, 59:22, 61:9,
61:16, 63:18, 63:19,
63:21, 76:4, 76:7,
83:9, 86:22, 87:7,
87:12, 87:18, 87:21,
89:21, 90:2, 90:4,
90:7, 90:20, 90:21,
91:22, 92:18, 93:4,
94:3, 94:10, 94:15,
94:21, 94:24, 94:25,
95:3, 95:15, 95:18,
96:20, 97:24, 101:10,
103:22, 104:13,
104:16, 104:18,
107:13, 109:7,
109:10, 116:22,
117:17, 124:17,
124:24, 125:25,
128:11, 130:20,
131:13, 147:7, 148:9,
148:11, 158:21,
159:3, 164:18,
166:13, 169:11,
169:14, 172:12

**VOLCY** [11] - 1:8,
3:7, 57:11, 57:13,
57:20, 57:25, 58:9,
58:11, 58:15, 58:17,
104:5

**volcy** [1] - 15:10

**Volcy's** [2] - 36:17,
75:23

**volunteered** [1] -
46:18

**volunteers** [1] -
47:10

## W

**wait** [3] - 116:14,
148:17

**waiting** [3] - 12:21,
64:16, 167:22

**walk** [2] - 121:12,
130:25

**walked** [2] - 13:19,

128:1

**walking** [2] - 141:13

**wallet** [1] - 138:24

**Walmart** [18] - 40:20,
40:23, 40:24, 41:18,
41:19, 42:3, 43:15,
53:10, 65:14, 65:15,
68:24, 75:4, 88:24,
89:2, 102:13, 103:5,
124:10, 152:2

**Walmarts** [1] - 41:22

**warehouse** [8] -
14:8, 14:9, 14:19,
42:1, 42:10, 102:3,
119:7

**warrant** [2] - 12:21,
146:13

**WAS** [17] - 10:18,
11:23, 22:22, 24:21,
27:15, 28:12, 60:18,
67:14, 71:23, 80:3,
82:8, 84:6, 145:10,
147:4, 147:23,
169:23, 171:23

**Washington** [1] -
1:20

**watch** [3] - 139:17,
140:15, 142:12

**watched** [1] - 23:20

**watching** [3] -
124:12, 142:16, 153:5

**week** [4] - 23:6,
112:15, 169:25,
172:24

**week-long** [1] - 23:6

**weekend** [2] - 170:2,
175:13

**weeks** [3] - 117:6,
143:25, 146:12

**weight** [2] - 21:3,
21:7

**west** [2] - 55:2, 58:1

**wheel** [1] - 119:23

**whereabouts** [2] -
23:5, 23:9

**WHEREUPON** [5] -
11:23, 24:21, 71:23,
82:8, 147:4

**WHICH** [9] - 10:17,
22:21, 27:14, 28:11,
67:13, 80:2, 145:9,
169:22, 171:22

**whole** [10] - 4:22,
89:24, 91:2, 93:3,
94:4, 94:5, 104:2,
104:7, 121:2, 122:24

**wife** [1] - 109:10

**wife's** [1] - 109:6

**WILLIAM** [1] - 1:13

**William** [1] - 4:9

**Winter** [13] - 42:4, 49:15, 50:9, 50:16, 50:17, 50:18, 55:14, 68:19, 75:15, 101:15, 102:16, 102:24, 103:7

**wish** [1] - 27:16

**WITNESS** [16] - 3:2, 14:1, 43:10, 104:4, 104:13, 105:10, 105:18, 107:8, 123:25, 126:21, 126:24, 143:3, 148:19, 151:10, 166:2, 167:9

**witness** [27] - 4:21, 16:11, 19:9, 22:6, 27:18, 27:19, 27:21, 28:5, 29:21, 60:9, 66:16, 69:2, 72:16, 72:19, 78:7, 83:5, 89:10, 90:12, 90:14, 90:16, 104:6, 104:10, 113:13, 143:4, 158:18, 170:16, 170:17

**word** [9] - 33:4, 59:3, 96:9, 96:14, 96:19, 97:21, 149:25, 161:11, 161:12

**words** [3] - 11:9, 96:10, 96:15

**works** [3] - 43:5, 98:3, 154:8

**worry** [2] - 8:16, 12:16

**worth** [2] - 70:8, 171:9

**wrap** [1] - 146:25

**written** [1] - 108:16

## Y

**year** [8] - 21:14, 21:20, 21:21, 41:10, 41:11, 105:20, 106:14, 117:9

**years** [4] - 18:3, 18:6, 106:1, 109:5

**yesterday** [5] - 5:1, 5:5, 7:3, 16:14, 130:15

**Yo** [1] - 57:10

**yourself** [3] - 55:23, 94:21, 96:3

**yourselves** [2] - 173:14, 173:25

## Z

**zoom** [1] - 168:24

SANDRA K. LEE, RPR  OFFICIAL UNITED STATES COURT REPORTER